THOMAS E. MONTGOMERY, County Counsel (State Bar No. 109654)
County of San Diego
By JAMES M. CHAPIN, Senior Deputy (State Bar No. 118530)
1600 Pacific Highway, Room 355
San Diego, California 92101-2469
Telephone: (619) 531-5244;  Fax: (619) 531-6005
E-mail: james.chapin@sdcounty.ca.gov

Attorneys for Defendants County of San Diego, Romeo De Guzman, Dana Harris
    and Maria Llamado

# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF RONNIE PAUL SANDOVAL and ANA SANDOVAL, an individual, <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF SAN DIEGO, a Public Entity; SAN DIEGO COUNTY JAIL, a Public Entity; and DOES 1-100, <br><br> Defendants. | No. 16cv1004-BEN(AGS) <br><br> Date:  July 10, 2017 <br> Time: 10:30 a.m. <br> Dept.:  5A - Courtroom of the Honorable Roger T. Benitez <br> Pre-Trial Conference Date: Sept. 18, 2017 |

---

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

---

# TOPICAL INDEX

**Page**

TABLE OF AUTHORITIES ................................................................-ii-

I     FACTS ....................................................................1

II    THE NURSE DEFENDANTS ARE NOT LIABLE FOR VIOLATION OF THE EIGHTH AMENDMENT ..........................................5

    A.  There Was No Deliberate Indifference To A Serious Medical Need .......5

    B.  Qualified Immunity Applies ................................................7

III   THERE IS NO CUSTOM OR POLICY UPON WHICH COUNTY LIABILITY CAN BE PREMISED ................................................9

    A.  The Cell Assignment Did Not Cause A Constitutional Violation ...........9

    B.  Failure To Train Is Not An Issue ..........................................10

IV   THE COUNTY IS NOT LIABLE FOR ANY STATE LAW CLAIMS .....11

    A.  Public Entity Immunity For Non-Statutory Claims ................................11

    B.  The Immunity Of Public Entities For Correctional Activities ..............12

        1.  Section 844.6 ..................................................12

        2.  Section 845.6 ..................................................12

V    THE NURSE DEFENDANTS ARE NOT LIABLE ON THE STATE LAW CLAIMS ..................................................14

    A.  The Nurses' Actions Met The Standard Of Care ................................14

    B.  Emotional Distress Claims ..................................................15

VI   CONCLUSION ..........................................................16

# TABLE OF AUTHORITIES

**Page**

Ashcroft v. al-Kidd, 563 U.S. 731 (2011)  ................................................................8

Berkley v. Dowds, 152 Cal.App.4th 518 (2007)  ....................................................15

Board of County Commissioners v. Brown, 520 U.S. 397 (1997) .........................9

Borrayo v. Avery, 2 Cal. App. 5th 304 (2016)  .......................................................14

Case v. Kitsap County Sheriff's Dep't, 249 F.3d 921 (9th Cir.2001)  .....................11

Castaneda v. Department of Corrections and Rehabilitation,
  212 Cal.App.4th 1051 (2013)  ...........................................................................13, 14

City of Canton, Ohio v. Harris, 489 U.S. 378 (1989) ...................................9, 10, 11

City of Oklahoma City v. Tuttle, 471 U.S. 808 (1985)  .............................................9

Cochran v. Cochran, 65 Cal.App.4th 488 (1998)  ....................................................16

Cochran v. Herzog Engraving Co., 155 Cal.App.3d 405 (1984)  ...........................12

Collins v. City of Harker Heights, 503 U.S. 115 (1992)  .........................................9

Connick v. Thompson, 131 S. Ct. 1350 (2011)  ................................................10, 11

Dougherty v. City of Covina, 654 F.3d 892 (9th Cir. 2011)  ...................................10

Estelle v. Gamble, 429 U.S. 97 (1976)  ...........................................................5, 6, 7

Farmer v. Brennan, 511 U.S. 825 (1994)  .................................................................6

Flores v. County of L.A., 758 F.3d 1154 (9th Cir.2014) ....................................10, 11

Kelly v. The Conco Companies, 196 Cal.App.4th 191 (2011)  .................................2

Lal v. California, 746 F.3d 1112  (9th Cir. 2014) ......................................................8

# TABLE OF AUTHORITIES
## (Cont'd.)

**Page**

McGuckin v. Smith, 974 F.2d 1050 (9th Cir. 1992) .................................................6

Merritt v. County of Los Angeles, 875 F.2d 765 (9th Cir. 1989) ....................10, 11

Monell v. New York City Dept. Of Social Services, 436 U.S. 658
 (1978) .................................................................................................9, 10, 11, 16

