THOMAS E. MONTGOMERY, County Counsel (State Bar No. 109654)
County of San Diego
By JAMES M. CHAPIN, Senior Deputy (State Bar No. 118530)
1600 Pacific Highway, Room 355
San Diego, California 92101-2469
Telephone: (619) 531-5244;  Fax: (619) 531-6005
E-mail: james.chapin@sdcounty.ca.gov

Attorneys for Defendants County of San Diego, Romeo De Guzman, Dana Harris
     and Maria Llamado

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF RONNIE PAUL SANDOVAL and ANA SANDOVAL, an individual, <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF SAN DIEGO, a Public Entity; SAN DIEGO COUNTY JAIL, a Public Entity; and DOES 1-100, <br><br> Defendants. | No. 16cv1004-BEN(AGS) <br><br> NOTICE OF LODGMENT IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT <br><br> Date:  July 10, 2017 <br> Time:  10:30 a.m. <br> Dept.:  5A - Courtroom of the Honorable Roger T. Benitez <br> Pre-Trial Conference Date:  Sept. 18, 2017 |

Defendants County of San Diego, Romeo De Guzman, Dana Harris and Maria Llamado hereby lodge the following exhibits in support of their motion for summary judgment, as follows:

Exhibit A     Declaration of Henry Castro, dated May 17, 2017.

Exhibit B     Declaration of Deborah Bell, filed December 14, 2015, Superior Court Case No. 37-2014-00033347-CU-PO-CTL, Estate of Ronnie Paul Sandoval, et al. v. County of San Diego, etc., et al.

Exhibit C     Declaration of Matthew Chavez, dated May 17,2017.

///

///

16cv1004-BEN(AGS)

1    Exhibit D    Declaration of Cesar Costa, filed December 14, 2015, Superior Court

2    Case No. 37-2014-00033347-CU-PO-CTL, Estate of Ronnie Paul Sandoval, et al. v.

3    County of San Diego, etc., et al.

4    Exhibit E    Declaration of Michael Bryan, dated May 17, 2017.

5    Exhibit F    Declaration of Lavinia Azucena Martinez, dated May 18, 2017.

6    Exhibit G    Declaration of Graham Wilkinson, filed December 14, 2015, Superior

7    Court Case No. 37-2014-00033347-CU-PO-CTL, Estate of Ronnie Paul Sandoval, et al.

8    v. County of San Diego, etc., et al.

9    Exhibit H    Declaration of Romeo de Guzman, dated May 16, 2017.

10   Exhibit I    Excerpts from the deposition transcript of Maria Llamado, dated

11   February 28, 2017.

12   Exhibit J    Declaration of Nathaniel Fox (unsigned).

13   Exhibit K    Declaration of Robert Shawcroft, dated May 17, 2017.

14   Exhibit L    Declaration of Kevin Johnson, dated May 17,2017.

15   Exhibit M    Declaration of Richard Geller, dated May 16, 2017.

16   Exhibit N    Declaration of Alicia Minns, dated May 16, 2017.

17   Exhibit O    Excerpts from the deposition transcript of Romeo de Guzman, dated

18   February 23, 2016.

19   Exhibit P    Excerpts from the deposition transcript of Dana Harris, dated March

20   2, 2017.

21   DATED: May 18, 2017              THOMAS E. MONTGOMERY, County Counsel

22                                    By: s/ JAMES M. CHAPIN, Senior Deputy
                                      Attorneys for Defendants County of San Diego,
23                                    Romeo De Guzman, Dana Harris and Maria Llamado
                                      E-mail: james.chapin@sdcounty.ca.gov
24

25

26

27

28

16cv1004-BEN(AGS)

# EXHIBIT "A"

THOMAS E. MONTGOMERY, County Counsel (State Bar No. 109654)
County of San Diego
By JAMES M. CHAPIN, Senior Deputy (State Bar No. 118530)
1600 Pacific Highway, Room 355
San Diego, California 92101-2469
Telephone: (619) 531-5244; Fax: (619) 531-6005
E-mail: james.chapin@sdcounty.ca.gov

Attorneys for Defendants County of San Diego, Romeo De Guzman, Dana Harris
and Maria Llamado

# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF RONNIE PAUL SANDOVAL and ANA SANDOVAL, an individual, | No. 16cv1004-BEN(AGS) |
| Plaintiffs, | DECLARATION OF HENRY CASTRO IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT |
| v. | Date:  July 10, 2017 |
| COUNTY OF SAN DIEGO, a Public Entity; SAN DIEGO COUNTY JAIL, a Public Entity; and DOES 1-100, | Time: 10:30 a.m. Dept.:  Courtroom of the Honorable Roger T. Benitez Pre-Trial Conference Date: Sept. 17, 2017 |
| Defendants. | |

I, HENRY CASTRO, declare as follows:

1.    I am a San Diego County Sheriff 's Deputy who was on patrol duty on February 22, 2014, out of the Rancho San Diego Station.  During a probation compliance check at a residence in Lemon Grove, I arrested Ronnie Sandoval for possession of methamphetamine and drug paraphernalia.  Mr. Sandoval was in possession of 1 gram of methamphetamine.  He did not appear to be under the influence at the time of the arrest.

///

///

///

///

///

16cv1004-BEN(AGS)

EXHIBIT A

2.      I transported Sandoval to San Diego Central Jail where he was booked at about 2:43 p.m. Mr. Sandoval did not appear to be in medical distress during the transport or during the booking process.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in June, California, this 17 day of May, 2017.

HENRY CASTRO

- 2 -

16cv1004-BEN(AGS)

EXHIBIT A

# EXHIBIT "B"

1  THOMAS E. MONTGOMERY, County Counsel (State Bar No. 109654)
   County of San Diego
2  By JAMES M. CHAPIN, Senior Deputy (State Bar No. 118530)
   1600 Pacific Highway, Room 355
3  San Diego, California 92101-2469
   Telephone: (619) 531-5244; Fax: (619) 531-6005
4  *[Exempt From Filing Fees  (Gov. Code § 6103)]*

5  Attorneys for Defendant County of San Diego

FILED
CIVIL BUSINESS OFFICE 3
CENTRAL DIVISION

2015 DEC 14  PM 3: 36

CLERK-SUPERIOR COURT
SAN DIEGO COUNTY, CA

6

7

8              IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                   IN AND FOR THE COUNTY OF SAN DIEGO

10

11  ESTATE OF RONNIE PAUL SANDOVAL          )    No. 37-2014-00033347-CU-PO-CTL
    and ANA SANDOVAL, an individual,        )    (Action filed:  October 1, 2014)
12                                          )
              Plaintiffs,                   )    DECLARATION OF DEBORAH BELL IN
13                                          )    SUPPORT OF MOTION FOR SUMMARY
         v.                                 )    JUDGMENT OR SUMMARY
14                                          )    ADJUDICATION
    COUNTY OF SAN DIEGO, a Public Entity;   )
15  SAN DIEGO COUNTY JAIL, a Public         )    Date:  March 4, 2016
    Entity; and DOES 1-100,                 )    Time:  8:30 a.m.
16                                          )    Dept.:  C-65
              Defendants.                   )    Trial Date:  None
17  _____)    ICJ:  Hon. Joan M. Lewis

18                                               "IMAGED FILE"

19       I, DEBORAH BELL, declare as follows:

20       1.    I was a registered nurse employed by the San Diego County Sheriff's Department

21  at the Central Jail.  I retired from County employment on January 28, 2015.  On February 22,

22  2014, I was working the Intake Triage position.  At about 2:37 p.m., I did the initial intake for

23  Ronnie Sandoval.

24       2.    For initial screening, I asked the following questions and Sandoval responded as

25  indicated:

26       --Have you been hurt or injured in the last 72 hours? Sandoval answered no.

27       --Have you been treated at a hospital during your arrest? Sandoval answered no.

28       --Have you been tasered or restrained with anything other than handcuffs?  Sandoval

                                   DECLARATION OF DEBORAH BELL IN SUPPORT OF MOTION
                                   FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION
                                              EXHIBIT B —

1    answered no.

2         --Do you have any major medical problems? Sandoval answered no.

3         --Do you have any communicable diseases? Sandoval answered no.

4         --When was your last chest x-ray? Sandoval answered no.

5         --Do you have any psychiatric problems? Sandoval answered no.

6         --Are you a patient of the regional center? Sandoval answered no.

7         --Are you feeling suicidal? Sandoval answered no.

8         3.       Sandoval was alert, oriented, ambulatory, and not in any form of distress.  I

9    approved him for booking.

10         I declare under penalty of perjury under California law that the foregoing is true and

11    correct.

12         Executed in *San Diego* California, this *10th* day of *Dec* , 2015.

13

14            *Deborah A. Bell*

15                DEBORAH BELL

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT B - .

# EXHIBIT "C"

THOMAS E. MONTGOMERY, County Counsel (State Bar No. 109654)
County of San Diego
By JAMES M. CHAPIN, Senior Deputy (State Bar No. 118530)
1600 Pacific Highway, Room 355
San Diego, California 92101-2469
Telephone: (619) 531-5244;  Fax: (619) 531-6005
E-mail: james.chapin@sdcounty.ca.gov

Attorneys for Defendants County of San Diego, Romeo De Guzman, Dana Harris
and Maria Llamado

# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

ESTATE OF RONNIE PAUL
SANDOVAL and ANA SANDOVAL,
an individual,

Plaintiffs,

v.

COUNTY OF SAN DIEGO, a Public
Entity; SAN DIEGO COUNTY JAIL,
a Public Entity; and DOES 1-100,

Defendants.

No. 16cv1004-BEN(AGS)

DECLARATION OF MATTHEW
CHAVEZ IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT

Date: July 10,2017
Time: 10:30 a.m.
Dept.: Courtroom of the
Honorable Roger T. Benitez
Pre-Trial Conference Date: Sept. 18, 2017

I, MATTHEW CHAVEZ, declare as follows:

1.     I am a San Diego County Sheriff's Deputy who was assigned to the Intake
Deputy Position at the San Diego Central Jail on February 22, 2014.

2.     At approximately 3:30 p.m., I first made contact with Ronnie Sandoval
while taking his fingerprints.  He was sweating and appeared disoriented.  I asked him if
he was alright.  He responded that he was cold and did not feel well.  He stated that he
was told eight months ago that he might be borderline diabetic, but did not take any
medication for it.

///

///

///

16cv1004-BEN(AGS)
EXHIBIT C

1      3.     I informed Deputy Bryan, who contacted the intake nurse. The nurse

2  promptly came out and tested Sandoval's blood sugar. They said it was normal. I then

3  placed Sandoval in a holding cell

4      4.     Mr. Sandoval was responding to questions in a normal manner and did not

5  appear to be in medical distress at this time.

6      I declare under penalty of perjury under California law that the foregoing is true

7  and correct.

8      Executed in _San Diego_, California, this _17th_ day of _May_, 2017.

9

10

11                 MATTHEW CHAVEZ

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 2 -

16cv1004-BEN(AGS)

EXHIBIT C

# EXHIBIT "D"

FILED
CIVIL BUSINESS OFFICE ∹
CENTRAL DIVISION

2015 DEC 14  PH 13: 36

CLERK-SUPERIOR COURT
SAN DIEGO COUNTY, CA

1   THOMAS E. MONTGOMERY, County Counsel (State Bar No. 109654)
    County of San Diego
2   By JAMES M. CHAPIN, Senior Deputy (State Bar No. 118530)
    1600 Pacific Highway, Room 355
3   San Diego, California 92101-2469
    Telephone: (619) 531-5244; Fax: (619) 531-6005
4   [Exempt From Filing Fees  (Gov. Code § 6103)]

5   Attorneys for Defendant County of San Diego

6

7

8          IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                IN AND FOR THE COUNTY OF SAN DIEGO

10

11  ESTATE OF RONNIE PAUL SANDOVAL    )   No. 37-2014-00033347-CU-PO-CTL
    and ANA SANDOVAL, an individual,  )   (Action filed:  October 1, 2014)
12                                     )
             Plaintiffs,              )   DECLARATION OF CESAR B. COSTA IN
13                                     )   SUPPORT OF MOTION FOR SUMMARY
        v.                            )   JUDGMENT OR SUMMARY
14                                     )   ADJUDICATION
    COUNTY OF SAN DIEGO, a Public Entity; )
15  SAN DIEGO COUNTY JAIL, a Public   )   Date: March 4, 2016
    Entity; and DOES 1-100,           )   Time: 8:30 a.m.
16                                     )   Dept.: C-65
             Defendants.              )   Trial Date: None
17  _____)   ICJ: Hon. Joan M. Lewis

18                                         "IMAGED FILE"

19       I, CESAR B. COSTA, declare as follows:

20       1.   I am a registered nurse employed by the San Diego County Sheriff's Department

21  at the Central Jail.  On February 22, 2014, at about 3:30 p.m., I was contacted by Sheriff's

22  Deputy Bryan to check the blood sugar of inmate Ronnie Sandoval.  Deputy Bryan stated that

23  Sandoval reported that he is borderline diabetic.

24       2.   I checked the medical intake notes and found that Sandoval denied any medical or

25  psychiatric problems.

26       3.   I checked Sandoval's blood sugar and it was normal.

27  ///

28  ///

1      4.     Sandoval had some sweating on his face, but was calm and breathing normally.
2 He was sitting comfortably on the bench with no shakes or tremors.  He had no complaints of
3 pain or dizziness.  There was no indication that he was in medical distress.

