1    Christopher S. Morris, Esq., SBN 163188
     cmorris@morrislawfirmapc.com
2    Danielle R. Pena, Esq., SBN 286002
     dpena@morrislawfirmapc.com
3    MORRIS LAW FIRM, APC
     501 West Broadway, Suite 1480
4    San Diego, CA 92101
     Telephone:  (619) 826-8060
5    Facsimile:   (619) 826-8065

6    Vincent Renda, Esq., SBN 213985
     vr@rendalawofices.com
7    RENDA LAW OFFICES, P.C.
     600 West Broadway, Suite 400
8    San Diego, CA 92101
     Telephone:  (619)819-0011
9    Facsimile:   (619) 819-0012

10   Attorneys for Plaintiffs

11

12                 UNITED STATES DISTRICT COURT

13               SOUTHERN DISTRICT OF CALIFORNIA

14   ESTATE OF RONNIE PAUL              Case No. 16cv1004-BEN(AGS)
     SANDOVAL and ANA SANDOVAL,
15   an individual,                     **OPPOSITION TO MOTION FOR
                                        SUMMARY JUDGMENT**
16              Plaintiff,
                                        Date:     July 10, 2017
17        v.                            Time:     10:30 a.m.
                                        Dept:     5A
18   COUNTY OF SAN DIEGO, a Public      Judge:    Hon. Roger T. Benitez
     entity; SAN DIEGO COUNTY JAIL,
19   a Public Entity, and DOES 1 through
     100;
20
                Defendants.
21

22

23

24

25

26

27

28

---

1

**TABLE OF CONTENTS**

2

3

I. INTRODUCTION ................................................................................. 6

II. STATEMENT OF FACTS ................................................................. 6

III. STANDARD OF LAW ..................................................................... 12

IV. THE OLD SUBJECTIVE STANDARD VS. THE NEW OBJECTIVE
STANDARD .......................................................................................... 13

V. DEFENDANT NURSES ACTED WITH DELIBERATE INDIFFERENCE .... 15

    *A.*    *Defendant DeGuzman* ................................................. 16

    *B.*    *Defendant Llamado* .................................................... 18

    *C.*    *Defendant Harris* ....................................................... 20

    *D.*    *Analysis Under the Objective Standard* .................... 22

VI. QUALIFIED IMMUNITY WILL NOT SAVE DEFENDANT NURSES ....... 22

    *A.*    *Defendant DeGuzman* ................................................. 23

    *B.*    *Defendant Llamado* .................................................... 23

    *C.*    *Defendant Harris* ....................................................... 24

VII. THE CUSTOM AND TRAINING ASSOCIATED WITH MOC1 WAS A
SUBSTANTIAL FACTOR IN RONNIE'S DEATH .............................. 25

VIII. PLAINTIFFS' STATE LAW CLAIMS ARE VIABLE .................. 28

IX. CONCLUSION .................................................................................. 30

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO MSJ          CASE NO. 16CV1004-BEN(AGS)

# TABLE OF AUTHORITIES

## CASES

*All Angels Preschool/Daycare v. County of Merced*
   197 Cal.App.4th 394 (2011)................................................28

*Anderson v. Creighton*
   483 U.S. 635 (1987) .............................................22, 23

*Baker v. County of Sonoma*
   2009 U.S. Dist. LEXIS 14831 (N.D. Cal. 2009).................................28

*Bd. of Comm'rs of Bryan Cnty. v. Brown*
   520 U.S. 397 (1997) ...............................................25

*Borges v. City of Eureka*
   2017 U.S. Dist. LEXIS 10721 (N.D. Cal. Jan. 25, 2017) ...............14

*Burgess v. Superior Court*
   2 Cal.4th 1064 (1992)..............................................29

*Castro v. Cty. of L.A.*
   833 F.3d 1060 (9th Cir. 2016)....................................13, 14, 15, 22

*Conn v. City of Reno*
   572 F.3d 1047 (9th Cir. 2009).........................................17

*Estate of Escobedo v. City of Redwood City*
   2005 U.S. Dist. LEXIS 23821 (N.D. Cal. Jan. 28, 2005) ...............13

*Estelle v. Gamble*
   429 U.S. 97 (1976) ..................................................15

*Farmer v. Brennan*
   511 U.S. 825 (1994) ..................................................17

*First Nat'l Bank v. Cities Serv. Co.*
   391 U.S. 253 (1968) ..................................................12

*Frary v. County of Marin*
   81 F.Supp.3d 811 (N.D. Cal. 2015)....................................23

*Gibson v. County of Washoe*
    290 F.3d 1175 (9th Cir. 2002) ........................................................................23

*Guerra v. Sweeny*
    2016 U.S. Dist. LEXIS 132637 (E.D. Cal. Sept. 27, 2016) ............................14

*Hallett v. Morgan*
    296 F.3d 732 (9th Cir. 2002) ..........................................................................23

*Hart v. County of Orange*
    254 Cal.App.2d 302 (1967) .............................................................................28

*Hollingsworth Solderless Terminal Co. v. Turley*
    622 F.2d 1324 (9th Cir. 1980) ........................................................................13

*Hunter v. Bryant*
    502 U.S. 224 (1991) ........................................................................................22

*Jett v. Penner*
    439 F.3d 1091 (9th Cir. 2006) ........................................................................15

*Kingsley v. Hendrickson*
    U.S. 135 S. Ct. 2466 (2015) ...........................................................13, 14, 15, 22

*M.H. v. County of Alameda*
    62 F.Supp.3d 1049 (N.D. Cal. Apr. 7, 2014) ..................................................23

*Malley v. Briggs*
    475 U.S. 335 (1986) ........................................................................................22

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*
    475 U.S. 574 (1986) ........................................................................................12

*McGuckin v. Smith*
    974 F.2d 1050 (9th Cir. 1991) .................................................................15, 16

*Melridge, Inc. v. Heublein*
    1991 U.S. Dist. LEXIS 4122 (D. Or. Apr. 2, 1991) ..........................................6

*Monell v. New York City Dept. of Social Services*
    436 U.S. 658 (1978) ...............................................................................6, 9, 25

PLAINTIFFS' OPPOSITION TO MSJ            CASE NO. 16CV1004-BEN(AGS)

*Nissan Fire & Marine Ins. Co., v. Fritz Cos.*

    210 F.3d 1099 (9th Cir. 2000) ........................................................................12

*Saucier v. Katz*

    533 U.S. 194 (2001) .....................................................................................23

*T. W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*

    809 F.2d 626 (9th Cir. 1987) ........................................................................12

*Tandel v. County of Sacramento*

    2012 U.S. Dist. LEXIS 21628 ........................................................................27

*Weishaar v. Cnty. of Napa*

    2016 U.S. Dist. LEXIS 173833 (N.D. Cal. Dec. 15, 2016) ............................14

*Wilhelm v. Rotman*

    680 F.3d 1113 (9th Cir. 2012) ......................................................................17

*WMX Techs., Inc. v. Miller*

    104 F.3d 1133 (9th Cir. 1997) ......................................................................15

**STATUTES**

Civil Code section 1714 ...................................................................................28

Government Code section 815 .........................................................................28

Government Code section 844.6 ......................................................................28

Government Code section 845.6 ............................................................28, 29, 30

**RULES**

Federal Rules of Civil Procedure 56 ................................................................12

Federal Rules of Civil Procedure 56(c) ...........................................................12

# I.

# INTRODUCTION

Ronnie Sandoval ("Ronnie") died due to a tragedy of errors.  His death is directly attributable to a shocking series of intentional avoidance.  Ronnie's death is best explained by breaking down his last night into two events.  The first event involves the cell he was left to die in.  The cell, medical observation cell #1, is the subject of Plaintiffs' *Monell* claim.  The second event involves the callous response of the county's medical staff once his dire medical needs became obvious.  DeGuzman and Defendant Harris flatly deny material conversations that other staff members recall in vivid detail regarding Ronnie's medical condition. That, in and of itself, creates a factual dispute that requires this motion be denied. In addition, Defendant Llamado admittedly understood Ronnie required immediate medical attention, but sat idle.  As such, the disputed facts set forth below inexorably lead to the conclusion that Defendants' motion should be denied.

# II.

# STATEMENT OF FACTS

On February 22, 2014, Ronnie's residence was searched pursuant to a probation compliance check.  Ronnie was arrested for possession of methamphetamine and drug paraphernalia.  He was then transported to San Diego Central Jail (herein "Central") where he was booked at approximately 2:24 p.m. (Exh. 1, Investigative Report, p. 2.)[1] While Ronnie was in line for fingerprinting he was contacted by Deputy Chavez who observed Ronnie was sweating profusely and appeared disoriented and lethargic.  (Exh. 2, Chavez Depo., 25:7-15; 28:2-10.) Ronnie told Chavez he was not feeling well and may be diabetic.  (Exh. 2, Chavez Depo., 28:2-10.)  Deputy Chavez informed senior Deputy Bryan who told Deputy Chavez to notify the intake nurse to check Ronnie's blood sugar.  (Exh. 2, Chavez

---

[1] Fed. R. Evid. 803(8)(C) provides an exception to the hearsay rule for police reports used in civil cases. *Melridge, Inc. v. Heublein*, 1991 U.S. Dist. LEXIS 4122 (D. Or. Apr. 2, 1991).

Depo., 28:24-29:2.) Ronnie's blood sugar was normal.  (Exh. 2, Chavez Depo., 30:12-15.)  Ronnie was then placed in an intake-holding cell.

Approximately an hour later, Deputy Chavez noticed Ronnie was still "sweating a lot and appeared to be very tired and disoriented." (Exh. 3, Chavez Report.)  When he approached Ronnie to ask him how he was feeling, Ronnie said, "I'm very cold and not feeling well." (Exh. 2, Chavez Depo., 39:15-20.)  Deputy Chavez thought this was odd given Ronnie was sweating profusely.  (Exh. 2, Chavez Depo., 40:6-10.)  Deputy Chavez reported his observations to Corporal Martinez.  Corporal Martinez told Deputy Chavez to escort Ronnie to the "second floor to have him more thoroughly evaluated," expecting medical to do a "full assessment." (Exh. 2, Chavez Depo., 32:19-25; 33:5-10.)  Up and until this point, the facts are generally agreed upon; but, once Ronnie was taken to the second floor medical screening area, the facts are hotly disputed.

When Deputy Chavez escorted Ronnie to the second floor medical screening area they encountered Nurse DeGuzman (herein "DeGuzman").  Deputy Chavez told DeGuzman about his observations regarding Ronnie's medical condition, such as his profuse sweating and disorientation.  (Exh. 3, Chavez Report; Exh. 2, Chavez Depo., 33:11-23.)  Deputy Chavez explicitly told DeGuzman "that he had been cleared by the medical staff downstairs, but there is still something going on so you need to look at him more thoroughly."  Deputy Chavez also mentioned Ronnie had his blood sugar checked the hour before. (Exh. 2, Chavez Depo., 45:8-14.) DeGuzman asked Deputy Chavez to take Ronnie "to *medical observation cell #1*" (herein "MOC1") and I'll take a look at him." (Exh. 2, Chavez Depo., 33:24-34:2; 42:21-25; Exh. 4, DeGuzman Depo., 76:8-19.)

At approximately 4:30 p.m., Deputy Chavez placed Ronnie in MOC1 and reported back to his post on the first floor.  (Exh. 3, Chavez Report.)  Shockingly, DeGuzman <u>denies</u> this conversation ever happened.  In fact, he denies ever being told Ronnie needed medical evaluation other than a blood sugar test. (Exh. 4,

1   DeGuzman Depo., 72:9-73:21.) DeGuzman, with the aid of Deputy Rodriguez and

2   Deputy Wilkinson, performed a "10 second" blood sugar test which came back

3   normal. (Exh. 4, DeGuzman Depo., 94:22-95:5.)  DeGuzman admits that he did not

4   do a medical assessment of Ronnie.  (Exh. 4, DeGuzman Depo., 96:4-5.)

5   DeGuzman claims after he performed a blood sugar check, Ronnie was "cleared for

6   the booking process."  (Exh. 4, Deguzman Depo., 98:11-23.)  At this point,

7   DeGuzman recalls a conversation with Deputy Rodriguez and Deputy Wilkinson in

8   which he asked why they wouldn't take Ronnie out of MOC1.  The deputies stated

9   because "he's under the influence."  At that time, Deputy Rodriguez told

10  DeGuzman that Sandoval was "shaking mildly … [and] appeared to be having

11  withdrawals from drugs." (Exh. 5, Rodriguez Report.)

12          According to Deputy Rodriguez's report "A short time later, Nurse

13  DeGuzman asked if [Ronnie] could go into a sobering tank. I relayed DeGuzman's

14  request to Deputy Wilkinson, who conferred with Corporal Brandon Powell.  They

15  determined it would be better if [Ronnie] remained in the observation cell."  (Exh.

16  5, Rodriguez Report.)  Rather than placing him in a sober cell, deputies thought

17  Ronnie would get constant monitoring in MOC1.

18          Ronnie remained in MOC1 for eight and a half hours without medical

19  evaluation.  For eight and a half hours, no one stepped foot in Ronnie's cell.  When

20  DeGuzman was asked why he failed to check or monitor Ronnie within those eight

21  and half hours, his response was "because I don't have to."  (Exh. 4, DeGuzman

22  Depo., 100:5-13.)  It appears despite knowing at least six deputies thought Ronnie

23  needed medical observation and despite being told Ronnie was suffering from drug

24  withdrawals, DeGuzman intentionally failed to monitor Ronnie 1) because he

25  claims he was never told Ronnie needed medical monitoring; and 2) because there

26  is no county requirement to perform routine interval medical checks on MOC1

27

28

PLAINTIFFS' OPPOSITION TO MSJ          CASE NO. 16CV1004-BEN(AGS)

unless medical staff is explicitly asked to monitor a patient." [2]  (Exh. 4, DeGuzman Depo., 44:23-45:7; 100:5-12; 116:6-12.)

It is undisputed that DeGuzman left his shift at 11 p.m. having never checked on Ronnie since his initial 10 second blood sugar test.  (Exh. 4, DeGuzman Depo., 99:7-17.)  When DeGuzman left work he did not inform the on-coming shift about Ronnie's condition nor did he inform the on-coming shift about the conversations he had with various deputies about Ronnie's condition or withdrawals.  (Exh. 4, DeGuzman Depo., 100:23-25,137:24-138:17.)

Because DeGuzman did not "endorse"[3] the on-coming shift regarding Ronnie's condition, pursuant to the custom associated with MOC1, the nursing staff ignored Ronnie's presence assuming he was being housed for a non-medical related purpose.  Again, Ronnie was left in medical observation cell #1 for another two hours until Sergeant Shawcroft observed Ronnie having a seizure at 12:53 a.m. (Exh. 6, Follow-Up Investigative Report, p. 4.)

Sergeant Shawcroft testified he was passing by Ronnie's cell and noticed Ronnie "wasn't tracking his eyes."  He observed Ronnie's skin tone was not a fleshy color.  As Sergeant Shawcroft was watching, Ronnie's "eyes rolled back into his head" and he slumped to his left.  (Exh. 7, Shawcroft Depo., 74:20-75:24.) Sergeant Shawcroft called out to the medical staff for help.  When Sergeant

---

[2] The cell (MOC1) Ronnie was placed in is the subject of Plaintiffs' *Monell* claim. The deputies refer to this cell as "medical observation cell #1." The nursing staff refers to this cell as a "holding cell #1." This cell is <u>within</u> the nursing bay (unlike sober and safety cells) and four feet away from the nurses' working station. This cell, unlike the safety and sobering cells, does not have a routine requirement to perform interval medical checks. The custom at Central is to use MOC1 as "multi-purpose cell." Deputies use MOC1 for segregation, discipline, and holding purposes; MOC1 is also used for medical purposes. When MOC1 is used for medical purposes, deputies are required to inform the nursing staff so that they can monitor and treat the patient. If the nursing staff is not informed of the medical patient, the nursing staff will <u>not</u> routinely monitor inmates in MOC1. As explained below, this custom created great confusion amongst the nursing staff and ultimately explains why Ronnie went without medical evaluation for eight and half hours. After Ronnie's death an immediate policy change was implemented to avoid the confusion that led to Ronnie's premature death.

[3] "Endorse" is a term of art used by jail staff to indicate a passing of vital information from one shift to another.

PLAINTIFFS' OPPOSITION TO MSJ                CASE NO. 16CV1004-BEN(AGS)

Shawcroft turned back around, he saw Ronnie hit his head against the wall and fall to the ground. (Exh. 7, Shawcroft Depo., 75:25-76:11.)  When Sergeant Shawcroft entered MOC1, Ronnie was on the ground seizing.  (Shawcroft Depo., 76:12-77:10; Exh. 8, Shawcroft Report.)  Nurse Harris (herein "Defendant Harris") was the first responder.  Nurse Llamado (herein "Defendant Llamado) followed closely behind.

Again, at this point in time the facts are hotly disputed. Within seconds, Sergeant Shawcroft, Defendant Harris, Defendant Llamado, Deputy Edge, and Deputy Andrade enter Ronnie's cell.

Deputy Andrade is a trained Emergency Medical Technician.  (Exh. 9, Andrade Depo, 8:16-9:19.)  He testified Ronnie was immediately unresponsive, meaning he was not "communicative, his eyes were not tracking and was breathing shallow." (Exh. 9, Andrade Depo., 42:21-43:11.)  Deputy Edge testified Ronnie was "unresponsive," "clammy" and "seizing."  (Exh. 10, Edge Depo., 55:2-18.) Defendant Llamado testified Ronnie was unresponsive, snoring, and seizing. (Exh. 11, Llamado Statement; Exh. 12, Llamado Depo., 114:16-19.)  When Llamado saw Ronnie had a "sluggish" pupillary response she knew it indicated something neurological was happening and formed the opinion to call paramedics (herein "911") almost immediately.

Within a few minutes, every individual that was present agreed Ronnie needed 911 – except Defendant Harris – the first responder.  Within minutes, Deputy Andrade, who informed nurses he was an EMT, told Defendant Harris Ronnie needed 911.  As a trained EMT, Deputy Andrade knew EMTs would not transport Ronnie in an unconscious state.  (Exh. 9, Andrade Depo., 47:12-18, 91:17-21.)  During the initial assessment, Deputy Andrade told Defendant Harris "two or three times" that 911 should be called.  (Exh. 9, Andrade Depo., 66:17-22.) At 1:05 a.m., 10 minutes into Ronnie's seizure, Defendant Harris, ignored requests of deputies and fellow nurses, and ordered EMTs be dispatched, not 911. (Exh. 6, Follow-Up Investigative Report, p. 5.)  At this time, Defendant Llamado looked at

10

1  Defendant Harris and told her Ronnie needed 911, not EMTs. Defendant Harris

2  said, "No, EMTs."  (Exh. 12, Llamado Depo., 117:16-118:1.)

3      Eight minutes into the incident, Defendant Llamado called Charge Nurse

4  Bautista to inform her they would be sending Ronnie out via EMTs.  After learning

5  of Ronnie's condition, Charge Nurse Bautista directed Defendant Llamado to

6  activate 911.  (Exh. 12, Llamado Depo., 78:23-79:10.)  Defendant Llamado "put the

7  phone down" and told Defendant Harris, "[Bautista] said he has to go now 911."

8  (Exh. 12, Llamado Depo., 79:11-19.)  Still, Defendant Harris refused.  Shockingly,

9  Defendant Harris <u>denies</u> ever being told to call paramedics.  Defendant Harris

10  denies the four occasions Deputy Andrade told her to call paramedics.  (Exh. 13,

11  Harris Depo., 86:23-24.) Defendant Harris denies the three occasions Defendant

12  Llamado told her to call paramedics.  (Exh. 13, Harris Depo., 86:20-22.)  Defendant

13  Harris also denies being told Charge Nurse Bautista directed her to call paramedics.

14  (Exh. 13, Harris Depo., 108:12-18.)

15      As time went on, Ronnie's condition continued to worsen.  Ronnie had been

16  drooling and seizing for the "bulk of the time."  (Exh. 7, Shawcroft Depo, 86:15-

17  23.)  At 1:25 a.m., thirty minutes into Ronnie's seizure, Defendant Harris called

18  Charge Nurse Bautista and requested her presence.  Charge Nurse Bautista came

19  downstairs and arrived at MOC1 minutes before the EMTs arrived.  Charge Nurse

20  Bautista was upset that 911 had still not been called.  (Exh. 22, Bautista Depo.,

21  29:1-5)  Once Charge Nurse Bautista observed Ronnie, she and Deputy Andrade

22  called for paramedics to be dispatched - again.  (Exh. 22, Bautista Depo., 30:13-16)

23  At the same time, EMTs arrived.  According to Deputy Edge, "The EMTs informed

24  us they will assist with first aid but that they would not transport [Ronnie] in the

25  current condition he was in."  (Exh. 14, Edge Report.) Finally, at the behest of the

26  EMTs, 911 was dispatched at 1:30 a.m., thirty-seven minutes after Ronnie was seen

27  seizing.  (Exh. 15, Paramedic Report.)

28      Paramedics arrived at 1:48 a.m., forty-three minutes after Defendant Harris

11

1   initially called EMTs.  Deputy Andrade testified Ronnie still had a pulse when

2   paramedics arrived.  (Exh. 9, Andrade Depo., 97:12-98:20.)  When paramedics

3   attempted to strap Ronnie to the gurney, Ronnie stopped breathing and lost his

4   pulse.  Ronnie was pronounced dead at 2:11 a.m.

5        Ronnie's cause of death was later found to be acute methamphetamine

6   intoxication.  According to Plaintiffs' emergency room expert, Dr. Falgiani, the

7   delay in adequate medical care ultimately caused Ronnie's death. Dr. Falgiani

8   opined, "If Mr. Sandoval had been taken to an emergency department at any time

9   during the time he was in Central *up to the time that he lost his pulse and went into*

10  *cardiac arrest*, more likely than not his life would have been able to be saved by

11  appropriate medical interventions." (Exh. 16, Falgiani Report.)

## III.

## STANDARD OF LAW

14       The summary judgment procedure is a method for promptly disposing of

15  actions.  *See* Fed. R. Civ. Proc. 56.  The judgment sought will be granted if "there is

16  no genuine issue as to any material fact."  Fed. R. Civ. Proc. 56(c).  The moving

17  party may produce evidence negating an essential element of the nonmoving party's

18  case.  *Nissan Fire & Marine Ins. Co., v. Fritz Cos*., 210 F.3d 1099, 1102 (9th Cir.

19  2000).  If the movant meets its burden, the nonmoving party must come forward

20  with specific facts demonstrating a genuine factual dispute for trial.  *Matsushita*

21  *Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574 (1986).

22       In opposing a summary judgment, the nonmoving party "must produce at

23  least some significant probative evidence tending to support the complaint."  *T. W.*

24  *Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.

25  1987) (quoting *First Nat'l Bank v. Cities Serv. Co*., 391 U.S. 253 (1968).  The Court

26  cannot make credibility determinations with respect to evidence offered, and is

27  required to draw all inferences in the light most favorable to the non-moving party.

28  See *T. W. Elec.,* 809 F.2d at 630-31 (citing *Matsushita*, 475 U.S. at 587).  Summary

1  judgment is therefore not appropriate "where contradictory inferences may

2  reasonably be drawn from undisputed evidentiary facts. . . ." *Hollingsworth*

3  *Solderless Terminal Co. v. Turley*, 622 F.2d 1324, 1335 (9th Cir. 1980); *Estate of*

4  *Escobedo v. City of Redwood City*, 2005 U.S. Dist. LEXIS 23821 (N.D. Cal. Jan.

5  28, 2005).

6  **IV.**

7  **THE OLD SUBJECTIVE STANDARD VS. THE NEW OBJECTIVE**

8  **STANDARD**

9   Plaintiffs' first claim alleges, by failing to provide adequate medical care,

10  Defendant Nurses were deliberately indifferent to Ronnie's serious medical need in

11  violation of the <u>Fourteenth</u> Amendment.[4]  (Exh. 17, First Amended Complaint, ¶¶

12  34-36.)  Upon a thorough review of recent case law in the Southern District, this

13  Court has a unique opportunity to decide an issue of first impression since the 2015

14  *Kingsley* opinion.  In *Kingsley*, the U.S. Supreme Court held that a pretrial

15  detainee's due process claim for excessive force is governed by an <u>objective</u>

16  <u>standard</u> as opposed to subjective standard.  After the Supreme Court's ruling in

17  *Kingsley v. Hendrickson*, U.S. 135 S. Ct. 2466, 2475 (2015), district courts have

18  applied its "objective standard" rationale to Section 1983 failure to summon aid

19  cases.

20   Recent cases have called into doubt the traditional understanding that

21  a pretrial detainee's claim for inadequate medical care is determined under the

22  Eighth Amendment's subjective deliberate-indifference standard.  In *Kingsley* at

23  2472-73, the U.S. Supreme Court held that a pretrial detainee's due process claim

24  for excessive force, unlike a convicted prisoner's similar claim under the Eighth

25  Amendment, is governed by an <u>objective</u> standard.  In *Castro v. Cty. of L.A.,* 833

26  F.3d 1060 (9th Cir. 2016)*,* the Ninth Circuit, on rehearing *en banc*, extended

27

28  [4]Ronnie was arrested for possession on February 22, 2014.  He died twelve hours later.  As such, he was a pretrial detainee for the purposes of this litigation.

PLAINTIFFS' OPPOSITION TO MSJ   CASE NO. 16CV1004-BEN(AGS)

*Kingsley's* reasoning to pretrial detainees' failure-to-protect claims and overruled circuit precedent "to the extent that it identified a single deliberate indifference standard for all § 1983 claims and to the extent that it required a plaintiff to prove an individual defendant's subjective intent to punish in the context of a pretrial detainee's failure-to-protect claim." *Id.* at 1067-68.

The Ninth Circuit concluded that "the test to be applied under *Kingsley* must require a pretrial detainee who asserts a due process claim for failure to protect to prove more than negligence but *less than subjective intent*—something akin to reckless disregard." *Id.* at 1071.[5]

Some district courts have applied *Castro's* reasoning to pretrial detainees' due process claims for inadequate medical care. For example, in *Guerra v. Sweeny*, 2016 U.S. Dist. LEXIS 132637 (E.D. Cal. Sept. 27, 2016), an Eastern District court held:

> "while no court has set out what the exact contours of what the *Castro* rule would look like in the untreated medical needs context, the stripping of the Eighth Amendment deliberate indifference standard of a subjective component—as *Castro* implies to be appropriate in this context—is a relatively simple feat: (1) the plaintiff made a request for medical care; (2) the plaintiff had a serious medical need; (3) the defendant did not take reasonable steps to obtain or provide medical care, even though a reasonable officer (or reasonable medical staff) in the circumstances would have appreciated the high degree of risk involved—making the likelihood of harm obvious; and (4) by not taking such measures, the defendant caused the plaintiff's injuries."

The Northern District has also followed suit in *Borges v. City of Eureka*, 2017 U.S. Dist. LEXIS 10721 (N.D. Cal. Jan. 25, 2017) and *Weishaar v. Cnty. of Napa*, 2016 U.S. Dist. LEXIS 173833 (N.D. Cal. Dec. 15, 2016), finding that, "when considered alongside *Castro's* broad interpretation of *Kingsley*, . . . *Castro's* objective 'deliberate indifference' test . . . is an appropriate lens through which to

---

[5] *Castro* therefore set out the elements of a Fourteenth Amendment failure-to-protect claim as follows: (1) the defendant made an intentional decision with respect to the plaintiff's conditions of confinement, (2) those conditions put the plaintiff at substantial risk of serious harm, (3) the defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious, and (4) by not taking such measures, the defendant caused the plaintiff's injuries. *Id.* at 1071.

14

1  evaluate" pretrial detainees' Fourteenth Amendment claims arising from untreated
2  serious medical needs.

3      This country is rooted in the age-old principle of innocent until proven guilty.
4  Thus, it follows that a pretrial detainee should be treated differently than a convict.
5  Their claims should not be analyzed by a single over-arching deliberate indifference
6  standard.  As such, Plaintiffs urge this Court to follow the Supreme Court's lead in
7  *Kingsley* and the Ninth Circuit's guidance in *Castro* and apply its "pretrial detainee
8  objective standard" in cases involving failure to summon adequate medical care.

9  **V.**

10  **DEFENDANT NURSES ACTED WITH DELIBERATE INDIFFERENCE**

11      In an abundance of caution and for the sake of brevity, Plaintiffs will provide
12  argument as to the more stringent subjective standard analysis.  "To maintain an
13  Eighth Amendment claim based on prison medical treatment, an inmate must show
14  'deliberate indifference to a serious medical need.'"  *Jett v. Penner*, 439 F.3d 1091,
15  1096 (9th Cir. 2006) (quoting *Estelle v. Gamble,* 429 U.S. 97, 106 (1976).  The two
16  part test for deliberate indifference requires the plaintiff to show (1) "'a serious
17  medical need by demonstrating that failure to treat a prisoner's condition could
18  result in further significant injury or the unnecessary and wanton infliction of
19  pain,'" and (2) "the defendant's response to the need was deliberately indifferent."
20  *Jett,v. Penner*, 439 F.3d at 1096; *WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136
21  (9th Cir. 1997).

22      Deliberate indifference is shown by "a purposeful act or failure to respond to
23  a prisoner's pain or possible medical need, and harm caused by the indifference."
24  *Id*.  (citing *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1991).)  Deliberate
25  indifference may be manifested "when prison officials deny, delay or intentionally
26  interfere with medical treatment, or it may be shown by the way in which prison
27  physicians provide medical care."  (*Id* at 1060).
28  / / /

15

*A.     Defendant DeGuzman*

The first element requires Plaintiffs to show Ronnie objectively suffered from a serious medical need.  See *McGuckin v. Smith*, 974 F.2d 1050 (9th Cir. 1991) ("The existence of an injury that a <u>reasonable</u> doctor or patient would find important and worthy of comment or treatment...")

Here, Ronnie's condition appeared to be serious enough for Deputy Chavez to have contacted him - twice.  Ronnie was sweating profusely, disoriented, and looked ill.  When Chavez approached Ronnie, Ronnie said he may be diabetic.  Chavez took this suggestion seriously and called for a nurse.  When the nurse notified Chavez that Ronnie's blood sugar level was normal, Chavez placed Ronnie in a holding cell.  An hour later, Ronnie appeared to look worse.  Chavez contacted Ronnie again.  This time Ronnie said he was not feeling well and was cold.  Chavez thought this was odd given Ronnie was sweating profusely.  Upon the suggestion of Corporal Martinez, the decision was made to take Ronnie out of the booking process so that he could go to the second floor to be thoroughly evaluated by medical staff.

While on the second floor, evidence shows Deputy Chavez informed DeGuzman that Ronnie was sweating profusely, disoriented, and lethargic.  DeGuzman was also informed Ronnie may be diabetic.  DeGuzman performed a "10 second" blood sugar test which came back normal.  Having ruled out the most obvious cause of the symptoms, it was incumbent on DeGuzman to continue to assess Ronnie to find the root cause of Ronnie's medical issue.

Approximately thirty minutes later, DeGuzman asked Deputy Rodriguez and Deputy Wilkinson why they would not take Ronnie out of MOC1.  The deputies stated because "he's under the influence."   Deputy Rodriguez told DeGuzman that Sandoval was "shaking mildly … [and] appeared to be having withdrawals from drugs."  At this point, six deputies agreed Ronnie needed further medical treatment, two of them stating that Ronnie was having drug withdrawals.

1    As such, a practical inference supports the contention that a reasonable nurse

2  would have been aware Ronnie was either 1) suffering from drug withdrawals or 2)

3  suffering from diabetic complications, each being a serious medical condition

4  requiring attentive medical treatment.  Objectively, diabetes and/or drug

5  withdrawals, if not properly treated, could be fatal or at the very least, could result

6  in further significant injury.  In fact, the county's policy for Addicted Arrestee Care

7  and Diabetes each call for immediate implementation of a treatment plan for any

8  inmate who is exhibiting relating symptoms.  (Exhs. 18 and 19, respectively.)  As

9  such, Ronnie was suffering from a serious medical condition.

10    The second element requires Plaintiff to show DeGuzman "knew of and

11  disregarded an excessive risk to plaintiff's health." *Farmer v. Brennan*, 511 U.S.

12  825, 837 (1994).  But "proof of subjective awareness is not limited to the purported

13  recollections of the individual involved." *Conn v. City of Reno*, 572 F.3d 1047,

14  1057 (9th Cir. 2009). Importantly, "whether the official had the requisite

15  knowledge of risk is a question of fact subject to demonstration in the usual ways,

16  including inference from circumstantial evidence.  Further, a factfinder may

17  conclude that the official knew of a substantial risk from the very fact that the risk

18  was obvious. *Id.*  The subjective component for finding deliberate indifference

19  requires that the prison official be aware of the inmate's "pain or possible medical

20  need" but the official does not have to be aware of the exact medical problem.

21  *Farmer v. Brennan*, 511 U.S. 825, 828 (1994); *Wilhelm v. Rotman*, 680 F.3d 1113,

22  1122 (9th Cir. 2012).

23    DeGuzman was told by multiple deputies Ronnie was suffering from either

24  diabetic complications or drug withdrawals.  Knowing Ronnie came back with two

25  normal blood sugar tests, DeGuzman knew Ronnie's symptoms must be related to

26  another underlying condition.  Given DeGuzman was told Ronnie was suffering

27  from drug withdrawals, and knowing Ronnie was arrested for a controlled

28  substance, the inference is clear.  (Exh. 4, DeGuzman Depo., 79:22-80:3.)  Lastly,

DeGuzman knew that the symptoms of low blood sugar and drug withdrawals look similar.  (Exh. 4, DeGuzman Depo., 28:9-15.)  Therefore, DeGuzman was acutely aware Ronnie had a serious medical need, whether that be diabetic complications or drug withdrawals or another underlying condition.

Further, Ronnie's serious medical condition was so obvious that six deputies understood a substantial risk of serious harm existed.  Importantly, satisfaction of this element does not turn solely on DeGuzman's recollection or admissions; rather, "a fact-finder may conclude that [DeGuzman] knew of a substantial risk from the very fact the risk was obvious" to so many others.

Lastly, Plaintiff must show that DeGuzman disregarded Ronnie's serious risk of harm.  There is no question DeGuzman disregarded Ronnie's risk of harm because he admittedly never checked or evaluated Ronnie for the six and a half hours he remained in MOC1.  Further evidence DeGuzman disregarded Ronnie's risk of harm was that he left work without endorsing Ronnie's condition to the on-coming shift.  DeGuzman knew that if he failed to endorse Ronnie's condition to the on-coming shift, pursuant to the county's custom associated with MOC1, Ronnie would never be medically monitored as it would be assumed he was being held for a non-medical related purpose.  As such, compelling evidence exists that DeGuzman was deliberately indifferent to Ronnie's serious medical need.

### B.    Defendant Llamado

Again, Plaintiffs must show Ronnie was objectively suffering from a serious medical condition.  To set the stage, Defendant Llamado and Defendant Harris' contact with Ronnie came approximately six and a half hours after DeGuzman's contact.  As Ronnie went ignored, his condition worsened.  Evidence shows at approximately 12:53 a.m., Sergeant Shawcroft witnessed Ronnie's eyes roll back into his head as Ronnie lost consciousness; he then saw Ronnie hit his head on the wall as he fell.  Sergeant Shawcroft, Deputy Edge, Deputy Andrade, and Nurse Llamado agreed that Ronnie was suffering from a seizure and potential head injury.

18

When staff entered MOC1, Ronnie was unresponsive.  It was clear by the staff's response that Ronnie was suffering from a serious medical condition.  In fact, the county's Code Blue policy classifies seizures and head trauma with altered mental status as 'life threatening emergencies."  (Exh. 20, Code Blue: Life Threatening Emergencies.)

As to the second element, Defendant Llamado admits she understood Ronnie was suffering from a serious medical condition.  Defendant Llamado testified Ronnie fit within the standard nursing procedures (herein "SNP") for seizures such that 911 needed to be called immediately.  Defendant Llamado also admits that Ronnie was unresponsive during her entire contact with him.  (Exh. 12, Llamado Depo., 83:14-84:2.)  As such, it is clear Defendant Llamado subjectively understood the risk to Ronnie's health.

Defendant Llamado also admits she disregarded Ronnie's serious medical condition.  During her deposition, Defendant Llamado made it clear that she believed Ronnie's condition required 911 support.  She testified she told Defendant Harris at least three times Ronnie needed 911.  Yet, Defendant Harris refused.  When asked why she did not call 911 herself, Defendant Llamado said she gave deference to Defendant Harris because "she was the first responder."  (Exh. 12, Llamado Depo., 74:9-75:7.)  Approximately eight minutes later, when Bautista ordered 911 be called, Defendant Llamado testified she put down the phone and told Harris, "[Bautista] said he has to go now 911."  However, Bautista's directive was not just to Harris but to Defendant Llamado as well.  As such, in failing to call paramedics at that time, Defendant Llamado disregarded a direct order from her superior.  During her deposition, Defendant Llamado admitted it was not enough just to inform Defendant Harris of Bautista's directive, because policy required Llamado to call 911 herself.  (Exh. 12, Llamado Depo., 104:1-6.)

/ / /

/ / /

C.     *Defendant Harris*

Again, Plaintiffs must show Ronnie was objectively suffering from a serious medical condition.  Akin to the Llamado analysis above, Ronnie was suffering from a serious medical condition.  Defendant Llamado and Defendant Harris contacted Ronnie at the same time.  It was generally agreed upon that Ronnie was suffering from a seizure and potential head injury.  When staff entered MOC1, Ronnie was unresponsive.

The second element requires Plaintiffs to show Harris knew of and disregarded an excessive risk to Ronnie's health.  However, proof of subjective awareness is not limited to the purported recollections of the individual involved.  It is important to distinguish that satisfaction of this element does not require Defendant Harris to admit she was subjectively aware.  Rather, Plaintiff can prove Defendant Harris was subjectively aware of Ronnie's condition by pointing to circumstantial evidence.  Again, the official does not need to know of the *exact* serious medical condition in order to impute knowledge of a serious risk.

Defendant Harris was acutely aware Ronnie was suffering from a serious medical condition.  She was the first responder and was initially informed Ronnie was having a seizure.  She witnessed Ronnie hit his head against the wall.  Harris noted Ronnie presented with generalized tremors and had a "sluggish" pupillary response.  Defendant Harris noted he was drooling and presented with a rate of 20 BPM, which she admitted was "kind of fast."  (Exh. 13, Harris Depo., 163:15-25.) She noted his oxygen level was 94%, which she admitted was "a little low."  (Exh. 13, Harris Depo., 166:10-16.) She also noted Ronnie's blood glucose level was 151, which she admitted was "slightly high."  (Exh. 13, Harris Depo., 168:9-13.) Combining these unstable vitals and Ronnie's seizures, along with Harris' request for EMTs and the staff's overall response, it is clear Defendant Harris knew Ronnie was suffering from a serious condition.

/ / /

20

1    Alternatively, because Ronnie's serious medical condition was obvious to

2  everyone else, subjective acknowledgement can be imputed against Defendant

3  Harris.  According to every other staff member, Ronnie was seizing and

4  unresponsive.  Deputy Andrade, Defendant Llamado, and Charge Nurse Bautista

5  confronted Harris about the seriousness of Ronnie's condition.  Thus, sufficient

6  evidence exists Defendant Harris knew Ronnie was suffering from a serious

7  medical condition.

8    Next, Defendant Harris acknowledged Ronnie's serious condition, yet

9  disregarded the risks associated with failing to act adequately.  Despite Ronnie's

10  unstable vitals, unresponsiveness, and prolonged seizures, Defendant Harris

11  callously refused to summon the 911 care needed.  Deputy Andrade told Defendant

12  Harris – at least four times – that Ronnie needed advanced life support (911).

13  Deputy Andrade informed Defendants Harris and Llamado he was a trained EMT

14  and that he knew EMTs would not transport Ronnie because he was unresponsive.

15  (Exh. 9, Andrade Depo., 91:17-21.)  Still Defendant Harris refused.  Defendant

16  Llamado, with 13 years of jail experience as opposed to Harris' one year of jail

17  experience, told her at least three times to call 911.  Defendant Harris looked

18  directly at Llamado and told her, "No."  Defendant Harris then refused a direct

19  order from her supervisor, Charge Nurse Bautista, and still failed to summon 911.

20    Lastly, there is sufficient evidence indicating Ronnie was suffering from

21  prolonged seizures.  (Exh. 12, Llamado Depo., 63:19-21, 128:9-19; Exh. 15,

22  paramedics report.)  Pursuant to the SNP for seizures, when an inmate suffers from

23  "prolonged seizures" 911 must be summoned immediately.  Thus, in addition to

24  ignoring her supervisor's directive, Harris also violated county policy by failing to

25  summon 911.  (Exh. 21, Seizure SNP.)  Defendant Harris was deliberate and

26  callous in her steadfast refusal to call 911.  Her response was like putting a Band-

27  Aid over a gunshot wound.

28    As such, each Defendant Nurse was deliberately indifferent in their actions.

They each knew Ronnie had a serious medical condition which needed adequate and attentive treatment.  Each failed in this regard.

### D.  Analysis Under the Objective Standard

Plaintiffs urge this Court to follow the holdings set forth in *Kingsley* and *Castro*. Again, pretrial detainees should not be analyzed through the same lens as convicts. With that said, if analyzing these facts under an objective standard, the conclusion is clear.  DeGuzman was unreasonable to ignore Ronnie's drug withdrawals or diabetic complications for six and a half hours.  In fact, six reasonable deputies thought Ronnie needed thorough medical evaluation and made sure DeGuzman knew of Ronnie's condition.  Llamado admits to being deliberately indifferent in that she, amongst others, knew Ronnie needed 911 but failed to summon medical care.  Lastly, Harris' conduct was so unreasonable that two nurses, including her supervisor, and a trained EMT deputy yelled at her to act prudently.  Still, she refused.  In fact, every medically trained person deposed in this case agreed Harris acted unreasonably and against policy.  Thus, if this Court were to extend the *Kingsley* and *Castro* analysis to Section 1983 failure to summon care cases, Defendant Nurses would surely be found deliberately indifferent.

## VI.

## QUALIFIED IMMUNITY WILL NOT SAVE DEFENDANT NURSES

Qualified immunity shields government agents from liability if a <u>*reasonable*</u> official could have believed that his or her conduct was lawful, in light of clearly established law and the information possessed by the official.  *Anderson v. Creighton,* 483 U.S. 635 (1987); *Hunter v. Bryant*, 502 U.S. 224 (1991).  Qualified Immunity shields all government officials except those who are either plainly incompetent or who knowingly violate the law.  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

First, the court must ask whether, taken in the light most favorable to the plaintiff, do the facts alleged establish a constitutional violation.  *Saucier v. Katz,*

22

1   533 U.S. 194, 201 (2001).  Second, if a violation could be proven, the court will

2   then consider whether the right was clearly established.  *Saucier* at 201.  This does

3   not require that the very action in question be previously held unlawful, but the

4   unlawfulness of the official's conduct "must be apparent" in light of the law existing

5   at the time of the conduct.  *Anderson v. Creighton*, 483 U.S. at 640.  At the time of

6   Ronnie's death, it was clearly established that a pretrial detainee had a

7   constitutional right to medical treatment.  *Gibson v. County of Washoe*, 290 F.3d

8   1175, 1187 (9th Cir. 2002).  It was also clearly established that the denial or delay

9   of adequate medical treatment for a prisoner's serious medical condition constitutes

10   deliberate indifference in violation of the Eighth and/or Fourteenth Amendment.

11   See *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002).

12        *A.     Defendant DeGuzman*

13        DeGuzman was explicitly informed Ronnie needed to stay in MOC1 because

14   he was suffering from drug withdrawals or diabetic complications.  He was told

15   Ronnie was diaphoretic, yet cold, and extremely disoriented.  He also knew six

16   deputies thought Ronnie was in such serious condition he needed "thorough

17   medical monitoring" above what is provided in sobering cells.  Despite this

18   knowledge, DeGuzman never checked or evaluated Ronnie prior to ending his shift;

19   instead, DeGuzman deliberately ignored him.  DeGuzman also failed to endorse

20   Ronnie to the on-coming shift, knowing that if he did not, Ronnie would continue

21   being ignored on the presumption he was being held for a non-medical reason.

22   Ignoring a patient suffering from drug withdrawals is a constitutional violation of a

23   clearly established right.[6]

24        *B.     Defendant Llamado*

25        Defendant Llamado admittedly knew Ronnie was unresponsive and suffering

26   from prolonged seizures, thereby requiring advanced cardiac life support (911), but

27

28   ---
    [6] *Frary v. County of Marin*, 81 F.Supp.3d 811, 832 (N.D. Cal. 2015); *M.H. v. County of Alameda*,
    62 F.Supp.3d 1049, 1079-1080 (N.D. Cal. Apr. 7, 2014).

PLAINTIFFS' OPPOSITION TO MSJ     CASE NO. 16CV1004-BEN(AGS)

1   admittedly she failed to act.  She had the duty and ability to summon 911, but chose

2   not to.  She admits to violating the county's seizure policy and her superior's

3   directive, both requiring 911 in response to Ronnie's condition.  She also admitted

4   that she failed to act adequately.  There is no question the right to adequate medical

5   care is a clearly established right.

6       *C.     Defendant Harris*

7       Defendant Harris either knew Ronnie needed 911 and intentionally denied

8   him adequate treatment; or, she was so utterly incompetent that her conduct cannot

9   be saved by qualified immunity.  There is no doubt Defendant Harris knew Ronnie

10  was unresponsive and suffering from prolonged seizures.  In fact, multiple county

11  officials yelled at her to call 911 – even to the point where both Andrade and

12  Bautista expressed frustration.  She was advised to call 911 by Deputy EMT

13  Andrade four times and by Nurse Llamado three times.  Her response was simply

14  "No."  She then intentionally defied her superior's direct order and again failed to

15  dispatch 911.  In doing so, she also violated county policy.  No reasonable officer

16  would think this conduct is lawful given that every medically-trained staff member

17  present in MOC1 – including the EMTs themselves – urged her to call 911.

18      Alternatively, the only explanation for Defendant Harris' conduct was that

19  she was too incompetent to appreciate the difference between 911 and EMTs.  911

20  paramedics are licensed to perform Advanced Cardiac Life Support (herein

21  "ACLS"), meaning they can start IV's, push medications and intubate.  EMTs can

22  only perform Basic Life Support (herein "BLS"), meaning CPR and first aid. (Exh.

23  9, Andrade Depo., 12:19-13:23.)  EMTs are used to transport conscious-responsive

24  patients.  Here, Andrade, Llamado, and Bautista called for paramedics because they

25  understood EMTs do not transport unresponsive patients nor could they perform

26  life saving measures.  The county's seizure SNP specifically requires ACLS in this

27  situation.  Shockingly, Defendant Harris testified that on the night of Ronnie's

28  death <u>she did not know the difference</u> between ACLS and BLS and who performed

24

1   which.  (Exh. 13, Harris Depo., 51:16-52:15.)[7]  In either situation, Defendant

2   Harris' conduct was either maliciously intentional or fearfully incompetent.  Again,

3   there is no question the right to adequate medical care is a clearly established right.

4     At the time of Ronnie's death, the law was clearly established that denial or

5   delay of adequate medical treatment is a constitutional violation.  Each nurse knew

6   Ronnie ws in serious medical distress, yet each nurse failed to summon adequate

7   care.  As such, their conduct should not be immunized.

8   **VII.**

9   **THE CUSTOM AND TRAINING ASSOCIATED WITH MOC1 WAS A**

10  **SUBSTANTIAL FACTOR IN RONNIE'S DEATH**

11    Plaintiffs' second and third claims are asserted against the county for

12  adopting a particular custom associated with MOC1, which ultimately explains why

13  Ronnie went eight and a half hours without medical evaluation.  A county can be

14  liable under 42 U.S.C. section 1983 only where it has an official policy or

15  unofficial custom that causes a constitutional violation.  *Monell v. New York City*

16  *Dept. of Social Services,* 436 U.S. 658 (1978).  For a Section 1983 claim, the

17  plaintiff must present evidence of unconstitutional conduct by a government

18  employee that occurred pursuant to a "policy statement, ordinance, regulation, or

19  decision officially adopted and promulgated by [the entity's] officers." *Id.* at 690.

20  As for causation, in direct policy infliction cases like *Monell*, fault and causation

21  are considered self-evident because the policy or custom itself is unlawful and

22  specifically directs the commission of an unlawful act.  *Bd. of Comm'rs of Bryan*

23  *Cnty. v. Brown*, 520 U.S. 397, 405-406 (1997).

24    Unlike sober and safety cells, MOC1 does not carry an obligation to perform

25  routine medical checks.  Nurses are assigned to safety and sober cells, but not to

26  MOC1.  (Exh. 12, Llamado Depo., 47:23-48:1.)  Nurses were trained to medically

27

28  [7] Truthfulness of this assertion is seriously in doubt given her steadfast refusal to call 911 and instead opting for EMTs. If she was actually unaware of a difference, it would have made no sense for her to remain so intransigent in her EMT selection.

25

check inmates in sober and safety cells every hour.  MOC1 has no such policy.
(Exh. 12, Llamado Depo., 48:13-49:3.)  It is undisputed that prior to Ronnie's death
the policy and training associated with MOC1 was to use the cell as a "multi-
purpose cell."  When deputies use MOC1 for segregation, overflow, discipline or
holding purposes, MOC1 is considered a "holding cell."  (Exh. 23, Estalano Depo.,
133:6-134:3.)  When deputies use MOC1 for medical purposes, MOC1 is
considered a medical cell.  (Exh. 23, Estalano Depo., 133:6-134:3.)  If MOC1 was
needed for a medical purpose, deputies were trained to inform the nursing staff who
would then know to monitor the inmate.

Further, there is no log for MOC1, unlike sober and safety cells.  (Exh. 4,
DeGuzman Depo., 44:23-45:17.)  Meaning there is no way for various medical
shifts to keep track of whether an inmate is there for holding or for medical reasons.
Thus, in order for medical staff to monitor an inmate in MOC1 they have to be told
to do so and then ensure to endorse that inmate to the on-coming shift.  As was the
case here, this policy and training led to mass confusion for the medical staff.
Deputy Chavez adamantly testified he had a conversation with DeGuzman telling
him to monitor Ronnie.  DeGuzman denies the conversation ever happened.
Deputy Rodriguez told DeGuzman Ronnie needed to stay in MOC1 because he was
suffering from drug withdrawals.  DeGuzman admits this happened, but still claims
he was never told to monitor Ronnie.  In addition to this type of incident, relying
solely on a verbal pass down system does not account for the hectic scenarios that
occur in county jails.  Nurses could be working overtime and forget.  Nurses could
get called away on a man-down without properly endorsing the inmate to another
nurse.  The possibilities are endless.

Next, because DeGuzman unbelievably thought Ronnie was being held for a
non-medical reason, DeGuzman did as he was trained to do and purposefully failed
to monitor Ronnie.  Nor did DeGuzman inform the other two nurses on duty of
Ronnie's condition.  In further pursuance of the policy and training thereon, he also

26

1  failed to endorse Ronnie to the on-coming shift.  As trained, when Harris and

2  Llamado arrived at 11:00 p.m., because they were not endorsed as to Ronnie's

3  condition, they too ignored Ronnie up and until his seizure, presuming deputies

4  were using MOC1 for holding purposes.  (Exh. 12, Llamado Depo., 53:8-54:17.)

5  Had there been a standing order to perform medical checks every hour, Ronnie

6  would have been evaluated at least eight times, by two different medical shifts, and

7  his death would have likely been prevented.

8      DeGuzman was adamant a new policy for MOC1 was needed, including a

9  cell-log so inmates can be easily tracked.  (Exh. 4, DeGuzman Depo., 45:21-46:19.)

10  DeGuzman admits "multi-use cells cause great confusion."  (Exh. 4, DeGuzman

11  Depo., 148:21-149:11.)  Defendant Llamado and Charge Nurse Bautista also

12  admitted that using this cell for so many reasons, and relying solely on a verbal

13  endorsement, created confusion amongst the nursing

14  staff.  (Exh. 12, Llamado Depo., 108:13-16; Exh.



15  22, Bautista Depo., 26:4-10.)  According to every

16  one deposed, after Ronnie's death a change in

17  policy occurred.  Now, deputies have to place a

18  magnetic placard on the door of MOC1 regardless if

19  the cell is used for medical or holding reasons.  (Exh. 22, Bautista Depo., 26:14-

20  22.)  This policy and training[8] directly advises any nurse, on any shift, if an inmate

21  is in need of observation and assessment.  (Exh. 22, Bautista Depo., 27:14-23.)

22  This new policy and training was explicitly implemented in order to avoid the

23  confusion that lead to Ronnie's premature death.

24  / / /

---

25  [8] To the extent Plaintiffs' failure to train claim requires a "pattern of similar violations," Plaintiff

26  can meet this burden solely by showing every nurse (at least six) between 3:00 p.m. and 12:53
a.m. ignored Ronnie because they were trained to do so unless given a specific endorsement

27  otherwise.  See *Tandel v. County of Sacramento*, the court found plaintiff established a pattern of
similar misconduct solely from the alleged misconduct done to him because he plead "multiple

28  acts of constitutional mistreatment from multiple personnel" over an extended time period.
*Tandel v. County of Sacramento*, 2012 U.S. Dist. LEXIS 21628.

# VIII.

## PLAINTIFFS' STATE LAW CLAIMS ARE VIABLE

Defendants attempt to sweep Plaintiffs' state law claims under a broad rug of immunity by restructuring Plaintiffs' allegations.  The basic rule of Government Code section 815, regarding public entity liability is that, *except as otherwise provided by statute*, a public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person.  This means that direct tort liability of public entities must be based on a specific statute declaring them to be liable, or at least creating some specific duty of care, and not on the general tort provisions of Civil Code section 1714.  *All Angels Preschool/Daycare v. County of Merced*, 197 Cal.App.4th 394, 395 (2011).

In order to refute liability, the county relies on Government Code sections 844.6 and 845.6, which state that an entity is immune from liability for injuries caused to prisoners.  However, Sections 844.6 and 845.6 do not offer blanket immunity, those very provisions carve out an exception for circumstances such as the one presented in this case.  Government Code section 845.6 provides in pertinent part, "a public employee, and the public entity where the employee is acting within the scope of his employment, is liable if the employee knows or has reason to know that the prisoner is in need of immediate medical care and he fails to take reasonable action to summon such medical care."  *Baker v. County of Sonoma*, 2009 U.S. Dist. LEXIS 14831 (N.D. Cal. 2009); *Hart v. County of Orange*, 254 Cal.App.2d 302 (1967); Cal. Gov. Code § 844.6.

Here, there is ample evidence suggesting various county staff members knew or had reason to know Ronnie was suffering from a serious medical condition such that he required immediate medical care.  Each Nurse Defendant knew Ronnie needed of medical care yet failed to take reasonable action to summon medical care.  It is important to note Plaintiffs' federal and state claims are not rooted in malpractice or a difference of opinion.  Rather, Plaintiffs' claims allege each Nurse

28

1   Defendant failed to summon medical care, period.  DeGuzman knew Ronnie was

2   suffering from drug complications and did absolutely nothing, ignoring him for six

3   and a half hours.  Llamado knew Ronnie was suffering from various life threatening

4   emergencies yet admittedly failed to summon 911.  Harris refused to call 911

5   despite being commanded to do so by her supervisor.  This conduct fits within the

6   constructs of Section 845.6.

7          With respect to Plaintiffs' fifth claim, that claim does focuses on the care

8   actually given to Ronnie.  The elements of a claim for professional negligence

9   incorporate a specific standard of care into the elements of a negligence claim.

10  "The elements of a cause of action in tort for professional negligence are: (1) the

11  duty of the professional to use such skill, prudence and diligence as other members

12  of his profession commonly possess and exercise; (2) a breach of that duty; (3) a

13  proximate causal connection between the negligent conduct and the resulting

14  injury; and (4) actual loss or damage resulting from the professional's negligence.

15  *Burgess v. Superior Court*, 2 Cal.4th 1064, 1077 (1992).

16         As far as DeGuzman is concerned, he was explicitly informed Ronnie was

17  suffering from drug withdrawals.  He admits that he did not perform a full

18  assessment on Ronnie other than a blood sugar test. After that test, DeGuzman

19  admittedly ignored Ronnie for the remainder of his shift.  According to Plaintiffs'

20  emergency room doctor, "the standard of care when dealing with a patient who may

21  have overtaken any type of controlled substance dictates a proper and thorough

22  medical screening exam … for a person who exhibited signs of acute toxicity being

23  his diaphoresis and disorientation." (Exh. 16, Falgiani Report.)  DeGuzman

24  admittedly breached that duty.  As a result, Ronnie went unevaluated for eight and a

25  half hours which ultimately resulted in Ronnie seizing and becoming unconscious.

26         As to Llamado, she admitted she breached policy and fell below the standard

27  of care by failing to summon adequate medical care despite appreciating Ronnie's

28  life threatening emergencies.  Lastly, "another breach in the standard of care was

the failure of Nurse Harris to call 911 instead of EMTs immediately upon her notification he was having a seizure.  The failure to call appropriate services resulted in a significant delay in the diagnosis and treatment…" (Exh. 16, Falgiani Report.)  Harris' failure is also evident by the testimony in this case.  Every medical personnel deposed agreed Harris violated policy and fell below the standard of care including County Nurse Supervisor Carlos Estolano.  (Exh. 23, Estolano Depo., 112:15-20; 118:10-16.)

As such, the county nor its employees, can escape state liability.  The crux of Plaintiffs' entire lawsuit is that Defendant Nurses failed to provide *any care*. Therefore the exception set forth in Section 845.6 applies.  In doing so, Nurse Defendants fell below the standard of care.

## IX.

## CONCLUSION

As detailed above, this matter is littered with disputes.  Multiple deputies and nurses claim each Defendant knew Ronnie was suffering from a serious medical condition.  And, multiple deputies and nurses claim each Defendant failed to act adequately.  This conduct violates clearly established law.  As such their conduct is deliberately indifferent and cannot be saved by qualified immunity.  Further, California provisions explicitly allow for these types of claims to go forward against county employees because they knew immediate care was needed, but each Defendant failed to summon adequate care. As such, Defendants' motion should be denied.

**MORRIS LAW FIRM, APC**

Dated:  June 26, 2017        s/ Danielle R. Pena
Christopher S. Morris, Esq.
Danielle R. Pena, Esq.
Attorneys for Plaintiffs

30

### <u>INDEX OF EXHIBITS TO OPPOSITION TO MOTION FOR SUMMARY</u>
### <u>JUDGMENT</u>

| Exhibit | Description | Pages |
|---------|-------------|-------|
| 1 | County of San Diego, Office of the Medical Examiner Investigative Report | 33-36 |
| 2 | Pertinent Portions of the Deposition Transcript of Office Matthew Chavez | 37-51 |
| 3 | San Diego County Sheriff's Department Officer Report of Matthew Chavez | 52-53 |
| 4 | Pertinent Portions of the Deposition Transcript of Romeo DeGuzman | 54-77 |
| 5 | San Diego Sheriff's Department Officer Report of Leonard Rodriguez | 78-79 |
| 6 | San Diego Sheriff's Department Follow-Up Investigation Report | 80-117 |
| 7 | Pertinent Portions of the Deposition of Robert Shawcroft | 118-126 |
| 8 | San Diego County Sheriff's Department Officer Report of Robert Shawcroft | 127-128 |
| 9 | Pertinent Portions of the Deposition Transcript of Matthew Andrade | 129-143 |
| 10 | Pertinent Portions of the Deposition Transcript of Nolan Edge | 144-148 |
| 11 | Statement of Maria Theresa Llamado, RN | 149-150 |
| 12 | Pertinent Portions of the Deposition Transcript of Maria Llamado | 151-172 |
| 13 | Pertinent Portions of the Deposition Transcript of Dana Harris | 173-187 |

PLAINTIFFS' OPPOSITION TO MSJ          CASE NO. 16CV1004-BEN(AGS)

| | | |
|---|---|---|
| 14 | San Diego County Sheriff's Department Crime/Incident Report of Nolan Edge | 188-192 |
| 15 | SDMSE Comprehensive Report | 193-198 |
| 16 | Expert Report of Michael Falgiani, MD, MBA, FACEP | 199-205 |
| 17 | First Amended Complaint | 206-237 |
| 18 | San Diego Sheriff's Department Medical Services Division Policy and Procedure Manual on Addicted Arrestee Care | 238-243 |
| 19 | San Diego County Sheriff's Medical Services Standardized Nursing Procedure on Diabetes Mellitus | 244-249 |
| 20 | San Diego County Sheriff's Department Medical Services Division Policy and Procedure Manual on Code Blue: Life Threatening Emergencies | 250-253 |
| 21 | San Diego County Sheriff's Medical Services Standardized Nursing Procedure on Seizure Disorder | 254-258 |
| 22 | Pertinent Portions of the Deposition Transcript of Shirley Bautista | 259-266 |
| 23 | Pertinent Portions of the Deposition Transcript of Carlos L. Estolano | 267-285 |
| 24 | Expert Report of Gwendolyn Vontoure, RN, PHN, BSN, MBA, MSN, HCM | 286-323 |
| 25 | San Diego County Sheriff's Department Statement Report of RN Marylene Allan | 324-327 |

32

# EXHIBIT 1

Exhibit 1
33



# County of San Diego

GLENN N. WAGNER, D.O.
CHIEF MEDICAL EXAMINER

**OFFICE OF THE MEDICAL EXAMINER**
5570 OVERLAND AVE., SUITE 101, SAN DIEGO, CALIFORNIA 92123-1206
TEL: (858) 694-2895  FAX: (858) 495-5956

4/24/2014

## INVESTIGATIVE REPORT

**CALL INFO**

| NAME OF DECEASED (LAST, FIRST MIDDLE) | | AKA | | HIO | CASE NUMBER |
|---|---|---|---|---|---|
| SANDOVAL, Ronnie Paul | | | | ☐ | **14-00466** |
| INVESTIGATOR | REPORTED BY | REPORTING AGENCY | | | PREVIOUS WAIVE # |
| Sandra Joseph | Det Pete Carrillo | San Diego Sheriff | | | |
| CALL DATE AND TIME | ARRIVAL DATE AND TIME | | | RETURN DATE AND TIME | |
| 02/23/2014   0556 | 02/23/2014   0630 | | | | |

**DECEDENT**

| DATE AND TIME OF DEATH | DATE OF BIRTH | AGE | GENDER | RACE |
|---|---|---|---|---|
| **02/23/2014   0211** | 09/30/1967 | 46 Years | Male | Hispanic Mexican |
| RESIDENCE (STREET, CITY, STATE, ZIP) | | | COUNTY | LAST SEEN ALIVE |
| 2121 Siegle Court Lemon Grove, CA 91945 | | | San Diego | |
| SOCIAL SECURITY NO. | CITIZENSHIP | OCCUPATION | | PAID AUTOPSY |
| | USA | Carpenter | | ☐ |

**DEATH**

| LOCATION OF DEATH | TYPE OF PLACE |
|---|---|
| San Diego Central Jail | Other |
| ADDRESS (STREET, CITY, STATE, ZIP) | |
| 1173 Front Street  San Diego, CA 92101 | |

SUMMARY

The decedent was a 46 year old, married, Hispanic male who resided in Lemon Grove. On 2/22/2014, the decedent was arrested for possession of a controlled substance and taken to San Diego Central Jail. During processing, the decedent was observed to be sweating profusely, but denied feeling unwell. He was placed in a holding cell for medical monitoring. On the early morning of 2/23/2013, the decedent was observed seated on the bench and he slumped towards the wall, his head struck the wall and he fell to the ground exhibiting seizure like behavior. Deputies called for medical assistance, however the decedent stopped breathing and death was pronounced at the scene.

Medical Examiner's jurisdiction invoked according to the California Government Code 27491: Deaths due to known or suspected as resulting in whole or in part from or related to accident or injury, either old or recent.

**INCIDENT**

| LOCATION OF INCIDENT | | INCIDENT PLACE TYPE | AT WORK ☐ | AT RESIDENCE ☐ |
|---|---|---|---|---|
| Unknown | | | | |
| ADDRESS (STREET, CITY, STATE, ZIP) | | COUNTY | | |
| Undetermined  Undetermined, | | | | |
| DATE AND TIME OF INCIDENT | INVESTIGATING AGENCY | OFFICER | BADGE # | REPORT # |
| 02/--/2014   Unk | San Diego Sheriff | Det. Pete Carrillo | | 1410-768 |
| DECEDENT WAS | BELTED | HELMETED ☐ Yes ☐ No | POSITION | ON PRIVATE PROPERTY ☐ Yes ☐ No |
| VEHICLE | | | LICENSE NUMBER | STATE |

**NOTIFICATION**

| IDENTIFIED BY | METHOD | DATE AND TIME | |
|---|---|---|---|
| Det Pete Carrillo | Personal Effects | 02/23/2014   0600 | |
| FUNERAL HOME | PROPERTY | PUBLIC ADMINISTRATOR | TYPE OF EXAM |
| Funeraria Del Angel-Humphrey | ☑ Yes ☐ No | ☐ Yes ☑ No | Autopsy |
| NAME OF NOK OR OTHER | RELATIONSHIP | DATE NOTIFIED | NOTIFIED BY |
| Anna Sandoval | Wife | 2/23/2014 7:00:00 AM | Other |

Page 1

Exhibit 1

34

| San Diego Medical Examiner | Case Number | : 14-00466 |
|---|---|---|
| 5570 Overland Avenue, Suite#101 | Investigator | : Sandra Joseph |
| San Diego, CA 92123-1206 | Date of Death | : 02/23/2014 |
| (858) 694-2895 | Date Today | : 04/24/2014 |

## INVESTIGATIVE NARRATIVE

Decedent: Ronnie Paul Sandoval

**Antemortem Events:**
On 2/23/2014, I obtained the following information from San Diego Sheriff Detective Pete Carrillo during a briefing at San Diego Central Jail. On 2/22/2014, San Diego Sheriff Deputies arrested the decedent at a home other than his, in Lemon Grove. The decedent was found in a bathroom with 1.09 grams of methamphetamine and drug paraphernalia. The decedent was taken to San Diego Central Jail at 1424 hours where he was prescreened and had a medical check. I spoke with Deputy Bryan #2880 who informed me at that time, he observed the decedent was "sweaty and appeared exhausted" and "the front of his shirt was drenched with sweat". Deputy Bryan stated the decedent reported he was pre-diabetic, but took no medications. He denied taking any illicit drugs. The decedent reported he had been sick the previous week but did not offer any specific symptoms. Deputy Bryan asked the decedent when he last ate, because he reported he was pre-diabetic. The decedent said he had last eaten the day before. Deputy Bryan asked a nurse to check the decedent and recalled the triage nurse said his vital signs were good and his blood sugar was 108 and he was medically cleared. Deputy Bryan took the decedent to a holding cell and gave him a sack lunch, plus one extra because he had not eaten since the previous day. Around 1700 hours the decedent was taken to the second floor and placed an observation cell, designated "Waiting Room 1". He was not dressed out and was still in street clothes. The decedent had not yet been booked. The decedent was viewed by deputies and medical staff during routine rounds. On 2/23/2014 at approximately 0053 hours, Sgt. Shawcroft #5213 observed the decedent appeared to have a "blank look" on his face. Sgt. Shawcroft observed the decedent slump towards the wall and his head struck the wall and he fell to the ground with seizure activity. The decedent was observed to have slight tremors. Jail medical staff was immediately summoned and oxygen was applied. The decedent was unresponsive to his name but appeared to be breathing. He was moved out of the cell for better access for medical care. Nursing staff called for emergency transport at 0105 hours. An oral airway was placed and the decedent was oxygenated by bag valve mask. At 0118 hours, the decedent started vomiting and was turned onto his side. Intravenous access was started by medical staff on his right arm. Paramedics responded at 0120 hours and EMTs took over. The decedent's condition worsened and he became apneic. San Diego Fire Department staff initiated CPR. Despite aggressive resuscitative efforts death was pronounced by Dr. Hwang of Scripps La Jolla by radio. The decedent was alone in the holding cell the entire time.

**Past Medical, Surgical, and Social History:**
Per Anna Sandoval, the decedent's wife, the decedent did not regularly see a physician and was not known to have recently been hospitalized. The decedent was diagnosed as "pre-diabetic" 1-2 years ago. Many years ago (around 20 year), he sustained a gunshot and had abdominal surgery. The decedent had a many year history of drug abuse.

Per San Diego Sheriff Inmate reports, the decedent has had arrests since 2004 for possession of narcotics, transporting controlled substances, attempt to destroy/conceal evidence, under the influence, battery, elder abuse and violation of federal parole.

**Scene Description:**
On 2/23/2014 at 0640 hours, I viewed the holding cell where the decedent became unresponsive. There was a small amount of blood on the floor which reportedly occurred when the intravenous access became dislodged.

The decedent's shoes were near the toilet. There was a partially consumed sack lunch on the bench the decedent had been sitting on and there was another apparently unconsumed sack lunch on the opposite bench. I found no drugs or paraphernalia during a search of the holding cell.

**Body Description:**
On 2/23/2014 at 0640 hours, I viewed the body. The decedent was lying strapped to a backboard. He was wearing a black tank top, shorts and underwear. The clothing had been cut by medics. The decedent's hands and wrists were shackled. His abdomen was distended and firm. His entire body was cool to the touch. Red lividity formed to his posterior body surfaces. His eyes were congested. There were numerous venipuncture marks on his right arm underneath a bloody gauze dressing. There was a faint midline abdomen surgical scar with two circular scars on either side. There was also a well healed, large scar on his right inner knee which was possibly a burn. There was a cervical collar around his neck and an airway. There were abrasions on his sternum from resuscitative efforts. There were no ligature marks, defensive wounds or visible trauma on his body his body.

On 2/23/2014, 92M Transport personnel E. Scott and I placed the decedent in a clean, white pouch. At 0729 hours, blue tamper evident seal #2522775 was affixed for transport to the Medical Examiner's Office.

**Special Requests:**
Detective Pete Carrillo requests to be contacted if there are any suspicious findings.

**Identification:**
The decedent was identified to me by Detective Pete Carrillo. Identity was confirmed by a booking photo from previous arrests.

**Antemortem Specimens:**
There were no antemortem specimens.

**Public Administrator:**
Public Administrator referral was not requested.

**Other Important Factors:**
There were no other important factors.

Signed: _____
      Sandra Joseph
      **Medical Examiner Investigator**

Date Signed: 3/16/2014

Approved by: _____

Page 3 of 3
14-00466

Exhibit 1
36

# EXHIBIT 2

Exhibit 2
37

# Estate of Ronnie Paul Sandoval, et al.
# vs. County of San Diego, et al.

## Deposition of
## OFFICER MATTHEW CHAVEZ
## February 23, 2016

| Exhibits | Transcript | Media Included<br>Word Index |
|---|---|---|

866.999.8310 | aptusCR.com



Exhibit 2
38

Officer Matthew Chavez

Estate of Ronnie Paul Sandoval, et al.
vs. County of San Diego, et al.

1  day?

2      A.   6:00 a.m.

3      Q.   I think the records indicate that Mr. Sandoval

4  came in in the early afternoon, like 3:30 or so is when

5  you first encountered him?

6      A.   Yes.

7      Q.   Can you tell me what you recall as far as your

8  initial encounter with Mr. Sandoval.

9      A.   He was sweating.  He looked a little bit

10 disoriented.  I mean, that's about it.  He looked a

11 little bit ill.

12     Q.   Was he -- he wasn't walking super smooth?

13     A.   I recall he was just walking sort of slow.

14 Nothing out of the ordinary.  He looked a little

15 lethargic.

16     Q.   So looked a little lethargic, disoriented, and

17 sweating, and you had been in the -- you had taken your

18 POST training with respect to signs and symptoms -- you

19 had done your POST training with respect to signs and

20 symptoms of drug use, moving up the scale to drug

21 intoxication?  You had done all that stuff, right?

22     A.   Yes.

23     Q.   Help me understand your understanding.  What

24 signs and symptoms do you correlate with somebody who's

25 a recreational user of, say, of stimulants?

Officer Matthew Chavez

Estate of Ronnie Paul Sandoval, et al.
vs. County of San Diego, et al.

1    A.   I did.

2    Q.   **First correlation was potential diabetes?**

3    A.   Yes.

4    Q.   **So what did you do?**

5    A.   I informed Deputy Bryan, who was another deputy

6    who was working with me down there on the floor --

7    excuse me.   Right before that, I asked him if he was

8    feeling okay.   He told me that he may have diabetes, but

9    he didn't get a diagnosis yet and he didn't take

10   medication for it.

11   Q.   **He told you that?**

12   A.   Yes.   Once he told me that, I informed Deputy

13   Bryan.

14   Q.   **Who's that?**

15   A.   Deputy Bryan was a senior deputy who was

16   working on the floor at that time.

17   Q.   **Is he a corporal or anything?**

18   A.   He was a training officer.   I don't recall if

19   he was a corporal.   I don't believe so.

20   Q.   **So you informed Deputy Bryan that, Hey, this**

21   **guy, he's looking sort of off, sweating, disoriented,**

22   **and he says he may be a potential diabetic?**

23   A.   Correct.

24   Q.   **What did Deputy Bryan tell you?**

25   A.   Deputy Bryan notified the intake nurse and the

Officer Matthew Chavez

Estate of Ronnie Paul Sandoval, et al.
vs. County of San Diego, et al.

1    intake nurse came out and checked Sandoval's blood

2    sugar.

3        Q.   That would have been Nurse Bell?

4        A.   I don't recall the nurse's name.  It was a male

5    nurse on the first floor.

6        Q.   And where did that initial blood screening take

7    place?

8        A.   Right there near the fingerprint, the Live Scan

9    machine.

10        Q.   Have you reviewed the videotapes in this case?

11        A.   No.

12        Q.   You can actually see that in the video right by

13    the Live Scan, they come out and do a little check on

14    him.

15        A.   Oh, really?

16        Q.   Yes.  So Nurse Bell comes out and does the

17    Live Scan.  Was there an individual deputy by the name

18    of "Cesar Costa," a nurse?

19        A.   I don't recall.

20        Q.   Yes, a nurse.  Cesar Costa.

21        A.   I don't recall.

22        Q.   Did you sit him down on the bench there across

23    from the Live Scan in the hall?

24        A.   I believe so.  He was sat down while the nurse

25    was speaking with him.

Officer Matthew Chavez

Estate of Ronnie Paul Sandoval, et al.
vs. County of San Diego, et al.

1    Q.   And did she do a glucose monitor -- did she

2    bring a machine out or did she do some other like --

3    A.   I think it was a handheld -- I don't even know

4    what you call those.  I am not familiar.

5    Q.   Like some sort of handheld device?

6    A.   Um-hum.

7    Q.   Was it on wheels like an IV machine or was it

8    just kind of like something she held in her hand like a

9    Breathalyzer?

10   A.   I think it was just a handheld where you prick

11   the finger and it tells you.

12   Q.   Got you.  What did Nurse Bell tell you about

13   the results of that exam?

14   A.   The nurse told us his blood sugar looks fine.

15   Give him some food.

16   Q.   And did you give him food?

17   A.   I believe Deputy Bryan gave him food -- one of

18   us gave him food.  I can't remember which one.  But he

19   ended up getting a sack lunch at that point, and then he

20   went back into the holding cell on the first floor.

21   Q.   So you did the Live Scan?

22   A.   Um-hum.

23   Q.   And during the Live Scan process, you noticed

24   some what you thought was strange behavior, so you sat

25   him down, had the glucose monitor, gave him a sack

Officer Matthew Chavez

Estate of Ronnie Paul Sandoval, et al.
vs. County of San Diego, et al.

1      A.   I think it was a small number.  Maybe one or

2   two others.  Not many.

3      Q.   Do you remember any of their names?

4      A.   I don't.

5      Q.   And how long was he out at that second holding

6   cell to have his booking photo retaken?

7      A.   I don't recall.

8      Q.   Did you notice some further observations that

9   caused you to do something different?

10     A.   He still looked ill to me.

11     Q.   Still sweaty?

12     A.   Yes.

13     Q.   Still kind of confused?

14     A.   Um-hum.

15     Q.   Lethargic?

16     A.   Yes.

17     Q.   Did he have his booking photo retaken?

18     A.   Yes.

19     Q.   Then what did you do?

20     A.   I asked, I believe, Deputy Martinez, female

21   deputy corporal who was working on the first floor, I

22   shared what information that I picked up while

23   contacting Sandoval with her.  She said you should

24   probably just take him up to the second floor to have

25   him more thoroughly evaluated.  That was that.

Officer Matthew Chavez

Estate of Ronnie Paul Sandoval, et al.
vs. County of San Diego, et al.

1          So I bypassed the normal steps that were down

2    there on the first floor leaving him in the second cell

3    and took him directly up to medical obs.

4          Q.   **To have him thoroughly evaluated?**

5          A.   Yes.

6          Q.   **So he could be observed?**

7          A.   Correct.

8          Q.   **And the deputies could give him -- excuse me --**

9    **the nurses give him a full assessment?**

10         A.   Correct.

11         Q.   **All right.  So what happened when you brought**

12   **him up to the second floor?**

13         A.   I contacted Nurse de Guzman at the medical

14   observation booths right there, the nurse's desk.  I

15   told him basically what I had observed.

16         Q.   **He was sweating?**

17         A.   Yes.

18         Q.   **Lethargic?**

19         A.   Yes.

20         Q.   **Confused?**

21         A.   Correct.

22         Q.   **And you had brought him up to be evaluated?**

23         A.   Correct.

24         Q.   **And what did he do?**

25         A.   Nurse de Guzman said, "Okay.  Go ahead and put

Officer Matthew Chavez

Estate of Ronnie Paul Sandoval, et al.
vs. County of San Diego, et al.

1   him in Medical Observation Cell No. 1, and then I'll

2   take a look at him."

3      Q.  The medical observation cell, that's different

4   than that 40 man holding cell --

5      A.  Correct.

6      Q.  That's just off to the side, right?

7      A.  Actually, it's in direct line of sight of the

8   entire nurse's station.

9      Q.  Actually, you're right.

10      And as a deputy, were you familiar with any of

11   the policies or regulations that govern the nurse's

12   responsibilities with respect to their observation

13   duties for those -- for that holding cell?

14      A.  I can't really speak to the nurses'

15   responsibilities.

16      Q.  I didn't think you could.

17      And you understand what a Title 15 check is,

18   right?

19      A.  Yes.

20      Q.  Was anybody responsible to do Title 15 checks

21   for that particular holding cell that you know of?

22      A.  All the deputies on the floor, that's part of

23   their responsibility on the floor.  I believe the nurses

24   do that as well, but I'm not sure what their parameters

25   are.

Officer Matthew Chavez

Estate of Ronnie Paul Sandoval, et al.
vs. County of San Diego, et al.

1    A.  No.  The majority of our communication was me

2  just sort of probing to see if I could figure out what

3  was wrong with him.

4    Q.  And how about any of the other inmates, did

5  they ever tell you, Hey, I was in the holding cell with

6  him and what's going on with this guy?  He looked kind

7  of messed up; anything like that?

8    A.  No.

9    Q.  We'll go ahead and mark this as Exhibit 1 to

10  your deposition.  This is your report.  Do you recognize

11  this, sir?

12    A.  Yes, I do.

13      (Exhibit 1 marked)

14  BY MR. MORRIS:

15    Q.  If you could look at the second sentence of the

16  first paragraph.  Your report reads, "I asked Sandoval

17  if he was alright.  Sandoval replied that he was very

18  cold and did not feel very well" -- excuse me -- "not

19  feel well."  Do you see that?

20    A.  Yes.

21    Q.  Does that refresh your recollection that

22  Sandoval actually told you that he wasn't feeling well?

23    A.  Yes.

24    Q.  Did you just happen to forget that and your

25  report helped you remember?

Officer Matthew Chavez

Estate of Ronnie Paul Sandoval, et al.
vs. County of San Diego, et al.

1    A.   Yes.

2    Q.   Now that you reviewed your report and refreshed

3    your recollection, can you tell me what you can recall

4    about that piece of communication between you and

5    Mr. Sandoval.

6    A.   He did say that he was very cold and me seeing

7    that he was sweating, I thought that was odd.

8    Q.   So he's telling you "I am just really cold,"

9    but he's sweating profusely?

10   A.   Correct.

11   Q.   At any point, did that then harken back to your

12   POST training when you started thinking, Well, sweating

13   profusely and complaining of being cold, signs and

14   symptoms of drug intoxication?  Did you make that

15   correlation?

16   A.   No.

17   Q.   At any time did you express to Nurse de Guzman

18   that you thought that Sandoval was a potential -- had a

19   potential drug problem?

20   A.   No.

21   Q.   You never made that correlation, right?

22   A.   Right.  Sandoval doesn't appear to be at first

23   glance what you would typically picture as someone who

24   has a drug problem.

25   Q.   Especially not a meth problem?

**Estate of Ronnie Paul Sandoval, et al.**
**vs. County of San Diego, et al.**

```
 1        A.   Correct.

 2        Q.   The cell that you were instructed to place

 3   Ronnie into, it's neither a medical observation unit

 4   cell or a sobering cell or a safety cell.  What is that

 5   cell?

 6        A.   It's a medical observation.

 7        Q.   You understand that Nurse de Guzman takes great

 8   issue with that characterization?

 9        A.   I mean, that's what they are referred to, so

10   that's the only name I know to call them.

11        Q.   And who refers to them as "medical observation

12   cells"?

13        A.   Everybody.

14             MR. CHAPIN:   Everybody else.

15   BY MR. MORRIS:

16        Q.   Everybody but the guy -- okay.  So you refer to

17   them as "medical observation cell," and as far as you

18   know, all the other deputies and staff refer to that as

19   a medical observation cell?

20        A.   Yes.  Slang term is Med-obs 1 and Med-obs 2.

21        Q.   Nurse de Guzman called it just a holding cell,

22   just a normal holding cell.  Not part of the medical

23   floor.  You would disagree with that characterization?

24        A.   Yeah.  He told me in Medical Observation

25   Cell 1.
```

Officer Matthew Chavez

Estate of Ronnie Paul Sandoval, et al.
vs. County of San Diego, et al.

1    A.   Yes.

2    Q.   Do you know that Nurse de Guzman testified that

3    you never explained to him that Mr. Sandoval was

4    sweating or lethargic or confused or anything like that,

5    that you never said anything like that.  You just said

6    check his blood sugar.  You disagree with that?

7    A.   I do.

8    Q.   You have a distinct recall of that actual

9    conversation taking place where you communicate your

10   observations to de Guzman, right?

11   A.   Yes.   I communicated my observations.  I told

12   him that he had been cleared by the medical staff

13   downstairs, but there was still something going on so

14   you need to look at him more thoroughly.

15   Q.   Is it your understanding that -- when he gets

16   placed in that cell, who can make the determination that

17   he can be moved to like a sobering cell or back down to

18   finish the booking process?  How would that

19   determination have been made?

20   A.   Any sobering cell or safety cell placements

21   have to be cleared and signed off by the nursing staff

22   prior to anyone going in there.

23   Q.   So deputies can't put somebody in the sobering

24   cell?

25   A.   We can recommend that they go in a sobering

Officer Matthew Chavez

Estate of Ronnie Paul Sandoval, et al.
vs. County of San Diego, et al.

```
 1              REPORTER'S CERTIFICATION

 2

 3        I, Susan Swan, RPR, CRR, CCRR, a Certified

 4   Shorthand Reporter in and for the State of California,

 5   do hereby certify:

 6

 7        That the foregoing witness was by me duly sworn;

 8   that the deposition was then taken before me at the time

 9   and place herein set forth; that the testimony and

10   proceedings were reported stenographically by me and

11   later transcribed into typewriting under my direction;

12   that the foregoing is a true record of the testimony and

13   proceedings taken at that time.

14

15        IN WITNESS WHEREOF, I have subscribed my name this

16   1st day of March, 2016.

17

18

19            Susan Swan
             _____

20            Susan Swan, RPR, CRR, CCRR

21            CSR No. 7338

22

23

24

25
```

Exhibit 2
50

Officer Matthew Chavez

Estate of Ronnie Paul Sandoval, et al.
vs. County of San Diego, et al.

```
 1            DECLARATION UNDER PENALTY OF PERJURY

 2    Case Name: Estate of Ronnie Paul Sandoval, et al.
               vs. County of San Diego, et al.
 3    Date of Deposition: 02/23/2016

 4    Job No.: 10022306

 5

 6                I, OFFICER MATTHEW CHAVEZ, hereby certify

 7    under penalty of perjury under the laws of the State of

 8    _____ that the foregoing is true and correct.

 9              Executed this _____ day of

10    _____, 2016, at _____.

11

12

13                        _____

14                        OFFICER MATTHEW CHAVEZ

15

16    NOTARIZATION (If Required)

17    State of _____

18    County of _____

19    Subscribed and sworn to (or affirmed) before me on

20    this _____ day of _____, 20__,

21    by_____,    proved to me on the

22    basis of satisfactory evidence to be the person

23    who appeared before me.

24    Signature: _____ (Seal)

25
```

# EXHIBIT 3

Exhibit 3
52

@ptus
COURT REPORTING

Exhibit: 1
Witness: Chavez
Date: 2-23-16

IAD Event No. E1465588

# San Diego County Sheriff's Department
## Officer Report

Case No. 14109768
Report No. 27156

**1**
Page 1 of 1

| GENERAL CASE INFORMATION | | | |
|---|---|---|---|

| Special Studies: | | | | Related Cases: |
|---|---|---|---|---|

Location, City, State, ZIP:
1173 Front St. San Diego, Ca 92101,San Diego, CA 92101

Occurred On:
2/23/2014 12:53:00 AM (Sunday)

Jurisdiction:
DETENTION FACILITY - CENTRAL

Beat:
021

Call Source:

(and Between):

| INDIVIDUAL/S | | | |
|---|---|---|---|

Name:
Sandoval, Ronnie

Person Code:

Interpreter Language:

ALIAS / AKA / NICKNAME / MONIKER:

Home Address, City, State, ZIP:

Res. Country:

County Residence:
N Nonresident

Undocumented:

| Race: H | Sex: M | Date of Birth / Age: 09/30/1967 - | Height: 5'9" | Weight: 187 lbs | Hair Color: GRY | Eye Color: BRO | Facial Hair: 06 - Mustache Only | Complexion: |
|---|---|---|---|---|---|---|---|---|

Employment Status:

Occupation/Grade:

Employer/School:

Employer Address, City, State, ZIP:

| CONTACT INFORMATION | | | |
|---|---|---|---|
| IDENTIFICATION: | | | |

| Type: BN - Booking Number | Number: 14713020 | State: | Country: |
|---|---|---|---|

Attire:

Injury:

Extent Of Treatment:

Violent Crime Circumstances:

| REPORT NARRATIVE |
|---|

Case# 1465588

ORIGIN:

On 02-22-14, I was assigned the Intake Deputy Position at San Diego Central Jail where I interacted with Inmate Ronnie Sandoval (BN#14713020).

DEPUTY'S OBSERVATIONS:

On 02-22-14, at approximately 1530 hours, I first made contact with Inmate Sandoval while taking his fingerprints. Inmate Sandoval was extremely sweaty and appeared to be slightly disoriented. I asked Sandoval if he was alright. Sandoval replied that he was very cold and did not feel well. Sandoval then spontaneously said that approximately eight months ago he was told that he may be "borderline diabetic". I asked Sandoval if he told the Intake Nurse this and he responded "Yes; I don't take any medication for it though."
At this time I notified Deputy Bryan (2880) about Inmate Sandoval. Deputy Bryan informed the intake nurse who promptly came out to the fingerprinting area and tested Sandoval's blood sugar. The nurse said that his blood sugar was normal. I placed Sandoval in Holding Cell #5 on the first floor.

At approximately, 1630 hours Inmate Sandoval was escorted to the forensics room to have his booking photograph taken. Sandoval was still sweating a lot and appeared to be very tired and disoriented. Deputy Martinez (7059) asked Sandoval how he was feeling. Sandoval became agitated and refused to answer any more questions regarding his health. Deputy Martinez and I decided that it would be best to expedite the booking process for Sandoval so he could see the nurse on the second floor. As soon as the photograph was completed, I escorted Sandoval through the intake sally port up to the second floor. I spoke with Nurse De Guzman (0770) and explained what I observed while in contact with Sandoval. Nurse De Guzman instructed me to place Sandoval in the Medical Observation Cell #1 and that he would examine Sandoval as soon as possible. I placed Sandoval in Medical Observation Cell #1 and explained to him that the nurse would see him as soon as possible. Sandoval responded, "Thank you."

I notified Deputies Wilkinson (3226) and Rodriguez (2334) that Sandoval was placed in the Medical Observation Cell #1.

I had no further contact with Sandoval.

| Reporting Officer SH1147 - CHAVEZ, MATTHEW | Division / Organization SDCJ / SDCJ - San Diego Central Jail | Reviewed By SH4202 - KAMOSS, KARL |
|---|---|---|
| Report Date 2/23/2014 7:34:43 AM | Detective Assigned SH1881 - CARRILLO, PETE | Reviewed Date 2/25/2014 12:25:49 AM |

NetRMS_CASDCR.rtf v11-15-06

COSD RRFP 000249

Exhibit 3
53

# EXHIBIT 4

Exhibit 4
54

# Estate of Ronnie Paul Sandoval, et al.
# vs. County of San Diego, et al.

## Deposition of
## ROMEO DE GUZMAN
## February 23, 2016

| Exhibits | Transcript | **Media Included** Word Index |
|---|---|---|

866.999.8310 | aptusCR.com



COURT REPORTING

Exhibit 4
55

Romeo de Guzman

**Estate of Ronnie Paul Sandoval, et al.**
**vs. County of San Diego, et al.**

1   seizure, you know.

2       Q.   Disoriented?

3       A.   Disoriented.   Not following --

4       Q.   What symptoms, Nurse de Guzman, do you

5   associate with somebody who, say, for instance, is a

6   diabetic who's suffering from low blood sugar?   What

7   does that look like as far as your understanding?

8       A.   How far is the blood sugar?

9       Q.   Somebody who's got low blood sugar.   Diabetic

10  with low blood sugar who needs some sugar right away.

11  What does that person look like?

12      A.   Looks like -- restless, too.   Almost the same.

13  Something like shaking.

14      Q.   Confused?

15      A.   Shaking and confused.   Uncomfortable.

16         MR. MORRIS:   Go off the record.

17         (Pause)

18  BY MR. MORRIS:

19      Q.   Nurse, one thing I forgot to ask you to do is

20  state your full name and spell your last name, for the

21  record.   Can you do that for me.

22      A.   My name is Romeo de Guzman.   My last name

23  spelled d-e G-u-z-m-a-n.

24      Q.   Is it a capital G?

25      A.   Sometimes I use it small d-e and capital G.

Exhibit 4
56

Romeo de Guzman

Estate of Ronnie Paul Sandoval, et al.
vs. County of San Diego, et al.

1    Q.   There was no assignment that you had to check

2    that individual every hour or every four hours?   Nothing

3    for that cell, right?

4    A.   No, nothing.

5    Q.   Do you know what a Title 15 hourly check is

6    that the deputies do?   They do the Title 15 checks?

7    A.   I know that the deputy is doing it.   I don't

8    know about the title.

9    Q.   Do you know what "Title 15" is?

10   A.   Something like that.   I have an idea, but I am

11   not really...

12   Q.   Title 15 is the code of regulations that govern

13   jails in California.

14   A.   Um-hum.

15   Q.   And that mandates there are hourly checks for

16   the deputies?

17   A.   Hourly checks for the deputies.

18   Q.   Are there hourly checks that the deputies do

19   for the cell that Mr. Sandoval was housed in?

20   A.   I think -- if they are doing it, I think it

21   should be included for every hour.   Because they do

22   rounds and check for all the inmates.

23   Q.   Right.   But in your statement that you gave the

24   investigating officer, you mentioned that there was no

25   log or anything that was required as far as the deputies

Romeo de Guzman

**Estate of Ronnie Paul Sandoval, et al.
vs. County of San Diego, et al.**

1   were concerned to do hourly checks in that cell?

2       A.   I don't know what -- for that cell.  I don't

3   know.  We have no log to monitor.  But in the rounds --

4   they have their own log that they do the rounds.  For

5   that cell alone, for individual -- like what we're doing

6   in safety cell and sobering cell, that every time that

7   we pass we initial and write down what they are doing;

8   if they are eating, if they are, like, standing or what

9   they are doing, you know.  We have a log.

10       Q.   You have a log for the sobering and safety

11   cell?

12       A.   That's right.

13       Q.   You don't have a nursing log for the holding

14   cell that Mr. Sandoval was in, right?

15       A.   No, sir.

16       Q.   No log?

17       A.   No.

18       Q.   Do you think there should be?

19       A.   Not needed.  It's a holding cell.  Why do we

20   need to have a log over there?

21       Q.   I think that's what you told the deputy in your

22   statement, that it would be best practice to have a log?

23       A.   Because somebody died like that.  It's better

24   now, you know -- if they would place somebody there and

25   it should be -- you know -- somebody need to be placed

Romeo de Guzman

**Estate of Ronnie Paul Sandoval, et al.
vs. County of San Diego, et al.**

1   there it -- that's something that needs to be monitored.

2       Q.   So you would agree that it would be best

3   practice to have a log for that holding cell?

4       A.   Yes.  And the holding cell need to -- if --

5   there's a log if somebody need to be monitored, you

6   know.  It's a simple -- like a normal inmate, no need to

7   have a log.  But if it's something that need to be

8   monitored, it's better to have a log.

9       Q.   Is there any -- back up.  There is a white

10  board, right?  You list the names of the people who are

11  in the detox or the sobering cells and the safety cells,

12  right?

13      A.   That's right.

14      Q.   But there is no space on that white board to

15  put the names of the individuals that are in the holding

16  cell here, right?

17      A.   That's right.

18      Q.   No name?

19      A.   No name.

20      Q.   Do you know why that is?

21      A.   This is a movement -- there's nothing -- what

22  do you call it -- different.  There's no difference

23  between -- it's a holding cell.  Just place it there.

24  Place, leave.  You know, booking, waiting for

25  fingerprinting, leave.

Romeo de Guzman

**Estate of Ronnie Paul Sandoval, et al.
vs. County of San Diego, et al.**

1      A.    Yeah.   By the door.

2      Q.    And he's standing there with Mr. Sandoval?

3      A.    Hum?

4      Q.    The deputy was standing behind the inmate you

5  were screening, with Mr. Sandoval?

6      A.    That's right.   You know, side, something like

7  that.   I don't know if it's behind or side.   With the

8  deputy.

9      Q.    What did Mr. Sandoval look like to you at that

10  moment?

11      A.    He was fine.   He was okay.

12      Q.    Have you seen the videos of Mr. Sandoval, sir,

13  when he was brought to you?

14      A.    No.

15      Q.    The video showed that he's covered in sweat.

16  Did you see that when you looked over and saw him at

17  that moment?

18      A.    No.

19      Q.    You didn't see any sweat?

20      A.    No.

21      Q.    What exactly did the deputy ask you to do?

22      A.    "Nurse, can you please check the inmate's blood

23  sugar."

24      Q.    Did he tell you what he had observed as far as

25  why he thought he needed the blood sugar?   Did he tell

Romeo de Guzman

Estate of Ronnie Paul Sandoval, et al.
vs. County of San Diego, et al.

1    you Mr. Sandoval was acting this, that, or whether it

2    looked this way or that way?

3        A.   No.

4        Q.   He didn't convey any information to you about

5    what he had observed with Mr. Sandoval?

6        A.   No.

7        Q.   Have you read that deputy's report about what

8    he observed with Mr. Sandoval?

9        A.   I read -- yeah.

10       Q.   You read his report?

11       A.   Yes.

12       Q.   And you know his report says Mr. Sandoval was

13   shaking and covered in sweat, right?

14       A.   That's what the report.

15       Q.   So is it your testimony, sir -- and the

16   deputy's name, by the way, is "Deputy Chavez."

17            Is it your testimony, sir, that Deputy Chavez

18   did not convey any of this information to you?  We have

19   marked as Exhibit 4 Deputy Chavez's report.

20       A.   I don't remember that Mr. Chavez told me

21   anything about Mr. -- about the inmate.

22            (Exhibit 4 marked)

23   BY MR. MORRIS:

24       Q.   If you look down here at the third paragraph,

25   the second sentence begins with "Sandoval," and it

Romeo de Guzman

**Estate of Ronnie Paul Sandoval, et al.
vs. County of San Diego, et al.**

1     A.   There's -- yeah.

2     Q.   You made that statement to Detective Carrillo.

3          What led you to conclude that he may have been

4  under the influence?  What things did you see that you

5  thought may be consistent with somebody who had taken

6  drugs?

7     A.   You know, I don't see anything.

8     Q.   Then why did you tell him that he looked like

9  he may have been under the influence?

10    A.   Because, you know, this is the -- this is what

11 I remember.  When the inmates ask me to check it -- I

12 ask the deputy to place in one of the holding cells.

13 The officer -- the deputy is asking that kind of

14 question to Mr. Sandoval, you know, something like "Are

15 you under the influence or anything?"

16         I asked him, too, you know.  Like for blood

17 sugar check -- "Are you okay?"  Something like that.

18 But I don't see anything.  Nothing is under the

19 influence of any drugs.

20    Q.   I made a report of all the statements you made.

21    A.   I did not say he was under the influence.

22    Q.   No.  You said that what you saw was consistent

23 or it indicated to you that he may have been under the

24 influence.  If you want to, we'll play that part of your

25 tape.

Romeo de Guzman

**Estate of Ronnie Paul Sandoval, et al.
vs. County of San Diego, et al.**

1    Q.  What did the deputy say to you about him

2  being --

3    A.  Something like -- "I just found out that he's

4  under the influence."  Maybe I overheard.  I still

5  remember -- who's the deputy --

6    Q.  Chavez?

7    A.  To tell you the truth, I don't remember Chavez.

8  The only thing that helped me is the Mexican guy, Mr. --

9  you know -- the other deputy.  He was the one who opened

10  the flap and he's the one that asking questions.

11    Q.  Slow down a little bit.

12    A.  Okay.

13    Q.  In this tape you say, Looking at him and

14  looking at the charges, I thought he might be under the

15  influence.  Let's break that down a little bit.

16    A.  That's right.

17    Q.  Let's talk about the charges first.

18    A.  That's right.

19    Q.  Did you pull him up on JMS to see what he had

20  booked on?

21    A.  No, I didn't.

22    Q.  How did you know that he had booked on a

23  controlled substance charge?

24    A.  I don't remember how did I found it.

25    Q.  Did you think based on the way he looked that

Exhibit 4
63

Romeo de Guzman

**Estate of Ronnie Paul Sandoval, et al.**
**vs. County of San Diego, et al.**

1   he had been booked on controlled substance?

2       A.   No.   I think it's based on saying -- I don't

3   know how I found it.   Maybe the deputy -- you know.

4       Q.   So somebody may have said it?

5       A.   Somebody may have said he's under the

6   influence, that's why he's arrested.   We have to find

7   the charges.

8       Q.   So if this guy is booked on controlled

9   substance charges, did you think that the way he looked

10  was consistent with somebody who was under the influence

11  who had been booked on controlled substance charges?

12      A.   During that time, he has no -- I don't see

13  anything that he's like under the influence of drugs.

14      Q.   In this tape, you say, Looking at him and

15  looking at the charges, I thought he might be under the

16  influence.   We talked about the charges already.   What

17  about him?

18      A.   That's why -- we are not sure.

19          MR. CHAPIN:   Objection.   It's been asked and

20  answered twice and he's answered it twice.

21  BY MR. MORRIS:

22      Q.   I would love an answer.   What observations

23  about --

24      A.   I told you already.   I observed him.

25      Q.   What about him led you to think that he was

Romeo de Guzman

```
1    patient presented to me, it was clearly that he's, like,

2    a normal person that can talk, that can walk, can

3    follow.

4         We have -- we have seen hundreds of inmates and

5    he's, like, very healthy as compared to other inmates

6    that I don't have to -- you know -- to worry about this

7    kind of small sweat.  Sometimes you can see saliva.

8    Sometimes you can see food in the clothes.

9         Do I make a diagnosis for that?  I would not

10   make a diagnosis for that.  I will ask the patient, "How

11   do you feel?"

12   Q.   You understand that people who have taken a lot

13   of drugs aren't in their right minds to answer the

14   questions properly?  You understand that, right?

15   A.   Yeah --

16   Q.   That's why your observations are very

17   important.  You understand that?

18   A.   I understand.  That's why my observation is

19   very clear that during my encounter to Mr. Sandoval, I

20   don't see anything that warranted to be sent to the

21   hospital or sent to the doctor.

22   Q.   How long was your interaction with Mr. Sandoval

23   when you checked his blood?

24   A.   I told you already.  Very quick.  Very quick.

25   Q.   Ten seconds?  Check his blood, boom?
```

Romeo de Guzman

Estate of Ronnie Paul Sandoval, et al.
vs. County of San Diego, et al.

1      A.   Something like that.

2           "How are you doing?"

3           "Doing good."

4           "Give me your finger.  Do you have any medical

5    problems or anything?"  Check.

6      Q.   Do you have a specific recollection, sir, of

7    you asking Mr. Sandoval during the time that you were

8    checking his blood sugar if he had any medical issues?

9    Did you have that question with him?

10     A.   Yes.  I even asked, "Do you take any

11   medication?"  Look at my statement.

12     Q.   Why did you ask him that?

13     A.   Of course.  You have to ask.

14     Q.   Why?  I thought your only job was to check his

15   blood sugar and that's it?

16     A.   If I ask you something -- you have to talk.

17   It's like...

18     Q.   Exactly.  And making observations is common

19   sense, right?

20     A.   That's right.  Yeah.  That's why I said, "How

21   do you feel?"  Like a conversation.  When you talk to me

22   in -- when you meet me in the hall?  Did you say, "How

23   are you, Nurse" -- when did you ask me how am I doing?

24          MR. CHAPIN:  You are not answering the

25   question.

Romeo de Guzman

**Estate of Ronnie Paul Sandoval, et al.
vs. County of San Diego, et al.**

1    BY MR. MORRIS:

2       Q.  So you were just making conversation?

3       A.  Just making conversation.  Thank you.

4       Q.  You weren't doing an assessment?

5       A.  I am not doing an assessment.

6       Q.  Just making conversation?

7       A.  Just making conversation.  Thank you, sir, for

8    helping me to find the right word.  That's what I mean.

9       Q.  So you were making conversation; your encounter

10   lasted about 10 seconds --

11      A.  Something like that.

12      Q.  He stuck his hand out, you clicked it, put it

13   in the glucose monitor, it came back 107?

14      A.  That's right.  Then say, "How are you doing?"

15      Q.  Send him on his way?

16      A.  You know.

17      Q.  After you took the reading, it was 107.  Did

18   you record that in JMS?

19      A.  No.

20      Q.  You should have, right?  I don't want to beat

21   you up for it, it's not that big of a deal.  That's what

22   you told Detective Carrillo, you should have recorded

23   it?

24      A.  That's what I said.

25      Q.  You should have recorded?

Romeo de Guzman

Estate of Ronnie Paul Sandoval, et al.
vs. County of San Diego, et al.

 1    go.  We can see him later and do total medical

 2    assessment, because there's a process.

 3        Q.  I understand that's what you think.  What did

 4    you say?  This is very important, sir.  I want you to

 5    think back, and I need you answer very clearly only if

 6    you specifically recall the exact words.  Because there

 7    is a difference of remembering on this issue.  The

 8    deputies say one thing and you say another.

 9            What exactly do you recall you saying to the

10    deputies after you took his blood sugar?

11        A.  I said, "He's cleared for booking process."

12        Q.  He is clear for booking process.  That's all

13    you said?

14        A.  That's what I remember.

15        Q.  How is it that he ended up staying in that

16    holding cell for the next eight hours?

17        A.  I have no idea.  It was not my call to place

18    the patient -- it's a holding cell.  It's a regular

19    holding cell.  It can be there, it can be anywhere.

20    He's an inmate.  I don't know.  Maybe they are waiting

21    for him for fingerprinting.  Ask the deputy about it,

22    you know, why he's there.  It's not for medical reason I

23    am sure 100 percent.

24        Q.  So your testimony is that you took his blood

25    sugar, you said he is cleared for booking process and

Romeo de Guzman

Estate of Ronnie Paul Sandoval, et al.
vs. County of San Diego, et al.

1    you left?

2        A.   Yeah.

3        Q.   And the deputies, what did they do?

4        A.   They went on their job and leave the patient

5    there, something like.   I don't know what they are

6    doing.

7        Q.   So the patient was left there?

8        A.   That's -- he was there.   It was there.

9        Q.   They left him there?

10       A.   They left him there.

11       Q.   And he was left there for eight hours?

12       A.   That's what I see, you know.

13       Q.   For eight hours?

14       A.   Eight hours.

15       Q.   Did you ever go back to check on how he was

16   doing?

17       A.   No.

18       Q.   Did you ever have any further interaction with

19   him?

20       A.   No.

21       Q.   Did you ever see if he got food?

22       A.   No.

23       Q.   Your screening station is about 20 feet away

24   from that holding cell?

25       A.   That's right.

Romeo de Guzman

**Estate of Ronnie Paul Sandoval, et al.**
**vs. County of San Diego, et al.**

1    Q.   While you were doing your work, you could see

2   him back in that holding cell the whole time?  The whole

3   eight hours, he's right there in front of you?

4    A.   Yeah.

5    Q.   And you didn't go up and talk to him, see how

6   he's doing, anything like that?

7    A.   No.

8    Q.   Why not?

9    A.   He's not -- I don't have to.

10   Q.   You don't have to?

11   A.   I don't have to.

12   Q.   All right.

13   A.   I don't have to, you know?

14   Q.   That's fine.  You don't have to.

15       You understand that this man died, right?

16   A.   Yes, sir.

17   Q.   He was left there for eight hours and then died

18  shortly after you took off shift, right?

19   A.   Yeah.

20   Q.   Do you know what he died from?

21   A.   Die of massive drug overdose.  I just found.

22  Massive drug overdose is what they said.

23   Q.   Did you tell either Nurse Marylene or Nurse

24  Caroline why Mr. Sandoval was in that holding cell?

25   A.   No.

Romeo de Guzman

**Estate of Ronnie Paul Sandoval, et al.**
**vs. County of San Diego, et al.**

1  Corporal Powell.  Corporal Powell determined it would be
2  better if Sandoval remained in the observation cell
3  closer to the nurse's station so the nurses could
4  monitor him."  See that?
5      A.  Just the statement.
6      Q.  Did Corporal Powell or Deputy Wilkinson or
7  Deputy Rodriguez tell you that they were leaving
8  Sandoval in the cell so that you could closely monitor
9  him?
10     A.  No.
11     Q.  Never?
12     A.  Never.  I swear.  Never.  I --
13     Q.  Why would they put that in their report if it's
14 not true?
15     A.  I don't know.  They can put anything they want.
16 I know -- working second floor, I know that the cell is
17 not for observation cell.  I know they will need to be
18 observed, I can send them to MOB.
19     Q.  Well, if he was in a sobering cell, which was
20 your duty that night, he would be checked every four
21 hours, right?
22     A.  Yes.
23     Q.  And you wanted him in a sobering cell, right?
24     A.  No.  You know, because something like talking.
25 "What do you think," something like that.

Romeo de Guzman

1    Q.   But he was there in that cell, right, about

2    20 feet away from you?

3    A.   Yes.

4    Q.   And did you have any further communication with

5    any deputy regarding Mr. Sandoval?

6    A.   No.

7    Q.   Any nursing staff?

8    A.   No.

9    Q.   When this nursing staff came on, who relieved

10   you?   Was that Llamado?

11   A.   Llamado and Harris, something like that.

12   Q.   The deputies have what's called a "pass down

13   procedure" where they take the information from one

14   shift and pass it down to the next?

15   A.   Um-hum.

16   Q.   Do you know what a "pass down" is?

17   A.   Like a report -- receiving report endorsement.

18   Q.   Well, just like when you come on shift, I

19   imagine the nurses that you are relieving tell you, Hey,

20   this guy is doing this, the sobering cell is this way,

21   that's what's going on here.   They give you that

22   information, right?

23   A.   That's right.

24   Q.   When you were leaving that night at 11:00 and

25   Llamado and Harris were coming on for the night shift,

Romeo de Guzman

**Estate of Ronnie Paul Sandoval, et al.**
**vs. County of San Diego, et al.**

1    did you relate to them any information regarding

2    Mr. Sandoval?

3        A.   No.

4        Q.   You didn't pass down any information about

5    Sandoval?

6        A.   No.

7        Q.   Can you explain to us why not?

8        A.   It's like -- he's not being monitored, you

9    know, that's like an ordinary inmate.  He's like

10   hundreds of inmates that goes there.

11       Q.   So you didn't consider him part of your

12   responsibility?

13       A.   He's not considered like a medical reason.

14       Q.   He wasn't being monitored?

15       A.   He was not being monitored.

16       Q.   Not by you?  Not by anybody?

17       A.   Not from us, nurses.

18       Q.   He wasn't being monitored by the nursing staff?

19       A.   No, nothing.

20       Q.   That's why you didn't feel the need to pass it

21   down to Nurse Llamado or Nurse Harris?

22       A.   Yes.

23       Q.   Right?

24       A.   Yes.

25       Q.   When somebody is having a seizure, is that a

Romeo de Guzman

**Estate of Ronnie Paul Sandoval, et al.**
**vs. County of San Diego, et al.**

1    A.   No.   You are asking me about that.   You are

2    asking me if it creates confusion to us.   We have been

3    working there and I don't get confused.   I know where to

4    place the patient.   I been in there for many years,

5    16 years.

6         It helps me think what's good for the inmate,

7    you know, based on my experience and based on my being

8    there for a long time.   It's my house.   I know what --

9    where -- sorry.

10   Q.   In your statement to Detective Carrillo in this

11   case, you said that there was a chance for great

12   confusion.   Do you remember using the words "great

13   confusion"?

14   A.   No.

15   Q.   At the 53 mark of your report you made a

16   statement that there is great confusion because the

17   nurse can place in there, the deputy can place in there.

18   I don't have a key, when you are talking about the

19   holding cell, okay?

20   A.   Um-hum.

21   Q.   This is at the 53 mark.   So would it be safe to

22   say that because that cell can be used for so many

23   different things that there is the potential to create

24   great confusion, as you said?

25   A.   Let me explain.   Confusing is something like --

Exhibit 4
74

Romeo de Guzman

Estate of Ronnie Paul Sandoval, et al.
vs. County of San Diego, et al.

1    if all the people have different thinking.  You know

2    something we're not doing the same -- something like,

3    misunderstanding, confused.  Me or -- every person are

4    different, the deputies, the nurses, you know.

5           The way in that room, the deputy thinks

6    different than what the nurses think.  Like me, I was

7    thinking that it's an ordinary cell.  And then now --

8        Q.   It's a monitoring cell?

9        A.   It's a monitoring cell.

10       Q.   So there's great confusion?

11       A.   Great confusion.

12       Q.   About what's it's for?

13       A.   For sure 100 percent, that room is not a

14   medical observation cell.  This is an ordinary holding

15   cell.  I am very sure, but I don't know about other

16   people working there, what they're thinking.  If you ask

17   the lieutenant, maybe they have different thinking too.

18   I don't know.  But for me, during that time, I know that

19   this is the ordinary holding cell.

20       Q.   But you understand their confusion because it's

21   in the medical area?

22       A.   This is the booking area.  It's a medical

23   area -- medical area is -- medical observation on the

24   10th floor.

25       Q.   You have got safety cells.  That's a medical

Romeo de Guzman

**Estate of Ronnie Paul Sandoval, et al.**
**vs. County of San Diego, et al.**

1                      REPORTER'S CERTIFICATION

2

3          I, Susan Swan, RPR, CRR, CCRR, a Certified

4     Shorthand Reporter in and for the State of California,

5     do hereby certify:

6

7          That the foregoing witness was by me duly sworn;

8     that the deposition was then taken before me at the time

9     and place herein set forth; that the testimony and

10    proceedings were reported stenographically by me and

11    later transcribed into typewriting under my direction;

12    that the foregoing is a true record of the testimony and

13    proceedings taken at that time.

14

15         IN WITNESS WHEREOF, I have subscribed my name this

16    1st day of March, 2016.

17

18

19         *Susan Swan*
      _____

20              Susan Swan, RPR, CRR, CCRR

21              CSR No. 7338

22

23

24

25

Exhibit 4
76

Romeo de Guzman

Estate of Ronnie Paul Sandoval, et al.
vs. County of San Diego, et al.

1        DECLARATION UNDER PENALTY OF PERJURY

2    Case Name: Estate of Ronnie Paul Sandoval, et al.
          vs. County of San Diego, et al.
3    Date of Deposition: 02/23/2016

4    Job No.: 10022305

5

6              I, ROMEO DE GUZMAN, hereby certify

7    under penalty of perjury under the laws of the State of

8    _____ that the foregoing is true and correct.

9              Executed this _____ day of

10   _____, 2016, at _____.

11

12

13                      _____

14                      ROMEO DE GUZMAN

15

16   NOTARIZATION (If Required)

17   State of _____

18   County of _____

19   Subscribed and sworn to (or affirmed) before me on

20   this _____ day of _____, 20__,

21   by_____,      proved to me on the

22   basis of satisfactory evidence to be the person

23   who appeared before me.

24   Signature: _____ (Seal)

25

# EXHIBIT 5

Exhibit 5

78



# San Diego County Sheriff's Department
## Officer Report

CAD Event No. **E1465588**

Case No. **14109768**

Report No. **27219**

**1**

Page 1 of 1

| GENERAL CASE INFORMATION | | | | |
|---|---|---|---|---|

| Special Studies: | | | | Related Cases: |
|---|---|---|---|---|

Location, City, State, ZIP:
**1173 Front St, San Diego, CA 92101**

Occurred On:
**2/23/2014 12:54:00 AM (Sunday)**

| Jurisdiction: DETENTION FACILITY - CENTRAL | Beat: 021 | Call Source: | (and Between): |
|---|---|---|---|

| INDIVIDUAL/S | | | |
|---|---|---|---|

| Name: Sandoval, Ronnie | | Person Code: | Interpreter Language: |
|---|---|---|---|

ALIAS / AKA / NICKNAME / MONIKER:

| Home Address, City, State, ZIP: | Res. Country: | County Residence: N Nonresident | Undocumented: |
|---|---|---|---|

| Race: H | Sex: M | Date of Birth / Age: 09/30/1967 - 46 | Height: 5'8" | Weight: 210 lbs | Hair Color: BLK | Eye Color: BRO | Facial Hair: 05 - Goatee and Mustache | Complexion: MED - Medium |
|---|---|---|---|---|---|---|---|---|

| Employment Status: | Occupation/Grade: | Employer/School: | Employer Address, City, State, ZIP: |
|---|---|---|---|

| CONTACT INFORMATION | | |
|---|---|---|

| Type: HP - Home Phone | Number/Address: 619 470-2303 | |
|---|---|---|

| IDENTIFICATION: | | | |
|---|---|---|---|

| Type: DLN - Drivers License Number | Number: C5171514 | State: CA - California | Country: |
|---|---|---|---|

| Type: SSN - SSN | Number: 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 | State: | Country: |
|---|---|---|---|

| Attire: | Injury: | Extent Of Treatment: | Violent Crime Circumstances: |
|---|---|---|---|

| REPORT NARRATIVE | | |
|---|---|---|

Origin:

On 2/22/14 at about 1700 hours, I was assigned to assist the deputies on the second floor at SDCJ with moving inmates through the medical screening and booking process.

Deputy's Observation and Actions:

I was standing in the hallway near the Medical Screening station when two unidentified deputies approached me. The two deputies were escorting an inmate; later identified as Ronnie Sandoval (9/30/67) to see the nurse because of some type of diabetic issue. I was not familiar with the process, so I told them I would inform Deputy Graham Wilkinson (#3236), who was showing me the operations of the second floor. A couple of minutes later I saw a deputy; later identified as Matthew Chavez (#1147) standing at Medical Observation Cell #1, which is located in the Medical Screen area. Deputy Wilkinson and I walked to cell #1 to assist the nurse; later identified as Romeo De Guzman (#0770). I unlocked the food flap so the nurse could check Sandoval's blood sugar level with a Glucose meter. I noticed the reading on the meter was 107. Nurse De Guzman informed Sandoval that his Glucose was normal. Deputy Wilkinson asked Sandoval if he was under the influence of drugs or alcohol and he stated he was not. I noticed Sandoval was shaking mildly, so I asked him to sit on the bench. Sandoval appeared to be having withdrawals from drugs, since I did not smell any odor of alcohol from his person. Deputy Wilkinson and I left Sandoval in the cell and continued with our other duties.

A short time later, Nurse De Guzman asked if Sandoval could go into a sobering tank. I relayed De Guzman's request to Deputy Wilkinson, who conferred with Corporal Brandon Powell (#7307). They determined it would be better if Sandoval remained in the observation cell. I had no other contact with Sandoval for the remainder of the shift, but I periodically looked over at him to check if he was okay. I did not notice any change in his behavior.

| Reporting Officer SH2334 - RODRIGUEZ, LEONARD | Division / Organization SDCJ / SDCJ - San Diego Central Jail | Reviewed By SH4202 - KAMOSS, KARL |
|---|---|---|
| Report Date 2/24/2014 2:47:00 PM | Detective Assigned SH1881 - CARRILLO, PETE | Reviewed Date 2/25/2014 12:23:23 AM |

NetRMS_CASDCR.rtf v11-15-08

Exhibit 5
79

COSD RRPT 000225

# EXHIBIT 6

Exhibit 6
80

## SAN DIEGO SHERIFF'S DEPARTMENT
### Follow-up Investigative Report

**Crime:** Death Investigation        **Case Number:** 14109768
**Victim:** Sandoval, Ronnie        **City:** San Diego
**Location:** 1173 Front Street (SDCJ)
**Date Occurred:** February 23, 2014        **Page 1 of 37**

---

### Origin:

On Sunday, February 23, 2014, at about 1507 hours, I received a telephone call from Sheriff's Homicide Detail Sergeant P. Meza (1851). During the call he requested I respond to San Diego Central Jail (SDCJ) to investigate an inmate death. I was assigned as the Lead Investigator. Detective Lopez (1228) was assigned to assist with the investigation.

### Investigation:

On February 23, 2014 at about 0055 hours, Sergeant Robert Shawcroft (5213) was walking through the medical area on the jails second floor when he observed an inmate sitting on the bench in waiting room #1. Sgt. Shawcroft observed the inmates' eyes roll back and his body slightly slump to his left on the bench. Sgt. Shawcroft summoned the help of Nurse Harris (5055) and deputies to assist with the inmate. Emergency Medical Technicians and Paramedics were called to the scene. After resuscitative efforts failed, the inmate was pronounced deceased at 0211 hours by Doctor Hwang from Scripps La Jolla Hospital. Sheriff's Homicide was notified of the inmate's death.

I arrived at the facility at 0215 hours. I obtained a package from the facility staff containing the decedent's identifying information. He was identified as:



Ronnie Paul Sandoval Jr.

DOB: 09/30/1967

SSN: 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

CII: 08164041

FBI: 925538EA0

### Criminal History:

Sandoval had an extensive criminal history including twenty three arrests since 1986. Offenses included rape, robbery, sodomy, assault with a deadly weapon, battery with injury, resisting arrest, elder abuse and felony evading. He was also a registered narcotics offender and had been arrested for being an addict in possession of a firearm, drug sales, possession of a controlled substance and being under the influence. Sandoval also had several prison commitments and parole violations.

---

Reporting Officer: Det. P. Carrillo    ID# 1881        CID - HOMICIDE

Approved By:    Sgt. P. Meza    ID# 1851        7/21/2014

Exhibit 6
81

COSD RRFP 000243

**SAN DIEGO SHERIFF'S DEPARTMENT**
**Follow-up Investigative Report**

**Crime:** Death Investigation                    **Case Number:** 14109768
**Victim:** Sandoval, Ronnie                       **City:** San Diego
**Location:** 1173 Front Street (SDCJ)
**Date Occurred:** February 23, 2014               **Page 2 of 37**

**Incident Briefing:**

At 0455 hours, Deputy Edge (#4706) briefed the investigative team on the observations and actions that were learned during the preliminary investigation. The briefing was conducted in the facility break room. Also in attendance were the following Sheriff and Crime Laboratory Personnel:

**Briefing Roster**

| Name | ARJIS | Assignment |
|---|---|---|
| J. Lopez, Det. | 1228 | Homicide |
| C. Chang, Criminalist | 4827 | Crime Laboratory |
| R. Legler, FET | 6701 | Crime Laboratory |
| Kevin Kamoss, Sgt. | 4468 | DIS |
| Karl Kamoss, Sgt. | 4202 | SDCJ |
| Deputy N. Fox | 5868 | SDCJ |
| Deputy M. Andrade | 0137 | SDCJ |
| Deputy M. Chavez | 1147 | SDCJ |
| C. Montgomery, Lt. | 4161 | SDCJ |
| N. Edge | 4706 | SDCJ |

Deputy Edge reported Ronnie Sandoval was arrested on February 22, 2014 at about 1149 hours by San Diego Sheriff's Deputy Henry Castro (5540) from the Rancho San Diego Station. Sandoval had been arrested for possession of a controlled substance (methamphetamine) in violation of health and safety code 11377 (A). The methamphetamine had a net weight of 1.09 grams. Sandoval also faced an additional charge 11364 of possession of drug paraphernalia in violation of health and safety code section 11364. Sandoval arrived at SDCJ on February 22, 2014 at about 1424 hours. He was prescreened by the jail nurse.

Deputy Edge said Sandoval was checked again by the same nurse before the triage nurse checked him again in live scan corridor at about 1533 hours.

---

Reporting Officer: Det. P. Carrillo          ID# 1881          CID - HOMICIDE

Approved By:     Sgt. P. Meza          ID# 1851          7/21/2014

Exhibit 6
82

COSD RRFP 000244

**SAN DIEGO SHERIFF'S DEPARTMENT**
**Follow-up Investigative Report**

**Crime:** Death Investigation                    **Case Number:** 14109768
**Victim:** Sandoval, Ronnie                        **City:** San Diego
**Location:** 1173 Front Street (SDCJ)
**Date Occurred:** February 23, 2014                **Page 3 of 37**

---

Sergeant Karl Kamoss (4202) said Sandoval was given a clean bill of health by the nurse and left on the first floor.

Deputy Edge said during the booking process, Deputy Chavez saw Sandoval's skin appeared sweaty and clammy and he appeared exhausted. Deputy Chavez sat Sandoval down and had the nurse see him. The nurse checked his blood pressure and said it was normal. Sandoval said he had been diagnosed eight months earlier with diabetes. The nurse gave Sandoval a blood test that came back fine.

On February 22, 2014 at about 1642 hours, Sandoval was fingerprinted and photographed. Deputy Edge said most of the deputies checked on him. This included Deputy Andrade (0137), Deputy Valbuena (3296) and Lt. Montgomery (4161) checking on him. Most of the time Sandoval was seated on the bench. He was seen bobbing his head and nodding off.

Deputy Chavez (1147) said yesterday, February 22, 2014 at about 1200 or 1300 hours, he escorted inmate Sandoval out of the holding cell and over to the fingerprint area of the jail. He noticed Sandoval was sweating. He asked Sandoval if he was okay and Sandoval said, "No, I'm fine." When Deputy Chavez grabbed his hands he noticed they were cold to the touch and soaked in sweat. Deputy Chavez told Deputy Bryan who notified the triage nurse of Sandoval's condition. The triage nurse came and took a blood sugar sample from Sandoval. The nurse said Sandoval's blood sugar was fine. Deputy Chavez was told to give Sandoval food and he would be good to go. Deputy Chavez knew dinner would be served around 1530 hours so he gave Sandoval a sack lunch.

Deputy Michael Bryan (2880) said Sandoval was being printed by Deputy Chavez and afterward Deputy Chavez sent Sandoval to him. Deputy Bryan had Sandoval sit on a bench outside of intake control. Deputy Bryan asked Sandoval if he took medication for diabetes. Sandoval said, "No." Sandoval also denied ingesting drugs or alcohol recently. Deputy Bryan asked Sandoval when the last time he ate. Sandoval said he had eaten last night. Deputy Bryan said he decided to have Triage Nurse Cesar look at Sandoval. Nurse Cesar took a reading of Sandoval's blood sugar and it read 108.

Inmate Sandoval was escorted to have his booking photograph taken. While Sandoval's photograph was being taken, Deputy Chavez noticed he was still sweating and dozing off.

Deputy Martinez was also in the booking photograph area and she asked Sandoval some questions. Sandoval appeared frustrated. Deputy Chavez decided to take Sandoval up to medical area on the second floor after he was photograph. At about 1700 hours, Deputy

---

Reporting Officer: Det. P. Carrillo          ID# 1881          CID - HOMICIDE

Approved By:      Sgt. P. Meza          ID# 1851          7/21/2014

Exhibit 6
83

COSD RRFP 000245

**SAN DIEGO SHERIFF'S DEPARTMENT**
**Follow-up Investigative Report**

**Crime:** Death Investigation                     **Case Number:** 14109768
**Victim:** Sandoval, Ronnie                       **City:** San Diego
**Location:** 1173 Front Street (SDCJ)
**Date Occurred:** February 23, 2014                      **Page 4 of 37**

---

Chavez escorted Sandoval to the sally port and up to the 2nd floor. Deputy Chavez met with a nurse seated in a medical screening area and advised him of the observations he had made of Sandoval. The nurse instructed Deputy Chavez to put Sandoval in a holding cell. The nurse was busy at the time. Deputy Chavez said he advised a deputy who was working overtime about Sandoval and placed Sandoval in the cell. Deputy Chavez said he also notified Deputy Wilkinson about Sandoval being placed in the cell. Deputy Chavez returned to his duties on the first floor.

Deputy Nathaniel Fox (5868) said on February 22, 2014 between 1930 and 2030 hours, he was looking for inmates who needed to be medically screened. He came upon Sandoval in waiting room number 1. Deputy Fox described Sandoval as being seated on the bench in the cell and appearing lethargic, a little bit shaky. Sandoval seemed tired. He asked Sandoval why he was by himself and why had he been placed in the waiting room. Sandoval said he didn't know why he was in the cell.

Deputy Fox looked at Sandoval's charges and noticed he hadn't been dressed out in jail clothing yet and thought that was strange. Deputy Fox asked the nurses if there was anything wrong with Sandoval. None of the nurses knew why Sandoval was in the waiting room. Deputy Fox asked the deputies who were working on the second floor and they also didn't know why Sandoval was there. Deputy Fox didn't pursue the matter any further and was not sure if Sandoval had been seen by medical staff again.

Deputy Edge said on February 23, 2014 at about 0053 hours, Sergeant Shawcroft (5213) observed Inmate Sandoval seated in the same waiting room on the second floor. Sandoval had a blank look on his face. Sandoval started to slump over toward the wall of the cell, Sandoval started to have a seizure and bumped his head on the wall and fall on the cell floor. Sgt. Shawcroft called Deputy Edge over to the cell along with night shift nurses Harris (5055) and Llamado (6492). Sergeant Shawcroft said Sandoval was having a seizure. Deputy Edge put gloves on and open cell door.

Inmate Sandoval's head and shoulder were in the corner of the cell, underneath the bench in the cell. The rest of his body was extended in the cell. Sgt. Shawcroft, Deputy Edge and the nursing staff went in the cell. They used their hands to try and wake him. Sandoval was making snorting sounds and had slight tremors to his body. His muscles were still tense. The medical staff got oxygen and the blood pressure monitor. The nurse put the oxygen mask on Sandoval's face and asked a deputy to hold the mask in place until she got the blood pressure monitor on him. A deputy continued to hold the oxygen mask while the nurse checked Sandoval's blood pressure and the oxygen reader on his finger.

---

Reporting Officer: Det. P. Carrillo          ID# 1881                    CID - HOMICIDE

Approved By:          Sgt. P. Meza          ID# 1851                    7/21/2014

Exhibit 6
84

COSD RRFP 000246

**SAN DIEGO SHERIFF'S DEPARTMENT**
**Follow-up Investigative Report**

**Crime:** Death Investigation                **Case Number:** 14109768
**Victim:** Sandoval, Ronnie                    **City:** San Diego
**Location:** 1173 Front Street (SDCJ)
**Date Occurred:** February 23, 2014                **Page 5 of 37**

The medical staff continued to call out Sandoval's name. Sandoval was unresponsive when his name was called. Sandoval was breathing on his own as there was moisture in the mask as he was breathing in and out and the bag was moving on the mask as he breathed.

Deputy Andrade said he arrived to assist with Sandoval. Deputy Andrade is an Emergency Medical Technician and had previously worked for the Fire Department. Deputy Andrade used the C-spine collar to isolate Sandoval's head and neck in the event he may have sustained a head injury. Andrade had knowledge on the use of the C-Spine collar. Sandoval was bunched up in corner of the cell. Deputies moved him to the middle of the cell to make more room for the first responders to provide medical care. Sandoval's head was secured the entire time.

At about 0105 hours, the nurses asked deputies to call for Emergency Medical Technicians to transport Sandoval to the hospital. Nurse Harris applied a nasal airway tube to Sandoval, to provide suction to clear out his mouth. Sandoval was spitting up saliva, when deputies first arrived at the cell.

Deputy Andrade said he applied the Ambubag to Sandoval and observed he was still breathing on his own. Sandoval was unresponsive and he never came out of it. Sandoval wasn't tracking. He had a blank stare and was not oriented. Nurse Bautista (6492) applied the Oral Paragein Airway (OPA). Sandoval had a gag reflex to the oral airway and started vomiting. Deputy Andrade moved Sandoval to his right side and used the suction to clear his mouth. The OPA was removed from Sandoval and they continued monitoring him. The Ambubag was placed back on Sandoval. Nurse Bautista applied an IV to Sandoval's right arm using a twenty gauge needle.

The emergency medical technicians (EMT) arrived at 0120 hours. It was determined Sandoval's condition was declining so the decision was made to call paramedics to the scene. The Lieutenant was present at this time. The nurse removed the bag valve mask and put the non-re-breather back on. Sandoval opened his eyes a couple of times. He had a glazed look in his eyes and his pupils did not react to the pen light.

EMT's John Trunick and Brithee Campos entered the cell. EMT Trunick applied the bag valve mask. RN Bautista started a twenty gauge IV in Sandoval's right arm. Sandoval was secured to a back board. EMT Trunick felt for a pulse. At about 0142 hours, Paramedics and the Fire Department arrived at the cell. The paramedics assessed Sandoval. Sandoval was brought out of the cell and placed on a gurney. As they were about to secure Sandoval's head to the backboard with tape, they discovered he was not breathing anymore.

---

Reporting Officer: Det. P. Carrillo          ID# 1881          CID - HOMICIDE

Approved By:        Sgt. P. Meza          ID# 1851          7/21/2014

Exhibit 6
85

COSD RRFP 000247

## SAN DIEGO SHERIFF'S DEPARTMENT
### Follow-up Investigative Report

**Crime:** Death Investigation                          **Case Number:** 14109768
**Victim:** Sandoval, Ronnie                             **City:** San Diego
**Location:** 1173 Front Street (SDCJ)
**Date Occurred:** February 23, 2014                    **Page 6 of 37**

Fire Department members started Cardiopulmonary Resuscitation (CPR) at 0148 hours. They continued CPR and until Sandoval was pronounced dead at 0211 hours by Scripps La Jolla Doctor Hwang. At 0214 hours, Sandoval was taken off the gurney and placed on floor.

Sandoval had been alone in the cell when this incident occurred. There was an inmate who happened to be in waiting room #2 next to him who was identified as Inmate Danny Washington Booking # 14713010.

Deputy Johnson (4938) video recorded paramedics and fire personnel rendering life-saving efforts. Lt. Montgomery said there had been no medical charting done of inmate Sandoval while on the first or second floor of the jail. Sandoval had been in cell (waiting room #1) for almost 8 hours.

### Investigation:

The briefing concluded at 0550 hours. I requested the assistance of Detective Fiske who responded to the jail. I tasked Detective Lopez (1228) and Fiske with interviewing the medical staff. Detective Lopez and I interviewed Inmate Danny Washington who had been in waiting room #2. We also attempted to interview two other inmates who were nearby in a sobering cell and may have been able to see waiting room #1 from their location, but due to their being under the influence, we were unable to ascertain a coherent statement. For details of the interviews refer to the Witness Interview Reports.

At 0600 hours, Detective Lopez and I were escorted up to the second floor medical screening area by Deputy Edge. Sheriff's Forensic Evidence Technician Rich Legler and Sheriff's Criminalist Cathy Chang accompanied us to the scene.

### Scene Investigation:

San Diego Central Jail is one of seven detention facilities located in San Diego County under the jurisdiction of the San Diego County Sheriff's Department. SDCJ is a booking and housing facility for men and serves as the primary point of intake for arrestees in central part of San Diego County.

At the time of this investigation Sandoval was in the process of being booked into the jail system and had not yet been classified or assigned to a housing unit. He had been taken up to the second floor medical screening area because of some of the physical signs he exhibited which caused deputies to be concerned for his welfare and expedite him to see

---

Reporting Officer: Det. P. Carrillo       ID# 1881            CID - HOMICIDE

Approved By:      Sgt. P. Meza            ID# 1851            7/21/2014

Exhibit 6
86
COSD RRFP 000248

## SAN DIEGO SHERIFF'S DEPARTMENT
### Follow-up Investigative Report

**Crime:** Death Investigation        **Case Number:** 14109768
**Victim:** Sandoval, Ronnie        **City:** San Diego
**Location:** 1173 Front Street (SDCJ)
**Date Occurred:** February 23, 2014        **Page 7 of 37**

the medical staff. Sandoval was placed into medical screening waiting room #1 on the second floor.

The Medical Screening area contains a nurse's station as well as three separate screening areas. Directly to the north east of the screening area and adjacent to the nursing station there are two separate holding cells called waiting rooms 1 and 2. Each room contains a stainless steel sink and toilet and metal benches. The rooms also have a large oversized window. These rooms are sometimes referred to as medical observation cells and are generally used to temporarily house an inmate prior to him being transferred up to the medical observation area. The large glass affords the nurses and floor deputies an unobstructed view into each waiting room. Located on the ceiling of the medical screening area is a closed circuit video surveillance camera that is directed toward the medical screening area and in the distance you can see waiting room #1.[1] Each waiting room has a door with a food flap and they have to be manually opened with a key that is under the control of the floor deputies. Each waiting room is identified by numbers on the door.



**Figure 1: Camera View of Medical Screening**

When I arrived at the medical screening area the door for waiting room #1 was closed and secured. The lighting inside the cell was on. Inmate Danny Washington (BKG #14713010) was still inside of waiting room #2 and had a clear view through the large glass window into waiting room #1.

---

[1] See Figure 1

Reporting Officer: Det. P. Carrillo      ID# 1881        CID - HOMICIDE

Approved By:     Sgt. P. Meza      ID# 1851        7/21/2014

Exhibit 6
87

COSD RRFP 000249

## SAN DIEGO SHERIFF'S DEPARTMENT
### Follow-up Investigative Report

**Crime:** Death Investigation                      **Case Number:** 14109768
**Victim:** Sandoval, Ronnie                         **City:** San Diego
**Location:** 1173 Front Street (SDCJ)
**Date Occurred:** February 23, 2014                      **Page 8 of 37**

Sandoval's body was located in the medical screening area hallway outside of waiting room #1. His body was covered with a blue medical blanket. Sandoval's body was supine and on a back board with his head oriented toward the west. I verified Sandoval's identity via his blue, jail identification band located on his left wrist. The band contained his photograph, his name, date of birth and his SDSO booking number.

Sandoval, an apparent Hispanic male adult, was wearing a blue shirt, green shorts and blue underwear. The left leg of his short pants and his shirt had been cut apparently by the emergency care providers during their resuscitative efforts. Leg and waist chains were still secured around Sandoval's ankles and wrists. These security devices were placed on Sandoval in preparation for his transport to the hospital. Sandoval had what appeared to be abrasion in the center of his chest area apparently made during CPR.

Medical intervention devices were adjacent to and on Sandoval's body including two Automated External Defibrillator (AED) pads adhering to his chest area, an endotracheal tube in his mouth and nose and an intraosseous infusion device on his left shin. Sandoval had a C-Spine collar around his neck and there was a reddish brown fluid that had flowed out of his left nostril. The inner crease of his right arm (opposite his elbow) had gauze with what appeared to blood on it, consistent with the location for an IV.



**Figure 2: Presentation of Medical Screening Area during Investigation**

I observed drops of what appeared to be blood on the floor directly outside of waiting room #1.

---

Reporting Officer: Det. P. Carrillo          ID# 1881                CID - HOMICIDE

Approved By:          Sgt. P. Meza           ID# 1851                7/21/2014

Exhibit 6
88

COSD RRFP 000250

## SAN DIEGO SHERIFF'S DEPARTMENT
### Follow-up Investigative Report

**Crime:** Death Investigation      **Case Number:** 14109768
**Victim:** Sandoval, Ronnie      **City:** San Diego
**Location:** 1173 Front Street (SDCJ)
**Date Occurred:** February 23, 2014      **Page 9 of 37**

---

At about 0635 hours, FET Legler took overall pictures of the scene and the holding cell. FET Legler took overall photographs of the medical screening area to document its condition. Criminalist Chang took measurements and documented the scene in a diagram.

Detective Juan Lopez and I inspected waiting room #1. The cell measured approximately six feet wide and ten feet deep.[5] The cell had two benches. One was affixed to the north wall and the other on the south wall. The toilet/sink combinations were affixed to the south wall in the eastern most part of the cell. The room contained a small dividing wall to allow for privacy when using the toilet. There was blood on the floor directly in the center of the cell and evidence of medical intervention. There was a needle with blood lying on the floor. The needle and blood on the floor reportedly occurred during the medical staffs attempts to obtain an IV.

Black and grey Nike tennis shoes were located near the toilet on the floor. On top of the north bench was a sack lunch that was not eaten. Underneath the south bench I located another sack lunch. This particular sack lunch appeared to be partially eaten.



**Figure 3:  Waiting Room #1**

On the floor near the blood was a BD Insyte Autoguard Winged Shielded IV Catheter. This was consistent with where the medical staff had attempted to get an IV started as well as explaining why there was blood on the cell floor.

This particular cell is not equipped with an intercom/emergency button.

Medical Examiner Investigator (MEI) Sandra Joseph (#22) arrived on scene at about 0637 hours. At about 0656 hours 92 Mike Transport Technician Elienai Scott (#5068) arrived.  MEI Joseph examined Sandoval while FET Legler photographed his body.[3] At about 0716 hours, at the request of the medical examiner, I requested Deputy Bohannon (0632) and Corporal Powell (7307) remove the leg and waist chains from Sandoval to facilitate the examination of his body.

---

Reporting Officer: Det. P. Carrillo    ID# 1881        CID - HOMICIDE

Approved By:    Sgt. P. Meza    ID# 1851        7/21/2014

Exhibit 6
89

COSD RRFP 000251

## SAN DIEGO SHERIFF'S DEPARTMENT
### Follow-up Investigative Report

**Crime:** Death Investigation      **Case Number:** 14109768
**Victim:** Sandoval, Ronnie      **City:** San Diego
**Location:** 1173 Front Street (SDCJ)
**Date Occurred:** February 23, 2014      **Page 10 of 37**

---

MEI Joseph examined Sandoval's eyes and found no petechial hemorrhages present and no ligature marks on his neck. No defensive-type injuries were present on Sandoval's hands and no trauma or injuries were noted on any part of his body other than what was previously mentioned. MEI Joseph placed a yellow Medical Examiner's identification band on Sandoval's right ankle. The tag contained Sandoval's name and the Medical Examiner's case number (#14-00466).



**Figure 4**

After Sandoval was photographed and examined, 92 Mike Transportation representative Elienai Scott placed his body in a white vinyl pouch and sealed it with blue, tamper evident seal #2522775 at 0729 hours. Sandoval's body was ultimately transported to the Medical Examiner's Office where an autopsy would be performed.

When the scene investigation was complete I assisted with interviewing the medical staff. Detective Lopez and I also interviewed inmate Danny Washington (Booking #14713010) who was in waiting room #2.

We attempted to interview inmate Steven Floyd (Booking #14712722). Floyd had been housed in sobering cell #1, located along the main hallway of the second floor. Floyd was unable to provide a statement due to his level of intoxication. Refer to the audio recording for details.

---

| Reporting Officer: Det. P. Carrillo | ID# 1881 | CID - HOMICIDE |
|---|---|---|
| Approved By:  Sgt. P, Meza | ID# 1851 | 7/21/2014 |

Exhibit 6

COSD RRFP 000252

## SAN DIEGO SHERIFF'S DEPARTMENT
### Follow-up Investigative Report

**Crime:** Death Investigation
**Victim:** Sandoval, Ronnie
**Location:** 1173 Front Street (SDCJ)
**Date Occurred:** February 23, 2014

**Case Number:** 14109768
**City:** San Diego

**Page 11 of 37**

Detective Lopez and I also contacted inmate Matthew Haney (Booking # 14713108) in Sobering Cell #2. Their statements are summarized below. All of the interviews were digitally recorded. For full details refer to the digital recordings.

### Witness Interviews

**Inmate Information:**

Steven Floyd
DOB: 05-25-1958
Booking #14712722



**Statement of Steven Floyd:**

We attempted to interview inmate Steven Floyd. Floyd had been housed in sobering cell #1, located along the main hallway of the second floor. Floyd was unable to provide a statement due to his level of intoxication. Refer to the audio recording for details.

**Inmate Information:**

Matthew John Haney
DOB: 07-04-1978
Booking # 14713108



**Statement of Matthew Haney:**

Matthew Haney said he didn't have his glasses on and was blind as a bat without them. He did see the medics enter the floor but was unable to see who they were treating and didn't know what was going on.

**Witness Information:**
Danny Lee Washington Jr.
Booking #14713010
DOB: 12-07-1991
Home: (619)772-8857
4460 Delta St. #9, San Diego, Ca. 92113

**Statement of Danny Washington:**

| Reporting Officer: Det. P. Carrillo | ID# 1881 | CID - HOMICIDE |
|---|---|---|
| Approved By:  Sgt. P. Meza | ID# 1851 | 7/21/2014 |

Exhibit 6
91

COSD RRFP 000253

## SAN DIEGO SHERIFF'S DEPARTMENT
### Follow-up Investigative Report

**Crime:** Death Investigation      **Case Number:** 14109768
**Victim:** Sandoval, Ronnie      **City:** San Diego
**Location:** 1173 Front Street (SDCJ)
**Date Occurred:** February 23, 2014      **Page 12 of 37**

Inmate Danny Washington said he briefly spoke with Sandoval in a cell they were placed in together during the initial booking process. Sandoval was shaking and told him he was diabetic. Washington was later moved to a medical cell and saw Sandoval sitting in the cell next to him. They did not communicate with each other. During the time Washington was in the cell next to Sandoval, he never saw Sandoval call for help or show signs he was in distress.

**Investigation (continued):**

With the scene investigation complete and all witnesses interviewed, the investigative team prepared to conclude our investigation. FET Legler maintained possession of the evidentiary photographs he had taken and placed those items into evidence. I maintained possession of the remainder of the items below and place them into evidence. Those items included:

1. 145 photographs taken by Rich Legler of the scene.
2. 1 DVD containing video from Vista Detention Facility
   (Received from Deputy Broussard #3221)
3. 1 video recorded by Deputy Johnson (4938)
   (Received from Deputy Edge)

At 0920 hours, the investigative team debriefed. Afterward, we cleared the facility by 0930 hours.

### Follow-up Investigation

Detectives Fiske and Lopez assisted with the medical staff interviews.
For further details refer to Detectives Fiske's and Lopez' follow-up report or to the digital recordings. A summary of the interviews are detailed below.

### Medical Staff Interviews

**Witness Information:**
Deborah Bell, RN
Sheriff's Detentions Nurse (6707)
San Diego Central Jail
Phone: (619) 615-2454

**Statement of RN Bell:**

Nurse Bell said she was working Intake Triage on February 22, 2014 at 1437 hours when inmate Sandoval came in to the jail. She asked Sandoval the following questions;

---

Reporting Officer: Det. P. Carrillo    ID# 1881        CID - HOMICIDE

Approved By:    Sgt. P. Meza    ID# 1851        7/21/2014

Exhibit 6
92

COSD RRFP 000254

## SAN DIEGO SHERIFF'S DEPARTMENT
### Follow-up Investigative Report

**Crime:** Death Investigation  
**Victim:** Sandoval, Ronnie  
**Location:** 1173 Front Street (SDCJ)  
**Date Occurred:** February 23, 2014

**Case Number:** 14109768  
**City:** San Diego

**Page 13 of 37**

Have you been hurt or injured in the last 72 hours? Sandoval answered no.
Have you been treated at a hospital during your arrest? Sandoval answered no.
Have you been tasered or restrained with anything other than handcuffs?
 Sandoval answered no.
Do you have any major medical problems? Sandoval answered no.
Do you have any communicable diseases? Sandoval answered no.
When was your last chest x-ray? Sandoval answered no.
Do you have any psychiatric problems? Sandoval answered no.
Are you a patient of the regional center? Sandoval answered no.
Are you feeling suicidal? Sandoval answered no.
Nurse Bell said Sandoval was alert and oriented so she approved him for booking.

Nurse Bell didn't have any other interaction with Sandoval.

**Witness Information:**
Marylene Allan, RN
Sheriff's Detentions Nurse (#9033)
San Diego Central Jail
Phone: (619) 615-2454

**Statement of RN Allan:**

RN Allan said she was assigned to work the second floor medical screening on 02/22/14. Allan said she did not have any contact with Inmate Sandoval during her shift on 02/22/14. She recalled seeing an inmate in waiting room #1 and room #2 however she did not see any issues with these inmates. She did not ask why these particular inmates were placed in these cells. She did not check in JIMS to see the status of why these inmates were in these holding cells. Although logs are maintained for the safety and sobering cells, logs are not maintained for the waiting rooms. The medical staff does not have the key to the holding cells.

The medical staff who work on the second floor are required to check on inmates in the waiting rooms if they have been placed there for medical reasons. RN Allan said she was not contacted by any detentions staff regarding these inmates in the waiting rooms. She was not aware if any deputies had approached medical staff regarding inmate Sandoval being in the waiting room. RN Allan did not know who the inmate in waiting room #1 (Sandoval) nor did she recall his description.

**Investigation (continued):**

Reporting Officer: Det. P. Carrillo        ID# 1881            CID - HOMICIDE

Approved By:       Sgt. P. Meza            ID# 1851            7/21/2014

Exhibit 6
93

COSD RRFP 000255

**SAN DIEGO SHERIFF'S DEPARTMENT**
**Follow-up Investigative Report**

**Crime:** Death Investigation                    **Case Number:** 14109768
**Victim:** Sandoval, Ronnie                         **City:** San Diego
**Location:** 1173 Front Street (SDCJ)
**Date Occurred:** February 23, 2014               **Page 14 of 37**

On Sunday February 23, 2014 at about 0805 hours, I interviewed Nurse Dana Harris (5055). See recording and report by Nurse Dana Harris for more details.

**Witness Information:**

Dana Harris, RN (5055)
Sheriff's Detentions Nurse
San Diego Central Jail
Phone: (949) 295-4268

**Statement of RN Harris:**

Nurse Harris said she has been a nurse since 2012. She has worked for the San Diego Sheriff's Department since February of 2013.

On February 23, 2014 hours at about 0055 hours, Sgt. Shawcroft flagged Nurse Harris down and said he thought an inmate was having a seizure. Harris walked over to holding cell #1 and saw Sandoval sitting on a bench. He was leaning towards his left. Sandoval then completely fell to his left and hit his head on the wall and ended up on the floor of the cell. Sgt. Shawcroft notified the deputy they needed to enter the room.

Nurse Harris entered the room and started assessing the patient. Sandoval's respiratory rate was 20 BPM. There were moderate oral secretions draining on the ground. There was no blood. His airway was clear and he was breathing on his own. His oxygen saturation was 94 percent. His pupils were 3mm and sluggish and responding to light bilaterally. There were no visible head wounds or open bleeding on his head from hitting the wall. A C-collar was placed. His blood glucose level was stable at 151. RN Maria Llamado took his blood pressure which was 137 over 58. Sandoval's heart rate was at 94 beats per minute. Sandoval's lungs were clear and his color was within normal limits. Nurse Harris applied the non-rebreather mask and set it to 15 liters per minute with oxygen resulting in an increase in oxygen to 98 percent from 94 percent. Sandoval was placed in the right recovery position. Sandoval's muscles were generalized stiff and there were some very mild generalized tremors, not tonic clonic (formerly known as Gran Mal seizure) in presentation. These were described as fine shakes all over his body.

Sandoval did not have any loss of bowel or bladder control. Sandoval's skin was warm and moist. Nurse Harris advised the sworn staff to call for EMT's to send Sandoval out to the hospital.

A reassessment was done. Sandoval's pupils remained 3 mm and sluggish and he responded to light bilaterally. He responded to commands. Sandoval squeezed Nurse

---

Reporting Officer: Det. P. Carrillo          ID# 1881                    CID - HOMICIDE

Approved By:        Sgt. P. Meza             ID# 1851                    7/21/2014

Exhibit 6
94                                                   COSD RRFP 000256

## SAN DIEGO SHERIFF'S DEPARTMENT
### Follow-up Investigative Report

**Crime:** Death Investigation                    **Case Number:** 14109768
**Victim:** Sandoval, Ronnie                       **City:** San Diego
**Location:** 1173 Front Street (SDCJ)
**Date Occurred:** February 23, 2014                          **Page 15 of 37**

---

Harris' left hand and made eye contact. Sandoval's radial pulse was 2 + and equal on both sides. Sandoval attempted to close his eyelids when Harris tried to open them. This is a sign he was alert. Sandoval remained in the right recovery position. Sandoval's airway remained patent (open/unblocked). Sandoval was breathing on his own at a rate of twenty BPM. Sandoval's oxygen saturation was at 98 percent at 15 liters per minute. Sandoval slightly opened his eyes on his own.

Nurse Llamado received a phone call from the charge nurse wanting to know Sandoval's status. The charge nurse was given an update.

Sandoval's oxygen saturation dropped to 84. Harris could still see the rise and fall of his chest. Sandoval was still breathing. Nurse Harris told Deputy Andrade to use the bag valve mask on Sandoval. She also told Andrade to upgrade Sandoval's status to 911. They re-adjusted Sandoval's oxygen monitor and it went back up to 98 percent. Sandoval was placed back on the non-rebreather. Nurse Harris inserted a nasal trumpet to the right nostril so they could get better oxygenation. They were still waiting for the arrival of paramedics.

At 0110 hours, Sandoval's blood pressure was checked again. His blood pressure was 163 over 105. Sandoval still had muscle stiffness. His heart rate was 55 beats per minutes. Sandoval still was responding to commands. His pupils were still 3mm and sluggish. Sandoval's lungs remained clear and his Oxygen saturation remained greater than 94 percent. They continued to await the arrival of paramedics.

At 0115 hours, Sandoval no longer was shaking or had muscle stiffness. They attempted multiple times to obtain a new set of vital signs. Sandoval's blood pressure was 135 over 58. His heart rate was 90 beats per minute. Sandoval's respiratory rate was at 18 BPM. His oxygen saturation was 99 percent at 15 liters per minute. They continued to await the arrival of paramedics.

At 0125 hours, Nurse Harris called charge Nurse Shirley Bautista. Nurse Bautista came to the second floor. Shortly thereafter the EMT's arrived on scene. The EMT's assessed Sandoval's status.

At 0148 hours, the paramedics arrived on scene. They assessed Sandoval.

At 0153 hours, Nurse Harris gave a verbal report to the paramedics.

At 0211 hours, Nurse Llamado told Nurse Harris the paramedics pronounced Sandoval dead.

---

Reporting Officer: Det. P. Carrillo          ID# 1881                    CID - HOMICIDE

Approved By:        Sgt. P. Meza             ID# 1851                    7/21/2014

Exhibit 6
95

COSD RRFP 000257

## SAN DIEGO SHERIFF'S DEPARTMENT
### Follow-up Investigative Report

**Crime:** Death Investigation  **Case Number:** 14109768
**Victim:** Sandoval, Ronnie  **City:** San Diego
**Location:** 1173 Front Street (SDCJ)
**Date Occurred:** February 23, 2014  **Page 16 of 37**

Nurse Harris said she had not had any prior contact with Inmate Sandoval. Sandoval had never called out he was in distress or needing help. The first time Harris became involved was when Sgt. Shawcroft alerted her to the situation. Nurse Harris said she was not briefed by anyone from the outgoing shift as to why inmate Sandoval was in waiting room #1.

Typically these holding cells are used for medical patients as well as non-medical patients. If the inmates in these cells are being held there for medical reasons, they would brief the oncoming shift with what is called a medical report. The next shift is told why the inmate is being held in the cell. Shift change occurred at 2300 hours. Nurse Harris couldn't recall the nurse she relieved. Nurse Harris said she was not briefed by the nurse she relieved as to why Sandoval was in the holding cell or any issues he may have been having.

There was no charting in medical records of anything occurring previous to this incident with inmate Sandoval during his booking.

**Witness Information:**
Maria Theresa Llamado, RN (6492)
Sheriff's Detentions Nurse
San Diego Central Jail
Phone: (619) 615-2454

**Statement of RN Llamado:**

RN Llamado started her shift on 02/22/14 at 2300 hours. She was assigned to the nurses' station and duties for the second floor medical screening. Inmate Sandoval was already in waiting room #1 when she started her shift. She was not briefed as to the reason Sandoval was in the holding cell. Usually the outgoing shift will relay information regarding the status of inmates with medical needs on the floor. If this is not done then staff presumes deputies are using the cells for "keep separate" inmates.

RN Llamado relieved RN Marylene Allen, RN Romeo DeGuzman and RN Caroline Dela Cruz.

On 02/23/14 at about 0058 hours, Llamado was seated at a nurse's booth helping another inmate when RN Harris told her there was a man down in waiting room #1.

Llamado responded to the cell (Waiting Room#1). Deputies were already present at the location. Sandoval was lying on his right side on the floor, with part of his head under the bench. Sandoval was snoring and "tensing up." Llamado noticed his arms were stiff

Reporting Officer: Det. P. Carrillo  ID# 1881  CID - HOMICIDE

Approved By:  Sgt. P. Meza  ID# 1851  7/21/2014

Exhibit 6
96  COSD RRFP 000258

**SAN DIEGO SHERIFF'S DEPARTMENT**
**Follow-up Investigative Report**

**Crime:** Death Investigation
**Victim:** Sandoval, Ronnie
**Location:** 1173 Front Street (SDCJ)
**Date Occurred:** February 23, 2014

**Case Number:** 14109768
**City:** San Diego

**Page 17 of 37**

as she tried to place a blood pressure cuff on. As she pulled his arm, Sandoval made a grunting sound.

Llamado placed the blood pressure cuff on Sandoval's left arm. His blood pressure reading was 137/58 with a pulse of 94. At about 0056 hours, Llamado measured Sandoval's oxygen using a 15 liter non-rebreather mask. His oxygen read 98%. RN Harris told her Sandoval's pupils were at 3mm and "sluggish."

Llamado retrieved a C-collar and a deputy assisted by applying it to Sandoval. Sandoval was moved slightly on his back to facilitate the application of the C-collar. During this, Sandoval was still snoring but unresponsive. Sandoval's eyes were closed. Llamado checked Sandoval's pants and saw they were dry. His pants were not soiled as a normally seen on a seizure patient.

Llamado left the room and started to prepare the "DHS" paperwork used to send out inmates to the hospital. She returned and was told by a deputy, who used to be a paramedic, to get a suction machine because Sandoval was starting to foam in the mouth. Llamado called a different floor for a suction device since the device on the second floor was not working. The Yankauer Suction Tube was brought to the location and the deputy used it on Sandoval. Llamado was present and she was "fixing the gadgets to make the suction work."

After the suctioning was complete, Llamado printed the copies of the "DHS" paperwork and notified the charge nurse, RN Shirley Bautista, of the incident. Bautista responded to the scene and tried to insert an IV. On the second attempt she placed the IV on his right arm. The IV ejected and blood must have come out of his arm. Llamado did not see this, but it explained the blood she saw on the floor where Sandoval was lying.

At about 0127 hours, EMT's arrived on scene. Paramedics were also called and they arrived at about 0148 hours. Paramedics placed Sandoval on a backboard. While transporting him from the floor to the gurney, Sandoval stopped breathing and paramedics started CPR.

Llamado heard paramedics pronounce Sandoval dead at about 0211 hours. After Sandoval was pronounced dead, Llamado did not see who covered the body with a blanket.

During her shift, Llamado had no contact with Sandoval until the medical assist call. Llamado checked Sandoval's medical log and saw no indication of medical issues during the pre-book screening. In 2012, medical history showed Sandoval told jail medical staff

Reporting Officer: Det. P. Carrillo    ID# 1881    CID - HOMICIDE

Approved By:    Sgt. P. Meza    ID# 1851    7/21/2014

Exhibit 6
97

COSD RRFP 000259

**SAN DIEGO SHERIFF'S DEPARTMENT**
**Follow-up Investigative Report**

**Crime:** Death Investigation
**Victim:** Sandoval, Ronnie
**Location:** 1173 Front Street (SDCJ)
**Date Occurred:** February 23, 2014

**Case Number:** 14109768
**City:** San Diego

**Page 18 of 37**

of a fracture and head trauma. Llamado referred me to the Sandoval's medical chart for details. There was no seizure history for Sandoval.

**Witness Information:**

Shirley Bautista, RN (9226)
Sheriff's Detentions Nurse
San Diego Central Jail
Phone: (858) 336-2790

**Statement of RN Bautista:**

RN Bautista said she was the charge nurse. She supervises all of the medical staff on her shift. She works from 2300 hours to 0730 hours. RN Bautista said she received a call from Nurse Llamado at about 0105 hours. Llamado told Bautista they were going to send an inmate out who had been having a seizure since 0055 hours. Bautista told Llamado to call 911 for the paramedics.

At about 0125 hours, Nurse Harris called Bautista and asked her to respond to the second floor. Bautista responded immediately because she believed it was about the inmate patient from Llamado's earlier call. Bautista believed she arrived on the second floor in less than one minute.

Bautista saw jail staff inside a medical holding cell. The inmate in the cell was on his back. A deputy was delivering oxygen to the inmate via an Ambubag. Bautista had learned the inmate was named Sandoval because Nurse Llamado had already sent his information to her. Bautista said Sandoval was on anti-inflammatory medication such as Motrin and Naproxen.

She also learned Sandoval denied having any medical problems when he was booked during this particular booking. Sandoval had not reached a point in the booking process where more in depth questions are asked. Sandoval was not on any medication to prevent seizures nor had he claimed having a history of seizures during the booking process.

When Bautista arrived on the second floor, she saw the inmate twitching mostly on the upper half of his body. It did not look like he was having a Grand Mal seizure. Bautista heard Emergency Medical Technicians (EMT's) had been called prior to her being called. A few minutes after Bautista arrived she heard the EMT's were already on scene. She told the jail staff to send the EMT's to the second floor but also told them to call paramedics. Bautista later learned the paramedics had been called at 0120 hours.

Reporting Officer: Det. P. Carrillo   ID# 1881          CID - HOMICIDE

Approved By:   Sgt. P. Meza   ID# 1851          7/21/2014

Exhibit 6
98

COSD RRFP 000260

**SAN DIEGO SHERIFF'S DEPARTMENT**
**Follow-up Investigative Report**

**Crime:** Death Investigation
**Victim:** Sandoval, Ronnie
**Location:** 1173 Front Street (SDCJ)
**Date Occurred:** February 23, 2014

**Case Number:** 14109768
**City:** San Diego

**Page 19 of 37**

---

Sandoval was not responsive but was breathing on his own. Bautista saw his chest and abdominal movement. Sandoval's face felt warm and moist, but he was not sweating profusely. Sandoval's finger felt cold but he had good capillary refill. There was good blood flow returned when Bautista touched the inmate's fingers. Bautista noticed although the inmate was breathing, she could hear a mild snoring sound. This indicated his airway might not be completely open. Bautista tried to open his airway with a jaw thrust maneuver. She still heard mild snoring from the inmate afterwards. Bautista said a C-collar had already been placed on the inmate. The deputies said a nasal airway had also already been placed. Bautista later learned Nurse Harris had placed the nasal airway. Bautista decided it would be best to place an oral airway. As soon as Bautista placed the oral airway, the inmate had a slight gag reflex. Bautista immediately removed the oral airway.

While supporting the inmate's head and with the help of a deputy, they turned Sandoval to his right side. The inmate vomited about 30 cc's of clear fluid with a very faint tinge of blood that looked pinkish. Bautista suctioned Sandoval's mouth and nose. The EMT's arrived and took over medical intervention. The EMT's reinserted the nasal airway. The EMT's took charge of the airway and oxygenation with the Ambubag.

Bautista attempted to start an IV. During the second attempt, she got the IV in properly and there was a lot of blood back flow. This meant the IV was in place. Bautista connected the inmate to a normal bag of saline. Once the IV was placed and a dressing was placed, Bautista went to change her bloody gloves. When she returned she noticed Sandoval's face had turned ashen in color. Bautista told the EMT's to "bag him" or deliver more oxygen. At about 0148 hours, Bautista heard the paramedics arriving. Bautista knelt down to check the inmate's carotid pulse. Before Bautista was able to get a carotid pulse, the paramedics told her to exit the cell so they could go inside. The paramedics took over the medical intervention.

Bautista confirmed Nurse Llamado and Nurse Harris were the jail nurses who helped her treat the inmate. After the paramedics took over, Bautista saw them doing chest compressions on Sandoval. Nurse Bautista returned to her other duties at her post on the third floor. The other two nurses remained on the second floor. Bautista said she was both the charge nurse and the desk nurse. At 0211 hours Nurse Llamado called Bautista and told her Sandoval had been pronounced deceased. Nurse Bautista notified her supervisor.

Bautista said Sandoval's seizure could be an indication of something drug related but she wouldn't know for sure until an autopsy and toxicology were done.

---

| | | |
|---|---|---|
| Reporting Officer: Det. P. Carrillo | ID# 1881 | CID - HOMICIDE |
| Approved By:   Sgt. P. Meza | ID# 1851 | 7/21/2014 |

Exhibit 6
99

COSD RRFP 000261

## SAN DIEGO SHERIFF'S DEPARTMENT
### Follow-up Investigative Report

**Crime:** Death Investigation      **Case Number:** 14109768
**Victim:** Sandoval, Ronnie      **City:** San Diego
**Location:** 1173 Front Street (SDCJ)
**Date Occurred:** February 23, 2014      **Page 20 of 37**

During the incident Bautista had noted Sandoval's oxygen saturations were 92 to 94 percent. Bautista said the preferable oxygen level was above 94 percent. Bautista believed Sandoval was saturated to nearly 99 percent earlier. Bautista said this would have been documented by the two other nurses present. Bautista noted Sandoval's radial wrist pulse palpated regularly. Sandoval's pupils were equal, measured at about 5 mm and sluggish. Bautista said 3m to 4 mm pupils were typical for the lighting conditions. (See report by Nurse Bautista for more details).

**Investigation (continued):**

On Wednesday March 19, 2014 at about 1840 hours, Detective Lopez and I interviewed Nurse Romeo De Guzman (0770). See recording and report by Nurse De Guzman for more details.

**Witness Information:**

Romeo De Guzman, RN (0770)
Sheriff's Detentions Nurse
San Diego Central Jail
Phone: (619) 254-6185

**Statement of RN De Guzman:**

Nurse De Guzman said he has been a nurse for twenty-three years. He has worked for the San Diego County Sheriff's Department for 14 years. He has worked at SDCJ the entire time and has done cross training at George Bailey Detention Facility.

Nurse De Guzman normally works from 1500 hours to 2300 hours. On February 22, 2014, Nurse De Guzman was working in medical screening on the second floor. They are tasked with screening the new inmates coming into the facility after they have been pre-screened on the first floor of the jail.

There is a deputy assigned to work the second floor who is in charge of inmate movement. On average, Nurse De Guzman will see about 15 to 20 inmates per day during the medical screening process. Nurse Allan and Nurse Delacruz were working with him on this particular day.

At about 1600 hours, while Nurse De Guzman was medically screening another inmate, a deputy approached Nurse De Guzman and asked if he could check inmate Sandoval's blood sugar because he believed he is diabetic. Sandoval was not ready for medical

| Reporting Officer: Det. P. Carrillo | ID# 1881 | CID - HOMICIDE |
|---|---|---|
| Approved By: Sgt. P. Meza | ID# 1851 | 7/21/2014 |

Exhibit 6
100

COSD RRFP 000262

**SAN DIEGO SHERIFF'S DEPARTMENT**
**Follow-up Investigative Report**

**Crime:** Death Investigation                    **Case Number:** 14109768
**Victim:** Sandoval, Ronnie                       **City:** San Diego
**Location:** 1173 Front Street (SDCJ)
**Date Occurred:** February 23, 2014                **Page 21 of 37**

screening yet so Nurse De Guzman asked the deputy to put Sandoval in the medical screening holding cell. The deputy placed Sandoval in the holding cell.

Nurse De Guzman retrieved the blood glucose machine. The deputy opened the food flap on the cell door. He told Sandoval to allow him to check his blood sugar. Sandoval gave De Guzman his finger. De Guzman checked Sandoval's blood sugar and it showed it was 107. De Guzman asked Sandoval if he was okay. Sandoval said, "Yeah, I'm okay." De Guzman said they can only treat the inmates for what they say is wrong with them. As a nurse they cannot guess what may be wrong with them.

De Guzman said Sandoval was alert and looking at him when he spoke to him. He realized Sandoval's charges were under the influence. The only concern De Guzman had was thinking Sandoval might have been diabetic since the deputy mentioned Sandoval was diabetic. Because his blood sugar showed 107 it was normal and Sandoval would be allowed to eat. De Guzman was thinking perhaps the inmate wanted to get his blood sugar checked before he ate. De Guzman told the deputy his blood sugar is not high and he can eat. De Guzman told the deputy that Sandoval was, "good to go." He told the deputy the inmate could go through the booking process. The deputy left Sandoval in the holding cell.

De Guzman said he had to return to his duties and said he had to wait for the deputy to move inmate Sandoval out of the cell. If the deputies wanted to put jail blues (clothing) on the inmate and return him, De Guzman said they would have continued and done the full medical screening on Sandoval then. After they do the full medical screening on an inmate they can decide if they will place an inmate in medical observation or send them to the hospital.

In De Guzman's opinion and based on the way Sandoval appeared to him, De Guzman believed Sandoval could go through the booking process. De Guzman didn't recall seeing Sandoval sweating. Nurse De Guzman believed at the time he was merely checking the inmate's blood sugar as a courtesy since the inmate was diabetic. He believed the deputy would return Sandoval to the booking process after he checked his blood sugar or allow him to remain to go through the medical screening process.

De Guzman said the deputies will place inmates in the holding cells in medical screening for different reasons. It's not just the medical staff who have inmates placed in these cells.

During this particular shift Nurse De Guzman said he saw a few other inmates after Sandoval. De Guzman said he would see Sandoval sitting down in the cell as he would pass by during his shift. He was waiting for the deputies to move Sandoval. De Guzman said he didn't have any more contact with Sandoval or speak to him. Sandoval didn't try

| Reporting Officer: Det. P. Carrillo | ID# 1881 | CID - HOMICIDE |
|---|---|---|
| Approved By:  Sgt. P. Meza | ID# 1851 | 7/21/2014 |

Exhibit 6
101

COSD RRFP 000263

**SAN DIEGO SHERIFF'S DEPARTMENT**
**Follow-up Investigative Report**

**Crime:** Death Investigation
**Victim:** Sandoval, Ronnie
**Location:** 1173 Front Street (SDCJ)
**Date Occurred:** February 23, 2014

**Case Number:** 14109768
**City:** San Diego

**Page 22 of 37**

and speak to him. De Guzman said he never saw Sandoval in distress. Sandoval didn't appear to be sweating or shaking. De Guzman said he saw inmate Sandoval about three other times during the rest of his shift. No one ever alerted him to any trouble with inmate Sandoval. De Guzman said he is not sure if any of the other nurses who worked his shift had contact with Sandoval. De Guzman didn't recall having any conversations with the other nurses on his shift regarding Sandoval. De Guzman said he did not tell the oncoming nurses why Sandoval was in the cell nor did the oncoming shift nurses ask him.

De Guzman said he is supposed to document his activity with the inmate in Jail Information Management System. He said he did not document his contact with Sandoval. His thinking at the time was, he only did a courtesy blood sugar check. Sandoval had not gone through a complete medical screening. De Guzman did not see any abnormalities with Sandoval.

De Guzman was responsible for checking the sobering cells during his shift. Nurse Allan was responsible for checking the safety cells. Nurse Debbie Bell was working on the first floor in triage.

De Guzman said he was relieved at the end of his shift by Nurses Llamado and Harris. Sandoval was still in the holding cell during shift change. The nurses did not ask why Sandoval was in the holding cell. De Guzman said he didn't tell the oncoming nurses about Sandoval being in the holding cell because he had not been placed in the cell for medical observation. De Guzman thought Sandoval was just waiting for the deputies to move him.

De Guzman said he wasn't worried about Sandoval's medical status. Sometimes they deal with inmates in a worse condition where they are suffering from alcoholic seizures. Nurse De Guzman said there are parameters regarding the intake triage of inmates when it comes to their blood sugar levels. An inmate will be rejected for booking if their blood sugar is too high. There are no parameters for drug intoxication level. Inmates come in and sometimes they are lucky if the inmate makes it through the booking process.

Nurse De Guzman said he ended his shift and went home. The following day he returned to work and became aware of inmate Sandoval had died. He felt bad when he heard about Sandoval dying. He thought to himself about why the deputy didn't move the inmate from that cell. He thought he wasn't able to send Sandoval at the time to U.C.S.D. Hospital because he wouldn't have qualified as someone who needed to go to the hospital based on what he observed. Sandoval wasn't eligible to go to the Medical Observation Unit because he was still in need of finishing the booking process.

---

Reporting Officer: Det. P. Carrillo         ID# 1881                    CID - HOMICIDE

Approved By:        Sgt. P. Meza            ID# 1851                    7/21/2014

Exhibit 6
102

COSD RRFP 000264

**SAN DIEGO SHERIFF'S DEPARTMENT**
**Follow-up Investigative Report**

**Crime:** Death Investigation
**Victim:** Sandoval, Ronnie
**Location:** 1173 Front Street (SDCJ)
**Date Occurred:** February 23, 2014

**Case Number:** 14109768
**City:** San Diego

Nurse De Guzman said the doctor is usually at the jail until 1600 hours. If the staff believed Sandoval was in bad condition then why didn't they take him to see the doctor? DeGuzman said if he had sent Sandoval to the doctor, the doctor would have been mad and wondered why he was sending the patient since his blood sugar was normal.

De Guzman said Sandoval didn't disclose he was high on drugs. He was quiet. He wasn't saying anything. He can't force the inmate to say something.

De Guzman didn't see any signs that would tell him Sandoval needed to go to the hospital. He didn't qualify for going to the medical observation since he had not finished the booking process. He was just waiting for the deputies to move Sandoval out of the cell so he could finish the booking process.

De Guzman said in retrospect the only thing he would have done different, is speak up, tell the deputy to take the inmate out of the cell and have him continue with the booking process. De Guzman said he does not have the keys to open the cell door. The deputies are in charge of inmate movement. If a patient remains in a cell for more than eight hours, it is not the nurses' call.

De Guzman said he believes inmates will still die while in custody. When they come in to the jail they do not disclose how much drugs they have ingested. It doesn't matter what cell they are housed in, they will die, because they don't disclose they have taken drugs. If the inmates are high on drugs or alcohol, they are not rejected for booking. He has often seen incidents of "man down" for this reason. De Guzman believes we should reject inmates coming in high on drugs and alcohol. De Guzman believes we should include a question to the incoming inmates and ask how much drugs they have used. They should also require the incoming arresting officers to ask the arrestees how much drugs they have used.

De Guzman said there was no requirement to log in a security check on those particular waiting room cells. He is not sure if there was another inmate in the adjacent cell. He didn't recall if there was an inmate there for medical reasons. They are required to log in checks for the safety and sobering cells. De Guzman agreed it would be good to require a check in log for the waiting rooms as well.

De Guzman recalled checking Sandoval's blood sugar within two minutes after he was placed in the second floor medical screening waiting room. He said perhaps the deputies did pass by the cell during the night checking on Sandoval.

De Guzman said he took a lunch break about 1630 hours. On this particular day no deputies asked De Guzman why Sandoval was in the holding cell. None of his fellow

| | | |
|---|---|---|
| Reporting Officer: Det. P. Carrillo | ID# 1881 | CID - HOMICIDE |
| Approved By: Sgt. P. Meza | ID# 1851 | 7/21/2014 |

Exhibit 6
103

COSD RRFP 000265

**SAN DIEGO SHERIFF'S DEPARTMENT**
**Follow-up Investigative Report**

**Crime:** Death Investigation                    **Case Number:** 14109768
**Victim:** Sandoval, Ronnie                      **City:** San Diego
**Location:** 1173 Front Street (SDCJ)
**Date Occurred:** February 23, 2014                    **Page 24 of 37**

---

nurses asked him why Sandoval was in the cell. No one asked him to check on Sandoval a second time. He did not speak to Sandoval at another time other than the time he originally checked his blood sugar. De Guzman didn't recall seeing Sandoval looking lethargic or shaking.

**Investigation (continued):**

On Wednesday March 19, 2014 at about 1800 hours, Detective Lopez and I interviewed Nurse Cesar Costa (9393). See recording and report by Nurse Costa for more details.

**Witness Information:**

Cesar Costa, RN (9393)
Sheriff's Detentions Nurse
San Diego Central Jail
Phone: (619) 203-7398

**Statement of RN Costa:**

Nurse Costa said on February 22, 2014 at about 1530 hours, he was working at SDCJ on the first floor in triage. Deputy Bryan (2880) entered the triage room and told him inmate Sandoval is diaphoretic (sweating heavily) and claiming he is border line diabetic. Costa reviewed the medical intake sheet for Sandoval and saw no medical or psychiatric issues were noted. Sandoval had seen Nurse Deborah Bell when he first arrived at the jail.

Nurse Costa finished interviewing the inmate he was with and responded right away to the first floor intake area near the Livescan to check on Sandoval with his blood sugar check machine. Sandoval was seated on the bench. He poked Sandoval's finger and noted his blood sugar result was 108. This particular number means Sandoval's blood sugar was normal. He looked at Sandoval and told him his blood sugar was 108. Sandoval nodded and remained seated. Sandoval still had some sweat on his face. Sandoval was breathing normally and calm. Sandoval was staring at the wall. Costa asked the deputy when the next meal would be. The deputy told Costa the meal was coming. Nurse Costa told the deputy Sandoval could go through the booking process.

Sandoval was quiet. He did not complain of pain or any medical issues. Costa tried to illicit some kind of conversation with Sandoval but Sandoval was quiet. When he told him what his blood sugar was, Sandoval remained silent. Sandoval didn't show any signs of distress or difficulty breathing. Sandoval seemed to be alert. There was nothing about Sandoval that alarmed Costa.

---

| | | |
|---|---|---|
| Reporting Officer: Det. P. Carrillo | ID# 1881 | CID - HOMICIDE |
| Approved By:   Sgt. P. Meza | ID# 1851 | 7/21/2014 |

Exhibit 6
104

COSD RRFP 000266

## SAN DIEGO SHERIFF'S DEPARTMENT
### Follow-up Investigative Report

**Crime:** Death Investigation      **Case Number:** 14109768
**Victim:** Sandoval, Ronnie      **City:** San Diego
**Location:** 1173 Front Street (SDCJ)
**Date Occurred:** February 23, 2014      **Page 25 of 37**

Nurse Costa returned to his work station and continued processing inmates. He was not aware of any policy that says they have to document when an inmate is normal. They are supposed to document when something is abnormal.

Nurse Costa later learned about Sandoval dying after he returned back to work. He was told by his supervisor he needed to write a report which he did.

Nurse Costa wrote in his report there was no complaint of pain with no shakes or tremors. Sandoval had no complaints of chest pain or dizziness. (See Costa's report for details) Nurse Costa said when he had gone to check on Sandoval, he had all of the arresting officers who were coming into the facility with new arrestees wait while he checked on Sandoval's blood sugar. (See recording for details).

**Investigation (continued):**
On Tuesday, April 15, 2014 at about 0603 hours, I interviewed Nurse Mercal Vivier (9393). See recording for more details.

**Witness Information:**
Mercal Vivier, RN (6895)
Sheriff's Detentions Nurse
San Diego Central Jail
Phone: (619) 615-2454

**Statement of RN Vivier:**
RN Mercal Vivier said she has been a nurse for 38 years. She has worked for the San Diego Sheriff's Department for 14 years. Her normal work hours are from 2300 hours to 0700 hours.

Nurse Vivier said she was working SDCJ's third floor on February 22, 2014 at about midnight. Nurse Vivier recalled having an interaction with an inmate on the 2nd floor that particular night but she didn't specifically recall inmate Sandoval.

I showed Nurse Vivier a still shot taken from surveillance video where she is looking into waiting room #1. Nurse Vivier identified herself in the video. Vivier recalled walking through and looking into that cell. Generally speaking she would ask the inmate how they are doing. She didn't recall specifically if she asked the inmate how he was doing but more than likely she did. Nurse Vivier recalled the inmate being in the cell and wondering why he was in there. Vivier didn't recall asking any other nurses why the inmate was in the cell.

| | | |
|---|---|---|
| Reporting Officer: Det. P. Carrillo   ID# 1881 | | CID - HOMICIDE |
| Approved By:    Sgt. P. Meza    ID# 1851 | | 7/21/2014 |

Exhibit 6
105

COSD RRFP 000267

**SAN DIEGO SHERIFF'S DEPARTMENT**
**Follow-up Investigative Report**

**Crime:** Death Investigation      **Case Number:** 14109768
**Victim:** Sandoval, Ronnie      **City:** San Diego
**Location:** 1173 Front Street (SDCJ)
**Date Occurred:** February 23, 2014      **Page 26 of 37**

---

When she walked by the inmate caught her attention because normally they do not have inmates in this cell. There was nothing about his particular inmate that caused her to be unduly alarmed. There was nothing out of the ordinary that would have caused her to get a hold of the other nurses.

### RONNIE SANDOVAL'S ARREST

I reviewed the Arrest Report (#14109648) authored by Deputy Henry Castro (#5540). The report documented Sandoval's arrest that took place on February 22, 2014.

On February 22, 2014 at about 1034 hours, San Diego Sheriff's Deputy Henry Castro contacted Ronnie Paul Sandoval Jr. during a probation compliance check at 2123 Seigle Court in the City of Lemon Grove. As Deputy Castro attempted to contact Sandoval, he initially did not respond to commands for him to come downstairs. Deputy Castro noticed what appeared to be glass meth-pipes being thrown out from a top bedroom window. After about ten minutes, Sandoval eventually came downstairs and was detained.

Officers observed a meth pipe on Sandoval s bed in his upstairs bedroom. In addition, the items which were thrown from the window were also confirmed to be three heavily-coated meth-pipes. Deputy Castro strongly believed Sandoval attempted to destroy evidence, because of the movement upstairs and the delayed time it took Sandoval to respond to his commands.

Deputy Castro felt there was additional illegal contraband hidden in Sandoval's bedroom. A search was conducted on Ronnie Sandoval's bedroom. National City Officer Cardoza #442 pointed out a plastic baggie containing a white crystal like substance on the floor next to Sandoval's dresser. Deputy Castro collected the baggie containing the white crystal like substance for evidence.

Deputy Castro advised Sandoval he was being placed under arrest for 11377 (a) H&S possession of a controlled substance and for 11364 H&S possession of drug paraphernalia. He placed Sandoval in the back seat of his patrol car. The arrest occurred on 02/22/2014 at 1149 hours.

Deputy Castro transported Sandoval the Rancho San Diego Sheriff's Station for processing. Once at the station, he read Sandoval his Miranda rights. Sandoval waived his Miranda rights and agreed to speak to Deputy Castro. Deputy Castro told Sandoval of the white crystal like substance that had been located next to his dresser. Sandoval said, ""Man that doesn't belong to me, a lot of people go into my bedroom". Deputy Castro asked him who else has access to his bedroom. Sandoval refused to answer any more question, so Deputy Castro ended the interview.

---

Reporting Officer: Det. P. Carrillo      ID# 1881      CID - HOMICIDE

Approved By:      Sgt. P. Meza      ID# 1851      7/21/2014

Exhibit 6
106

COSD RRFP 000268

**SAN DIEGO SHERIFF'S DEPARTMENT**
**Follow-up Investigative Report**

**Crime:** Death Investigation

**Case Number:** 14109768

**Victim:** Sandoval, Ronnie

**City:** San Diego

**Location:** 1173 Front Street (SDCJ)

**Date Occurred:** February 23, 2014

**Page 27 of 37**

Deputy Castro tested and weighed the white crystal like substance using a NIK test kit. The white crystal like substance tested positive for methamphetamine. The total gross weight was 1.9 grams with a net weight of 1.0 grams. He processed and labeled the crystal methamphetamine and placed it into the Rancho San Diego Sheriff's evidence locker.

Deputy Castro also placed a blue cloth bag containing a burnt table spoon, two used syringes, metal bottle cap and a cloth tourniquet in the Rancho San Diego Sheriff's Station evidence. He was unable to determine if Sandoval had been the person who had discarded these items in the backyard of a nearby residence.

Deputy Castro transported Sandoval and an additional person he arrested by the name Kirk Trzynka to the San Diego Central Jail where they were booked without incident. Sandoval was booked for 11377 (a) H&S possession of a controlled substance and 11364 H&S possession of drug paraphernalia. Trzynka was booked for 11550 H&S under the influence of a controlled substance.

**Investigation (continued):**

I reviewed the deputies reports prepared in this case and learned the following information summarized below. For details see deputy reports attached to this case.

Jail records indicate Ronnie Sandoval was booked at San Diego Central Jail on February 22, 2014 at 1423 hours.

Deputy Matthew Chavez was assigned the Intake Deputy Position at San Diego Central Jail where he interacted with Inmate Ronnie Sandoval (BN#14713020).

On 02-22-14, at approximately 1530 hours, he first made contact with Inmate Sandoval while taking his fingerprints. Sandoval was extremely sweaty and appeared to be slightly disoriented. Deputy Chavez asked Sandoval if he was alright. Sandoval replied he was very cold and did not feel well. Sandoval spontaneously said approximately eight months ago he was told he may be "borderline diabetic." Deputy Chavez asked Sandoval if he told the Intake Nurse this and he responded "Yes; I don't take any medication for it though."

At this time Deputy Chavez notified Deputy Bryan (2880) about Sandoval. Deputy Bryan informed the intake nurse who promptly came out to the fingerprinting area and tested Sandoval's blood sugar. The nurse said his blood sugar was normal. Deputy Chavez placed Sandoval in Holding Cell #5 on the first floor.

| | | |
|---|---|---|
| Reporting Officer: Det. P. Carrillo | ID# 1881 | CID - HOMICIDE |
| Approved By: Sgt. P. Meza | ID# 1851 | 7/21/2014 |

Exhibit 6
107

COSD RRFP 000269

## SAN DIEGO SHERIFF'S DEPARTMENT
### Follow-up Investigative Report

**Crime:** Death Investigation          **Case Number:** 14109768
**Victim:** Sandoval, Ronnie          **City:** San Diego
**Location:** 1173 Front Street (SDCJ)
**Date Occurred:** February 23, 2014          **Page 28 of 37**

At approximately 1630 hours, Sandoval was escorted to the forensics room to have his booking photograph taken. Sandoval was still sweating a lot and appeared to be very tired and disoriented. Deputy Martinez (7059) asked Sandoval how he was feeling. Sandoval became agitated and refused to answer any more questions regarding his health. Deputies Martinez and Chavez decided it would be best to expedite the booking process for Sandoval so he could see the nurse on the second floor. As soon as the photographs were completed, Deputy Chavez escorted Sandoval through the intake sally port to the second floor.

Deputy Chavez spoke with Nurse De Guzman (0770) and explained his observations of Sandoval. Nurse De Guzman was working at a computer and instructed Deputy Chavez to place Sandoval in Medical Observation Cell #1 nearby and he would examine Sandoval as soon as possible. Deputy Chavez placed Sandoval in Medical Observation Cell #1 at approximately 1700 hours as he was instructed. He explained to Sandoval the nurse would see him as soon as possible. Sandoval responded, "Thank you."

Deputy Chavez told Deputies Wilkinson (3226) and Rodriguez (2334) Sandoval was placed in the Medical Observation Cell #1 on the jail's second floor.

At about 1930 hours, Deputy Nathanial Fox #5868 contacted inmate Ronnie Sandoval inside Waiting Room 1. He asked Sandoval why he was in the cell by himself and not going through the booking process. Sandoval said he did not know why he was separated. Sandoval appeared lethargic and was slurring his speech. Deputy Fox asked the medical screening nurses if they knew why Sandoval was being held in Waiting Room 1. None of the medical screening nurses knew why Sandoval was being held in Waiting Room 1.

Deputy Fox secured the door for Waiting Room 1. Due to Sandoval's narcotics charges, Deputy Fox felt he may have been kept separate for observation by medical staff and was unable to further investigate due to assisting with facility operations. Throughout his shift, Deputy Fox periodically checked on the welfare of Sandoval. Sandoval maintained the same lethargic demeanor but did not show signs of further medical distress.

On 02/23/14 at about 0055 hours, Sgt. Shawcroft walked through the medical area on the second floor and noticed Inmate Sandoval inside of the medical holding cell.

Sandoval was sitting on the bench looking out in Sgt. Shawcroft's direction. He noticed Sandoval's gaze was not at him, but distant and his skin color looked grayish. Sgt. Shawcroft watched Sandoval for approximately a minute or so. As he observed him he noticed Sandoval's eyes roll back in his head as his body slightly slumped to his left on

---

Reporting Officer: Det. P. Carrillo     ID# 1881        CID - HOMICIDE

Approved By:     Sgt. P. Meza     ID# 1851        7/21/2014

Exhibit 6
108

COSD RRFP 000270

**SAN DIEGO SHERIFF'S DEPARTMENT**
**Follow-up Investigative Report**

**Crime:** Death Investigation      **Case Number:** 14109768
**Victim:** Sandoval, Ronnie      **City:** San Diego
**Location:** 1173 Front Street (SDCJ)
**Date Occurred:** February 23, 2014      **Page 29 of 37**

the bench. Sgt. Shawcroft immediately called to Nurse Harris #5055 in the medical area and informed her of Sandoval's condition. He also called Deputy Edge to assist. Nurse Harris and Sgt. Shawcroft watched Sandoval fall further to his left and onto the floor hitting his head on the wall on his way down.

Deputy Edge arrived and opened the cell door. Deputy Edge, Nurse Harris and Sgt. Shawcroft entered the cell to give medical attention to Sandoval. It appeared Sandoval was having a seizure. Deputy Edge assisted Sandoval by holding his head off the cement floor and away from the steel bench. Nurse Harris brought an oxygen tank and mask into the cell and placed it on Sandoval's face. Deputy Edge took over and held the mask over Sandoval's nose and mouth while Nurse Harris took his vitals.

Sgt. Shawcroft left the cell to notify Sgt. Kamoss #4202 of the situation and to advise him Emergency Medical Technicians (EMT's) were notified for Sandoval.

Deputy Nolan Edge #4706 said he entered the cell and saw Inmate Sandoval lying down on his right side in the corner of the cell near the door with his head underneath the bench. Sergeant Shawcroft informed him Sandoval had hit his head on the wall as he fell to the floor from the bench.

Deputy Nolan placed his right hand on Sandoval's left arm and gently shook his arm while calling his name in an attempt to see if Sandoval was responsive. Sandoval's left arm was shaking and his muscles were tense. Sandoval was breathing hard and spitting on the floor. At approximately 0056 hours, Nurse Harris placed an oxygen mask on Sandoval's face and asked Deputy Nolan to hold it in place. Nolan held the oxygen in place with his left hand. Nurse Harris applied a cuff on Sandoval's right arm in order to take his blood pressure. An O2 sensor was placed on Sandoval's right hand to monitor his oxygen level. Deputy Nolan continued to call Sandoval's name in an attempt to get a response. Sandoval would periodically open his eyes for a second, but he would not respond.

At approximately 0101 hours, Deputy Andrade #0137, Corporal Fox #5868, and Deputy Sobaszek #3209 entered the cell to assist with administering first aid. Deputy Nolan informed the responding deputies about Sandoval's situation. Due to the nature of Sandoval's fall it was determined a C-Spine collar be placed on his neck to prevent any further injury to Sandoval's head, neck, and spine. Keeping Sandoval's head and neck immobile, deputies slid him into the middle of the cell to allow more space to be available to continue with first aid. At approximately 0102 hours, Nurse Llamado #6492 entered the cell and handed the C-Spine collar, (Orthopedic medical device to support the neck) to Deputy Andrade. Deputies Andrade and Nolan placed the C-Spine collar on

---

Reporting Officer: Det. P. Carrillo    ID# 1881      CID - HOMICIDE

Approved By:    Sgt. P. Meza    ID# 1851      7/21/2014

Exhibit 6
109

COSD RRFP 000271

**SAN DIEGO SHERIFF'S DEPARTMENT**
**Follow-up Investigative Report**

**Crime:** Death Investigation                **Case Number:** 14109768
**Victim:** Sandoval, Ronnie                **City:** San Diego
**Location:** 1173 Front Street (SDCJ)
**Date Occurred:** February 23, 2014                **Page 30 of 37**

---

Sandoval's neck. At approximately 0105 hours, EMT personnel were called per Nurse Harris.

At approximately 0106 hours, Nurse Harris applied a nasopharyngeal airway, (A medical appliance tube that opens the airway), to assist with keeping Sandoval's airway open. To further assist with keeping Sandoval's airway clear, Deputies Johnson #4983 and Valbuena #3296 went up to the 3rd Floor and brought back an "Easy-Go-Vac" to suction out any fluids in Sandoval's mouth to keep his airway clear. At approximately 0110 hours, suction was applied to Sandoval's nose and throat.

Sandoval's breathing became shallow and his pupils did not react to light. Deputy Andrade applied a bag valve mask, (A medical device to provide positive pressure ventilation), to assist Sandoval with breathing. At approximately 0112 hours, Registered Charge Nurse Bautista #9226 entered the cell. Nurse Bautista monitored Sandoval and applied an oropharyngeal airway, (A medical device preventing the tongue from covering the epiglottis). Sandoval still had a gag reflex and started vomiting. RN Bautista removed the oropharyngeal airway from Sandoval's mouth. Sandoval was turned to his right side and suction was applied to remove the secretions in his mouth. Nurse Bautista established an IV in Sandoval's right arm. Leg and waist chains were placed onto Sandoval to prepare him for transport. Deputy Andrade suggested assistance from paramedics due to Sandoval's current condition. Medical staff continued to monitor Sandoval's vital signs.

At approximately 0120 hours, American Medical Response EMTs arrived at the cell. The EMTs informed the deputies they would assist with first aid but they would not be able to transport Sandoval in his current condition. At that time paramedics were called to respond. EMT Trunick entered the cell and took over ventilating Sandoval with the bag valve mask. Sandoval was placed on a backboard to keep him immobile and to prepare him for transport. At approximately 0136 hours, EMT Trunick informed medical staff he could still feel a pulse.

At approximately 0142 hours, San Diego Fire Department Engine 201 and Medic 11 arrived at the scene. The paramedics began to assess Sandoval and secure him to the backboard.

As the paramedics were about to tape down and secure Sandoval's head to the backboard they noticed Sandoval had stopped breathing and had no pulse. The paramedics removed Sandoval from the cell, placed him onto a medical gurney and at approximately 0148 hours Cardio Pulmonary Resuscitation (CPR) was started. At approximately 0201 hours, Deputy Andrade secured the door to Waiting Room 1.

---

Reporting Officer: Det. P. Carrillo                ID# 1881                CID - HOMICIDE

Approved By:        Sgt. P. Meza                ID# 1851                7/21/2014

Exhibit 6
110

COSD RRFP 000272

**SAN DIEGO SHERIFF'S DEPARTMENT**
**Follow-up Investigative Report**

**Crime:** Death Investigation                    **Case Number:** 14109768
**Victim:** Sandoval, Ronnie                       **City:** San Diego
**Location:** 1173 Front Street (SDCJ)
**Date Occurred:** February 23, 2014                **Page 31 of 37**

---

At approximately 0211 hours, Sandoval was pronounced dead by Dr. Hwang from Scripps La Jolla. Sandoval was taken off of the gurney and placed on the floor outside of Waiting Room 1.

Deputy Nolan Edge completed Crime/Incident Report #14109768 to document the incident. See his report for full details.

I reviewed the deputy's report written by Deputy Leonard Rodriguez. Deputy Rodriguez essentially stated on 2/22/14 at about 1700 hours, he was assigned to assist the deputies on the second floor at SDCJ with moving inmates through the medical screening and booking process.

Deputy Rodriguez was standing in the hallway near the Medical Screening station when two unidentified deputies approached him. The two deputies were escorting an inmate; later identified as Ronnie Sandoval (9/30/67) to see the nurse because of some type of diabetic issue. Rodriguez was not familiar with the process, so he told the deputies he would inform Deputy Graham Wilkinson (#3236), who was showing Rodriguez the operations of the second floor.

A couple of minutes later Rodriguez saw a deputy; later identified as Matthew Chavez (#1147) standing at Medical Observation Cell #1, which is located in the Medical Screening area. Deputies Wilkinson and Rodriguez walked to cell #1 to assist the nurse; later identified as Romeo De Guzman (#0770). Rodriguez unlocked the food flap so the nurse could check Sandoval's blood sugar level with a Glucose meter. Rodriguez noticed the reading on the meter was 107. Nurse De Guzman informed Sandoval his Glucose was normal.

Deputy Wilkinson asked Sandoval if he was under the influence of drugs or alcohol and he stated he was not. Rodriguez noticed Sandoval was shaking mildly, so he asked him to sit on the bench. Sandoval appeared to be having withdrawals from drugs, since he did not smell any odor of alcohol from his person. Deputies Wilkinson and Rodriguez left Sandoval in the cell and continued with their other duties.

A short time later, Nurse De Guzman asked if Sandoval could go into a sobering tank. Deputy Rodriguez relayed Nurse De Guzman's request to Deputy Wilkinson, who conferred with Corporal Brandon Powell (#7307). Rodriguez said they determined it would be better if Sandoval remained in the observation cell. Rodriguez had no other contact with Sandoval for the remainder of the shift, but he periodically looked over at him to check if he was okay. He did not notice any change in his behavior.

---

Reporting Officer: Det. P. Carrillo          ID# 1881          CID - HOMICIDE

Approved By:     Sgt. P. Meza          ID# 1851          7/21/2014

Exhibit 6
111

COSD RRFP 000273

**SAN DIEGO SHERIFF'S DEPARTMENT**
**Follow-up Investigative Report**

**Crime:** Death Investigation      **Case Number:** 14109768
**Victim:** Sandoval, Ronnie      **City:** San Diego
**Location:** 1173 Front Street (SDCJ)
**Date Occurred:** February 23, 2014      **Page 32 of 37**

I reviewed the deputy's report written by Deputy Graham Wilkinson. Wilkinson said on 02/22/14, he was assigned to the Intake/Transportation Deputy position. He was assisting with normal operations on the 2nd floor and interacted with Inmate Ronnie Sandoval.

On 02/22/14 at approximately 1645 hours Wilkinson observed Deputy Chavez (#1147) placing Sandoval into medical observation cell #1 to be evaluated by medical staff. Sandoval was visibly sweating and stated he was not feeling well. Deputy Rodriguez (#2334) opened the cell door's food flap, so medical staff could obtain his blood sugar level with a glucose meter. Sandoval's blood sugar reading was normal at "107" according to medical staff. Wilkinson asked Sandoval if he was under the influence of any narcotics or alcohol, Sandoval replied, "No." Wilkinson asked Sandoval if he needed anything; Sandoval stated "No, I just want to feel better." Wilkinson had no further contact with Sandoval.

I called Deputy Rodriguez on the telephone (the conversation was not recorded) to clarify his statement. Deputy Rodriguez confirmed his statement and said about 30 to 45 minutes after Sandoval was placed in the cell and his blood sugar was checked, Nurse De Guzman approached him and asked him to put Sandoval in the sobering tank. Deputy Rodriguez spoke to Deputy Wilkinson and asked him about moving Sandoval to the sobering tank. Deputy Wilkinson spoke to Corporal Powell. Corporal Powell determined it would be better if Sandoval remained in the observation cell closer to the nurse's station so the nurses could monitor him.

I called Deputy Wilkinson and asked him who had made the determination to leave Sandoval in holding cell #2. (The phone conversation was not recorded). Deputy Wilkinson recalled speaking to Corporal Powell and moving Sandoval. Wilkinson said Corporal Powell advised it would be better to leave Sandoval in the medical observation cell where he would be closer to the nurses' station so the nurses could monitor him. Wilkinson said he did periodic hourly checks on Sandoval throughout the night. Sandoval appeared to be okay. Wilkinson said he did brief the oncoming shift of deputies as to why Sandoval was in the cell.

I reviewed the Deputy's report written by Corporal Powell. Powell said on 2/22/2014, at approximately 0713 hours, he was assigned to the Booking Deputy position at the San Diego Central Jail (SDCJ). While homicide detectives were conducting their investigation, he was tasked to remove the leg and waist chains from the deceased inmate. The inmate was identified as Ronnie Sandoval Bn#14713020.

At approximately 0715 hours, Powell made entry into the crime scene. Deputy Bohannon and Powell were asked by Homicide Detective Carrillo #1881 to remove the leg and

---

Reporting Officer: Det. P. Carrillo      ID# 1881      CID - HOMICIDE

Approved By:    Sgt. P. Meza      ID# 1851      7/21/2014

Exhibit 6
112

COSD RRFP 000274

**SAN DIEGO SHERIFF'S DEPARTMENT**
**Follow-up Investigative Report**

**Crime:** Death Investigation                    **Case Number:** 14109768
**Victim:** Sandoval, Ronnie                      **City:** San Diego
**Location:** 1173 Front Street (SDCJ)
**Date Occurred:** February 23, 2014                  **Page 33 of 37**

---

waist chains from the deceased inmate. While removing the leg and waist chains we had to lift the feet and roll the deceased inmate on his side in order to remove the chains.

Since Corporal Powell had not mentioned anything about Deputy Rodriguez or Wilkinson inquiring about moving Sandoval to the sobering tank in his report, I decided to call him and inquire about the movement. (The phone conversation was not recorded).

Corporal Powell said he did not have any interaction with Inmate Sandoval other than taking the legs and waist chains off of him after he was deceased. He did not recall getting briefed about Sandoval and did not recall telling Deputies Rodriguez or Wilkinson to leave Sandoval in the medical observation cell. Corporal Powell said he would not override the nurses' wishes. Corporal Powell said he had a trainee with him named Bohannon and they both removed the leg and waist chains from Sandoval. This is the only interaction they had with Sandoval.

I reviewed the deputy's report written by Deputy Andrade. Deputy Andrade said on 02-23-2014, he was assigned to the 2nd Floor as the Search Room Deputy at San Diego Central Jail. At approximately 0053 hours, Deputy Edge was instructed by Sergeant Shawcroft to come over to waiting room 1. Sergeant Shawcroft told Deputy Edge Sandoval had just had a seizure and hit his head.

At approximately 0101 hours, Andrade was walking back to the second floor deputy station when he noticed Deputy Edge and the nursing staff inside Waiting Room Cell 1 attending to Sandoval. Deputy Edge informed Andrade, Sandoval had just suffered a seizure and hit his head on the wall. Andrade observed Sandoval lying on the ground on his right side unresponsive and breathing with a non-rebreather mask (A medical device that requires oxygen therapy) around his head. Deputy Andrade asked the nursing staff if they could get a cervical collar (Orthopedic medical device to support the neck) so they could take spinal cord precautions.

Deputy Andrade was handed a cervical collar by Registered Nurse Llamado. With his training and experience and his current Emergency Medical Technician certificate Deputy Andrade performed the proper measuring technique and applied the collar to Sandoval. Deputy Edge suggested they move Sandoval out from under the bench. Andrade secured Sandoval's head, Deputy Edge secured his upper body and Deputy Sobazek #3209 entered the cell and secured Sandoval's legs. Sandoval was moved to the middle of the cell to provide medical staff room to render medical aide.

At approximately 0105 hours, RN Harris #5055 entered the cell with the blood pressure machine to take Sandoval's blood pressure. At that time RN Harris checked Sandoval's pupils, his pupils didn't react to light. Sandoval was unresponsive and breathing but had

---

Reporting Officer: Det. P. Carrillo          ID# 1881                    CID - HOMICIDE

Approved By:       Sgt. P. Meza              ID# 1851                    7/21/2014

Exhibit 6
113
COSD RRFP 000275

## SAN DIEGO SHERIFF'S DEPARTMENT
### Follow-up Investigative Report

**Crime:** Death Investigation                    **Case Number:** 14109768
**Victim:** Sandoval, Ronnie                        **City:** San Diego
**Location:** 1173 Front Street (SDCJ)
**Date Occurred:** February 23, 2014                    **Page 34 of 37**

---

secretions in his mouth. The nursing staff requested EMT's to transport Sandoval. Deputy Andrade suggested to them a few times they should request Paramedics because Sandoval was unresponsive and had a seizure with a possible head injury. EMT's were dispatched at that time.

RN Harris was monitoring Sandoval and applied a nasopharyngeal airway (A medical appliance tube that opens the airway) in Sandoval's right nostril. At that time a suction device arrived at the cell from the third floor via Deputy Valbuena #3296. Sandoval's nasal and throat were suctioned due to the secretions in his airway. Deputy Andrade requested Sandoval to be given rescue breaths by a bag valve mask (A medical device to provide positive pressure ventilation) because Sandoval was unresponsive, his breathing was shallow and slow, his pupils didn't react to light, and he had secretions in his airway.

Sandoval was ventilated at 1 breath every five to six seconds totaling 12 breaths per minute. At approximately 0112 hours, Registered Charge Nurse Bautista #9226 entered the cell. RN Bautista monitored Sandoval and applied an oropharyngeal airway (A medical device preventing the tongue from covering the epiglottis). Sandoval still had a gag reflex and started vomiting. RN Bautista removed the oropharyngeal airway from Sandoval's mouth. Sandoval was turned to his right side and suction was applied to remove the secretions in his mouth. RN Bautista established an IV in Sandoval's right arm.

At approximately 0120 hours, American Medical Response EMT's arrived at Waiting Room Cell 1. At that time Deputy Andrade suggested again they upgrade to Paramedics. Paramedics were dispatched because the transporting EMT's told the medical staff they could not transport Sandoval because he was unconscious. At 0120 hours. EMT Trunick entered the cell and took over ventilating Sandoval. The medical staff continued monitoring Sandoval and updating his vitals by taking his blood pressure. At 0135 hours, Nursing staff and deputies secured Sandoval to a backboard. EMT Trunick obtained and felt a cardioid pulse.

At approximately 0142 hours, San Diego Fire Department Engine 201 and Medic 11 arrived at Waiting Room Cell 1. Paramedic's assessed Sandoval. A few minutes later Paramedic's decided to pick Sandoval up off the ground and onto a medical gurney. When they lifted him up off the ground they confirmed he was pulseless (Appearing dead; not breathing or having a pulse). CPR was started on Sandoval by San Diego Fire Department personnel. Deputy Andrade stood by and observed Paramedic's render care to Sandoval. Sandoval was pronounced deceased by Dr. Hwang of Scripps La Jolla Hospital at 0211 hours via telephone by Paramedics.

---

Reporting Officer: Det. P. Carrillo          ID# 1881          CID - HOMICIDE

Approved By:          Sgt. P. Mezal          ID# 1851          7/21/2014

Exhibit 6
114

COSD RRFP 000276

## SAN DIEGO SHERIFF'S DEPARTMENT
### Follow-up Investigative Report

**Crime:** Death Investigation      **Case Number:** 14109768
**Victim:** Sandoval, Ronnie      **City:** San Diego
**Location:** 1173 Front Street (SDCJ)
**Date Occurred:** February 23, 2014      **Page 35 of 37**

---

### Medical History

I attempted to review the Medical/Psychiatric Questionnaire that would have been completed during Sandoval's medical screening however Sandoval had not made it to the medical screening process during this particular booking.

### In-Custody Timeline

From the Deputy Reports, interviews, Sandoval's Inmate History Report and facility video footage, I was able to put together the following timeline of Sandoval's in-custody, documented contacts and activities for February 22nd and 23rd, 2013, until the time he was pronounced deceased.

> ➤ 10:34:   Sandoval contacted at Siegle Court in Lemon Grove and arrested pursuant to a probation compliance check and possession of methamphetamine.
> ➤ 14:21: Sandoval entered SDCJ escorted by two deputies.
> ➤ 14:23: Sandoval walked into pre-booking area
> ➤ 14:38 – Sandoval walked into Medical Prescreening and meets with Nurse Bell.
> ➤ 15:44:   Sandoval is in Livescan corridor being fingerprinted by Deputy Chavez. Sandoval says he is borderline diabetic. Sandoval walked to bench by Deputy Chavez. He appears to be sweating. Nurse is called.
> ➤ 15:46:   Intake Nurse Costa arrives and checks Sandoval's blood sugar on bench. Sandoval's blood sugar is 108, within normal range.
> ➤ 15:47: Livescan corridor – Deputy Bryan escorts Sandoval to holding cell.
> ➤ 16:47:   Forensic room –Sandoval's booking photograph taken, still sweating, appeared tired, possibly disoriented. Deputy Martinez asks questions. Sandoval's refuses to answer any more questions about his health. Deputies Chavez and Martinez decide to escort Sandoval to 2nd Floor Nurse. Sandoval walks under his own power. Pauses briefly and then continues walking.
> ➤ 16:57: Deputy Chavez escorts Sandoval in the elevator and up to the second floor. Sandoval follows Deputy Chavez's directions.
> ➤ 16:58:   Detox corridor 2nd floor – Deputy Chavez escorts Sandoval over to Nurse De Guzman, Nurse asks Deputy Chavez to place Sandoval in Holding cell #1. Deputy Chavez speaks to Deputies Wilkinson and Rodriguez.
> ➤ 17:00:   Medical Screening corridor – Deputy Chavez places Sandoval in waiting room #1. Approximately one minute later Nurse De Guzman checks on Sandoval. His blood sugar is 107. Deputy Rodriguez and Wilkinson assisted nurse. Sandoval remains in cell.

---

| Reporting Officer: Det. P. Carrillo | ID# 1881 | CID - HOMICIDE |
|---|---|---|
| Approved By:    Sgt. P. Meza | ID# 1851 | 7/21/2014 |

Exhibit 6
115

COSD RRFP 000277

**SAN DIEGO SHERIFF'S DEPARTMENT**
**Follow-up Investigative Report**

**Crime:** Death Investigation                    **Case Number:** 14109768
**Victim:** Sandoval, Ronnie                       **City:** San Diego
**Location:** 1173 Front Street (SDCJ)
**Date Occurred:** February 23, 2014                       **Page 36 of 37**

---

- ➢ 19:21: Deputy Nathaniel Fox checks on Inmate Sandoval in waiting room #1. Sandoval appears lethargic. Deputy Fox walks over and speaks to nurse about why Sandoval is in cell. Nurses didn't know why he was there.
- ➢ 00:50: Sgt. Shawcroft looks into cell and observes Sandoval. Sgt. Shawcroft's summons the help of Nurse Harris and then Deputy Edge. "Man Down" notifications made. Deputy Edge opens cell door at 0053 hours. Staff enters cell. Medical assessment begins. Nurse Llamado assists in getting equipment to cell.
- ➢ 01:05: 911 is called – Request made for EMT's 0131 hours EMT's arrive at cell.
- ➢ 01:30: – 2nd call made to 911, paramedics requested. at 0149 hours, paramedics and fire arrive on scene.
- ➢ 01:51: Paramedics and Fire personnel remove Sandoval from cell on gurney. No pulse detected. CPR initiated.
- ➢ 02:11: CPR continues and Sandoval is pronounced deceased by Dr. Hwang.

**Investigation (continued):**

### Autopsy Summary

On February 24, 2014, at 1210 hours, Forensic Pathology Fellow Doctor of Obstetrics Zachary O'Neill being supervised by Chief Deputy Medical Examiner Doctor Jonathan Lucas performed an autopsy on Ronald Sandoval. Based on the autopsy findings and the circumstances surrounding the death as currently understood;

The CAUSE OF DEATH was determined to be "Acute Methamphetamine Intoxication."

The MANNER OF DEATH was listed as "Accident."

I.      Acute methamphetamine intoxication.
    A. Methamphetamine blood concentration 38 mg/L.
    B. Pulmonary edema and congestion.
    C. Urine retention

II.     Hepatic steatosis with early bridging fibrosis and chronic inflammation.

III.    Obesity.

IV.     History of gunshot wound of abdomen, remote
    A. No projectile identified

V.      No significant trauma.

---

Reporting Officer: Det. P. Carrillo          ID# 1881          CID - HOMICIDE

Approved By:      Sgt. P. Meza          ID# 1851                   7/21/2014

Exhibit 6
116

COSD RRFP 000278

### SAN DIEGO SHERIFF'S DEPARTMENT
#### Follow-up Investigative Report

**Crime:** Death Investigation        **Case Number:** 14109768
**Victim:** Sandoval, Ronnie        **City:** San Diego
**Location:** 1173 Front Street (SDCJ)
**Date Occurred:** February 23, 2014        **Page 37 of 37**

**Conclusion:**

At some point prior to his arrest on February 22, 2014, Ronnie Sandoval ingested a lethal dose of methamphetamine. Twenty times the amount of methamphetamine it would take to kill a human being. Sandoval was also found to be in possession of methamphetamine while being contacted at his residence. Sandoval's substance abuse history is documented by drug related arrests that date back to 1988.

While in custody, Sandoval began to suffer the effects of the methamphetamine he ingested. He did not complain to staff about any abdominal discomfort, nor did he tell them he had ingested the drugs.

During his tenure at SDCJ Sandoval was under the direct supervision of his arresting officer during the booking process and afterward, he was exposed to multiple SDCJ sworn staff at least once per hour. All of the Security Checks were documented in JIMS.

Sandoval's failure to disclose the fact he had ingested a lethal dose of methamphetamine prior to his arrest to medical and sworn staff certainly contributed to his death.

As there is no evidence of foul play involved in Sandoval's death, this case should remain under the jurisdiction of the Medical Examiner's Office.

Reporting Officer: Det. P. Carrillo    ID# 1881        CID - HOMICIDE

Approved By:    Sgt. P. Meza    ID# 1851        7/21/2014

Exhibit 6

117

COSD RRFP 000279

# EXHIBIT 7

Exhibit 7
118

# Estate of Ronnie Paul Sandoval, et al.
# vs. County of San Diego, et al.

## Deposition of
## ROBERT SHAWCROFT
## March 15, 2016

| Exhibits | Transcript | Media Included Word Index |
|---|---|---|

866.999.8310 | aptusCR.com

@aptus
COURT REPORTING

Exhibit 7
119

Robert Shawcroft

**Estate of Ronnie Paul Sandoval, et al.
vs. County of San Diego, et al.**

1    A.    Then the captain's in on that time, and you

2  have an admin lieutenant, admin sergeant, all that on

3  top.

4    Q.    Gotcha.  A little more staffing during the

5  day --

6    A.    Oh, yeah.

7    Q.    -- as far as management staffing?

8    A.    Uh-huh.

9    Q.    "Yes"?

10    A.    Yes.

11    Q.    All right.  So you were just walking through,

12  just checking to make sure, see if anything was going

13  on you needed, just observing, and that's when you saw

14  Mr. Sandoval?

15    A.    Yeah.  I don't know if I was just walking

16  over to the safety cells or just talking to the

17  deputies at the station.  I don't remember how I got

18  down that hallway.  But, yeah, I just walked past the

19  window, and I saw him in there.

20    Q.    Can you describe for me exactly what you

21  recall seeing as you walked past his cell?

22    A.    All I remember was that I kind of was looking

23  at him.  You know, again being a people-watcher, I

24  looked at him, and, you know, I'm outside the glass,

25  which I'm still not that far from him, even though

Robert Shawcroft

Estate of Ronnie Paul Sandoval, et al.
vs. County of San Diego, et al.

1   he's sitting on the bench in there.  He's on the front

2   one, the front observation cell.  So I'm staring at

3   him, but he -- you know, I thought he was looking at

4   me, but I noticed he really wasn't even looking at me.

5   So as I kept moving, you know, his eyes weren't

6   tracking me.  He just was kind was staring past me.

7   Then I'd stop.  I think I stopped, and I was kind of

8   looking.  I don't know if I backed up or what I did.

9   But then I noticed that he was kind of a different

10  color, too; like his tone wasn't a fleshy color.  And

11  I remember that's really all -- by the time I, like,

12  noticed these two things or these things about him,

13  these things that drew my attention to him, I just saw

14  his eyes roll back in his head, and he fell to his

15  left, you know, kind of slunched -- kind of

16  slunched -- slumped right here -,-

17          Okay.  He didn't fall all the way down at

18  that point.  I think he just kind of moved, but his

19  eyes rolled back.  And I remember seeing the eyes roll

20  back, and I thought, "Well, that's -- that's --

21  there's something going on with this guy."  So that's

22  when I remember I was looking to see --

23          There were nurses there, and they were --

24  they were doing those evaluations.

25     Q.   The intake evals?

Robert Shawcroft

**Estate of Ronnie Paul Sandoval, et al.
vs. County of San Diego, et al.**

1      A.    Yeah.   Second-floor ones.

2            And I don't remember at what point, or maybe

3   as I was trying to get one's attention or whatever the

4   case may be, but I remember looking back, and that's

5   when he went all the way and then hit his head on the

6   side of the wall and slid down to the floor.

7            And I remember Deputy Edge was there, and I

8   think all three of us went in.  And that's when -- I

9   know immediately Edge tried to control his head,

10  because it was so close to all those things.  And then

11  the nurses started to act out.

12      Q.    Deputy Edge testified that he saw him

13  tensing, twitching, having a seizure.  Do you recall

14  that as well?

15      A.    Yeah.   I remember it looked like a seizure,

16  and I think that's -- that's why Edge went down and

17  started to control his head, because that's what we

18  normally -- that's what we were accustomed to see, is

19  that type of behavior in a seizure.

20      Q.    Did you see the seizure before you went into

21  the cell as you walked by, or only once you got into

22  the cell or --

23      A.    No.

24      Q.    -- or if you can recall?

25      A.    No.   He wasn't seizing when I was outside.   I

Robert Shawcroft

Estate of Ronnie Paul Sandoval, et al.
vs. County of San Diego, et al.

1   saw him when I saw the other symptoms, you know, the

2   color and then his stare.

3       Q.    Yeah.

4       A.    And that just -- that's what drew my

5   attention.

6       Q.    Gotcha.

7       A.    So I don't think he even had that seizure

8   until he hit the wall, hit the ground.  And he was on

9   the ground, and as we were going in there, I remember

10  opening the door, and he was seizing.

11      Q.    The way that cell is situated, there's a --

12  where the -- facing the nurses station where they're

13  doing the intake, it looks like a Plexiglas window in

14  the door.  Is there also glass along that hallway

15  where you were walking by, or did you --

16      A.    Yeah.  There's a big window right there.

17      Q.    Oh, there is.  Okay.  You can't see that on

18  the video, so it looks like you just kind of stopped,

19  and I was thinking, "It looks like you can see through

20  right there," because you kind of stopped.  But you

21  can --

22      A.    Yeah.  That stone wall goes up maybe -- maybe

23  three, four feet.  Maybe not four feet.  And then

24  there's that Plexiglas from that --

25      Q.    Gotcha.

**Robert Shawcroft**

**Estate of Ronnie Paul Sandoval, et al.
vs. County of San Diego, et al.**

1   had -- he was aware or -- you know, I remember --

2          Okay.  I remember thinking to myself, "Okay.

3   Well, this dude's fine," whatever, and then just

4   telling Kamoss, Sergeant Kamoss, "Hey, man.  This is

5   what you got on your floor."  But they called for

6   whatever, EMTs or paramedics to come.  So, you know, I

7   just figured it was done at that, and I just went back

8   up to the third floor, to the third and fourth floor.

9       Q.   So you were in the cell, to the best of your

10  recollection, how long, between -- if you could put an

11  estimate on there?

12      A.   Like maybe five minutes?  Ten minutes?  I

13  don't know.  I really don't know.

14      Q.   And during that five minutes --

15          Well, just so you know, Deputy Edge testified

16  that during that five minutes, that Sandoval was

17  continuing to seize.  Did you observe that?

18      A.   Yeah.  He seized for the bulk of the time.

19      Q.   So he was -- the whole time, the five minutes

20  or so that you were in there, he was seizing?

21      A.   Not the entire time, because I left when it

22  seemed like it was, you know, under control.  But the

23  bulk of the time that we were in there, I would say.

24  Because I remember they ran over to get oxygen and,

25  you know, both nurses were working at him at one

| Robert Shawcroft | Estate of Ronnie Paul Sandoval, et al. |
|---|---|
| | vs. County of San Diego, et al. |

```
 1          I, the undersigned, a certified shorthand reporter
 2   of the State of California, do hereby certify:
 3          That the foregoing proceedings were taken before
 4   me at the time and place herein set forth; that any
 5   witnesses in the foregoing proceedings, prior to
 6   testifying, were duly sworn; that a record of the
 7   proceedings was made by me using shorthand which was
 8   thereafter transcribed under my direction; that the
 9   foregoing transcript is a true record of the testimony
10   given.
11          I further certify I am neither financially
12   interested in the action nor a relative or employee of any
13   attorney or party to this action.
14          IN WITNESS WHEREOF, I have this date subscribed my
15   name.
16
17   Dated:   March 28th, 2016
18                    Tricia A. Rosate
19                    _____
20                    Tricia Rosate, RDR, RMR, CRR, CCRR
                      CSR No. 10891
21
22
23
24
25
```

Exhibit 7
125

Robert Shawcroft

Estate of Ronnie Paul Sandoval, et al.
vs. County of San Diego, et al.

1              DECLARATION UNDER PENALTY OF PERJURY

2    Case Name: Estate of Ronnie Paul Sandoval, et al.
              vs. County of San Diego, et al.

3    Date of Deposition: 03/15/2016

4    Job No.: 10022676

5

6              I, ROBERT SHAWCROFT, hereby certify

7    under penalty of perjury under the laws of the State of

8    _____ that the foregoing is true and correct.

9            Executed this _____ day of

10   _____, 2016, at _____.

11

12

13            _____

14              ROBERT SHAWCROFT

15

16   NOTARIZATION (If Required)

17   State of _____

18   County of _____

19   Subscribed and sworn to (or affirmed) before me on

20   this _____ day of _____, 20__,

21   by_____,   proved to me on the

22   basis of satisfactory evidence to be the person

23   who appeared before me.

24   Signature: _____ (Seal)

25

# EXHIBIT 8

Exhibit 8
127



# San Diego County Sheriff's Department
## Officer Report

CAD Event No. **E1465588**

Case No. **14109768**

Report No. **27228**

**1**

Page 1 of 1

| GENERAL CASE INFORMATION | | |
|---|---|---|
| Special Studies: | | Related Cases: |
| Location, City, State, ZIP:<br>**1173 Front St. San Diego, Ca 92101,** | | Occurred On:<br>**2/22/2014 12:55:20 PM (Saturday)** |
| Jurisdiction:<br>**DETENTION FACILITY - CENTRAL** | Beat:<br>**021** | Call Source: | (and Between): |

| INDIVIDUAL/S | | | |
|---|---|---|---|
| Name:<br>**Sandoval, Ronnie Paul** | Person Code: | | Interpreter Language: |

ALIAS / AKA / NICKNAME / MONIKER:

| Home Address, City, State, ZIP:<br>**7733 Brookhaven Rd San Diego, CA 92114** | | Res. Country:<br>**US - UNITED STATES** | County Residence:<br>**N Nonresident** | | Undocumented: |
|---|---|---|---|---|---|
| Race:<br>**H** | Sex:<br>**M** | Date of Birth / Age:<br>**09/30/1967 - 42** | Height:<br>**5' 8"** | Weight:<br>**210 lbs** | Hair Color:<br>**BLK** | Eye Color:<br>**BRO** | Facial Hair:<br>**05 - Goatee and Mustache** | Complexion: |
| Employment Status: | | Occupation/Grade: | | Employer/School: | |

| CONTACT INFORMATION | |
|---|---|
| Type:<br>**HP - Home Phone** | Number/Address:<br>**619 470-2303** |

| IDENTIFICATION | | | |
|---|---|---|---|
| Type:<br>**DLN - Drivers License Number** | Number:<br>**C5171514** | State:<br>**CA - California** | Country:<br>**US - UNITED STATES** |
| Type:<br>**SSN - SSN** | Number:<br>**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** | State: | Country: |
| Attire:<br>**Blue Jeans, Black\Wht Sweater, White Sneakers** | Injury: | Extent Of Treatment: | Violent Crime Circumstances: |

## REPORT NARRATIVE

ORIGIN:

On the morning of 02-24-2014 at 0055 hours, I was assigned as the Security Sergeant position at the San Diego Central Jail (SDCJ). After visiting with the deputies on the 2nd Floor, I walked through the medical area and noticed an inmate inside one of the holding cells.

DEPUTY"S OBSERVATIONS AND ACTIONS:

The inmate was sitting on the bench looking out in my direction. I noticed his gaze was not at me but distant and his skin color looked grayish. The inmate in the cell was Ronnie Sandoval BN14713020. I watched Sandoval for approximately a minute or so. As I was watching him, I noticed his eyes roll back in his head as his body slightly slumped to his left on the bench. I immediately called to the nurse (Nurse Harris #5055) in the medical area and informed her of Sandoval's condition. I called Deputy Edge to our location to assist us. While Deputy Edge was walking to us, Nurse Harris and I watched Sandoval fall further to his left and onto the floor hitting his head on the wall on his way down.

Deputy Edge arrived and opened the cell door. Deputy Edge, Nurse Harris and I entered the cell to give medical attention to Sandoval. It appeared Sandoval was having a seizure. Deputy Edge assisted Sandoval by holding his head off the cement floor and away from the steel bench. Nurse Harris brought an oxygen tank and mask into the cell and placed it on Sandoval's face. Deputy Edge took over and held the mask over Sandoval's nose and mouth while Nurse Harris took his vitals.

I left the holding cell to notify Sgt. Kamoss #4202 of the situation and to advise him Emergency Medical Technicians (EMT's) were notified for Sandoval. I went back to the cell to check on Sandoval again before I returned to my assigned work area. Sandoval appeared to be coming out of his seizure but was groggy and still not fully responsive.

| Reporting Officer<br>**SH5213 - SHAWCROFT, ROBERT** | Division / Organization<br>**SDCJ / SDCJ - San Diego Central Jail** | Reviewed By<br>**SH4161 - MONTGOMERY, CYNTHIA** |
|---|---|---|
| Report Date<br>**2/24/2014 9:50:37 PM** | Detective Assigned<br>**SH1881 - CARRILLO, PETE** | Reviewed Date<br>**2/25/2014 1:05:07 AM** |
| NetRMS_CASDCR.rtf v11-15-06 | | Printed on 2-13-2017 9:37 AM |

Exhibit 8

128

COSD RFPI 000229

# EXHIBIT 9

Exhibit 9
129

# Estate of Ronnie Paul Sandoval, et al. vs. County of San Diego, et al.

## Deposition of
## MATTHEW ANDRADE
## April 13, 2016



| Exhibits | Transcript | **Media Included** |
| --- | --- | --- |
| | | Word Index |

866.999.8310 | aptusCR.com

Exhibit 9
130

Matthew Andrade

Estate of Ronnie Paul Sandoval, et al.
vs. County of San Diego, et al.

1      A.   I did not.

2      Q.   Did you get a degree from there?

3      A.   I did not.

4      Q.   How long did you attend Diablo Valley?

5      A.   Maybe six months to a year.

6      Q.   Great.  And what did you do after that?

7      A.   Then I moved to, I believe, Sacramento for a

8  year.

9      Q.   What kind of jobs did you hold in Sacramento?

10     A.   I was -- basically worked on cars.  So I did

11  that for a year there.

12     Q.   And then after Sacramento?

13     A.   Moved to San Diego, I think maybe a year

14  after-ish.  And then I've been down here, I believe,

15  since 2003.  2003, 2002.  So about -- yeah.

16     Q.   What kind of jobs have you held since you

17  moved to San Diego?

18     A.   I was a busser.  Started as a busser here.

19  Then I got picked up -- I worked on the ambulance for

20  about a year.  Then I --

21     Q.   AMS?

22     A.   What do you mean?

23     Q.   AMR.  Excuse me.

24     A.   No.  I worked as -- it's a BLS company.  So it

25  was called Star.

**Matthew Andrade**

**Estate of Ronnie Paul Sandoval, et al.**
**vs. County of San Diego, et al.**

| | | |
|---|---|---|
| 1 | Q. | What do you mean when you say "BLS"? |
| 2 | A. | Basic life support. |
| 3 | Q. | So like a private -- |
| 4 | A. | Yeah. It was a private company. |
| 5 | Q. | And you worked there for -- |
| 6 | A. | About a year. |
| 7 | Q. | Okay. Then what did you do? |
| 8 | A. | So then I got picked up -- do you want me to |

9  list volunteer time, too, or anything like that, or just

10  job based?

| | | |
|---|---|---|
| 11 | Q. | Sort of jobs that kind of helped you |

12  establish --

| | | |
|---|---|---|
| 13 | A. | Okay. So during that time I worked on the |

14  ambulance, I got picked up with Mt. Laguna Volunteer

15  Fire Department.

| | | |
|---|---|---|
| 16 | Q. | Okay. As an EMT? |
| 17 | A. | As an EMT/firefighter. |
| 18 | Q. | How long were you there? |
| 19 | A. | About almost maybe two and a half years. |
| 20 | Q. | Why did you leave Mt. Laguna? |
| 21 | A. | It was just a volunteer position. |
| 22 | Q. | Unpaid? |
| 23 | A. | Unpaid. |
| 24 | Q. | Oh. |
| 25 | A. | And then during that time, I got picked up at |

Matthew Andrade

Estate of Ronnie Paul Sandoval, et al.
vs. County of San Diego, et al.

1  certs expire.  So I got picked up by the sheriff's

2  department and thrown right into the academy.  Just kind

3  of -- the knowledge just -- maybe I'll come back to it

4  down the road.

5      Q.  What was left for you to get your

6  paramedic's --

7      A.  Just work on the ambulance.

8      Q.  That's it?

9      A.  That's it.

10     Q.  Like a certain number of hours?

11     A.  Yeah.

12     Q.  How many hours?

13     A.  I think it was like 400ish.  400, 500 hours I

14  needed.

15     Q.  So you had the book knowledge, the hospital

16  knowledge.  You just needed, like, the in-field trauma

17  to be done.

18     A.  Yes.

19     Q.  Could you help enlighten me just a little bit

20  on the difference between an EMT and a paramedic.

21     A.  Well, simple explanation for that.  EMTs

22  basically just give basic lifesaving procedures.  They

23  don't start IVs.  They don't push any medications.  And

24  they can't intubate.

25         And as ALS is advanced lifesaving, is

**Matthew Andrade**

**Estate of Ronnie Paul Sandoval, et al.**
**vs. County of San Diego, et al.**

1  basically I can establish IVs.  I can push medications.

2  I can drop a -- I can intubate.  I can hook them up to a

3  monitor and read heart rhythms.  Just a brief scenario

4  of those two, the differences.

5       Q.  You can give meds, start IVs.  You can give

6  injections.

7       A.  Yeah.

8       Q.  You can do invasive techniques.

9       A.  Yes.

10       Q.  Field techniques.

11       A.  Yes.

12       Q.  You're not going to do surgery.  I mean --

13       A.  No, not going to do surgery.

14       Q.  Invasive field techniques.

15       A.  Yes.  It's more -- it's just a little bit more

16  advanced.

17       Q.  EMT, on the other hand, can just transport,

18  basically?

19       A.  They -- yeah.  I mean they can do basic first

20  aid.  So I mean they can splint.  They can do CPR.  They

21  can put the nonrebreather mask.  They can put him in

22  a -- they can put him in a position of C-spine for

23  spinal precautions.  But they can't start IVs.

24       Q.  Okay.  And what is a nonrebreather mask?

25       A.  Basically, a mask that delivers oxygen.  So

Matthew Andrade

Estate of Ronnie Paul Sandoval, et al.
vs. County of San Diego, et al.

1   plastic thing that goes over your mouth, with a thing

2   that goes around the back, and it's got a tube of

3   oxygen; right?

4       A.  Yes.

5       Q.  And that was on there before you got there.

6       A.  Yes.

7       Q.  You don't know who put that on.

8       A.  I don't.

9       Q.  Okay.  I think we've captured the scene fairly

10  well.  You walk in.  There's Edge, a nurse, piece of

11  medical equipment, the nonrebreather mask on.  He's

12  wedged under the bench.

13       What happens next?

14      A.  Okay.  At that time I asked for a C-collar, so

15  cervical collar.  And what that does is stabilizes

16  someone's neck.

17      Q.  Why did you think there was a need for a

18  C-collar?

19      A.  I was told that he had a seizure, Sandoval,

20  and he hit his head on the bench.

21      Q.  Can you describe for me the condition of

22  Mr. Sandoval when you walked in.

23      A.  He was breathing, and he was unresponsive.

24      Q.  When you say "unresponsive," what do you mean?

25      A.  When you ask somebody questions, they don't

Matthew Andrade

Estate of Ronnie Paul Sandoval, et al.
vs. County of San Diego, et al.

1    respond back.

2         Q.   So were his eyes alert and open, or were they

3    rolled back, or were they just nontracking?

4         A.   They're not tracking.

5         Q.   How about his breathing?

6         A.   I don't recall.  I just remember he was

7    breathing.

8         Q.   Do you recall if it was shallow?

9         A.   I -- I don't.  I'd have to look at my notes.

10        Q.   Okay.  Your report says shallow.

11        A.   Okay.

12        Q.   But again --

13        A.   If that's -- if that's what it says, then yes.

14        Q.   I'm trying to get your independent --

15        A.   Yeah, yeah.

16        Q.   So he's nonresponsive; eyes nontracking;

17   assuming, for purpose of just restating it, shallow

18   breathing.  You put the C-collar on him.

19        A.   Yes.

20        Q.   And it says in the report something about

21   measuring a C-collar.

22             What does that mean?

23        A.   So when you place a collar on somebody, you

24   know, you want to be -- you want to watch their neck.

25   So you want to keep it -- you want to keep him in a

Matthew Andrade

Estate of Ronnie Paul Sandoval, et al.
vs. County of San Diego, et al.

1        A.   Yes, 'cause he assisted with moving him out.

2        Q.   So you, Sobazek, and Shawcroft move him from

3    under the bench.  He's got --

4        A.   I don't -- I don't believe Shawcroft helped

5    out.

6        Q.   Excuse me.  Edge.

7        A.   Edge.

8        Q.   I meant to say Edge.  Sorry.

9             You, Edge, and Sobazek moved him out from the

10   bench.

11       A.   Yes.

12       Q.   And is that about the first time that you

13   called for -- you thought, okay, he needs paramedics?

14   Is that about --

15       A.   Yeah.  I believe right after that, then I

16   think medical staff -- I think they did a blood

17   pressure, and I think that's when I advised that he

18   needs paramedics.

19       Q.   And when you say they did a blood pressure,

20   they brought in a blood pressure machine?

21       A.   Yes.  I don't know if it was right after or

22   before, but they did take a blood pressure.

23       Q.   You're not sure if it was while he was still

24   wedged under the bench or after he'd been brought out,

25   but right about that same time?

Matthew Andrade

Estate of Ronnie Paul Sandoval, et al.
vs. County of San Diego, et al.

1    requests for paramedics?

2        A.   I don't remember the response from her at the

3    time.

4        Q.   Regardless, if you don't remember her

5    response, we do know that she didn't summon the

6    paramedics; right?

7        A.   No.

8        Q.   Let me ask it in the affirmative.

9             Did she summon paramedics pursuant to your

10   request?

11       A.   So let's back up.  I believe maybe she was

12   at -- from the first time I suggested, I think she was

13   there.  And then when the EMTs came on the scene, then I

14   think they called 911 or -- the paramedics showed up.  I

15   don't know if they were called before or whatnot, but

16   they showed up after, after the EMTs.

17       Q.   I got you.  And I'm just focusing now on those

18   requests that you were making for the paramedics.

19       A.   Yes.

20       Q.   We have those initial handful or two or three,

21   whatever, when you first assessed the situation.

22       A.   Yes.

23       Q.   And then we have a gap in time where the EMTs

24   show up.

25       A.   Yes.

Exhibit 9
138

Estate of Ronnie Paul Sandoval, et al.
vs. County of San Diego, et al.

```
1         Q.   At 1:20, American Medical Response EMTs
2    arrived at waiting cell 1.   "At that time I suggested
3    again" -- that's your writing; right?   "At that time I
4    suggested again"?
5         A.   Yes.
6         Q.   So over and above the few times in the
7    paragraph at the top, you suggested again --
8         A.   Yes.
9         Q.   -- once the paramedics got there.
10        A.   Yes.
11        Q.   Yes?
12        A.   Yes.
13        Q.   "Again we upgrade to Paramedics."   And you use
14   the word "upgrade," "upgrade" meaning personnel with
15   more medical training.
16        A.   Yes.
17        Q.   "Paramedics were dispatched because the
18   transporting EMTs told the medical staff they could not
19   transport Sandoval because he was unconscious."
20             He'd been unconscious all along; right?
21        A.   Yes.
22        Q.   And you knew the EMTs couldn't transport him
23   because he was unconscious; right?
24        A.   Yeah.   I mean --
25        Q.   And that's why you requested paramedics.
```

Matthew Andrade

**Estate of Ronnie Paul Sandoval, et al.**
**vs. County of San Diego, et al.**

1    A.   I don't.

2    Q.   Were you privy to their conversations?

3    A.   No.  I stepped back.

4    Q.   "When they lifted him up off the ground they

5    confirmed he was pulseless."  You used the word

6    "confirmed" there.

7         What did you mean by that?

8    A.   Just confirmed from probably -- you know, they

9    hooked him to the monitor.  They feel the pulse, and

10   they confirmed the pulse.  So he didn't have a pulse at

11   that time.

12   Q.   Did you think he was -- see, "confirmed" means

13   there's a suspicion and then it's confirmed.

14        Was there a suspicion that he was pulseless

15   before he got up on the gurney?

16   A.   No.  I believe he was -- he had a pulse all

17   the way to the time, even when they were there,

18   because -- you'd have to talk to them, but I believe

19   that they went in the cell, hooked up a monitor that

20   actually shows a heart rhythm.

21        I mean you're going to have to ask -- talk to

22   the Rural/Metro medics, but I think -- I believe he had

23   a pulse at that time, and the time that he was lifted

24   from the ground up to the gurney, when he got on the

25   gurney, that's when he went pulseless.

Matthew Andrade

Estate of Ronnie Paul Sandoval, et al.
vs. County of San Diego, et al.

1    Q.   Oh.   And I get that that's what your

2    impression is --

3        A.   Yes.

4        Q.   -- but I'm confused as to the word

5    "confirmed," 'cause when you use "confirmed" like that,

6    it's like --

7        A.   It's confirmed, like, hey, this is -- you've

8    got a confirmed pulseless.   I mean he's confirmed --

9    confirmed does not have a pulse.

10       Q.   Okay.

11       A.   And so, like, he does not have a pulse.   So

12   they hook somebody up to a monitor, and it's showing,

13   you know, 20 beats a minute.   Then they check the pulse,

14   it's pulseless.   So confirm he's pulseless.   So -- but

15   what my thing is, I believe he had a pulse when he was

16   on the ground, before getting transferred from the

17   ground to the gurney.

18       Q.   And what do you base that belief on?

19       A.   Because they didn't do CPR right there in the

20   cell.

21       Q.   And they had him hooked up to a monitor.

22       A.   I -- like I said, you'd have to --

23       Q.   To the best of your recollection.

24       A.   To the best of my recollection?   Usually the

25   first thing, when you go to a call like this, you want

Matthew Andrade

Estate of Ronnie Paul Sandoval, et al.
vs. County of San Diego, et al.

1       I, the undersigned, a Certified Shorthand

2   Reporter of the State of California, do hereby certify:

3       That the foregoing proceedings were taken

4   before me at the time and place herein set forth; that

5   any witnesses in the foregoing proceedings, prior to

6   testifying, were duly sworn; that a record of the

7   proceedings was made by me using machine shorthand,

8   which was thereafter transcribed under my direction;

9   that the foregoing transcript is a true record of the

10  testimony given.

11      Further, that if the foregoing pertains to the

12  original transcript of a deposition in a federal case,

13  before completion of the proceedings, review of the

14  transcript [x] was [ ] was not requested.

15

16      I further certify I am neither financially

17  interested in the action nor a relative or employee of

18  any attorney or party to this action.

19      IN WITNESS WHEREOF, I have this date

20  subscribed my name.

21

22  Dated:  April 25, 2016

23

24  _____
    Colleen M. Peterman
25  CSR No. 7882

Matthew Andrade

Estate of Ronnie Paul Sandoval, et al.<br>vs. County of San Diego, et al.

1    DECLARATION UNDER PENALTY OF PERJURY

2    Case Name: Estate of Ronnie Paul Sandoval, et al.
              vs. County of San Diego, et al.
3    Date of Deposition: 04/13/2016

4    Job No.: 10023561

5

6              I, MATTHEW ANDRADE, hereby certify

7    under penalty of perjury under the laws of the State of

8    _____ that the foregoing is true and correct.

9              Executed this _____ day of

10   _____, 2016, at _____.

11

12

13                        _____

14                        MATTHEW ANDRADE

15

16   NOTARIZATION (If Required)

17   State of _____

18   County of _____

19   Subscribed and sworn to (or affirmed) before me on

20   this _____ day of _____, 20__,

21   by_____, proved to me on the

22   basis of satisfactory evidence to be the person

23   who appeared before me.

24   Signature: _____ (Seal)

25

# EXHIBIT 10

Exhibit 10
144

# Estate of Ronnie Paul Sandoval, et al.
# vs. County of San Diego, et al.

## Deposition of
## NOLAN EDGE
## February 24, 2016

| Exhibits | Transcript | Media Included |
|----------|------------|----------------|
| | | Word Index |

866.999.8310 | aptusCR.com

**aptus**
COURT REPORTING

Exhibit 10
145

Nolan Edge

1    A.    Yes.

2    Q.    What did you observe as far as his person?

3    What did he look like?

4    A.    He was laying there.  He was unresponsive.

5    Q.    Was his skin color, was it like a grayish

6    color?

7    A.    I don't recall.  It was -- I just remember he

8    was clammy.

9    Q.    His skin was wet?

10   A.    Yes.

11   Q.    Skin was wet, on his side, unresponsive?

12   A.    Yes.

13   Q.    Was he like tremoring or having some sort of --

14   A.    Yes.  He was in and out.  He was kind of --

15   tremble a little bit.  I could feel his muscles tense if

16   he had a little tremor.

17   Q.    So it looked like he was seizing to you?

18   A.    Yes.

19   Q.    How long did it take you to -- once you arrived

20   at the cell to enter the cell?

21   A.    I don't remember exactly how long.  It wasn't

22   that long.  I pretty much went in fairly quickly.  I

23   don't remember exactly how long, though.

24   Q.    Did you have a key?

25   A.    Yes.

Nolan Edge

Estate of Ronnie Paul Sandoval, et al.
vs. County of San Diego, et al.

1              REPORTER'S CERTIFICATION

2

3      I, Claire Andrews, CLR, a Certified Shorthand

4   Reporter in and for the State of California, do hereby

5   certify:

6

7      That the foregoing witness was by me duly sworn;

8   that the deposition was then taken before me at the time

9   and place herein set forth; that the testimony and

10  proceedings were reported stenographically by me and

11  later transcribed into typewriting under my direction;

12  that the foregoing is a true record of the testimony and

13  proceedings taken at that time.

14

15      IN WITNESS WHEREOF, I have subscribed my name this

16  7th day of March, 2016.

17

18

19      _____

20      Claire Andrews, CLR,

21      CSR No. 13509

22

23

24

25

Exhibit 10
147

Nolan Edge

Estate of Ronnie Paul Sandoval, et al.
vs. County of San Diego, et al.

```
 1              DECLARATION UNDER PENALTY OF PERJURY

 2     Case Name: Estate of Ronnie Paul Sandoval, et al.
                   vs. County of San Diego, et al.
 3     Date of Deposition: 02/24/2016

 4     Job No.: 10022307

 5

 6                  I, NOLAN EDGE, hereby certify

 7     under penalty of perjury under the laws of the State of

 8     _____ that the foregoing is true and correct.

 9                  Executed this _____ day of

10     _____, 2016, at _____.

11

12

13                              _____

14                              NOLAN EDGE

15

16     NOTARIZATION (If Required)

17     State of _____

18     County of _____

19     Subscribed and sworn to (or affirmed) before me on

20     this _____ day of _____, 20__,

21     by_____,    proved to me on the

22     basis of satisfactory evidence to be the person

23     who appeared before me.

24     Signature: _____ (Seal)

25
```

# EXHIBIT 11

Exhibit 11
149

Inmate's Name: Sandoval, Ronnie
Booking Number: 14713020
DOB: 9/30/67

At approximately 0058 assisted RN 5055 in responding to i/p in medical holding cell #1. With two deputies in the cell, found i/p lying on his R side with his head at the corner under the bench. I/P sounded snoring, un responsive, no incontinence, appeared to be having mild tremors, tensing of muscles. Writer placed Bp cuff on L arm, Bp 137/58, P 94. Placed on O2 non re breather mask @ 15L/min, O2 Sat 98%, pupils 3 mm & sluggish per assessment of RN 5055. At approximately 0103, C collar applied with help of deputy # 0137. Writer prepared DHS for send out via EMT. Suction machine prepared for suctioning. Deputy #0137 suctioned i/p's oral secretions. Approximately 0125 assisted RN 9226 in preparing supplies for IV insertion & RN 9226 was able to insert IV on her second attempt in the R ante-cubital area. EMT arrived @ approximately 0127. At approximately 0148 paramedics arrived. CPR started by paramedics after i/p was transferred from the floor to the gurney. i/p was declared dead @ 0211.

Submitted by: Maria Theresa LLamado RN 6492

Exhibit 11
150

COSD RRFP 000300

# EXHIBIT 12

Exhibit 12
151

Maria Llamado
February 28, 2017

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ESTATE OF RONNIE PAUL
SANDOVAL and ANA SANDOVAL, an
individual,

        Plaintiffs,

   vs.                         Case No.: 16cv1004-BEN(AGS)

COUNTY OF SAN DIEGO, a Public
entity; SAN DIEGO COUNTY
JAIL, a Public Entity, and
DOES 1 through 100;

        Defendants.
_____

DEPOSITION OF MARIA LLAMADO

February 28, 2017

9:24 a.m.

1600 Pacific Highway, Room 355

San Diego, California

REPORTED BY:
Elana Zucconi
CSR No. 9651, RPR, CRR

Maria Llamado
February 28, 2017

1        A.    Sobering cells and screening.

2        Q.    Excuse me, sobering cells and screening?

3        A.    Yes.

4        Q.    And if you can recall, were the sobering cells

5    full that night?

6        A.    Yes.

7        Q.    All four were full?

8        A.    All four with, I think, two of the sobering

9    cells had doubled.

10       Q.    Did the sobering cells have beds in them?

11       A.    No.

12       Q.    And there is a nurse that is assigned to the

13   safety cells, right?

14       A.    Yes.

15       Q.    And a nurse that is assigned to sobering cells,

16   right?

17       A.    Yes.

18       Q.    "Yes"?

19       A.    Um-hum.  Yes.

20       Q.    And those nurses, in conjunction with those

21   duties, also do the medical screening, right?

22       A.    Yes.

23       Q.    Is there a nurse assigned to the waiting cells,

24   the holding cells, like Mr. -- the two holding cells

25   where Mr. Sandoval was?

Maria Llamado
February 28, 2017

```
1        A.    No.   No.

2        Q.    Nobody gets that assignment, right?

3        A.    No.

4        Q.    Let me ask in the affirmative.  Does anybody

5   get assigned to those holding cells, a nurse get

6   assigned to those holding cells, like they do the

7   sobering or the safety?

8        A.    No.

9              MR. CHAPIN:  You are talking about one and two?

10             MR. MORRIS:  Yes.

11             THE WITNESS:  No.

12  BY MR. MORRIS:

13       Q.    As far as you know, there is no nursing

14  obligation to do routine checks on individuals in the

15  holding cell, correct?

16       A.    Unless an inmate was -- if the nurse, the

17  out-going shift, would endorse -- would tell the

18  night -- the oncoming shift that there is an inmate in

19  that holding cell that needs follow-up.

20       Q.    Sure.  If you are specifically told by a nurse

21  that that person needs follow-up, you would do that?

22       A.    Yes.

23       Q.    But there is no standing obligation, like, in

24  the safety cells or sobering cells, for a nurse to

25  routinely monitor somebody in the holding cell, true?
```

Exhibit 12
154

Maria Llamado
February 28, 2017

1      A.    Yes.

2      Q.    Right?

3      A.    Yes.

4      Q.    Let me ask it -- I asked that question wrong.

5            Is there an affirmative obligation for a nurse

6    to routinely do checks on individuals in the holding

7    cell without being told that that person needs medical

8    screening by another nurse?

9      A.    Yes.  It -- the thing is we visual, like we --

10   usually when our -- when we see inmates in the holding

11   cell like that, and they are not in any distress, that's

12   how we check them.

13     Q.    Right.  But what I am trying to get at, there

14   is an assignment, a standing assignment for a nurse to

15   check individuals in the sobering cell, true?

16     A.    Yes.

17     Q.    And there is a standing assignment for a nurse

18   to check individuals in the safety cells --

19     A.    Yes.

20     Q.    -- true?

21     A.    Yes.

22     Q.    Is there a standing assignment for a nurse to

23   check individuals in the holding cells, like somebody is

24   assigned that?

25     A.    I cannot remember.  I don't think -- I don't

Maria Llamado
February 28, 2017

1      Q.    And there are inmates that had been dressed

2  out, ready to be medically screened?

3      A.    Yes.

4      Q.    And did you start to screen any of those

5  inmates?

6      A.    Yes.   I started -- I can't remember how many I

7  started, but I think I started two or three of them.

8      Q.    And is the best as you can recall, when is the

9  first time you noticed inmate Sandoval in the holding

10  cell?

11     A.    After the other nurse, next sitting -- sitting

12  next on -- in the next booth, told me that we have a man

13  down.

14     Q.    And had you begun medically screening other

15  inmates at that time?

16     A.    Yes.   I was in the middle of screening my

17  second or third inmate.

18     Q.    Approximately how long into your shift was it

19  that the nurse next to you told you there was a man

20  down?

21     A.    Oh, I cannot recall the time or how many

22  minutes.   But it is in my charting, the time.

23     Q.    Okay.   We will get to your chart.   I am just

24  trying to get now what you can recall off the top of

25  your head.

Maria Llamado
February 28, 2017

```
1       A.    I cannot recall.  No, I cannot recall the
2    time --
3       Q.    Was it like halfway through your shift?  Maybe
4    an hour in?
5       A.    Oh, it was probably like -- maybe like -- maybe
6    an hour, somewhere there.
7       Q.    Sure.  That's fine.
8             At the time that nurse -- was it Nurse Harris
9    the one --
10      A.    Yes.
11      Q.    -- who was next to you?
12      A.    Yes.
13      Q.    At the time that Nurse Harris told you there
14   was a man down, you had already seen inmate Sandoval in
15   the holding cell, true?
16      A.    Yeah.  Like the side of my eyes (indicating),
17   you know.
18      Q.    But you hadn't done any assessment on him?
19      A.    No.  No.
20      Q.    Had anybody --
21      A.    Like --
22      Q.    Go ahead.
23      A.    Sorry, like assessment like -- like -- like
24   talking to him or looking, like, (indicating), no.  I
25   just saw him going through -- going out through the
```

Exhibit 12
157

Maria Llamado
February 28, 2017

```
 1        Q.    But it was within the timeframe that you
 2   arrived to see Mr. Sandoval, right?
 3        A.    I don't know how many minutes after I -- when
 4   he started having the seizure.  I cannot recall how many
 5   minutes after he was having -- while he was having the
 6   seizure or when I suggested that we call paramedics.
 7        Q.    Why did you think to call paramedics?
 8        A.    Because usually for -- I know I had seizure
 9   patients, we -- that was our routine, like, usually for
10   our -- our -- our, like -- like my assessment and my --
11   what I think that the patient should get out by a
12   paramedic.
13        Q.    Standard nursing protocol says when someone is
14   having a prolonged seizure, you call a paramedic, so
15   that's why you wanted to call the paramedics --
16        A.    Yeah.
17        Q.    -- true?
18        A.    Yes.
19        Q.    So it wasn't a seizure, a flash-in-the-pan
20   seizure, it was a seizure over a period of time, right?
21        A.    Um-hum.  It looked like a longer seizure.
22        Q.    And did they tell you that when he -- when they
23   had seen him seizing, that he hit his head?
24        A.    No.  I cannot remember that.
25        Q.    And Andrade, we deposed Deputy Andrade, he
```

Exhibit 12
158

Maria Llamado
February 28, 2017

1     A.   Okay.

2     Q.   All right.  So when you arrived on the scene

3     and you had the interaction with the medical cart, the

4     oxygen tank and the call for EMTs, your assessment,

5     looking at Mr. Sandoval, was that he fit within the

6     standard nursing protocol for seizures such that a 9-1-1

7     should be called, right?

8     A.   Yes.

9     Q.   And when you suggested 9-1-1 and Andrade

10    suggested 9-1-1 and Harris went with the EMTs, did you

11    say anything to her, like, "Why aren't you calling the

12    paramedics?"  Did you question her in any way?

13    A.   No.  I just said, "He has to go out 9-1-1."

14    Q.   And weren't you Nurse Harris' senior?  Hadn't

15    you been there longer than her?

16    A.   Yes.

17    Q.   How is it that she was able to make that

18    decision instead of you?

19    A.   I -- since she was the team leader, I gave her

20    the -- the -- what do you call it --

21    Q.   The deference?

22    A.   Yeah.  That she was a team leader and that was

23    her -- her suggestion or her assessment, her --

24    Q.   And --

25    A.   Sorry, that was her assessment at the current

Exhibit 12
159

Maria Llamado
February 28, 2017

1    time.

2         Q.    And how is it that she became the team leader

3    when you had been there so much longer than her?

4         A.    It is usually the first responder.

5         Q.    Oh, it became her scene because she was the

6    first one on site?

7         A.    Yes.  Yes.

8         Q.    That made her the team leader?

9         A.    Yes.

10        Q.    All right.  So you show up at the scene, there

11   is at least one deputy inside, you have the medical cart

12   and the oxygen tank, and the call goes out by Harris for

13   EMTs.  What happens next?

14        A.    So we set up the oxygen, the -- the deputy

15   helped me put the oxygen on, and then I remember she was

16   still observing the patient.  She was still standing

17   there and I told her I was -- I was going to get the

18   paperwork ready for an E -- for whoever, an EMT or

19   whoever, you know, who is coming.  We usually fill out

20   the form that we handle -- we give it -- we give it to

21   the -- the ambulance team, prior -- so they can have all

22   of that information on what is going on with the

23   patient, so they can give it to the ER.

24        Q.    Okay.  So there has to be paperwork that is

25   given to the ambulance too?

Maria Llamado
February 28, 2017

1  sending some air tube up to Bautista.  When did that

2  occur?

3      A.   Air tube to Bautista?  It is a -- a copy of

4  the -- usually when we fill out that form, we copy it,

5  and then so the nurse -- the third floor has a copy, and

6  we have a folder where we put all the copy of our

7  send-outs.

8      Q.   And did you do that in this case?

9      A.   I think I -- I cannot remember, but I think I

10  did.

11      Q.   Isn't it true, you send it up to Bautista and

12  you had a phone conversation with her?

13      A.   Yes, after that.  I told her I was -- I was --

14  I tube -- I am tubing a copy of our -- of an inmate

15  that's going out.  And I said, "He is still here."

16      Q.   Okay.  So you are filling out the paperwork,

17  you put it in an envelope --

18      A.   Um-hum.

19      Q.   -- you make a copy of it?

20      A.   Yeah.

21      Q.   You take the copy and you put it in the tube --

22      A.   Um-hum, yes.

23      Q.   -- and you send it to Bautista, and you call

24  her?

25      A.   Yes.

Exhibit 12
161

Maria Llamado
February 28, 2017

1      Q.    And you tell her, "I am tubing you some

2  paperwork"?

3      A.    Yes.

4      Q.    And you explain to her what you have seen?

5      A.    Yes.

6      Q.    And what does she tell you to do, ma'am?

7      A.    And she said, "He has to go out 9-1-1."

8      Q.    Bautista told you to send him out 9-1-1 as

9  well?

10      A.    Yes.

11      Q.    Did you go out to the scene and tell Harris

12  that Bautista agreed with you and Andrade that he should

13  go out 9-1-1?

14      A.    Yes.  I was standing, after I put the phone

15  down, because we have a phone right there on the counter

16  (indicating).  After I put the phone down, I looked at

17  her and I said, "Shirley said he has to go now 9-1-1."

18      Q.    And Shirley is Shirley Bautista?

19      A.    Shirley Bautista.

20      Q.    So now it is you, Andrade and Shirley, the

21  supervisor, who all say 9-1-1?

22      A.    Yes.

23      Q.    And you relay that to Nurse Harris?

24      A.    Yes.

25      Q.    Did Nurse Harris then call out to the deputies

Exhibit 12
162

Maria Llamado
February 28, 2017

| | |
|---|---|
| 1 | second attempt.  But I know she did, after awhile. |
| 2 | Q.   And was -- the reports indicate there was some |
| 3 | blood everywhere? |
| 4 | A.   When she was putting the IV? |
| 5 | Q.   Yes. |
| 6 | A.   I cannot remember blood everywhere. |
| 7 | Q.   Taking you back now to the moment where you |
| 8 | finished the paperwork, tubed it up to Bautista, did you |
| 9 | then go back to Mr. Sandoval? |
| 10 | A.   Yes. |
| 11 | Q.   Was he still seizing? |
| 12 | A.   I cannot remember if he was seizing when I came |
| 13 | back. |
| 14 | Q.   But he had been seizing to the extent that you |
| 15 | thought 9-1-1 was necessary, when you first observed |
| 16 | him, right? |
| 17 | A.   Yes. |
| 18 | Q.   Was he ever responsive? |
| 19 | A.   While he was seizing? |
| 20 | Q.   Any of the time that you were interacting with |
| 21 | him, did he ever speak to you -- |
| 22 | A.   No. |
| 23 | Q.   He was never responsive, right? |
| 24 | A.   No. |
| 25 | Q.   Let me ask you this question in the |

Maria Llamado
February 28, 2017

1    affirmative.  Was he ever responsive?

2        A.    No.

3        Q.    Was he ever -- did he ever follow your

4    direction?

5        A.    No.

6        Q.    Were you checking his vitals?

7        A.    Yes.

8        Q.    What do you recall about the vitals?

9        A.    I know he had vital signs initially.

10       Q.    And do you recall what his saturation rate

11   was --

12       A.    No, I cannot recall the number of his

13   saturation.  Maybe it was in the 90s.

14       Q.    What about his blood pressure?

15       A.    His blood pressure was -- I know it was like

16   above 100, systolic.  But I cannot exactly recall the

17   number.

18       Q.    What about his respiratory rate, do you recall

19   that?

20       A.    No.  It was -- it was -- I think it was

21   Ms. Harris who was observing his respirations or --

22       Q.    How about his heart rate, do you recall that?

23       A.    The heart rate would be through the oximeter

24   (indicating).

25       Q.    The reports indicate that the heart rate at one

Maria Llamado
February 28, 2017

1     Q.    In retrospect, it wasn't just enough to tell

2     Ms. Harris to call 9-1-1, you should have done it

3     yourself?

4     A.    Um-hum.

5     Q.    Right?

6     A.    Yes.

7     Q.    Do you know why you didn't?  That's what I am

8     trying to understand.  You seem like, obviously, you are

9     an empathetic, caring person.

10    A.    Yes.

11    Q.    You don't like to lose patients?

12    A.    Of course.

13    Q.    And when Nurse Harris doesn't respect your

14    directive to call 9-1-1, I can't figure out why you

15    didn't just say, "I am going to do it," or tell a deputy

16    to do it.

17    A.    Yeah.  I don't know what happened to me that

18    time.

19    Q.    Well, you are just a nice person.  You didn't

20    want to overrule her?

21    A.    Yeah, I probably did, you know, like -- I don't

22    know what happened.

23    Q.    If it happens again, you will make sure you

24    call 9-1-1, right?

25    A.    Yes, of course I learned my lesson.

Maria Llamado
February 28, 2017

```
1        Q.    Right?

2        A.    Yes.

3        Q.    You could use those cells for all sorts of

4    different things?

5        A.    Yes.

6        Q.    Ad. Seg., right?

7        A.    Yes.

8        Q.    Medical issues?

9        A.    Yes.

10       Q.    Frequent flyer who gets pulled out of sobering,

11   because he can sober up in a holding cell?

12       A.    Yes.

13       Q.    Would you agree that having those cells used

14   for so many different purposes created some confusion

15   for the nursing staff?

16       A.    Of course.

17       Q.    Okay.  I would just like to go -- look at your

18   statement real quick.  Do we have that handy?

19             MS. PENA:  Of course.

20             MR. MORRIS:  We will mark this as Exhibit No. 1

21   to your deposition, ma'am.

22             (Exhibit 1 marked)

23   BY MR. MORRIS:

24       Q.    We will mark this as Exhibit 1 to your

25   deposition.
```

Exhibit 12
166

Maria Llamado
February 28, 2017

```
 1        A.    I went to get him some -- I cannot remember if
 2    I went -- I tried to get him some medicine, gave it to
 3    him and had the deputy take him to -- take him out of
 4    the holding -- of the -- sitting in front of me and put
 5    him back in the holding cell.
 6        Q.    Gotcha.
 7              "Llamado responded to the cell.  Deputies were
 8    already present at the location.  Sandoval was lying on
 9    his right side, on the floor, with part of his head
10    under the bench."  Do you recall if that was the
11    positioning of his body?
12        A.    Yeah.  Now I recall.
13        Q.    Did anybody tell you he had fallen and hit his
14    head?
15        A.    No.
16        Q.    "Sandoval was snoring and, quote, tensing up."
17    Can you describe that for me, when you say "tensing up,"
18    that's the seizure?
19        A.    Seizure-like activity.
20        Q.    What part of his body was tense?
21        A.    As I recall, it was more of his arms, like this
22    (indicating).  Like, you know, this part (indicating).
23        Q.    His arms and chest?
24        A.    Yes.
25        Q.    And what was his facial expression?
```

Maria Llamado
February 28, 2017

| | |
|---|---|
| 1 | his arms and the sluggish pupils, that's when you made |
| 2 | the decision that he needed 9-1-1? |
| 3 | A.   I cannot remember when I said 9-1-1. |
| 4 | Q.   But it was there, during the initial time, you |
| 5 | said it was the med cart -- there is the med cart, the |
| 6 | oxygen tank, and you made the decision to call 9-1-1, it |
| 7 | was like right in the beginning phases.  That is what |
| 8 | your testimony was today? |
| 9 | A.   Yes. |
| 10 | Q.   So it would have been right about that time |
| 11 | when you are checking the vitals, you got the oxygen |
| 12 | there -- |
| 13 | A.   Yes.  Okay, yes. |
| 14 | Q.   Does that jog your memory? |
| 15 | A.   Um-hum.  Yes. |
| 16 | Q.   And when you said, "We need to transport him |
| 17 | via 9-1-1," did you say it to anyone in particular?  Did |
| 18 | you say it to Harris or did you say it to the deputies? |
| 19 | A.   I told -- I told -- I kind of said it out loud. |
| 20 | I said, "He has to go out 9-1-1." |
| 21 | Q.   To whom did you say it to? |
| 22 | A.   I was -- I was -- I looked at her and I said, |
| 23 | "He has to go out 9-1-1." |
| 24 | Q.   And at that point in time, Harris said, "No, |
| 25 | EMT"? |

Exhibit 12
168

Maria Llamado
February 28, 2017

```
1       A.    Yes.  Yes.

2       Q.    The statement you gave to Detective Carrillo

3  doesn't talk about your interaction with respect to

4  9-1-1 or EMTs to Harris.  Do you know why you didn't

5  tell Detective Carrillo that you told Harris to call

6  9-1-1?

7       A.    I -- I don't know.  I cannot remember.

8       Q.    Okay.  I will read the next paragraph down.

9  "Llamado retrieved a C collar and a deputy assisted by

10 applying it to Sandoval."  The deputy would have been

11 Andrade, true?

12      A.    Yes.

13      Q.    "Sandoval was moved slightly on his back, to

14 facilitate the action of the C collar.  During this,

15 Sandoval was still snoring, but unresponsive."  Now, at

16 this point in time, snoring indicated to you an airway

17 constriction, right -- obstruction?

18      A.    Probably -- yeah, a little slight airway

19 obstruction, or probably some mucous in his mouth.

20      Q.    Fair enough.

21            "Sandoval's eyes were closed.  Llamado checked

22 Sandoval's pants and saw that they were dry.  His pants

23 were not soiled, as a normally seen on a seizure

24 patient."  All right.  "Llamado left the room and

25 started to prepare the DHS."  Do you know what DHS
```

Maria Llamado
February 28, 2017

1    Exhibit 3 to your deposition.

2            (Exhibit 3 marked)

3    BY MR. MORRIS:

4        Q.    I don't have the stand-alone SNP for the

5    seizure disorder, but having done a few of these cases,

6    I understand that the SNP is plugged into the medical

7    records, true?

8        A.    Yes.

9        Q.    Okay.  So this is the SNP for a seizure

10   disorder and this is from Ronnie's -- excuse me,

11   Mr. Sandoval's medical chart.  And it says here,

12   "Immediate emergency care is required when the seizures

13   are ongoing, prolonged or repeated over a few minutes."

14           That's what you saw that led you to tell Nurse

15   Harris to call 9-1-1, true?

16       A.    Yes.

17       Q.    The seizures were ongoing, prolonged and

18   repeated, right?

19       A.    Yes.

20       Q.    And the first thing you are to do is to call

21   9-1-1, and that's what you told Ms. Harris to do, right?

22       A.    Yes.

23       Q.    You followed the seizure protocol, right?

24       A.    Yes.

25       Q.    Unfortunately, Nurse Harris didn't heed your

Exhibit 12
170

Maria Llamado
February 28, 2017

| | |
|---|---|
| 1 | REPORTER'S CERTIFICATE |
| 2 | |
| 3 | |
| 4 | I, ELANA ZUCCONI, CSR No. 9651, Certified |
| 5 | Shorthand Reporter, certify: |
| 6 | That the foregoing proceedings were taken |
| 7 | before me at the time and place therein set forth, at |
| 8 | which time the witness was put under oath by me; |
| 9 | That the testimony of the witness, the |
| 10 | questions propounded, and all objections and statements |
| 11 | made at the time of the examination were recorded |
| 12 | stenographically by me and were thereafter transcribed; |
| 13 | That a review of the transcript by the |
| 14 | deponent was requested; |
| 15 | That the foregoing is a true and correct |
| 16 | transcript of my shorthand notes so taken. |
| 17 | I further certify that I am not a relative or |
| 18 | employee of any attorney of the parties, nor financially |
| 19 | interested in the action. |
| 20 | I declare under penalty of perjury under the |
| 21 | laws of California that the foregoing is true and |
| 22 | correct. |
| 23 | Dated this 3rd day of March, 2017. |
| 24 | *Elana Zucconi* |
| 25 | _____ |
| | ELANA ZUCCONI, CSR No. 9651 |

U.S. LEGAL SUPPORT
(619) 573-4883                                    133

Exhibit 12
171



DECLARATION

I herby declare I am the deponent in the
within matter; that I have read the foregoing deposition
and know the contents thereof; and I declare that the
same is true of my knowledge except as to the matters
which are therein stated upon my information or belief,
and as to those matters, I believe it to be true.

I declare under the penalties of perjury of
the State of California that the foregoing is true and
correct.

Executed on the _3_ day of _April_ 2017,
at _San Diego_, _Ca._
(City)                     (State)

MARIA LLAMADO

131

U.S. LEGAL SUPPORT
(619) 573-4883

Exhibit 12
172

# EXHIBIT 13

Exhibit 13
173

Dana Harris
March 02, 2017

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ESTATE OF RONNIE PAUL
SANDOVAL and ANA SANDOVAL, an
individual,

        Plaintiffs,

  vs.                      Case No.: 16cv1004-BEN(AGS)

COUNTY OF SAN DIEGO, a Public
entity; SAN DIEGO COUNTY
JAIL, a Public Entity, and
DOES 1 through 100;

        Defendants.

_____

VIDEOTAPED DEPOSITION OF DANA HARRIS

March 2, 2017

2:11 p.m.

1600 Pacific Highway, Room 355

San Diego, California

REPORTED BY:
Elana Zucconi
CSR No. 9651, RPR, CRR

U.S. LEGAL SUPPORT
619-573-4883

Exhibit 13
174

Dana Harris
March 02, 2017

```
 1        A.    These things are happening around me, so I am
 2   not sure how many times.
 3        Q.    Is it routine or not routine?
 4        A.    Routine, that's a sworn question.  I am not
 5   sworn staff.  I am not sure.
 6        Q.    For you to observe somebody in the holding cell
 7   in street clothes, was that a routine event or something
 8   that was abnormal for you?
 9        A.    Oh, my goodness, I don't know.  Um, if I saw a
10   person in street clothes in that cell, it wouldn't
11   necessarily (indicating).  So routine, because it
12   wouldn't --
13        Q.    So it happened all the time?
14        A.    Not all the time.  But it wouldn't strike me as
15   something that's significantly abnormal.
16        Q.    What is advanced cardiac life support, do you
17   know?
18        A.    It is a certification, advanced CPR, it
19   includes -- yeah, it is an advanced CPR certification.
20        Q.    And in San Diego, are EMTs advanced cardiac
21   life support certified?
22        A.    No.
23        Q.    Just paramedics, right?
24        A.    Yes.
25        Q.    And you knew that at the time in 2014,
```

Exhibit 13
175

Dana Harris
March 02, 2017

1    February?

2        A.    I don't think I did.

3        Q.    When did you learn that, after this event?

4        A.    Yes.

5        Q.    Did you learn it when you were discussing this

6    event?

7        A.    Discussing this event, I am not sure if I was

8    discussing this event specifically when I learned about

9    it.  The -- no.

10       Q.    Well, describe for me the circumstances that

11   led you to become aware that it was only paramedics that

12   had the advanced cardiac life support certification.

13       A.    I can't recall the specifics.  It is possible

14   that I overheard one of the nurses say it during or

15   maybe just that same night.

16       Q.    How about one of the deputies?

17       A.    That would have been abnormal, so I am going to

18   say no.

19       Q.    Do you remember a deputy by the name of Deputy

20   Andrade?

21       A.    I think I know who that is.

22       Q.    Is he one of the deputies in the cell with

23   Mr. Sandoval that night?

24       A.    I think Deputy Andrade was helping me with that

25   patient in the cell that night.

Exhibit 13
176

Dana Harris
March 02, 2017

| | |
|---|---|
| 1 | interaction at all with Mr. Sandoval, prior to the man |
| 2 | down? |
| 3 | A.    Interaction, no. |
| 4 | Q.    You qualified the word "interaction."  What, if |
| 5 | anything, do you recall as far as your noticing or |
| 6 | interacting or checking on Mr. Sandoval, prior to the |
| 7 | man down? |
| 8 | A.    Okay.  So seeing him in that cell, just as any |
| 9 | inmate being in that cell, I would have done -- I would |
| 10 | have done a scan to see if he was in any distress or |
| 11 | anything going on with that. |
| 12 | Q.    I understand that that's your routine custom |
| 13 | and practice.  I am asking you do you have a distinct |
| 14 | recollection of checking him, scanning him, looking him |
| 15 | up and down, anything like that? |
| 16 | A.    No. |
| 17 | Q.    And you didn't ask anybody on the nursing floor |
| 18 | why Mr. Sandoval was in the holding cell, true? |
| 19 | A.    I don't recall asking anyone about that, no. |
| 20 | Q.    Did anybody tell you why he was there? |
| 21 | A.    I don't recall anybody telling me the reason he |
| 22 | was in that cell either. |
| 23 | Q.    And you were on the second floor the entire |
| 24 | evening before the man down, true? |
| 25 | A.    I am not sure. |

Dana Harris
March 02, 2017

| | |
|---|---|
| 1 | first got there, I don't remember. |
| 2 | Q.   No, I am on the ground.  I am on the ground. |
| 3 | A.   On the ground, so they must have been closed. |
| 4 | Q.   Eyes closed, the report indicates drool, fine |
| 5 | muscle tremors, noncommunicative, and a deputy told you |
| 6 | he is having a seizure.  Did you conclude, at that point |
| 7 | in time, that he was having a seizure? |
| 8 | A.   He did not -- to me, he did not present as a |
| 9 | tonic clonic seizure. |
| 10 | Q.   Okay.  I am not interested in tonic clonic. |
| 11 | Okay?  I am just interested in seizure.  Did you think |
| 12 | he was having a seizure? |
| 13 | A.   I did not. |
| 14 | Q.   What would you have needed to see in order for |
| 15 | you to conclude that he was having a seizure? |
| 16 | A.   Those same symptoms that I stated earlier. |
| 17 | Q.   Tensing of the muscles? |
| 18 | A.   With seizure.  So it is not a subtle tensing. |
| 19 | It is generalized, almost like a fish out of water |
| 20 | tensing and relaxing. |
| 21 | Q.   Well, there are varying gradations of seizure, |
| 22 | no, ma'am? |
| 23 | A.   Varying gradations of seizures.  There are |
| 24 | different types of seizures. |
| 25 | Q.   Okay.  Not all seizures are full-body seizures, |

Dana Harris
March 02, 2017

1  evidence into account, but your conclusion was that he

2  wasn't seizing, right?

3      A.   Yes.

4      Q.   When did you first come to the conclusion that

5  Mr. Sandoval was actually seizing, if ever?

6      A.   I never suspected a seizure on this patient.

7      Q.   During the entire night?

8      A.   During the entire night.

9      Q.   Is that why you didn't think paramedics were

10 necessary?

11         MR. CHAPIN:  Objection; it is vague as to time.

12         THE WITNESS:  No, that's not a true -- that

13 wouldn't be a true statement.

14 BY MR. MORRIS:

15     Q.   Why didn't you think paramedics were necessary?

16     A.   Because the patient was still responsive.  His

17 vital signs were stable.  He was breathing on his own.

18 There was nothing that I saw that warranted a paramedic

19 call.

20     Q.   He was unresponsive, though?

21     A.   He made -- no, he was not unresponsive.

22     Q.   Well, he was not communicative?

23     A.   He was communicative in the sense that calling

24 his name, he made the effort to look at me.  And he

25 followed commands.

Dana Harris
March 02, 2017

1     Q.    But he didn't speak to you?

2     A.    He did not speak.

3     Q.    And he was drooling?

4     A.    At some point, there was drooling.

5     Q.    And he had hit his head?

6     A.    He had bumped his head.

7     Q.    And people were telling you he was seizing?

8     A.    People with no medical training.

9     Q.    All right.  They didn't have medical training,

10    so you took that into account when you measured the --

11    A.    I take into account that they thought he was

12    seizing.

13    Q.    Okay.  And do you know that Nurse Llamado

14    testified, two days ago, that she concluded that he was

15    seizing?

16    A.    I did not know that.

17    Q.    Did she tell you that she thought he was

18    seizing?

19    A.    I don't recall her saying that to me.

20    Q.    Did she tell you to call 9-1-1 initially?

21    A.    I do not recall her telling me to call 9-1-1

22    initially.

23    Q.    Did Andrade tell you to call 9-1-1?

24    A.    I don't recall him saying call 9-1-1 either.

25    Q.    So you don't recall anybody telling you to call

Dana Harris
March 02, 2017

1    the one who decided EMTs and not paramedics?

2        A.    Initially, I -- I did choose EMTs, yes, that

3    was me.

4        Q.    And that there was -- you recall there being

5    some discussion about that about EMTs versus paramedics,

6    and that you opted for EMTs over paramedics?

7        A.    I don't recall a discussion about it.

8        Q.    Some disagreement about EMTs versus paramedics?

9        A.    I definitely don't recall any disagreement

10   about it.  I just remember that I needed -- I told them

11   to call out EMT.

12       Q.    Right.  But you remember at least there is

13   somebody who disagreed or said wait, what about

14   paramedics at that point in time, and you opted for

15   EMTs?

16       A.    I don't remember any disagreement or anyone

17   speaking up to why not paramedics.  I don't remember any

18   of that.

19       Q.    Do you remember the word "paramedic" being used

20   at all in that initial assessment?

21       A.    Being --

22       Q.    By anybody.

23       A.    Not that I recall, no.

24       Q.    So nobody said paramedic?

25       A.    I don't remember if anyone said paramedic.  I

Exhibit 13
181

Dana Harris
March 02, 2017

1      A.   I am not sure.  Not an hour.

2      Q.   Not an hour?

3      A.   Yeah.  I am not sure.

4      Q.   Half hour?

5      A.   I don't -- that seems longer than I am

6    remembering, half an hour.  So maybe less than half an

7    hour.

8      Q.   15 minutes?

9      A.   I don't know.  I really don't know.

10     Q.   Okay.  Now, during this deposition, you have

11   drawn a very firm distinction between unresponsive and

12   uncommunicative, right?  You said he is responsive

13   because he squeezed your hand and tried to close his

14   eyes, that type of thing?

15     A.   Yes.

16     Q.   But he was never communicative?  He never spoke

17   to you, correct?

18     A.   Correct.

19     Q.   At some point, did you make the determination

20   that he had actually became now unresponsive?

21     A.   I did not.  Patients in Central Jail commonly

22   do not speak English as their first language.  So the

23   fact that he was not speaking to me did not necessarily

24   ring anything with me.  The fact that he was able to

25   follow my commands weighed more for me.

Dana Harris
March 02, 2017

```
 1      A.    Correct.

 2      Q.    You don't recall him ending up on the floor?

 3      A.    I do not.

 4      Q.    Sergeant Shawcroft notified the deputy they

 5   needed to enter the room.  But just as a general rule,

 6   you would agree that what you recall at 8:05 in the

 7   morning would be more accurate than what you would

 8   recall three years later, true, as a general rule?

 9      A.    I think more accurate would be the night of,

10   which would be my report.

11      Q.    Well, be that as it may, what you recall

12   directly after the event would be more accurate than

13   your statement today, true?

14      A.    That is true.

15      Q.    Okay.  The next paragraph he writes, "Nurse

16   Harris entered the room and started assessing the

17   patient.  Sandoval's respiratory rate was 20 beats per

18   minute."  Is that normal?

19      A.    It wouldn't be 20 beats per minute.  It would

20   be --

21      Q.    Breaths, right?

22      A.    20 breaths per minute.  And 20 is on the higher

23   end.

24      Q.    So breathing heavy?

25      A.    Breathing more ra- -- slightly rapid, yes.
```

Exhibit 13
183

Dana Harris
March 02, 2017

```
1    ground?

2         A.    I don't recall that, no.

3         Q.    Okay.  So that is consistent with your

4    recollection that there was no blood from a wound?

5         A.    Correct.

6         Q.    Okay.  His airway was clear and he was

7    breathing on his own.  That's consistent with your

8    recollection, true?

9         A.    As far as I can remember.

10        Q.    His oxygen saturation was 94 percent.  That is

11   consistent with how you have testified here today, true?

12        A.    94 is a little low.  I don't -- I don't know.

13   I am not sure if that is true or not.

14        Q.    What do you mean, you are not sure if it is

15   true or not?

16        A.    94 percent is a little low.

17        Q.    So when you say it is not true, what do you

18   mean?  Do you mean that it's --

19        A.    I am not sure if his 02 sat was 94 percent or

20   not.

21        Q.    All right.  So do you think that Detective

22   Carrillo misheard you or do you think you told --

23        A.    I have no idea.

24        Q.    -- Detective Carrillo something incorrect?

25        A.    I don't know.  I don't know.  I am just saying
```

Dana Harris
March 02, 2017

1    A.    No, it does not.

2    Q.    There was no visible head wounds or open

3    bleeding on his head from hitting the wall.  That is

4    true, right?

5    A.    I don't remember him having any head wounds or

6    any -- anything on his head or bleeding.

7    Q.    A C collar was placed, do you remember that?

8    A.    I remember I put that in my report, so yes.

9    Q.    His blood glucose level was stable at 151.  Is

10   that normal?

11   A.    151 -- 151 is slightly higher for a patient --

12   a healthy patient that doesn't have diabetes, but it is

13   not at such a level to be alarmed.

14   Q.    Did that -- would that be consistent with

15   somebody who is hypoglycemic, like you talked about

16   earlier?

17   A.    No.

18   Q.    Well, if you have taken his glucose level and

19   it was within normal range, you testified earlier that

20   your assessment was he was hypoglycemic, so I am just

21   trying to understand.

22   A.    I -- I don't -- I don't believe I testified

23   that he was hypoglycemic.  The hypoglycemia came up -- I

24   don't remember when we were talking about hypoglycemia.

25   Maybe a suspicion, but I don't remember specifically

Exhibit 13
185

Dana Harris
March 02, 2017

1                      DECLARATION

2

3

4            I herby declare I am the deponent in the

5   within matter; that I have read the foregoing deposition

6   and know the contents thereof; and I declare that the

7   same is true of my knowledge except as to the matters

8   which are therein stated upon my information or belief,

9   and as to those matters, I believe it to be true.

10           I declare under the penalties of perjury of

11  the State of California that the foregoing is true and

12  correct.

13           Executed on the _____ day of _____ 2017,

14  at _____, _____.

15       (City)                  (State)

16

17

18                          _____

19                          DANA HARRIS

20

21

22

23

24

25

U.S. LEGAL SUPPORT
619-573-4883                                    200

Exhibit 13
186

Dana Harris
March 02, 2017

1                    REPORTER'S CERTIFICATE

2

3

4         I, ELANA ZUCCONI, CSR No. 9651, Certified

5    Shorthand Reporter, certify:

6              That the foregoing proceedings were taken

7    before me at the time and place therein set forth, at

8    which time the witness was put under oath by me;

9              That the testimony of the witness, the

10   questions propounded, and all objections and statements

11   made at the time of the examination were recorded

12   stenographically by me and were thereafter transcribed;

13              That a review of the transcript by the

14   deponent was requested;

15              That the foregoing is a true and correct

16   transcript of my shorthand notes so taken.

17              I further certify that I am not a relative or

18   employee of any attorney of the parties, nor financially

19   interested in the action.

20              I declare under penalty of perjury under the

21   laws of California that the foregoing is true and

22   correct.

23         Dated this 7th day of March, 2017.

24

25                    ELANA ZUCCONI, CSR No. 9651

Exhibit 13
187

# EXHIBIT 14

Exhibit 14
188

# San Diego County Sheriff's Department
## Crime/Incident Report

CAD Event No.: **E1465588**          Case No. **14109768**

Primary Victim: **Sandoval, Ronnie Paul**     Report No. **14109768.1**

**1**
Page 1 of 4

## GENERAL CASE INFORMATION

| | |
|---|---|
| Primary Charge: **920000 - ZZ - DEATH** | |
| Special Studies: | Related Cases: |
| Location, City, State, ZIP: **1173 Front St, San Diego, CA 92101** | Occurred On: **02/23/2014 00:53:00 (Sunday)** |
| Jurisdiction: **DETENTION FACILITY - CENTRAL** | Beat: **021** | Call Source: **DEPUTY** | (and Between): |
| Means: | Motives: |

## VICTIM/S

### Victim #1

| Person Code: | ☐ Secured Premise | ☐ Discovered Crime | ☐ Reporting Party | ☐ Law Enforcement Officer |
|---|---|---|---|---|

| Name: **Sandoval, Ronnie Paul** | Victim Type: **I - Individual** | Interpreter Language: |
|---|---|---|

ALIAS / AKA / NICKNAME / MONIKER:

| Name Type: | First: | Middle: | Last: | Suffix: |
|---|---|---|---|---|

| Victim Of: **920000 - ZZ - DEATH** | County Residence: **N - Nonresident** |
|---|---|
| Home Address, City, State, ZIP: **2121 Siegle Ct., Lemon Grove, CA 91945** | Res. Country: | Place of Birth: | Undocumented: |

| Race: **H** | Sex: **M** | Date of Birth / Age: **09/30/1967 - 45** | Height: **5' 9"** | Weight: **187 lbs** | Hair Color: **BRO** | Eye Color: **BRO** | Facial Hair: **06 - Mustache Only** | Complexion: |
|---|---|---|---|---|---|---|---|---|

| Employment Status: **U - Unemployed** | Occupation/Grade: | Employer/School: | Employer Address, City, State, ZIP: |
|---|---|---|---|

CONTACT INFORMATION:

| Type: **HP - Home Phone** | Number/Address: **619 669-1940** |
|---|---|

IDENTIFICATION:

| Type: **FBI - FBI No.** | Number: **925538EA0** | State: | Country: |
|---|---|---|---|
| Type: **CII - CII Number** | Number: **08164041** | State: | Country: |
| Type: **AFIS - Automated Fingerprint Identification System** | Number: **C00118080** | State: | Country: |
| Type: **BN - Booking Number** | Number: **1413020** | State: | Country: |

| Attire: | Injury: | Extent of Treatment: | Violent Crime Circumstances: |
|---|---|---|---|

| LAW ENFORCEMENT OFFICER KILLED OR ASSAULTED INFORMATION | Type: | Type Activity: | Type Assignment: |
|---|---|---|---|

## IBR/UCR OFFENSE/S

| Offense Description: **920000 - ZZ - DEATH** | Level: **O** | Against: | Completed? **Yes** | Counts | Using: |
|---|---|---|---|---|---|
| Location Type: **15 - Jail/Prison** | Hate/Bias: **88 - None (No Bias)** | | | Domestic Violence: **No** | |
| Criminal Activity: | Type Security: | Gang Related: | Entry: | Point of Entry: | |
| Weapons/Force: | Tools: | Targets: | | | |

| Reporting Officer **SH4706 - EDGE, NOLAN** | Division / Organization **San Diego Central Jail** | Reviewed By **SH4202 - KAMOSS, KARL** |
|---|---|---|
| Report Date **2/23/2014 6:27:46 AM** | Detective Assigned **SH1881 - CARRILLO, PETE** | Reviewed Date **02/25/2014 17:38:07** |
| NetRMS_CASDCR.rtf v11-15-06 | Printed By SH1881 | |

COSD RRFP 000211

Exhibit 14
189



### San Diego County Sheriff's Department
### Crime/Incident Report

| CAD Event No.: | E1465588 | Case No. | 14109768 | **2** |
|---|---|---|---|---|
| Primary Victim: | Sandoval, Ronnie Paul | Report No. | 14109768.1 | Page 2 of 4 |

| **ARRESTEE/S** |
|---|
| **SUSPECT/S (Not Yet Arrested)** |
| **WITNESSES** |
| **OTHER ENTITIES** |
| **PROPERTY** |
| **REPORT NARRATIVE** |

**SYNOPSIS:**
I responded to Inmate Ronnie Sandoval #14713020 lying on the floor having what appeared to be a seizure inside of Waiting Room #1, located on the 2nd Floor, at the San Diego Central Jail (SDCJ). I entered the cell to assist SDCJ medical staff with first aid. EMTs responded to SDCJ and escorted to the 2nd Floor. Sandoval's condition was not improving, paramedics were called to respond. Shortly after paramedics arrived, Sandoval stopped breathing and had no pulse. Paramedics administered C.P.R. on Sandoval. At 0211 hours, Sandoval was pronounced dead by Dr. Hwang from Scripps La Jolla. Sheriff's Homicide, Division of Inspectional Services (DIS), and the Crime Lab responded to SDCJ to conduct their investigation.

**ORIGIN:**
On the morning of 02-24-2014, at approximately 0055 hours, I was assigned as the Search/Medical Screening Deputy at SDCJ when I was asked by Sergeant Shawcroft #5213 to meet him at Waiting Room #1 and assist him with an inmate having a seizure.

**BACKGROUND:**
Ronnie Sandoval was arrested on 02/21/14 at 1149 hours for 11377(A) HS- possession of a controlled substance and 11364 HS- possession of drug paraphernalia. He arrived at SDCJ, at approximately 1424 hours. Sandoval went through the initial medical screening with no medical problems noted.

At approximately 1530 hours, Sandoval was examined a second time by a nurse on the 1st Floor. At approximately 1700 hours, Sandoval was escorted to the 2nd Floor via the inmate elevators and placed into Waiting Room #1 for further medical observation. See attached Deputy's report by Deputy Chavez #1147 for further details.

**INVESTIGATION:**
I opened the door to Waiting Room #1 and entered the cell. I saw Sandoval lying down on his right side in the corner of the cell near the door with his head underneath the bench. Sergeant Shawcroft informed me that Sandoval had hit his head on the wall as he fell to the floor from the bench.

I placed my right hand on Sandoval's left arm and gently shook his arm while calling his name in an attempt to see if Sandoval was responsive. Sandoval's left arm was shaking and his muscles were tense. Sandoval was breathing hard and spitting on the floor. At approximately 0056 hours, Nurse Harris #5055 placed an oxygen mask on Sandoval's face and asked me to hold it in place. I held the oxygen in place with my left hand. Nurse Harris applied a cuff on Sandoval's right arm in order to take his blood pressure. An O2 sensor was placed on Sandoval's right hand to monitor his oxygen level. I continued to call

| Reporting Officer<br>**SH4706 - EDGE, NOLAN** | Division / Organization<br>**San Diego Central Jail** | Reviewed By<br>**SH4202 - KAMOSS, KARL** |
|---|---|---|
| Report Date<br>**2/23/2014 6:27:46 AM** | Detective Assigned<br>**SH1881 - CARRILLO, PETE** | Reviewed Date<br>**02/25/2014 17:38:07** |
| NetRMS_CASDCR.rtf v11-15-06 | Printed By SH1881 | |

COSD RRTP 000212

Exhibit 14
190



## San Diego County Sheriff's Department
## Crime/Incident Report

| | | | | |
|---|---|---|---|---|
| CAD Event No.: | E1465588 | Case No. | 14109768 | **3** |
| Primary Victim: | Sandoval, Ronnie Paul | Report No. | 14109768.1 | Page 3 of 4 |

Sandoval's name in an attempt to get a response. Sandoval would periodically open his eyes for a second, but he would never respond to me.

At approximately 0101 hours, Deputy Andrade #0137, Corporal Fox #5868, and Deputy Sobaszek #3209 entered the cell to assist with administering first aid. I informed the responding deputies about Sandoval's situation. Due to the nature of Sandoval's fall it was determined that a C-Spine collar be placed on his neck to prevent any further injury to Sandoval's head, neck, and spine. Keeping Sandoval's head and neck immobile we slid him into the middle of the cell to allow more space to be available to continue with first aid. At approximately 0102 hours, Nurse Llamado #6492 entered the cell and handed the C-Spine collar, (Orthopedic medical device to support the neck), to Deputy Andrade. Deputy Andrade and I placed the C-Spine collar on Sandoval's neck. At approximately 0105 hours, EMT personnel were called per Nurse Harris.

At approximately 0106 hours, Nurse Harris applied a nasopharyngeal airway, (A medical appliance tube that opens the airway), to assist with keeping Sandoval's airway open. To further assist with keeping Sandoval's airway clear, Deputies Johnson #4983 and Valbuena #3296 went up to the 3rd Floor and brought back an "Easy-Go-Vac" to suction out any fluids in Sandoval's mouth to keep his airway clear. At approximately 0110 hours, suction was applied to Sandoval's nasal and throat.

Sandoval's breathing became shallow and his pupils did not react to light. Deputy Andrade applied a bag valve mask, (A medical device to provide positive pressure ventilation), to assist Sandoval with breathing. At approximately 0112 hours, Registered Charge Nurse Bautista #9226 entered the cell. Nurse Bautista monitored Sandoval and applied an oropharyngeal airway, (A medical device preventing the tongue from covering the epiglottis). Sandoval still had a gag reflex and started vomiting. RN Bautista removed the oropharyngeal airway from Sandoval's mouth. Sandoval was turned to his right side and suction was applied to remove the secretions in his mouth. Nurse Bautista established an IV in Sandoval's right arm. Leg and waist chains were placed onto Sandoval to prepare him for transport. Deputy Andrade suggested assistance from paramedics due to Sandoval's current condition. Medical staff continued to monitor Sandoval's vital signs.

At approximately 0120, American Medical Response EMTs arrived at the cell. <u>The EMTs informed us that they will assist with first aid but they would not be able to transport Sandoval in the current condition he was in.</u> At that time paramedics were called to respond. EMT Trunick entered the cell and took over ventilating Sandoval with the bag valve mask. Sandoval was placed on a backboard to keep him immobile and to prepare him for transport. At approximately 0136 hours, EMT Trunick informed medical staff that he could still feel a pulse.

At approximately 0142 hours, San Diego Fire Department Engine 201, and Medic 11 arrived at the scene. The paramedics began to asses Sandoval and secure him to the backboard.
As the paramedics were about to tape down and secure Sandoval's head to the backboard they noticed Sandoval had stopped breathing and had no pulse. The paramedics removed Sandoval from the cell, placed him onto a medical gurney, and at approximately 0148 hours CPR was started. At approximately 0201 hours, Deputy Andrade secured the door to Waiting Room 1.

| Reporting Officer | Division / Organization | Reviewed By |
|---|---|---|
| **SH4706 - EDGE, NOLAN** | **San Diego Central Jail** | **SH4202 - KAMOSS, KARL** |
| Report Date | Detective Assigned | Reviewed Date |
| **2/23/2014 6:27:46 AM** | **SH1881 - CARRILLO, PETE** | **02/25/2014 17:38:07** |

| | | |
|---|---|---|
| NetRMS_CASDCR.rtf v11-15-08 | Printed By SH1881 | COSD RRTP 000213 |

Exhibit 14
191



| | San Diego County Sheriff's Department Crime/Incident Report | | **4** |
|---|---|---|---|
| CAD Event No.: **E1465588** | | Case No. **14109768** | |
| Primary Victim: **Sandoval, Ronnie Paul** | | Report No. **14109768.1** | Page 4 of 4 |

At approximately 0211 hours, Sandoval was pronounced dead by Dr. Hwang from Scripps La Jolla. Sandoval was taken off of the gurney and placed on the floor outside of Waiting Room 1.

At approximately 0455 hours, Homicide, Crime Lab, and DIS began a de-brief with Corporal Fox, Deputy Andrade, and I. A timeline of the events is attached to the report.


EVIDENCE:
Collected by the Homicide Division.

INJURIES:
See Medical Examiner's report.

PROPERTY DAMAGE:
None.

FOLLOW UP:
The Homicide Division will conduct the follow up investigation.


RELATED REPORTS:
Deputy's Reports by: Sergeant Shawcroft 5213, Chavez 1147, Powell 7307, Bohannan 0632, Bryan 2880, Johnson 4983, Sobaszek 3209, Valbuena 3296, Andrade 0137, Fox 5868, McKinney 5731, Richards 7594

| Reporting Officer **SH4706 - EDGE, NOLAN** | Division / Organization **San Diego Central Jail** | Reviewed By **SH4202 - KAMOSS, KARL** |
|---|---|---|
| Report Date **2/23/2014 6:27:46 AM** | Detective Assigned **SH1881 - CARRILLO, PETE** | Reviewed Date **02/25/2014 17:38:07** |
| NetRMS_CASDCR.rtf v11-1s-06 | Printed By SH1881 | |

COSD RRFP 000214

Exhibit 14
192

# EXHIBIT 15

Exhibit 15
193

## Comprehensive Report

**SDMSE**
1010 2nd Ave
San Diego, CA 92101

Incident Date: 02/23/2014                QA Net #: 4739693                                Patient Care #: 4739693
                                                                                          Life Threat: Mild

### Patient Information

**Name:** sandoval, ronnie

**Age:** 46 Years                    **D.O.B:** 09/30/1967 (mm/dd/yyyy)
**Gender:** M                        **SSN:**
**Address:** prisoner               **Weight:** 113.000 KG / LB        **Race:**
san diego, ca 92101                 **Phone:**                        **Ethnicity:**

| Call Type and Location | Call Disposition | Response Times and Mileage | | |
|---|---|---|---|---|
| **911 Caller:** EMERGENCY | **Disposition:** Dead at Scene | **1st Resp. Arr.:** | | |
| **Call Type:** Seizure/Convulsions | **Resp. Mode:** | **PSAP:** 01:30 | **Incident #:** FS14021816 | |
| **Resp. Mode:** | **Destination:** | **Disp. Notified:** 01:30 | | |
| **Urgency:** | **Diverted From:** | **Unit Disp.:** 01:30 | | |
| **Response:** | | **Enroute:** 01:32 | **Start Miles:** | |
| **Location:** Other Location | | **At Scene:** 01:32 | **Scene Miles:** 0.0 | **To Scene:** |
| **Address:** 1173 Front St | | **At Patient:** | | |
| SAN DIEGO, , CA92101 | | **Depart:** | | |
| **Zone:** San Diego | | **Arrive Dest:** | **Dest. Miles:** 0.0 | **To Dest:** |
| | | **In Service:** 02:38 | | |
| | | **In Quarters:** | **End Miles:** | **To End:** |
| | | **Cancelled:** | | |
| | | **Mutual Aid Number:** E201 | | |
| | | **Veh. #:** E201 | | |
| | | **Veh. Type:** | | |
| | | **Primary Role:** | | |

### Call Information

**Destination Name:**                              **Response Request:**
**Destination Type:**                              **Response Disposition:** Dead at Scene
**Lights Sirens To Scene:**
**Vehicle Type:**                                  **Lights Sirens From Scene:**

**Factors Affecting Response**

### Medicare Questionnaire

**Reason for Ambulance Transport:**
**Treatment/Procedure Not Available**
**at Sending Facility:**

### Patient Condition

**Provider Impression:**
**Chief Complaint:** Cardiac Arrest X
**Onset Date/Time:** 02/23/2014 at 00:00
**Alcohol/Drug Use:** Alcohol and/or Drug Paraphernalia at Scene
**Injury Intent:**
**Cause of Injury:**
**Dispatch Reason:** Seizure/Convulsions

**Primary Symptom**

CardioRespiratory Arrest

**Other Associated Symptoms**

### Assessment Exam

**Time of Assessment:** 2014-02-23T02:49:22-06:00
Abdomen-left-lower:
Abdomen-left-upper:
Abdomen-right-lower:
Abdomen-right-upper:
Back-cervical:
Back-lumbar:

Inc. Date: 02/23/2014        Patient Name: sandoval, ronnie        SDMSE        Page: 1
Incident #: FS14021816       QA Net #: E20122314013658565          Date Printed: 08/03/2016 17:16

Exhibit 15
194

Back-thoracic:

Chest:

Ext-left-low:

Ext-left-up:

Ext-right-low:

Ext-right-up:

Eyes-left: Fixed/Non-Reactive

Eyes-right: Fixed/Non-Reactive

GU:

Head:

Heart:

Mental: Unresponsive

Neck:

Neuro:

Skin: Pale, Dry

## Injury Details

## Narrative

**Summary of Events**

I: 46 Year Old Male found in Supine position.C: Cardiac Arrest – H: Pt prisoner in jail, booked approx 14:00hrs for drug charges. Pt had meth in possession & assumed to be using. Approx 00:45hrs pt seen to b slumped forward on bench with arms behind body. Pt witnessed to fall forward striking head on ground. Per Jail medical staff pt seen to have "tremor like shakes" for approx 15mins. After episode pt able to answer questions but appeared "sluggish & dazed".Staff state pt "desated" & given O2, sat increased. Staff state "vitals stable" but no numbers given to fire. Staff placed 20g IV in R AC, 1000 NS TKO. AMR BLS 50 called to Tx pt to ER. UOA pt on back board w/ no straps, c-collar in place. Nasal airway inserted & pt being ventilated w/ BVM & O2. Unknown who placed collar, airway & initiated BVM.

BLS crew Trunick I19248 & Campos I21305A: Medical Assessment:

@ 2/23/14 02:49

Skin: Dry, Pale

Eyes-Left: Fixed/Non-Reactive

Eyes-Right: Fixed/Non-Reactive

Mental Status: Unresponsive

Pt in cell on back board w/ AMR BLS 50 "assisting ventilatons" IV pulled out & bleeding, direct pressure being held PTOA.

Pt pulseless w/ agonal respirations.

No obvious signs of trauma.

R: As noted

ET tube attempted unsuccessfully by M11 PM Westbrook. King airway then placed by M11 PM. Unable to document M11 crew on ePCR. Documented as FF/PM White. White did not place airways.T: BH contact made. Pt pronounced by MD Hwang @ 02:11hrs. Sherrif on scene assume care of pt.

## Patient Vitals

| Time | B/P | Pulse | Rhythm | Resp. | Effort | SpO2 | SpO2 Qual. | EtCO2 | GCS | Pain | Stroke Scl | PTA | B.G. | RTS | Limb | Patient Position |
|------|-----|-------|--------|-------|--------|------|-----------|-------|-----|------|-----------|-----|------|-----|------|-----------------|
| 01:49 | | 0 | | 0 | | | | Look In Narr. | | | | | | | | Supine |
| 01:51 | | | | 0 | | | | 0 | | | | | | | | |
| 01:52 | | | | | | | | 23 | | | | | | | | |
| 01:56 | | | | 0 | | | | 0 | | | | | | | | |
| 02:02 | | | | | | | | Look In Narr. | 3 | | | | | | | |
| 02:04 | | 0 | | 0 | | | | 12 | | | | | | | | |
| 02:06 | | | | 10 | | | | 24 | | | | | | | | |
| 02:11 | | | | 8 | | | | 21 | | | | | | | | |

**Glasgow Coma Score**

| Date/Time | Glasgow Eye Opening | Glasgow Verbal | Glasgow Motor | Glasgow Coma Score |
|-----------|--------------------|----------------|----------------|--------------------|
| 01:49 | | | | |
| 01:51 | | | | |
| 01:52 | | | | |
| 01:56 | | | | |
| 02:02 | 1 | 1 | 1 | 3 |
| 02:04 | | | | |
| 02:06 | | | | |
| 02:11 | | | | |

## ECG Monitor

| Time | ECG Type | ECG Lead | ECG Interpretation | ECG Ectopy | Cause For Change | Capture |
|------|----------|----------|-------------------|-----------|------------------|---------|
| 01:53 | ECG-Monitor | | Pulseless Electrical Activity - PEA | | | |

| 01:56 | ECG-Monitor | | Asytole | | | | | | | |
| 01:58 | ECG-Monitor | | Asytole | | | | | | | |
| 02:03 | ECG-Monitor | III | Asytole | | | No Ectopy Noted | | | | |
| 02:08 | ECG-Monitor | | Asytole | | | | | | | |
| 02:13 | ECG-Monitor | | Asytole | | | | | | | |

## Procedures and Treatments

| Time | Crew | Name | Location | Size of Equipment | Attempts | Response | Success | Comments |
|------|------|------|----------|-------------------|----------|----------|---------|----------|
| 01:50 | GE | CPR -Cardiopulmonary Resuscitation | | | 1 | | | |
| 01:51 | JA | Airway - BVM | | | 1 | | | |
| 01:52 | CW | Airway-EtO2 Monitoring | | | 1 | | | |
| 01:55 | CW | Venous Access-I O Adult | Tibia IO-Left | | 1 | Unchanged | Yes | |
| 01:59 | CW | Airway - Endotracheal Intubation | | | 1 | Unchanged | No | |
| 02:01 | CW | ALS Assessment | | | 1 | | | |
| 02:02 | CW | Airway - King | | Red | 1 | Unchanged | Yes | |

## Intubation Confirmation - Initial/Final

| Time | ETCO2 Prior to | Size | Depth | Lung Sounds | ETCO2 | Abdomen Sound | Dr/RN Verifying | Secured By |
|------|----------------|------|-------|-------------|-------|---------------|-----------------|------------|
| 01:59 | | | | | | | | |
| 02:02 | | 53 Red mm | 21 cm | L-Present/ R-Present | 45.00 Silent | | | |

## Medication Administered

| Time | Crew | Medication | Route | Dosage | Response | PTA | Comments |
|------|------|------------|-------|--------|----------|-----|----------|
| 01:51 | BF | Oxygen by Positive Pressure Device | | 15 LPM | | | |
| 01:56 | CW | Epinephrine 1:10,000 | Intravenous | 1 MG | Unchanged | | |
| 01:58 | CW | Epinephrine 1:10,000 | Intravenous | 1 MG | Unchanged | | |
| 02:04 | CW | Epinephrine 1:10,000 | Intravenous | 1 MG | Unchanged | | |
| 02:08 | CW | Epinephrine 1:10,000 | Intravenous | 1 MG | Unchanged | | |

## Prior Aid

| Prior Aid | | Performed By | Outcome |
|-----------|--|--------------|---------|

## Past Medical History

| MEDICATION ALLERGIES | Generic Name | Description |
|----------------------|--------------|-------------|

| Patient Medications | Generic Name | Dosage |
|---------------------|--------------|--------|

**Medical Surgery History**

Unable to Obtain PMH

| History Primarily Obtained From | Pregnancy | Advanced Directives | Practitioner Name |
|---------------------------------|-----------|---------------------|-------------------|
| Health Care Personnel | | | |

## Vehicular Information

**Vehicular Injury Indicators:**

**Area of Vehicle Impacted:**

**Seat Row Location of Patient:** 0          **Position of Patient:**

**Airbag Deployment:**

## Safety Equipment Used

## Unit Personnel

| Crew Member | Crew Member Level | Crew Member Role |
|-------------|-------------------|------------------|
| Fox, Brian | EMT-Basic | First Responder |
| Atkinson, Jonathan | EMT-Basic | First Responder |
| White, Chris | EMT-Paramedic | Secondary Patient Caregiver |
| Econie, Greg | EMT-Basic | First Responder |

Inc. Date: 02/23/2014          Patient Name:sandoval, ronnie          SDMSE          Page: 3
Incident #: FS14021816          QA Net #: E20122314013658565 Exhibit 15          Date Printed: 08/03/2016 17:16

196

| Hospital/Receiving Agent Signature |
|---|

Hospital/Receiving Agent

Receiving Facility Signature: The above-named patient, &PN was received by this facility at the date and time indicated above.

| I Agree | I Disagree | Not Applicable |
|---|---|---|

Signature

$$1144$$

Printed Name   1144                                        Date    02/23/2014 03:02

| Technician |
|---|

Technician

I acknowledge that the above assessments/treatments were provided for this patient.

| I Agree | I Disagree | Not Applicable |
|---|---|---|

Signature

Printed Name   White, Chris                               Date    02/23/2014

Reason Pt. Unable to Sign

Patient Consent Form

Billing Authorization

Accept Treatment and Transport I &PN the undersigned, hereby authorize all benefits to be made payable directly to Rural/Metro Ambulance. If I have Medicare, I permit a copy of this authorization to be used in place of the original, and request that payment of authorized Medicare benefits be made on my behalf to Rural/Metro for any ambulance services provided to me by Rural/Metro Ambulance. I authorize any holder of medical information or documentation about me to release to the Centers for Medicare and Medicaid Services and its agents and carriers, as well as to Rural/Metro Ambulance, any information or documentation needed to determine these benefits payable for related services or any services provided to me by Rural/Metro Ambulance now or in the future. I hereby approve release of information including diagnosis, to Rural/Metro Ambulance, from any hospital, doctor, or other heath care provider, for claims of insurance benefits. I authorize any holder of medical information or documentation about me to release it to the Medical Director of Rural/Metro Ambulance or their authorized agent for purposes of quality assurance or research. I understand I am financially responsible to Rural/Metro Ambulance for charges not covered by this authorization or denied by insurance carrier and do hereby guarantee payment in full of this bill. I have been advised that this transport may be deemed not medically necessary and I accept responsibility for payment. I have been advised that I may be responsible for any unpaid portion of these charges not covered by Medicare, Medicaid, or other insurance. I further agree that if collection is made by suit or otherwise, I agree to pay all collection costs including reasonable attorney's fees. I also acknowledge that I have been provided with a copy of Rural/Metro Corporation's Notice of Privacy Practices. Rural/Metro Billing Authorization and Privacy Acknowledgment Form I request that payment of authorized Medicare, Medicaid, or any other insurance benefits be made on my behalf to Rural/Metro Ambulance ('Rural/Metro') for any services provided to me by Rural/Metro now or in the future. I understand that I am financially responsible for the services provided to me by Rural/Metro, regardless of my insurance coverage, and in some cases, may be responsible for an amount in addition to that which was paid by my insurance. I agree to immediately remit to Rural/Metro any payments that I receive directly from insurance or any source whatsoever for the services provided to me and I assign all rights to such payments to Rural/Metro. I authorize Rural/Metro to appeal payment denials or other adverse decisions on my behalf without further authorization. I authorize and direct any holder of medical information or documentation about me to release such information to Rural/Metro and its billing agents, and/or the Centers for Medicare and Medicaid Services and its carriers and agents, and/or any other payers or insurers as may be necessary to determine these or other benefits payable for any services provided to me by Rural/Metro, now or in the future. A copy of this form is valid as an original. Privacy Practices Acknowledgment: by signing below, I acknowledge that I have received Rural/Metro's Notice of Privacy Practices. I agree, in order for you to service my account or to collect any amounts I may owe, you may contact me by telephone at any telephone number associated with my account, or telephone numbers found from other sources, including wireless telephone numbers, which could result in charges to me. You may also contact me by sending text messages or emails, using any email address I provide. Methods of contact may include using prerecorded or artificial voice messages and/or use of an automatic telephone dialing system or other dialing device, as applicable.

**I Agree**      I Disagree      Not Applicable

Signature

1144

Printed Name   ronnie sandoval                    Date   02/23/2014

Valuables

Valuables:

# EXHIBIT 16

Exhibit 16
199

March 28, 2017


Attorney Christopher Morris

Morris Law Firm, APC
401 West A Street, Suite 1820
San Diego, CA 92101

Re: Ronnie Paul Sandoval, Jr.

Dear Mr. Morris,


Thank you for the opportunity to review the records on the above mentioned individual.

I have reviewed the following records for Ronnie Paul Sandoval, Jr.:

- First Amended Complaint
- Complete Death Investigation Report
- Deposition of Nurse DeGuzman
- Deposition of Nurse Harris
- Deposition of Nurse Llamado
- Deposition of Nurse Bautista
- Deposition of Deputy Andrade


<u>Case Summary</u>

On February 22, 2014, Mr. Ronnie Paul Sandoval Jr. was arrested for possession of a controlled substance and taken to the San Diego Central Jail. During the intake process around 1:00 p.m. it was noted that Mr. Sandoval was "extremely sweaty and appears to be slightly disoriented." At this time Mr. Sandoval was taken to see a nurse who performed a blood glucose test that was reported as normal yet no actual result was documented. At 3:40 p.m. Mr. Sandoval was taken for fingerprints and at 3:44 p.m. he was noted to be still sweaty and shaking. At approximately 4:40 p.m.

Exhibit 16
200

Mr. Sandoval was having his photograph taken by Deputy Chavez who noted that
Mr. Sandoval was "still sweating a lot and appeared to be very tired and disoriented."
At this point, Deputy Chavez took Mr. Sandoval to the Medical Observation Unit
(MOU) for "further medical observation." He was seen by Nurse DeGuzman who
took his blood sugar again. Not once during this entire process was Mr. Sandoval
taken to have a medical screening exam by a physician. Mr. Sandoval was placed
in Medical Waiting Room cell #1 where he sat for over eight hours without any
assessment or medical attention.

At approximately 12:41 a.m. on February 23, 2014, per officers reports Mr.
Sandoval was seen having a seizure and hit his head. No one entered his cell at this
time. At 12:52 a.m. a nurse checks on him and one minute later at 12:53, the cell
door was opened. At this time two nurses and two officers enter Mr. Sandoval's cell
and find him on the floor unresponsive. A call was placed for Emergency Medical
Technicians (EMT) at 1:03 a.m., ten minutes after nurses had entered his cell, and
twenty-two minutes after he was witnessed having a seizure. Multiple sources have
testified to the fact that more than one person with medical training who was present
during this situation recommended calling paramedics as opposed to EMT. The
EMT arrived at approximately 1:20 a.m. and only after the EMT reported that they
could not transport Mr. Sandoval in his current condition were paramedics called.
Paramedics arrived at approximately 1:48 a.m.  The paramedics moved Mr.
Sandoval onto their stretcher and at that point Mr. Sandoval stopped breathing and
lost his pulse. The paramedics performed CPR which was unsuccessful and Mr.
Sandoval was pronounced dead at approximately 2:11a.m.

Exhibit 16
201

## Experience

As a board certified Emergency Medicine physician I have taken care of countless patients with overdoses of varying substances over my thirteen-year career including residency training. I did my residency training at the University of Florida – Shands Jacksonville and received considerable training on the diagnosis and management of acute toxicological emergencies. This included an entire month rotation on toxicology which included in depth study of toxidromes and management of acute ingestions.

If a patient such as Mr. Sandoval had presented to the emergency department with any of the symptoms described throughout the records, a thorough evaluation would have been conducted. This evaluation would include a full set of vital signs along with a thorough history and physical exam to evaluate for any signs or symptoms of an acute ingestion. The work-up for a patient such as this that is experiencing symptoms such as diaphoresis and disorientation would include an electrocardiogram (EKG) to look for arrhythmias caused by certain toxic ingestions. The work-up would also include laboratory testing consisting of a minimum of a complete blood count (CBC), complete metabolic panel (CMP), alcohol level, osmolality to look for methanol or ethylene glycol ingestion, salicylate level, acetaminophen level, urinalysis and urine drug screen. His evaluation would also include a significant period of close monitoring including being on a continuous cardiac and pulse oximetry monitor.

## Treatment

Treatment for most acute toxic ingestions and overdoses is mostly supportive. This includes maintaining intravenous access in case the patient requires an acute

Exhibit 16
202

intervention as well as administering medications to treat many of the symptoms that are caused by toxic ingestions. A patient should not be medically cleared until all symptoms have resolved and vital signs are normalized.

Seizures can happen with many different toxic ingestions and these seizures associated with possible ingestion are treated with appropriate pharmacologic intervention. Seizures can take on many forms ranging from absence seizures to subtle focal motor seizures all the way to full tonic-clonic seizures. In the setting of a possible ingestion, these seizures need to be treated appropriately for the safety of the patient. Usually the first line treatment for seizures includes benzodiazepines such as Ativan or Valium. If these are ineffective, an anti-convulsant medication such as Dilantin or Fosphenytoin may be used. During this entire time, it is paramount that the patient's airway be monitored closely as patients may choke on saliva or even choke on their own tongue. For refractory seizures, it sometimes may become necessary to intervene to protect a patient's airway and paralyze them with continuous electroencephalography (EEG). With regards to treating a methamphetamine specific overdose, the same principles hold true. The mainstay of therapy is supportive care including close monitoring on a cardiac monitor and frequent re-evaluation of the patient's airway. To the best of my knowledge, I have not treated a patient who had ingested methamphetamine who later died as a direct result of the methamphetamine.

### Opinions

The standard of care when dealing with a patient who may have taken any type of controlled substance dictates a proper and thorough medical screening exam to be performed to ensure that this patient is safe from a medical standpoint. The standard of care when evaluating a patient with a possible toxic ingestion of any kind requires

Exhibit 16
203

a complete and thorough medical screening exam to evaluate for severity of toxicity and to prevent complications from an overdose. With appropriate intervention, the vast methamphetamine majority of overdoses can be managed medically to prevent death.

There were many breaches in the standard of care regarding Mr. Sandoval's case. The first breach in the standard of care was the failure of the San Diego Central Jail to provide a proper and thorough medical screening exam for a person who exhibited signs of acute toxicity being his diaphoresis and disorientation. At this point, Mr. Sandoval should have been taken to the nearest emergency department for a thorough medical evaluation to ensure that he was safe from a medical standpoint. The standard of care was also breached by San Diego Central Jail by failing to monitor and/or provide continual medical evaluation of Mr. Sandoval during the eight hours from when he was placed into a holding cell until he had a seizure. Mr. Sandoval should have had a nurse assigned to his cell who would provide consistent and appropriate re-evaluations of Mr. Sandoval once staff was informed Mr. Sandoval was being pulled out of line because he was diaphoretic and disoriented. Had these serial examinations been conducted and documented more likely than not they would have shown a deterioration in Mr. Sandoval's condition requiring medical evaluation and intervention.

Another breach in the standard of care was the failure of Nurse Harris to call 9-1-1 instead of EMT immediately upon her notification that Mr. Sandoval was having a seizure. This failure to call the appropriate medical service resulted in a significant delay in the diagnosis and treatment of Mr. Sandoval's life threatening condition and eventual death. Had paramedics been called immediately upon learning that Mr. Sandoval was suffering from a seizure and hit head he would have received life

Exhibit 16
204

saving measures and been transported to an emergency department capable of treating his symptoms and more likely than not prevented Mr. Sandoval's untimely death.

It is my opinion that there were multiple opportunities for the staff at Central Jail to get Mr. Sandoval appropriate medical attention. If Mr. Sandoval had been taken to an emergency department at any time during the time he was in Central Jail up to the time that he lost pulses and went into cardiac arrest, more likely than not his life would have been able to be saved by appropriate medical interventions.

The above opinions are given to a reasonable degree of medical certainty, based on information furnished to me in this case. I reserve the right to amend any opinion set forth in this report based on any new or additional information received.

_____          3/28/2017
                                          _____
Michael Falgiani, MD, MBA, FACEP                    Date

Exhibit 16
205

# EXHIBIT 17

Exhibit 17
206

Vincent Renda, Esq., SBN 213985
RENDA LAW OFFICES
600 West Broadway, Suite 400
San Diego, CA 92101
Telephone: (619) 819-0011
Facsimile: (619) 819-0012

Christopher S. Morris, Esq., SBN 163188
Danielle R. Pena, Esq., SBN 286002
MORRIS LAW FIRM, APC
401 West A Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 826-8060
Facsimile: (619) 826-8065

Attorneys for PLAINTIFFS

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN DIEGO – CENTRAL HALL OF JUSTICE

| | |
|---|---|
| ESTATE OF RONNIE PAUL SANDOVAL and ANA SANDOVAL, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF SAN DIEGO, a Public entity; SAN DIEGO COUNTY JAIL, a Public Entity, and DOES 1 through 100;<br><br>Defendants. | Case No. 37-2014-00033347-CU-PO-CTL [Hon. Joan M. Lewis, Dept. C-65]<br><br>**FIRST AMENDED COMPLAINT**<br><br>*IMAGED FILE* |

Plaintiff, ANA SANDOVAL, individually and as successor in interest to RONNIE SANDOVAL, RONNIE SANDOVAL, JR., individually, and JOSIAH SANDOVAL, individually, are informed and believe, and based upon such information and belief allege the following:

## PARTIES

1.    Plaintiff, ANA SANDOVAL, individually and as successor in interest to RONNIE SANDOVAL, RONNIE SANDOVAL, JR., individually, and JOSIAH SANDOVAL, individually, are to be collectively referred to herein as "Plaintiffs."

2.    At all times relevant hereto, Plaintiff Ana Sandoval is and was a resident of San Diego County.

3.    At all times relevant hereto, Ronnie Sandoval, Jr. and Josiah Sandoval were

1

Exhibit 17
207

1    residents of San Diego County.   At the time of this Complaint, Ronnie Sandoval, Jr. is
2    approximately thirty (30) years old residing in San Diego County; and Josiah Sandoval is
3    approximately seventeen (17) years old residing in Riverside County, California.

4        4.    Pursuant to CCP § 372, if this Court deems it appropriate, Josiah Sandoval, requests
5    he be appointed a *guardian ad litem* for the purposes of pursuing this litigation.

6        5.    Defendant, County of San Diego, ("County") at all times mentioned herein, is a
7    public entity authorized by law to establish certain departments responsible for enforcing the laws
8    and protecting the welfare of the citizens of San Diego County. At all times mentioned herein,
9    Defendant County is responsible for overseeing the operation, management, and supervision of the
10   San Diego Central Jail ("Central"), as well as its Corrections Officers and Medical Staff.

11       6.    At all times relevant hereto, Defendant County of San Diego is a public entity in
12   San Diego, California. It is a government agency duly organized and existing under the laws of the
13   State of California operating and doing business in the City of San Diego.

14       7.    With certain exceptions, none of which apply herein, public entities and public
15   employees are liable for their torts to the same extent as private parties.  Moreover, nothing in this
16   immunity exonerates a public employee from liability for injury proximately caused by his or her
17   own negligent or wrongful acts or omissions. (*Gov. Code*, §§ 820 subd. (a), 820.8, 815.2, subd.
18   (a)). Moreover, pursuant to *Government Code Sections §§ 815.4, 815.2(a)* public entities are
19   vicariously liable for tortious acts or omission of an independent contractor or employee,
20   respectively.

21       8.    The true names and capacities of Defendants sued herein under section 474 of the
22   Code of Civil Procedure as DOES 1 through 100, inclusive, and each of them, is unknown to
23   Plaintiffs, who therefore sue said Defendants by such fictitious names. Plaintiffs will seek to amend
24   this complaint to set forth the true names and capacities of said fictitiously named Defendants when
25   the names and capacities of said fictitiously named Defendants have been fully ascertained.  Each
26   of the fictitiously named Defendants are responsible in some manner for the events and occurrences
27   herein alleged, and Plaintiffs' damages, as herein alleged, were directly and proximately caused by
28   the conduct, acts, and/or omissions of said Defendants

2

FIRST AMENDED COMPLAINT

Exhibit 17
208

1    9.    At all times relevant hereto, each Defendant was the agent or employee of each co-

2  defendant and, in doing the things alleged herein, was acting within the scope of his/her/its authority

3  as agent or employee and with the permission of each co-defendant.

4                                **JURISDICTION AND VENUE**

5    10.    This Court has jurisdiction over all causes of action asserted in this Complaint

6  pursuant to the California Constitution, Article VI, Section 10 because this case is a cause not given

7  by statute to other trial courts. The claims asserted herein arise under California law.

8    11.    This action is properly filed in this Court because the facts giving rise to Plaintiffs'

9  claims occurred in the County of San Diego, State of California and because all parties live in the

10  County of San Diego.

11    12.    On or about July 7, 2014, the Plaintiffs presented to County of San Diego's Office

12  of County Counsel via US postal mail a 20-page Notice of Claim letter which included: (1) CD1

13  (Rev. 6/11) Claim Form; (2) a copy of San Diego County Sheriff's Department Public Records

14  Request – Victim Copy: 14109768; (3) a copy of the County of San Diego Office of the Medical

15  Examiner's Toxicology Report: Med. Exam No.: 14-00466; (4) a copy of the County of San Diego

16  Office of the Medical Examiner's Investigative Report: Case No.: 14-00466; and (5) a copy of the

17  County of San Diego Office of the Medical Examiner's Autopsy Report: ME#.: 14-00466

18  (collectively "Claim"), for the injuries, losses, and damages suffered and incurred by the Plaintiffs

19  by reason of the above-described occurrence, all in compliance with the California Torts Claims

20  Act.

21    13.    On or about July 28, 2014, The County of San Diego's Office of County Counsel

22  Claims and Investigation Division sent a letter of acknowledgement to counsel for Plaintiff Ana

23  Sandoval, confirming receipt of the Claim, identified the County File No. as: 140232 and informed

24  the Plaintiffs' counsel that the Claim was under investigation. ("Confirmation Letter").

25    14.    On or about August 2014, the County of San Diego sent the Plaintiffs' counsel a

26  letter rejecting the Claim in its entirety ("Rejection Letter").

27  / / /

28

3

FIRST AMENDED COMPLAINT

Exhibit 17
209

**FACTS RELEVANT TO ALL COUNTS**

15.     On or about February 22, 2014 at approximately 11:45 a.m., Ronnie Paul Sandoval's (herein "Sandoval") house was searched pursuant to a probation compliance check. When the sheriffs entered his home Mr. Sandoval was apparently seen trying to destroy an unknown amount of methamphetamine as he was standing inside his bathroom. Mr. Sandoval was arrested for possession of a controlled substance and for violation of his parole.

16.     At approximately 1:00 p.m. on February 22, 2014, Mr. Sandoval was taken to San Diego Central Jail (herein "Central"). During his intake process, deputies noticed Mr. Sandoval "was extremely sweaty and appeared to be slightly disoriented." (Attached hereto as Exhibit 1.) Mr. Sandoval said he was cold and not feeling well. Deputies had a nurse approach Mr. Sandoval to perform a blood sugar test. The results of the test were never documented, but the nurse stated in her report that Mr. Sandoval's sugar level was normal.

17.     At approximately 2:27 p.m. on February 22, 2014, Mr. Sandoval entered the medical pre-screen area where other inmates were present. Mr. Sandoval was escorted by a County deputy. Defendants engaged in conversation with Mr. Sandoval at that time and noticed his condition.

18.     At approximately 2:38 p.m. on February 22, 2014, Mr. Sandoval was escorted from the medical pre-screen area with a County deputy and one other inmate. At that time, Mr. Sandoval was still sweaty and shaking.

19.     At approximately 3:33 p.m. on February 22, 2014, Mr. Sandoval was searched by the County deputies along with other inmates. At 3:40 p.m. Mr. Sandoval was fingerprinted. By 3:44 p.m. Mr. Sandoval was drenched with sweat. One minute later, an officer engaged in conversation with Mr. Sandoval. And one minute after that a medical nurse approached Mr. Sandoval to engage in conversation with him.

20.     At approximately 4:40 p.m. on February 22, 2014, Mr. Sandoval enters another room and takes a seat. At that time the County is preparing to take Mr. Sandoval's booking photograph. While having his booking photograph taken Deputy Chavez stated, Mr. Sandoval "was still sweating a lot and appeared to be very tired and disoriented." (Exhibit 1.) At this point, an inmate told deputies that Mr. Sandoval was shaking violently and was losing pallor.

4

FIRST AMENDED COMPLAINT

Exhibit 17
210

21.     Around 4:47 p.m., on February 22, 2014, County deputies decided to take Mr. Sandoval to the Medical Observation Unit (Herein "MOU") for "further medical observation." (Attached hereto as Exhibit 2.) He was seen by a nurse to have his blood sugar taken again because Mr. Sandoval thought he was a diabetic. The nurse that took his blood test reviewed Mr. Sandoval's chart prior to administering the blood test. The nurse said Mr. Sandoval's chart said he was under the influence of a drug.

22.     Mr. Sandoval was placed in Medical Waiting Room cell #1 and was told by Officer Chavez "a nurse would see him as soon as possible." However, Mr. Sandoval went without any medical attention for the next eight (8) hours.  Literally no one entered the threshold of his door until nearly 1:00 a.m. on February 23, 2014, in response to his seizure.

23.     At approximately 12:32 a.m. on February 23, 2014, Mr. Sandoval is first observed by a County deputy who approaches the window of Mr. Sandoval's cell. However, Mr. Sandoval does not respond. No further action was taken.

24.     At approximately 12:41 a.m. on February 23, 2014, Mr. Sandoval falls out of frame on the video footage and, according to officers' reports, has a seizure while sitting on the bench in screening cell #1. Inexplicably, no one enters the cell for another twelve (12) minutes.

25.     Finally, at approximately 12:52 a.m. on February 23, 2014, a medical nurse walks over to Mr. Sandoval's cell and looks in on him.  One minute later a County deputy comes to the area with medical equipment.  At 12:53 a.m. the cell door is opened for the very first time since 5:01 p.m. on the previous day when Mr. Sandoval was first placed in the screening cell.

26.     At approximately 12:53 a.m. on February 23, 2014, two (2) officers and two (2) nurses enter the screening cell where they find Mr. Sandoval on the floor and non-responsive.

27.     Disregarding the County's "Code Blue" policy, approximately ten (10) minutes after the medical nurse saw Mr. Sandoval having a seizure, she called an EMT at approximately 1:03 a.m. She waited 30 more minutes until she advised her supervisor of Mr. Sandoval's condition. The nurse told her supervisor she called for an EMT. The supervisor said an EMT is insufficient and ordered she call paramedics. However, paramedics were not called until the EMTs arrived and informed medical staff they could not transport Mr. Sandoval. Paramedics did not arrive until 1:48

5

FIRST AMENDED COMPLAINT

Exhibit 17
211

1    a.m., an hour and eight minutes after Mr. Sandoval's seizure. Twelve minutes later, at 2:11 a.m.,

2    paramedics called Mr. Sandoval's time of death.

3        28.    To make matters worse, after the county called paramedics, and as Mr. Sandoval's

4    condition continued to worsen, county employees attempted to stabilize his breathing and suction

5    the foam from Mr. Sandoval's airways by applying an "Easy-Go-Vac" to clear fluid from Mr.

6    Sandoval's lungs and mouth; however, the "Easy-Go-Vac" was not working properly. (RFA, #48)

7    Within minutes, Mr. Sandoval started to lose consciousness.

8        29.    In summary, video footage shows at 5:01 p.m., on February 22, 2014, Mr. Sandoval

9    was taken to the medical screening cells and was left to languish, alone, for nearly eight (8) hours.

10   The videos painstakingly show, hour after hour after hour, no one coming to check on Mr.

11   Sandoval. He was never given food or water, he was never evaluated, medication never

12   administered, and his vitals were never taken. Mr. Sandoval was never glanced at *for the eight (8)*

13   *hours while in the medical observation cell.* In fact, the county admits that no county employee

14   entered the screening cell between the hours of 5:00 p.m. – 11:00 p.m. (RFA, #26, Exhibit 3).

15   Presumably, this is because there is a custom and practice at Central to use medical screening cell

16   #1 and #2 as overflow cells for administrative segregation, when the administrative segregation

17   cells were occupied. A nurse on call at the time of Mr. Sandoval's death said in her death

18   investigation statement,

19       "Inmate Sandoval was already in the cell when she started her shift. She was
20       not briefed by anyone as to the reason Sandoval was in the holding cell.
         Usually, during shift change, the outgoing shift endorses the incoming shift
21       with information about pending medical needs on the floor. If there is no
         endorsement, then it's presumed deputies are using the cells for "keep
22       separate" inmates."

23       30.    Moreover, some evidence indicates that unlike the medical observation bay,

24   sobering and safety cells, medical staff is under the impression that medical monitoring is not

25   required for medical screening cells #1 and #2. A nurse on shift during Mr. Sandoval's passing

26   said, "no monitoring rounds are required in the medical screening areas .... Patients could be there

27   for two days until deputies take them to general population cells." This same nurse stated it would

28   be best practice to require monitoring of medical screening areas as they do for sobering or safety

6

FIRST AMENDED COMPLAINT

Exhibit 17

212

1    cells, which requires interactive observations.

2        31.    Further, according to reports, after watching Mr. Sandoval seize for ten (10)

3    minutes, medical staff compounded their indifference by calling an EMT rather than a paramedic.

4    An EMT does not have the ability to administer medications, start intravenous lines or provide

5    advanced airway management. In fact, according to an officer's report, when the EMT arrived they

6    told Central staff they could not transport Mr. Sandoval because he was unconscious. That's when

7    medical staff called paramedics. Officers' reports indicate that at approximately 1:20 a.m., when

8    the EMT's arrived, Mr. Sandoval was still breathing on his own with his eyes open. However,

9    approximately 1:48 a.m., while paramedics were strapping Mr. Sandoval to a gurney, he stopped

10   breathing. This indifferent decision caused over an hour delay in providing adequate treatment and

11   transportation for Mr. Sandoval.

12       32.    It is clear that county employees knew Mr. Sandoval was suffering from medical

13   distress; officers admitted that in their reports, which is validated by Deputy Chavez's decision to

14   send Mr. Sandoval to the medical screening area, after a nurse's initial check when being processed.

15   Numerous deputies saw Mr. Sandoval drenched in sweat, appearing exhausted and lethargic,

16   confused, disoriented and slurring his speech. Further, someone, documented in Mr. Sandoval's

17   chart that he was under the influence of drugs but seemingly did not take any further actions to

18   monitor Mr. Sandoval's medical condition due to a combination of deliberate indifference as well

19   as the county's failure to institute a policy requiring safety checks for inmates placed in the medical

20   screening cells. The pathologist stated Mr. Sandoval's cause of death was acute methamphetamine

21   intoxication.

22       33.    The deliberate indifference, intentional failure, negligence, recklessness and

23   carelessness of the Defendants and Does 1-100, and each of them, was a substantial factor in

24   causing the death of Mr. Sandoval.

25   / / /

26   / / /

27   / / /

28   / / /

7

FIRST AMENDED COMPLAINT

Exhibit 17
213

## FIRST CAUSE OF ACTION

### 42 U.S.C § 1983 – 14th Amendment Cruel and Unusual Punishment

### [Against William D. Gore, individually and DOES 1-100 –

### Deliberate Indifference to a Serious Medical Need]

(Brought by ANA SANDOVAL as Successor in Interest to RONNIE SANDOVAL)

34.    Plaintiffs reallege and incorporate by reference all paragraphs above, as though fully set forth herein.

35.    Prison officials are personally liable for a plaintiff's constitutional deprivation if they acted with "deliberate indifference to a substantial risk of serious harm," *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998). To allege deliberate indifference, the medical needs must objectively be "sufficiently serious ...." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citing *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). Additionally, the prison official must "know[] of and disregard[] an excessive risk to inmate health or safety . . . ." *Farmer*, 511 U.S. at 837. A prisoner's right to receive adequate medical treatment is clearly established, and it is also clearly established that prison staff cannot "intentionally deny or delay access to medical care." *Clement v. Gomez*, 298 F.3d 898, 906 (9th Cir. 2002).

36.    Further, although some individually named defendants did not personally participate in the infliction of an inmate's injury, they may be held individually liable if they "caused" him to be subjected to a constitutional deprivation. *Chew v. Gates*, 27 F.3d 1432 (9th Cir. 1994). A supervisor can be held personally liable for implementing a policy so deficient that the policy amounts to a "repudiation of constitutional rights" and causes the violation. *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989). Furthermore, a supervisor is liable in his individual capacity if he "sets in motion a series of acts by others, or knowingly refused to terminate a series of acts by others, which he kn[e]w or reasonably should [have] know[n] would cause others to inflict the constitutional injury." *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991). Sheriff Gore and Central's DOE Medical Director's "DOE MD" were the officials responsible for Central's medical and mental health policies, practices, and customs.

37.    Sheriff Gore and Central's DOE MD's actions set in motion a series of events that

8

Exhibit 17
214

1   lead to and caused Mr. Sandoval's death. Gore and DOE MD designed, implemented, authorized,

2   approved, or acquiesced Central's departmental policies that govern the management and

3   monitoring of inmates placed in the MOU or in the medical screening areas. They are equally

4   responsible for failing to implement a policy that requires monitoring of the medical screening

5   cells, Waiting Cell #1 and #2 (herein "screening cells"). These cells are used to screen inmates for

6   serious medical conditions prior to booking the inmates. These very cells should be monitored as

7   much as the others, if not more, because the screening cells only hold newly arrested inmates who

8   have not been previously screened or those who have not yet been through the intake process. A

9   policy that requires some sort of interactive monitoring is crucial and obvious, especially for rapid

10   assessment of chronic conditions, such as diabetes, or alcohol and drug withdrawals. However,

11   according to several nurses providing statements in this matter, those "screening cells" don't require

12   monitoring, unlike the safety or sobering cells that require interactive monitoring. For these obvious

13   oversights, Gore and DOE MD are liable as they had overall supervisory responsibility for Central's

14   medical policies, and not only were each of them responsible for the medical operations of Central

15   as a whole, but they were familiar with incidents and deaths in the jail due to these inadequate

16   policies as they regularly reported them to the county board of supervisors. This woefully

17   inadequate custom is a substantial factor in Mr. Sandoval's death.

18       38.    In addition to Gore and DOE MD, other county employees are equally liable for Mr.

19   Sandoval's death.

20       39.    Several various county employees acknowledged Mr. Sandoval's outward

21   symptoms of medical distress. County staff suspected Mr. Sandoval was destroying evidence.

22   Further, someone in the medical staff wrote in Mr. Sandoval's chart that he was suspected of being

23   under the influence. When he was first brought to Central, deputies noticed Mr. Sandoval was

24   extremely sweaty and disoriented. Mr. Sandoval told the deputy he was cold and not feeling well.

25   Sometime later, a fellow inmate told deputies that Mr. Sandoval was shaking violently and was

26   losing pallor. These symptoms were acknowledged two (2) hours after Mr. Sandoval arrived at

27   Central.

28       40.    In short, at this point, Central staff knew Mr. Sandoval was under the influence, had

9

FIRST AMENDED COMPLAINT

Exhibit 17
215

1   been in possession of a controlled substance, was sweating, disoriented, shaking, losing color and

2   was complaining of being cold. Right at this moment, the nursing staff knew Mr. Sandoval was

3   experiencing a serious medical condition. Even if not drug poising, the medical staff knows that

4   diaphoresis – sweating at rest – in men over 50, is a serious medical condition as it is regularly

5   attributed to diabetes, heart failure and Parkinson's disease.

6       41.     Mr. Sandoval went the next eight hours without any medical attention, despite being

7   in the medical screening area. Literally no one entered his screening cell until ten minutes after

8   witnessing Mr. Sandoval's seizure.

9       42.     Next, in a blatant disregard for the county's policy, a nurse ignores her duties under

10  the County's "LIFE THREATENING EMERGENCIES: CODE BLUE" policy.

**POLICY**

The term "Code Blue" shall be used to describe the conditions of a cardiac arrest, respiratory arrest or any other serious medical emergency which is potentially life threatening and shall trigger the 911 request for a paramedic emergency response team.

14      43.     Here, despite knowing Mr. Sandoval was suspected of being under the influence,

15  had been seen sweating, shaking and disoriented, complaining he was cold, and after just having a

16  seizure, a Central nurse disregarded the "Code Blue" policy by calling for an EMT – a conscious

17  decision – rather than following protocol and calling for a "paramedic." The nurses statement in

18  the death investigation noted she intentionally called for EMTs despite a deputy's (a former EMT)

19  repeated suggestion that paramedics should be dispatched, not EMTs, because Mr. Sandoval was

20  unresponsive and had a seizure with a possible head injury. However, the nurse continued her call

21  to the EMTs. This deliberately indifferent decision caused over an hour delay in providing

22  appropriate medical attention.

23      44.     Knowing that Mr. Sandoval died from methamphetamine intoxication, literature is

24  clear that had Mr. Sandoval been taken to hospital before his cardiac arrest, he would have been

25  saved. Thus, had paramedics initially been called rather than EMTs, Mr. Sandoval would have still

26  been alive by the time he was transported to the hospital and would have been administered

27  activated charcoal, which binds undigested methamphetamine, cold IV fluids as well as

28  benzodiazepams which controls the patient's anti-psychotic behaviors. Mr. Sandoval would have

10

FIRST AMENDED COMPLAINT

Exhibit 17
216

1   lived but for the nurses failure to adhere to the County's "Code Blue" policy.[1]

2       45.    Then, to compound matters, while waiting for paramedics, the medical staff

3   attempted to clear Mr. Sandoval's airways by suctioning the foam from his mouth, nasal and throat.

4   However the suction machine, Easy-Go-Vac, was not working properly and a deputy was forced to

5   run to the third floor to retrieve that floor's Easy-Go-Vac. By the time the deputy arrived, Mr.

6   Sandoval had lost consciousness.

7       46.    Due to these deliberately indifferent acts and/or omissions herein alleged, Mr.

8   Sandoval's serious medical condition was ignored, and he was left to die in the one place where he

9   was supposed to receive his initial medical observation, the screening cell.

10       47.    These actions and inactions of the Central staff resulted in the violation of Mr.

11   Sandoval's rights under the Fourteenth Amendment of the United States Constitution.

12       48.    As a result of Gore's, DOE MD's and Central staff's deliberate indifference to Mr.

13   Sandoval's serious medical needs, he was subjected to cruel and unusual punishment prohibited by

14   the Eighth and Fourteenth Amendment of the United States Constitution. As a result thereof,

15   plaintiffs are entitled to damages pursuant to 42 U.S.C. § 1983 in an amount to be proven at trial.

16       49.    The aforementioned acts and/or omissions of the defendants were reckless and/or

17   accomplished with a conscious disregard of Mr. Sandoval's rights thereby entitling plaintiffs to an

18   award of exemplary and punitive damages according to proof.

19   **SECOND CAUSE OF ACTION**

20   **42 U.S.C § 1983 – 14th Amendment Cruel and Unusual Punishment**

21   **[Against Defendant County of San Diego – Screening Cell Customs]**

22   (Brought by ANA SANDOVAL as Successor in Interest to

23   RONNIE SANDOVAL)

24       50.    Plaintiffs reallege and incorporate by reference all paragraphs stated above, as

25   though fully set forth herein.

26   ---

[1] The mortality data on methamphetamine toxicity demonstrates a very low incidence of overdose deaths in the

27   community at-large. One 2007 survey estimated that the number of persons who have used methamphetamine in
their lifetime in the U.S. was 10.4 million people (about 4.3% of the population), and the death rate amongst these

28   10.4 million from a pure methamphetamine overdose is minuscule, just several hundred individuals (U.S. DHHS
SAMHSA, 2006C; U.S. DHHS NIDA, 2007).

11

FIRST AMENDED COMPLAINT

Exhibit 17
217

1    51.    As part of the death investigation in this matter, multiple nurses gave statements in

2    relation to Mr. Sandoval's death. Multiple nurses stated there was a custom and practice at Central

3    to use the medical screening cells as administrative segregation cells or "keep separate" cells when

4    those cells are occupied.

5    ~~nurses and duties for the second floor medical screening~~. Inmate Sandoval was already
     in the cell (Waiting Room #1) when she started her shift. She was not briefed by anyone

6    as to the reason Sandoval was in the holding cell. Usually, during shift change, the

7    outgoing shift endorses the incoming shift with information about pending medical needs
     on the floor. If there is no endorsement, then its presumed deputies are using the cells for

8    "keep separate" inmates. ~~The assigned daytime nurses she relieved were RN Marylene~~

9    52.    The nurses stated they are usually briefed (pass-down) regarding medical inmates

10   that need attention. If they are not briefed regarding a particular inmate detained in a medical

11   screening cell the nurses assume they are keep separate inmates.

12   53.    The custom is obviously indifferent to inmates' potential serious medical condition

13   because inmates won't be medically screened unless explicitly told by other nurses during shift

14   change. This custom does not account for busy schedules, limited staff, emergency situations or

15   mandown situations.

16   54.    These screening cells are where inmates are taken right as they come into Central.

17   These inmates have not yet been booked, nor have they gone through the medical intake process.

18   In short, inmates in the screening cells have not been seen by any medical staff since arriving at

19   Central. These inmates are in the most critical state as many inmates awaiting intake are suffering

20   from chronic and fatal diseases and conditions (without medication), including drug poisoning and

21   alcohol withdrawals.

22   55.    Here, deputies were clearly concerned about Mr. Sandoval as they had him seen

23   twice by medical, prior to having his mug shot taken, and then ultimately taking Mr. Sandoval to

24   the second floor for "medical observation." He was noticed by the deputies to be sweating

25   profusely, disoriented, confused, shaking and losing color, yet none of the nurses were aware that

26   Mr. Sandoval was awaiting medical attention.

27   56.    According to several nurses' statements, this is a custom, pattern and practice. This

28   is the normal course and operation of business, as seen by the uncontroverted actions of the medical

12

FIRST AMENDED COMPLAINT

Exhibit 17
218

1   staff that night, in noticing Mr. Sandoval in the screening cell but never thinking to provide him

2   with medical attention in the eight (8) hours span while he was detained in that cell. They assumed

3   Mr. Sandoval was a "keep separate" inmate.

4       57.    Central books 70,000 inmates a year. These inmates must all go through medical

5   screening. However, it appears, because the medical screening cells are used as "keep separate

6   cells," nurses would have to be told to screen any particular inmate rather than screening every

7   inmate as their normal course of practice. This is a painfully destructive custom that is

8   unconscionably indifferent to the lives of inmates and detainees.

9       58.    Thus, the County is liable for permitting and instituting a custom and practice that

10   severely limits the medical screening of newly arriving inmates by making it contingent on an

11   explicit verbal pass-down, per individual inmate, during medical staff shift changes. As here, this

12   allows for inmates to be left to languish – for hours, and according to one nurse, multiple days –

13   without medical observation. As such, Mr. Sandoval's death was a direct and proximate result of

14   Central's custom and practice of only checking inmates in the screening cells if advised to do so

15   by other nurses during shift change.

16       59.    This widely accepted custom and practice was the moving force in causing Mr.

17   Sandoval's premature death.

18   **THIRD CAUSE OF ACTION**

19   **42 U.S.C § 1983 – 14th Amendment Cruel and Unusual Punishment**

20   **[Against Defendant County of San Diego –**

21   **Failure to Implement a Screening Cell Observation Policy/ Failure to Train]**

22   (Brought by ANA SANDOVAL as Successor in Interest to RONNIE SANDOVAL)

23       60.    Plaintiffs reallege and incorporate by reference all paragraphs stated above, as

24   though fully set forth herein.

25       61.    According to the medical nurses, most specifically the nurse on-shift prior to Mr.

26   Sandoval seizing, unlike the medical observation bay or the sober or safety cells, there is no County

27   requirement to monitor inmates in the screening cells.

28       62.    In an audio statement recorded by a death investigator after Mr. Sandoval's passing,

13

FIRST AMENDED COMPLAINT

Exhibit 17
219

a nurse stated, "no monitoring rounds are required in the medical screening areas." This nurse states *ad nasuem* that no one checks these cells. He even states, on multiple occasions, he's seen inmates being left in those cells for up to two (2) days without being monitored or screened.

63.     This same nurse said that deputies are not charged with monitoring the medical screening cells either, thus neither the medical staff nor the deputies are responsible for performing observation checks of the screening cells. The nurse states, unless they are made aware of an inmate awaiting medical attention, they only go to the screening cells if there is a "mandown" call.

64.     This same nurse states that it is necessary and best practice to require "interactive" observation checks not just on the third floor (medical observation bay) but in the screening cells as well. He assumed this lack-of-policy is because resources are limited, but again, he stresses the importance of requiring medical rounds in the screening cells.

65.     The County's failure to incorporate a critical observation policy for medical screening cells is deliberately indifferent to the serious medical needs of inmates, because there is a custom to only monitor inmates in the medical screening cells if advised to do so, and because there is no requirement for even minimal observation rounds. An inmate, never having been medically screened, can be left to languish as they slip through the cracks, until they mandown.

66.     The nurse stated this happens several times as this is the widespread custom and practice at Central. Had the medical staff been required to perform observation rounds they would have seen what all the other deputies saw when Mr. Sandoval was being booked. The medical staff would have seen his diaphoresis, as well as his shaking, disorientation and loss of pallor. Since there is no requirement to make rounds for the medical screening cell and because of the custom to assume, if not told otherwise, that the medical screening cells are actually overflow cells for administrative segregation inmates, Mr. Sandoval was never seen by the medical staff despite multiple deputies acknowledging Mr. Sandoval's medical distress. This was a substantial factor leading to Mr. Sandoval's preventable death.

67.     Alternatively, if there is indeed an observation round requirement for the medical screening cells, the County has failed in training its staff as to these requirements. As stated above, multiple nurses admitted they are not required to perform checks on inmates placed in the medical

14

FIRST AMENDED COMPLAINT

Exhibit 17
220

1    screening cells. This is clearly corroborated in the hours and hours of footage showing nurse after
2    nurse, deputy after deputy, passing Mr. Sandoval's cell without so much as a glance. This is not the
3    practice of one nurse, nor is this a singular incident.

4        68.    Likewise, had Central staff been adequately trained to make interactive rounds for
5    the medical screening cells, the nurses would have seen firsthand Mr. Sandoval's rapid
6    deterioration; such as his diaphoresis as well as his shaking, disorientation and loss of pallor.

7        69.    The county's deliberate indifference in failing to train its employees is the direct and
8    proximate cause of Mr. Sandoval's death. This inaction resulted in the violation of his rights under
9    the Fourteenth Amendment of the United States Constitution.

10                            **FOURTH CAUSE OF ACTION**

11                                       **Negligence**

12                               **[Against DOES 1-100]**

13               (Brought by ANA SANDOVAL as Successor in Interest to

14                           RONNIE SANDOVAL)

15       70.    Plaintiffs reallege and incorporate by reference all paragraphs stated above, as
16   though fully set forth herein.

17       71.    Defendants, and each of them, have a duty to monitor, supervise, operate and
18   manage Central and its inmates in a manner so as to prevent the acts and/or omissions alleged
19   herein. Said defendants owed Mr. Sandoval, as an inmate in defendants' custody, care and
20   control, a duty of due care to protect his health and physical safety.

21       72.    Defendants were negligent and their conduct fell below a reasonable standard of
22   care when they failed to discharge their duties as custodians of Mr. Sandoval. It was foreseeable
23   that as a result of defendants' acts and omissions, as described above, Mr. Sandoval, known to be
24   under the influence of a drug, seen sweating profusely, shaking, disoriented and showing signs of
25   diaphoresis,  would encounter serious medical complications if his conditions went unmanaged.
26   Defendants' breach directly and proximately caused Mr. Sandoval's premature death.

27   / / /

28   / / /

15

FIRST AMENDED COMPLAINT

Exhibit 17
221

**FIFTH CAUSE OF ACTION**

**Medical Malpractice**

**[Against DOES 1-100]**

(Brought by ANA SANDOVAL as Successor in Interest to

RONNIE SANDOVAL)

73.     Plaintiffs reallege and incorporate by reference all paragraphs stated above, as though fully set forth herein.

74.     Defendants, and each of them, have a duty to operate and manage Central in a manner so as to prevent the acts and/or omissions alleged herein. Said defendants owed Mr. Sandoval, as an inmate in defendants' custody, care and control, a duty of due care to protect his health and physical safety.

75.     Defendants were negligent in their administering of medical care. DOES either failed to give medical care or gave such care that falls below the standard of reasonable care when they failed to discharge their duties as custodians and/or medical professionals. It was foreseeable that as a result of defendants' acts and omissions, as described above, that Mr. Sandoval would encounter serious medical complications if his conditions went unmanaged. Defendants' breach directly and proximately caused Chino's death.

**SIXTH CAUSE OF ACTION**

**Wrongful Death**

**[Against All Defendants]**

(Brought by ANA SANDOVAL, individually and RONNIE SANDOVAL, JR.,

individually, and JOSIAH SANDOVAL, by and through his *Guardian Ad Litem*)

76.     Plaintiffs reallege and incorporate by reference all paragraphs stated above, as though fully set forth herein.

77.     As a result of the Central staffs' grossly negligent treatment of Mr. Sandoval's known serious medical needs, Mr. Sandoval was left to die.

78.     By reason of Mr. Sandoval's death, and the negligent actions as explained above, his heirs have suffered, and continue to suffer, loss of love, society, companionship, comfort,

16

Exhibit 17
222

care, guidance, financial support, and other services as a result of Mr. Sandoval's preventable death.

### SEVENTH CAUSE OF ACTION

### Negligent Hiring, Supervision and Retention

### [Against All Defendants]

79.   Plaintiffs reallege and incorporate by reference all paragraphs stated above, as though fully set forth herein.

80.   At all times mentioned herein Defendants acted negligently in the hiring, training, supervision and retention of its employees, independent contractors, agents and other individuals.

81.   As a direct and proximate result of the Defendants aforementioned acts and omissions the Plaintiffs, and each of them, sustained serious injury and damage in the sum within the jurisdiction of this Court.

82.   The Plaintiffs and each of them have sustained economic damages consisting of: (1) the value of the lost of financial and other support from the Decedent; (2) the value of gifts or benefits that the Decedent would have provided, (3) the value of burial expense, and (4) the reasonable value of household services the Decedents would have provided.

83.   Further, the Plaintiffs and each of them have also sustained non-economic damages consisting of loss of the Decedent's love, companionship, comfort, care, assistance, protection, affection, society and moral support.

### EIGHTH CAUSE OF ACTION

### Intentional & Negligent Infliction of Distress

### [Against All Defendants]

84.   Plaintiffs reallege and incorporate by reference all paragraphs stated above, as though fully set forth herein.

85.   At all times mentioned herein Defendants in acting in the manner alleged herein, intentionally and negligently inflicting both physical distress on the Decedent and emotional distress on Plaintiffs.

17

86.   As a direct and proximate result of the Defendants aforementioned acts and omissions the Plaintiffs, and each of them, sustained serious injury and damage in the sum within the jurisdiction of this Court.

87.   The Plaintiffs and each of them have sustained economic damages consisting of: (1) the value of the lost of financial and other support from the Decedent; (2) the value of gifts or benefits that the Decedent would have provided, (3) the value of burial expense, and (4) the reasonable value of household services the Decedents would have provided.

88.   Further, the Plaintiffs and each of them have also sustained non-economic damages consisting of loss of the Decedent's love, companionship, comfort, care, assistance, protection, affection, society and moral support.

## NINTH CAUSE OF ACTION

### Reckless Endangerment & Increased Risk of Harm

### [Against All Defendants]

89.   Plaintiffs reallege and incorporate by reference all paragraphs stated above, as though fully set forth herein.

90.   At all times mentioned herein Defendants acting in the manner alleged herein, increased and detrimentally changed the risk of harm that existed by taking the Decedent from the first general arrestee holding cell where he was among others and isolated the Decedent in Waiting Room #1 for over eight (8) hours without observation or adequate preventative measure.  But for Defendants actions, individuals in the general holding cell would have monitored the Decedent, warned San Diego County Jail personal of the Decedent's condition, administered first aid and/or otherwise assisted the Decedent.

91.   As a direct and proximate result of the Defendants aforementioned acts and omissions the Plaintiffs, and each of them, sustained serious injury and damage in the sum within the jurisdiction of this Court.

18

FIRST AMENDED COMPLAINT

Exhibit 17
224

92.    The Plaintiffs and each of them have sustained economic damages consisting of: (1) the value of the lost of financial and other support from the Decedent; (2) the value of gifts or benefits that the Decedent would have provided, (3) the value of burial expense, and (4) the reasonable value of household services the Decedents would have provided.

93.    Further, the Plaintiffs and each of them have also sustained non-economic damages consisting of loss of the Decedent's love, companionship, comfort, care, assistance, protection, affection, society and moral support.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for the following relief:

1.    For compensatory, general and special damages against each defendant, jointly and severally, in an amount according to proof;

2.    For punitive and exemplary damages against each individually named defendant, in their individual capacity, in an amount appropriate to punish defendants and deter others from engaging in similar misconduct;

3.    For costs and reasonable attorney's fees pursuant to 42 U.S.C. § 1988 and as otherwise authorized by statute or law; and

4.    For such other relief, including injunctive and/or declaratory relief, as the Court may deem proper.

## REQUEST FOR JURY

Plaintiffs hereby request a jury trial in this action.

Respectfully Submitted,

RENDA LAW OFFICES

Dated: February 8, 2016

Vincent Renda, Esq.
Attorneys for PLAINTIFFS

19

FIRST AMENDED COMPLAINT

Exhibit 17
225

Ex. 1

Exhibit 17
226



## San Diego County Sheriff's Department
## Officer Report

CAD Event No.  **E1466588**

Case No.  **14109768**

Report No.  **27156**

Page 1 of 1

---

### GENERAL CASE INFORMATION

| Special Studies: | | | | | | Related Cases: | |
|---|---|---|---|---|---|---|---|

Location, City, State, ZIP:
**1173 Front St. San Diego, Ca 92101,San Diego, CA  92101**

Occurred On:
**2/23/2014 12:53:00 AM (Sunday)**

| Jurisdiction: **DETENTION FACILITY - CENTRAL** | Beat: **021** | | Call Source: | (and Between): |
|---|---|---|---|---|

---

### INDIVIDUAL/S

| Name: **Sandoval, Ronnie** | | | | | Person Code: | | Interpreter Language: |
|---|---|---|---|---|---|---|---|

| Home Address, City, State, ZIP: | | | | Res. Country: | County Residence: **N Nonresident** | Undocumented: |
|---|---|---|---|---|---|---|

| Race: **H** | Sex: **M** | Date of Birth / Age: **09/30/1967 -** | Height: **5'9"** | Weight: **187 lbs** | Hair Color: **GRY** | Eye Color: **BRO** | Facial Hair: **06 - Mustache Only** | Complexion: |
|---|---|---|---|---|---|---|---|---|

| Employment Status: | Occupation/Grade: | Employer/School: | Employer Address, City, State, ZIP: |
|---|---|---|---|

### CONTACT INFORMATION
### IDENTIFICATION

| Type: **BN - Booking Number** | Number: **14713020** | | State: | | Country: |
|---|---|---|---|---|---|

| Alias: | Injury: | Extent Of Treatment: | Victims Crime Circumstances: |
|---|---|---|---|

---

### REPORT NARRATIVE

Case# 1466588

ORIGIN:

On 02-22-14, I was assigned the Intake Deputy Position at San Diego Central Jail where I interacted with Inmate Ronnie Sandoval (BN#14713020).

DEPUTY'S OBSERVATIONS:

On 02-22-14, at approximately 1530 hours, I first made contact with Inmate Sandoval while taking his fingerprints. Inmate Sandoval was extremely sweaty and appeared to be slightly disoriented. I asked Sandoval if he was alright. Sandoval replied that he was very cold and did not feel well. Sandoval then spontaneously said that approximately eight months ago he was told that he may be "borderline diabetic". I asked Sandoval if he told the Intake Nurse this and he responded "Yes; I don't take any medication for it though."
At this time I notified Deputy Bryan (2880) about Inmate Sandoval. Deputy Bryan informed the intake nurse who promptly came out to the fingerprinting area and tested Sandoval's blood sugar. The nurse said that his blood sugar was normal. I placed Sandoval in Holding Cell #5 on the first floor.

At approximately, 1630 hours Inmate Sandoval was escorted to the forensics room to have his booking photograph taken. Sandoval was still sweating a lot and appeared to be very tired and disoriented. Deputy Martinez (7059) asked Sandoval how he was feeling. Sandoval became agitated and refused to answer any more questions regarding his health. Deputy Martinez and I decided that it would be best to expedite the booking process for Sandoval so he could see the nurse on the second floor. As soon as the photograph was completed, I escorted Sandoval through the intake sally port up to the second floor. I spoke with Nurse De Guzman (0770) and explained what I observed while in contact with Sandoval. Nurse De Guzman instructed me to place Sandoval in the Medical Observation Cell #1 and that he would examine Sandoval as soon as possible. I placed Sandoval in Medical Observation Cell #1 and explained to him that the nurse would see him as soon as possible. Sandoval responded, "Thank you."

I notified Deputies Wilkinson (3226) and Rodriguez (2334) that Sandoval was placed in the Medical Observation Cell #1.

I had no further contact with Sandoval.

---

| Reporting Officer **SH1147 - CHAVEZ, MATTHEW** | Division / Organization **SDCJ / SDCJ - San Diego Central Jail** | Reviewed By **SH4202 - KAMOSS, KARL** |
|---|---|---|
| Report Date **2/23/2014 7:34:43 AM** | Detective Assigned **SH1891 - CARRILLO, PETE** | Reviewed Date **2/25/2014 12:25:49 AM** |

NetRMS_OASDCDR.rtf v11-15-06

Printed: February 19, 2015 / 7:25 AM

COSD RRFP 000005

Exhibit 17
227

# Ex. 2

Exhibit 17
228



## San Diego County Sheriff's Department
## Crime/Incident Report

| | | | |
|---|---|---|---|
| CAD Event No.: | E1466588 | Case No. | 14109768 |
| Primary Victim: | Sandoval, Ronnie Paul | Report No. | 14109768.1 |

**2**

| ARRESTEE/S |
|---|
| SUSPECT/S (Not Yet Arrested) |
| WITNESSES |
| OTHER ENTITIES |
| PROPERTY |
| REPORT NARRATIVE |

**SYNOPSIS:**
I responded to Inmate Ronnie Sandoval #14713020 lying on the floor having what appeared to be a seizure inside of Waiting Room #1, located on the 2nd Floor, at the San Diego Central Jail (SDCJ). I entered the cell to assist SDCJ medical staff with first aid. EMTs responded to SDCJ and escorted to the 2nd Floor. Sandoval's condition was not improving, paramedics were called to respond. Shortly after paramedics arrived, Sandoval stopped breathing and had no pulse. Paramedics administered C.P.R. on Sandoval. At 0211 hours, Sandoval was pronounced dead by Dr. Hwang from Scripps La Jolla. Sheriff's Homicide, Division of Inspectional Services (DIS), and the Crime Lab responded to SDCJ to conduct their investigation.

**ORIGIN:**
On the morning of 02-24-2014, at approximately 0055 hours, I was assigned as the Search/Medical Screening Deputy at SDCJ when I was asked by Sergeant Shawcroft #5213 to meet him at Waiting Room #1 and assist him with an inmate having a seizure.

**BACKGROUND:**
Ronnie Sandoval was arrested on 02/21/14 at 1149 hours for 11377(A) HS- possession of a controlled substance and 11364 HS- possession of drug paraphernalia. He arrived at SDCJ, at approximately 1424 hours. Sandoval went through the initial medical screening with no medical problems noted.

At approximately 1530 hours, Sandoval was examined a second time by a nurse on the 1st Floor. At approximately 1700 hours, Sandoval was escorted to the 2nd Floor via the inmate elevators and placed into Waiting Room #1 for further medical observation. See attached Deputy's report by Deputy Chavez #1147 for further details.

**INVESTIGATION:**
I opened the door to Waiting Room #1 and entered the cell. I saw Sandoval lying down on his right side in the corner of the cell near the door with his head underneath the bench. Sergeant Shawcroft informed me that Sandoval had hit his head on the wall as he fell to the floor from the bench.

I placed my right hand on Sandoval's left arm and gently shook his arm while calling his name in an attempt to see if Sandoval was responsive. Sandoval's left arm was shaking and his muscles were tense. Sandoval was breathing hard and spitting on the floor. At approximately 0056 hours, Nurse Harris #5055 placed an oxygen mask on Sandoval's face and asked me to hold it in place. I held the oxygen in place with my left hand. Nurse Harris applied a cuff on Sandoval's right arm in order to take his blood pressure. An O2 sensor was placed on Sandoval's right hand to monitor his oxygen level. I continued to call

| Reporting Officer | Division / Organization | Reviewed By |
|---|---|---|
| SH4706 - EDGE, NOLAN | San Diego Central Jail | SH4202 - KAMOSS, KARL |
| Report Date | Detective Assigned | Reviewed Date |
| 2/23/2014 6:27:46 AM | SH1881 - CARRILLO, PETE | 02/25/2014 17:38:07 |

| | | |
|---|---|---|
| NetRMS_CASDCR.rtf v11-15-06 | Printed By 8H0721 | Printed: February 19, 2015 - 7:24 AM |

COSD RRFP 000002

Exhibit 17
229



**San Diego County Sheriff's Department**
**Crime/Incident Report**

CAD Event No.: E1465588    Case No. **14109768**

Primary Victim: Sandoval, Ronnie Paul    Report No. 14109768.1

**3**

Page 3 of 4

Sandoval's name in an attempt to get a response. Sandoval would periodically open his eyes for a second, but he would never respond to me.

At approximately 0101 hours, Deputy Andrade #0137, Corporal Fox #5868, and Deputy Sobaszek #3209 entered the cell to assist with administering first aid. I informed the responding deputies about Sandoval's situation. Due to the nature of Sandoval's fall it was determined that a C-Spine collar be placed on his neck to prevent any further injury to Sandoval's head, neck, and spine. Keeping Sandoval's head and neck immobile we slid him into the middle of the cell to allow more space to be available to continue with first aid. At approximately 0102 hours, Nurse Llamado #6492 entered the cell and handed the C-Spine collar, (Orthopedic medical device to support the neck), to Deputy Andrade. Deputy Andrade and I placed the C-Spine collar on Sandoval's neck. At approximately 0105 hours, EMT personnel were called per Nurse Harris.

At approximately 0106 hours, Nurse Harris applied a nasopharyngeal airway, (A medical appliance tube that opens the airway), to assist with keeping Sandoval's airway open. To further assist with keeping Sandoval's airway clear, Deputies Johnson #4983 and Valbuena #3296 went up to the 3rd Floor and brought back an "Easy-Go-Vac" to suction out any fluids in Sandoval's mouth to keep his airway clear. At approximately 0110 hours, suction was applied to Sandoval's nasal and throat.

Sandoval's breathing became shallow and his pupils did not react to light. Deputy Andrade applied a bag valve mask, (A medical device to provide positive pressure ventilation), to assist Sandoval with breathing. At approximately 0112 hours, Registered Charge Nurse Bautista #9226 entered the cell. Nurse Bautista monitored Sandoval and applied an oropharyngeal airway, (A medical device preventing the tongue from covering the epiglottis). Sandoval still had a gag reflex and started vomiting. RN Bautista removed the oropharyngeal airway from Sandoval's mouth. Sandoval was turned to his right side and suction was applied to remove the secretions in his mouth. Nurse Bautista established an IV in Sandoval's right arm. Leg and waist chains were placed onto Sandoval to prepare him for transport. Deputy Andrade suggested assistance from paramedics due to Sandoval's current condition. Medical staff continued to monitor Sandoval's vital signs.

At approximately 0120, American Medical Response EMTs arrived at the cell. The EMTs informed us that they will assist with first aid but they would not be able to transport Sandoval in the current condition he was in. At that time paramedics were called to respond. EMT Trunick entered the cell and took over ventilating Sandoval with the bag valve mask. Sandoval was placed on a backboard to keep him immobile and to prepare him for transport. At approximately 0136 hours, EMT Trunick informed medical staff that he could still feel a pulse.

At approximately 0142 hours, San Diego Fire Department Engine 201, and Medic 11 arrived at the scene. The paramedics began to asses Sandoval and secure him to the backboard.
As the paramedics were about to tape down and secure Sandoval's head to the backboard they noticed Sandoval had stopped breathing and had no pulse. The paramedics removed Sandoval from the cell, placed him onto a medical gurney, and at approximately 0148 hours CPR was started. At approximately 0201 hours, Deputy Andrade secured the door to Waiting Room 1.

| Reporting Officer | Division / Organization | Reviewed By |
|---|---|---|
| SH4706 - EDGE, NOLAN | San Diego Central Jail | SH4202 - KAMOSS, KARL |
| Report Date | Detective Assigned | Reviewed Date |
| 2/23/2014 6:27:46 AM | SH1881 - CARRILLO, PETE | 02/26/2014 17:38:07 |

NetRMS_CASDCR.rtf v11-15-06    Printed By SH0721    Printed: February 19, 2015 - 7:24 AM

Exhibit 17
230

COSD RRFP 000003



### San Diego County Sheriff's Department
### Crime/Incident Report

| | |
|---|---|
| CAD Event No.: **E1465538** | Case No. **14109768** |
| Primary Victim: **Sandoval, Ronnie Paul** | Report No. **14109768.1** |

**4**
Page 4 of 4

At approximately 0211 hours, Sandoval was pronounced dead by Dr. Hwang from Scripps La Jolla. Sandoval was taken off of the gurney and placed on the floor outside of Waiting Room 1.

At approximately 0455 hours, Homicide, Crime Lab, and DIS began a de-brief with Corporal Fox, Deputy Andrade, and I. A timeline of the events is attached to the report.


EVIDENCE:
Collected by the Homicide Division.

INJURIES:
See Medical Examiner's report.

PROPERTY DAMAGE:
None.

FOLLOW UP:
The Homicide Division will conduct the follow up investigation.


RELATED REPORTS:
Deputy's Reports by: Sergeant Shawcroft 5213, Chavez 1147, Powell 7307, Bohannan 0632, Bryan 2880, Johnson 4983, Sobaszek 3209, Valbuena 3296, Andrade 0137, Fox 5868, McKinney 5731, Richards 7594

| Reporting Officer SH4706 - EDGE., NOLAN | Division / Organization San Diego Central Jail | Reviewed By SH4202 - KAMOSS, KARL |
|---|---|---|
| Report Date 2/23/2014 6:27:46 AM | Detective Assigned SH1881 - CARRILLO, PETE | Reviewed Date 02/25/2014 17:38:07 |
| NetRMS_CASOCR.rtf v11-15-06 | Printed By SH0721 | Printed: February 19, 2015 - 7:24 AM |

COSD RRFP 000004

Exhibit 17
231

Ex. 3

Exhibit 17
232

1   THOMAS E. MONTGOMERY, County Counsel
    County of San Diego
2   By JAMES M. CHAPIN, Senior Deputy (SBN 118530)
    1600 Pacific Highway, Room 355
3   San Diego, California 92101-2469
    Telephone: (619) 531-5244; Fax: (619) 531-6005
4   *[Exempt From Filing Fees (Gov. Code § 6103)]*

5   Attorneys for Defendant County of San Diego

6

7

8              IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                  IN AND FOR THE COUNTY OF SAN DIEGO

10

11  ESTATE OF RONNIE PAUL SANDOVAL )   No. 37-2014-00033347-CU-PO-CTL
    and ANA SANDOVAL, an individual  )   Action filed: October 1, 2014
12                                    )
             Plaintiffs,              )   IMAGED FILE
13                                    )
        v.                            )   COUNTY OF SAN DIEGO'S RESPONSE
14                                    )   TO PLAINTIFF'S REQUEST FOR
    COUNTY OF SAN DIEGO, a Public     )   ADMISSION
15  Entity; SAN DIEGO COUNTY JAIL, a  )
    Public Entity and DOES 1 through 100, )   (Set Two)
16                                    )
             Defendants.              )   Dept.: C-65
17                                    )   ICJ:   Hon. Joan M. Lewis
                                      )
18  _____

19  PROPOUNDING PARTY: Plaintiff Estate of Ronnie Paul Sandoval

20  RESPONDING PARTY:   Defendant County of San Diego

21  SET NUMBER:         Two

22        Defendant County of San Diego ("County") hereby responds to Plaintiff's Second Set of

23  Request for Admission as follows:

24                        **PRELIMINARY STATEMENT**

25        Responding party has not completed discovery, the investigation of the facts, witnesses or

26  documents, the analysis of available information, or the preparation for trial in this case.

27  Discovery and investigation are continuing. All the following responses are based solely upon

28  such information and documents that are presently available to and specifically known to

    COUNTY OF SAN DIEGO'S RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSION
                                (Set Two)

Exhibit 17
233

1  REQUEST FOR ADMISSION No. 23:

2      Admit that YOU forgot about RONNIE PAUL SANDOVAL after he was placed in the

3  HOLDING CELL.

4  RESPONSE TO REQUEST FOR ADMISSION No. 23:

5      Deny.

6  REQUEST FOR ADMISSION No. 24:

7      Admit that YOU did not check on RONNIE PAUL SANDOVAL at any time when he

8  was placed in the HOLDING CELL.

9  RESPONSE TO REQUEST FOR ADMISSION No. 24:

10      Deny.

11 REQUEST FOR ADMISSION No. 25:

12     Admit that after RN Romeo Deguzman checked RONNIE PAUL SANDOVAL's blood

13 sugar levels YOU did not complete any subsequent medical evaluations on RONNIE PAUL

14 SANDOVAL.

15 RESPONSE TO REQUEST FOR ADMISSION No. 25:

16     Objection, this request is vague and ambiguous as to time.

17 REQUEST FOR ADMISSION No. 26:

18     Admit that on the date of the INCIDENT between the hours of 17:00 - 23:00 YOU did

19 not go into the HOLDING CELL.

20 RESPONSE TO REQUEST FOR ADMISSION No. 26:

21     Admit.

22 REQUEST FOR ADMISSION No. 27:

23     Admit that on the date of the INCIDENT between the hours of 17:00 - 23:00 YOU did

24 not monitor RONNIE PAUL SANDOVAL's medical condition while he was in the HOLDING

25 CELL.

26 RESPONSE TO REQUEST FOR ADMISSION No. 27:

27     Objection, the request is vague and ambiguous as to the term "medical condition" and is

28 not limited in time. Without waiving the objection, County responds: Deny.

---

5

COUNTY OF SAN DIEGO'S RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSION
(Set Two)

Exhibit 17
234

1   REQUEST FOR ADMISSION No. 42:

2       Admit that a suction machine was need in regard to this INCIDENT.

3   RESPONSE TO REQUEST FOR ADMISSION No. 42:

4       Admit.

5   REQUEST FOR ADMISSION No. 43:

6       Admit that YOUR medical personnel utilized a suction machine in this INCIDENT.

7   RESPONSE TO REQUEST FOR ADMISSION No. 43:

8       Admit.

9   REQUEST FOR ADMISSION No. 44:

10      Admit that the suction machine on RONNIE PAUL SANDOVAL'S floor was broken at

11  the time of the INCIDENT.

12  RESPONSE TO REQUEST FOR ADMISSION No. 44:

13      Admit.

14  REQUEST FOR ADMISSION No. 45:

15      Admit that YOU had to get the suction machine from another floor to utilize on RONNIE

16  PAUL SANDOVAL during this INCIDENT.

17  RESPONSE TO REQUEST FOR ADMISSION No. 45:

18      Admit.

19  REQUEST FOR ADMISSION No. 46:

20      Admit that Deputy Shawcroft witnessed RONNIE PAUL SANDOVAL's seizure in the

21  HOLDING CELL.

22  RESPONSE TO REQUEST FOR ADMISSION No. 46:

23      Admit.

24  REQUEST FOR ADMISSION No. 47:

25      Admit that YOU did not complete an oral interview of Deputy Shawcroft.

26  RESPONSE TO REQUEST FOR ADMISSION No. 47:

27      Admit.

28  ///

COUNTY OF SAN DIEGO'S RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSION
(Set Two)

Exhibit 17
235

1 | RESPONSE TO REQUEST FOR ADMISSION No. 58:

2 |     Admit.

3 | REQUEST FOR ADMISSION No. 59:

4 |     Admit that RN Cesar Costa interactions with RONNIE PAUL SANDOVAL occurred

5 | approximately eleven (11) hours prior to when RONNIE PAUL SANDOVAL was declared

6. | dead.

7 | RESPONSE TO REQUEST FOR ADMISSION No. 59:

8 |     Admit.

9 | REQUEST FOR ADMISSION No. 60:

10 |     Admit that there was no electronic records as to why RONNIE PAUL SANDOVAL was

11 | being held in the HOLDING CELL.

12 | RESPONSE TO REQUEST FOR ADMISSION No. 60:

13 |     Admit.

14 | REQUEST FOR ADMISSION No. 61:

15 |     Admit YOU did not place RN Maria Llamado on notice as to why RONNIE PAUL

16 | SANDOVAL was in the HOLDING CELL.

17 | RESPONSE TO REQUEST FOR ADMISSION No. 61:

18 |     Admit.

19 | REQUEST FOR ADMISSION No. 62:

20 |     Admit that the medical nurses working at YOUR facility on the date of the INCIDENT

21 | did not know why RONNIE PAUL SANDOVAL was in the HOLDING CELL.

22 | RESPONSE TO REQUEST FOR ADMISSION No. 62:

23 |     Deny.

24 | REQUEST FOR ADMISSION No. 63:

25 |     Admit that the deputies working at YOUR facility on the date of the INCIDENT did not

26 | know why RONNIE PAUL SANDOVAL was in the HOLDING CELL.

27 | RESPONSE TO REQUEST FOR ADMISSION No. 63:

28 |     Deny.

COUNTY OF SAN DIEGO'S RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSION
(Set Two)

Exhibit 17
236

| ATTORNEY OR PARTY WITHOUT ATTORNEY AND ADDRESS<br>Vincent Renda, Esq. (213985)<br>RENDA LAW OFFICES<br>600 West Broadway, Suite 400<br>San Diego, California 92101<br>ATTORNEYS FOR Plaintiffs | TELEPHONE NO.<br>(619) 819-0011 | COURT USE ONLY |
|---|---|---|
| **SUPERIOR COURT OF CALIFORNIA**<br>COUNTY OF SAN DIEGO, CENTRAL DIVISION | | |
| Plaintiff(s)   Estate of Ronnie Paul Sandoval, et al. | | I/C Judge: Hon. Joan M. Lewis<br>Dept:   C-65 |
| Defendant(s)  County of San Diego, et al. | | |
| **PROOF OF SERVICE** | | Case No. 37-2014-00033347-CU-PO-CTL |

I, Laurie E. Dillon, declare that: I am over the age of eighteen years and not a party to the case. I am employed in, or am a resident of, the County of San Diego, California, where the mailing occurs; and my business address is 600 West Broadway, Suite 400, San Diego, California 92101.

That on **March 8, 2016**, I served the following document(s):

**FIRST AMENDED COMPLAINT**

___  **Service By Mail (CCP 1013a(1)&(3))** I declare that I am readily familiar with the business' practice for collection and processing of correspondence for mailing with the United States Postal Service; and that the correspondence shall be deposited with the United States Postal Service the same day in the ordinary course of business. In accordance with that practice, I placed a true and correct copy of the document(s) listed above in a separate envelope addressed to each addressee listed below. I then sealed each envelope and, with postage thereon fully prepaid, I placed each for deposit in the United States Postal Service, at my business address shown above.

_X_  **Service By E-Mail Or Electronic Transmission:** Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the document(s) to be electronically served to the individuals listed below by sending a request for service to the San Diego Superior Court's e-file provider, One Legal. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

**James M. Chapin, Esq.**
**Office of County Counsel**
**Attorneys for Defendant**
**James.chapin@sdcounty.ca.gov**

**Shelly Haight, Paralegal**
**Office of County Counsel**
**Shelly.haight@sdcounty.ca.gov**

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on **March 8, 2016.**

_Laurie E. Dillon_
Laurie E. Dillon

Exhibit 17
237

# EXHIBIT 18

Exhibit 18
238

# San Diego County Sheriff's Department
## Medical Services Division
### Policy and Procedure Manual

| Date | Dissemination | Category | Number |
|---|---|---|---|
| 2/28/2011 | Medical Services Division | Medical & Psychiatric Care Services | MSD.A.2 |
| Subject: ADDICTED ARRESTEE CARE | | | Page 1 of2 |
| Related Sections: MSD P&P: | | | |

In compliance With: CCR Title 15, California Health and Safety Code, Section and IMQ sections 303 and 322.

I.  PURPOSE:

To insure that the addicted arrestee will receive necessary medical treatment throughout his/her incarceration.

To insure a safe environment for the arrestee during the detoxification phase.

II.  POLICY:

Medical care shall be provided to *VP's* exhibiting symptoms of addiction from recreational drugs, controlled substances or alcohol.

III.  PROCEDURE:

A.  When there is reasonable cause to believe an arrestee has an addictive condition, nursing staff will implement a treatment plan in accordance with the SNP.

B.  An arrestee with an addictive condition will be monitored for signs, symptoms and complications of withdrawal.

C.  An arrestee who prior to his/her incarceration was being treated at an Outpatient Treatment Center (Methadone clinic) for heroin dependence will have the opportunity to continue treatment (dosing) according to the Methadone Clinic's protocols. The *VP* will assume the financial responsibility for continued treatment. An exception to this would be in the event that a pregnant female were unable to pay for services and cessation of Methadone treatment could jeopardize the viability of the fetus.

D.  The following processes should be followed when an individual states that they are currently in a Methadone Treatment Program.

1.  Advise the IiP that it is their responsibility to contact their Outpatient Treatment Center (Methadone clinic).

2.  On those occasions when assistance is needed, the nursing staff may assist the *VP*.

ADDICTED ARRESTEE CARE

Exhibit 18
239

# San Diego County Sheriff's Department
## Medical Services Division
## Policy and Procedure Manual

| Date | Dissemination | Category | Number |
|------|---------------|----------|--------|
| 2/28/2011 | Medical Services Division | Medical & Psychiatric Care Services | MSD.A.2 |

| Subject: **ADDICTED ARRESTEE CARE** | Page 2 of 2 |
|---|---|

**Related Sections:** MSD P&P:

**In compliance With:** CCR Title 15, California Health and Safety Code, Section and IMQ sections 303 and 322.

3.  Methadone Programs will only dose liP's at the three booking jails, SDCJ, LCDF and VDF and for that reason, transfers to non-booking jails should be delayed until the tapering Methadone treatment has been completed.

4.  liP's medical record shall be flagged as an Outpatient Treatment Center (Methadone clinic) patient.

5.  The Methadone Clinic Program will be responsible for supplying and administering methadone as well as maintaining required records.

6. The following are approved Outpatient Treatment Centers (Methadone clinics):

    a. San Diego Health Alliance (San Diego)
       7020 Friars Road, San Diego, CA 92123
       (619) 718-9890

    b. San Diego Health Alliance (El Cajon)
       234 N. Magnolia Avenue, El Cajon, CA 92020
       (619) 579-8373

    c. San Diego Health Alliance (San Marcos)
       1560 Capalina Street, San Marcos, CA 92069
       (760) 744-2104

    d. Home Avenue Clinic
       3940 Home Avenue, San Diego, CA 92105
       (619) 262-8000

    e. Third Ave. St. Clinic (San Diego Treatment Services)
       1161 3rd Avenue, Chula Vista, CA 91911
       (619) 498-8260

E.  Additional processes must be followed upon incarceration if the female inmate is pregnant an heroin dependent and is not currently in a Methadone Treatment Program.

ADDICTED ARRESTEE CARE

Exhibit 18
240

# San Diego County Sheriff's Department
## Medical Services Division
### Policy and Procedure Manual

| Date | Dissemination | Category | Number |
|------|---------------|----------|--------|
| 2/28/2011 | Medical Services Division | Medical & Psychiatric Care Services | MSD.A.2 |

| Subject: ADDICTED ARRESTEE CARE | Page 3 of2 |
|---|---|

| Related Sections: MSD P&P: |
|---|

| In compliance With: CCR Title 15, California Health and Safety Code, Section and IMQ sections 303 and 322. |
|---|

1. Ascertain whether liP is greater or less than 20 weeks.

   a. If the nurse is unable to determine by liP's LMP and/or physical assessment:

      i. Obtain an order for stat ultrasound to determine fetal age

      ii. If the facility is unable to do an ultrasound within 24 hours, refer the 1/P to UCSD for a stat ultrasound.

2. Upon incarceration if the pregnant female is less than 20 weeks

   a. Initiate SNP for heroin withdrawal

   b. Schedule for the next OBSC.

3. Upon incarceration to jail if the pregnant female is greater than 20 weeks pregnant and in active heroin withdrawal:

   a. Immediately refer to labor and delivery at UCSD for management.

4. Upon incarceration if the pregnant female is greater than 20 weeks pregnant and by history has been using heroin prior to coming to jail but is not actively withdrawing from heroin;

   a. Contact the on call OB-GYN physician and obtain an order for Morphine. Staff will need to ascertain how much heroin the individual is currently taking. This information will be used as a guideline to determine amount of Morphine to be prescribed.

   b. The liP will need to be seen in L&D within 24 hours where consultation with Perinatology can be obtained.

   c. Obtain stat referral to a perinatologist at UCSD for further management/recommendations for either a tapering dose of Morphine or continuing Morphine until delivery

ADDICTED ARRESTEE CARE

Exhibit 18
241

# San Diego County Sheriff's Department
## Medical Services Division
### Policy and Procedure Manual

| Date | Dissemination | Category | Number |
|---|---|---|---|
| 2/28/2011 | Medical Services Division | Medical & Psychiatric Care Services | MSD.A.2 |
| Subject: ADDICTED ARRESTEE CARE | | | Page 4 of 2 |
| Related Sections: MSD P&P: | | | |
| In compliance With: CCR Title 15, California Health and Safety Code, Section and IMQ sections 303 and 322. | | | |

F. In the event the female inmate is pregnant and currently in a Methadone Treatment Program.

  1. Obtain Treatment Program's information and call the agency and advise them of their patient's incarceration.

  2. Arrange for the *VP* to continue receiving methadone treatment from the clinic.

  3. If *VP* is unable pay for the service, notify the facility Nursing Supervisor and the Director of Nursing.

    a. Sheriffs Case Manager will assist in securing services for the pregnant inmate.

G. In the event a pregnant inmate is transferred from a prison or agency and is currently receiving Methadone.

  1. Review transfer medication information.

    a. Notify the facility Nursing Supervisor and the Director of Nursing

  2. Call the El Cajon Health Alliance Clinic at (619) 579-8373 and give them a brief medical history of the *VP*. Included in this information should be a booking number.

  3. Complete a form letter and fax to (619) 579-8155 together with the order for methadone from prison or outside county/state agency.

H. In the event the pregnant inmate is scheduled for court

  1. Arrangements can be made in advance for Health Alliance Clinic to dose the *VP* in the court holding area or

  2. Call the El Cajon Clinic the day before the *VP* goes to court and

ADDICTED ARRESTEE CARE

Exhibit 18
242

# San Diego County Sheriff's Department
## Medical Services Division
### Policy and Procedure Manual

| Date | Dissemination | Category | Number |
|------|---------------|----------|--------|
| 2/28/2011 | Medical Services Division | Medical & Psychiatric Care Services | MSD.A.2 |

| Subject: ADDICTED ARRESTEE CARE | Page 5 of 2 |
|---|---|

**Related Sections:** MSD P&P:

**In compliance With:** CCR Title 15, California Health and Safety Code, Section and IMQ sections 303 and 322.

make arrangements to deliver the Methadone at 0515 or

   3. Call the Sheriff's Pharmacist if help is needed with the arrangements.

  I. In the event the pregnant inmate comes into custody over a weekend

    1. Obtain the name and phone number of the IiP's Methadone Clinic.

    2. Contact San Diego Health Alliance. at (619) 579-8373
      **SD Health Alliance has limited hours on the weekends.

      a. After hours contact Dennis Whitmyer, at 619.993.7865.

      c. MSD Staff member will fax information, including an ROI to SD Health Alliance.

      d. A follow-up call will be made by an MSD medical staff member to SD Health Alliance to arrange dosing.

Implemented: 1/90
Reviewed: 9/19/97, 8/10/01,9118/02,8/9/04,8/12/05,7/31/06,7/31/07,07/09/08,7.13.09,2/2/12,2.12.13
Revised: 3/18/92,2/26/93,4/1194,5/24/95,1/29/96,9/17/96,9/18/98,8/11/99,7/31/00,8/18/0,5/21/07,
2/28/11

ADDICTED ARRESTEE CARE

Exhibit 18
243

# EXHIBIT 19

Exhibit 19
244

SNP.D.6

**SAN DIEGO COUNTY SHERIFF'S MEDICAL SERVICES**
**STANDARDIZED NURSING PROCEDURE**

**DIABETES MELLITUS**

I. PATIENT CONDITIONS:

    A. The patient gives a history of diabetes mellitus
        1. Type 1 (insulin dependent),
        2. Type II (non- insulin dependent)
        3. Currently pregnant with diagnosis of gestational diabetes.

    B. The patient reports a history of diet controlled diabetes and is not currently taking oral diabetes medication.

II. SUBJECTIVE:

    A. Obtain past history and current treatment including:
        1. Medications
           a. Insulin
               i. Name of insulin
               ii. Amount and time of last dose
        2. Oral diabetic medications
           a. Name of oral diabetes medication(s)

    B. Obtain information re: prior hospitalization or complications related to diabetes i.e. diabetic, ketoacidosis or hypoglycemic coma.

    C. For females of child-bearing age, note LMP and inquire about the possibility of being pregnant.
        1. If pregnancy is confirmed by a urine test, schedule for MDSC or OBSC within the next 24 hours.

III. OBJECTIVE:

    A. Vital Signs.
    B. Results of fingerstick blood sugar.
    C. Presence of Ketones in the urine
    D. Presence of any of the following:

| SYMPTOMS OF HYPERGLYCEMIA | SYMPTOMS OF HYPOGLYCEMIA |
|---|---|
| Increased Blood Sugar | Low Blood Sugar |
| Skin warm/hot & dry, Polydipsia | Skin cool/clammy, Tremulous |
| Polyuria, Urine Dip-+Ketones, | Increased anxiety |
| +Glucose, | Confusion or Unresponsive |
| Acetone Breath, Confusion | Palpitations, Tachycardia |
| Dehydration, Signs and Symptoms of Shock | Headache, Seizures |

SNP.D.6

### SAN DIEGO COUNTY SHERIFF'S MEDICAL SERVICES
### STANDARDIZED NURSING PROCEDURE

### DIABETES MELLITUS

IV. <u>ASSESSMENT</u>:

    A. Altered Health Maintenance
    B. Potential altered nutrition (less than body requirements) r/t imbalance between insulin need and insulin dose.
    C. Potential non-adherence r/t complexity of management regimen
    D. Knowledge deficit of therapeutic regimen
    E. Anxiety related to diabetes and its prognosis

V. <u>TREATMENT PLAN:</u>

    A. <u>Insulin Dependent Diabetics (Type I) No oral agents used</u>

        1. Obtain initial capillary blood sugar and collect a urine specimen for the presence of ketones and document results in JIMS
        2. If results are greater than <u>250</u> collect a urine and test for ketones.
            a. Follow orders (table 1-)for sliding scale insulin, for blood sugar retesting and medical follow-up

        3. Order a diabetic diet with snack
        4. Schedule I/P for MDSC
        5. Routine testing
            a. Blood sugar and ketone testing should be done:
               i. Twice a day
               ii. Prior to administering insulin
               iii. More often if ordered/indicated

**\*\*\*\*Inmates refusing glucose testing will not be given insulin and educated on importance of compliance and monitoring blood sugar.**

    B. <u>Non-Insulin Dependent Diabetes (Type II)</u>

        1. Obtain initial capillary blood sugar and collect a urine specimen for the presence of ketones and document results in JIMS
        2. If results are greater than <u>250</u> collect a urine and test for ketones.
            a. Follow orders (table 1) for sliding scale insulin, for blood sugar retesting and medical follow-up
            b. Repeat sliding scale <u>every four hours for additional coverage.</u>
        3 Order a diabetic diet with <u>NO SNACK</u>

SNP.D.6

## SAN DIEGO COUNTY SHERIFF'S MEDICAL SERVICES
## STANDARDIZED NURSING PROCEDURE

### DIABETES MELLITUS

    4.  Schedule I/P for MDSC
    5   Routine testing
        a. Blood sugar and ketones
            i.   Twice a day
           ii.  Prior to administering insulin
          iii.  More often if ordered/indicated

C  For I/P's claiming they are diabetic and managed with diet only

      1   Obtain blood sugar
      2.  If results are greater than 251 collect a urine and test for ketones.
          a. Follow orders (table 1below  for sliding scale insulin, for
               blood sugar retesting and medical follow-up
          b.  Schedule I/P for MDSC
      3.  Continue bid blood sugar checks until seen by MD.

## TREATMENT PLAN:

1. Hyperglycemia Sliding Scale:

| Blood Sugar | Give Insulin SC Now | U/A Dip for Ketones | Repeat BS & SS Within 4 hours |
|---|---|---|---|
| <250 | None | No check | No |
| 251-350 | 3 units regular | No ketones present | No, MDSC next available |
| 251-350 | 3 units regular | Ketones present | Yes, MDSC next available |
| 351-450 | 5 units regular | No ketones present | Yes, MDSC next available |
| 351-450 | 5 units regular | Ketones present | Yes, MDSC next available |
| >450 | 7 units regular | No ketones present | Yes, MDSC next available |
| >450 | 10 units see below) | Ketones present | Yes, notify MD |

    a.    Repeat blood sugar, ketones and sliding scale coverage as needed at checks.
    b.    Blood glucose checks by finger stick BID, or as directed by the physician, for
         the duration of the stay.
    c.    Diabetic diet may be ordered by an RN for the duration of the stay.

2 For hyperglycemia with ketoacidosis (blood sugar>450 mgm% and ketones are positive on dipstick):

    a.    Begin an IV of normal saline at 1000 cc/hour for the first hour and 500 cc/hour
         for the second hour if necessary.
    b.    Give human regular insulin, 10 units IV bolus.
    c.    If physician is available on site, physician to evaluate patient at once. If no on-
         site physician evaluation is possible within one hour from the time of the
         request and/or the patient is unresponsive, send the patient to the emergency
         room by 911 transport.

SNP.D.6

**SAN DIEGO COUNTY SHERIFF'S MEDICAL SERVICES
STANDARDIZED NURSING PROCEDURE**

**DIABETES MELLITUS**

D   For hypoglycemia (blood sugar <70mgm%), patient meets one or more hypoglycemia criteria stated above:

    1   If responsive give:
       Glucose tab or jelly and offer food (sandwich).

    2.   If unresponsive give:
       a. Start an IV and push 1 ampoule of 50% Dextrose. Use D5W at 125 cc/hr once 50% Dextrose has been given.
       b. If unable to establish an IV give Glucagon one unit ( 1 mg) IM X 1 dose.
       c. Recheck blood sugar after 10 minutes.
       d. If patient remains unresponsive and blood sugar is <60 give 50 cc of 50% glucose intravenously.
          1) A Physician should evaluate the patient immediately. If there is no on-site physician, notify the physician on-call for further instructions.
          2) Recheck responsiveness in 3-5 minutes.  If still unresponsive, send the patient to the emergency room by 911 transport.
          3) Hold all diabetic medications until evaluated by a physician.

E   PATIENT EDUCATION:

    1.   Test blood glucose as directed, use blood glucose information to manage disease.  Test more frequently when ill or under stress.

    2.   Take insulin as directed.  Used properly, insulin can control diabetes, but not cure it.

    3.   Choose healthy foods and eat them in the right amounts on a routine basis.

    4.   Exercise regularly.

    5.   Learn to manage stress to lessen its effects on your body.

    6.   Follow diabetic diet as prescribed.

    7.   Proper skin and nail care.

**SNP.D.6**

## SAN DIEGO COUNTY SHERIFF'S MEDICAL SERVICES
## STANDARDIZED NURSING PROCEDURE

### DIABETES MELLITUS

8. Routine carrying of sugar, candy, or other readily absorbed carbohydrate so that it may be taken at the first sign of an impending reaction.

9. Instruct the I/P on the signs and symptoms of hypoglycemia and the use of glucose tablets.

Implemented: 11/22/95
Revised: 02/16/96, 08/05/99, 02/00, 09/11/02, 11/07/03, 07/15/04, 04/25/05, 10/04/07, 11.28.11, 1/8/13
Reviewed: 10/96, 08/18/03, 08/09/04, 8/12/05, 7/31/06, 07/30/07, 07/10/08 and 8.05.09

# EXHIBIT 20

Exhibit 20
250

# San Diego County Sheriff's Department
## Medical Services Division
### Policy and Procedure Manual

| Date | Dissemination | Category | Number |
|------|---------------|----------|--------|
| 10/4/2007 | Medical Services Division | Medical & Psychiatric Care Services | MSD.C.2 |
| **Subject: CODE BLUE: LIFE THREATENING EMERGENCIES** | | | Page 1 of 3 |
| **Related Sections: DSB P&P: M.5 & M.6; MSD P&P: F.2** | | | |
| **In Compliance With:   CCR Title 15, Section 1208.** | | | |

I.  PURPOSE:

   To provide guidelines for handling a CODE BLUE, a life threatening emergency of an inmate/patient (I/P), staff, and/or visitors within the detention facilities.

II.  POLICY:

   Emergency Response Staff, (9)-911, will be called to provide Advanced Cardiac Life Support (ACLS) for CODE BLUE: Life threatening emergency.  A physician (MD), or Registered Nurse (RN) shall evaluate patients with any medical emergency and request appropriate transportation.  First responder shall provide Basic Life Support (BLS Class "C") and first aid medical care to stabilize the condition.

III. PROCEDURE:

   A. NOTE: IF THERE IS A PHYSICIAN IN THE FACILITY, THEY SHALL BE CALLED TO THE SCENE,

   B. Personnel responding to a **CODE BLUE** in the event of a cardiac arrest should follow the following:

   1. **The FIRST PERSON** on the scene or to discover victim shall:
      a. Assess situation.
      b. Without leaving patient, immediately call for help (911).
      c. Start Cardiopulmonary Resuscitation (CPR).

   2. **The NEXT PERSON** on the scene shall:
      a. Notify Control Deputy.
      b. Notify Medical Staff.

   3. The Medical staff shall take appropriate emergency equipment such as: the Emergency Response or Code Blue cart or bag, AED, Oxygen tank, Ambu bag, suction machine, back board and cervical collar.

      a. Assess situation immediately.

      b. Monitor patient

   CODE BLUE: LIFE THREATENING EMERGENCIES

Exhibit 20
251

# San Diego County Sheriff's Department
## Medical Services Division
### Policy and Procedure Manual

| Date | Dissemination | Category | Number |
|---|---|---|---|
| 10/4/2007 | Medical Services Division | Medical & Psychiatric Care Services | MSD.C.2 |
| **Subject: CODE BLUE: LIFE THREATENING EMERGENCIES** | | | Page 2 of 3 |
| **Related Sections: DSB P&P: M.5 & M.6; MSD P&P: F.2** | | | |
| **In Compliance With:   CCR Title 15, Section 1208.** | | | |

      c.  Apply AED pads

      d.  Delegate as necessary.  Physicians who are ACLS certified may use their respective ACLS protocols in accordance to their professional licensure.  <u>Only</u> an ACLS certified physician, when on site, may attempt intubation.

4.  Document the sequence of events in the Notes field of the encounter the following:

      a.  Location of the rescue/mandown,  CPR assessment including time started and I/P's response to resuscitation efforts.

      b.  Treatment given and response prior to arrival of Emergency Response Staff.

         i.  Time of Emergency Response Team arrival & transfer of patient out of facility.

         ii.  Disposition of patient.

5.  Medical staff managing the Code shall record in the Medical Emergency Log the name of the I/P and when he/she was transported to a hospital.

6.  If the victim is an inmate, medical staff shall notify the Charge and Supervising Nurse.

7.  If the victim is a visitor or employee, medical staff shall submit a written progress note to the facility Supervising Nurse identifying the individual as a visitor or employee.  The progress note summarizing the incident and nursing actions.

B.  The following are examples of  (but not limited to) conditions that require 911 Paramedic Emergency Response.

1.  Cardiac or Respiratory Arrest

CODE BLUE: LIFE THREATENING EMERGENCIES

Exhibit 20
252

# San Diego County Sheriff's Department
## Medical Services Division
### Policy and Procedure Manual

| Date | Dissemination | Category | Number |
|------|---------------|----------|--------|
| 10/4/2007 | Medical Services Division | Medical & Psychiatric Care Services | MSD.C.2 |
| **Subject: CODE BLUE: LIFE THREATENING EMERGENCIES** | | | Page 3 of 3 |
| **Related Sections: DSB P&P: M.5 & M.6; MSD P&P: F.2** | | | |
| **In Compliance With:   CCR Title 15, Section 1208.** | | | |

2.  Status Epilepticus

3.  Stab wounds with symptomatic vital signs.

4.  Blunt trauma to the chest, abdomen or back with symptomatic vital signs.

5.  Head trauma with altered mental status

6.  Chest pain with symptomatic vital signs.

7.  Any emergency situation that the MD, NP, or RN/LVN deems necessary; and when they feel the patient's health may be compromised if there is a delay in treatment.

8.  Emergency transport by air is also available when needed.

Implemented: 7/91
Revised:  4/1/92, 4/1/94, 5/22/95, 1/19/96, 8/11/99, 8/10/01, 8/18/03, 10/04/07
Reviewed: 9/19/97, 9/18/98, 7/31/00, 9/18/02, 8/9/04, 8/12/05, 7/31/06, 7/31/07, 07/09/08, 7.14.09, 2/28/11, 2/3/12, 2.12.13

# EXHIBIT 21

Exhibit 21
254

SNP.S.1

## SAN DIEGO COUNTY SHERIFF'S MEDICAL SERVICES
## STANDARDIZED NURSING PROCEDURE

### SEIZURE DISORDER

PATIENT CONDITIONS:

1. Inmate presents to 2nd stage screening and gives a medical history of seizures with one of the following.
   - A. I/P is currently under the care of an MD.
   - B. The I/P has a history of seizures but **is not** currently under an MD's care.

2. An inmate that is having a seizure.
   - A. Symptoms of a seizure can include but not limited to:
     - i. Drooling
     - ii. Eyes fluttering or rolling up
     - iii. Incontinence
     - iv. Shaking or tremors
     - v. Starring
     - vi. Teeth Clenching

   - B. These individuals might include but not limited to:
     - i. An individual never having had a seizure
     - ii. An individual withdrawing from alcohol
     - iii. An individual currently being treated for a seizure disorder
     - iv. An individual having an acute head injury

SUBJECTIVE:

1. The inmate admits to a history of a seizure disorder- Medical staff should note the year the seizure disorder was diagnosed and whether the seizure was secondary to a trauma, infection or substances (alcohol, heroin, benzodiazepines).
2. Information regarding last seizure
3. Obtain a list of current medications, last dose and last therapeutic blood level.

OBJECTIVE:

1. Vital signs, orientation, and mentation.
2. Note old head injury, surgery scars or track marks.
3. Injuries from recent seizure activity; i.e. tongue trauma, ecchymosis, lacerations, etc.

SNP.S.1

## SAN DIEGO COUNTY SHERIFF'S MEDICAL SERVICES
## STANDARDIZED NURSING PROCEDURE

### SEIZURE DISORDER

ASSESSMENT:

Nursing Diagnosis:
1. Potential for Injury 1.6.1

TREATMENT PLAN :

1. For the I/P that has a history of seizures, is currently not being treated and presenting to 2nd screening:
    A. Request lower bunk for this patient
    B. Enter JIMS instruction "Seizure Disorder"
    C. Schedule I/P for MD Sick Call.

2. For the I/P that gives a past history of alcohol seizures and is currently withdrawing from alcohol initiate the Alcohol Withdrawal SNP.

3. For the I/P that is pregnant with a history of seizures presenting to 2nd screening
    A. Do not start them on Dilantin.
    B. Refer I/P to the next available MD or OB sick call for follow-up.

4. For the I/P presenting to 2nd screening who has been compliant with seizure medication regimen:
    A. The I/P has been compliant with his/her medications with the last dose being within 48 hours, has had no recent seizure activity, and no signs of Dilantin toxicity (nystagmus, ataxia, confusion, bradycardia or lethargy or increased seizure activity).
    B. Start the I/P on their regular dose of Dilantin (if known).
    C. If patient does not know his/her usual regimen:
       Start the I/P on Dilantin 300 mg PO q hs x 30 days.
    D. Request lower bunk for this patient
    E. Enter JIMS instruction "Seizure Disorder"
    F. Schedule I/P for MD Sick Call.

5. For the I/P presenting to 2nd screening who has been compliant with Dilantin as their seizure medication regimen but whose last Dilantin dose is greater than 48-hours:

    A. Draw Lab: Dilantin level prior to giving the Loading dose.
       i. If the I/P states or if outside medical or pharmacy records indicate that Dilantin hasn't been taken for 1 month or longer, it is not necessary to draw a Dilantin level.

SNP.S.1

## SAN DIEGO COUNTY SHERIFF'S MEDICAL SERVICES
## STANDARDIZED NURSING PROCEDURE

### SEIZURE DISORDER

B. Start medication:  Dilantin 700 mg PO x 1 (Loading dose), the Dilantin 300mg PO qhs X 30 days. (**May be given no sooner than 4hours after loading dose.)
C. Request lower bunk for this I/P.
D. Enter in the JIMS instruction section "Seizure Disorder"
E. Schedule I/P for the next available MD Sick Call.

6. For the I/P with a different medication regimen other than Dilantin:

A. Verify medication orders as per guideline, with I/P's pharmacy or physician.
B. Contact the on-site or on-call physician for orders of verified medications.
C. If the medications cannot be verified, contact the on-site or on-call MD for anticonvulsant orders.
D. Request lower bunk for patient.
E. Enter JIMS instruction "Seizure Disorder"
F. Schedule I/P for MD sick call for a follow-up evaluation.

7. For the individual that is having a seizure (with or without previous history of Seizures), contact the on-site MD or on-call physician.

8. Immediate emergency care is required when the seizures are ongoing, prolonged or repeated over a few minutes. This is a condition known as Status Epilepticus:

A. Call 911
B. Protect the airway
C. Protect I/P from self harm
D. O2 at 10-15 liters/minute per non-rebreather mask.
E. Insert oral airway or nasal trumpet as indicated
F. Perform a capillary blood glucose test and if glucose is < 60 give 1 ampoule of 50% Dextrose.
G. Start an IV with Normal Saline
H. Call the on-site or on-call MD for possible anticonvulsant medication.

PATIENT EDUCATION:
1. Assess I/P's knowledge of his/her medical history.
2. Teach importance of compliance with medication and medical regime.
3. Educate I/P on the importance of a lower bunk for sleeping to avoid major injury if seizure should occur.

Exhibit 21
257

SNP.S.1

## SAN DIEGO COUNTY SHERIFF'S MEDICAL SERVICES
## STANDARDIZED NURSING PROCEDURE

### SEIZURE DISORDER

Implemented: 10/01/95
Revised: 02/16/96, 08/05/99, 08/10/01, 01/20/04, 05/07/07, 5/16.11
Reviewed: 10/96, 08/02, 08/18/03, 08/09/04, 8/12/05, 7/31/06, 07/30/07, 07/10/08 and 8.11.09


Reference

*Advance medical life support* (1 edition ed.). (2011). Philadelphia: Mosby/JEMS.

Epilepsy: MedlinePlus Medical Encyclopedia. (n.d.). *National Library of Medicine - National Institutes of Health*. Retrieved May 16, 2011, from http://www.nlm.nih.gov/medlineplus/ency/article/000694.htm

# EXHIBIT 22

Exhibit 22
259

Shirley Bautista
February 28, 2017

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ESTATE OF RONNIE PAUL
SANDOVAL and ANA SANDOVAL, an
individual,

            Plaintiffs,

    vs.                              Case No.: 16cv1004-BEN(AGS)

COUNTY OF SAN DIEGO, a Public
entity; SAN DIEGO COUNTY
JAIL, a Public Entity, and
DOES 1 through 100;

            Defendants.

_____

DEPOSITION OF SHIRLEY BAUTISTA

February 28, 2017

1:20 p.m.

1600 Pacific Highway, Room 355

San Diego, California

REPORTED BY:
Elana Zucconi
CSR No. 9651, RPR, CRR

U.S. LEGAL SUPPORT
(619) 573-4883

Exhibit 22
260

Shirley Bautista
February 28, 2017

1   position to tell me what goes on in those holding cells

2   than you would, because she is there a lot?

3       A.   Probably for -- at that time, yeah.

4       Q.   Okay.  Now, would you agree with her testimony

5   earlier today that the fact that the -- those holding

6   cells can be used as administrative segregation or

7   medical or all sorts of reasons, that that creates some

8   confusion for the nursing staff?  Do you agree with

9   that?

10      A.   It could be.

11      Q.   And you understand that the policy with respect

12  to those two holding cells has recently changed, right?

13      A.   Yes.

14      Q.   Could you describe for me that change in

15  policy?

16      A.   That if the inmate is going to be placed there

17  or is placed there for a medical reason, then they -- we

18  have like a placard that sticks to the door, that it is

19  medical.  Or the deputy will write, you know, the reason

20  for the inmate being there.  They would write "medical,"

21  or if it is for "keep separate" (indicating), they write

22  it there.

23      Q.   Okay.  And it was Nurse Llamado's impression

24  that that change in policy came about because of what

25  happened in this case.  Do you agree with that?

Shirley Bautista
February 28, 2017

1     A.    I -- to be honest, I don't know if -- if the
2     change in policy is -- happened before or after that
3     time.   I don't remember.  But I can't say that it was
4     spec- -- I can't really be for sure that it was for that
5     reason, because I am not included in making or advising
6     the policies.
7          Q.    Okay.  You don't know what occasioned that new
8     policy?
9          A.    I don't know.
10         Q.    But it is your recollection that it came about
11    right about the same time that this happened with
12    respect to Mr. Sandoval?
13         A.    Possibly.
14         Q.    And do you think it is a good idea that there
15    are now placards on the door that tell the nurses, hey,
16    this guy was placed in here by a deputy for medical
17    reasons?  Is that a good idea?
18         A.    Yes.
19         Q.    Why is that a good idea?
20         A.    If we know what is the reason why the patient
21    is there, and if it is -- if we know it is for a medical
22    reason, then, you know, we know that we need to observe
23    that guy and reassess the patient.
24         Q.    And did you ever talk to Nurse DeGuzman about
25    what his impressions were as to why Mr. Sandoval was

Shirley Bautista
February 28, 2017

1     Q.    What seizures require 9-1-1 and what seizures
2   don't?
3     A.    Well, if the inmate or the patient is actively
4   seizing for several minutes and doesn't come out of it,
5   then you need to send out by 9-1-1.
6     Q.    If it was just kind of like a one-and-done
7   seizure, he had one little seizure and then he is done,
8   you don't call 9-1-1?
9     A.    Yes.
10    Q.    Now, what's a -- can you describe for me, when
11  you say "seizure," what does that mean to you?  When you
12  look at somebody and you say, "Okay, they are having a
13  seizure," what are you seeing?
14    A.    I would see a patient having like tonic clonic
15  movement, shaking of the arms.
16    Q.    Tense?
17    A.    Tense.  You know, the rhythmic shaking, the
18  arms and the legs or the entire body.  There would be
19  drooling of saliva.  The eyeballs, you know,
20  (indicating) goes up.  Doesn't talk to you.  There would
21  be -- some would have like incontinence of bowel or
22  bladder, and some would be biting their tongue.
23    Q.    And when you see those things, even though they
24  would be short-lived, that is something you would call
25  9-1-1 for?  Someone shaking, drooling, eyes rolled back,

Exhibit 22
263

Shirley Bautista
February 28, 2017

1   you would call 9-1-1, I imagine?

2       A.    Not even with that kind of -- a grand mal

3   seizure, not everybody gets sent out to the hospital.

4       Q.    So if somebody is having a grand mal seizure,

5   why wouldn't you send them to the hospital?

6       A.    Because usually they would wake up from it.

7       Q.    And then they would be fine?

8       A.    They would be fine.  They would be talking to

9   you and they will tell you, "Oh, I haven't had my

10  medication for this long," and we just call the doctor

11  and start.  Or the doctor would just say, "Okay, let's

12  get the blood, the medication blood level."

13      Q.    How long does a person have to be seizing

14  without waking up that triggers a call to 9-1-1 for you?

15      A.    For me personally, I would say like three

16  minutes.

17      Q.    A three-minute seizure and then you would call

18  9-1-1?

19      A.    Yeah.

20      Q.    Three minutes without waking up?

21      A.    Yeah, because that's -- I have seen a lot of

22  seizures in the jail, and usually they will be waking up

23  in two minutes or --

24      Q.    I'm sorry?

25      A.    They will be waking up --

Exhibit 22
264

Shirley Bautista
February 28, 2017

### DECLARATION

I herby declare I am the deponent in the within matter; that I have read the foregoing deposition and know the contents thereof; and I declare that the same is true of my knowledge except as to the matters which are therein stated upon my information or belief, and as to those matters, I believe it to be true.

I declare under the penalties of perjury of the State of California that the foregoing is true and correct.

Executed on the ___04___ day of ___APRIL___ 2017, at ___ESCONDIDO___, ___California___.

(City)                         (State)

SHIRLEY BAUTISTA

U.S. LEGAL SUPPORT
(619) 573-4883

89

ORD INDEX

EXHIBITS

Exhibit 22
265

Shirley Bautista
February 28, 2017

```
1                    REPORTER'S CERTIFICATE

2

3

4              I, ELANA ZUCCONI, CSR No. 9651, Certified

5     Shorthand Reporter, certify:

6              That the foregoing proceedings were taken

7     before me at the time and place therein set forth, at

8     which time the witness was put under oath by me;

9              That the testimony of the witness, the

10    questions propounded, and all objections and statements

11    made at the time of the examination were recorded

12    stenographically by me and were thereafter transcribed;

13             That a review of the transcript by the

14    deponent was requested;

15             That the foregoing is a true and correct

16    transcript of my shorthand notes so taken.

17             I further certify that I am not a relative or

18    employee of any attorney of the parties, nor financially

19    interested in the action.

20             I declare under penalty of perjury under the

21    laws of California that the foregoing is true and

22    correct.

23         Dated this 3rd day of March, 2017.

24

25                    ELANA ZUCCONI, CSR No. 9651
```

Exhibit 22
266

# EXHIBIT 23

Exhibit 23

267

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN DIEGO

| | | |
|---|---|---|
| Estate of Ronnie Paul Sandoval | ) | |
| and Ana Sandoval, an individual, | ) | |
| Plaintiffs, | ) | No. 37-2014-00033347 |
| v. | ) | CU-PO-CTL |
| County of San Diego, a public | ) | |
| entity; San Diego County Jail, | ) | |
| a public entity; and | ) | |
| Does 1 through 100; | ) | |
| Defendants. | ) | |
| | ) | |

Deposition of CARLOS L. ESTOLANO

April 11, 2017

Reported by Veronica S. Thompson, CSR 6056, RPR, CRR

Exhibit 23
268

Deposition of Carlos L. Estolano          ESTATE OF RONNIE PAUL SANDOVAL, et al. vs. COUNTY OF SAN DIEGO, et al.

```
 1   nurse, is the supervisor --
 2              MS. PENA:  I'm simply asking --
 3              MR. CHAPIN:  -- is supposed to be following --
 4              MS. PENA:  I'm simply asking -- I'm following
 5   up on what he already told us and testified to, which
 6   was if a charge nurse tells their RN or LVN to call 911,
 7   that is their directive and that's what they are
 8   supposed to do.
 9              MR. CHAPIN:  Same objections.
10              Try to answer it.
11              MS. PENA:  He already answered that question.
12              Okay.
13              MR. CHAPIN:  I'm just posing my objections --
14              MS. PENA:  That's fine.
15              MR. CHAPIN:  -- so you can try to answer the
16   question.
17              THE WITNESS:  The person at the scene is the
18   one responsible for making the call.
19   BY MS. PENA:
20       Q.   Understood.
21       A.   If you're asking me that based on a phone call
22   from the attending nurse to the situation that a charge
23   nurse would activate paramedics, that would be an answer
24   that only the charge nurse can answer.
25       Q.   I'm not asking you, sir, if they would.  I'm
```

Exhibit 23
269

1   asking you if the charge nurse did activate 911 based on

2   that phone call, is that a directive that the RN or LVN

3   should follow?

4           MR. CHAPIN:  That's a different question.

5           If your question is should the --

6           MS. PENA:  We already answered -- he did

7   answer.

8           MR. CHAPIN:  -- should the nurse follow the

9   charge nurse's direction, that's a different question.

10          THE WITNESS:  The answer is yes.

11          MS. PENA:  Okay.  We already answered that

12  question.

13  BY MS. PENA:

14      Q.  Now, my next question is, does that scenario

15  fit into this number 7?  Because number 7 is very

16  ambiguous, so that's why I'm trying to ask you if that

17  would be -- if that would qualify as a number 7

18  provision.

19          MR. CHAPIN:  And that's an ambiguous question.

20          THE WITNESS:  My answer would be I do not

21  know.

22  BY MS. PENA:

23      Q.  Okay.  Fair enough.  Okay.  Thank you, sir.  I

24  just wanted to go through that.  I'm sure we will come

25  back to it.

Exhibit 23
270

1   things that I'm asking him which are recognitions for

2   methamphetamine overdose.

3           MR. CHAPIN:  Well --

4           MS. PENA:  This is his list.  So I'm just --

5           MR. CHAPIN:  -- methamphetamine intoxication

6   was his answer, not overdose.

7           MS. PENA:  I've never asked about

8   intoxication.  All I've asked about was overdose or

9   poisoning.

10          MR. CHAPIN:  I'll object to that as vague and

11  ambiguous.  Nobody knows what that is.

12          MS. PENA:  It's a late objection.

13          Go ahead.

14          No -- it's in -- actually, it's in POST

15  training, so people should know what it is.

16          MR. CHAPIN:  I'm objecting as vague and

17  ambiguous.

18  BY MS. PENA:

19      Q.   Would difficulty walking and/or talking also

20  be an objective symptom that you would look for if you

21  were evaluating an inmate or a client for

22  methamphetamine poisoning or overdose?

23      A.   It could be for that and a number of other

24  medical conditions.

25      Q.   Thank you.

Exhibit 23
271

1        Q.   Yes, sir.  Do you remember what -- actually,

2   why don't we start here.

3        What nurses' notes did you review?

4        A.   I can't recall.  I can tell you that -- the

5   people who are involved as I understood it, I reviewed

6   the case, but as if -- do I recall every note that I

7   read?  No, I don't recall.  I would have to review them

8   in order to freshen my mind -- my memory on what I

9   actually reviewed.

10       Q.   Fair enough.

11       Who do you believe was involved in this

12   situation as far as your nursing staff is concerned?

13       A.   From my recollection -- which part of the

14   incident?

15       Q.   You tell -- the whole incident.

16       A.   If you're talking about the -- because we were

17   earlier talking about the 911 response.

18       Q.   Correct.

19       A.   So the 911 response, as I recall, had

20   nurses -- Harris --

21       Q.   Uh-huh.

22       A.   -- as -- I believe her being the first

23   responder; Nurse Yamato, who was there as well; and the

24   charge nurse, Shirley Bautista.

25       Q.   Okay.  Okay.  Now, you referred to that as the

Exhibit 23

272

1   would you typically look at the death investigation

2   report to see kind of what the investigator found as a

3   result of the incident to see if there's any discipline

4   or any actions that you need to take as a facility

5   supervisor?

6        A.   I believe that death investigation report

7   comes months after -- it simply takes that long to

8   review.  And I believe that goes at the level of the

9   hospital administrator and the chief medical officer.

10       Q.   The chief medical officer and who else?

11       A.   And the medical administrator.

12       Q.   Who is the medical administrator?

13       A.   Barbara Lee.

14       Q.   Has she been the medical administrator since

15  this incident?

16       A.   To the best of my recollection, she has been.

17       Q.   Barbara Lee?

18       A.   Correct.

19       Q.   L-e-e?

20       A.   Uh-huh, yes.

21       Q.   And then chief medical officer is Joshua?

22       A.   Dr. Joshua.

23       Q.   Okay.  Okay.  So you're telling me -- and this

24  is news to me.

25            So you're telling me that if -- in an instance

Exhibit 23
273

1    about Nurse de Guzman.

2    BY MS. PENA:

3        Q.   I'm absolutely not asking you to speculate.

4            I'm asking you, as your 16 years of a facility

5    supervisor, what would your impression be if someone

6    told you that's what happened that night?

7            MR. CHAPIN:   It's an incomplete hypothetical,

8    vague and ambiguous, calls for speculation.

9            THE WITNESS:   My answer will be that based on

10   Mr. de Guzman's note --

11           MS. PENA:   Move to strike as nonresponsive.

12   BY MS. PENA:

13       Q.   I'm not asking you about his note, sir.   I'm

14   asking you about what I've just said to you, and I will

15   say it again.

16           Assume with me, sir, that you interviewed

17   these people, and let's say -- let's take the reports

18   out of this.

19           You interviewed these people, and you were

20   told by Nurse de Guzman that someone brought him to him

21   on the second floor.   He looked his blood level.   He

22   said his blood level was fine.

23           Then you have Deputy Chavez telling you, "Hey,

24   I brought this guy up here, and I told Nurse de Guzman

25   what he was exhibiting and that he needed medical

Exhibit 23
274

1    hypotheticals, my assumption would be that if a nurse

2    who's the first responder believes that somebody is

3    going through a seizure activity, it becomes that

4    nurse's judgment at that moment to activate either EMTs

5    or 911.  And as the seizure activity turns into status

6    epilepticus, our policy and common practice will dictate

7    to activate 911.

8    BY MS. PENA:

9        Q.  Okay.  So if you're having -- the records here

10   are pretty clear.  He had a 10- to 15-minute prolonged

11   seizing and tensing.  He was unresponsive.  He never

12   talked or communicated.  One nurse says that he -- his

13   pupils were somewhat reactive.  The other nursing staff

14   says his pupils never reacted.

15           So assuming that is your hypothetical, for

16   about 10 to 15 minutes prolonged seizing and tensing,

17   nonresponsive, not communicative, does that sound like a

18   life-threatening, 911 type of situation?

19       A.  Assuming, as you said, for that extended

20   period of time, you would activate 911.

21       Q.  Okay.

22       A.  I have -- as I said earlier, I had never been

23   presented with the idea that Nurse Harris had refused to

24   activate 911, which is different than having a different

25   perception of what was happening at that time.  You

Exhibit 23
275

1   you're the one who stated that she refused.

2       Q.    Correct.

3       A.    That's not my understanding.

4       Q.    Okay.  Well, she -- fair -- it's fair to say

5   that she evaluated the situation differently than all of

6   your other tenured nurses.  That's fine.  But when your

7   charge nurse says, "Call 911," and Yamato relays that to

8   Harris and Harris says, "No.  We don't need it," if that

9   happened, sir, which is what the testimony indicates --

10  if that happened, would that be a violation of her

11  superior's orders or a violation of policy or anything

12  of that nature?

13          MR. CHAPIN:  Objection.  That's vague and

14  ambiguous, incomplete hypothetical.

15          THE WITNESS:  It would only depend as to the

16  amount of time that the activity had gone through, so I

17  do not know how long if, in fact, as you said, it's a

18  matter of record --

19  BY MS. PENA:

20      Q.    Uh-huh.

21      A.    -- that she stipulated or is this somebody

22  else's recollection?  This is Nurse Harris'

23  recollection?

24      Q.    This is both Nurse Harris and Yamato as far as

25  how long he was tensing up for and how long -- the

Exhibit 23
276

1   paramedics' report says he was seizing for 10 to

2   15 minutes which is, I guess, passed down by one of your

3   two responders.

4          So the 10 to 15 minutes is pretty clear.  Some

5   say tensing, some say seizing.  But that's not my

6   question.

7          My question to you is, if you have a directive

8   from your charge nurse to call 911 in this man-down type

9   of situation, should Harris call 911, or should she

10  disregard her superior's directive and make her own

11  evaluation of the situation?

12      A.    I would have activated 911 based on the

13  information you're giving me.

14      Q.    As Nurse Harris?  Is that --

15      A.    As -- as -- I as a nurse.

16      Q.    As a responder?

17      A.    You're asking me.

18      Q.    Okay.

19      A.    I, as a nurse, would have activated 911 based

20  on the hypothetical that you presented.

21      Q.    Understood, and thank you for that.

22          My question now, in your position as a

23  facility supervisor, if you learned that you have a

24  nurse who's responding to a situation and assessing it

25  on her own, and then she was -- the second responder

Exhibit 23
277

```
 1   activated 911.

 2             MS. PENA:  Okay.  Not responsive.

 3             I'm going to go with Jim's question because it

 4   seems a little easier.

 5   BY MS. PENA:

 6        Q.   Jim's question is --

 7        A.   Honest to God -- honest to God, I'm trying to

 8   give you the answer based on the way you're asking the

 9   questions.

10        Q.   Okay.  Perhaps I am very inartful at what I

11   do.  Okay.  That's very possible.

12             I understand very much that you would have

13   activated 911.  Thank you.

14             My question is, in a given scenario where a

15   nurse has her own thoughts but she gets a directive from

16   her supervisor, can she ignore that directive?

17        A.   A nurse should follow chain of command.

18        Q.   Okay.  Is it a violation of policy if she

19   ignores the directive from her chain of command?

20        A.   Our policy indicates that the first responder

21   has to assess the situation.  And based on the

22   information that you have given me --

23        Q.   Uh-huh.

24        A.   -- so far, in this particular case, after

25   several minutes of being on status epilepticus, 911
```

Exhibit 23
278

1       A.    You asked me if there was a policy that talks

2   about having two providers having a difference of

3   opinion and -- and --

4       Q.    Whether the second responder should elevate.

5       A.    -- to my knowledge, there's nothing that is --

6   that is specific.

7       Q.    Okay.  Now, perhaps it's not a written policy,

8   but is it maybe like an understanding, or no?

9           MR. CHAPIN:  I'm going to object as vague and

10  ambiguous.

11  BY MS. PENA:

12      Q.    Is it --

13          MR. CHAPIN:  Getting way off base as to what

14  you're asking about policies.  You've posed

15  hypotheticals, various ones.  And now we're so far

16  afield from that, I'm not sure what policies we're

17  talking about.

18          MS. PENA:  Let me clarify for you.

19  BY MS. PENA:

20      Q.    I don't know if it's a policy.  I guess you're

21  telling me it's not.

22          Is it a best practice within the jail?  Is it

23  a best custom within the jail that if your second

24  responder feels that a patient is in need of lifesaving

25  support, that they would elevate the call?

Exhibit 23
279

| | |
|---|---|
| 1 | MR. CHAPIN:  Same objection, and assumes |
| 2 | that -- if it assumes that the second responder has made |
| 3 | a full assessment, I think it's a fair question. |
| 4 | MS. PENA:  Let's assume that. |
| 5 | MR. CHAPIN:  Does that make -- make it easier |
| 6 | for you?  Just trying to -- |
| 7 | MS. PENA:  Thank you.  Let's assume that. |
| 8 | Let's add that fact into it. |
| 9 | THE WITNESS:  Based on the assumption if the |
| 10 | person has made a full assessment of the situation, they |
| 11 | should have activate 911. |
| 12 | BY MS. PENA: |
| 13 | Q.   Even though the first responder deemed it |
| 14 | unnecessary? |
| 15 | A.   Yes. |
| 16 | Q.   Thank you. |
| 17 | We're almost done here. |
| 18 | A.   You keep on promising. |
| 19 | Q.   We're almost done.  I promise. |
| 20 | MR. CHAPIN:  Trying to help. |
| 21 | MS. PENA:  I thank you, Jim.  I thank you, |
| 22 | Jim.  Okay. |
| 23 | BY MS. PENA: |
| 24 | Q.   Just to be thorough, that directive that came |
| 25 | from Bautista to call 911 after Yamato kind of filled |

Exhibit 23
280

1    evidence.

2              MS. PENA:  It is -- okay.  Well, you know, we

3    can talk about that later.

4              MR. CHAPIN:  It's argumentative.

5    BY MS. PENA:

6         Q.    Okay.  There is a new policy for this holding

7    cell that we're -- that we're calling a holding cell,

8    correct, since -- since Mr. Sandoval's passing?

9         A.    Holding versus medical cell?

10        Q.    What does that mean?

11        A.    Well, a holding cell -- we're talking about

12   the same location.

13        Q.    That's -- right.

14        A.    That same -- same location or --

15        Q.    That had the X on it.

16        A.    Whether it's at that or another room --

17        Q.    Okay.

18        A.    -- is -- if it is a holding cell, is for

19   deputies to manage.  If it is a medical cell, is for

20   medical staff to dictate this position.

21        Q.    Okay.  So if it's using -- so that one cell

22   that Ronnie had a seizure and died in, that cell --

23   you're telling me it's either -- that same cell is

24   either going to be used as a holding cell or it's going

25   to be used as a medical cell.  If it's used as a holding

Exhibit 23
281

1    cell, the deps manage it.  If it's used as a medical

2    cell, the nurses manage it?

3         A.   Correct.

4         Q.   Okay.  The main question here, sir, is, how do

5    you -- how now -- because that was the case back then.

6    That was the case when Mr. Sandoval died.

7              How now has that policy changed as far as

8    identification of the purpose of that cell?

9         A.   As I recall, I believe there's a magnetic sign

10   that is placed on the door indicating that this is a

11   medical cell.

12        Q.   Okay.  So the change in policy would --

13   sounds -- sounds like an informal change in policy in

14   that it's still a multipurpose cell, but now there's an

15   actual magnetic placard.  And I guess what you're saying

16   is when a deputy comes and brings an inmate/client in

17   there, they'll slap the medical placard on the door

18   that -- which then indicates to the medical staff that

19   this is their responsibility now.  Is that true?

20        A.   I think it's a little more than that.

21        Q.   Okay.

22        A.   I think that there needs to be -- the

23   expectation is there's communication between --

24        Q.   Also.  Okay.

25        A.   -- deputies and nurses as to the reason why

Exhibit 23
282

1    this person is brought in to this medical cell.

2         Q.   Okay.  And the communication portion, that was

3    always in effect.  It was always multiuse cell.  And

4    then if a deputy tells you they're using it for a

5    medical cell, then it's a medical cell.  Correct?

6         A.   And if the nurse states that the person is no

7    longer in need to be there, that becomes a holding cell.

8         Q.   Okay.  So that's interesting.  I'm sorry.

9              So -- so now it has kind of changed a little

10   in that there's still the communication, there's still

11   the multiuse cell, but now there are placards to also

12   help identify the purpose of the cell?

13        A.   Yes.

14        Q.   Okay.  So practically speaking, a deputy comes

15   in.  He puts the placard on the door, talks to the

16   nurse.  Says this guy needs medical evaluation.  That's

17   a medical cell, and the nurses will do what they have to

18   do.  Correct?

19        A.   Yes.

20        Q.   Okay.  Once the nurses has cleared that

21   inmate/patient, would they then take the magnet off the

22   door and -- and tell the deputy, "This guy's cleared,"

23   or what -- what is -- what is the protocol for when it

24   switches again from a medical cell to a holding cell?

25        A.   I believe it's not only do they -- I'm trying

Exhibit 23
283

1           DECLARATION UNDER PENALTY OF PERJURY

2

3           I, CARLOS L. ESTOLANO, the witness herein,

4   declare under penalty of perjury that I have read the

5   foregoing in its entirety; and that the testimony

6   contained herein is a true and accurate transcription of

7   my testimony elicited at said time and place.

8           Executed this _____ day of _____,

9   20_____.

10

11

12                              _____

13                              CARLOS L. ESTOLANO

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit 23
284

1              REPORTER'S CERTIFICATE

2

3         I, Veronica S. Thompson, Certified Shorthand

4    Reporter for the State of California, do hereby certify:

5         That the witness named in the foregoing

6    deposition was by me duly sworn; that the deposition was

7    then taken before me at the time and place herein set

8    forth; that the testimony and proceedings were reported

9    stenographically by me and were transcribed through

10   computerized transcription by me; that the foregoing is

11   a true record of the testimony and proceedings taken at

12   that time; and that I am not interested in the event of

13   the action.

14        Witness my hand dated April 18, 2017.

15

16

17        _____

18        Veronica S. Thompson

19        CSR 6056, RPR, CRR

20

21

22

23

24

25

Exhibit 23
285

# EXHIBIT 24

Exhibit 24
286

# REVIEW AND ANALYSIS

## DEATH OF RONNIE SANDOVAL JR.

PREPARED FOR

ATTORNEY CHRISTOPHER MORRIS

MORRIS LAW FIRM, APC

Gwendolyn Vontoure RN, PHN, BSN, MBA, MSN, HCM

Exhibit 24
287

Ronnie Sandoval vs. San Diego County Jail
Page 1 of 33

March 27, 2017

Attorney Christopher Morris
Morris Law Firm, APC
401 West A Street, Suite 1820
San Diego, CA  92101

Re:  Death of Ronnie Paul Sandoval, Jr.

Dear Mr. Morris,

Thank you for the opportunity to assist you with the review of this case. Enclosed you will find a
review and analysis of the pictures, videos, reports, depositions, and interview reports; as well
policies that I received relative to the death of Mr. Ronnie Paul Sandoval.
I have reviewed the following records for Ronnie Paul Sandoval, Jr.:

- Deposition of Nurse Harris
- Deposition of Nurse DeGuzman
- Deposition of Nurse Llamado
- Deposition of Nurse Bautista
- Deposition of Deputy Andrade
- San Diego County Sheriff's Department Detention Services Bureau – Manual of Policies
  and Procedures:
  - M.5 Medical Emergencies
  - M.6 Life Threatening Emergencies - Code Blue
- San Diego Sheriff's Department: Standard of Nursing Protocol (SNP) for Seizure
  Disorders, Code Blue Policy, Safety, and Sobering Cells:
- Death Investigation Report
- Paramedics Report

Exhibit 24
288

Ronnie Sandoval vs. San Diego County Jail
Page 2 of 33

Contents

**Summary of Opinions** ................................................................................................ 5

    Dana Harris RN .................................................................................................. 5

    Llamado RN ....................................................................................................... 5

    DeGuzman RN ................................................................................................... 6

    San Diego County Jail ....................................................................................... 6

**Summary of Findings** ................................................................................................ 6

**DeGuzman RN** ........................................................................................................... 6

    Bautista RN Charge Nurse ............................................................................... 7

    Deputy Mathew Andrade ................................................................................. 7

    San Diego County Jail ...................................................................................... 7

**Review of Depositions** ............................................................................................... 8

    Deposition of Dana Harris RN ......................................................................... 8

    Deposition of Nurse DeGuzman ....................................................................... 8

    Deposition of Nurse Llamado .......................................................................... 9

    Deposition of Nurse Bautista ........................................................................... 9

    Deposition of Deputy Mathew Andrade ......................................................... 10

**County of San Diego's Practice Regarding "Holding/Waiting" Cell #1** .................. 12

**"Holding/Waiting" Cells** .......................................................................................... 12

**New Policies for Observations of Sobering, and Safety Cells; October, 2013** ......... 12

**Ethical Principles in Nursing** .................................................................................. 12

    1.   Assessment ........................................................................................... 15

    2.   Diagnosis ............................................................................................... 16

    3.   Outcome ................................................................................................ 16

    4.   Planning ................................................................................................ 16

    5.   Implementation ..................................................................................... 16

        a.   Coordination of Care .................................................................... 16

        b.   Health Teaching and Health Promotion ...................................... 16

        c.   C&D ............................................................................................... 16

    6.   Evaluation ............................................................................................. 16

    8.   Education ............................................................................................... 16

    9.   Evidence Based Practice and Research ................................................ 17

Exhibit 24
289

Case 3:16-cv-01004-BEN-MSB   Document 24   Filed 06/26/17   PageID.648   Page 290 of 327

Ronnie Sandoval vs. San Diego County Jail
Page 3 of 33

10.    Quality of Practice........................................................................................ 17
11.    Communication ............................................................................................ 17
12.    Leadership..................................................................................................... 17
13.    Collaboration ................................................................................................ 18
14.    Professional Practice Evaluation ................................................................ 18
15.    Resource Utilization .................................................................................... 18
16.    Environmental Health.................................................................................. 18

SOAP/SOAPIE Documentation Methods........................................................... 18

   S-Subjective.................................................................................................... 18

   O-Objective .................................................................................................... 18

   A-Analysis ...................................................................................................... 18

   P-Plan ............................................................................................................. 18

   I-Implementation............................................................................................ 18

   E-Evaluation .................................................................................................. 18

Physical Assessment & Deviations ..................................................................... 19

   Respiratory ..................................................................................................... 19

      RN Harris ................................................................................................... 19

Sputum................................................................................................................. 20

   RN Harris........................................................................................................ 20

Pulse Oximetry (SPO2)........................................................................................ 20

   Factors that Cause Errors in the Pulse Oximeter .......................................... 21

   RN Harris........................................................................................................ 21

Neurological Nursing Examination of the Unconscious Patient.......................... 22

   RN Harris........................................................................................................ 22

Glasgow Coma Scale............................................................................................ 23

   Eyes Opening Response ................................................................................. 23

   Verbal Response ............................................................................................. 23

   Motor Response .............................................................................................. 23

      Eye Opening ............................................................................................... 23

      Verbal Response ......................................................................................... 24

      Motor Response .......................................................................................... 24

   RN Harris........................................................................................................ 24

Exhibit 24
290

Case 3:16-cv-01004-BEN-MSB   Document 24   Filed 06/26/17   PageID.649   Page 291 of 327

Ronnie Sandoval vs. San Diego County Jail
Page 4 of 33

Pupillary Reaction ............................................................................................................. 25

RN Harris ............................................................................................................................ 25

Deviations Standards of Care ........................................................................................... 25

Code Blue Policy M.5, MSD C.2 (2013) Responsibility of Staff ........................................ 25

RN Harris ............................................................................................................................ 26

RN Llamado ........................................................................................................................ 27

Deviations from "Code Blue" Policy ................................................................................. 27

Epilepsy/Seizure .................................................................................................................... 27

Cause of Seizure Activity ................................................................................................... 27

Seizure Signs & Symptoms ................................................................................................ 28

Types of Seizures ............................................................................................................... 28

Generalized Seizures ...................................................................................................... 28

Nonepileptic Seizures ..................................................................................................... 28

Partial Seizures ............................................................................................................... 28

Status Epilepticus .............................................................................................................. 29

Causes ................................................................................................................................ 29

San Diego Sheriff's Department: Standard of Nursing Protocol (SNP) for Seizure Disorders
............................................................................................................................................. 29

RN Harris ............................................................................................................................ 29

Methamphetamine Signs & Symptoms of Overdose ...................................................... 30

RN Harris ............................................................................................................................ 31

Nursing Documentation ..................................................................................................... 31

RN DeGuzman ..................................................................................................................... 32

Exhibit 24
291

Ronnie Sandoval vs. San Diego County Jail
Page 5 of 33

## Summary of Opinions

This summary is based on a review of the depositions provided, incident reports, Standard Nursing Protocols, Standards of Nursing Care, Ethical Principles, and review of the San Diego County Sheriff's Department Detention Services Bureau-Manual of Policies and Procedures (M.5, 2013), (M.6,2013).

**Dana Harris RN**

- Failed to act as a reasonable and prudent nurse.
- Failed to respond to the scene with needed emergency equipment per Code Blue Policy.
- Failed to Manage the emergency and assess the patient continuously: blood pressure, pulse, and respirations.
- Failed to implement C-Spine precautions in a witnessed fall with head trauma.
- Failed to provide timely access to emergent care per Medical Emergencies Policy.
- Failed to recognize a condition that warrants 911 notification for Paramedic Emergency Response per Code Blue Policy.
- Failed to call 911 per the Code Blue Policy and SNP Seizure Disorder.
- Failure to perform BLS measures for stabilizing the patient's condition per Code Blue Policy.
- Failed to ensure that emergency equipment was in proper working condition.
- Failed to utilize additional emergency equipment to assess patients heart rhythm i.e. AED per Code Blue Policy.
- Failed to remain with the patient and delegate as necessary per Code Blue Policy.
- Failed to perform a focused systems assessment of inmate/patient Sandoval.
- Failed to protect the airway of the unconscious patient.
- Failed to recognize signs and symptoms of a seizure.
- Failed to treat a prolonged seizure as a life-threatening condition
- Failed to protect the patient's airway per SNP Seizure Disorder.
- Failed to recognize signs and symptoms of Respiratory Failure.
- Failed to place the unconscious patient in the recovery position to avoid airway obstruction.
- Failed to start an intravenous line with normal saline.
- Failed to notify the onsite, or on-call MD, per SNP Seizure Disorder.
- Failed to document the sequence of events of the "man down" in the notes field of the encounter per the Code Blue Policy.
- Failed to record nursing actions.

**Llamado RN**

- Failed to act as a reasonable and prudent nurse.
- Failed to follow Code Blue Policy #M6
- Failed to call 911 as directed by RN Bautisa, Charge Nurse
- Failed to notify the control deputy to call 911
- Failed to provide report to the Paramedic Emergency Response Team
- Failed to call 911 after forming the opinion inmate/patient was suffering from prolonged seizures.
- Failed to flow code blue policy that requires second responder to make the 911/EMT determination
- Failed to act in the benefit of the inmate/patient.

Exhibit 24
292

Ronnie Sandoval vs. San Diego County Jail
Page 6 of 33

## DeGuzman RN

- Failed to act as a reasonable and prudent nurse.
- Failed to ever assess patient after being informed of medical distress.
- Failed to pass down or endorse patient information to on-coming shift
- Failed to act in the benefit of the inmate/patient.
- Failed to "do no harm to the inmate/patient."

## San Diego County Jail

San Diego County Jail failed in their duty to develop and implement a standardized procedure for the medical observation policy requirements for the "waiting cells."

### Summary of Findings

This is a case about Ronnie Sandoval a 46-year-old male inmate/patient arrested on possession of Methamphetamine charges. On 02/23/14, his house was searched during a probationary compliance check. It was reported that Mr. Sandoval was believed to have been upstairs destroying evidence for at least 10 minutes. While being booked at the Central Jail in San Diego County, Deputy Chavez notices that inmate Sandoval was in "bad shape." He was checked by the nursing staff for possibly hyper or hypoglycemia, which returned normal results. An hour later the same officer notices that the inmate looks worse i.e. diaphoretics and disoriented. Officer Chavez states that he escorts the inmate to the second floor and places him into "waiting cell" #1 so that he could be monitored by the nursing staff.

Per the sworn and nursing staff, this type of cell is used as a multipurpose cell. Mr. Sandoval remained in this cell for over 8 ½ hours until he was seen seizing. Mr. Sandoval was never evaluated during those 8 ½ hours. At approximately 12:41 a.m. on February 23, 2014, per sworn reports, Mr. Sandoval was seen having a seizure. At 12:53, the cell door was opened. At this time RN Harris, Llamado and two officers enter Mr. Sandoval's cell and find him on the floor unresponsive. RN Harris advised sworn to call for Emergency Medical Technicians (EMT) at 1:03 a.m., ten minutes after nurses had entered his cell. Multiple sources have testified to the fact that more than one person with medical training who was present during this situation recommended calling paramedics as opposed to EMT.

The EMT arrived at approximately 1:20 a.m. and informed county staff they could not transport Mr. Sandoval in his current condition. The paramedics were called and dispatched at 1:30 a.m. Paramedics arrived at approximately 1:48 a.m. The paramedics moved Mr. Sandoval onto their stretcher and at that point Mr. Sandoval stopped breathing and lost his pulse. The paramedics performed CPR which was unsuccessful and Mr. Sandoval was pronounced dead at approximately 2:11a.m.

## DeGuzman RN

Deputy Chavez gave a report to RN Deguzman that Mr. Sandoval was sweating profusely and was very disoriented. RN Deguzman never provided care to inmate/patient Sandoval for the remainder of his 8 ½ hour shift. On the other hand, RN Deguzman claims that he was not given any information on this patient. Although inmate/patient Sandoval never revealed to the sworn custodial staff, or health care staff that he ingested Methamphetamines, there were numerous deviations from the Standards of Nursing Care, and the policy and procedures manual. He was placed in a cell forgotten and neglected for 8 ½ hrs. while being within approximately, 4 feet from the nursing cubicle of RN DeGuzman.

Exhibit 24
293

Ronnie Sandoval vs. San Diego County Jail
Page 7 of 33

## Dana Harris RN

On February 23, 2014, Dana Harris RN arrived to work at the San Diego County Jail. Per RN Harris she usually receives a shift report from the outgoing nursing staff. She does not recall the cell type to which she was assigned, the staff she relieved that evening, nor ever receiving a report on inmate/patient Ronnie Sandoval. She was instructed multiple times from RN Llamado, RN Charge Nurse Bautista, and Deputy Andrade to call 911 but denies ever being told. Also, RN Harris maintains that Ronnie Sandoval's condition was stable during the man down and that Paramedic care was not warranted. RN Harris failed to implement nursing actions that adhered to Standard Nursing Protocols, Policy and Procedures causing a significant delay in gaining access to life-saving emergent care for the inmate/patient. There was a critical forty to forty-five-minute lapse of time in gaining emergent life-saving access to care for inmate/patient Ronnie Sandoval.

## Llamado RN

On February 23, 2014, Llamado RN arrived to work at the San Diego County Jail and was one of the first responders to the waiting cell where Ronnie Sandoval was found "man down." RN Llamado witnessed inmate/patient Sandoval have a continuous seizure lasting approximately ten minutes. RN Llamado was instructed by RN Bautista to call 911 but at the direction of RN Harris who was "in charge of the code." Against RN Llamado's better judgment, the direction of the Charge Nurse, RN Bautista, and the SNP for Seizures, and the Code Blue Policy, she failed to call 911, contributing to the forty to forty-five minute delay in access to emergent care for Ronnie Sandoval.

## Bautista RN Charge Nurse

On February 23, 2014, was operating in the capacity of Charge Nurse. Post notification of Ronnie Sandoval's condition RN Bautista instructed RN Llamado to call 911 at approximately 0105; which was about ten minutes after the "man down" was called. RN Bautista arrived at the second floor "waiting cell" at around 0120 which was about the same time of the EMT's arrival. It was not until then that she learned that RN Harris had not called 911 as directed but instead made the decision to contact the EMT's instead. Charge Nurse Bautista began assisting with life-saving measures. RN Bautista requested that 911 be called at approximately 0120 but, the 911 call was not placed until 0130. 911 arrived at 0132 and did not reach the waiting cell until 0148; resulting in a forty to forty-five minute delay from the initial direction given by the Charge Nurse RN Charge Nurse Bautista to call 911.

## Deputy Mathew Andrade

On February 23, 2014, Deputy Andrade was a first responder to the waiting cell where Ronnie Sandoval was found "man down." Per the Medical Emergencies Policy M.5 Deputy Andrade acted as a first responder and employed his EMT skills of emergency management and assessment, to perform life-saving measures for inmate/patient Sandoval. Deputy Andrade instructed the nurses multiple times to call 911.

## San Diego County Jail

On February 23, the San Diego County Jail failed to protect the welfare of inmate/patient Ronnie Sandoval by neglecting to implement a medical observation requirement for its "Waiting Cells."

Exhibit 24
294

Ronnie Sandoval vs. San Diego County Jail
Page 8 of 33

## Review of Depositions

**Deposition of Dana Harris RN**

Prior to February 22, 2014, RN Harris had been a Registered Nurse since 2012. Since passing her California Board of Nursing Examination, her nursing background has consisted of approximately one year of Telemetry Nursing and approximately one year of correctional nursing. Telemetry nurses are found in critical care floors or step-down units of hospitals. Their primary function is to monitor the electrocardiogram or EKG of one or more assigned patients. As abnormalities in the patient's EKG are noted, the nurse reports them to the attending physician. Also, their responsibilities may include monitoring a patient's blood pressure, respiratory status, and medication administration. RN Harris's experience in the county jail has included intake screening on the first floor, and the second-floor duties included sobering screening, and sobering, or screening and safety but not both.

RN Harris states that as part of her job training she was required to obtain certifications in Pre-Hospital Trauma Life Support (PHTLS) that was an onsite course. RN Harris states in her deposition that the course touched on trauma life support topics, such as patient falls. She reports that they may have gone through a scenario with cardiac arrest and does not recall a scenario that involves seizures nor overdose training during PHTLS. PHTLS is recognized world-wide as the leading prehospital emergency trauma care. The goal is to provide the First Responder with the knowledge base and skills set to improve the quality of trauma care and decrease mortality rates. RN Harris states that only under certain circumstances is there an obligation for nurses to check on the inmates in the "waiting cells" such as when a nurse receives report that a patient was hyperglycemic and requires a glucose check within a particular time interval. However, unless the nurse is informed of a concern that a patient needed nursing observation, there is no medical obligation to check the cell. RN Harris was the first nurse on the scene and in charge of the emergent "man down" situation.

RN Harris does not recall ever receiving training on the Standard of Nursing Protocol for Seizures. She acknowledges that she was provided with what she describes as "major" Standard Nursing Protocols that were more common but does not remember what they were. RN Harris states that seizures are characterized differently than code blue. She categorized her immediate actions upon her assessment of whether she witnessed the seizure or was informed by the deputy that a patient has been seizing for three minutes. Subsequently, she states that if she saw the seizure for a prolonged period that would equate to Status Epilepticus if it lasted at least five minutes, which is a Medical emergency, then she would alert the deputy to call 9-1-1. RN Harris regards the symptoms of drooling, unresponsiveness, and having body tremors as having more probability of being related to hypoglycemia rather than seizures.

**Deposition of Nurse DeGuzman**

Romeo Deguzman RN has been a Registered Nurse since 1995. While working at San Diego County Jail, he acknowledges that he had received some training on Drug Intoxication and that he also had training on Standard Nursing Protocols (SNP) requires one to undergo eight hours of training. Mr. Deguzman states "we have guidelines you can check, you know if they are under the influence of drugs, or not." Mr. Deguzman infers and refers to the SNP serving as a guideline for mild, severe, and moderate drug intoxication.

Exhibit 24
295

Ronnie Sandoval vs. San Diego County Jail
Page 9 of 33

On the 02/23/17 RN Deguzman states that at about 1600, a deputy asked him to check inmate/patient Sandoval's blood sugar which resulted in a blood glucose reading of 107. DeGuzman states that inmate Sandoval was alert and looking at him and answering questions; describing the inmate/patient as "quiet" and did not see any diaphoresis. DeGuzman states that he directed the officer to place the inmate/patient into holding cell #1. He states there is a total of two holding cells which are used for the general purpose such as Ad-Seg. DeGuzman says that he thought the deputy was just bringing inmate Sandoval to have his blood sugar checked. After the blood sugar was complete DeGuzman states that he walked back to his cubicle to screen other patient/inmates (< 10) and that the deputy left. DeGuzman affirms that he saw Sandoval sitting in the cell and that he was waiting for the deputy to move the inmate. Deguzman says that he saw the inmate a few times throughout the night and that he was visible to everyone. But, he claims he was never made aware of inmate/patient Sandoval's being placed into the waiting cell for medical related reasons. At 2300 RN Deguzman ended his shift and stated that RN Harris was one of the nurses that came in to relieve him. DeGuzman says that normally he documents the patients care in JIMS and was not able to document his care for inmate/patient Sandoval because he was not done with medical screening yet. RN DeGuzman states that he did not give report to the nurses on inmate Sandoval.

Although RN DeGuzman had knowledge that inmate/patient may have diabetes, inmate/patient Sandoval sat for 8 1/2 hours without another nursing evaluation. RN Deguzman's cubicle was less than four feet from where inmate Sandoval was being held.

**Deposition of Nurse Llamado**

RN Llamado RN was one of the first responders but claims Nurse Harris was in charge of the man down situation. In her testimony, she recalls that she felt that 911 should be called because her evaluation of inmate/Sandoval was that he was experiencing prolonged seizures. She states that she was instructed by her supervisor RN Bautisa to call 911 but she failed to do so.

**Deposition of Nurse Bautista**

Shirley Bautista became a Registered Nurse in 1995 and worked for several agencies within the Sheriff's Department since 1999. RN Bautista has worked in a Nursing Supervisory position since 2003 in the position of "Charge Nurse." In providing supervision for the LVN's and RN's, the nurses contact RN Bautista for advice, for second opinions, and to discuss the best route of care for a patient. RN Bautista states that when a nurse feels that the patient's condition warrants being "transferred out" to the hospital, RN Bautista does not always go and examine the patient before transport unless the nurse calls for help; most of the time the nurses who are responding to the patient make the decision. RN Bautista is notified that a patient is going to the hospital or facility through a method called "tubing" in which paperwork completed by the sending nurse is sent in the "pneumatic tube."

Per RN Bautista, the rationale for sending the patient's paperwork in this manner is not for the nurse in charge to review but to let her know that they are sending someone out. The charge nurse is responsible for following up on the patient that was sent out. RN Bautista states she did not receive any formal training in the symptomatology's that are associated with a patient that is overdosing from methamphetamine. However, she says that through self-learning she has knowledge of methamphetamine intoxication and/or overdose. These patients can be agitated, restless, thus the symptoms associated with body temperature rises, the patient can be combative, and fail to follow directions. RN Bautista also acknowledges reading about a patient who has taken too much methamphetamine who became incoherent and unable to speak. Per RN Bautista, when the inmates come in they go through the triage are which shows the arresting charge.

Exhibit 24
296

Ronnie Sandoval vs. San Diego County Jail
Page 10 of 33

RN Bautista identifies that there is a total of four "Sobering Cells" located in the front, near the nursing station. These cells are for patients that are coming down off of alcohol or drugs that cannot be in general population with other inmates. Also, RN Bautista identified "Safety Cell" as cells used for inmate/patients who were suicidal

Also, RN Bautista states that there were occasions that inmates were placed in "Holding Cells," before completion of the intake process for keeping the prisoner separate from other inmates due to their level of classification i.e. protective custody, or they were a child molester.

RN Bautista affirms that the SNP for patients engaged in seizure activity that does not cease after three minutes or is "prolonged" is to call 911 because SNP calls for Advanced Cardiac Life Support (ACLS). The Paramedics should be called because the EMTS cannot perform ACLS.

On the evening of February 23, 2014, at approximately 2200, or 2300 RN Bautista was covering the entire medical facility as the Charge Nurse RN. At the time of the "man down," she was not in the vicinity. RN Bautista phoned RN Llamado regarding another matter when RN Llamado told her of the "man down" for inmate Ronnie Sandoval. RN Llamado called RN Bautista informing her that they were sending the patient out via the EMT's. RN Bautista then inquired if the patient had come out of the seizure and if he was awake to which RN Llamado replied "no." RN Bautista then directed RN Llamado to call 911. She then states that she received a call from RN Harris requesting her presence on the second floor at the "man down."

At this time, RN Bautista believes at least 5 to 10 minutes had passed since she instructed RN Llamado to call 911. RN Bautista recalls that when she arrived at the cell where inmate Sandoval was located, there were two other deputies present along with RN Harris, who had just completed vital signs. She noted the presence of "twitching" but not tremors. His color was normal, he was non-verbal, his eyes were closed, there were no "gurgling" sounds, and he was unresponsive to verbal stimuli. After RN Bautista, had assessed Ronnie Sandoval, she noted that the Paramedics were not there and requested that 911 be called; she was unaware that the nurses had not followed her direction give to call 911. RN Bautista then began participating in life-saving measures for the inmate via the Ambu bag and suctioning the inmate. His gag reflex was verified due to the patients vomiting.

The Paramedics had not arrived so RN Bautista again requested that 911 be called; she was unaware that the nurses had not followed her direction give to call 911. RN Bautista then began participating in life-saving measures for the inmate via the Ambu bag and suctioning the inmate which his gag reflex was verified due to the patients vomiting. Upon arrival of the EMT's, they took over bagging the inmate/patient, stating "We can't transport him" "Somebody call 911." RN Bautista recalls inserting an intravenous line to the patient's left arm and multiple unsuccessful attempts. Once the Paramedics arrived they took over, placing inmate Sandoval on their gurney and began chest compressions.

## Deposition of Deputy Mathew Andrade

Deputy Mathew Andrade was one of the deputies on the scene on 02/23/14 at approximately 0101, he is also an EMT. The duties of the EMT fall under Basic Life Support (BLS) in which he is provisioned to engage in basic life saving procedures. He cannot start an intravenous line, cannot administer medications, and is not allowed to intubate. At the time of the incident, Deputy Andrade had been employed as a deputy for at least 10 months. He affirms that when an inmate is being held in a cell the deputy makes rounds every hour to ensure the inmate is okay, breathing, has a pulse, and does not have signs of medical distress. He describes a total of 2 "medical holding cells near the nurse's station that can be at times used as a multi-purpose for patients that are awaiting Administrative Segregation (Ad-Seg), or have a problem."

Exhibit 24
297

On 02/23/14 he recalls being called over by Sergeant Shawcroft who at the time was not aware of Deputy Andrade's medical background. He reports that he walked through the nurse's station to the cell where he noted that inmate Sandoval was on the ground. Deputy Edge, along with one of the nurses were inside of the cell. He recalls that upon entering the cell there was another nurse present and Sandoval was located under the bench with a non-rebreather mask on. Deputy Andrade asked for a C-Collar to stabilize the patient's neck. He states that he was informed that the patient had a seizure and hit his head on the bench. He describes the condition of inmate Sandoval as breathing but, "unresponsive." He goes on to further elaborate on Mr. Sandoval's unresponsiveness. He states that his eyes were not tracking and that his breathing was shallow. After receiving the C-Collar from RN Llamado, he measured it prior to application. After the patient's neck was stabilized, he states that himself, Deputy Edge and Deputy Sobazek moved inmate Sandoval to the middle of the room. He states that a blood pressure was taken and that his pupils were non-reactive to light. He advised the nursing staff that the patient needed the Paramedics. He also states that he subsequently asked multiple times for the paramedics to be called to which nurse Harris stated she was calling the EMT's. Based on the EMT experience of Deputy Andrade and the condition of the patient, he realized that EMT staff would not be able to provide care for the patient due to his unresponsiveness, witnessed seizure by Deputy Edge, and possible head trauma. The inmate also presented with what Deputy Andrade refers to as "white stuff" around the outer lips. He states that while continuing to monitor the inmate, the inmate never regained consciousness. He presented with shallow breathing so the nurse inserted a Nasopharyngeal Airway to open the airway and allow more air to get in.

After the NPA was inserted, the suction machine was brought down from the third floor by Deputy Valbuena. inmate/patient Sandoval's airways were suctioned to remove secretions from the airway. A bag valve mask was then requested by Deputy Andrade to provide a higher percentage of oxygen delivery to the patient. Deputy Andrade states that the inmate/patient was ventilated at 1 breath every five to six seconds totaling 12 breaths per minute. He states that at some point an Oropharyngeal airway was inserted which revealed that Mr. Sandoval still had a gag reflex. He was then placed on his side and suctioned to clear his airway. They then removed the OPA because the patient still had a gag reflex and began vomiting. The patient remained unresponsive, eyes not tracking, breathing still shallow @ 12 breaths per minute. Approximately 20 minutes after entering the cell, the EMT's arrived and assessed the inmate. At approximately 0112 he states that RN Bautista, a Registered Nurse entered the patient's cell inserted an Oropharyngeal airway. It was determined that inmate/patient Sandoval still had a gag reflex as evident by vomiting post insertion. RN Bautista then inserted intravenous access. At 0120 the EMT's arrived, took over ventilations, and assessed the inmate/patient; they checked to see if Sandoval had a pulse. Meanwhile the health care staff continued to monitor the inmate/patient's vitals and blood pressure. The EMT's determined that they could not transport the patient due to his being unconscious, unresponsive, no pupillary response, and shallow breathing. Deputy Andrade again requested that the Paramedics be called. The patient was upgraded, the call was placed, and the patient was placed onto a back board by deputies and nursing staff. The paramedics showed up 15 minutes later. Once the Paramedics placed Mr. Sandoval on their gurney, they began CPR. Deputy Andrade states that due to the patients declining health status he requested a few times (>1, <5) times, that the nursing staff call the Paramedics.

Exhibit 24
298

Ronnie Sandoval vs. San Diego County Jail
Page 12 of 33

## County of San Diego's Practice Regarding "Holding/Waiting" Cell #1

### "Holding/Waiting" Cells

In review of the deposed testimonies for sworn and nursing staff, a past practice pattern emerges in which the staff make reference to the term "waiting cells." This term is not found in Title 24, nor Title 15 and has no clear delineation of use for sworn staff to place inmates and for nursing staff to monitor them.

On 02/23/14 there was no existing policy that required the nurse to check on or monitor patients housed in these cells. This is especially so because the nurses do not view this "holding/waiting" cell as either a safety nor sobering cell. There was a lapse in judgment on behalf of the San Diego County Jail in that they failed to develop and implement policies that regulated the use of and required observations for this type of "waiting cell." Nonetheless, the County's poor decision making created a constant state of chaos and lack of communication between the deputies and the nursing staff in regards to whose responsibility it was to care for inmates placed into the "waiting cells." Since the death of Ronnie Sandoval, new policies and procedures have been implemented that set parameters for health care and sworn staff to monitor patients detained in these cells. Also, within the new policy guidelines, there is no mention of the term "waiting cell." This custom may explain the behavior of certain Nurse defendants, as opined below. To a reasonable degree of medical certainty, the County's failure to implement a medical monitoring requirement for the "holding/waiting" cells equates to deliberate indifference to the lives to its inmate/patients.

In the San Diego County Sheriff's Department Detention Services Bureau – Manual of Policies and Procedures for 2011, only two types of cells are identified, Safety Cell Use J.2 Sobering Cells; Definition and Use.

### New Policies for Observations of Sobering, and Safety Cells; October, 2013

Since the incident on February 23 2014, new policies have been implemented that outlined parameters for health care and sworn staff observations:

A nursing assessment must be obtained as soon as possible after placing an inmate in a sobering cell, but no later than 30 minutes. Thereafter, the medical staff shall check the inmate every 4 hours, or sooner if clinically indicated. The nurse shall document the nursing assessment in the medical record per the Medical Services Division Policy and Procedure. Sworn staff observes inmates that are placed in sobering cells at least every 20 to 30 minutes. They are also required to record the behavior of the inmate, time of observation, and document it in their observation log located outside the sobering cell door. Theses logs/ documentation of observations and the inmate's condition are then reviewed and signed off by the oncoming Watch Commander at the beginning of each shift. If it is observed by sworn or medical staff that an inmate's medical and/or mental status is declining, the watch commander will ensure the inmate is promptly evaluated by medical staff, and as soon as possible receive a psychiatric evaluation.

### Ethical Principles in Nursing

In the correctional setting nurses have a duty to ensure that patients are given timely access to care. Nursing values associated with this principle include nurse advocacy, respect, and eliminating barriers to care. Nurses that work in the correctional setting are frequently challenged to employ the six Ethical Principles:

Exhibit 24
299

Ronnie Sandoval vs. San Diego County Jail
Page 13 of 33

1. Respect for persons (autonomy and self-determination)
2. Beneficence (doing good)
3. Nonmaleficence (avoiding harm)
4. Justice (fairness, equitability, truthfulness)
5. Veracity (telling the truth)
6. Fidelity (remaining faithful to one's commitment)

**RN Harris**

| Deviations Ethical Principles | Comments |
|---|---|
| • Failed to act in the benefit of the inmate/patient. | • RN Harris did not call 911, per the Code Blue Policy.<br>• RN Harris did not call 911 per the Standard Nursing Protocol (SNP)<br>• RN Harris did not perform a focused systems assessment on the unconscious, seizures, and witnessed fall.<br>• Failed to call 911 per the Code Blue Policy and SNP Seizure Disorder<br>• Failure to perform Basic Life Support Measures to stabilize the patient's condition, per Code Blue Policy<br>• RN Harris violated the Ethical Principles of Beneficence, and Nonmaleficence |
| • Failed to uphold "Justice." | • RN Harris did not call 911 per the Code Blue Policy.<br>• RN Harris reported that the inmate patient was responsive during the "man down.<br>• Deputy Andrade, RN Bautista, and RN Llamado all state that inmate/patient Sandoval was "unresponsive."<br>• RN Harris "denies" that she was ever told to call 911.<br>• Deputy Andrade, RN Bautista, and RN Llamado all state that RN Harris was instructed to call 911.<br>• RN Harris deviated from the Ethical Principles of "Veracity" and "Justice." |
| • Failed to act as a prudent nurse. | • RN Harris did not respond to the scene with working emergency i.e. suction machine.<br>• RN Harris did not perform a focused systems assessment of inmate/patient Sandoval.<br>• RN Harris did not perform appropriate BLS measures for stabilizing the inmate/patient's condition per Code Blue Policy.<br>• RN Harris did not use additional emergency equipment to assess patients heart rhythm i.e. AED per Code Blue Policy and SNP for Seizures.<br>• RN Harris failed to recognize and act upon the inmate/patient with a witnessed fall.<br>• RN Harris failed to protect the patient's airway per BLS, Code Blue Policy, and SNP Seizure Disorder; inmate/patient Sandoval remained in the Supine position for approximately 10 minutes before being placed in the recovery position by the Charge RN at approximately<br>• RN Harris failed to protect the airway of the unconscious, seizing, witnessed falls patient. |

Exhibit 24
300

Ronnie Sandoval vs. San Diego County Jail
Page **14** of 33

|   |   |
|---|---|
|   | • RN Harris displayed poor nursing assessment skills and could not recognize signs and symptoms of a seizure.<br>• RN Harris failed to recognize and act upon the life-threatening condition of the unconscious inmate/patient with "prolonged" seizure, per the SNP for seizures.<br>• Inmate Sandoval's seizure activity lasted for approximately 10 minutes.<br>• RN Harris Failed to implement the Code Blue Policy.<br>• RN Harris did not call 911 per the Code Blue Policy and SNP Seizure Disorder.<br>• RN Harris failed to call 911, as directed by the Charge Nurse, RN Bautista.<br>• RN Harris did not provide inmate/patient Sandoval with timely access to emergent care per Medical Emergencies Policy; resulting in "critical" forty to forty-five minute delay of life-saving measures.<br>• Failed to start an Intravenous access line.<br>• RN Harris failed to manage the emergency and assess the patient continuously: blood pressure, pulse, and respirations.<br>• RN Harris failed to document the inmate/patient's condition, nursing actions, care provided, and patient responses for care provided to inmate/patient Sandoval.<br>• Failed to notify the onsite, or on-call MD, per SNP Seizure Disorder.<br>• Failed to accurately document the sequence of events of the "man down" in the Notes Field of the encounter per the Code Blue Policy.<br>• RN Harris failed to act a "Prudent Nurse" and violated the Ethical Principle of Fidelity. |

## RN DeGuzman

| Deviations Ethical Principles | Comments |
|---|---|
| • Failed to act in the benefit of the inmate/patient. | • RN DeGuzman was the RN who was given the initial report on inmate/patient Sandoval.<br>• RN DeGuzman failed to assess the inmate patient for over 8 ½ hrs.<br>• In breaching his duty to provide timely access to care for inmate/patient Sandoval, RN Deguzman violated the Ethical Principle of "Beneficence."<br>• Failed to pass down or endorse patient information to on-coming shift |
| • Failed to "Do No Harm." | • RN Deguzman neglected to care for inmate/patient Sandoval.<br>• The lack of assessment and early intervention in identifying that the inmate patient was having an life threatening complications attributed to the deterioration of inmate Sandoval.<br>• RN DeGuzman deviated from the Ethical Principle of "Nonmaleficence." |

Exhibit 24
301

Ronnie Sandoval vs. San Diego County Jail
Page 15 of 33

| | |
|---|---|
| • Failed to "Uphold Justice" | • RN DeGuzman denies that he was ever given report by Deputy Chavez, and did not pass report to the oncoming nursing staff.<br>• The cell that inmate Sandoval was being temporarily housed in was approximately 4 feet in proximity to the nurse's station.<br>• This cell was monitored on close circuit view from the nurse's station<br>• RN DeGuzman deviated from the "Ethical Principle of Justice."<br>• RN DeGuzman had a duty to assess the wellbeing and medical condition of inmate/patient Sandoval.<br>• RN DeGuzman breached that duty when he failed to act as a prudent nurse and denied inmate/patient Sandoval the right to timely access to emergent care.<br>• Failed to pass down or endorse patient information to on-coming shift.<br>• RN DeGuzman deviated from the Ethical Principle of Fidelity. |

**RN Llamado**

| Deviations Ethical Principles | Comments |
|---|---|
| • Failed to act in the benefit of the inmate/patient. | • RN Llamado failed to call 911 per Code Blue Policy & SNP for Seizures. Although RN Llamado states that she felt the patient's condition warranted calling 911 she refrained because she was not the nurse in charge.<br>• Therefore, RN Llamado failed to "do good" for the inmate patient and deviated from the Ethical Principles of Beneficence. |
| • Failed to act as a prudent nurse. | • RN Llamado failed to follow policy and procedures for Code Blue, as well as Nursing Standard Protocols for the patient having a seizure.<br>• RN Llamado's reluctance to follow policy and the SNP resulted in harm to inmate/patient Sandoval.<br>• RN Llamado deviated from the Ethical Principles of Nonmaleficence. |

**Standards of Correctional Nursing Care.**  The essential job functions of the Registered Nurse in the correctional setting is to provide care to patients that are deemed safe, effective, efficient, and clinically appropriate. Nursing Care is guided by sixteen Standards of Nursing Practice in the correctional care setting. The first six of the standards represent the Nursing Process and inter-related process in which the nurse promotes into every patient encounter.

1. **Assessment**- is the process in which the nurse gathers or collects data regarding the patients' health care condition. In the process of assessment, the nurse draws on previously learned knowledge to identify changes in the patient's condition. This data is collected through observation, verbal interaction, completion of the physical examination, and patient's medical history.

Exhibit 24
302

Ronnie Sandoval vs. San Diego County Jail
Page 16 of 33

2. **Diagnosis**-this is the process in which the nurse draws on their knowledge base to analyzes data gathered to render a "Nursing Diagnosis."

3. **Outcome** Identification-is focuses on the nursing diagnosis and the identified needs of the patient. It employs the SMART technique to set goals that are specific, measurable, attainable, realistic, time specific in arriving at an outcome statement.

4. **Planning**-this is where the nurse plans interventions that will assist the patient in achieving the measurable outcomes.

5. **Implementation**- The nursing interventions may consist of one to many that take place over an hour to several weeks, or months, depending on the patient's condition.

    a. **Coordination of Care**-the nurse coordinates the delivery of care.
    b. **Health Teaching and Health Promotion**- the nurse employs strategies to promote health and a safe environment.
    c. **C&D** are not applicable to this case.

6. **Evaluation**- is a continuous nursing process in which nursing care delivery is in a continuous state.

7. **Ethics**

    a. the nurse practices in an ethical manner to deliver care in a manner that preserves and protects patient autonomy, dignity, rights, values, and beliefs.
    b. Recognizes the centrality of the patient and, when possible, the family, as core members of any healthcare team.
    c. Upholds patient confidentiality within legal and regulatory parameters.
    d. Maintains a therapeutic and professional nurse–patient relationship within appropriate professional role boundaries.
    e. Contributes to resolving ethical issues involving the patient, nurse colleagues, healthcare providers, correctional personnel, and other stakeholders.
    f. Takes appropriate action regarding instances of illegal, unethical, or inappropriate behavior that could endanger or jeopardize the best interests of the patient or situation.
    g. Speaks up when appropriate to question healthcare practice when necessary for safety and quality improvement.
    h. Advocates for equitable patient care.
    i. Maintains professional records that provide evidence of competence and lifelong learning.

8. **Education**

    a. Participates in ongoing educational activities related to appropriate knowledge bases and professional issues.
    b. Demonstrates a commitment to lifelong learning through self-reflection and inquiry to address learning and personal growth needs
    c. Seeks experiences that reflect current practice to maintain knowledge, skills, abilities, and judgment in clinical practice or role performance
    d. Acquires knowledge and skills appropriate to the role, population, specialty, setting, role, or situation
    e. Seeks formal and independent learning experiences to develop and maintain clinical and professional skills and knowledge.

Exhibit 24
303

f.   Identifies learning needs based on nursing knowledge, the various roles the nurse may assume, and the changing needs of the population.
g.   Participates in formal or informal consultations to address issues in nursing practice as an application of education and knowledge base.
h.   Shares educational findings, experiences, and ideas with peers.
i.   Contributes to a work environment conducive to the education of healthcare professionals.
j.   Maintains professional records that provide evidence of competence and lifelong learning.

## 9.  Evidence Based Practice and Research

a.   Utilizes current evidence-based nursing knowledge, including research findings, to guide practice.
b.   Incorporates evidence-based research when initiating changes in nursing practice.
c.   Participates, as appropriate to education level and position, in the formulation of evidence-based practice through research findings
d.   Shares personal or third-party research findings with colleagues and peers.

## 10. Quality of Practice

a.   Demonstrates quality by documenting the application of the nursing process in a responsible, accountable, and ethical manner.
b.   Uses creativity and innovation to enhance nursing care.
c.   Participates in quality improvement.

## 11. Communication

a.   The correctional registered nurse communicates effectively in a variety of formats in all areas of practice.
b.   Questions the rationale supporting care processes and decisions when they do not appear to be in the best interest of the patient.
c.   Discloses observations or concerns related to hazards and errors in care or the practice environment to the appropriate level.
d.   Maintains communication with other correctional professionals to minimize risks associated with transfers and transition in care deliver.

## 12. Leadership

a.   The registered correctional nurse demonstrates leadership in the professional practice setting and the profession.
b.   Oversees the nursing care given by others while retaining accountability for the quality of care given to the patient.
c.   Abides by the vision, the associated goals, and the plan to implement and measure progress of an individual patient or progress within the context of the healthcare services rendered in the correctional organization.
d.   Demonstrates a commitment to continuous, lifelong learning, and education for self and others.
e.   Seeks ways to advance nursing autonomy and accountability.

Exhibit 24
304

Ronnie Sandoval vs. San Diego County Jail
Page 18 of 33

### 13. Collaboration

a. The correctional registered nurse collaborates with the patient, correctional facility administration, family, and other healthcare professionals in his or her conduct of nursing practice.

### 14. Professional Practice Evaluation

a. The correctional registered nurse evaluates her or his own nursing practice in relation to professional practice standards and guidelines, relevant statutes, rules, and regulations.

### 15. Resource Utilization

a. The correctional registered nurse utilizes appropriate resources to plan and provide nursing services that are safe, effective, and financially responsible

   i. Assesses individual patient care needs and resources available to achieve desired outcomes.
   ii. Identifies patient care needs, potential for harm, complexity of the task, and desired outcome when considering resource allocation.
   iii. Delegates elements of care to appropriate healthcare workers in accordance with any applicable legal or policy parameters or principles.
   iv. Identifies the evidence when evaluating resources.
   v. Advocates for resources, including technology, that enhance correctional nursing practice
   vi. Modifies practice when necessary to promote positive interaction among patients, care providers, correctional personnel, and technology.
   vii. Assists the patient and, when possible, the family in identifying and securing appropriate services to address needs across the healthcare continuum.

### 16. Environmental Health

a. The correctional registered nurse practices in an environmentally safe and healthy manner. "Environmental health addresses all the physical, chemical, and biological factors external to a person, and all the related factors impacting behaviors. It encompasses the assessment and control of those environmental factors that can potentially affect health. It is targeted towards preventing disease and creating health-supportive environments" [World Health Organization (WHO), 2012].

## SOAP/SOAPIE Documentation Methods

The SOAP is a method of charting patient care that is commonly used in the correctional setting. It outlines a systematic approach that details the progression of patient goal oriented patient care and response to treatment. SOAPIE charting adds two additional elements to the chart documentation.

**S-Subjective**: reports what the patient says.
**O-Objective**: documents nursing observations.
**A-Analysis**: identifies the nursing diagnosis.
**P-Plan**: describes the nursing interventions to be carried out.
**I-Implementation**: records how the interventions were implemented.
**E-Evaluation**: examines the actual patient response and outcome to the implemented intervention.

Exhibit 24
305

Ronnie Sandoval vs. San Diego County Jail
Page **19** of 33

## Second Floor Activities

I have reviewed the above depositions and interviews of the nursing and sworn staff who were involved with the 02/23/14/02/24/14 incident, and identified the deviations from Policy, Standard Nursing Protocols, Standards of Nursing Care, and Ethical Principles.

### Physical Assessment & Deviations

The first step in assessing any patient that is not responsive is to evaluate the CAB's, which stand for Chest Compressions, Airway and Breathing. According to the American Heart Association, health care providers should: Assume that when they witness a patient suddenly collapse that the patient has had a primary cardiac arrest with a shockable rhythm. It is further recommended that the Emergency Response System is activated and the "AED" retrieved. The patient's airway should be assessed for patency and the patient's vital signs should be evaluated. Patients experiencing current or progressive brain injury can exhibit unstable vital signs. If the patient is stable it is important to complete a full neurology-assessment to determine if a patient is unconscious and unable to follow commands by using the Glasgow Coma Scale.

### Respiratory

The main goal of the respiratory assessment is to evaluate how adequately the patient's gas exchange is between delivering oxygen to the tissues, and the excretion of carbon dioxide. Patients with labored respirations are working hard to exhale due to an abnormality of lung recoil which leads to airway resistance. Adequate assessment of a patient's respiratory status also includes lung auscultation, the rate, depth, symmetry, and the use of accessory muscles (sternocleidomastoid muscles of the neck, and intercostals of the abdomen).

1.   Rate
2.   Depth
3.   Symmetry
4.   Lung Auscultation

### RN Harris

| Deviations Standards of Care | Comments |
|---|---|
| • Failed to Assess, monitor, and interpret the signs and symptoms associated with respiratory distress and airway blockage. | • At **0108** RN Harris assesses the patient and notes a visible rise and fall of the chest. RN Harris failed to interpret the snoring sounds made by inmate/patient Sandoval a sign and symptom of respiratory obstruction.<br>• Snoring, or gurgling are usually heard when the upper airways are partially obstructed by tissues, liquid, or emesis.<br>• Soft tissue airway obstruction in the "unconscious patient can occur under a variety of circumstances, such as: prolapse of the tongue.<br>• RN Harris deviated from ANA Standard 1.<br>• Assessment. |

Exhibit 24
306

Ronnie Sandoval vs. San Diego County Jail
Page **20** of 33

| | |
|---|---|
| • Failed to implement nursing actions in caring for the patient with a suspected head injury. | • RN Harris states that she placed a Nasal Pharyngeal Airway (NPA) which is *contraindicated* in patients with suspected head injuries or trauma. <br> • RN Harris states she placed an NPA because of snoring, drooling that blocks airway; later recants and says it was placed mistakenly because of the misplaced O2 sensor. <br> • RN Harris deviated from ANA Correctional Standard #5. <br> • RN Harris had a duty to assess and provide nursing actions for the unconscious, post seizures, witnessed fall patient. <br> • RN Harris breached that duty when she failed to implement nursing actions that would support the patient with a head injury. |

## Sputum

Sputum production is indicative of an underlying pathology such as in patients with emphysema or pulmonary edema. The sputum can be described as frothy, blood tinged.

### RN Harris

| Deviations Standards of Care | Comments |
|---|---|
| • Failed to recognize the medical emergency frothy or blood tinged or frothy sputum; indicative of Pulmonary Edema. | • RN Harris also reports the presence of moderate oral secretions draining on the ground; not blood-tinged. <br> • RN Bautista Charge RN noted blood-tinged sputum. <br> • The Autopsy indicates "Pulmonary Edema." <br> • RN Harris deviated from the ANA Correctional Standards #1., #5. <br> • RN Harris had a duty to manage the patient the airway for the unconscious patient. <br> • RN Harris breached that duty when she failed to assess and recognize signs and symptoms of Pulmonary Edema. |

### Pulse Oximetry (SPO2)

Pulse Oximetry is a two-sided probe that is placed over the patient's fingertip allowing an infrared light to pass through. The rate of absorption will vary depending on the number of oxygen molecules linked to each hemoglobin molecule. The pulse oximeter transposes this light absorption into a percentage reading that describes the total oxygen carrying capacity which is commonly referred to in the health care setting as the SAO2.

Exhibit 24
307

Ronnie Sandoval vs. San Diego County Jail
Page **21** of **33**

## Factors that Cause Errors in the Pulse Oximeter

- Abnormal Hemoglobin
- Peripheral circulatory failure
- Medical dyes
- Blockage of blood flow due to pressure on arms or fingers.

O2 Saturation Levels

Normal SP02 levels range from 96% to 99% in the patient who is healthy. In the presence of pulmonary, cardiovascular or chronic disease the O2 Saturation may drop rapidly. An O2 Saturation lower than 90% is defined as "Acute Respiratory Failure."

When an SPO2 level drops 3-4% even if not less than 90% acute disease is suspected. RN Harris.

| Deviations Standards of Care | Comments |
| --- | --- |
| • Failed to recognize symptoms of "Acute Respiratory Failure. | • 1255 RN Harris reports oxygen saturation level was 94%, which increases to 98% post placement of the non-rebreather mask at 15 Lpm.<br>• 0108 Oxygen Saturation drops to 84 percent<br>• RN Harris deviated from ANA Correctional Standards of Care #1, #2.<br>• RN Harris had a duty to competently assess and monitor inmate/patient Sandoval's respiratory efforts.<br>• RN Harris breached that duty when she failed to recognize signs and symptoms of Acute Respiratory Failure. |

## Cardiovascular

The Cardiovascular assessment should include: blood pressure, heart rate, capillary refill, and assessment of upper and lower extremities.

Exhibit 24
308

Ronnie Sandoval vs. San Diego County Jail
Page 22 of 33

## RN Harris

| Deviations Standards of Care | Comments |
|---|---|
| • Failed to perform a Cardiovascular Assessment. | • 1258 RN Harris reports that the patients' blood pressure is 137/58.<br>• 0103 vitals checked; no documentation noted of blood pressure.<br>• 1:10, RN Harris checked Sandoval's blood pressure 163/105; heart rate 55 beats per minute<br>• No further assessment of vital signs reported after 01:10<br>• No record of vital signs documented in the medical record at 5 minute intervals as stated: 0058, 0103, 0108, 0113, 0118, 0123 (EMT's arrive)<br>• RN Harris deviated from ANA Correctional Standard #1. |
| • Failed to document the Cardiovascular Assessment | • RN Harris deviated from the ANA Correctional Standard #1. |

## Neurological Nursing Examination of the Unconscious Patient

The loss of consciousness immediately after a fall is the most sensitive indicator for neurologic deterioration and is associated with neurological complications. Several causes are associated with the unconscious patient; these can include Head Injury, Skull Fracture, Concussion, Cardiac Arrest, Blood Loss, Cerebrovascular Accident, Epileptic Fits, Drug Overdose, Hypothermia, Poisonous Substances, and Fumes.

## RN Harris

| Deviations Standards of Care | Comments |
|---|---|
| • Failed to assess and implement nursing actions for managing the unconscious patient.<br>• Failed to assess and implement nursing actions for managing the patient with a possible head injury<br>• Failed to assess and implement nursing actions for the patient with decreased neuro-function. | • There are conflicting statements in the testimony presented by RN Harris in which she states that she witnessed the patient "slump forward" and "bump" or "hit" his head on the wall. She also reports that she and an officer assisted the patient to the floor. In her assessment, she stated Ronnie Sandoval had no head wounds, and a C-Collar was placed by Deputy Andrade.<br>• Inmate/patient Sandoval presented unresponsive and never regained consciousness. There are also conflicting statements as to the pupillary size, and reaction to light. RN Harris states that inmate/patient Sandoval's pupils were 3mm and sluggish.<br>• Deputy Andrade an EMT and RN Bautista, the Charge Nurse, state that there was no pupillary response and noted that the patient was unresponsive with tremors. |

Exhibit 24
309

Ronnie Sandoval vs. San Diego County Jail
Page 23 of 33

|  | |
|---|---|
| | • RN Llamado also states that the patient was having seizures and was unresponsive.<br>• RN Llamado deviated from ANA Correctional Standards #1,#4.<br>• RN Harris had a duty to assess and manage unconscious, post seizure, witnessed falls patient.<br>• RN Harris breached that duty when she failed to assess and implement nursing actions that aligned with the Code Blue policy/procedure, and Standard Nurse Protocols for Seizures. |

## Glasgow Coma Scale

The Glasgow Coma Scale is internationally used as a tool for measuring a patient's level of consciousness for traumatic injuries. It is a method that allows nurses to assess a patient's level of stability or deterioration in neurological function and take appropriate nursing actions.
Usually if the patient has a GCS of 8 or less it is indicative of a severe brain insult. It is imperative that the Registered Nurse have a sound foundation in understanding how to correctly use the GCS.

| Eyes Opening Response | |
|---|---|
| Spontaneous-opens with blinking at baseline | 4 |
| To verbal stimuli, command, speech | 3 |
| To pain only (not applied to face) | 2 |
| No response | 1 |
| **Verbal Response** | |
| Oriented | 5 |
| Confused conversation, but able to answer questions | 4 |
| Inappropriate words | 3 |
| Incomprehensible speech | 2 |
| No response | 1 |
| **Motor Response** | |
| Obeys commands for movement | 6 |
| Purposeful movement to painful stimulus | 5 |
| Withdraws in response to pain | 4 |
| Flexion: decorticate posturing | 3 |
| Extension: decerebrate posturing | 2 |
| No response | 1 |
| **Total** | |

## Eye Opening

The assessment of the patient's ability to open their eyes evaluates the functioning of the patient's brainstem. It also demonstrates that a specialized group of neurons within the brain, RAS has been stimulated; indicating that the patient is aware of their environment. However, eye opening is not always indicative of a patients intact neurologic functioning (Waterhouse, **2005**).

Exhibit 24
310

Ronnie Sandoval vs. San Diego County Jail
Page 24 of 33

**Verbal Response**

Assessment of the patient's verbal response allows the nurse to gain information about the patient's speech, comprehension, and functioning areas of the higher cognitive centers within the brain and is associated with the patient's ability to articulate, express, and reply (Waterhouse, 2005).

• If the patient is oriented, they received a score of "5." At this level, the patient can state their name; indicate where they are (location), and the current year, month, day, date, of the week.

• If the patient is confused, they receive a score of "4," which means that one of the questions regarding orientation were answered incorrectly and can be an indicator of early neurologic deterioration.

• If the patient is speaking a language that is not understandable or limited in which the patient uses words instead of sentences the score received is a "3."

• When the patient is making incomprehensible sounds, the score given is "2." The sounds are usually in response to a painful stimulus which may indicate damage to the patient's speech center of the brain.

• In instances when there is no verbal response, the patient is not able to produce any speech or sound in response to speech or painful stimuli and a score of "1" is given.

**Motor Response**

Evaluation of the patient's motor response focuses on evaluating the area of the brain that identifies sensory input and translates it into a motor response or movement.

### RN Harris

| Deviations Standards of Care | Comments |
|---|---|
| • Failed to perform a focused neurology examination of the unconscious patient. | • 1258 RN Harris assess the inmate/patient's motor **response and reports the muscles are stiffened**<br>• **0103 RN Harris** reports the patient squeezes her hand. |
| • Failed to assess and stabilize the unconscious patient of a witnessed fall. | • RN Harris deviated from ANA Correctional Standard #1<br>• RN Harris had a duty to assess and implement nursing actions for the unconscious, witnessed falls patient.<br>• RN Harris breached that duty when she failed to complete a focused neurology examination of the unconscious, witnessed falls patient. |

Exhibit 24
311

Ronnie Sandoval vs. San Diego County Jail
Page 25 of 33

## Pupillary Reaction

Normal pupil size ranges from 2 to 4 mm in a bright light setting and 4 to 8 in a dark setting. They should normally present as equal in size. Changes in a patient's pupillary reaction can indicate pressure on the oculomotor optic nerves and increased intracranial pressure. Nursing examination of the pupils is based on PERRLA which stands for pupils equal, round, reactive to light and accommodation. Pupils should be assessed before and after exposure to light. Nursing Documentation a detailed description of whether the pupils are pinpoint, small, large, or dilated. Also, the shape of the pupils may vary to include regular round shape, keyhole, and ovoid. Documentation of the pupil's reaction focuses on if they are brisk, sluggish, nonreactive, or fixed? When assessing the pupillary response, the nurse should hold both eyelids open and shine a light into the eyes. The pupils should constrict immediately and equally bilaterally; after you remove the light, they should immediately dilate back to baseline. In many cases, a change in pupillary response, such as unequal or dilated pupils, results from a progressive neurologic condition.

## RN Harris

| Deviations Standards of Care | Comments |
|---|---|
| Failed to perform a complete assessment of the inmate/patient's pupils. | • At **1258** RN Harris assesses the patient's pupils which she states are at three millimeters and sluggish to light."<br>• There are conflicting testimonies from other staff members who state the inmate/patient had no pupillary response.<br>• At **1:03**, RN Harris reports the pupils remain sluggish but, makes eye contact and attempts to close eyelids. |
| Failed to document pupillary assessment every five minutes as stated they were performed. | • RN Harris failed to assess and document the patient's condition.<br>• RN Harris deviated from ANA Correctional Nursing Standards #1.<br>• RN Harris had a duty to compete and document neurologic examinations on the unconscious, post seizure, witnessed falls patient.<br>• RN Harris breached that duty when she exhibited poor assessment skills identifying life-threatening signs and symptoms within the neurology exam. |

## Code Blue Policy M.5, MSD C.2 (2013) Responsibility of Staff

Per the (2013) Life-Threatening Emergencies: Code Blue Policy M6., the following staff members possessed the authority, thereby an obligation to call 911 or other medical transport for any medical condition they deem necessary: Sworn Staff, "any" MD, RN or LVN.

1. The term "Code Blue" is applied to events of cardiac, respiratory arrests, and trauma emergencies.

Exhibit 24
312

Ronnie Sandoval vs. San Diego County Jail
Page 26 of 33

    A. The First Person-RN Harris
      1) Assesses the victim's condition
      2) Calls for help
      3) Starts CPR if warranted.

    B. The Second Person-RN Llamado
      1) Notifies the control deputy to initiate the 911 call:
        a. Upon arrival of the paramedics answer additional information

2. Provide the Watch commander with information surrounding the injury or accident.

    A. The Registered Nurse or Licensed Vocational Nurse:

      1. Responds to the scene with needed emergency bag or equipment.
      2. Assesses the victim immediately
      3. Manages the emergency, providing continuous assessment: Monitoring of Blood Pressure, Pulse, and Respirations as needed.
      4. Delegates as necessary
      5. Documents the sequence of events in the inmate/patient's medical record.
      6. When the paramedic emergency response team arrives, the medical staff member relinquishes care after providing the paramedics with information regarding the scene, emergency medical care provided, and any medical history.

    B. If there is a physician in the facility, he/she will be called to the scene.

    C. In addition to sworn staff, any MD, RN or LVN shall have the authority to call 911 or other medical transport for any medical condition they deem necessary.

    *Sections F& E are not applicable in this situation.

**RN Harris**

| Deviations from "Code Blue" Policy | Comments |
|---|---|
| • Failed to follow **"Code Blue"** Life-Threatening Emergencies: Code Blue Policy M6; | • RN Harris states that one of the first things she must do if she encounters somebody on the second-floor intake in code blue is to alert one of her deputies to call 9-1-1. |
| • Failed to assess and identify the presence of a life-threatening emergency as outlined in the "Code Blue" policy M6 | • RN Harris defines a code as a patient that is either non-responsive or not breathing. <br> • RN Llamado and Andrade told her to call paramedics but she refused stating the EMTs were the ones to be called; RN Harris denies this. |
| • Failed to remain with patient per code blue policy. | • Deputy Andrade states that when he entered the room that RN Harris entered the cell shortly after with a blood pressure machine |
| • Failed to follow up on paramedics Estimated Time of Arrival (ETA) (EMS protocols) | • This resulted in a 45-40 minute delay |

Exhibit 24
313

Ronnie Sandoval vs. San Diego County Jail
Page 27 of 33

| | |
|---|---|
| • Failed to documents the sequence of events in the inmate/patient's medical record. | • Minimal documentation noted in the medical record.<br>• Unable to verify delivery of care per RN Harris's testimony due to lack of or missing documentation depicting the "man down" event.<br>• RN Harris deviated from ANA Correctional Standards #1, #5.<br>• RN Harris had a duty to competently assess, and implement BLS care to inmate/patient Sandoval.<br>• RN Harris breached that duty when she failed to follow policy and procedure regarding Medical Emergencies, such as calling 911.<br>• |

**RN Llamado**

| Deviations from "Code Blue" Policy | Comments |
|---|---|
| • Failed to follow 'Code Blue" Life-Threatening Emergencies: Code Blue Policy M6 | • RN Llamado testifies that she wanted to call 911 and believed that the inmate/patient was having prolonged seizure activity.<br>• RN Llamado deviated from ANA Correctional Standards #11, #4.<br>• RN Llamado had a duty to call 911 in compliance with current policies/procedures for Medical Emergencies.<br>• RN Llamado breached that duty when she failed to act as a prudent nurse in calling 911. |

**Epilepsy/Seizure**

Epilepsy or Seizure is a term used to describe abnormal brain activity that occurs within the cells of the brain. Seizures can affect the patient's body in the form of convulsions, only certain parts of the body, and their mind through an altered mental status. Seizures that are prolonged which means that they do not subside. The Epilepsy Foundation advises calling for emergency assistance when a convulsion continues for more than five minutes. Patients with Epilepsy are not usually cause for concern; the seizure will more than like stop after a few minutes. However, most seizures are considered a life-threatening condition and can progress to Status Epilepticus which is defined as a continuous state of seizure.

**Cause of Seizure Activity**

Several causes attribute to a patient's seizure activity, such as genetics, health conditions, fever, medications, drugs, and other unknown reasons. According to the Epilepsy Foundation when seizures coupled with any of the following conditions "immediate" medical attention is necessary: Diabetes, Brain Infections, Heat Exhaustion, Poisoning, Hypoglycemia, and High Fever.

Exhibit 24
314

## Seizure Signs & Symptoms

- Signs and symptoms that are indicative of seizure activity include:
- Temporary confusion
- A staring spell
- Uncontrollable jerking movements of the upper and lower extremities of the body
- Loss of consciousness or awareness
- Psychic symptoms

   Signs and symptoms of seizure activity are dependent upon the type of seizure. In most instances, patients who suffer from seizures will usually experience the same type of seizure.

### Types of Seizures

**Generalized Seizures**

   Generalized Seizures affect both hemispheres of the brain from the onset of the seizure, producing "loss of consciousness," which may be brief or last for an extended period.

- **Tonic-Clonic Seizures** present with a "stiffening" of the limbs which represents the "Tonic phase" followed by the "Clonic phase," in which there is jerking of the limbs and face. Some patients, experience only one phase. Other signs associated with this type of seizure are incontinence, bitten tongue, noisy or labored breathing. During seizure activity nothing should be placed into the patient's mouth; the patient should be turned on one side to keep the airway clear from obstruction. Post seizure activity the patient may present lethargic, confused, and want to sleep, full recovery can take minutes to hours.
- **Myoclonic Seizures** present with brief, rapid contractions of body muscles that usually occur at the same time on bilateral sides of the body.
- **Atonic Seizures** present as an abrupt loss of muscle tone causing head drops, loss of posture, and sudden "collapse." This type of seizure is a source of great concern due to its abruptness in which it occurs without warning. People who experience this kind of seizure fall with force, resulting in injuries to the head and face.
- **Absence Seizures** (Petit Mal Seizures) associated with abrupt lapses of awareness and end abruptly; usually seen in children.

   **Nonepileptic Seizures** are not characterized by electrical disruptions in the brain. This type of seizure is categorized into:

- **Physiologic Non-Epileptic Seizures** are caused by various health conditions that result in a change in blood, sugar, or oxygen levels to the brain.
- **Psychogenic Non-Epileptic Seizures** are caused by stressful psychological experiences or emotional trauma.

**Partial Seizures**

   Partial Seizures are characterized by electrical disturbances that only affect one hemisphere of the brain; there are two types of Partial Seizures:

- **Simple Partial Seizures** are characterized by the absence of loss of consciousness. The patient may present as fully awake but, unable to speak or move until seizure activity has stopped. Also, these patients can remember events during the seizure.

Exhibit 24
315

Ronnie Sandoval vs. San Diego County Jail
Page **29** of **33**

- **Complex Partial Seizures** affect a larger area of the brain and the patients level of consciousness. The patient experiencing this type of seizure is unable to interact with others, experiences an inability to control movement, speech, actions, and has not recollection of the events post seizure activity. The patient may appear to be conscious with eyes that are open and have movement. However, the patients level of consciousness is altered and can be compared to a dreamlike or trancelike state. Incomprehensible language may also be spoken

## Status Epilepticus

Is a continuous seizure with a duration that is longer than 5 minutes, or recurrent seizures without a break in between.

This type of seizure requires "emergent" treatment to reduce patient morbidity and mortality. If left untreated it can lead to brain injury.

## Causes

Status Epilepticus may be provoked by drugs and alcohol withdrawal symptoms Brain injury from trauma, Subarachnoid Hemorrhage, Tumors, Cerebral Metastasis, Stroke, Infection, Cerebral Anoxia, Hypoxia Metabolic Disturbances

## San Diego Sheriff's Department: Standard of Nursing Protocol (SNP) for Seizure Disorders

Per the San Diego Sheriff's Department SNP for Seizure Disorder ongoing seizure activity that is prolonged or repeated over a few minutes' warrants "immediate" emergency care, and is known as Status Epilepticus. Per this SNP the following actions should be taken:

- **Call 911\***
- Protect the Airway
- Protect the Inmate/Patient Self-Harm
- Administration of Oxygen (O2) at 10-15 liters per minute using a Non-Rebreather Mask
- Insertion of Oral Airway or Nasal Trumpet, as indicated
- Perform Capillary Blood Glucose Test
    - 1258 RN Harris reports that there are some very mild generalized tremors that are "not" Tonic Clonic in presentation.

## RN Harris

| Deviations from Standard Nursing Protocols (SNP) | Comments |
|---|---|
| • Failed to assess and identify, and take action for life threatening symports associated with prolonged seizure activity i.e. "Call 911" | • Per the reviewed testimonies, there was a 40-45 minute delay in the notification of 911, despite numerous statements that reiterate RN Harris was instructed to upgrade the patient to 911 status. |
| • Failed to implement the SNP for seizures | • RN Harris states that seizures are characterized differently than code blue. |

Exhibit 24
316

Ronnie Sandoval vs. San Diego County Jail
Page **30** of **33**

| | |
|---|---|
| | • RN Harris Failed to implement a plan of care based on policy, and protocols.<br>• RN Harris failed to take direction from nursing leadership.<br>• RN Harris deviated from ANA Correctional Standards #1, #8, # 14.<br>• RN Harris had a duty to employ policies/procedures, and SNP's for the patient/inmate exercising a prolonged seizure.<br>• RN Harris breached that duty when she failed to call 911 per the Seizure SNP and Code Blue Policy. |

## Methamphetamine Signs & Symptoms of Overdose

Methamphetamine is a powerful stimulant that primarily acts on the central nervous system. Suspected Methamphetamine overdose is a life-threatening emergency that can be acute (sudden) in which a person accidentally or intentionally ingests the drug. It can also be labeled a s chronic (long-term) in which the person uses the drug on a regular basis. When large amounts of the drug are taken the following dangerous side, effects may occur:

| | |
|---|---|
| • Agitation | • Irregular Heart Rhythm |
| • Bradycardia | • Kidney damage and possibly kidney failure |
| • Chest pain | • Muscle Twitches |
| • Coma (in extreme cases) | • Paranoia |
| • Difficulty Breathing | • Seizures |
| • Dilated Pupils | • Severe stomach pain |
| • Diaphoresis | • Shock |
| • Hallucinations & Psychosis | • Stroke |
| • Heart attack | • Tachycardia |
| • Heart stops (in extreme cases) | • Delirium |
| • Incoherence | |

***Chances for recovery are dependent upon how quickly the patient receives medical attention.***

Exhibit 24
317

Ronnie Sandoval vs. San Diego County Jail
Page 31 of 33

**RN Harris**

| Deviations from Standard Nursing Protocols (SNP) | Comments |
|---|---|
| Failed to recognize signs and symptoms of an overdose. | • RN Harris's recollection of symptoms associated with a Heroine drug overdose are decreased respirations, pinpoint pupils, and perspiration.<br>• She attributes symptoms of a Methamphetamine overdose with arrhythmias, anxiety, and that the patient is "kind of squirmy." She denies that the patient would have profuse sweating but, would have an increased temperature.<br>• Does not recall delirium, and incoherence being associated with methamphetamine overdose but, does state there would be loss of consciousness.<br>• RN Harris Deviated from ANA Correctional Standards #1, #8, #14.<br>• RN Harris had a duty to ensure that she possessed the knowledge base, and skill set to manage patients suffering from methamphetamine poisoning overdoses.<br>• RN Harris breached that duty when she failed to identify manage the suspected overdose patient.<br>• As a result, there was a 40-45 minute delay in providing inmate/patient Sandoval with access to life-sustaining treatment. |

## Nursing Documentation

Nursing documentation is a method for channeling effective communication which results in continuity, and evaluation of patient care. When nurses are precise in charting their assessments, plans of care, implementation, and evaluations of patients, they are in fact employing the "Nursing Process." Nursing documentation is the only proof a nurse has to show the quality of care that was rendered. Charting in the medical record is key in determining whether or not the standard of care is met. Failure of the nurse to document care provided is "careless conduct" by the nurse. Each nurse is responsible for their own charting.

Exhibit 24
318

Ronnie Sandoval vs. San Diego County Jail
Page **32** of **33**

### RN DeGuzman

| Deviations from Standard Nursing Protocols (SNP) | Comments |
|---|---|
| • Failed to Delegate and endorse the patient inmate to oncoming staff.<br>• Failed to assess, monitor and interpret objective and subjective data collected though observation, inspection, and examination.<br>• Failed to plan and deliver health care, that ensures continuity of care. | • RN Deguzman had prior knowledge that inmate/patient Sandoval was a diabetes patient and did not give a shift report and did not document his assessment of the inmate/patients' blood sugar.<br>• RN DeGuzman failed to document in the JIMS his assessment and data collected in regards to inmate/patient Sandoval's Blood Glucose reading.<br>• Although RN DeGuzman recognized that the deputy had not come back to take inmate/patient Sandoval back to the booking process, RN DeGuzman continued to ignore inmate/patient Sandoval for the entirety of his shift.<br>• RN Deguzman deviated from ANA Correctional Standard # 1, #4, # 7, #11, #12<br>• RN Deguzman had a duty to advocate for the inmate/patient Sandoval. RN DeGuzman was the only member of the health care team that had knowledge of the inmate Sandoval's diabetes and arresting charge.<br>• RN Deguzman breached that duty when he neglected to advocate for inmate/patient Sandoval. |

### RN Llamado

| Deviations from San Diego County Jail Policy & Procedures | Comments |
|---|---|
| Failed to take action for life threatening symports associated with prolonged seizure activity i.e. "Call 911<br><br>Failed to implement the SNP for seizures | RN LLamado had a duty to call 911 per the Code Blue Policy, SNP for Seizures, and the direction given to her by RN Bautista, Charge RN.<br><br>She breached that duty by not following the standing Code Blue policy and the SNP for Seizures.<br><br>As a result, RN Llamado's failure to act had a direct impact and delay in access to life-sustain emergent care for inmate patient Sandoval. |

Exhibit 24
319

Ronnie Sandoval vs. San Diego County Jail
Page **33** of **34**

### Conclusion

In conclusion, it is my professional opinion that the nurses at the San Diego County Jail: RN DeGuzman, RN Harris, and RN Llamado had a duty to ensure that inmate/patient Sandoval received timely access to medical and nursing care from highly efficient and competent nursing staff. The events of 02/23/14-02/24/14, clearly indicate that the nurses at the San Diego County Jail breached their duty by failing to advocate for inmate/patient Sandoval. The nurses failed to follow Standing Policy, Procedure, and Protocols. They neglected to implement life-sustaining emergency procedures thereby and creating a critical forty to forty-five minute gap/delay of life-sustaining emergent care to inmate/ patient Sandoval.

San Diego County Jail had a duty to protect the well-being of inmate/patient Sandoval by ensuring that a Standardized Policy and Procedure was in place that regulates the movement, use, and medical observation requirements. Mr. Sandoval was arrested on narcotics charges and while awaiting booking he began to exhibit the ill effects of a methamphetamine overdose. He was housed in a cell with large window views that was no more than four feet away from where the nurses sat at their cubicles. He sat in a holding cell for over 8 ½ hours deteriorating and not one nurse acted in a prudent manner to inquire as to his status or why he was being housed in the medical area. Mr. Sandoval was placed in the waiting cell at the request of Deputy Chaves. RN DeGuzman knew the inmate/patient possibly had diabetes but failed to relay that information to the next shift; nor did he check on the patient throughout his shift.

At approximately 0055 RN Harris was summoned to the cell were she witnessed inmate/patient Sandoval slump forward, hit his head on an unforgiving surface, and then subsequently fell to the floor. Inmate/patient Sandoval was unconscious and had just suffered head trauma. He had fine body tremors, he was diaphoretic and had unresponsive pupils. At 0058 when RN Harris entered the cell with the knowledge that inmate/patient Sandoval suffered some type of trauma. A prudent nurse draws on their knowledge base and skills set to rapidly stabilize, competently assess, and gain access to emergent care, as a means for decreasing the patients risk for morbidity and mortality. When RN Harris entered the cell at 0058 she failed to implement "Effective Clinical Reasoning" in that she was unable to process the signs and symptoms that inmate/patient Sandoval's condition was deteriorating due to her poor assessment skills. RN Harris insisted that inmate/patient Sandoval only required EMT's who are only able to perform BLS care. One of the first signs of deterioration in the patient is a decrease in their level of consciousness. Inmate/patient Sandoval was unconscious and deteriorating for 45 minutes. Inmate/patient Sandoval was denied access to a higher level of care. At 0148, the Paramedics arrive and by 0211 Ronnie Sandoval was pronounced dead.

Ronnie Sandoval's condition constituted a "Serious Medical Need," per the San Diego County Sheriff's Department Detention Services Bureau – Manual of Policies and Procedures: M.5 Medical Emergencies, M.6 Life Threatening Emergencies Code Blue, and the Standard of Nursing Protocol (SNP) for Seizure. RN Harris was the nurse in charge of the "man down," and although she was instructed by the Charge Nurse RN Bautista, Deputy Andrade, EMT, and RN Llamado to "upgrade the patient to 911 status," she refused. Her poor assessment skills led to her inability to act as a prudent nurse and implement nursing actions to promote emergency access to care. Also, the Code Blue Policy at the San Diego County states: "The following staff members possessed the authority, thereby an obligation to call 911 or other medical transport for any medical condition they deem necessary: Sworn Staff, "any" MD, RN or LVN."

While nurses DeGuzman, Llamado, and Harris had the clear obligation to call 911 pursuant to those policies, they failed to either property assess (Harris and DeGuzman) or follow their own instincts (Llamado) which resulted in a significant delay in inmate Sandoval receiving proper treatment which ultimately led to his untimely demise.

Exhibit 24
320

Ronnie Sandoval vs. San Diego County Jail
Page 34 of 34

Further, the San Diego County Jail failed to protect the welfare of inmate/patient Sandoval by neglecting to implement a medical observation requirement for their "Waiting Cells.

## References

- American Nurses Association (ANA). (2013). *Correctional Nursing: Scope & Standards of Practice.* Silver Springs, MD: Nursesbooks.org

- AHA CPR Guidelines - Updated 2014 / 2015 -. (2014/2015). Retrieved from http://www.cprcertificationonlinehq.com/aha-cpr-guidelines-latest-jan-2014/

- Correctional Nurse Legal Briefs: Understanding Professional Liability. (n.d.). Retrieved from http://correctionalnurse.net/correctional-nurse-legal-briefs-understanding-professional liability/Epilepsy Foundation. (n.d.). Retrieved from http://www.epilepsy.com/ Knox, C. M., Muse, M. V., & Schonely, L. (2013). *Correctional Nursing: Scope and Standards of Practice.* GA, Methamphetamine Overdose. (n.d.). Retrieved from https://medlineplus.gov/ency/article/007480.htm

- Short Definitions of Ethical Principles and Theories Familiar words, what do they mean?. (n.d.). Retrieved fromhttp://www.nursingworld.org/MainMenuCategories/EthicsStandards/Resources/Ethics -Definitions.pdf

- Up-to-date. (n.d.). Retrieved from http://www.uptodate.com/contents/basic-airway-management-in-adults? Source=related link

Exhibit 24
321

Thank you,

Gwendolyn Vontoure
RN, BSN, PHN, MSN, MBA/HCM

Date   3 - 27 - 17

Exhibit 24
322

Statement of Expertise

My name is Gwendolyn Vontoure, and I have been a Registered Nurse for a little over eighteen years. I hold the following degrees in Nursing and Business Administration, RN, BSN, PHN, MSN, MBA/HCM.  I am employed by California Correctional Health Care Services (CCHCS), which is the Medical/Nursing Headquarters Division for the Department of Corrections and Rehabilitation (CDCR) in the State of California. I work in a highly charged leadership environment and work on various projects. I am a Subject Matter Expert for out Nursing, Electronic Health Record (EHRS) rollout. I began my career as a Correctional Nurse, in 2006 and had worked in a variety of challenging clinical positions. As a Staff Nurse, I managed and cared for inmates housed Administrative Segregation, Triage Treatment Area, and conducted Telemedicine clinics for high-risk patient/inmates. In 2009, I worked as a Supervising Registered Nurse II (SRNII), my duties included oversight of Registered Nurses, Licensed Vocational Nurses, and other healthcare staff. Also, one of my duties as an SRN II was to chair the Emergency Response Committee within the institution. This committee reviewed all emergencies to ensure that compliance with policies, procedures, and response times were followed. In 2009, I perused my passion for nursing and the law and became certified as a Legal Nurse Consultant.  In 2011, I became the Regional Telemedicine Coordinator, providing oversight for Statewide Telemedicine Chronic Care areas, and assisted in the revision of the Inmate Medical Services Policy and Procedures (IMSPP), Telemedicine Services Policy, Volume 11. Chapter 1., Telemedicine General Service Guidelines. In transitioning to new opportunities, I moved into the Professional Education Development Department. Duties in this area have included Healthcare Auditing in Private Prisons in which I reviewed medical records of CDCR endorsed inmates to CDCR were receiving timely access to health care that followed the policies and procedures of CCHCS.

Thank you,

Gwendolyn Vontoure
RN, BSN, PHN, MSN, MBA/HCM

Exhibit 24
323

# EXHIBIT 25

Exhibit 25
324

## SAN DIEGO SHERIFF'S DEPARTMENT
### Statement Report

**Crime:** Death Investigation (ICD)       **Case Number:** 14109768
**Victim:** Sandoval, Ronnie
**Location:** 1173 Front Street       **City:** San Diego (SDCJ)
**Date:** February 23, 2014       Page 1 of 3

### STATEMENT OF RN MARYLENE ALLAN

#### ORIGIN:

On Wednesday, March 19, 2014, at about 2002 hours, Detective Carrillo and I interviewed RN Marylene Allan at the San Diego Central Jail (SDCJ). The interview took place inside the medical conference room within the nurses' station on third floor. I recorded the 20 minute interview and later provide the audio recording to Detective Carrillo. The following is a summary of RN Allan's statement; refer to the recording for details.

#### WITNESS INFORMATION:

Marylene Allan
Sheriff's Detention Nurse
San Diego Sheriff's Department
ARJIS: 9033
Work Location: San Diego Central Jail
1173 Front Street, San Diego
Phone: 619-615-2454

#### STATEMENT:

RN Allan indicated she documented her involvement in the incident regarding the death of inmate Sandoval. She reviewed her report prior to the interview. Allan later stated the report was attached to Sandoval's medical record.

RN Allan has been a registered nurse for about 18 years. She is assigned as a nurse at SDCJ. Her normal shift hours are 1500 hours to 2300 hours. Allan started her shift on 2/22/14 and was assigned to the second floor medical screening. At the start of her shift, she completed a task on the third floor to assist the desk nurse. Allan returned to the second floor for her assignment. Allan's duties on the second floor include medical screening for new inmates and alcohol/ heroin medical follow-ups. Alcohol/heroin follow- ups include distributing nighttime medications to inmates on the second floor. In addition to the alcohol/heroin follow-ups, Allan screened about 20 inmates at the medical booths during her shift.

---

Reporting Officer: Det. J. Lopez    ID# 1881        CID - HOMICIDE

Approved By:    Sgt. P. Meza    ID# 1851        6/10/2014

Exhibit 25
325

COSD RRFP 000305

## SAN DIEGO SHERIFF'S DEPARTMENT
### Statement Report

| | | |
|---|---|---|
| **Crime:** | Death Investigation (ICD) | **Case Number: 14109768** |
| **Victim:** | Sandoval, Ronnie | |
| **Location:** | 1173 Front Street | **City:** San Diego (SDCJ) |
| **Date:** | February 23, 2014 | **Page 2 of 3** |

Nurses Caroline Dela Cruz and Romeo DeGuzman were assigned to work with Allan on the second floor on 2/22/14. One nurse is responsible for the safety cell placements, one is responsible for sobering cell placements /checks, and one nurse is assigned to alcohol/heroin follow-ups. The nurse assigned to the alcohol/heroin follow-ups is also responsible for dinner break relief for the first floor nurse. The dinner break is between 1600 to 1730 hours and the second floor is staffed by two nurses.

On 2/22/14, Allan was assigned the alcohol/heroin duty and relived the first floor nurse for lunch at 1625 hours. The break was for 30 minutes. Allan took her dinner break at 1715 and returned to duty at 1745 hours.

During her shift she was not made aware of Sandoval or his status. Allan was made aware of the inmate's death the following day (2/23/14). She did not recall who Sandoval was. Allan did not have any contact with Sandoval during her shift on 2/22/14.

During her shift on 2/22/14, Allan saw an inmate in each of the holding cells (Waiting Room #1 and #2). Allan did not see any issues with either of the two inmates in the holding cells. Allan did not ask why those inmates were placed or held in those particular cells. Allan did not check JIMS to see the booking status of any of the inmates. Medical staff would only check JIMS at the request of a deputy.

The holding cell (referring to Waiting Rooms #1 and #2) in the nurses' station do not have a particular name. Allan knows there are two cells but does not know how they are numbered. The holding cells are used by deputies or medical staff. Deputies will place inmates in the cells due to "keep separate" status or inmates waiting for the booking process. Medical staff uses the cells to have inmates placed there for "medical reasons." Medical staff does not have keys to any of the holding cells.

Safety and sobering cell checks are logged in the computer. There is no log for the holding cells (Waiting Rooms #1 and #2) in the nurse's station. The white board at the nurse's station wall is used by deputies to list which inmate is in a particular safety cell or sobering cell. Handwritten notes list the inmate's name and status. There is no block or area to list information on holding cells #1 and #2.

Medical staff assigned to the second floor nurses' station are required to check on inmates held in the holding cells (Waiting Room#1 or Waiting Room#2) if they were placed there for medical reasons. Medical staff would be informed of "endorsements" indicating the inmate's medical issue such as blood pressure monitoring. Allan was not contacted by any medical or detentions staff with regards to the two inmates in the holding cells.

---

| | | |
|---|---|---|
| Reporting Officer: Det. J. Lopez   ID# 1881 | | CID - HOMICIDE |
| Approved By:   Sgt. P. Meza   ID# 1851 | | 6/10/2014 |

Exhibit 25
326

COSD RRFP 000306

## SAN DIEGO SHERIFF'S DEPARTMENT
### Statement Report

| | | |
|---|---|---|
| **Crime:** | Death Investigation (ICD) | **Case Number: 14109768** |
| **Victim:** | Sandoval, Ronnie | |
| **Location:** | 1173 Front Street | **City:** San Diego (SDCJ) |
| **Date:** | February 23, 2014 | **Page 3 of 3** |

Allan is not aware if deputies approached medical staff to inquire about Sandoval.  Allan did not discuss any issues with her partners about Sandoval.

Allan then stated she was aware of the medical issues with the inmate in cell #2 because he was listed on her alcohol/heroin withdrawal follow-up list.  His name was Wright.  Allan checked on Wright in cell#2 about two times during her shift.  Wright was listed to receive heroin withdrawal medication.  Allan recalls inmate Wright was removed by deputies towards the end of her shift, to complete his booking process.

When checking on inmate Wright, she remembers seeing an inmate in cell#1 but did not remember specifics.  Allan did not know who the inmate (Sandoval) in cell#1 was or recalled his description.  Allan is not positive if the inmate in cell#1 was inmate Sandoval.  Allan did not see deputies moving bodies in or out of the holding cells.

Allan did not recall seeing deputies checking on the inmates in cells #1 or #2.  Allan explained when she sits at the nurses' booth, her back is to the cell and she cannot see if deputies are checking on the inmates.  When the workload is minimal, Allan sits in the nurses' screening booth or retrieves supplies for the work station and did not have constant view of the holding cells.

At the end of their shift, medical staff provides a report on the status of the sobering and safety cells, or any special endorsements for the relief staff.  Allan does not recall if any information about the inmates in cells#1 or cell#2 was relayed to the medical staff that relieved them.

| | | | |
|---|---|---|---|
| Reporting Officer: | Det. J. Lopez | ID# 1881 | CID - HOMICIDE |
| Approved By: | Sgt. P. Meza | ID# 1851 | 6/10/2014 |

Exhibit 25
327

COSD RRFP 000307