UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANA SANDOVAL, et al.,<br><br>         Plaintiffs,<br><br>v.<br><br>COUNTY OF SAN DIEGO, et al.,<br><br>         Defendants. | Case No.:  3:16-cv-01004-BEN-AGS<br><br>**ORDER:**<br><br>**(1) GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; and**<br><br>**(2) REMANDING PLAINTIFFS' STATE-LAW CLAIMS TO THE SAN DIEGO SUPERIOR COURT** |

## INTRODUCTION

Plaintiffs Ana Sandoval, individually and as successor in interest to Ronnie Sandoval, Ronnie Sandoval, Jr., and Josiah Sandoval (collectively "Plaintiffs") filed this civil rights action pursuant to 42 U.S.C. § 1983 following the in-custody death of Ronnie Sandoval ("Sandoval") while he was detained at the San Diego Central Jail.

Plaintiffs allege that during Sandoval's confinement, County of San Diego ("County") employees Romeo de Guzman, Dana Harris, and Maria Llamado (collectively, "individual Defendants") were deliberately indifferent to Sandoval's serious medical needs and liable for his wrongful death.  Plaintiffs further allege the Defendant County was deliberately indifferent to Sandoval's serious medical needs and

1

liable for his wrongful death due to its custom of using a verbal pass down system and its failure to sufficiently train its employees in monitoring inhabitants placed in medical observation cells.

## PROCEDURAL HISTORY

On April 25, 2016, individual Defendants and Defendant County (collectively, "Defendants") removed Plaintiffs' lawsuit from the Superior Court of California to this Court. (Docket No. 1.) Now pending is Defendants' motion for summary judgment on all of Plaintiffs' claims. (Docket No. 20.) For the reasons set forth below, Defendants' motion is **GRANTED in part**.

## BACKGROUND[1]

On February 22, 2014, San Diego Sheriff's Deputy Henry Castro ("Deputy Castro")[2] conducted a probation compliance check at Sandoval's residence, which resulted in Sandoval's arrest for possession of methamphetamine and drug paraphernalia. (First Amended Complaint ("FAC") ¶ 15; Defs.' Ex. A at p. 4.)[3] Deputy Castro transported Sandoval to the San Diego Central Jail, where he was booked around 2:43 p.m. (FAC ¶ 16; Defs.' Ex. A at p. 5.) At the time of his arrest and booking, Sandoval "did not appear to be under the influence of drugs or in medical distress." (Defs.' Separate Statement of Undisputed Material Facts ("SSUMF") No. 1; Pls.' Response to SSUMF No. 1.)

///

---

[1] The Court's reference to certain pieces of evidence is not an indication that it is the only pertinent evidence relied on or considered by the Court. The Court has reviewed and considered all the evidence submitted by the parties. In addition, Defendants' evidentiary objections, to which Plaintiffs did not respond, are sustained. (*See* Docket No. 25-2.)

[2] Unless otherwise stated, the Court's reference to a "Deputy" or other law enforcement officer is to a County of San Diego Deputy Sheriff.

[3] All page number references to the parties' moving papers in this Order refer to the page numbers generated by the CM/ECF system.

At approximately 3:30 p.m., Deputy Matthew Chavez was taking Sandoval's fingerprints and noticed Sandoval was sweating and appeared disoriented. (Defs.' Ex. C at p. 10; Pls.' Ex. 2 at p. 39.) Deputy Chavez asked Sandoval "if he was alright," to which Sandoval responded that he was cold, did not feel well, and may be diabetic. (Defs.' Ex. C at p. 10; Pls.' Ex. 2 at p. 40.) Deputy Chavez advised Deputy Bryan, who notified the intake nurse. (Defs.' Ex. C at p. 11; Pls.' Ex. 2 at pp. 40-41.) Deputy Bryan observed that Sandoval "did not look well," and asked if he was sick, to which Sandoval responded "he was sick the week before but was not at the moment." (Defs.' Ex. E at p. 16.) Deputy Bryan also asked if Sandoval "had taken any drugs or had been drinking recently," which he denied. (*Id.*) Because Sandoval indicated that he may have diabetes, Deputy Bryan inquired about the timing of his last meal, and Sandoval told him it was "last night." (*Id.* at p. 17.)

The intake nurse arrived to test Sandoval's blood sugar level and determined that it was normal before clearing him to continue the booking process. (Defs.' Ex. C at p. 11, Ex. E at p. 16; Pls.' Ex. 2 at p. 42.) Deputy Chavez placed Sandoval in a holding cell to have his booking photo retaken. At approximately 4:00 p.m., Deputy Bryan brought Sandoval two sack lunches. (Defs.' Ex. C at p. 11, Ex. E at p. 17; Pls.' Ex. 2 at pp. 42-43.)

At approximately 4:30 p.m., Sandoval was escorted to the forensics room to have his booking photograph taken. (Pls.' Ex. 3 at p. 53.) Deputy Lavinia Martinez observed Sandoval looking tired, and asked him multiple times him "how he was feeling, what was the matter, and if he had swallowed anything." (Defs.' Ex. F at p. 20; *see also* Pls.' Ex. 3 at p. 53.) "Sandoval became agitated" by Deputy Martinez's questioning, and "refused to answer any more questions about his health." (Pls.' Ex. 3 at p 53.) Deputies Martinez and Chavez determined that they should expedite Sandoval's booking process so he could see the nurse on the second floor. (Pls.' Ex. 2 at pp. 43-44, Ex. 3 at p. 53.) After Sandoval had his photo retaken, Deputy Chavez escorted Sandoval to the second floor nurses' station "to have him more thoroughly evaluated." (*Id.*)

3

Upon arriving at the second floor, Deputy Chavez spoke with Defendant Romeo de Guzman ("Nurse de Guzman") and explained what he had observed during his contact with Sandoval. (Pls.' Ex. 2 at pp. 43-44, Ex. 3 at p. 53.) Deputy Chavez told Nurse de Guzman he had brought Sandoval to be evaluated, and Nurse de Guzman asked Deputy Chavez to take Sandoval to medical observation cell number one (hereinafter "MOC1") and told him he would "look at him." (Pls.' Ex. 2 at pp. 44-45.) Deputy Chavez notified Deputies Graham Wilkinson and Leonard Rodriguez that Sandoval was placed in MOC1. (Pls.' Ex. 3 at p. 53.)

At approximately 4:45 p.m., Deputy Wilkinson watched Deputy Chavez place Sandoval in MOC1. (Defs.' Ex. G at p. 22; *see also* Pls.' Ex. 3 at p. 53.) Around this time, Nurse de Guzman checked Sandoval's blood sugar level, which was determined to be normal. (Pls.' Ex. 4 at pp. 60-61, 65-66.) Nurse de Guzman's shift ended around 11:00 p.m. During the rest of his shift, Nurse de Guzman did not conduct any further checks or otherwise interact with Sandoval. (Pls.' Ex. 4 at pp. 69, 72-73.) Deputy Wilkinson further observed Sandoval sweating and stating he did not feel well. (Defs.' Ex. G at p. 22.) Deputy Wilkinson asked Sandoval if he was under the influence of narcotics or alcohol, to which Sandoval responded "No." (*Id.*) Deputy Wilkinson further asked if Sandoval needed anything, to which Sandoval replied "No, I just want to feel better." (Defs.' Ex. G at p. 22.)