Mueller v. Auker, 700 F.3d 1180 (9th Cir.2012) ....................................................11

Mullenix v. Luna, 577 U.S. ___, 136 S.Ct. 305 (2015) ...........................................7

Nelson v. State of California, 139 Cal.App.3d 72 (1982) .......................................13

Peralta v. Dillard, 744 F.3d 1076 (9th Cir. 2014),
 cert. denied, 135 S. Ct. 946 (2015) ....................................................................6

Sanchez v. Vild, 891 F.2d 240 (9th Cir. 1989) ........................................................7

S.B. v. County of San Diego, No. 15-56848, 2017 WL 1959984
 (9th Cir. May 12, 2017) .......................................................................................7

Toguchi v. Chung, 391 F.3d 1051 (9th Cir. 2002) ...................................................6

Trevino v. Gates, 99 F.3d 911 (9th Cir. 1996) .........................................................9

Watson v. State, 21 Cal.App.4th 836 (1993) ..........................................................14

White v. Pauly, No. 16-67, 2017 WL 69170 (U.S. Jan. 9, 2017) ........................7, 8

Wilson v. Seiter, 501 U.S. 294 (1991) ......................................................................5

## TABLE OF AUTHORITIES
### (Cont'd.)

**Page**

### STATUTES

Code of Civil Procedure
  Section 377.34 .........................................................................................15

Government Code
  Section 815 .............................................................................................11
  Sections 844 through 846 .......................................................................12
  Section 844.6 .....................................................................................12, 13
  Section 844.6(a)(2) ................................................................................12
  Section 845.6 ...........................................................................12, 13, 14

42 United States Code
  Section 1983 ..............................................................................................9

THOMAS E. MONTGOMERY, County Counsel (State Bar No. 109654)
County of San Diego
By JAMES M. CHAPIN, Senior Deputy (State Bar No. 118530)
1600 Pacific Highway, Room 355
San Diego, California 92101-2469
Telephone: (619) 531-5244;  Fax: (619) 531-6005
E-mail: james.chapin@sdcounty.ca.gov

Attorneys for Defendants County of San Diego, Romeo De Guzman, Dana Harris
    and Maria Llamado

# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF RONNIE PAUL SANDOVAL and ANA SANDOVAL, an individual, <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF SAN DIEGO, a Public Entity; SAN DIEGO COUNTY JAIL, a Public Entity; and DOES 1-100, <br><br> Defendants. | No. 16cv1004-BEN(AGS) <br><br> MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT <br><br> [Fed.R.Civ.P. 56] <br><br> Date:  July 10, 2017 <br> Time: 10:30 a.m. <br> Dept.:  5A - Courtroom of the Honorable Roger T. Benitez <br> Pre-Trial Conference Date:  Sept. 18, 2017 |

## I

## FACTS

On February 22, 2014, Deputy Sheriff Henry Castro was performing a probation compliance check at a residence in Lemon Grove when he found probationer Ronnie Sandoval in possession of methamphetamine and drug paraphernalia.  He arrested Mr. Sandoval and transported him to San Diego Central Jail, where he was booked at about 2:43 p.m.  Mr. Sandoval did not appear to be under the influence of drugs or in medical distress during the transport or during the booking process.  (Exhibit A - Declaration of Henry Castro.)

///

During the intake process, Nurse Deborah Bell assessed Sandoval for his condition for intake and asked a series of questions.  Sandoval responded to the questions, denied having any medical problems, and was alert, oriented, and not in any form of distress. (Exhibit B - Declaration of Deborah Bell.)

At approximately 3:30 p.m., Deputy Chavez took Sandoval's fingerprints during intake.  He noticed that Sandoval was perspiring and asked him if he was alright. Sandoval said he did not feel well and stated that he might be diabetic.  Chavez informed another deputy who contacted the intake nurse, Cesar Costa.  Costa came right out and tested Sandoval's blood sugar and it was normal.  Costa noticed that Sandoval had some sweating on his face, but was calm, breathing normally and was sitting comfortably on the bench.  He had no shakes or tremors and no complaints of pain or dizziness.  There was no indication to either Deputy Chavez or Nurse Costa that Sandoval was in medical distress.  (Exhibit C - Declaration of Matthew Chavez; Exhibit D - Declaration of Cesar Costa.)

At that time, Deputy Bryan saw Deputy Chavez fingerprinting Sandoval.  Deputy Bryan asked Sandoval if he was sick, and Sandoval said he was sick the week before, but not at the moment.  Deputy Bryan asked Sandoval if he had taken any drugs or had been drinking recently and Sandoval said he had not.  He saw Nurse Costa asked Sandoval several questions about medications and being sick.  Based on the responses, the nurse cleared Sandoval to continue the booking process.  (Exhibit E - Declaration of Michael Bryan.)