4      I declare under penalty of perjury under California law that the foregoing is true and
5 correct.

6      Executed in _San Diego_, California, this _11_ day of _December_, 2015.

_Cesar B. Costa_

CESAR B. COSTA

- 2 -

# EXHIBIT "E"

1  THOMAS E. MONTGOMERY, County Counsel (State Bar No. 109654)
   County of San Diego
2  By JAMES M. CHAPIN, Senior Deputy (State Bar No. 118530)
   1600 Pacific Highway, Room 355
3  San Diego, California 92101-2469
   Telephone: (619) 531-5244;  Fax: (619) 531-6005
4  E-mail: james.chapin@sdcounty.ca.gov

5  Attorneys for Defendants County of San Diego, Romeo De Guzman, Dana Harris
       and Maria Llamado

6

7

8              IN THE UNITED STATES DISTRICT COURT

9          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

10

11 ESTATE OF RONNIE PAUL            )  No. 16cv1004-BEN(AGS)
   SANDOVAL and ANA SANDOVAL,      )
12 an individual,                   )  DECLARATION OF MICHAEL BRYAN
                                    )  IN SUPPORT OF MOTION FOR
13            Plaintiffs,           )  SUMMARY JUDGMENT
                                    )
   v.                              )
14                                  )  Date:  July 10, 2017
   COUNTY OF SAN DIEGO, a Public    )  Time: 10:30 a.m.
15 Entity; SAN DIEGO COUNTY JAIL,   )  Dept.: Courtroom of the
   a Public Entity; and DOES 1-100,)  Honorable Roger T. Benitez
16                                  )  Pre-Trial Conference Date: Sept. 18, 2017
             Defendants.            )
17 _____)

18        I, MICHAEL BRYAN, declare as follows:

19        1.    I am a San Diego County Sheriff's Deputy who was assigned to the Intake

20 Deputy position at the San Diego Central Jail on February 22, 2014, where I interacted

21 with inmate Ronnie Sandoval.

22        2.    At approximately 3:35 p.m., I observed Deputy Chavez fingerprinting

23 Sandoval on the first floor at intake.  I noticed that Sandoval did not look well, so I asked

24 him if he was sick and he said he was sick the week before but was not at the moment.  I

25 asked him if he had taken any drugs or had been drinking recently and he said he had not.

26        3.    Nurse Costa checked on Sandoval and completed a blood sugar check.  The

27 nurse asked him several questions about medications and being sick.  Based on the

28 responses, the nurse cleared Sandoval to continue the booking process.

                                                    16cv1004-BEN(AGS)

                                              EXHIBIT E

4.      Because Sandoval had commented about being borderline diabetic, I asked him when he had eaten last and he said "last night."  Out of concern for diabetes, at about 4:00 p.m., I brought Sandoval two sack lunches.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in _SAN DIEGO_, California, this _17th_ day of _MAY_____, 2017.

MICHAEL BRYAN

- 2 -

16cv1004-BEN(AGS)

EXHIBIT E

# EXHIBIT "F"

1   THOMAS E. MONTGOMERY, County Counsel (State Bar No. 109654)
    County of San Diego
2   By JAMES M. CHAPIN, Senior Deputy (State Bar No. 118530)
    1600 Pacific Highway, Room 355
3   San Diego, California 92101-2469
    Telephone: (619) 531-5244;  Fax: (619) 531-6005
4   E-mail: james.chapin@sdcounty.ca.gov

5   Attorneys for Defendants County of San Diego, Romeo De Guzman, Dana Harris
        and Maria Llamado

6

7

8                 IN THE UNITED STATES DISTRICT COURT

9             FOR THE SOUTHERN DISTRICT OF CALIFORNIA

10

11  ESTATE OF RONNIE PAUL                )   No. 16cv1004-BEN(AGS)
    SANDOVAL and ANA SANDOVAL,           )
12  an individual,                       )   DECLARATION OF LAVINIA
                                         )   AZUCENA MARTINEZ IN SUPPORT OF
13              Plaintiffs,              )   MOTION FOR SUMMARY JUDGMENT
                                         )
         v.                              )
14                                       )   Date:  July 10, 2017
    COUNTY OF SAN DIEGO, a Public        )   Time: 10:30 a.m.
15  Entity; SAN DIEGO COUNTY JAIL,       )   Dept.:  Courtroom of the
    a Public Entity; and DOES 1-100,     )   Honorable Roger T. Benitez
16                                       )   Pre-Trial Conference Date: Sept. 18,2017
                Defendants.              )
17  _____ )

18      I, LAVINIA AZUCENA MARTINEZ, declare as follows:

19      1.    I am a San Diego County Sheriff's Deputy who was assigned as the Visit

20  Deputy at the San Diego Central Jail on February 22, 2014.

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

16cv1004-BEN(AGS)

EXHIBIT F1.

1        2.     At about 4:30 p.m., I saw inmate Ronnie Sandoval being evaluated by the

2  nurse. Since he appeared to be tired, I asked him how he was feeling. I asked multiple

3  times how he was feeling, what was the matter, and if he had swallowed anything. I

4  repeated myself multiple times to the point he became very agitated and refused to

5  answer any further questions.

6        3.     Deputy Chavez took Sandoval to the second floor nurses' station.

7        I declare under penalty of perjury that the foregoing is true and correct.

8        Executed in _San Diego_, California, this _15_ day of _May_, 2017.

10

11                       LAVINIA AZUCENA MARTINEZ

- 2 -

EXHIBIT F

# EXHIBIT "G"

1 | THOMAS E. MONTGOMERY, County Counsel (State Bar No. 107187)
County of San Diego

FILED
CIVIL BUSINESS OFFICE 3
CENTRAL DIVISION

2015 DEC 14  PM 3: 36

CLERK-SUPERIOR COURT
SAN DIEGO COUNTY, CA

2 | By JAMES M. CHAPIN, Senior Deputy (State Bar No. 118530)
1600 Pacific Highway, Room 355
3 | San Diego, California 92101-2469
Telephone: (619) 531-5244; Fax: (619) 531-6005
4 | *[Exempt From Filing Fees  (Gov. Code § 6103)]*

5 | Attorneys for Defendant County of San Diego

6

7

8 |                **IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9 |                     **IN AND FOR THE COUNTY OF SAN DIEGO**

10

11 | ESTATE OF RONNIE PAUL SANDOVAL )    No. 37-2014-00033347-CU-PO-CTL
and ANA SANDOVAL, an individual, )    (Action filed:  October 1, 2014)

12 |             )

13 |        Plaintiffs, )    DECLARATION OF GRAHAM
            )    WILKINSON IN SUPPORT OF MOTION

14 |    v.                  )    FOR SUMMARY JUDGMENT OR
            )    SUMMARY ADJUDICATION

15 | COUNTY OF SAN DIEGO, a Public Entity; )
SAN DIEGO COUNTY JAIL, a Public )    Date:  March 4, 2016

16 | Entity; and DOES 1-100,        )    Time:  8:30 a.m.
            )    Dept.:  C-65

17 |        Defendants. )    Trial Date:  None
            )    ICJ:  Hon. Joan M. Lewis

18 |                            **"IMAGED FILE"**

19 |      I, GRAHAM WILKINSON, declare as follows:

20 |      1.      I am a San Diego County Sheriff's Deputy who was on duty at the San Diego

21 | Central Jail on February 22, 2014.  I was assigned to the Intake/Transportation position.

22 |      2.      At about 4:45 p.m., I saw Deputy Chavez place Ronnie Sandoval into medical

23 | observation cell #1 to be seen by medical staff.  A nurse checked his blood sugar level and

24 | stated it was normal.

25 |      3.      Sandoval was sweating and stated he did not feel well.  I asked him if he was

26 | under the influence of narcotics or alcohol.  He said "No."  I asked him if he needed anything,

27 | and he said, "No, I just want to feel better."

28 | ///

EXHIBIT 6

4.     We determined that it would be better to leave Sandoval in the medical observation cell close to medical. I checked on Sandoval periodically through the end of my shift at 6:00 p.m. and he appeared to be all right. He did not appear at anytime to be in medical distress.

I declare under penalty of perjury under California law that the foregoing is true and correct.

Executed in <u>SAN DIEGO</u> , California, this <u>23RD</u> day of <u>DECEMBER</u> , 2015.

GRAHAM WILKINSON

DECLARATION OF GRAHAM WILKINSON IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION

EXHIBIT G

# EXHIBIT "H"

THOMAS E. MONTGOMERY, County Counsel (State Bar No. 109654)
County of San Diego
By JAMES M. CHAPIN, Senior Deputy (State Bar No. 118530)
1600 Pacific Highway, Room 355
San Diego, California 92101-2469
Telephone: (619) 531-5244;  Fax: (619) 531-6005
E-mail: james.chapin@sdcounty.ca.gov

Attorneys for Defendants County of San Diego, Romeo De Guzman, Dana Harris
    and Maria Llamado

# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF RONNIE PAUL SANDOVAL and ANA SANDOVAL, an individual, | No. 16cv1004-BEN(AGS) |
| Plaintiffs, | DECLARATION OF ROMEO DE GUZMAN IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT |
| v. | Date: July 10, 2017 Time: 10:30 a.m. |
| COUNTY OF SAN DIEGO, a Public Entity; SAN DIEGO COUNTY JAIL, a Public Entity; and DOES 1-100, | Dept.:  Courtroom of the Honorable Roger T. Benitez Pre-Trial Conference Date: Sept. 18, 2017 |
| Defendants. | |

I, ROMEO DE GUZMAN, declare as follows:

1.     I am a registered nurse employed by the San Diego County Sheriff's Department at the Central Jail.  On February 22, 2014, at about 4:00 p.m., I was contacted by a Sheriff's deputy to check the blood sugar of inmate Ronnie Sandoval.

2.     I asked Sandoval if he was taking any medication and he said he was not.  I asked him if he was ok and he said "Yes."

3.     I checked Sandoval's blood sugar and it was normal.  The deputy gave Sandoval some food.

///

///

///

16cv1004-BEN(AGS)

EXHIBIT H

4.    Sandoval was alert, coherent, ambulatory, and not in any form of distress.

5.    I saw Sandoval about three times during the rest of my shift and there was nothing to note about his condition. When I left the jail at 11:30 p.m., Sandoval was in the holding cell, sitting up, awake, and not in distress.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in _Sun Diego_, California, this _16th_ day of _May_, 2017.

_____

ROMEO DE GUZMAN

- 2 -

EXHIBIT H

# EXHIBIT "I"

Maria Llamado
February 28, 2017



UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA   CERTIFIED ORIGINAL

ESTATE OF RONNIE PAUL
SANDOVAL and ANA SANDOVAL, an
individual,

            Plaintiffs,

    vs.                          Case No.: 16cv1004-BEN(AGS)

COUNTY OF SAN DIEGO, a Public
entity; SAN DIEGO COUNTY
JAIL, a Public Entity, and
DOES 1 through 100;

            Defendants.

_____


            DEPOSITION OF MARIA LLAMADO


            February 28, 2017

            9:24 a.m.


    1600 Pacific Highway, Room 355

        San Diego, California


REPORTED BY:
Elana Zucconi
CSR No. 9651, RPR, CRR





EXHIBIT 1

Maria Llamado
February 28, 2017

1        A.    Yes.  But there are other patients who have

2   psych-like diagnosis, like schizo -- like stable psych

3   problems that are in the general population, because

4   they -- the sixth floor is always -- they run out of

5   beds.

6        Q.    So sixth floor runs out of beds and somebody

7   from a mental hospital could end up in the general pop?

8        A.    Yeah.

9        Q.    But typically somebody from a general -- from a

10  psych -- from a State mental hospital would either end

11  up on the sixth floor or PSU?

12       A.    Yes.

13            MR. CHAPIN:  Is that another case?

14            MR. MORRIS:  Yes.  Let's move on to this case.

15            MR. CHAPIN:  Let's move on to this case.

16            MR. RENDA:  Do you want to go off the record

17  one second?

18            MR. MORRIS:  Yes.

19            (Discussion off the record)

20            MR. MORRIS:  Back on the record.

21  BY MR. MORRIS:

22       Q.    Can you tell me what time you started work on

23  the night of February 22nd, 2014, the night that

24  Mr. Sandoval was found dead?

25       A.    Work on the second floor?

EXHIBIT I

Maria Llamado
February 28, 2017

1       Q.    Yes, ma'am.

2       A.    If I can remember, maybe I started around

3    11:10.  I got there 11:10.

4       Q.    And can you tell me what your shift was that

5    night?

6       A.    11:00 to 7:00.

7       Q.    Eight-hour shift?

8       A.    Yes.

9       Q.    There's three shifts?

10      A.    Yes.

11      Q.    And were you, at that point in time, assigned

12   always to the 11:00 to 7:00 shift?

13      A.    Yes.

14      Q.    And then how long would you be assigned to the

15   night shift?  Like would that last a month and then they

16   would switch you to days?

17      A.    No.  They change it.  It depends -- they change

18   it every week or every -- it depends where staffing is

19   needed.

20      Q.    But at that point in time in February, late

21   February of 2014, you were assigned to the night shift?

22      A.    Yes.

23      Q.    And how long had you been assigned to the night

24   shift, if you can recall?

25      A.    Total night shift?

Maria Llamado
February 28, 2017

1     A.    Yes.

2     Q.    Right?

3     A.    Yes.

4     Q.    Let me ask it -- I asked that question wrong.

5           Is there an affirmative obligation for a nurse

6     to routinely do checks on individuals in the holding

7     cell without being told that that person needs medical

8     screening by another nurse?

9     A.    Yes.  It -- the thing is we visual, like we --

10    usually when our -- when we see inmates in the holding

11    cell like that, and they are not in any distress, that's

12    how we check them.

13    Q.    Right.  But what I am trying to get at, there

14    is an assignment, a standing assignment for a nurse to

15    check individuals in the sobering cell, true?

16    A.    Yes.

17    Q.    And there is a standing assignment for a nurse

18    to check individuals in the safety cells --

19    A.    Yes.

20    Q.    -- true?

21    A.    Yes.

22    Q.    Is there a standing assignment for a nurse to

23    check individuals in the holding cells, like somebody is

24    assigned that?

25    A.    I cannot remember.  I don't think -- I don't

EXHIBIT 1

Maria Llamado
February 28, 2017

1      Q.   And there are inmates that had been dressed

2   out, ready to be medically screened?