At approximately 7:30 p.m., Deputy Nathaniel Fox contacted Sandoval in MOC1 and asked him why he was in the cell; Sandoval stated he did not know. (Docket No. 21, Defs.' Ex. J at p. 2.) Deputy Fox asked the screening nurses if they knew why Sandoval was held in the cell; none of them knew why. (*Id.*) Deputy Fox was unable to ascertain which deputies had placed Sandoval in the cell and returned to his duties, but periodically checked on Sandoval's welfare throughout his shift. (*Id.* at pp. 2-3.) Deputy Fox observed that Sandoval "appeared lethargic but did not show any signs of medical distress" until approximately 12:53 a.m. the following morning. (*Id.* at p. 3.)

///

4

Defendants Maria Llamado ("Nurse Llamado") and Dana Harris ("Nurse Harris") began their shifts at approximately 11:00 p.m. (Defs.' Ex. I at pp. 29-30, Ex. P at pp. 79-81.) Nurse de Guzman did not "pass down" any information about Sandoval to Nurse Llamado or Nurse Harris. (Pls.' Ex. 4 at p. 73.) When Nurse de Guzman left the jail at 11:30 p.m., Sandoval was "sitting up, awake, and not in distress." (Defs.' Ex. H at p. 26.)

Nurse Harris first noticed Sandoval in MOC1 within the first 20 minutes of her shift. (Defs.' Ex. P at pp. 83-85.) Nurse Harris saw Sandoval sitting upright and leaning against the back wall. (*Id.* at pp. 84-85.)

Around 12:55 a.m., Sergeant Robert Shawcroft was walking through the medical area at the San Diego County Jail and observed Sandoval sitting on the bench in MOC1. (Defs.' Ex. K at p. 54.) As he was looking in, Sandoval's "eyes rolled back and he slumped slightly to his left on the bench. [Sergeant Shawcroft] immediately summoned Nurse Harris and other deputies into the cell." (*Id.*; Pls.' Ex. 7 at p. 121.) Sergeant Shawcroft observed that Sandoval "appeared to be having a seizure." (Defs.' Ex. K at p. 54; *see also* Pls.' Ex. 7 at p. 122.) Nurse Harris was the first nurse to respond. Shortly after, Nurse Llamado, Deputy Nolan Edge, and Deputy Matthew Andrade entered Sandoval's cell.

Around 12:58 a.m., Nurse Harris assessed Sandoval's condition and asked the deputies to call for Emergency Medical Transport ("EMTs"). (Defs.' Ex. P at pp. 97, 105.) Around 1:10 a.m., while waiting for the arrival of the EMTs, Nurse Harris determined Sandoval's conditioned had worsened and requested an upgrade for paramedics. (*Id.* at pp. 99, 105.) Although Sergeant Shawcroft related to Nurse Harris that Sandoval may have been seizing, based on her assessment of Sandoval's symptoms, she did not suspect Sandoval was actually seizing at any point. (*Id.* at pp. 91-95.) Shortly after 1:25 a.m., the EMTs arrived. (*Id.* at p. 105.) Around 1:48 a.m., the paramedics arrived. Around 2:11 a.m., Sandoval was pronounced dead. (*Id.*) Sandoval's cause of death was later found to be acute methamphetamine intoxication. (Defs.' Ex. M. at p. 61, Ex. N at p. 70.)

5

The County of San Diego Office of the Medical Examiner noted Sandoval's "postmortem peripheral blood methamphetamine concentration . . . was measured at 38 mg/L." (Defs.' Ex. M at p. 61; *see also* Defs.' Ex. N at p. 70.) "A concentration of 38 mg/L is an astronomically high level of methamphetamine to find in blood." (Defs.' Ex. M at p. 61.) "This level indicates Mr. Sandoval ingested a dose of methamphetamine several hundred times more than a typical recreational dose." (Defs.' Ex. N at p. 70.)

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A fact is material if it might affect the outcome of the suit under the governing law. *Anderson*, 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In considering a summary judgment motion, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his or her favor. *Id*. at 255.

The moving party bears the initial burden of showing there are no genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). It can do so by negating an essential element of the non-moving party's case, or by showing that the non-moving party failed to make a showing sufficient to establish an element essential to that party's case, and on which the party will bear the burden of proof at trial. *Id.* The burden then shifts to the non-moving party to show that there is a genuine issue for trial. *Id.* As a general rule, the "mere existence of a scintilla of evidence" will be insufficient to raise a genuine issue of material fact. *Anderson*, 477 U.S. at 252. There must be evidence on which the jury could reasonably find for the non-moving party. *Id.*

## DISCUSSION

Plaintiffs assert claims under 42 U.S.C. § 1983 against the individual Defendants for violations of Sandoval's Fourteenth Amendment rights due to alleged deliberate

indifference to his serious medical needs, and claims against Defendant County for an alleged unconstitutional custom and inadequate training.  Defendants' move for summary judgment on the grounds that the individual Defendants are entitled to qualified immunity, Plaintiffs failed to raise a genuine issue of material fact to support their claims that the individual Defendants' conduct amounted to a constitutional violation of Sandoval's rights, and the County's custom and training did not cause violations to Sandoval's constitutional rights.  The Court agrees that summary judgment for Defendants is appropriate for all of Plaintiffs' federal claims. [4]

## A.      Deliberate Indifference to Serious Medical Needs – Individual Defendants

"Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'"  *Albright v. Oliver,* 510 U.S. 266, 271 (1994) (citation omitted in original).  To prevail on a Section 1983 claim, a plaintiff must show: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution; (2) by a person acting under the color of state law.   42 U.S.C. § 1983.  The parties do not dispute that the individual Defendants acted under the color of law.  Thus, the issue is whether any of their conduct deprived Sandoval of his constitutional rights.

"Inmates who sue prison officials for injuries suffered while in custody may do so under the Eighth Amendment's Cruel and Unusual Punishment Clause or, if not yet convicted, under the Fourteenth Amendment's Due Process Clause."  *Castro v. Cnty. of*

---

[4] Plaintiffs also assert various claims under California state law.  In light of the conclusions of this Order, those claims are remanded to the San Diego Superior Court.  *See* 28 U.S.C. § 1367(c)(3) (providing that a district court may decline to exercise jurisdiction supplemental jurisdiction over remaining claims where it has "dismissed all claims over which it has original jurisdiction"); *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 561 (9th Cir. 2010) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims.").

7

*Los Angeles*, 833 F.3d 1060, 1067-68 (9th Cir. 2016) (en banc) (citing *Bell v. Wolfish*, 441 U.S. 520, 535 (1979) (holding that, under the Due Process Clause, a detainee may not be punished prior to conviction)).

Here, it is undisputed that at the time of Sandoval's death, he was a pretrial detainee. As such, Sandoval's rights derive from the Due Process Clause of the Fourteenth Amendment. Although Defendants' briefing analyzes Sandoval's rights under the Cruel and Unusual Punishment Clause of the Eighth Amendment, the Court assumes Defendants intended to advance their arguments under the correct clause.