At about 4:30 p.m., Deputy Martinez saw Sandoval having his booking photo taken.  Since he appeared to be tired, she asked him how he was feeling.  He became agitated with questions about his health and refused to answer any of questions by Deputy Martinez.  (Exhibit F - Declaration of Lavinia Azucena Martinez.)

At about 4:45 p.m., Deputy Wilkinson saw Deputy Chavez place Sandoval into medical observation cell #1 to be seen by medical staff.  Wilkinson observed that Sandoval was sweating and he asked Sandoval if he was under the influence of narcotics

- 2 -

1    or alcohol.  Sandoval said "No."  Wilkinson asked Sandoval if he needed anything, and

2    he said "No, I just want to feel better."  Corporal Powell decided to leave Sandoval in the

3    observation cell close to medical.  Wilkinson checked on Sandoval periodically through

4    his shift, and he appeared to be all right and did not appear at any time to be in medical

5    distress.  (Exhibit G - Declaration of Graham Wilkinson.)

6           When Sandoval arrived in the observation cell, Nurse Romeo de Guzman checked

7    Sandoval's blood sugar level again and it was normal.  De Guzman asked Sandoval if he

8    was taking any medication and he said he was not.  He asked him if he was ok and he

9    said "Yes."   De Guzman observed that Sandoval was alert, coherent, ambulatory, and not

10   in any form of distress.  De Guzman told deputies that Sandoval was cleared to complete

11   the booking process.  He saw Sandoval about three times during the rest of his shift and

12   he appeared fine.  When De Guzman left the jail at 11:30 p.m., Sandoval was in the cell,

13   sitting up, awake, and not in distress.  (Exhibit H - Declaration of Romeo de Guzman;

14   Exhibit O - Deposition of Romeo de Guzman, 71:22-72:11, 98:9-23.)  The cell that

15   Sandoval was placed into is next to the screening nurses' station on the second floor.  The

16   cell has a full window facing the nurses so that the inmate can be observed at all times.

17   (Exhibit I - Deposition of Maria Llamado, 58:13-59:19, 60:14-61:7, 49:4-12; Exhibit O -

18   Deposition of De Guzman, 64:10-20; Deposition of Dana Harris, 67:9-71:11.)

19          At approximately 7:30 p.m., Deputy Fox contacted Sandoval the observation cell

20   next to the nursing station.  He asked Sandoval why he was there and he responded that

21   he did not know.  Deputy Fox asked the screening nurses if they knew why Sandoval was

22   being held in the cell.  They responded that they did not know.  Deputy Fox was unable

23   to determine why deputies had placed him in the cell, but throughout his shift, he

24   periodically checked on the welfare of Sandoval, who did not show any signs of medical

25   distress, until he was seen by Sgt. Shawcroft later that night.  (Exhibit J - Declaration of

26   Nathaniel Fox.)

27          On February 23, at about 12:55 a.m., Sgt. Shawcroft was walking through the

28   medical area when he saw Sandoval sitting on the bench in the medical observation cell.

- 3 -

16cv1004-BEN(AGS)

Shawcroft stopped and watched Sandoval for a moment, and then he saw Sandoval begin to slump over on the bench.  He immediately summoned Nurse Harris and other deputies into the cell.  Deputies assisted as nursing staff got oxygen and checked for blood pressure and oxygen levels.  Sandoval was breathing on his own and had mild tremors, but was not having a grand mal seizure.  His vital signs remained in the normal range.  Nurse Harris requested that EMTs be called.  Nursing staff continued with treatment efforts and EMTs arrived at 1:20 a.m. and took over.  Paramedics arrived at about 1:42 a.m.  While Paramedics were attending to Sandoval, he stopped breathing.  Paramedics performed CPR, but were unable to revive him.  He was later pronounced dead by a doctor.  (Exhibit K - Declaration of Robert Shawcroft; Exhibit L - Declaration of Kevin Johnson.)

Nurse Maria Llamado's only involvement with the Sandoval was early in her 11:00 p.m. shift when she was told there was a man down.  (Exhibit I - Deposition of Maria Llamado, 39:22-40:8, 53:8-17, 126:3-8.)  She brought a medical cart to the cell where Sandoval was down.  She placed a blood pressure cuff on Sandoval and read his blood pressure; it was within normal limits.  She measured his oxygen level and checked his pupils; they were normal.  She set up oxygen and prepared paperwork for the EMTs.  When Sandoval's condition continued, she called Supervising Nurse Bautista and told her about it; Bautista advised to call 9-1-1.  (Exhibit I - Deposition of Maria Llamado, 75:10-76:13, 78:11-79:19; 115:21-116:13.)  She then got the suction machine because Sandoval had secretions coming from his mouth and assisted in applying a "C" collar.  (Exhibit I - Deposition of Maria Llamado, 87:4-88:16, 118:8-119:4.)