3      A.   Yes.

4      Q.   And did you start to screen any of those

5   inmates?

6      A.   Yes.  I started -- I can't remember how many I

7   started, but I think I started two or three of them.

8      Q.   And is the best as you can recall, when is the

9   first time you noticed inmate Sandoval in the holding

10   cell?

11      A.   After the other nurse, next sitting -- sitting

12   next on -- in the next booth, told me that we have a man

13   down.

14      Q.   And had you begun medically screening other

15   inmates at that time?

16      A.   Yes.  I was in the middle of screening my

17   second or third inmate.

18      Q.   Approximately how long into your shift was it

19   that the nurse next to you told you there was a man

20   down?

21      A.   Oh, I cannot recall the time or how many

22   minutes.  But it is in my charting, the time.

23      Q.   Okay.  We will get to your chart.  I am just

24   trying to get now what you can recall off the top of

25   your head.

EXHIBIT 1

Maria Llamado
February 28, 2017

1    that wasn't the holding cell you were talking about?

2       A.   No.

3       Q.   Okay.  And so you looked at the medically

4    screening cells for a man down --

5       A.   Yes.

6       Q.   -- right?

7       A.   Yes.

8       Q.   And you didn't see anybody?

9       A.   No.

10      Q.   And Nurse Harris said, "No, it is the one right

11   here (indicating)"?

12      A.   Um-hum.

13      Q.   The cell where Mr. Sandoval was being held, the

14   holding cell, approximately how far from your medical

15   intake booth was that cell?

16      A.   Oh, from here to (indicating) from where she

17   was sitting (indicating), probably one, two -- probably

18   four feet away, I think.  Somewhere in there.

19   Approximately four or five feet away from me.

20      Q.   All right.  The holding cell where Mr. Sandoval

21   was, was four or five feet away from you, and was Nurse

22   Harris' booth in between you and that holding cell, or

23   was she on the other side of you?

24      A.   She was sitting next to me, on this side

25   (indicating).

EXHIBIT I

Maria Llamado
February 28, 2017

```
 1        Q.    So the question was --

 2        A.    Left side.

 3        Q.    So the question was, was Nurse Harris' booth

 4   between you and the holding cell or on the other side of

 5   you from the holding cell?

 6        A.    On the other side.

 7        Q.    Okay.  So you were the closest nurse to the

 8   holding cell?

 9        A.    Yes.

10        Q.    And then she said, "Mimi, we have a man down"?

11        A.    Yes.

12        Q.    And then what happened?

13        A.    So -- if I can remember, she -- she was the

14   first one who went inside -- no.  There was a deputy who

15   opened -- already opened the door, and then there was

16   a -- I cannot remember if the deputy was inside and she

17   was inside, standing.  Maybe there was a deputy inside

18   and then she was standing next to the inmate and I was

19   standing -- I got up and stood outside the door.

20        Q.    You need to keep your voice up.

21        A.    Yeah.

22        Q.    Okay.  So I am trying to understand.  You --

23   when you -- when Nurse Harris said, "There is a man

24   down," was she still at her booth?

25        A.    I cannot recall if -- no, she was standing
```

EXHIBIT 1

Maria Llamado
February 28, 2017

```
 1    already, going to the booth.  Or she was like right
 2    there by the door of the holding cell.
 3        Q.   Okay.  So the way from your booth position, if
 4    you look towards the holding cell, would you see the
 5    door or would you see a plexiglass window?
 6        A.   You can see the door.
 7        Q.   And there is also a window there, true?
 8        A.   Yes.  Yeah.  The door -- okay.  It would be
 9    (indicating).  The door is this way (indicating), and
10    then the glass is on this side (indicating).
11        Q.   All right.  So if you are from your -- let me
12    describe this and see if I got this right.
13        A.   Uh-huh.
14        Q.   If you are at your booth, facing an inmate,
15    doing a medical screening, okay, and you look towards
16    your left or right --
17        A.   Right.  Going this way (indicating).
18        Q.   So if you look towards your right --
19        A.   Yeah, in the backside (indicating).
20        Q.   -- from your booth, you would see both a
21    plexiglass window and a door --
22        A.   Yes.
23        Q.   -- true?
24             And you can see through that plexiglass window,
25    into that cell, right?
```

EXHIBIT I

Maria Llamado
February 28, 2017

1    A.   Yes.

2    Q.   And does the door also have a window on it?

3    A.   The door has a window, the top window

4    (indicating).

5    Q.   Okay.  So there is both a plexiglass window and

6    a door with a window in it?

7    A.   Yes.

8    Q.   And so when Nurse Harris told you there was a

9    man down, was she standing by the door or was she at her

10   booth?

11   A.   I cannot recall.  I think she was standing by

12   the door.

13   Q.   Okay.  And then what happened?

14   A.   And then, of course, a deputy has to open the

15   door and then she -- I don't know if she is standing

16   outside the door, because the holding cell is so small,

17   and then we looked at the inmate and we saw him having a

18   seizure.

19   Q.   Okay.  So do you recall who the deputies were

20   that you saw?

21   A.   I cannot remember.  I know he used to be an

22   EMT.  That's what he said.

23   Q.   There is one by the name of Andrade?

24   A.   Yeah, that one.

25   Q.   He used to be an EMT?

EXHIBIT 1

Maria Llamado
February 28, 2017

```
 1    time.
 2        Q.   And how is it that she became the team leader
 3    when you had been there so much longer than her?
 4        A.   It is usually the first responder.
 5        Q.   Oh, it became her scene because she was the
 6    first one on site?
 7        A.   Yes.  Yes.
 8        Q.   That made her the team leader?
 9        A.   Yes.
10        Q.   All right.  So you show up at the scene, there
11    is at least one deputy inside, you have the medical cart
12    and the oxygen tank, and the call goes out by Harris for
13    EMTs.  What happens next?
14        A.   So we set up the oxygen, the -- the deputy
15    helped me put the oxygen on, and then I remember she was
16    still observing the patient.  She was still standing
17    there and I told her I was -- I was going to get the
18    paperwork ready for an E -- for whoever, an EMT or
19    whoever, you know, who is coming.  We usually fill out
20    the form that we handle -- we give it -- we give it to
21    the -- the ambulance team, prior -- so they can have all
22    of that information on what is going on with the
23    patient, so they can give it to the ER.
24        Q.   Okay.  So there has to be paperwork that is
25    given to the ambulance too?
```

EXHIBIT 1

Maria Llamado
February 28, 2017

```
1        A.    Um-hum.   Yes.

2        Q.    Is it the same paperwork that is given to the

3    ambulance team that is given if the paramedics had come?

4        A.    Yes.   Same.

5        Q.    Same paperwork?

6        A.    Yes, same paperwork.

7        Q.    So you were preparing the paperwork for whoever

8    was going to arrive?

9        A.    Yes.

10       Q.    And where did you go to prepare that paperwork?

11       A.    The paperwork is on top of the med cart.

12       Q.    So you are still right there on the scene?

13       A.    Yes, I was right there.

14       Q.    And you filled it out with a pen?

15       A.    Yes.

16       Q.    How long did that take you to do that?

17       A.    It -- I would go to the computer and look at

18   his name and booking number, and I don't know if it

19   needs a birthday, and I would go to look at the history.

20       Q.    I asked you if you could prepare the paperwork

21   right there on the scene of the cart, with a pen.   And

22   now you say you had to go to the computer?

23       A.    Yes.   I would fill it out right there

24   (indicating), on the -- I was not close to the patient.

25   I was standing on our -- what do you call this, like
```

EXHIBIT 1

Maria Llamado
February 28, 2017

```
1    sending some air tube up to Bautista.  When did that

2    occur?

3         A.   Air tube to Bautista?  It is a -- a copy of

4    the -- usually when we fill out that form, we copy it,

5    and then so the nurse -- the third floor has a copy, and

6    we have a folder where we put all the copy of our

7    send-outs.

8         Q.   And did you do that in this case?

9         A.   I think I -- I cannot remember, but I think I

10   did.

11        Q.   Isn't it true, you send it up to Bautista and

12   you had a phone conversation with her?

13        A.   Yes, after that.  I told her I was -- I was --

14   I tube -- I am tubing a copy of our -- of an inmate

15   that's going out.  And I said, "He is still here."

16        Q.   Okay.  So you are filling out the paperwork,

17   you put it in an envelope --

18        A.   Um-hum.

19        Q.   -- you make a copy of it?

20        A.   Yeah.

21        Q.   You take the copy and you put it in the tube --

22        A.   Um-hum, yes.

23        Q.   -- and you send it to Bautista, and you call

24   her?

25        A.   Yes.
```

EXHIBIT 1

Maria Llamado
February 28, 2017

1   Q.   And you tell her, "I am tubing you some

2   paperwork"?

3   A.   Yes.

4   Q.   And you explain to her what you have seen?

5   A.   Yes.

6   Q.   And what does she tell you to do, ma'am?

7   A.   And she said, "He has to go out 9-1-1."

8   Q.   Bautista told you to send him out 9-1-1 as

9   well?

10  A.   Yes.

11  Q.   Did you go out to the scene and tell Harris

12  that Bautista agreed with you and Andrade that he should

13  go out 9-1-1?

14  A.   Yes.  I was standing, after I put the phone

15  down, because we have a phone right there on the counter

16  (indicating).  After I put the phone down, I looked at

17  her and I said, "Shirley said he has to go now 9-1-1."

18  Q.   And Shirley is Shirley Bautista?

19  A.   Shirley Bautista.

20  Q.   So now it is you, Andrade and Shirley, the

21  supervisor, who all say 9-1-1?

22  A.   Yes.

23  Q.   And you relay that to Nurse Harris?

24  A.   Yes.

25  Q.   Did Nurse Harris then call out to the deputies

Maria Llamado
February 28, 2017

1   you know, like giving him oxygen.

2       Q.   Through the mask?

3       A.   The mask.

4       Q.   Do you recall anything else about a suction

5   machine?

6       A.   Yes, I got the suction machine too.  And I know

7   I prepped the suction machine and I think I turned it

8   on.

9       Q.   Why did you need a suction machine?

10      A.   Just to see if he has any -- what do you call

11   this, secretion in his mouth, that would be -- that

12   would -- to prevent him from aspirating his secretions.

13      Q.   The report indicates, at that point in time, he

14   was rolled over and a bunch of stuff came out of his

15   mouth, some foam and some pinkish fluid --

16      A.   Um-hum.

17      Q.   -- do you recall that?

18      A.   I cannot recall that.

19      Q.   Did you think he needed suction?

20      A.   Of course, with secretion coming out of his

21   mouth.

22      Q.   Well, did you see the secretion?

23      A.   I did not really see the -- I cannot remember.

24      Q.   And do you have a suction machine on the second

25   floor?

EXHIBIT 1

Maria Llamado
February 28, 2017

1       A.    Yes.

2       Q.    But it was broken, right?

3       A.    It wasn't broken.

4       Q.    And didn't you have to go to the third floor to

5    get the suction machine?

6       A.    No, we didn't go to the third floor.

7       Q.    You recall the suction machine on the second

8    floor was working?

9       A.    Yes.  Because we check it all the time, at the

10   beginning of the shift.

11      Q.    Every floor should have a suction machine --

12      A.    Yes.

13      Q.    -- right?

14      A.    Uh-huh.

15      Q.    And did you actually perform the suction?

16      A.    It wasn't me.  I think it was the deputy.

17      Q.    Andrade?

18      A.    Yes.

19      Q.    And to the best of your recollection, ma'am,

20   the suctioning takes place prior to the arrival of Nurse

21   Bautista?

22      A.    I would say probably yes.

23      Q.    Do you recall anything else besides the oxygen

24   mask and the suctioning happening prior to the arrival

25   of Nurse Bautista?

EXHIBIT 1

Maria Llamado
February 28, 2017

1      A.   I cannot really picture his face.

2      Q.   Was his face tense --

3      A.   It was like -- no, I cannot recall.

4      Q.   But his arms and chest were tensing?

5      A.   Yes, that's what I can recall right now.

6      Q.   "Llamado notices arms were stiff as she tried

7   to place a blood press. (sic) cuff on."  Do you recall

8   that?

9      A.   Yes.

10      Q.   You couldn't get the cuff on?  Or you could,

11   but his arms were just stiff?

12      A.   Um-hum.  Yes.

13      Q.   "And she pulled his arm.  Sandoval made a

14   grunting sound."  Can you recall that for us?

15      A.   Like a snoring sound.

16      Q.   And that is consistent with somebody seizing?

17      A.   Yes.

18      Q.   At that point in time, you formed the opinion

19   that 9-1-1 should be called?

20      A.   No.  Not yet.

21      Q.   Okay.  Let's read a little further.  "Llamado

22   placed the blood pressure cuff on Sandoval's left arm.

23   His blood pressure reading was 137 over 58."  What can

24   you tell me about that blood pressure reading?

25      A.   The blood pressure is still within normal

EXHIBIT 1

Maria Llamado
February 28, 2017

```
 1    limits.

 2        Q.   Okay.  With a pulse of 94?

 3        A.   Yes.

 4        Q.   Is that normal?

 5        A.   That is normal.

 6        Q.   A little high, though?

 7        A.   The pulse of 80 to a hundred is still okay.

 8        Q.   At about 15 -- "At 056, Llamado measured

 9    Sandoval's oxygen level using a 15-liter non-rebreather

10    mask.  His oxygen read 98 percent.  RN Harris told" --

11    "Sandoval's pupils were at 3 millimeters."  Is that

12    normal?

13        A.   Normal, yes.

14        Q.   "And sluggish," what does that mean?

15        A.   Sluggish means slow to respond to, you know,

16    being -- when you shine a light on your eyes, it is

17    usually -- it does -- it changes to -- the pupils, it

18    changes its size.

19        Q.   They constrict?

20        A.   Right away.  Yeah, it constricts faster.  But I

21    guess when she did it, it was sluggish.

22        Q.   What does that mean when they are sluggish?

23        A.   There is something going on in the like neuro,

24    neurologically.

25        Q.   So based on his -- the seizure he was having in
```

Maria Llamado
February 28, 2017

1      A.   Yes.  Yes.

2      Q.   The statement you gave to Detective Carrillo

3   doesn't talk about your interaction with respect to

4   9-1-1 or EMTs to Harris.  Do you know why you didn't

5   tell Detective Carrillo that you told Harris to call

6   9-1-1?