"While a detainee's rights arise under the Due Process Clause of the Fourteenth Amendment, the guarantees of the Eighth Amendment guide courts and provide a minimum standard of care for determining detainees' rights, including the right to medical care." *Frary v. Cnty. of Marin*, 81 F. Supp. 3d 811, 824 (N.D. Cal. 2015) (citing *Or. Advocacy Ctr. v. Mink,* 322 F.3d 1101, 1120 (9th Cir. 2003)). The Fourteenth Amendment "imposes, at a minimum, the same duty the Eighth Amendment imposes: persons in custody have the established right to not have officials remain deliberately indifferent to their serious medical needs." *Id.* (quoting *Gibson v. Cnty. of Washoe,* 290 F.3d 1175, 1187 (9th Cir. 2002) (internal quotation marks omitted; citation omitted in original), *overruled on other grounds by Castro*, 833 F.3d 1060).

To prevail on a Fourteenth Amendment claim for inadequate medical care, a detainee must show "deliberate indifference" to his or her "serious medical needs." *See Lolli v. Cnty. of Orange*, 351 F.3d 410, 419 (9th Cir. 2003) (applying "traditional Eighth Amendment standards" to Fourteenth Amendment claims for failure to provide adequate care for serious medical needs claims). Deliberate indifference "includes 'both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference.'" *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) (quoting *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012), *overruled in part on other grounds by Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014) (en banc)).

8

### 1. Objective Standard – Serious Medical Need

"To meet the objective element of the standard, a plaintiff must demonstrate the existence of a serious medical need." *Colwell*, 763 F.3d at 1066 (citing *Estelle,* 429 U.S. at 104). A serious medical need exists if failure to treat the injury or condition "could result in further significant injury" or cause "the unnecessary and wanton infliction of pain." *Id.* (quoting *Jett v. Penner,* 439 F.3d 1091, 1096 (9th Cir. 2006)).

Defendants' do not contest the fact that Sandoval had a serious medical need. While the parties dispute whether treatment could have saved Sandoval's life, they do not dispute that the postmortem revealed that Sandoval suffered from acute methamphetamine intoxication, which obviously resulted in "further significant injury" since it was left untreated. *Colwell*, 763 F.3d at 1066. Therefore, the Court is satisfied that no genuine issues exist as to this element.

### 2. Subjective Standard – Deliberate Indifference

Here is where the Plaintiffs' Section 1983 claims fail. To meet the subjective standard, the prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but that person "must also draw the inference." *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) (quoting *Farmer*, 511 U.S. at 837). "This 'subjective approach' focuses only 'on what a defendant's mental attitude actually was.'" *Id.* (quoting *Farmer,* 511 U.S. at 839).

Deliberate indifference "may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988) (citing *Estelle*, 429 U.S. at 104-05). However, "[m]ere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights." *Id.* (citing *Estelle*, at 106). To meet this standard, a prisoner must prove "more than ordinary lack of due care for the prisoner's interests or safety." *Snow*, 681 F.3d at 985 (quoting *Farmer,* 511 U.S. at 835). "A prison official acts with 'deliberate indifference . . . only if the [prison official] knows of and disregards an

3:16-cv-01004-BEN-AGS

excessive risk to inmate health and safety.'" *Toguchi*, 391 F.3d at 1057 (quoting *Gibson*, 290 F.3d at 1187); *see also Lolli*, 351 F.3d at 419.

As noted above, the two-element objective-subjective deliberate indifference standard for an Eighth Amendment claim guides the Court's determination of the minimum standard of care for a pretrial detainee such as Sandoval. *Frary v*, 81 F. Supp. 3d at 824 (citation omitted). Plaintiffs acknowledge the "traditional understanding that a pretrial detainee's claim for inadequate medical care is determined under the Eighth Amendment's subjective deliberate-indifference standard." (Opp'n at p. 13.) Nevertheless, relying on the Supreme Court's decision in *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015) and the Ninth Circuit's discussion of *Kingsley* in *Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (en banc), Plaintiffs urge the Court to apply a "pretrial detainee objective standard" for both of the deliberate indifference elements of their inadequate medical care claim. (Opp'n at pp. 13-15.) The Court does not interpret *Kingsley* or *Castro* to justify deviation from concededly established law.

In *Kingsley*, the Supreme Court held that courts must apply an objective standard in determining whether force is "excessive" in an excessive force claim brought by a pretrial detainee under the due process clause of the Fourteenth Amendment. *Kingsley*, 135 S. Ct. at 2472-73. As a result, a pretrial detainee bringing an excessive force claim under the due process clause of the Fourteenth Amendment is not required to prove the defendant's state of mind, and need only show "the force purposely or knowingly used against him was objectively unreasonable." *Id.* at 2473.

In *Castro*, the Ninth Circuit found *Kingsley's* reasoning required it to overrule its decision in *Clouthier v. County of Contra Costa*, 591 F.3d 1232 (9th Cir. 2010) "to the extent that it identified a single deliberate indifference standard for all § 1983 claims and to the extent that it required a plaintiff to prove an individual defendant's subjective intent to punish in the context of a pretrial detainee's failure-to-protect claim." *Castro*, 833 F.3d at 1070. Noting *Kingsley* "did not squarely address whether the objective standard applies to all kinds of claims by pretrial detainees, including both excessive

10

force claims and failure-to-protect claims," it found enough similarities between these claims to warrant extending *Kingsley's* holding to failure-to-protect claims. *Castro*, 833 F.3d at 1069-70 ("On balance, we are persuaded that *Kingsley* applies, as well, to failure-to-protect claims brought by pretrial detainees against individual defendants under the Fourteenth Amendment. Excessive force applied directly by an individual jailer and force applied by a fellow inmate can cause the same injuries, both physical and constitutional. Jailers have a duty to protect pretrial detainees from violence at the hands of other inmates, just as they have a duty to use only appropriate force themselves.")

The Court is not persuaded that these cases change its analysis of Plaintiffs' claims. First, neither *Kingsley* nor *Castro* overruled or otherwise discussed application of an objective standard for determining a defendant's mental state in the context of the claim at issue here, *i.e.*, *an inadequate medical care claim* brought under the due process clause of the Fourteenth Amendment. Second, it appears the Ninth Circuit has declined to reach this issue in at least three cases since *Castro* was decided.[5]

Plaintiffs' also rely on three district court cases for their assertion that "[s]ome district courts have applied *Castro's* reasoning to pretrial detainees' due process claims

---

[5] *See Edwards v. Mondora*, 700 F. App'x 661, 663 (9th Cir. 2017) ("The district court properly granted summary judgment on Edwards' constitutionally inadequate medical care claims because, *under any potentially applicable standard*, Edwards failed to raise a genuine dispute of material fact as to whether any of the defendants knew of and disregarded an excessive risk to Edwards' health.") (citations omitted; emphasis added); *Darling v. Los Angeles Cnty. Sheriff's Dep't*, 695 F. App'x 216, 217 (9th Cir. 2017) ("The district court properly dismissed Darling's claims for inadequate medical care and unconstitutional conditions of confinement because *under any potentially applicable standard*, Darling failed to allege facts sufficient to show that defendants knew of and disregarded an excessive risk to her health or safety.") (citation omitted; emphasis added); *Nyland v. Calaveras Cnty. Sheriff's Jail*, 688 F. App'x 483, 485 (9th Cir. 2017) ("Dismissal of Nyland's claim of constitutionally inadequate medical care was proper because *under any potentially applicable standard*, Nyland failed to allege facts sufficient to show that defendants knew of and disregarded an excessive risk to his health.") (citations omitted; emphasis added).

for inadequate medical care." (Opp'n at p. 14.) In so doing, Plaintiffs mischaracterize or misconstrue the first decision. The second and third are unpersuasive.