Nurse Dana Harris was the first nurse to respond when Sgt. Shawcroft reported that Sandoval was down.  She had also started work on the 11:00 shift.  She first noticed Sandoval 20 minutes into her shift; he was in the observation cell sitting upright on the bench.  She was later alerted about Sandoval by Sgt. Shawcroft to go to the holding cell near her station.  She went to the cell and saw Sandoval as he was slumping over.  Sandoval did not appear to be having a seizure.  He had fine tremors and his vital signs

- 4 -

were stable.  Based on his presentation, she immediately asked deputies to call for Emergency Medical Transport (EMT).  When his condition appeared to deteriorate, she asked deputies to call for paramedics.  Deputy Johnson was escorting EMTs to the cell when he heard the request at 1:20 a.m., and immediately notified command to call for paramedics.  Harris continued to monitor Sandoval while awaiting paramedics and also used a nasopharyngeal airway in case of an obstruction because he was grunting and drooling.  (Exhibit P - Deposition of Dana Harris, 62:4-64:2, 66:3-69:12, 75:2-81:19, 85:4-25, 91:22-24, 96:9-19, 103:23-105:2, 111:7-112:4, 188:18-24; Exh. 7; Exhibit L - Declaration of Kevin Johnson.)

The cause of death was later found to be acute methamphetamine intoxication.  Sandoval had ingested 20 times a fatal dose of methamphetamines.  In all jail videos in which Sandoval appears, he is calm, cooperative, ambulatory with normal gait, and does not show any indication of physical or mental distress that would suggest the need for immediate medical care.  Sandoval did not exhibit any symptoms indicative of acute methamphetamine intoxication which was the cause of his death.  (Exhibit M - Declaration of Richard Geller, ¶¶ 4-9; Exhibit N - Declaration of Alicia Minns.)

Plaintiffs have sued three nurses, Harris, Llamado and De Guzman, and the County of San Diego, alleging nine causes of action.  Defendants are entitled to summary judgment as set forth below.

## II

## THE NURSE DEFENDANTS ARE NOT LIABLE FOR VIOLATION OF THE EIGHTH AMENDMENT

The First Cause of Action alleges deliberate indifference to a serious medical need in violation of the Eighth Amendment.  (First Amended Complaint "FAC" ¶¶ 34-49.)

### A.   There Was No Deliberate Indifference To A Serious Medical Need.

Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when they act with deliberate indifference to an inmate's serious medical needs.  *Wilson v. Seiter*, 501 U.S. 294, 302 (1991); *Estelle v. Gamble*, 429 U.S.

16cv1004-BEN(AGS)

97, 106 (1976).  Deliberate indifference to an inmate's serious medical needs may be manifested in two ways: the intentional denial, delay, or interference with a plaintiff's medical care, or by the manner in which the medical care was provided.  *See Estelle*, 429 U.S. at 104–05.  In either case, the indifference to the inmate's medical needs must be substantial; inadequate treatment due to malpractice, or even gross negligence, does not amount to a constitutional violation.  *Estelle*, 429 U.S. at 106; *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2002).

A "serious" medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 104.  In order to show deliberate indifference, an inmate must prove sufficient facts to indicate that prison officials acted with a culpable state of mind.  *See Wilson*, 501 U.S. at 300–02.  "Under this standard, the prison official must not only 'be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.' " *Toguchi*, 391 F.3d at 1057 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).  The court must focus on "what a defendant's mental attitude actually was (or is), rather than what it should have been (or should be)." *Farmer*, 511 U.S. at 838–39.  "Even if a prison official *should* have been aware of the risk, if he 'was not, then he has not violated the Eighth Amendment, no matter how severe the risk.'" *Peralta v. Dillard*, 744 F.3d 1076, 1086 (9th Cir. 2014), *cert. denied*, 135 S. Ct. 946 (2015) (quoting *Gibson v. Cnty. Of Washoe*, 290 F.3d 1175, 1188 (9th Cir. 2002)).