7      A.   I -- I don't know.  I cannot remember.

8      Q.   Okay.  I will read the next paragraph down.

9   "Llamado retrieved a C collar and a deputy assisted by

10   applying it to Sandoval."  The deputy would have been

11   Andrade, true?

12      A.   Yes.

13      Q.   "Sandoval was moved slightly on his back, to

14   facilitate the action of the C collar.  During this,

15   Sandoval was still snoring, but unresponsive."  Now, at

16   this point in time, snoring indicated to you an airway

17   constriction, right -- obstruction?

18      A.   Probably -- yeah, a little slight airway

19   obstruction, or probably some mucous in his mouth.

20      Q.   Fair enough.

21          "Sandoval's eyes were closed.  Llamado checked

22   Sandoval's pants and saw that they were dry.  His pants

23   were not soiled, as a normally seen on a seizure

24   patient."  All right.  "Llamado left the room and

25   started to prepare the DHS."  Do you know what DHS

EXHIBIT 1

Maria Llamado
February 28, 2017

1   stands for?

2       A.   That's the -- the -- I don't know what DHS,

3   hospital something, but that's the -- the form that we

4   fill out for transfer to the ER.

5       Q.   Fair enough.  "Used to send out to inmates in

6   the hospital.  She returned and was told by a deputy who

7   used to be a paramedic," that would have been Andrade,

8   right?

9       A.   Yes.

10      Q.   "To get a suction machine, because Sandoval was

11  starting to foam in the mouth."  Do you recall seeing

12  his foam in the mouth?

13      A.   No.  Because I guess -- I couldn't see it

14  because he was wearing the mask.

15      Q.   The next sentence says, "Llamado called a

16  different floor for a suction device, since the device

17  on the second floor was not working."

18      A.   I cannot remember that.  Really?

19      Q.   If you read the last full paragraph of your

20  report there.  Does that refresh your recollection that

21  the suction machine wasn't working on the third floor --

22  or excuse me, the second floor?

23      A.   I don't remember who brought down -- I cannot

24  remember, but the suction machine on the second floor

25  usually works, because we check it at the beginning of

EXHIBIT 1

Maria Llamado
February 28, 2017

1   blanket."  Is that true?

2       A.   Yes.

3       Q.   "During her shift, Llamado had no contact with

4   Sandoval until the medical assist call.  She did not

5   give Sandoval any medication.  Llamado was occupied with

6   sobering duties and inmate placements.  Llamado had not

7   seen Sandoval prior to this incident."  All true?

8       A.   Yes.

9       Q.   Consistent with how you testified here today,

10  true?

11      A.   Yes.

12      Q.   Okay.  And then if you could turn to the last

13  page.  There is a statement --

14           MR. MORRIS:  I don't think that is on there,

15  Dani.

16           MS. PENA:  Oh.  That is separate.

17           MR. MORRIS:  Okay.  We will mark this as

18  Exhibit 2.

19           (Exhibit 2 marked)

20  BY MR. MORRIS:

21      Q.   Can I ask you, ma'am, when did you write this

22  statement?

23      A.   This was written after -- after everything was

24  all done.

25      Q.   Okay.  That is super vague.

Maria Llamado
February 28, 2017

1                          DECLARATION

2

3

4            I herby declare I am the deponent in the

5     within matter; that I have read the foregoing deposition

6     and know the contents thereof; and I declare that the

7     same is true of my knowledge except as to the matters

8     which are therein stated upon my information or belief,

9     and as to those matters, I believe it to be true.

10           I declare under the penalties of perjury of

11    the State of California that the foregoing is true and

12    correct.

13           Executed on the __3__ day of _April_ 2017,

14    at _San Diego_____, ____Ca._____.

15          (City)                    (State)

16

17

18        _Maria Theresa Llamado Vday_

19                       MARIA LLAMADO

20

21

22

23

24

25

Maria Llamado
February 28, 2017

1                    REPORTER'S CERTIFICATE

2

3

4          I, ELANA ZUCCONI, CSR No. 9651, Certified

5     Shorthand Reporter, certify:

6          That the foregoing proceedings were taken

7     before me at the time and place therein set forth, at

8     which time the witness was put under oath by me;

9          That the testimony of the witness, the

10    questions propounded, and all objections and statements

11    made at the time of the examination were recorded

12    stenographically by me and were thereafter transcribed;

13         That a review of the transcript by the

14    deponent was requested;

15         That the foregoing is a true and correct

16    transcript of my shorthand notes so taken.

17         I further certify that I am not a relative or

18    employee of any attorney of the parties, nor financially

19    interested in the action.

20         I declare under penalty of perjury under the

21    laws of California that the foregoing is true and

22    correct.

23    Dated this 3rd day of March, 2017.

24                    *Elana Zucconi*

25    _____
                ELANA ZUCCONI, CSR No. 9651

# EXHIBIT "J"

THOMAS E. MONTGOMERY, County Counsel (State Bar No. 109654)
County of San Diego
By JAMES M. CHAPIN, Senior Deputy (State Bar No. 118530)
1600 Pacific Highway, Room 355
San Diego, California 92101-2469
Telephone: (619) 531-5244; Fax: (619) 531-6005
E-mail: james.chapin@sdcounty.ca.gov

Attorneys for Defendants County of San Diego, Romeo De Guzman, Dana Harris
        and Maria Llamado

# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF RONNIE PAUL SANDOVAL and ANA SANDOVAL, an individual, | No. 16cv1004-BEN(AGS) |
| Plaintiffs, | DECLARATION OF NATHANIEL FOX IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT |
| v. | Date: July 10, 2017 |
| COUNTY OF SAN DIEGO, a Public Entity; SAN DIEGO COUNTY JAIL, a Public Entity; and DOES 1-100, | Time: 10:30 a.m. Dept.: Courtroom of the Honorable Roger T. Benitez Pre-Trial Conference Date: Sept. 18, 2017 |
| Defendants. | |

I, NATHANIEL FOX, declare as follows:

1.      I am a San Diego County Sheriff's Deputy who was assigned to the Booking Deputy position at the San Diego Central Jail on February 22, 2014.

2.      At approximately 7:30 p.m., I contacted inmate Ronnie Sandoval in a cell next to the nursing station.  I asked him why he was there.  He said he did not know.

3.      I asked the screening nurses if they knew why Sandoval was being held in the cell.  None of them knew why.  I was unable to determine what deputies had placed him in the cell and I returned to my duties.

///

///

///

16cv1004-BEN(AGS)

EXHIBIT J

1    4.    Throughout my shift, I periodically checked on the welfare of Sandoval.  He

2  appeared lethargic but did not show any signs of medical distress until he apparently

3  suffered some kind of seizure at about 12:53 a.m. the next morning.  I assisted with

4  security while he was being treated by nursing staff and EMTs.

5        I declare under penalty of perjury that the foregoing is true and correct.

6        Executed in _____, California, this _____ day of _____, 2017.

7                          -- signed copy to follow --

8                          _____

9                          NATHANIEL FOX

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

16cv1004-BEN(AGS)

EXHIBIT J

# EXHIBIT "K"

THOMAS E. MONTGOMERY, County Counsel (State Bar No. 109654)
County of San Diego
By JAMES M. CHAPIN, Senior Deputy (State Bar No. 118530)
1600 Pacific Highway, Room 355
San Diego, California 92101-2469
Telephone: (619) 531-5244;  Fax: (619) 531-6005
E-mail: james.chapin@sdcounty.ca.gov

Attorneys for Defendants County of San Diego, Romeo De Guzman, Dana Harris
        and Maria Llamado

# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| ESTATE OF RONNIE PAUL SANDOVAL and ANA SANDOVAL, an individual, | No. 16cv1004-BEN(AGS) |
|---|---|
| Plaintiffs, | DECLARATION OF ROBERT SHAWCROFT IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT |
| v. | Date:  July 10, 2017 |
| COUNTY OF SAN DIEGO, a Public Entity; SAN DIEGO COUNTY JAIL, a Public Entity; and DOES 1-100, | Time: 10:30 a.m. Dept.:  Courtroom of the Honorable Roger T. Benitez Pre-Trial Conference Date: Sept. 17, 2017 |
| Defendants. | |

I, ROBERT SHAWCROFT, declare as follows:

1.      I am a Sergeant with the San Diego County Sheriff's Department who was on duty at the San Diego Central Jail on February 22-23, 2014.

2.      On February 23, 2014, at about 12:55 a.m., I was walking through the medical area when I saw inmate Ronnie Sandoval sitting on the bench in medical observation cell #1. Just as I looked in, his eyes rolled back and he slumped slightly to his left on the bench.  I immediately summoned Nurse Harris and other deputies into the cell.  He appeared to be having a seizure.

///

///

///

16cv1004-BEN(AGS)

EXHIBIT K

3.     Nursing staff got oxygen and a deputy held the oxygen mask in place while a nurse checked for blood pressure and oxygen levels.  Sandoval was breathing on his own, but was nonresponsive.  Nursing staff continued with treatment efforts and Sandoval appeared to be coming out of his seizure when EMTs were called.  They arrived at 1:20 a.m., and took over.  Paramedics were called and arrived at 1:42 a.m. They commenced CPR when Sandoval stopped breathing.  He was pronounced dead by a doctor at 2:11 a.m.

I declare under penalty of perjury under California law that the foregoing is true and correct.

Executed in S̲a̲n̲ ̲D̲i̲e̲g̲o̲, California, this 1̲7̲ᵗʰday of ̲M̲a̲y̲ , 2017.

ROBERT SHAWCROFT

16cv1004-BEN(AGS)

EXHIBIT K

# EXHIBIT "L"

1  THOMAS E. MONTGOMERY, County Counsel (State Bar No. 109654)
   County of San Diego
2  By JAMES M. CHAPIN, Senior Deputy (State Bar No. 118530)
   1600 Pacific Highway, Room 355
3  San Diego, California 92101-2469
   Telephone: (619) 531-5244;  Fax: (619) 531-6005
4  E-mail: james.chapin@sdcounty.ca.gov

5  Attorneys for Defendants County of San Diego, Romeo De Guzman, Dana Harris
        and Maria Llamado

6

7

8              IN THE UNITED STATES DISTRICT COURT

9          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

10

11  ESTATE OF RONNIE PAUL          )   No. 16cv1004-BEN(AGS)
    SANDOVAL and ANA SANDOVAL,     )
12  an individual,                 )   DECLARATION OF KEVIN JOHNSON
                                   )   IN SUPPORT OF MOTION FOR
13           Plaintiffs,           )   SUMMARY JUDGMENT
        v.                         )
14                                 )   Date: July 10, 2017
    COUNTY OF SAN DIEGO, a Public  )   Time: 10:30 a.m.
15  Entity; SAN DIEGO COUNTY JAIL, )   Dept.: Courtroom of the
    a Public Entity; and DOES 1-100, )  Honorable Roger T. Benitez
16                                 )   Pre-Trial Conference Date: Sept. 18, 2017
             Defendants.           )
17  _____)

18       I, KEVIN JOHNSON, declare as follows:

19       1.      I am a San Diego County Sheriff's Deputy who was assigned to the kitchen

20  Deputy position at the San Diego Central Jail on February 22, 2014.  At about 1:05 a.m.,

21  I was on the third floor when Deputy Valbuena was handed a suction device by Nurse

22  Bautista.  I accompanied Valbuena to the second floor.

23       2.      At approximately 1:10 a.m., I was providing security while deputies and

24  nurses were providing medical assistance to inmate Ronnie Sandoval.

25       3.      At approximately 1:20 a.m., I met EMTs at the second floor elevator and

26  escorted them to Sandoval.  At that time, I heard a nurse say we need to have paramedics

27  respond.  I immediately notified command that paramedics were needed.

28  ///

                                                      16cv1004-BEN(AGS)

                                                      EXHIBIT L

4.    Paramedics arrived on the second floor at 1:42 a.m. and I escorted them to Sandoval.  They began to provide medical assistance immediately.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in <u>SAN DIEGO</u>, California, this <u>17</u> day of <u>MAY</u>, 2017.

KEVIN JOHNSON

- 2 -

EXHIBIT L

# EXHIBIT "M"

THOMAS E. MONTGOMERY, County Counsel (State Bar No. 109654)
County of San Diego
By JAMES M. CHAPIN, Senior Deputy (State Bar No. 118530)
1600 Pacific Highway, Room 355
San Diego, California 92101-2469
Telephone: (619) 531-5244;  Fax: (619) 531-6005
E-mail: james.chapin@sdcounty.ca.gov

Attorneys for Defendants County of San Diego, Romeo De Guzman, Dana Harris
    and Maria Llamado

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF RONNIE PAUL SANDOVAL and ANA SANDOVAL, an individual, | No. 16cv1004-BEN(AGS) |
| Plaintiffs, | DECLARATION OF RICHARD J. GELLER IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT |
| v. | Date: July 10, 2017 |
| COUNTY OF SAN DIEGO, a Public Entity; SAN DIEGO COUNTY JAIL, a Public Entity; and DOES 1-100, | Time: 10:30 a.m. Dept.:  Courtroom of the Honorable Roger T. Benitez Pre-Trial Conference Date:  Sept. 18, 2017 |
| Defendants. | |

I, RICHARD J. GELLER, declare as follows:

1.      My curriculum vitae is attached to this declaration.  I am employed by the Department of Clinical Pharmacy, University of California San Francisco School of Pharmacy.  In that role I am the director of the Fresno/Madera Division of the California Poison Control System, a position I have held since 1987.  I also teach medical toxicology and advanced pharmacy practice to fourth year doctoral students.  In addition to being a Health Sciences Associate Professor, University of California San Francisco School of Pharmacy, I am also an Associate Clinical Professor, Medicine, University of California San Francisco School of Medicine, and an Adjunct Professor of Pharmacy Practice, University of the Pacific School of Pharmacy and Health Sciences, where I also teach fourth year doctoral pharmacy students.  In my 28 years of experience as a poison

EXHIBIT M

control medical director, I have observed and consulted on hundreds of cases of exposure
to methamphetamine, including a number of fatal exposures. I am a physician currently
and consecutively licensed by the Medical Board of California since 1983, certificate
number G49837.