The first, *Guerra v. Sweeney*, No. 113CV01077AWIBAMPC, 2016 WL 5404407, at *4 (E.D. Cal. Sept. 27, 2016), did not conclude that *Castro's* objective standard should be applied. Rather, it discussed what the elements of an inadequate medical care claim would "look like" based on *Castro's* reasoning, before concluding: "Although the standard by which Plaintiff's deliberate indifference to a serious medical condition claim is judged is *subject to dispute*, even assuming that the above-listed test applies, Plaintiff's claim fails." *Id.* at *3-4 (emphasis added). Moreover, *Guerra* noted, "[a]fter *Castro*, most district courts in this circuit have continued to apply the Eighth Amendment standard to pretrial detainees' claims of injury resulting from untreated serious medical needs."[6] *Id.* at *3.

In the second case, *Weishaar v. County of Napa*, the district court assumed without discussion that *Castro* required courts apply an objective standard for *all* claims alleging deliberate indifference under the Fourteenth Amendment. *See id.*, No. 14-CV-01352-LB, 2016 WL 7242122, at *1 (N.D. Cal. Dec. 15, 2016).[7] But *Castro* expressly denounced a

---

[6] *Guerra* listed: *James v. Lee*, 2016 WL 5338074, *4 (S.D. Cal. Sept. 23, 2016); *Atayde v. Napa State Hosp.*, 2016 WL 4943959, *4 (E.D. Cal. Sept. 16, 2016); *Kelley v. City of Henderson*, 2016 WL 4473420, *3 (D. Nev. Aug 24, 2016); *see also Estate of Sandra Vela v. Cnty. of Monterey*, 2016 WL 4678300, *3 (N.D. Cal. Sept. 7, 2016). *Guerra*, 2016 WL 5404407, at *3.

[7] "The first issue is whether, as an arrested probation violator, Mr. Forest was a convicted inmate or a pretrial detainee for § 1983 purposes. The applicable § 1983 test will depend on this decision. If Mr. Foster was a convicted prisoner, then his § 1983 claim would arise under the Cruel and Unusual Punishment Clause of the Eighth Amendment; if he was a pretrial detainee, then his § 1983 claim lies under the Due Process Clause of the Fourteenth Amendment. *E.g., Castro*, 833 F.3d at 1067-68 (citing *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)). The difference is significant. Under both clauses,' Mr. Foster 'must show that the prison officials acted with 'deliberate indifference.' *Castro*, 833 F.3d at 1068. The tests for identifying 'deliberate indifference' are, however, different under these respective clauses. The Eighth

12

single de facto deliberate indifference standard for all section 1983 claims. *See Castro*, 833 F.3d at 1070 (overruling *Clouthier* "to the extent that it identified a single deliberate indifference standard for all § 1983 claims"). The Court respectfully disagrees with the district court's assumption, and notes Plaintiffs do not advance this contention.

The third case, *Borges v. City of Eureka*, recognized that *Castro* "did not specifically address whether this new objective 'deliberate indifference' test should apply specifically to pretrial detainees' Fourteenth Amendment claims arising from untreated serious medical needs." No. 15-CV-00846-YGR, 2017 WL 363212, at *9 (N.D. Cal. Jan. 25, 2017). It concluded that because: (1) "the Ninth Circuit has long analyzed claims that government officials failed to address pretrial detainees' serious medical needs using the same 'deliberate indifference' standard" as failure-to-protect detainees, and (2) *Castro* "expressly overruled [*Clouthier*, *supra*, an inadequate medical care claim case] . . . for interpreting 'deliberate indifference' as requiring proof of the officer's subjective intent to punish," *Castro*'s objective "deliberate indifference" test was "an appropriate lens through which to evaluate the [inadequate medical care] claim." *Borges*, 2017 WL 363212, at *9 (internal citations omitted). The Court again respectfully disagrees with the district court's reasoning.

As discussed above, *Castro* overruled *Clouthier* "to the extent that it identified a single deliberate indifference standard for all § 1983 claims," but in particular *in the context of a pretrial detainee's failure-to-protect claim*." *Castro*, 833 F.3d at 1070 (emphasis added). Simply put, neither *Kingsley* nor *Castro* discussed application of an objective standard in the context of Plaintiffs' inadequate medical care claim.

///

Amendment test contains a subjective component, whereas the Fourteenth Amendment test is 'purely objective.' *Id.* at 1067-68, 1070-71 (discussing, *inter alia*, *Kingsley v. Hendrickson,* 135 S. Ct. 2466 (2015))." *Weishaar*, 2016 WL 7242122, at *6 (internal quotation marks omitted).

13

In sum, because the Court is not convinced *Kingsley* and *Castro* change its analysis of Plaintiffs' claims, it shall apply the subjective standard for deliberate indifference set forth above. Defendants assert none of the individual Defendants were aware that Sandoval had a serious medical need and Plaintiffs do not present any direct evidence to the contrary. Thus, the Court must determine whether the circumstantial evidence offered presents a triable issue of material fact as to any of the individual Defendants' knowledge of Sandoval's serious medical need. Reviewing the admissible evidence in the light most favorable to Plaintiffs, the Court finds Plaintiffs have failed to raise a triable issue of material fact for each of their claims against each individual Defendant.

### a) Defendant Nurse de Guzman

As explained above, the undisputed evidence supports an objective finding that Sandoval suffered a serious medical need: acute methamphetamine intoxication. However, Plaintiffs do not argue that Nurse de Guzman should have been aware of this need. Instead, they vaguely argue that "[Sandoval's] condition appeared to be serious enough for Deputy Chavez to have contacted him – twice. [Sandoval] was sweating profusely, disoriented, and looked ill." (Opp'n at p. 16.) Plaintiffs further argue the evidence "supports the contention that a reasonable nurse would have been aware" Sandoval was suffering from "drug withdrawals"[8] or "diabetic complications, each being a serious medical condition." (*Id.* at pp. 16-17.) Regardless of which serious medical need, the Court finds Plaintiffs have not presented admissible evidence to establish a triable issue of material fact that Nurse de Guzman was actually aware Sandoval had a serious medical need.

It is undisputed that Nurse de Guzman first interacted with Sandoval around 4:30 p.m. on the day of his arrest when Deputy Chavez contacted him to test Sandoval's blood sugar level. Deputy Chavez testified at his deposition that when he contacted Nurse de

---

[8] Plaintiffs did not explain whether acute methamphetamine intoxication and drug withdrawals present the same symptoms or would receive the same type of treatment.

14

Guzman, he told Nurse de Guzman he had observed Sandoval sweating, appearing lethargic and confused, and had brought him up to be evaluated. (Pls.' Ex. 2 at pp. 43-44.)[9] He also told Nurse de Guzman that Sandoval "had been cleared by the medical staff downstairs, but there was still something going on so [Nurse de Guzman] needed to look at him more thoroughly." (*Id.* at p. 49.) Nurse de Guzman directed him to put Sandoval in MOC1, and said he would "take a look at him." (*Id.* at pp. 44-45.)