The subjective standard for deliberate indifference requires "more than ordinary lack of due care for the prisoner's interests or safety." *Farmer*, 511 U.S. at 835 (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)).  "[A]n *inadvertent* failure to provide adequate medical care by itself [does not] create a cause of action under § 1983." *McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir. 1992).  Differences in judgment between a prisoner and a prison official regarding appropriate medical diagnosis and ///

- 6 -

1   treatment are not enough to establish a deliberate indifference claim.  *See Estelle*, 429

2   U.S. at 107–08; *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).

3          In this case, Sandoval continuously denied any drug use, denied being ill and

4   refused to answer specific questions.  He never appeared to anyone to be in serious

5   medical distress until the moment he began to experience the full absorption of the fatal

6   dose of methamphetamine that he had ingested.  At that moment, he was immediately

7   attended to by jail nursing staff and deputies who called for assistance first by EMTs,

8   then paramedics.  The amount of the drug was so severe that he could not have been

9   revived, even if he had been at the emergency room at the time of his collapse.

10  (Declaration of Alicia Minns, ¶¶ 4-8.)  While in the jail, Sandoval was placed in an

11  observation cell where he could be seen at all times and where he could have requested

12  medical assistance at any time from nursing staff who were nearby and visible to him.

13         No member of the jail staff, either deputies or nurses, was aware that a substantial

14  risk of serious harm existed to Sandoval.  Even if they should have been aware of the

15  risk, they cannot be liable under the Eighth Amendment, no matter how severe the risk

16  might have been.

17         B.     Qualified Immunity Applies.

18         As the Supreme Court has frequently stated, qualified immunity protects "'all but

19  the plainly incompetent or those who knowingly violate the law.'" *Mullenix v. Luna*, 577

20  U.S. ___, 136 S.Ct. 305, 308 (2015) (citing *Malley v. Briggs,* 475 U.S. 335, 341, 106

21  S.Ct. 1092 (1986)).  Immunity applies unless existing precedent has placed the statutory

22  or constitutional question "beyond debate."  *Id*.  In *White v. Pauly,* the Supreme Court

23  reiterates its often-repeated admonition that "clearly established law" should not be

24  defined "at a high level of generality" but must be "particularized" to the facts of the

25  case.  *White v. Pauly*, No. 16-67, 2017 WL 69170, at *4–5 (U.S. Jan. 9, 2017) (citing

26  *Ashcroft v. al–Kidd,* 563 U.S. 731, 742 (2011) and *Anderson v. Creighton,* 483 U.S. 635,

27  640 (1987)); *S.B. v. County of San Diego*, No. 15-56848, 2017 WL 1959984, at *5 (9th

28  Cir. May 12, 2017).  The Court has emphasized this point again and again because

- 7 -

1  qualified immunity is important to society as a whole, and because the immunity from

2  suit is effectively lost if a case is erroneously permitted to go to trial.  *White v. Pauly*,

3  2017 WL 69170, at *4 (citing *Pearson v. Callahan,* 555 U.S. 223, 231 (2009)).

4         Even if the facts could be construed to show a nurse's conduct violated a

5  constitutional right, the inquiry does not end there.  Under the second prong of the

6  qualified immunity test, it must be determined whether the alleged violation was clearly

7  established at the time of the alleged misconduct.  *Lal v. California*, 746 F.3d 1112,

8  1116 (9th Cir. 2014).   A Government official's conduct violates clearly established law

9  when, at the time of the challenged conduct, the contours of a right are sufficiently clear

10  that every reasonable official would have understood that what he is doing violates that

11  right.  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

12         In the present case, the "clearly established" analysis requires that there be a case

13  where a nurse violated the Eighth Amendment in circumstances similar to those

14  confronted by the Defendant nurses in dealing with inmate Sandoval.  There is no case

15  that clearly establishes that any of the limited contact these nurses had with Sandoval

16  amounted to deliberate indifference.  Sandoval refused to provide any information to any

17  of the jail staff about his condition or that he had swallowed drugs.

18         De Guzman checked Sandoval when he got to his area, asked him about his health,

19  observed him in the cell during his shift, and Sandoval was never in medical distress on

20  his shift.  Harris and Llamado attended to Sandoval immediately when he first was seen

21  in distress and continued treatment efforts, and monitoring him, while calling for EMTs,

22  and then paramedics when his condition deteriorated.  Existing precedent does not clearly

23  establish that these actions violate the Eighth Amendment prohibition against cruel and

24  unusual punishment.

25  ///

26  ///

27  ///

28  ///

16cv1004-BEN(AGS)

### III

### THERE IS NO CUSTOM OR POLICY UPON WHICH COUNTY LIABILITY CAN BE PREMISED

The Second Cause of Action alleges in ambiguous terms that a custom of using verbal pass-down about the status of inmates in this medical observation cell is deliberate indifference, in violation of the Eighth Amendment.  (FAC ¶¶ 51-58.)  The Third Cause of Action alleges the same claim while adding a "failure to train" allegation.