2.      I have been certified by the American Board of Internal Medicine and the
American Board of Emergency Medicine. I practiced clinical medicine, both as an
internist and as an emergency physician, for a period of 27 years. During that time I
treated in an emergency department setting the acute effects of methamphetamine
exposure on multiple occasions. In addition to being an internist and emergency
physician, I am a very experienced medical toxicologist, having been certified by the
American Board of Medical Toxicology and by the American Board of Emergency
Medicine in the subspecialty of medical toxicology. A medical toxicologist is an expert
in the adverse clinical effects of xenobiotics, importantly including medications, on the
human body, as well as being an expert in the diagnosis and treatment of poisoning from
all poisons, including medications.

3.      I have previously testified as an expert in medical and forensic toxicology in
federal court and in superior courts in the State of California, and specifically, I have
testified as an expert regarding the acute effects of methamphetamine intoxication.

4.      According to the County of San Diego, Office of the Medical Examiner,
Autopsy Report, Ronnie Paul Sandoval's death was caused by Acute Methamphetamine
Intoxication, with the Manner of death being an accident. (Copy attached.) I note that
the postmortem peripheral blood methamphetamine concentration, performed by a
GC/MS (gas chromatography/mass spectrometry) method, was measured at 38 mg/L.
Methamphetamine has been reported to undergo some degree of post-mortem
redistribution, which can falsely elevate post-mortem drug concentrations if blood is
harvested from the heart and there is a delay between death and autopsy. However, this
effect is greatly attenuated when post-mortem blood is harvested from a peripheral blood
vessel, as was correctly done by the San Diego Medical Examiner in this case. GC/MS is

- 2 -

EXHIBIT M

1    a gold standard for both identification and quantification of postmortem blood toxicology
2    testing. The concentration of 38 mg/L is very likely to have been quite reflective of the
3    concentration of methamphetamine in Mr. Sandoval's blood at the time of his death.

4         A concentration of 38 mg/L is an astronomically high level of methamphetamine
5    to find in blood. To put this into perspective, therapeutic blood levels of
6    methamphetamine, found experimentally after administering therapeutic doses of
7    methamphetamine orally, are in the range of 20-32 *micrograms* per liter, or 0.020 – 0.032
8    mg/L. In a series of deaths caused by methamphetamine overdoses, the average blood
9    methamphetamine blood concentration found at autopsy was 2 mg/L. The County of San
10   Diego Medical Examiner's conclusion that Ronnie Paul Sandoval's death was caused by
11   Acute Methamphetamine Intoxication appears to be accurate.

12        5.    I have also reviewed the San Diego Sheriff's Department Follow-up
13   Investigative Report, Case Number 14109768, pages 000243 through 000320, and
14   several videos from jail surveillance on February 22, 2015. The Report contains witness
15   statements and documentation regarding contacts with Mr. Sandoval on February 22-23,
16   2014.

17        6.    On page 000245 of the San Diego Sheriff's Department Follow-up
18   Investigative Report, Case Number 14109768, it is documented that Mr. Sandoval denied
19   to Deputy Michael Bryan that he had recently ingested drugs or alcohol. He disclosed a
20   history of diabetes mellitus. Some observers have stated in the above report that Mr.
21   Sandoval appeared to be exhausted, sleepy, and that he was sweating. With the exception
22   of the diaphoresis, this is not the usual clinical picture of methamphetamine use. He was
23   not agitated or combative. Given Mr. Sandoval's statements that he had not recently used
24   drugs and that he had diabetes, the plausible reason that he was sweating was that his
25   blood sugar was low as a complication of diabetes. Deputies twice asked the jail nurse to
26   check his blood sugar, and it was normal on both occasions. From the information
27   available to jail deputies, they properly concluded that hypoglycemia needed to be
28   excluded, and twice had this checked. Thus, the deputies made a reasonable laymen's

- 3 -

16cv1004-BEN(AGS)

EXHIBIT M

1   conclusion regarding his sweating, and showed concern in having his blood sugar
2   checked.

3          7.      I have examined multiple videos made available to me by the Office of
4   County Counsel.  On a video labeled 0-2014-02-22-14-20-00-042, Mr. Sandoval is
5   observed walking into a room with a deputy at 14:27 on February 22, 2014.  He appears
6   calm, his gait is normal.  He is able to easily assume and hold a seating posture on a
7   bench.  He is seen conversing with a deputy.  He approaches a window when instructed
8   and converses with another deputy.  He appears to be cooperative.  In observing this
9   video, I can see no reason as an experienced internist, emergency physician or medical
10  toxicologist that the deputies should have seen that Mr. Sandoval needed immediate
11  medical care because of methamphetamine intoxication or any other condition.

12         On a second video labeled 1-2014-02-22-15-00-00-023, Mr. Sandoval is observed
13  at 15:30 sitting in a room with at least 5 other males.  He appears awake, calm.  He is
14  again able to maintain a sitting posture, and intermittently walks around the room with a
15  gait which appears normal.  Four other men in the room show evidence of possible
16  altered mental status, but Mr. Sandoval does not.  On a video labeled 0-2014-02-22-15-
17  30-00-051, Mr. Sandoval is observed at 15:44 walking in a hall nonchalantly with his
18  hands in his pockets and sitting down.  On a video labeled 0-2014-02-22-16-57-00-033,
19  Mr. Sandoval is observed at 16:58 walking down a red line in a hall briskly and without
20  difficulty.  Finally, on a video labeled 4-2014-02-22-16-57-00-063, Mr. Sandoval is
21  observed at 16:58 walking down a hall without difficulty.

22         In observing Mr. Sandoval in each of these videos, I can see no reason as an
23  experienced internist, emergency physician or medical toxicologist that the jail staff
24  should have concluded that Mr. Sandoval needed immediate medical care because of
25  methamphetamine intoxication or any other condition.

26  ///
27  ///
28  ///

- 4 -

16cv1004-BEN(AGS)

EXHIBIT M

1    8.    I have reproduced a table below printed in a textbook called Medical

2 Toxicology, edited by Dr. Marsha Ford and others, published by WB Saunders in 2001,

3 which shows the signs and symptoms of acute methamphetamine intoxication. The

4 description of the various amphetamine/methamphetamine clinical presentations remain

5 pertinent today. I am a co-author of one chapter in Medical Toxicology.

| Clinical Presentation of Acute Amphetamine Toxicity | |
|---|---|
| Degree of Severity | Signs and Symptoms |
| Mild | Nausea, vomiting, abdominal pain, widely dilated pupils, flushing or pallor, sweating, headache, restlessness, tremor, hyperreflexia, irritability, bruxism (grinding of teeth) trismus (jaw clenching), palpitations |
| Moderate | Hyperactivity, confusion, aggression, muscle rigidity, tachycardia, tachypnea, hypertension, chest discomfort, mild pyrexia, hallucinations, dehydration |
| Severe | Delirium, hyperpyrexia (greater than 40 degrees centigrade), hypertension or hypotension, seizures, coma, renal failure associated with rhabdomyolysis, cardiac dysrhythmias (atrial and ventricular tachydysrhythmias |
| Potentially Fatal | Ventricular fibrillation, myocardial infarction, cerebrovascular accident (stroke), extreme hyperthermia, acute cardiac failure, repeated seizures, cerebral edema with brainstem compression secondary to hypoxia or hyponatremia. |

16    9.    The clinical signs and symptoms which were observed by deputies

17 observing Mr. Sandoval in the Central Jail do not remotely match the signs and

18 symptoms of acute methamphetamine intoxication. Given his appearance in the videos I

19 have observed, and the deputies' verbal accounts of his appearance, I doubt that, had Mr.

20 Sandoval been examined by an experienced emergency physician or specialist in internal

21 medicine on the day of his arrest, they would have been any more likely than the jail staff

22 in identifying that Mr. Sandoval had a serious medical condition requiring immediate

23 medical care, let alone that he was about to die from a methamphetamine overdose. Mr.

24 Sandoval did not appear to show signs of a serious medical condition

25 ///

26 ///

27 ///

28 ///

-5-

EXHIBIT M

1  until he was observed to slump over shortly before his death.  At that point, he was
2  immediately attended to by jail nurses, EMTs and Paramedics.
3      I declare under penalty of perjury that the foregoing is true and correct.
4      Executed in Fresno, California, this 16th day of May, 2017.
5
6  
7               RICHARD J. GELLER
8
9
10
11
12
13
14
15
16
17
18
19
20

EXHIBIT M

# EXHIBIT "N"

1    THOMAS E. MONTGOMERY, County Counsel (State Bar No. 109654)
     County of San Diego
2    By JAMES M. CHAPIN, Senior Deputy (State Bar No. 118530)
     1600 Pacific Highway, Room 355
3    San Diego, California 92101-2469
     Telephone: (619) 531-5244;  Fax: (619) 531-6005
4    E-mail: james.chapin@sdcounty.ca.gov

5    Attorneys for Defendants County of San Diego, Romeo De Guzman, Dana Harris
        and Maria Llamado

6

7

8               **IN THE UNITED STATES DISTRICT COURT**

9             **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

10

| 11 | ESTATE OF RONNIE PAUL SANDOVAL and ANA SANDOVAL, an individual, | ) ) ) | No. 16cv1004-BEN(AGS) |
|----|----|----|----|
| 12 | | ) ) | DECLARATION OF ALICIA B. MINNS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT |
| 13 | Plaintiffs, | ) ) | |
| 14 | v. | ) ) | Date: July 10, 2017 |
| 15 | COUNTY OF SAN DIEGO, a Public Entity; SAN DIEGO COUNTY JAIL, a Public Entity; and DOES 1-100, | ) ) ) | Time: 10:30 a.m. Dept.: Courtroom of the Honorable Roger T. Benitez |
| 16 | | ) ) | Pre-Trial Conference Date: Sept. 18, 2017 |
| 17 | Defendants. | ) | |

18       I, ALICIA B. MINNS, declare as follows:

19        1.     I am a physician licensed to practice medicine in the State of California.  I

20 received my medical doctor degree from Tufts University in Boston, MA in 2000.  I

21 completed an Emergency Medicine residency at University of California, San Diego

22 (UCSD) in 2004.  I subsequently completed a Toxicology Fellowship at UCSD, where I

23 currently serve as faculty.  I am currently the Fellowship Director for the Medical

24 Toxicology Fellowship, and I oversee the Medical Toxicology Consult and Admitting

25 Services at UCSD Medical Centers in Hillcrest and La Jolla.  I am very knowledgeable

26 about the effects of methamphetamine, and I am qualified to testify on its effects on the

27 body.  In my 13 years of experience as an Emergency Physician, I have personally treated

28 numerous patients with methamphetamine intoxication.  I have also worked as a clinic

1  physician in the jail clinic and am familiar with standard medical care that is provided to
2  the inmates.

3         2.      Based upon my education, training, and experience; and my review of
4  medical records, deposition transcripts, and other materials, I believe the San Diego
5  County Central Jail ("SDCJ") nursing staff was at all times within the appropriate
6  standard of care.  In reaching my opinion, I draw on my experience as an Emergency
7  Physician and my familiarity with the nurse triage process.  I also rely on my previous
8  work treating inmates in various correction facilities and my experience examining and
9  treating patients under the influence of or taking a wide variety of drugs and medications.
10 I also draw on my extensive knowledge and review of the medical literature regarding
11 illicit drugs such as methamphetamine.  I have reviewed the following materials:

12         •      Office of the Medical Examiner's Autopsy report.
13         •      San Diego Sheriff's Department Investigative Report.
14         •      San Diego County Sheriff's Department Crime/Incident Report.
15         •      Deposition of Henry Castro, San Diego Sheriff's Deputy.
16         •      Deposition of Dana Harris, RN.
17         •      Deposition of Maria Llamado, RN.
18         •      Deposition of Shirley Bautista, RN.
19         •      Video clips from day of the incident.
20         •      Dr. Richard Geller report.

21        3.      The following are facts as I interpret them from the above records:

22        a)      Ronnie Sandoval arrived at SDCJ at 1424 after being arrested for
23 possession of a controlled substance and possession of drug paraphernalia.

24        b)      He was medically screened upon arrival. He was alert and oriented
25 and fit for booking.  He had no complaints at that time.

26 ///
27 ///
28 ///

-2-

EXHIBIT   N

1            c)     At 1530, Mr. Sandoval was noted to be sweaty. He told staff that he

2 was a "borderline diabetic." RN Costa checked his blood sugar, which was normal. He

3 was asked by Deputy Bryan if he had taken any drugs or had been drinking, and he

4 replied that he had not. He was given a meal and ambulated without assistance.

5            d)     At 1630, Mr. Sandoval was brought to forensics for a booking photo

6 and then to Medical Observation. Deputy Wilkinson asked again if he was under the

7 influence of drugs or alcohol, and he stated he was not. He stated that he had not eaten

8 that day.

9            e)     At approximately 0055, Sergeant Shawcroft observed Mr. Sandoval's

10 eyes roll back and his body slump. RN Harris was alerted that Mr. Sandoval looked like

11 he was having a seizure. He was slumped over to this right side and had fine tremors.

12 Nursing arrived on scene and responded by taking his vital signs and applying an oxygen

13 mask. Deputy Andrade also responded and applied a cervical collar. Mr. Sandoval's

14 vital signs were normal.