At his deposition, Nurse de Guzman denied recollection of Deputy Chavez's statements regarding his observations of Sandoval. (Pls.' Ex. 4 at p. 61.) Instead, he recalled Deputy Chavez asked him to perform a blood sugar test, and that Sandoval looked "fine" and "okay" at that moment. (*Id.* at pp. 60-61.) In his declaration in support of Defendants' motion for summary judgment, Nurse de Guzman stated he asked Sandoval if he was taking any medication, which Sandoval denied. (Defs.' Ex. H at p. 25.) Nurse de Guzman also asked if Sandoval was "ok" and Sandoval said "Yes." (*Id.*) Nurse de Guzman observed Sandoval as "alert, coherent, ambulatory, and not in any form of distress." (*Id.* at p. 26) After Nurse de Guzman tested Sandoval's blood sugar level, which was normal, he saw Sandoval approximately three times during the rest of his shift, finding "there was nothing to note about his condition." (*Id.*) When Nurse de Guzman left work at 11:30 p.m., "Sandoval was in the holding cell, sitting up, awake, and not in distress." (*Id.*) When his shift ended, Nurse de Guzman did not pass down any information about Sandoval because he did not believe he was being held in MOC1 for a medical reason. (Pls.' Ex. 4 at p. 73.)

In a conclusory fashion, Plaintiffs argue "it was incumbent on DeGuzman [sic] to continue to assess Sandoval to find the root cause of [Sandoval's] medical issue" after Nurse de Guzman "ruled out the most obvious cause of the symptoms" by finding his blood sugar level was normal. (Opp'n at p. 16.) The Court disagrees. A jail is not a

_____

[9] Plaintiffs' appear to have underlined portions of their deposition transcripts. The Court's quotation of their deposition exhibit omits the emphasis for ease of reading.

hospital emergency room. Sandoval was not a patient presenting to a medical care provider requesting relief from symptoms of an unknown ailment. In such a scenario, Sandoval would presumably be truthful and informative to the provider to aid the determination and appropriate course of treatment for his ailment.

In contrast, here Sandoval was being assessed as part of the booking process after he was arrested for a suspected probation violation. It is undisputed that Sandoval did not advise any prison official of his drug overdose condition, or vocalize a request for treatment. Nurse de Guzman's obligation to provide adequate medical care is conditioned upon his determination that Sandoval had a serious medical need. Moreover, the undisputed evidence shows Nurse de Guzman's efforts to discover Sandoval's serious medical need were thwarted, not only because Sandoval failed at any time to advise him (or any of the other deputies and medical staff) of his drug overdose condition, but also because Sandoval lied and denied his use of drugs to Nurse de Guzman.

Plaintiffs also argue, without citing to any evidence (admissible or otherwise), that approximately thirty minutes after Nurse de Guzman tested Sandoval's blood sugar, Nurse de Guzman asked Deputies Rodriguez and Wilkinson why they would not take Sandoval out of MOC1 and the deputies stated it was because Sandoval was "under the influence." (Opp'n at p. 16.) According to Plaintiffs, Deputy Rodriguez "told DeGuzman [sic] that Sandoval was 'shaking mildly . . . [and] appeared to be having withdrawals from drugs." (*Id.*) They then conclude "[a]t this point, six deputies agreed [Sandoval] needed further medical treatment, two of them stating that [Sandoval] was having withdrawals." (*Id.*) Viewing the evidence in a light most favorable to Plaintiffs, the Court finds neither Plaintiffs' assertions nor their conclusion are supported by the evidence.

First, there is no admissible evidence that any deputy expressly told Nurse de Guzman that Sandoval appeared to, or was undergoing, drug withdrawals. Nor does the inadmissible evidence establish this fact; Deputy Rodriquez's report states: "Deputy Wilkinson asked Sandoval if he was under the influence of drugs or alcohol and he stated

16

he was not. I noticed Sandoval was shaking mildly, so I asked him to sit on the bench. Sandoval appeared to be having withdrawal from drugs." (Pls.' Ex. 5 at p. 79.) Even if the Court considered Deputy Rodriguez's report, contrary to Plaintiffs' assertion this statement does not suggest Deputy Rodriguez explicitly advised Nurse de Guzman that Sandoval appeared to be, or was undergoing drug withdrawals. Nor does any admissible evidence corroborate this exchange to support such an inference.

Second, the evidence indicates Nurse de Guzman consciously considered whether Sandoval was under the influence of drugs or alcohol. During Nurse de Guzman's deposition, when asked why he told a detective Sandoval "looked like he may have been under the influence," Nurse de Guzman responded:

> [T]his is what I remember. When the inmates ask me to check it - - I ask the deputy to place in one of the holding cells. The officer - - the deputy is asking that kind of question to Mr. Sandoval, you know, something like "Are you under the influence of or anything? I asked him, too, you know. Like for blood, sugar check - - "Are you okay?" Something like that. But I don't see anything. Nothing is under the influence of drugs [sic].

(Pls.' Ex. 4 at p. 62.) Nurse de Guzman testified that "someone may have said [Sandoval was] under the influence," but "[d]uring that time . . . [he] did not see anything that [Sandoval was] under the influence of drugs [sic]." (*Id.* at p. 64.) Nurse de Guzman further testified that "my observation is very clear that during my encounter with Mr. Sandoval, I don't see anything that warranted to be sent to the hospital or sent to the doctor [sic]." (*Id.* at p. 65.) Thus, based on the undisputed evidence offered, Plaintiffs' assertion that Nurse de Guzman should have recognized Sandoval was experiencing drug withdrawals is unfounded.

Plaintiffs' contention that multiple deputies believed Sandoval needed "additional medical treatment" is also unsupported by the evidence. Although multiple deputies expressed concern for Sandoval's wellbeing, the admissible evidence does not indicate that their concern was based on their belief that Sandoval had a *serious* medical need.

17

Deputy Chavez testified that after the intake nurse found Sandoval's blood sugar level normal and Sandoval was given some food, he advised Deputy Martinez of his observations that Sandoval "looked ill." (Pls.' Ex. 2 at pp. 41-43.) Deputy Martinez directed him to bring Sandoval to the nurses' station "to have him thoroughly evaluated." (*Id.* at p. 43-44.) At most, this evidence creates a genuine issue as to whether Deputy Chavez and the other deputies were concerned that Sandoval "looked ill" because he was sweaty, lethargic, and appeared somewhat confused and thought me hay require additional *evaluation*. However, Plaintiffs have not created a genuine issue or established Sandoval's symptoms were "obvious" signs of a *serious* medical condition requiring medical *treatment*. *Gibson*, 290 F.3d at 1197 (acknowledging that a plaintiff may demonstrate that officers "must have known" of an obvious risk of harm).

In other words, Deputy Chavez's concern for Sandoval's health, without more, does not establish Deputy Chavez believed Sandoval had a presently occurring *serious* medical need, other than perhaps diabetes (which was belied by the normal blood sugar level tests), let alone a deadly acute methamphetamine intoxication. Indeed, in his deposition, Deputy Chavez expressly denied ever forming the belief that Sandoval "had a potential drug problem" or stating this belief to Nurse de Guzman. (*Id.* at pp. 47-48.)[10]

---

[10] Q. Now that you reviewed your report and refreshed your recollection, can you tell me what you can recall about that piece of communication between you and Mr. Sandoval.
A. He did say that he was very cold and me seeing that he was sweating, I thought that was odd.