A.   The Cell Assignment Did Not Cause A Constitutional Violation.

A County can be liable under 42 U.S.C. §1983 only where it has an official policy or an unofficial custom that causes a constitutional violation.  *Monell v. New York City Dept. Of Social Services*, 436 U.S. 658 (1978).  Plaintiffs must show a causal link between the policy or custom and the particular constitutional violation that occurred.  *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985).  A local governmental unit may not be held responsible for the acts of its employees under a respondeat superior theory of liability.  *See Board of County Commissioners v. Brown*, 520 U.S. 397, 403 (1997); *Collins v. City of Harker Heights*, 503 U.S. 115, 121 (1992); *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989); *Monell*, 436 U.S. at 691.

Municipal liability under section 1983 "generally implies a course of action consciously chosen from among various alternatives" and is not established by "[p]roof of a single incident of unconstitutional activity ... unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."  *Oklahoma City v. Tuttle*, 471 U.S. at 823–824; see also *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (municipal liability for improper custom may not be predicated on isolated or sporadic incidents).

Verbal pass-down of information is standard practice for many types of information.  These claims have no merit because there was no serious medical condition that required pass-down information critical to Sandoval.  The nursing staff had cleared Sandoval to complete the booking process because his condition did not call for immediate medical attention.  He

- 9 -

provided no relevant information after being asked numerous times, and he did not present as someone who was in serious medical distress.  Even if there was a miscommunication between deputies and nurses about the status of Sandoval, he was in the best place to be when he began to experience distress – in an observation cell at the nurses' station.  .  This single event does not involve an Eighth Amendment violation and cannot create County liability.  (See Exhibit O - Deposition of Romeo De Guzman, 121:8-13.)

        **B.**    <u>Failure To Train Is Not An Issue</u>.

The mere allegation of "failure to train" does not state a constitutional claim against the County or the Sheriff.  *City of Canton, Ohio v. Harris*, 489 U.S. 378; *Dougherty v. City of Covina*, 654 F.3d 892, 901 (9th Cir. 2011).  Such a showing depends on three elements: (1) the training program must be inadequate in relation to the tasks the particular employees must perform; (2) the officials must have been deliberately indifferent to the rights of persons with whom the [local officials] come into contact; and (3) the inadequacy of the training must be shown to have actually caused the constitutional deprivation at issue.  *Merritt v. County of Los Angeles*, 875 F.2d 765, 770 (9th Cir. 1989); *see also Connick v. Thompson*, 131 S. Ct. 1350, 1359-60 (2011) (stating, "To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.' [] Only then 'can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983.'" (quoting *Canton*, 489 U.S. at 388)).  "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."  *Connick*, 131 S. Ct. at 1359.

"Deliberate indifference is a stringent standard of fault requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick,* 131 S.Ct. at 1360; *Flores v. County of L.A.,* 758 F.3d 1154, 1158 n. 10 (9th Cir.2014). "Mere negligence in training or supervision ... does not give rise to a *Monell* claim." *Dougherty v. City of Covina,* 654 F.3d at 900.  "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate

- 10 -

indifference' for purposes of failure to train." *Connick,* 131 S.Ct. at 1360; *Flores v. County of L.A.,* 758 F.3d at 1159; *see also Mueller v. Auker,* 700 F.3d 1180, 1194 (9th Cir.2012).  Finally, "adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the [municipality] liable." *City of Canton,* 489 U.S. at 391, 109 S.Ct. 1197.  "Mere proof of a single incident of errant behavior is a clearly insufficient basis for imposing liability on the County." *Merritt,* 875 F.2d at 770; *see also Case v. Kitsap County Sheriff's Dep't,* 249 F.3d 921, 931–32 (9th Cir.2001).

Plaintiff's allegation of deliberate indifference in failing to train only relates to the cell assignment practice.  This cell was a medical observation cell that had a large observation window in the nursing station.  The cell is in a high-traffic area where deputies and nurses are continuously present.  If Sandoval had been assigned to a regular cell, he would have had hourly checks, but would not have been under constant observation.  He was seen at precisely the moment that he began to show medical distress and was already in the nursing station where the medical equipment was available.

Since no member of the jail staff knew that Sandoval was aware that a substantial risk of serious harm existed to Sandoval, since the cell assignment custom did not cause a constitutional violation, and since there is no pattern of constitutional violations here, there can be no County liability under *Monell.*

## IV

## THE COUNTY IS NOT LIABLE FOR ANY STATE LAW CLAIMS

The remaining causes of action are grounded in negligence (except for the eighth cause of action which additionally alleges intentional infliction of severe emotional distress).