15            f)     At approximately 0105, nursing asked the deputies to call for EMT

16 transport to the hospital. Mr. Sandoval was unresponsive but breathing on his own. An

17 IV was inserted and an oral airway was placed.

18            g)     EMT personal arrived at 0120. It was determined that Mr. Sandoval's

19 condition was declining so paramedics were called.

20            h)     Paramedics arrived at the jail at 0130, and were on scene 12-18

21 minutes later. Shortly after arrival, Mr. Sandoval went into cardiac arrest.

22            i)     At 01:53, Mr. Sandoval was in a fatal cardiac rhythm called Pulseless

23 Electrical Activity ("PEA"), shortly followed by asystole. Standard CPR and

24 medications including epinephrine were given.

25            j)     Mr. Sandoval was pronounced dead at 0211.

26 ///

27 ///

28 ///

- 3 -

EXHIBIT N

4.    An autopsy was performed on Mr. Sandoval that confirmed his death was due to methamphetamine intoxication. Toxicology analysis of Mr. Sandoval's peripheral blood showed a methamphetamine concentration of 38mg/L and an amphetamine (metabolite of methamphetamine) concentration of 1mg/L. This concentration of methamphetamine measured in Mr. Sandoval's blood at autopsy is massive and consistent with an overdose. This level indicates Mr. Sandoval ingested a dose of methamphetamine several hundred times more than a typical recreational dose. Additionally, Mr. Sandoval's methamphetamine level is substantially higher than other levels reported in methamphetamine fatality cases.

5.    Mr. Sandoval never told any of the jail staff that he had used or swallowed methamphetamine. He was asked multiple times if he used drugs or alcohol and denied it. Although he was noted to be sweaty, this is a nonspecific sign. He could have been sweaty from multiple other conditions. His vital signs were normal, even shortly before his cardiac arrest. His glucose was normal and he never voiced any specific complaints. Many individuals booked into jail are either under the influence of drugs, in drug or alcohol withdrawal, or have untreated medical conditions. Unless the inmate discloses his/her medical and drug history to the staff, it is unreasonable to expect the nursing staff to "guess." As an Emergency Physician, I have seen numerous inmates who, due to specific medical complaints, or abnormal vital signs, are referred to the Emergency Department after failing screening during the booking process. Based on my review of the records provided, Mr. Sandoval did not have any complaints or objective signs that warranted hospital referral.

6.    Mr. Sandoval went into cardiac arrest shortly after the paramedics arrived on scene. Even if the paramedics were called initially, the same sequence of events and outcome would have occurred. Considering transport times, Mr. Sandoval would have suffered a cardiac arrest during transport, or shortly upon arrival to a hospital. The same care (Advanced Cardiac Life Support) would have been provided by the hospital, and his outcome would be the same.

- 4 -

EXHIBIT   N

7.      Massive ingestions of methamphetamine are often fatal.  Frequently, individuals who ingest methamphetamine are trying to evade the law be "eating their evidence" of narcotic possession before police apprehension.  Emergency Physicians and Medical Toxicologists call this act "body stuffing," and the most dangerous aspect of this action is that victims often hide their overdose from law enforcement and others such as health care providers until they become overwhelmingly ill due to their fear of arrest or further criminal charges.  Individuals who overdose on these large quantities of methamphetamine can either die suddenly with a massive seizure or lethal heart rhythm, or progress into a coma with severely elevated temperatures and muscle damage that can progress onto a slower but eventual death, often regardless of medical intervention. Death in most cases of methamphetamine overdose is also often related to severely elevated body temperatures called extreme hyperthermia.

8.      Based on my knowledge of this case and medical toxicology, it is my opinion that with medical probability, Mr. Sandoval's death was not preventable.  He never reported any specific complaints to nursing staff and denied any drug ingestion. By the time he was deteriorating, even heroic resuscitation efforts by health care providers would not have prevented his death.  This result and scenario are commonly seen in these massive methamphetamine ingestions, and resuscitation efforts are often futile.

I declare under penalty of perjury that the foregoing is true and correct based upon my review of the records.

Executed in ⸂ an D ⸃, California, this _16_ day of ___May__, 2017.

ALICIA B. MINNS

- 5 -

EXHIBIT   N

# EXHIBIT "O"

Romeo de Guzman

Estate of Ronnie Paul Sandoval, et al.
vs. County of San Diego, et al.

1        SUPERIOR COURT OF THE STATE OF CALIFORNIA

2      COUNTY OF SAN DIEGO - CENTRAL HALL OF JUSTICE

3

4  ESTATE OF RONNIE PAUL SANDOVAL,
    and ANA SANDOVAL, an individual,

5

6             Plaintiffs,

7      vs.                No. 37-2014-00033347-
                           CU-PO-CTL

8  COUNTY OF SAN DIEGO, a Public Entity;
    SAN DIEGO COUNTY JAIL, a Public

9  Entity; and DOES 1 through 100,

10            Defendants.
    ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

11

12

13

14          DEPOSITION OF ROMEO DE GUZMAN

15           San Diego, California

16         Tuesday, February 23, 2016

17

18

19

20

21

22  Reported by:
    SUSAN SWAN, RPR, CRR,

23  CCRR, CSR No. 7338

24  Job No. 10022305

25

CERTIFIED ORIGINAL
@
aptuscr.com

EXHIBIT  0

Romeo de Guzman

Estate of Ronnie Paul Sandoval, et al.
vs. County of San Diego, et al.

1    checking the medical -- checking the supplies, the crash

2    cart.

3        Q.   But the 10 also does medical screening?

4        A.   Yes.

5        Q.   Does the 10 check the sobering or safety cells?

6        A.   If you are on break.  That's the function, too.

7    They also have the first floor for break.  We go on

8    break, they can check ours.  I can ask them, "I am going

9    to on break.  You can check it."

10       Q.   The medical screening nurses all work in the

11   same general area, right?

12       A.   Yes.

13       Q.   On video you can see the cell where Sandoval is

14   being housed and all the medical personnel for that

15   floor, the three nurses, have access to that hallway,

16   right?

17       A.   Yes.

18       Q.   And use that hallway regularly, right?  Walk by

19   the holding cells?

20       A.   Yes.

21       Q.   Do you know as you sit here whether the

22   deputies -- you may not know the answer to this -- but

23   do you know if the deputies are assigned to do Title 15

24   checks to the holding cells?  Do you know one way or the

25   other?

EXHIBIT   0

Romeo de Guzman

Estate of Ronnie Paul Sandoval, et al.
vs. County of San Diego, et al.

1    was trying to -- I couldn't understand exactly what you

2    were saying, but it seemed like you said that maybe

3    somebody had died in one of those holding cells.  I

4    wasn't sure if I -- maybe you were saying maybe if

5    somebody died -- or if it was a statement that you were

6    making.  I couldn't tell.

7         A.   What do you mean?

8         Q.   You know those holding cells that Sandoval was

9    placed in?

10        A.   Um-hum.

11        Q.   Has anybody ever passed away that was being

12   held in there?

13        A.   No.  I don't remember anything -- anybody.  No.

14        Q.   If you could look at page 22 of this report

15   that we've provided for you.  I will read this paragraph

16   into the record:  "Nurse de Guzman said he ended his

17   shift and went home.  The following day he returned to

18   work and became aware of Inmate Sandoval had died.  He

19   felt bad when he heard about Sandoval dying.  He thought

20   to himself about why the deputy didn't move the inmate

21   from the cell.  He thought to himself" -- excuse me --

22   "he thought he wasn't able to send Sandoval at the time

23   to UCSD Hospital because he wouldn't have qualified as

24   someone who needed to go to the hospital based on what

25   he had observed.  Sandoval wasn't eligible to go to the

EXHIBIT   0

Romeo de Guzman

Estate of Ronnie Paul Sandoval, et al.
vs. County of San Diego, et al.

REPORTER'S CERTIFICATION

1

2

3      I, Susan Swan, RPR, CRR, CCRR, a Certified

4    Shorthand Reporter in and for the State of California,

5    do hereby certify:

6

7      That the foregoing witness was by me duly sworn;

8    that the deposition was then taken before me at the time

9    and place herein set forth; that the testimony and

10   proceedings were reported stenographically by me and

11   later transcribed into typewriting under my direction;

12   that the foregoing is a true record of the testimony and

13   proceedings taken at that time.

14

15     IN WITNESS WHEREOF, I have subscribed my name this

16   1st day of March, 2016.

17

18

19     *Susan Swan*

20     Susan Swan, RPR, CRR, CCRR

21     CSR No. 7338

22

23

24

25

EXHIBIT  U

EXHIBIT "P"

Dana Harris
March 02, 2017

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


ESTATE OF RONNIE PAUL
SANDOVAL and ANA SANDOVAL, an
individual,

           Plaintiffs,

    vs.                     Case No.: 16cv1004-BEN(AGS)

COUNTY OF SAN DIEGO, a Public
entity; SAN DIEGO COUNTY
JAIL, a Public Entity, and
DOES 1 through 100;

           Defendants.
_____


VIDEOTAPED DEPOSITION OF DANA HARRIS


March 2, 2017

2:11 p.m.


1600 Pacific Highway, Room 355

San Diego, California


REPORTED BY:
Elana Zucconi
CSR No. 9651, RPR, CRR

EXHIBIT  P

Dana Harris
March 02, 2017

```
 1              MR. MORRIS:  I will let you know for the
 2    record, it is 11:00, in that time.
 3    BY MR. MORRIS:
 4        Q.   And when you get to work at 11:00 o'clock, did
 5    the County of San Diego -- it was Central Jail at that
 6    time, right?
 7        A.   Yes.
 8        Q.   Had you been assigned to any other jails other
 9    than Central, prior to this event?
10        A.   Had I been to any other -- no.
11        Q.   How about after this event, did you get sent
12    off to any other jails?
13        A.   No.
14        Q.   Okay.  So when you show up at work, what is the
15    first thing you do, routinely?
16        A.   Routinely --
17              (Mr. Welsh exits the deposition room)
18              THE WITNESS:  -- routinely, I guess I would
19    check my -- my assignment, where I am going to be
20    working.
21    BY MR. MORRIS:
22        Q.   And if I asked you if you have a specific
23    independent recollection of what you did that night
24    prior to your interaction with Mr. Sandoval, I take it
25    you probably wouldn't recall every little thing you did
```

EXHIBIT  P

Dana Harris
March 02, 2017

1    prior to meeting Mr. Sandoval, right?

2         A.   I would not be able to recall details.

3         Q.   That's why I am asking you routinely.  So

4    routinely, you would check your assignment.  And would

5    that happen at the desk at the third floor, with the

6    charge nurse, or would that be someplace else where you

7    would find your assignment?

8         A.   I can't remember where the assignment was, but

9    logically it would have been at that desk.

10        Q.   And once you are given your assignment to the

11   second floor, what do you do?

12        A.   We go down to the second floor and receive

13   reports from the nurse that's already there, going off

14   shift.

15        Q.   So what is called the -- in deputy parlance,

16   pass down, you guys call it a pass down to the nurses?

17        A.   Usually we just call it like a shift report, or

18   something to that extent.

19        Q.   Okay.  So you get a shift report from the --

20   from the nursing staff that is leaving?

21        A.   Yes.

22        Q.   And that night, September 23rd, 2014 -- or

23   excuse me, February 23, 2014, did you receive any

24   indication or any notification or information with

25   respect to Mr. Sandoval in that shift change pass-down

Dana Harris
March 02, 2017

```
 1    procedure?
 2         A.    Not that I recall.
 3         Q.    Do you know -- do you know who the nursing
 4    staff was that was leaving?
 5         A.    No.
 6         Q.    If I said Mr. DeGuzman, do you recall
 7    Mr. DeGuzman being there?
 8         A.    No.
 9         Q.    What have you done in preparation for your
10    deposition today?  Have you read your report?
11         A.    I have read my report.
12         Q.    Did you read both your written report and your
13    statement to Sergeant --
14         A.    My written report and a report that was written
15    by sworn, I am not sure if it was a statement of the
16    sergeant or not.
17         Q.    Okay.  Did you review the videotapes?
18         A.    I have not reviewed any videotapes.
19         Q.    Did you review any of the reports written by
20    anybody else?
21         A.    No.  Just those two documents.
22         Q.    Okay.  All right.  So to the best of your
23    recollection, nobody told you anything about
24    Mr. Sandoval when you got there on February 23rd, 2014,
25    true?
```

EXHIBIT  P

Dana Harris
March 02, 2017

```
 1    floor?

 2         A.   Can you ask -- ask one more time, sorry.

 3         Q.   Let me ask it this way.  When you received

 4    notification that Mr. Sandoval was man down, what were

 5    you doing?

 6         A.   I didn't receive notification that Sandoval was

 7    man down.  I know I was at my desk.  I am not sure

 8    specifically what I was doing.  And there was a sworn

 9    staff who made a comment out loud that alerted me to the

10    issue with Sandoval.

11         Q.   And do you recall who that staff was?

12         A.   It was a ranking, so a sergeant or a corporal.

13    I don't remember his name, though.

14         Q.   If I were to use the name Sergeant Shawcroft,

15    would that help jog your memory?

16         A.   The name Shawcroft jogs my memory from my

17    report that I read.

18         Q.   Okay.  So can you tell me, if you could, where

19    exactly you were when you first heard somebody yell "man

20    down"?

21         A.   I believe I was at my desk, my station.

22         Q.   And in relation to your station, I know that

23    there is the holding cell that is kind of behind the

24    booth area, and then there is a nursing booth that I

25    think Nurse Llamado was at, and then there is another
```

Dana Harris
March 02, 2017

1    nursing booth.  Were you in the booth adjacent to

2    Ms. Llamado?

3         A.   I am not following your perspective.  My memory

4    is that there is three or four nursing stations in a

5    row, like a booth, and there is a desk behind that

6    booth, and then there is two or three holding cells off

7    kitty -- catty-corner to the -- to those nursing desks

8    (indicating).