Q. So he's telling you "I am just really cold," but he's sweating profusely?
A. Correct.

Q. At any point, did that then harken back to your POST training when you started thinking, Well [sic], sweating profusely and complaining of being cold, signs and symptoms of drug intoxication? Did you make that correlation?
A. No.

18

The Court concludes Plaintiffs have failed to raise at least a genuine issue that Nurse de Guzman had knowledge that Sandoval was experiencing diabetic complications, drug withdrawals, acute methamphetamine intoxication, or had any other serious medical need. As a result, they have failed to raise a triable issue of material fact regarding Nurse de Guzman's deliberate indifference. *Toguchi*, 391 F.3d at 1057. Defendants' motion for summary judgment as to Plaintiffs' claim against Defendant Nurse de Guzman is therefore **GRANTED**.

b) <u>Defendant Nurse Llamado</u>

Unlike Defendant Nurse de Guzman, the Court finds the undisputed evidence supports the inference that Defendant Nurse Llamado was aware that Sandoval had a serious medical need. However, Nurse Llamado did not interact with Sandoval until she was alerted to his fall by Defendant Nurse Harris. (Pls.' Ex. 12 at pp. 156-57.) She testified at her deposition that "standard nursing protocol" for a nurse would be to call for paramedics when observing a person undergoing a "prolonged seizure." (*Id.* at pp. 158-59.) Nurse Llamado further testified that "[i]t looked like" Sandoval was undergoing a "longer seizure," which prompted her to suggest calling paramedics pursuant to that protocol. (*Id.*) It is undisputed that a prolonged seizure could result in "further significant injury." Thus, for purposes of determining the instant summary judgment

///

---

Q. At any time did you express to Nurse de Guzman that you thought that Sandoval was a potential - - had a potential drug problem?
A. No.

Q. You never made that correlation, right?
A. Right. Sandoval doesn't appear to be at first glance what you would typically picture someone who has a drug problem.

Q. Especially not a meth problem?
A. Correct.

19

motion, the Court finds these facts sufficient to establish Nurse Llamado's knowledge. *Colwell*, 763 F.3d at 1066.

However, as stated above, knowledge of a serious medical need alone is insufficient to defeat summary judgment. Plaintiffs' must also present evidence that Nurse Llamado was deliberately indifferent to Sandoval's serious medical need. *Toguchi*, 391 F.3d at 1057. The Court finds Plaintiffs have failed to offer sufficient evidence to support their claim.

At her deposition, Nurse Llamado testified that after she recognized Sandoval looked like he was undergoing a prolonged seizure, she responded by suggesting the responders call paramedics. (Pls.' Ex. 12 at p. 158.) When Nurse Harris decided to call the EMTs, Nurse Llamado deferred to her decision because Nurse Harris was the "team leader" as she was the "first one on site." (*Id.* at pp. 159-60.) Nurse Llamado understood Nurse Harris's decision was based on Nurse Harris's assessment of Sandoval's condition. (*Id.*)

Next, Nurse Llamado filled out the paperwork for the EMTs, and phoned and sent paperwork to her superior, Nurse Bautista. (*Id.* at pp. 160-61.) After Nurse Llamado explained what she had seen to Nurse Bautista, Nurse Bautista told her "[Sandoval] has to go out 9-1-1," which she relayed to Nurse Harris. (*Id.* at pp. 161-62.) Although Nurse Harris acknowledged she should have called for paramedics herself, when asked why she did not say "I am going to [call the paramedics]" or "t[old] a deputy to do it," Nurse Llamado stated she "did not know what happened to [her] that time," that she did not want to "overrule" Nurse Harris, and that if it happened again, she would call 9-1-1. (*Id.* at p. 165.)

Viewing the evidence in the most favorable light to Plaintiffs, the Court is not convinced that Plaintiffs have raised a question of material fact to prove Nurse Llamado was deliberately indifferent. Although Nurse Llamado admitted she did not follow the nursing protocol or Nurse Bautista's directive by calling for paramedics herself, on at least two occasions she voiced her opinion that paramedics be called. She also filled out

20

the necessary paperwork and advised her superior of the situation. Additionally, she testified that she decided to defer to Nurse Harris's assessment of the situation because Nurse Harris was the "first responder" and the "team leader." At most, these facts suggest an inference of negligence, but negligence is insufficient to establish the more egregious deliberate indifference element of Plaintiffs' claim. *M.H. v. Cnty. of Alameda*, 62 F. Supp. 3d 1049, 1076 (N.D. Cal. 2014) (quoting *Hutchinson*, 838 F.3d at 394) ("mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights."); *see also Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990) ("While poor medical treatment will at a certain point rise to the level of constitutional violation, mere malpractice, or even gross negligence, does not suffice.").

In short, the Court finds Plaintiffs have failed to establish the existence of a genuine issue of material fact such that a reasonable trier of fact could find Nurse Llamado acted with deliberate indifference. Defendants' motion for summary judgment as to Plaintiffs' claim against Defendant Nurse Llamado is **GRANTED**.

### c) Defendant Nurse Harris

In contrast to Defendant Nurse Llamado, Defendant Nurse Harris did not make a determination that Sandoval was undergoing a seizure, prolonged or otherwise. (Pls.' Ex. 13 at p. 179.) However, the undisputed facts establish that after Nurse Harris responded to Sandoval's fall and assessed his condition, she did determine EMTs were necessary and ordered a call be placed. (Pls.' Ex. 12 at pp. 158-60.) Shortly thereafter, Nurse Harris determined Sandoval's condition required "upgrad[ing] to paramedics," and ordered they be called. (Defs.' Ex. P at pp. 99-100.) Viewing the facts in light most favorable to Plaintiffs, the Court finds these facts sufficient to demonstrate Nurse Harris at least suspected that Sandoval had a serious medical need.

However, as with Defendant Nurse Llamado, the Court finds Plaintiffs have not established Nurse Harris acted with deliberate indifference toward Sandoval's serious medical need. Quite the contrary.

Plaintiffs rely on the opinions of Deputy Andrade, Defendant Nurse Llamado, and Charge Nurse Bautista, all of whom individually concluded Sandoval's condition required a call to the paramedics at the first instance. (*See* Opp'n. at p. 21.) In her deposition, Nurse Harris denied recollection of being advised that paramedics rather than EMTs should be called. (Pls.' Ex. 13 at p. 181.) Even assuming Nurse Harris had been so advised, the Court agrees with Defendants that Plaintiffs' arguments amount to a disagreement over the Nurses' opinions about appropriate medical care, which does not rise to deliberate indifference. *Colwell*, 763 F.3d at 1068 (quoting *Snow*, 681 F.3d at 987) ("A difference of opinion between a physician and the prisoner—*or between medical professionals*—concerning what medical care is appropriate does not amount to deliberate indifference.") (emphasis added). Indeed, the essence of Plaintiffs' argument is that Nurse Harris must have acted with deliberate indifference because she was the only witness who did not agree that Sandoval showed seizure activity and/or initially needed paramedics. But this is not the standard.