### A.   Public Entity Immunity For Non-Statutory Claims.

Unless provided by statute, public entities are not liable for tort claims seeking money damages.  Government Code section 815 provides in relevant part:  "Except as otherwise provided by statute:  (a) A public entity is not liable for an injury, whether such

- 11 -

injury arises out of an act or omission of the public entity or a public employee or any other person." Thus, "sovereign immunity is the rule in California; governmental liability is limited to exceptions specifically set forth by statute." *Cochran v. Herzog Engraving Co.*, 155 Cal.App.3d 405, 409 (1984). None of the state law causes of action are statutory causes of action. The County is not directly liable for any of the common law torts alleged.

B.     The Immunity Of Public Entities For Correctional Activities.

Government Code sections 844 through 846 codify several specific provisions applicable to correctional institutions. Of relevance to this case are sections 844.6 and 845.6.

1.     Section 844.6.

Section 844.6, subdivision (a)(2) broadly states that public entities are not liable for any injury to a prisoner unless liability is imposed by statute. The statute provides in relevant part: "(a) Notwithstanding any other provision of this part, except as provided in this section and in ... [section] 845.6 . . . , a public entity is not liable for: . . . (2) An injury to any prisoner." Section 844.6 also makes clear that this provision does not immunize a public *employee* from liability for injury proximately caused by the employee's negligent conduct, and specifies that a public entity has a duty to pay a judgment based on a medical malpractice claim against a public employee.

2.     Section 845.6.

The first sentence of section 845.6 reaffirms that a public entity is immune from liability for injuries caused by the failure to furnish or obtain medical care for prisoners, but states that a public entity is liable for the failure to summon medical care under certain narrowly defined circumstances. The statute provides in relevant part:

> Neither a public entity nor a public employee is liable for injury proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody; but ... a public employee, and the public entity where the employee is acting within the scope of his employment, is liable if the employee knows or has reason to know that the prisoner is in need of immediate medical care and he fails to take reasonable action to summon such medical care.

Section 845.6 also makes clear that this provision does not immunize a public *employee* from a medical malpractice claim or excuse a public entity from its duty to indemnify under section 844.6.

In *Castaneda v. Department of Corrections and Rehabilitation*, 212 Cal.App.4th 1051, 1070 (2013), the Court of Appeal described the scope of the duty to summon immediate medical care provided in section 845.6.  The *Castaneda* court noted that the statute "creates ... limited public-entity liability when: (1) the public employee 'knows or has reason to know [of the] need,' (2) of '*immediate* medical care,' and (3) 'fails to take reasonable action to *summon* such medical care.' (§ 845.6, italics added.)"  The *Castaneda* court also explained that "[s]ection 845.6 is very narrowly written to authorize a cause of action against a public entity for its employees' failure to summon immediate medical care only, not for certain employee's malpractice in providing that care."  *Id.*

The limited duty provided in section 845.6 is reflected in the structure and text of the statute:

> A narrow reading of section 845.6 is also compelled as a matter of statutory interpretation. First, the duty to summon is presented as the exception to the broad, general immunity for failing to furnish or provide medical care. Second, section 845.6 imposes the duty to summon on "public employees" generally, not medical care providers in particular. Many such public employees are "[p]rison authorities [who] do not have the medical training to know whether a prisoner's medical condition has been properly diagnosed and treated." ([*Watson v. State* (1993) 21 Cal.App.4th 836, 843 (*Watson* ) ].) The Legislature could not have contemplated imposing a duty to do more than to *summon* medical care as it imposed that duty on "public employees," such as prison authorities, generally.

*Castaneda,* 212 Cal.App.4th at p. 1071 (fn. omitted).

The *Castaneda* court also explained that California courts have concluded that the failure of a health care professional who is *summoned* to provide medical assistance to a prisoner to thereafter *provide* adequate treatment to the prisoner does not come within the scope of the duty set forth in section 845.6.  There is a distinction between failure to summon medical care—for which the State can be held liable under section 845.6— and negligence in providing care—for which the State is immune.  *See Nelson v. State of California*, 139 Cal.App.3d 72 (1982).

- 13 -

1    The Court in *Watson* also considered the parameters of governmental liability

2    under section 845.6.  *Watson* determined section 845.6 confers a broad general immunity

3    on the public entity, and the duty to summon medical care under section 845.6 neither

4    encompasses a duty to provide reasonable medical care, nor includes a concomitant duty

5    to assure that prison medical staff properly diagnose and treat the medical condition, nor

6    imposes a duty to monitor the quality of care provided.  *Watson v. State*, 21 Cal.App.4th

7    836, 841-843 (1993); *Castaneda,* 212 Cal.App.4th at pp. 1071–1072.