9         Q.   Okay.  Approximately in -- how far away was the

10   holding cell, Holding Cell 1, right where Mr. Sandoval

11   was in?

12        A.   I am not sure.  It was the -- am not sure.

13        Q.   Okay.  Approximately how far away from you, the

14   desk that you were using that night, was the holding

15   cell where Mr. Sandoval was being held?

16        A.   I am not sure.  But I took less than 20 paces

17   to get there, that I am sure of.

18        Q.   Would it help you to know that Nurse Llamado

19   testified that it was about four feet away from her

20   booth?

21        A.   It does not necessarily help me.  It doesn't.

22        Q.   At any time prior to your notification from

23   Sergeant Shawcroft that there was a man down, had you

24   taken note of Mr. Sandoval's presence in the holding

25   cell?

Dana Harris
March 02, 2017

1      A.   Yes.

2      Q.   When did you first notice him in there?

3      A.   I think that I noticed him at the beginning of

4  the shift.

5      Q.   What particularly do you recall about the first

6  time you noticed Mr. Sandoval?

7      A.   I remember there was a guy sitting on the

8  bench.

9      Q.   Do you recall what he was doing?

10     A.   As far as I can remember, sitting.

11     Q.   Were his eyes open?

12     A.   Awake.

13     Q.   Were his eyes open?

14     A.   I don't recall his eyes.

15     Q.   You don't recall if they were open or closed?

16     A.   No.

17     Q.   Was he sitting upright or leaning?

18     A.   I think he was sitting upright.

19     Q.   Nurse Llamado described him, when she first

20  noticed him, as eyes closed, leaning up against the

21  toilet wall.  Did you see him in that condition?

22     A.   The toilet wall, I remember him as sitting on

23  the bench, in the cell.

24     Q.   Was he leaning up against the back wall?

25     A.   I don't recall him leaning -- leaning up

Dana Harris
March 02, 2017

1    against the back wall, so I -- I remember him sitting

2    upright.

3         Q.   Not supporting his body weight in any way?

4         A.   Leaning on the back wall (indicating), yes.

5         Q.   Okay.  So you recall him sitting on the bench,

6    leaning up against the back wall.  You don't recall

7    whether his eyes were open or closed?

8         A.   I don't.

9         Q.   Approximately how far into your shift did you

10   first take notice of Mr. Sandoval?

11        A.   I remember seeing him, so probably within the

12   first 20 minutes of my shift.

13        Q.   When you noticed him in there, did you notice

14   what he was wearing?

15        A.   I don't recall what he was wearing.  At this

16   time, I do not.

17        Q.   Did you inquire as to why he was there with

18   anybody?

19        A.   No.  I don't recall doing that, no.

20        Q.   Why not?

21        A.   Routinely, if that patient needs nursing care,

22   we would have received a report on him.

23        Q.   Did you check on him at all?  Did you go in

24   there and take vital signs, see if he needed anything,

25   prior to the man down event?

EXHIBIT  ρ

Dana Harris
March 02, 2017

1      A.   I had not entered Mr. Sandoval's cell prior to

2  the man down event.

3      Q.   Okay.  So I am asking you, did you check on

4  him?  I didn't ask you if you entered.  I asked you if

5  you checked on him.  Did you go up to the window,

6  examine, see how he is doing, anything like that?

7      A.   That is entirely possible that I may have gone

8  up to the window --

9      Q.   Motion to strike as nonresponsive.

10         I am not asking you --

11         MR. CHAPIN:  Let her answer the question.

12  BY MR. MORRIS:

13     Q.   -- if it was entirely possible.  I am asking

14  you do you have distinct recollection of doing so?

15         MR. CHAPIN:  You need to let her answer the

16  question.  You can ask another question.

17         Do you have a distinct recollection of going up

18  to the window --

19  BY MR. MORRIS:

20     Q.   Going up to the window --

21     A.   I do not have a distinct recollection of going

22  up to the window.

23         MR. CHAPIN:  Okay.

24  BY MR. MORRIS:

25     Q.   Do you have a distinct recollection of any

Dana Harris
March 02, 2017

```
1    interaction at all with Mr. Sandoval, prior to the man

2    down?

3         A.    Interaction, no.

4         Q.    You qualified the word "interaction."  What, if

5    anything, do you recall as far as your noticing or

6    interacting or checking on Mr. Sandoval, prior to the

7    man down?

8         A.    Okay.  So seeing him in that cell, just as any

9    inmate being in that cell, I would have done -- I would

10   have done a scan to see if he was in any distress or

11   anything going on with that.

12        Q.    I understand that that's your routine custom

13   and practice.  I am asking you do you have a distinct

14   recollection of checking him, scanning him, looking him

15   up and down, anything like that?

16        A.    No.

17        Q.    And you didn't ask anybody on the nursing floor

18   why Mr. Sandoval was in the holding cell, true?

19        A.    I don't recall asking anyone about that, no.

20        Q.    Did anybody tell you why he was there?

21        A.    I don't recall anybody telling me the reason he

22   was in that cell either.

23        Q.    And you were on the second floor the entire

24   evening before the man down, true?

25        A.    I am not sure.
```

EXHIBIT  P

Dana Harris
March 02, 2017

1        A.    Walk over to the sergeant.

2        Q.    And at the time that you walked over to the

3    sergeant, was the sergeant inside the cell?

4        A.    No.

5        Q.    What did you observe when you walked over to

6    where the sergeant was?

7        A.    Based on my report, the patient was leaning --

8    slowly leaning over -- slumping over to the side.

9        Q.    Was he on the floor?

10       A.    No, on the bench.

11       Q.    And you prefaced that statement by saying from

12   looking at your report.  What I am really interested

13   now -- and we will go over in your report in a minute.

14   What I am really interested now is your independent

15   recollection.  Okay?  Looking back on your own mind's

16   eye, not what you read, but what you recall.  Okay?  And

17   if you don't recall, then you don't recall.

18            So at the time you heard him yell, "There is a

19   man having a seizure in here," and you walked over, he

20   was still upright on the bench?

21       A.    The time that Shawcroft alerted me, the patient

22   was not directly upright.  He was starting to slump over

23   (indicating).

24       Q.    Starting to slump over.  Then what happened?

25       A.    We went in the cell.  Myself and I believe the

Dana Harris
March 02, 2017

1    sergeant went in with me initially.  We went in the

2    cell.

3        Q.   At some point in time, did you see him slump

4    over and hit his head?

5        A.   Based on my recollection, I don't remember him

6    hitting his head.  But based on my report, he bumped his

7    head.

8        Q.   Thinking back in your mind's eye, and you see

9    him slump over, did he slump from the bench to the

10   floor?

11       A.   No.  No.

12       Q.   He slumped across the bench?

13       A.   In my mind, I have him closer to the wall

14   (indicating).

15       Q.   Okay.

16       A.   So he is slumped over towards the wall

17   (indicating).

18       Q.   Okay.  So you are making a motion to your

19   left-hand side?

20       A.   Which would have been -- yes, his left.

21       Q.   Okay.  So his left, he is slumped to the left

22   and leaned up against the wall?

23       A.   In my mind, yes.

24       Q.   And your report indicates that when he did so,

25   he hit his head?

Dana Harris
March 02, 2017

1      A.   My report, yes, says he bumped his head.  Or he

2   hit his head, that's what it says.

3      Q.   But you don't have a specific recollection in

4   your mind's eye of that event?

5      A.   Right.

6      Q.   Okay.  Fair enough.

7           So you hear, "This man is having a seizure,"

8   you walk in there, were his eyes open or closed?

9      A.   I can't recall if his eyes were open or closed.

10     Q.   Did he have any drool?

11     A.   I don't recall drool when I first got into the

12   cell.

13     Q.   You see him slump over and hit his head, then

14   what happens?

15     A.   I am confused as to whether you want me to pull

16   it from my recollection or you want me to pull it from

17   my report.

18     Q.   Well, let's start with in your mind's eye.  If

19   you say, "I have no recollection of this event

20   whatsoever without reading my report," I would think

21   that is odd, given that a man died.  But if that's what

22   your testimony is, so be it.  But I am really just

23   interested in now your independent recollection.

24     A.   Okay.  I don't remember if his eyes were open

25   or closed.  What we did next, I think we got him onto

EXHIBIT   P

Dana Harris
March 02, 2017

```
 1    the ground, in a recumbent position.
 2         Q.   You say "we," who are you talking about then?
 3         A.   Deputies.  I am not sure who.
 4         Q.   Well, there were two deputies, right?
 5         A.   I really -- when something happens in the jail,
 6    there is usually a cul- -- a group of deputies.  So I am
 7    not sure if I just had two deputies at that time or if I
 8    had more.
 9         Q.   Okay.  So you and a group of deputies got him
10    on the ground?
11         A.   Again, I am not sure if there was a group of
12    deputies.  But me and a deputy or two, I am not sure.
13         Q.   Okay.
14         A.   Onto the ground.
15         Q.   Okay.  And you and a deputy or two got him onto
16    the ground?
17         A.   That's what I remember happening, yeah.
18         Q.   Okay.  So at that point in time, the person who
19    yelled -- we know it was the sergeant who yelled, "This
20    guy is having a seizure," did you notice, observate --
21    make observations consistent with seizure when you were
22    interacting with Mr. Sandoval there?
23         A.   No.  No.
24         Q.   And that's your story?
25         A.   Yes.
```

EXHIBIT P

Dana Harris
March 02, 2017

1      Q.    You didn't see any body tremors, any tensing?

2      A.    I saw fine -- if I am remembering this

3   correctly, I remember fine tremors.  Eventually.  I

4   can't remember what he presented to -- what he presented

5   as initially.

6      Q.    Okay.  Looking in your mind's eye, when you

7   first walked in there and you put him on the ground,

8   what did you observe?

9      A.    Um, I can remember that I was trying to get a

10  pupillary response, and he would try and close his

11  eyelids, which is a sign that he is still conscious.  I

12  can remember fine tremors.  I can remember him squeezing

13  my hand.

14     Q.    How about drool?

15     A.    I know that in my report there was drool.  I

16  can't remember specifically drool.

17     Q.    Was he ever communicative with you?  Did he

18  ever talk with you?

19     A.    Talk, no.

20     Q.    And when you tried to get a pupillary response,

21  you had to open his eyes, right?

22     A.    Yes.

23     Q.    So his eyes were closed?

24     A.    His eyes were closed once we got him on the

25  ground.  Your question was were his eyes closed when we

EXHIBIT   P

Dana Harris
March 02, 2017

1    first got there, I don't remember.

2        Q.   No, I am on the ground.  I am on the ground.

3        A.   On the ground, so they must have been closed.

4        Q.   Eyes closed, the report indicates drool, fine

5    muscle tremors, noncommunicative, and a deputy told you

6    he is having a seizure.  Did you conclude, at that point

7    in time, that he was having a seizure?

8        A.   He did not -- to me, he did not present as a

9    tonic clonic seizure.

10       Q.   Okay.  I am not interested in tonic clonic.

11   Okay?  I am just interested in seizure.  Did you think

12   he was having a seizure?

13       A.   I did not.

14       Q.   What would you have needed to see in order for

15   you to conclude that he was having a seizure?

16       A.   Those same symptoms that I stated earlier.

17       Q.   Tensing of the muscles?

18       A.   With seizure.  So it is not a subtle tensing.

19   It is generalized, almost like a fish out of water

20   tensing and relaxing.

21       Q.   Well, there are varying gradations of seizure,

22   no, ma'am?

23       A.   Varying gradations of seizures.  There are

24   different types of seizures.

25       Q.   Okay.  Not all seizures are full-body seizures,

EXHIBIT   P

Dana Harris
March 02, 2017

1    right?

2         A.    Again, there are different types of seizures.

3         Q.    The question I asked you, ma'am, not all

4    seizures are full-body seizures, right?

5         A.    Not all tonic clonic seizures, it is -- there

6    are partial seizures, in which your body would not do

7    that.

8         Q.    So it is inconsistent with you for -- to have

9    one part of your body tensing, not -- let me ask you

10   this.  For it to be a seizure, in your book, it has to

11   be a full-body seizure, for it to qualify as a seizure?

12        A.    It does not need to be a full-body seizure.

13   There needs to be dilated pupils.  Usually the patient

14   stops breathing during that tense period of the seizure.

15   There may be loss of -- loss of bowel or bladder

16   control.  The patient may -- a lot of the times, the

17   patient is extremely hypertensive and tachycardic,

18   things like that.  So it needs to be the whole picture,

19   not just these fine tremors.

20        Q.    So did you discount the deputy's observations

21   that he was having a seizure?

22        A.    I do not -- no.

23        Q.    You took those into account and still concluded

24   that he wasn't seizing?

25        A.    Yes.

EXHIBIT P

Dana Harris
March 02, 2017

```
 1    evidence into account, but your conclusion was that he
 2    wasn't seizing, right?
 3        A.   Yes.
 4        Q.   When did you first come to the conclusion that
 5    Mr. Sandoval was actually seizing, if ever?
 6        A.   I never suspected a seizure on this patient.
 7        Q.   During the entire night?
 8        A.   During the entire night.
 9        Q.   Is that why you didn't think paramedics were
10    necessary?
11             MR. CHAPIN:  Objection; it is vague as to time.
12             THE WITNESS:  No, that's not a true -- that
13    wouldn't be a true statement.
14    BY MR. MORRIS:
15        Q.   Why didn't you think paramedics were necessary?
16        A.   Because the patient was still responsive.  His
17    vital signs were stable.  He was breathing on his own.
18    There was nothing that I saw that warranted a paramedic
19    call.
20        Q.   He was unresponsive, though?
21        A.   He made -- no, he was not unresponsive.
22        Q.   Well, he was not communicative?
23        A.   He was communicative in the sense that calling
24    his name, he made the effort to look at me.  And he
25    followed commands.
```

EXHIBIT P

Dana Harris
March 02, 2017

1    did not do the assessment.