To show deliberate indifference, Plaintiffs "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances" and Nurse Harris "chose this course in *conscious* disregard of an excessive risk to [Sandoval's] health." *Id.* (quoting *Snow*, 681 F.3d at 988) (internal citation and quotation marks omitted; emphasis added). Even assuming for the sake of argument that Nurse Harris's course of treatment was "medically unacceptable under the circumstances," the Court finds Plaintiffs have not established a genuine issue of material fact that Nurse Harris's decisions were made with "conscious disregard of an excessive risk" to Sandoval's health. *Id.* On the contrary, the undisputed evidence demonstrates that Nurse Harris immediately responded to Sandoval's fall and determined a course of care according to her assessment of his condition. (Pls.' Ex. 12 at pp. 158-60.) Based on her assessment, Sandoval was not experiencing a prolonged seizure or any other seizure activity, and did not initially require paramedic intervention. (Defs.' Ex. P at pp. 99-100.) At her deposition, Nurse Harris acknowledged that other persons had told her Sandoval was seizing, but explained

22

her belief that they were people "with no medical training." (Pls.' Ex. 13 at p. 180.) Nevertheless, she testified that she accounted for their observations in assessing Sandoval's condition. (*Id.*) During the course of her treatment of Sandoval, she determined an upgrade to paramedics was necessary, and ordered they be called. (*Id.*)

In sum, Plaintiffs have failed to raise a genuine issue of material fact regarding Nurse Harris's deliberate indifference to Sandoval's serious medical need. Accordingly, Defendants' motion for summary judgment as to Defendant Nurse Harris is **GRANTED**.

### 3. Qualified Immunity

Alternatively, Defendants assert that even if there is a genuine issue of material fact, the individual Defendants are entitled to qualified immunity. The Court agrees.

Qualified immunity serves to shield government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It attaches when an official's conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (quoting *Mullenix v. Luna,* 136 S. Ct. 305, 308 (2015)) (internal quotation marks omitted). Additionally, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Id.*

In determining whether an officer is entitled to qualified immunity, the court considers: (1) whether there has been a violation of a constitutional right, and (2) whether that right was clearly established at the time of the officer's alleged misconduct. *C.V. by & through Villegas v. City of Anaheim*, 823 F.3d 1252, 1255 (9th Cir. 2016). Both prongs must be present for the officer to be liable; otherwise, he or she is entitled to immunity. A party opposing application of qualified immunity need not point to a case directly on point; but "for a right to be clearly established, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *White*, 137 S. Ct. at 551 (quoting *Mullenix*, 136 S. Ct. at 308) (internal quotation marks omitted).

The Supreme Court recently reiterated "the longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.'" *Id.* at 552 (quoting *Ashcroft v. al–Kidd,* 563 U.S. 731, 742 (2011)). Rather, "the clearly established law must be 'particularized' to the facts of the case." *Id.* (citing *Anderson v. Creighton,* 483 U.S. 635, 640 (1987). "Otherwise, '[p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.'" *Id.* (quoting *Anderson*, 483 U.S. at 639).

Looking at the record as a whole, the evidence indicates that during the booking process, Sandoval appeared sweaty, lethargic, and somewhat confused. Several deputies expressed their concern by approaching Sandoval and asking him whether he was under the influence of any drugs or alcohol and if he was okay. Sandoval steadfastly denied drug or alcohol use, despite having ingested "a dose of methamphetamine several hundred times more than a typical recreational dose." (Defs.' Ex. N at p. 70.) "Sandoval became agitated" by a deputy's questioning, and "refused to answer any more questions about his health." (Pls.' Ex. 3 at p 53.) Although he mentioned he might be diabetic, after receiving two normal blood sugar test results, he never advised anyone, let alone the individual Defendants, of his ultimately life-threatening condition. Up until his collapse, Sandoval did not present any symptoms to alert the jail staff that he had a serious condition. After he collapsed, he received prompt medical attention pursuant to the team leader/first-responder's assessment of his condition. Although some of the jail staff disagreed about whether Sandoval was experiencing prolonged seizures, Plaintiffs provide no evidence to support the individual Defendants' conscious disregard for an excessive risk to Sandoval's health. Sandoval's cause of death was determined after the fact to be acute methamphetamine intoxication.

Even if the Court were to hypothetically assume Plaintiffs established a constitutional violation, qualified immunity applies to each of the individual Defendants because Sandoval's right to receive adequate medical care for an *unknown* serious medical need was not clearly established at the time of the alleged misconduct. Plaintiffs

24

only generally assert that "[a]t the time of [Sandoval's] death, it was clearly established that a pretrial detainee had a constitutional right to medical treatment." (Opp'n at p. 23.) In their individual analysis of the individual Defendants' conduct, Plaintiffs only provide their own legal conclusions that the individual Defendants' conduct constituted constitutional violations under clearly established law; they cite no case law "particularized" to the facts of their case. (*Id.* at pp. 23-24.) Nor has the Court's own research revealed case authority to support Plaintiffs' contentions that any of these facts give rise to a constitutional violation.

Simply put, Plaintiffs have failed to establish that the individual Defendants' conduct amounted to a constitutional violation under clearly established law at the time of Sandoval's death. Thus, there was nothing further of which they needed to be aware. Accordingly, the individual Defendants are entitled to qualified immunity and are thereby shielded from liability. *See White*, 137 S. Ct. at 552 (explaining "clearly established" analysis requires identification of a case where an officer acting under similar circumstances as the defendant officer was held to have violated a constitutional right). Defendants' motion for summary judgment on Plaintiffs' claims against the individual Defendants is therefore **GRANTED** on this alternative ground.

## B. Deliberate Indifference to Serious Medical Needs – *Monell* Claims

A municipality may not be held liable under Section 1983 for the unconstitutional acts of its employees on a theory of respondeat superior. *Connick v. Thompson*, 563 U.S. 51, 60 (2011). A municipality may only be held liable under Section 1983 where it causes the constitutional violation through its established policies, customs, or practices. *Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658, 690-91 (1978). "In order to establish municipal liability, a plaintiff must show that a 'policy or custom' led to the plaintiff's injury." *Castro*, 833 F.3d at 1073 (quoting *Monell* at 694). "The [Supreme] Court has further required that the plaintiff demonstrate that the policy or custom of a municipality 'reflects deliberate indifference to the constitutional rights of its inhabitants.'" *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 392 (1989)).

25

Plaintiffs' complaint advances two theories of *Monell* liability. First, the County's "custom and practice" at the Central Jail "to use the medical screening cells as administrative segregation cells or 'keep separate' cells" without requiring nurses to pass-down information about persons held in those cells unless they "need attention" is deliberately indifferent to inmates' and pretrial detainees'[11] serious medical needs. (FAC ¶¶ 51-52.) Second, the County failed to train its staff about the requirements of the observation policy,[12] which constitutes deliberate indifference to inmates' and pretrial detainees' lives. (*Id.* ¶¶ 64, 67, 69.) The Court finds there is insufficient evidence to create a genuine issue of fact for either of Plaintiffs' *Monell* theories.