8                                          V

9                      THE NURSE DEFENDANTS ARE NOT
                       LIABLE ON THE STATE LAW CLAIMS

10

11         A.    <u>The Nurses' Actions Met The Standard Of Care</u>.

12         In any medical malpractice action, the plaintiff must establish: (1) the duty of the

13    professional to use such skill, prudence, and diligence as other members of his profession

14    commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal

15    connection between the negligent conduct and the resulting injury; and (4) actual loss or

16    damage resulting from the professional's negligence.  *Borrayo v. Avery*, 2 Cal. App. 5th

17    304, 310 (2016).

18         As set forth in the declarations of Dr. Alicia Minns and Dr. Richard Geller, an

19    autopsy was performed on Sandoval that confirmed his death was due to

20    methamphetamine intoxication.  The concentration of methamphetamine measured in

21    Sandoval's blood at autopsy was massive and indicates he ingested a dose of

22    methamphetamine several hundred times more than a typical recreational dose and

23    substantially higher than other levels reported in methamphetamine fatality cases.

24         Dr. Minns and Dr. Geller both note that Sandoval never told any of the jail staff

25    that he had used or swallowed methamphetamine.  He was asked multiple times if he

26    used drugs or alcohol and he denied it. Although he was noted to be sweaty, he could

27    have been sweaty from multiple conditions.  His vital signs were normal, even shortly

28    before his cardiac arrest.  His glucose was normal and he never voiced any specific

                                       - 14 -

1  complaints.  Based on the records and video of Sandoval, he did not have any complaints

2  or objective signs that warranted hospital referral, and nursing staff cannot guess when a

3  patient fails to disclose his medical and drug history.

4  　　　As stated by Dr. Minns and Dr. Geller, Sandoval went into cardiac arrest shortly

5  after the paramedics arrived on scene and even if the paramedics had been called initially,

6  the same sequence of events and outcome would have occurred.  Sandoval would have

7  suffered a cardiac arrest during transport, or shortly upon arrival to a hospital.  The same

8  care (Advanced Cardiac Life Support) would have been provided by the hospital, and his

9  outcome would have been the same.

10  　　　Dr. Minns has specific experience with jail inmates who ingest methamphetamine

11  to evade the law, and hide their overdose from law enforcement and health care providers

12  until they become overwhelmingly ill due to their fear of arrest or further criminal

13  charges.  She comments that individuals who overdose on these large quantities of

14  methamphetamine can either die suddenly with a massive seizure or lethal heart rhythm,

15  or progress into a coma with severely elevated temperatures and muscle damage that can

16  progress onto a slower but eventual death, often regardless of medical intervention.

17  　　　Dr. Minns' opinion is that the actions of the nursing staff were within the

18  appropriate standard of care.  Sandoval's death was not preventable and by the time he

19  was deteriorating, even heroic resuscitation efforts by health care providers would not

20  have prevented his death.

21  　　　B.　　Emotional Distress Claims.

22  　　　These claims are barred by Code of Civil Procedure section 377.34, which

23  provides:  "In an action or proceeding by a decedent's personal representative or

24  successor in interest on the decedent's cause of action, the damages recoverable ... do not

25  include damages for pain, suffering, or disfigurement." *Berkley v. Dowds*, 152

26  Cal.App.4th 518, 530 (2007) (cause of action alleging intentional infliction of emotional

27  distress of decedent barred by Code Civ. Proc., § 377.34).  Moreover, a cause of action

28  for intentional infliction of emotional distress requires proof of "extreme and outrageous

- 15 -

conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress." *Cochran v. Cochran*, 65 Cal.App.4th 488, 494 (1998).  Conduct is "outrageous" when it is "so extreme as to exceed all bounds of that usually tolerated in a civilized community."  See *Kelly v. The Conco Companies*, 196 Cal.App.4th 191, 215 (2011)(internal quotation marks omitted).  No matter how the nurses' actions are viewed, they cannot be considered outrageous as so defined.

VI

CONCLUSION

There can be no liability under the Eighth Amendment or for the state law claims. Since no employee knew or had reason to know of the need for immediate medical care, there can be no individual liability and qualified immunity applies.  The County is not liable on a *Monell* theory, and is otherwise immune under state law.  The motion for summary judgment should be granted.

DATED: May 18, 2017                    THOMAS E. MONTGOMERY, County Counsel

By: s/ JAMES M. CHAPIN, Senior Deputy
Attorneys for Defendants County of San Diego,
Romeo De Guzman, Dana Harris and Maria Llamado
E-mail: james.chapin@sdcounty.ca.gov

- 16 -

16cv1004-BEN(AGS)