2          MR. MORRIS:  She testified that she saw him

3    seizing.

4          MR. CHAPIN:  I am objecting, because that

5    misstates her testimony.

6          MR. MORRIS:  That is not true.

7    BY MR. MORRIS:

8      Q.   And Nurse Bautista testified that when she got

9    there, she thought he was seizing.  And you disagree

10   with Nurse Bautista on that issue too, right?

11         MR. CHAPIN:  Objection; same -- objection;

12   misstates her testimony, incomplete.

13         THE WITNESS:  Yes.

14   BY MR. MORRIS:

15     Q.   And because you didn't think he was seizing,

16   you didn't think he needed paramedics, right --

17     A.   Not a true statement.

18     Q.   Is that --

19     A.   Not a true statement.

20     Q.   You didn't think he needed paramedics?

21         MR. CHAPIN:  Objection; vague as to time.

22         THE WITNESS:  I didn't think he needed

23   paramedics because he was breathing on his own, his

24   vital signs were stable, he was responding to commands.

25

EXHIBIT   P

Dana Harris
March 02, 2017

```
1        Q.   Okay.  That is like mistakes were made.  I

2   don't want to put an actor to the passive voice.

3             Okay.  Did you call or ask a deputy to call for

4   EMTs?

5        A.   Yes.  But that happened earlier.

6        Q.   We are just -- I am still there on the floor.

7   When did that happen?

8        A.   The EMT call?

9        Q.   The call, the -- the decision you made to call

10  for EMTs, when did that happen?

11       A.   Almost -- I can't recall.  I would have to look

12  at my report.  But it was almost immediately.

13       Q.   Okay.  And at the time you called for EMTs, why

14  did you make the decision to call for EMTs and not

15  paramedics?

16       A.   My patient was stable.  He was responsive.  His

17  vital signs were stable.  There was nothing going on

18  with my patient that would have made me warrant calling

19  a paramedic.

20       Q.   Other than he was unresponsive?

21       A.   He was responsive.

22       Q.   He hit his head?

23       A.   He bumped his head.

24       Q.   And he was drooling?

25       A.   Vital signs are stable.  He is responding to
```

Dana Harris
March 02, 2017

1          "Answer, I believe it was Nurse Harris."

2          And then turning to Page 66.

3          Question at Line 20, "We have those initial

4   handful or two or three, whatever, when you first assist

5   the situation?

6          "Yes.

7          "And then we have a gap in time where the EMTs

8   show up?

9          "Yes."

10         So he characterized him asking you two or three

11  times there, in the initial assessment, to call

12  paramedics and not EMTs.  And he testified it was

13  because he was an EMT and he knew that EMTs couldn't do

14  anything.

15         Do you recall at all Deputy Andrade instructing

16  you to call paramedics and not EMTs?

17     A.   No.

18     Q.   So we are on the floor -- approximately how

19  long on the floor was it until Nurse Llamado arrived?

20     A.   I believe Nurse Llamado was within the initial,

21  so maybe a couple of minutes.  Initial assessment on the

22  floor.

23     Q.   Okay.  So walk me through then, what's the next

24  thing you recall happening?

25     A.   It was a lot of commotion.  Most of it is a

EXHIBIT   P

Dana Harris
March 02, 2017

1    blur.  I just know that at some point during the

2    assessments and the reassessments, his SPO2 level

3    dropped to an unacceptable level.  At that time, I

4    notified one of my deputies nearest to me to upgrade the

5    patient to a paramedic status.

6         Q.   Approximately how long into your contact with

7    Mr. Sandoval was it that you decided that it needed to

8    be upgraded to paramedics?

9         A.   I am not sure.  I would have to look at my

10   notes, which has approximations of time.

11        Q.   Do you have your notes with you?

12        A.   I do not.  I was told not to bring anything in

13   here.

14        Q.   Okay.  When I say -- just to orient you as to

15   time, you arrive at the cell at 12:55.  And the EMTs

16   arrive at approximately 1:30.  Where along that

17   continuum, if you were going to guess -- or give me your

18   best estimate, excuse me, as to how far into your

19   contact with Mr. Sandoval and the cell floor did you

20   make the request to upgrade to 9-1-1?

21        A.   Best estimate, I believe I was running vitals

22   q 5, so maybe within the first 10 minutes.  I am not --

23   I am really not sure.

24        Q.   And to whom did you make that request to

25   upgrade?

EXHIBIT   P

Dana Harris
March 02, 2017

1        A.    Again, it would have been any nearest deputy in

2    the cell with me.

3              MR. MORRIS:  Do you have the EMT --

4              MS. PENA:  You mean the medic report?

5              MR. MORRIS:  Yeah.

6              I would like to show you now what we would like

7    to mark as Exhibit 1 to your deposition.

8              (Exhibit 1 marked)

9              THE WITNESS:  Okay.

10   BY MR. MORRIS:

11       Q.    This is the EMT report.

12       A.    Okay.

13       Q.    Now, if you look there right around the top, it

14   says, "Response times and mileage."  Do you see that

15   heading?

16       A.    Yes.

17       Q.    The first response arrival PSAP, which we know

18   is the time when the call comes in.

19       A.    Okay.

20       Q.    The call for EMT -- excuse me, for paramedics

21   didn't come in until 1:30, which would have been,

22   according to your testimony, 25 minutes after you had

23   decided to upgrade it to paramedics.  Do you know why

24   that call was delayed 25 minutes?

25       A.    No.  No.

EXHIBIT ρ

Dana Harris
March 02, 2017

1      Q.   And could you describe the drool for me.

2      A.   No.   I don't even remember the patient

3   drooling.

4      Q.   How about any sort of snoring or anything that

5   led you to believe that there may be some sort of

6   blockage?   Do you remember anything like that?

7      A.   I know that I put in an NPA, a nasopharyngeal

8   airway.   And if I did that, then I must have assumed

9   that it was either an impending loss of the airway or a

10   possible obstruction of the airway, if I put in an NPA.

11      Q.   And what is an NPA used for?

12      A.   It is used to kind of open the airway, as an

13   alternative airway, if you think that your oral airway

14   is going to be compromised.

15      Q.   And so it is safe to assume, with the fact that

16   you put the NPA in, that you sought -- you formed the

17   opinion that his oral airway potentially could be

18   compromised?

19      A.   In this particular situation, it is hard to

20   remember.   All I can say is what I would normally do or

21   what I was normally thinking.   And I would normally be

22   thinking if I am going to put in an NPA, that maybe

23   something can happen to his airway, is one reason why I

24   will put in an NPA.

25      Q.   And what would indicate to you that there was a

Dana Harris
March 02, 2017

 1   possible impingement of the airway?  What things would

 2   you say, okay, I should put an NPA in there?

 3        A.   In general, drooling, grunting -- not grunting,

 4   but drooling and snoring.

 5        Q.   Okay.

 6             THE REPORTER:  Your hair is rubbing the mike,

 7   if you could move it.

 8             THE WITNESS:  Sorry.

 9   BY MR. MORRIS:

10        Q.   So let me -- we got the deputy telling you that

11   he was -- somebody was seizing, and you arrive and you

12   see him slump over and hit -- bump his head.  He is not

13   communicative.  He's got body tremors and he is

14   drooling.  And he's got a potential impingement of his

15   oral airway.  Are those all indications to you of a

16   serious medical condition?

17        A.   All of these -- if those presented together, I

18   guess what is -- what I am trying to say, some of these

19   things are initial and some of these things showed up

20   later, I don't know -- it is hard to say.  If I had a

21   patient that showed all of those things initially --

22             MR. CHAPIN:  And I think that is sort of his

23   question.  If you had all of those things, is that a

24   serious medical condition?  Is that fair?

25             MR. MORRIS:  (No audible response.)

EXHIBIT  P

Dana Harris
March 02, 2017

1      A.    Again, it would have been any nearest deputy in

2   the cell with me.

3            MR. MORRIS:  Do you have the EMT --

4            MS. PENA:  You mean the medic report?

5            MR. MORRIS:  Yeah.

6            I would like to show you now what we would like

7   to mark as Exhibit 1 to your deposition.

8            (Exhibit 1 marked)

9            THE WITNESS:  Okay.

10  BY MR. MORRIS:

11     Q.    This is the EMT report.

12     A.    Okay.

13     Q.    Now, if you look there right around the top, it

14  says, "Response times and mileage."  Do you see that

15  heading?

16     A.    Yes.

17     Q.    The first response arrival PSAP, which we know

18  is the time when the call comes in.

19     A.    Okay.

20     Q.    The call for EMT -- excuse me, for paramedics

21  didn't come in until 1:30, which would have been,

22  according to your testimony, 25 minutes after you had

23  decided to upgrade it to paramedics.  Do you know why

24  that call was delayed 25 minutes?

25     A.    No.  No.

Dana Harris
March 02, 2017

1   paragraph.  "These holding cells are used for medical

2   patients, as well as nonmedical patients.  If the inmate

3   in these cells are being held there for medical reasons,

4   they would brief the oncoming shift with what is called

5   a medical report.  The next shift is told why the inmate

6   is being held in the cell.  Sift" -- "shift change

7   occurred at 2300 hours.  Nurse Harris could not recall

8   the nurse she relieved.  Nurse Harris said she was not

9   briefed by the nurse she relieved, as to why Sandoval

10  was in the holding cell or any issues he may have been

11  having."  That is consistent with your testimony, true?

12       A.   Yes.

13       Q.   You don't recall being briefed at all?

14       A.   I do not.

15       Q.   Had you been briefed, I imagine you would have

16  assessed him much earlier, true?

17       A.   True.

18       Q.   Okay.  Last exhibit, No. 7.  This is your

19  charting, true?

20       A.   True.

21       Q.   Is what you wrote that morning, to put into his

22  medical charts, true?

23       A.   True.

24       Q.   So we have the subjective, the S, right on the

25  SOAP?

EXHIBIT 7
DEPO OF: *HARRIS*
DATE: *3-2-17*
ELANA K. ZUCCONI
*FRONT & BACK*

Inmate's Name: Sandoval, Ronnie
Booking Number: 14713020
DOB: 09/30/67

Mandown second floor holding cell, all provided times are approximate due to the nature of the situation

S: ~0055 Sergeant #5892 notifies this writer that an i/p looks like he is having a seizure in second floor holding cell #1, this writer immediately walked over for assessment and witnessed i/p on bench, i/p slumped over to his right + hit head on cell wall + with generalized fine tremors. Review of JIMS shows no SZ hx, however arrested for controlled substance.

OAP:

~0058am: In holding cell for assessment. Breathing @ RR 20/min, +moderate oral secretions draining on the ground not blood tinged, airway clear, sp02 94%, pupils 3mm sluggish response to light bilaterally, no visible head wound, C-collar placed, BG 151mg/dL, RN#6492 taking vital signs with BP 137/58 HR 94. Lungs CTAB, color wnl. Applied NRB @ 15Lpm with resultant increase in sp02 to 98%, R recovery position, i/p muscles are stiffened (generalized), some very mild generalized tremors not tonic clonic in presentation, no loss of bowel/bladder control. Skin is warm and moist. Advised sworn to call for send out EMT.

**Pupils remain 3mm and sluggish to light bilaterally, responds to commands (squeezes this writer's hand and makes eye contact), radial pulse +2 and equal, i/p attempts to close eyelids when this writer opens them for pupillary assessment, remains in right recovery position, airway remains patent, RR 20, sp02 98% on NRB @15Lpm. Slightly opens eyes independently. RN#6492 receives phone call from charge nurse#9226 and states the charge nurse wants to know why I am choosing to send the i/p out by EMT, I respond to RN#6492 because his vital signs/sp02 are stable, his glucose is stable, he is breathing on his own, and he is responding to commands.

**Sp02 reading drops to 84% with visible rise and fall of i/p chest and color remains wnl, instructed deputy #0137 to BVM and upgrade i/p to 911 status, while separate sp02 monitor was re-adjusted, after monitor adjustment sp02 98% placed back on NRB, this writer inserted nasal trumpet to R nare. Pending 911

~0110am BP 163/105 still with muscle stiffness. HR 55, still responding to commands, pupils still 3mm sluggish in response to light bilaterally, lungs remain CTAB, sp02 remains >94% on NRB, Pending 911

~0115am i/p no longer with mild tremors or muscle stiffness, multiple attempts to obtain new set of vital signs finally successful with BP 135/58 HR 90 RR18 sp02 99% still with NRB @ 15Lpm. Pending 911.

~0125am This writer called and requested the presence of Charge RN #9226, who arrived on scene. EMTs observed on scene, shortly after charge RN #9226 arrived, assessing patient status/ treatment.

~0148am Paramedics observed on scene assessing patient status/treatment

COSD RRFP 000298
EXHIBIT P

~0153am Gave verbal report to paramedics

~0211am Per RN #6492 Paramedics declared l/p death.

*no time entry provided for these events as writer unsure of time, only sequence of events.

Submitted by:  Harris, Dana RN 5055

COSD RRFP 000299

EXHIBIT   P

Dana Harris
March 02, 2017

REPORTER'S CERTIFICATE

1

2

3

I, ELANA ZUCCONI, CSR No. 9651, Certified

Shorthand Reporter, certify:

That the foregoing proceedings were taken

before me at the time and place therein set forth, at

which time the witness was put under oath by me;

That the testimony of the witness, the

questions propounded, and all objections and statements

made at the time of the examination were recorded

stenographically by me and were thereafter transcribed;

That a review of the transcript by the

deponent was requested;

That the foregoing is a true and correct

transcript of my shorthand notes so taken.

I further certify that I am not a relative or

employee of any attorney of the parties, nor financially

interested in the action.

I declare under penalty of perjury under the

laws of California that the foregoing is true and

correct.

Dated this 7th day of March, 2017.

_____

ELANA ZUCCONI, CSR No. 9651

EXHIBIT  P