### 1.    Policy, Practice, or Custom Claim

In order to establish *Monell* liability for an unconstitutional policy, practice, or custom claim, a plaintiff must prove: "(1) that [the plaintiff] possessed a constitutional right of which [s]he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and, (4) that the policy is the moving force behind the constitutional violation." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (quoting *Plumeau v. Sch. Dist. No. 40 Cnty. of Yamhill,* 130 F.3d 432, 438 (9th Cir.1997)) (internal quotation marks omitted; alterations in original).

Plaintiffs argue Sandoval's death and failure to receive adequate medical care for his serious medical needs were caused by the County's adoption of "a custom associated

---

[11] Plaintiffs' briefing solely discussed deliberate indifference to inmates' constitutional rights. In light of Sandoval's status as a pretrial detainee, the Court assumes Plaintiffs intended to include pretrial detainees in their arguments.

[12] Plaintiffs' complaint alternatively asserted the County failed to adopt an observation policy for the medical screening cells. (Compl. ¶¶ 64, 67, 69.) However, Plaintiffs' opposition inexplicably intertwines its discussion of both of its *Monell* liability theories, which did not include discussion of this alternative assertion, which the Court deems waived. (*See* Opp'n at pp. 25-27.) In any event, this claim appears to fall under Plaintiffs' arguments regarding its unconstitutional policy, practice, or custom claim.

with MOC1" in which its medical staff do not perform medical checks on MOC1's inhabitants unless they are told to do so by the outgoing medical staff who would pass-down or endorse this information before leaving their shift (hereinafter referred to as the "custom" or "verbal pass down system"). (Opp'n at pp. 25-26.) The County does not deny the existence of the alleged custom. Instead, it maintains no constitutional violation occurred, and it therefore cannot be liable for Sandoval's death. (Mot. at pp. 9-10.) Thus, the Court must determine whether there is sufficient evidence to support Plaintiffs' claim that the verbal pass down system amounts to deliberate indifference to Sandoval's constitutional right and caused a constitutional violation. The Court finds there is not.

Plaintiffs rely on the deposition testimony of several County employees. They say that the verbal pass down system caused confusion amongst the medical staff, and that after Sandoval's death, the County instituted a policy change to ameliorate this confusion. (Opp'n at pp. 26-27.) In a conclusory fashion, Plaintiffs contend that "relying solely on a verbal pass down system does not account for the hectic scenarios that occur in county jails" such as when "[n]urses could be working overtime and forget [or] get called away on a man-down without properly endorsing the inmate to another nurse." (*Id.*) However, none of the evidence establishes that the verbal pass down system previously caused a constitutional violation, *i.e.*, inadequate care for a serious medical need. Indeed, Plaintiffs acknowledge that the verbal pass down system requires the outgoing medical staff to verbally inform the incoming medical staff of any *known* medical needs a MOC1 inhabitant may have.[13] (*Id.*)

At best, Plaintiffs have established that some of the County staff were sometimes confused about why an inmate or pretrial detainee was being held in MOC1, and are of the opinion that a new policy was needed to prevent this confusion. But without evidence

_____

[13] Notably, Plaintiffs did not present evidence of prior inmates or pretrial detainees being held in MOC1 who were denied adequate medical care for their *known* serious medical needs or died as a result.

27

of prior injury or death to MOC1 inhabitants due to a failure to pass down information about a known *serious medical need*, Plaintiffs have not demonstrated a genuine issue of material fact of a causal connection between the custom and Sandoval's alleged failure to receive adequate medical care or death.

In short, based on these facts, the Court finds Plaintiffs have failed to present sufficient evidence that the County's verbal pass down system is a custom that causes its employees to be deliberate indifference MOC1 inhabitants' serious medical needs, or that there is a causal connection between the custom and the alleged constitutional violation. Defendants' motion for summary judgment of this claim is **GRANTED**.

### 2. Failure to Train Claim

In limited circumstances, an allegation of a "failure to train" can be the basis for liability under Section 1983. *Canton,* 489 U.S. at 387. To establish liability, a plaintiff must show: (1) deprivation of a constitutional right; (2) a training policy that "amounts to deliberate indifference to the [constitutional] rights of persons"; and (3) that his constitutional injury would have been avoided had the municipal entity properly trained its employees. *Blankenhorn v. City of Orange*, 485 F.3d 463, 484 (9th Cir. 2007) (citing *Lee v. City of Los Angeles*, 250 F.3d 668, 681 (9th Cir. 2001)) (internal citation and quotation marks omitted). "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train. . . . Without notice that a course of training is deficient in a particular respect, decision makers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick*, 563 U.S. at 62.

Here, in essence Plaintiffs argue the County trained its medical staff to "ignore" inmates in MOC1 unless they observe a medical need or information about a medical need is passed down or endorsed by the outgoing medical staff to the oncoming medical staff. (Opp'n at pp. 26-27.) Plaintiffs conclude without evidence that if the County had implemented the same standing order to perform hourly medical checks on MOC1 as it does "safety and sober cells," Sandoval "would have been evaluated at least eight times,

by two different medical shifts, and his death would likely have been prevented." (Opp'n at p. 27.) Even if the Court assumes Plaintiffs' premise, *i.e.*, that at least six nurses ignored Sandoval because they were not passed down information about him, their conclusion is not supported by the evidence. (*Id.* at p. 27 n.8.)

As discussed above, prior to being placed in MOC1, several deputies and County nurses asked Sandoval how he was doing and whether he was under the influence of drugs or alcohol, either as part of their normal course, or because they observed Sandoval as sweaty, lethargic, or somewhat disoriented. Rather than advise them of his actual serious medical need (acute methamphetamine intoxication), Sandoval stated he may be diabetic, had a cold the week prior (but no longer had it), denied use of drugs or alcohol, felt cold, and wanted to feel better. His blood sugar level was tested, found to be normal, and he was provided with extra meals as a precaution. Once Sandoval was placed in MOC1, he was given an additional blood sugar level test, also normal, and was asked again whether he was okay and whether he was under the influence of drugs or alcohol. Again he denied using drugs or alcohol. Moreover, at no point did Sandoval request medical care for, or give any other indication that he required care for, a substantiated serious medical need. In MOC1, he was constantly visible to the nursing staff, who did not observe him as having a serious medical need until he fell, which did prompt their immediate response.

Even viewing these facts in the light most favorable to Plaintiffs, the evidence does not indicate a failure in training that amounts to deliberate indifference to a constitutional right, much less that the alleged inadequate training caused Sandoval's death.[14] Thus, ///

_____

[14] On the contrary, the evidence indicates that if Sandoval had presented with symptoms of a serious medical need or told the medical staff he had ingested an inordinate amount of methamphetamine, this information would have been passed down or endorsed from outgoing staff to oncoming staff, per the policy.

Plaintiffs have failed to raise a triable issue of material fact as to this claim. Accordingly, summary judgment for Defendants on this claim is **GRANTED**.

## CONCLUSION

Although Sandoval's death was tragic and premature, the Court finds Plaintiffs have not established sufficient evidence to support their claims that the individual Defendants or the County violated Sandoval's constitutional rights. Therefore, the Court finds summary judgment appropriate for each of Plaintiffs' federal claims, upon which its jurisdiction is based. The Court declines to retain supplemental jurisdiction over Plaintiffs' remaining state law claims, which are hereby **REMANDED** to the San Diego Superior Court.

**IT IS SO ORDERED.**

Dated: February 6, 2018

Hon. Roger T. Benitez
United States District Judge