

Danielle R. Pena, Esq., SBN 286002
dpena@morrislawfirmapc.com
PHG Law Group
501 West Broadway, Suite 1480
San Diego, CA 92101
Telephone: (619) 826-8060
Facsimile: (619) 826-8065

Joseph M. McMullen, Esq., SBN 246757
joe@jmm-legal.com
Law Office of Joseph M. McMullen
501 West Broadway, Suite 1510
San Diego, CA 92101
Telephone: (619) 501-2000
Facsimile: (619) 615-2264

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ESTATE OF RONNIE PAUL
SANDOVAL and ANA SANDOVAL,
an individual,

        Plaintiff,

    v.

COUNTY OF SAN DIEGO, a Public
entity; SAN DIEGO COUNTY JAIL,
a Public Entity, and DOES 1 through
100;

        Defendants.

Case No. 16cv1004-BEN(AGS)

**DECLARATION OF CAROL SOBEL
IN SUPPORT OF PLAINTIFFS'
MOTION FOR AWARD OF
ATTORNEYS' FEES**

Date: June 9, 2025
Time: 10:30 a.m.
Courtroom 5a
Hon. Roger T. Benitez

I, Carol A. Sobel, declare as follows:

1.     I am an attorney admitted to practice before the Supreme Court of the State of California, the Supreme Court of the United States, the Ninth Circuit Court of Appeals, and the United States District Courts for the Central and Eastern Districts of California. I submit this declaration in support of the fees requested by Plaintiff's counsel in this matter, Mr. McMullen and Ms. Pena. It is based on facts of which I have personal knowledge and, if I called to testify to those facts, I could and would do so competently.

2.     I graduated from law school and was admitted in 1978. After 20 years with the ACLU Foundation of Southern California, I entered private practice in April of 1997. My current practice primarily involves complex civil rights litigation and class actions focusing on homelessness, First Amendment rights, and police practices in protest litigation.

3.     I have received many awards for my legal work over the years. Some of these awards are set out in my resumé at Exhibit 1.

4.     For the six years prior to 1997, I was a Senior Staff Counsel in the legal department of the ACLU Foundation of Southern California. In this position, I prepared many fee motions in cases where the ACLU represented the prevailing party. The ACLU does not bill clients on an hourly basis for its services, so I was required to obtain information to establish reasonable market rates for the ACLU lawyers. To do so, I obtained current billing rates for lawyers of comparable skill and experience at several large and boutique commercial firms throughout the City. I did this on an annual basis, contacting partners who were familiar with the ACLU lawyers in question so that they could make an informed judgment about

1

the comparable skill levels of the attorneys at their firms whose rates were used to establish ACLU billing rates.

5.    Since leaving the ACLU, I continue to survey firms annually to obtain relevant comparisons for rates. I begin this process the first time in each year I prepare a fee motion or enter settlement discussions regarding fees. I make it a point to obtain rates for attorneys in both larger law firms engaged in complex litigation, as well as smaller boutique commercial and civil rights law firms. Based on the information I obtained regarding rates at each of these firms, I believe there is a significant disparity between fees awarded to attorneys at smaller civil rights firms and those at larger firms that sometimes do pro bono civil rights work.

6.    While most declarations I file concerning market rates involve cases brought in the Central District of California, over the past several years I also submitted declarations supporting fee applications for civil rights attorneys in the Eastern, Northern and Southern Districts of California, as well as the Western District of Washington. To obtain information regarding market rates for attorneys in the relevant legal market, I review fee applications submitted by, and awards to, private attorneys practicing the range of civil rights law, as well as court awards made to various ACLU offices, Disability Rights Legal Center ("DRLC"), Disability Rights Advocates, Asian Americans Advancing Justice, the Western Center on Law and Poverty ("WCLP"), MALDEF and other public interest groups in the relevant legal market. In some instances, the relevant legal market is the home court for an attorney who seeks out-of-market rates based on special skills not available in the legal market where the case was brought.

7.    I look to rates for attorneys in previous cases as they are strong evidence of reasonable rates. *See Chaudhry v. City of Los Angeles*, 751 F3d 1096,

1111 (9th Cir. 2014); *U.S. v. $28,000 in U.S. Currency*, 802 F.3d 1100, 1106 (9th Cir. 2015); *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 976 (9th Cir. 2008).

8.    I also review fee motions filed by private civil rights and public interest firms and attorneys in the relevant geographic market. For Los Angeles, those firms include McLane Bednarski & Litt; Schonbrun Seplow Harris Hoffman & Zeldes; Hadsell Stormer Renick & Dai, Law Office of Dale Galipo, and Shegerian & Associates, among other firms. I do this to learn what is being sought and approved as market rates for lawyers at these firms.

9.    Because many cases brought by public interest groups are co-counseled by attorneys at commercial firms regularly engaged in complex anti-trust and other business litigation, I review those billing rates as well. In addition, when I become aware of a case where statutory fees are sought, I regularly obtain fee applications and any resulting awards from on-line public records for the courts, including PACER and state court websites, as well as legal research databases such as LEXIS and Westlaw. Declarations by attorneys at, and awards to, large firms engaged in complex litigation provide me with information regarding customary billing rates for these firms. I estimate that I review around 100 or more fee motions, supporting declarations and fee awards annually.

10.    I do not charge to provide a fee declaration, although I do suggest that, if successful, the attorneys in private civil rights practices donate to a non-profit legal organization. I currently chair the board of a legal services organization serving low-income clients in Orange, Riverside and San Bernardino.

11.    I believe I am extremely qualified to provide declarations for the civil rights bar and the non-profit legal community because of my work at the ACLU and in private practice, my adjunct teaching of a civil rights practicum at Loyola Law School for the past 17 years, and my role in organizing legal representation

3

for large-scale prosecutions and other legal actions involving hundreds of individuals. For example, at the request of the ACLU of Georgia, I organized the initial representation of approximately1000 Mariel Cubans in immigration hearings after they were transferred to federal prisons in Southern California following the uprising at the Atlanta Federal Penitentiary in the late 1980s. Ultimately, the USC Criminal Law Clinic took over responsibility; however, in the initial rounds of hearings, I recruited dozens of law students from UCLA, Loyola and USC and supervised them in representing the Mariel Cubans at administrative hearings. I also organized attorneys and students to represent about 5,000 high- school students in Southern California charged as truants after they walked out of school to protest the proposed Sensenbrenner immigration bill in Congress in 2005. Many of the individuals who were law students when I coordinated representation in these two events are now part of the civil rights community through their own practices or pro bono work by law firms. Through all this work, I am familiar with a significant portion of civil rights and public interest law students and lawyers in Los Angeles and can assess their skill, experience and reputation based on my professional interactions with them.

12.    In addition, unlike most other attorneys providing expert evidence of market rates, I have extensive experience in a broad range of civil rights litigation, including, among other areas, employment discrimination, First Amendment Church/State law, free speech and assembly and anti-SLAPP litigation, homelessness litigation, due process with respect to both civil and criminal fines and penalties, police excessive force, false arrest and civil rights class actions. As my resumé demonstrates, I successfully brought landmark cases in these and other civil rights subject areas, including a state-wide class-action on behalf of women's health-care providers in California against the anti-abortion group Operation

4

Rescue. *National Abortion Federation, et al. v. Operation Rescue, et. al.*, 8 F.3d 680 (9th Cir. 1993). Many of these cases required novel approaches to the issues and became models for attorneys challenging similar issues around the country.

13.    For example, in *Jones v. City of Los Angeles*, 2014 U.S. App. LEXIS 6640 (9th Cir. Apr. 10, 2014) (subsequent citation on vacatur upon settlement omitted), first filed in 2003, the groundwork was laid for *Martin v. City of Boise,* 920 F.3d 584 (9th Cir. 2019). When *Jones* was filed, I had to overcome the hurdle of multiple adverse decisions in the Ninth Circuit and one at the California Supreme Court, as well as several such decisions across the country, all unsuccessful in striking policies criminalizing homelessness after *Pottinger v. City of Miami*, 720 F. Supp. 955 (S.D. Fla. 1989), *aff'd.* 40 F.3d 1155 (11th Cir. 1994). While the United States Supreme Court rejected the underlying Eighth Amendment principle this past term in *Grants Pass v. Johnson*, __ U.S. __, 144 S.Ct. 2202 (2024), the approach I developed remained viable for two decades.

14.    In *National Abortion Federation*, the district court dismissed the action pursuant to *Bray v. Alexandria Clinic,* 506 U.S. 263 (1993), holding the first two clauses of the Ku Klux Klan Act, 42 U.S.C.S. § 1985 did not state a claim for relief. I then amended the complaint to include a claim under another section of 42 U.S.C. § 1985 that had little, if any, use since the statute's passage 150 years earlier. The Circuit reversed and remanded, finding the district court erred in denying Plaintiffs' move to amend to add a claim under 42 U.S.C.S. § 1985(3), the "hindrance" clause. 8 F.3d at 685-87.

15.    I have been qualified twice as an expert to testify at trial on issues concerning non-profit legal practice: once before the State Bar and once in Los Angeles Superior Court. The Second Appellate District of California explicitly noted my qualification as an expert to opine on reasonable market rates for attorney fees. *See*

*Jochimsen v. County of Los Angeles*, No. B223518, 2011 Cal.App.Unpub. LEXIS 4688, at *19-*22 (2d Dist. June 23, 2011) (unpublished) (approving expert basis for opinion). Both before and since the *Jochimsen* decision, my declarations in support of fee applications for civil rights and public interest attorneys have been cited repeatedly by courts as evidence of reasonable market rates. Most recently, in *Hit & Miss Enterprises, Inc.*, 2:18-cv-09996-WLH-SSC (C.D. Cal. 2025), Judge Hsu cited my declaration to approve the rate sought by attorney Thomas Beck. Doc. 138, p.5.

16.    In September 2023, my declaration was cited with approval for both rates and methodology in an award of attorney fees in *Mickail Myles v. County of San Diego*, Case No. 3:15-cv-01985-JAH-BLM (S.D. Cal. 2023) [Doc. 484, p.7]. The motion in *Myles* was filed in late 2022. The Court in *Myles* expressly rejected the defense expert's objection to my declaration. Recently, U.S. District Judge Bernal noted my declaration as support for the rates approved for the Law Office of Dale Galipo in *Paola French, et al. v. City of Los Angeles, et al.*, EDCV 20-0416 JGB (SPx) (February 21, 2024). My declaration was also cited with approval in *Valenzuela v. City of Anaheim*, Case No. SACV 17-00278-CJC (DFMx) (C.D. CA. 2023) [Dkt. 462] and the companion case of *Craig v. City of Anaheim*, SACV 17-02094-CJC (DFMx) (C.D. CA 2023) [Dkt. 280].

17.    In addition, in *Nadarajah v. Holder*, 569 F.3d 906, 912–14 (9th Cir. 2009), the Ninth Circuit referenced my declaration with approval in support of the rates for Mr. Arulanantham and other ACLU attorneys under the Equal Access to Justice Act ("EAJA"). In *Torrance Unified School District v. Magee*, 2008 U.S. Dist. LEXIS 95074 (C.D. Cal. Nov. 10, 2008), granting fees pursuant to the federal IDEA statute, 20 U.S.C. § 1415(i)(3)(c), the court cited to my declaration as persuasive evidence of rates. In *Atkins v. Miller*, CV 01-01574 DDP (C.D. Cal.

2007), this Court awarded fees to a 1975 graduate at $675 an hour, specifically citing my declaration and that of Barry Litt to support the rate. *Id.* at 8-9 and n.4. Additional cases in which my declarations have been cited favorably include, among others, *Charlebois v. Angels Baseball LP*, 993 F.Supp.2d 1109, 1119-20 (C.D. Cal. 2012); *Orantes-Hernandez v. Holder*, 713 F.Supp.2d 29, 963-964 (C.D. Cal. 2010); *Hiken v. DOD*, 2013 U.S. Dist. LEXIS 118165 (N.D. Cal. Jan. 14, 2013), *Vasquez v. Rackauckas*, 2011 U.S. Dist. LEXIS 83696 (C.D. Cal. July 29, 2011); *Rauda v. City of L.A.*, 2010 U.S. Dist. LEXIS 138837 (C.D. Cal. Dec. 20, 2010); *Jochimsen v. Cty. of L.A.*, No. B223518, 2011 Cal.App.Unpub. LEXIS 4688, at \*19-\*22 (June 23, 2011) (unpublished); *Dugan v. Cty. of L.A.*, No. 2:11-cv-08145-CAS-SHx, 2014 U.S. Dist. LEXIS 195199, at \*5-\*14 (C.D. Cal. Mar. 3, 2014); *Flores v. City of Westminster*, No. SA CV 11-0278-DOC(RNBx), 2014 U.S. Dist. LEXIS 200551, at \*19-\*20 (C.D. Cal. Oct. 23, 2014); *Lu v. United States*, No. CV 01-01758 CBM (Ex), 2014 U.S. Dist. LEXIS 77789, at \*21-\*23 (C.D. Cal. May 23, 2014); *Wagafe v. Trump*, No. 2:17-cv-00094-RAJ (W.D. Wash. Feb. 27, 2019) [Dkt. 223]; *Webb v. Officer J. Ackerman*, No. 13-cv-01992 PLA (C.D. Cal. January 4, 2018) [Dkt. 180, p.5]; and *Carrillo v. Schneider Logistics*, awarding fees in Circuit Case No. 12-55042 (9th Cir. Apr. 2014), following the affirmance of a preliminary injunction (*see* 501 Fed. Appx. 713(9th Cir. Dec. 28, 2012). The Ninth Circuit cited my declaration in approving EAJA rates for the ACLU and other immigration attorneys in *Gomez-Sanchez v. Sessions*, No. 14-72506 (9th Cir. July 17, 2019) [Dkt. 88].

18.     I also litigated statutory fee issues at the appellate level in several cases. Most notably, I successfully argued before the California Supreme Court in *Tipton-Whittingham v. City of L.A.*, 34 Cal.4th 604 (2004), the companion case to *Graham v. Daimler-Chrysler*, 34 Cal.4th 533 (2004), establishing the continued

7

vitality of the "catalyst" fee doctrine under California law. I was also lead counsel in *Jones v. City of L.A.*, 555 Fed. App'x 659 (9th Cir. 2014), holding entitlement to fees as a "prevailing party" based on the Ninth Circuit's necessary approval of a settlement conditioned on vacatur of the panel decision.

19.    I am informed that fees are sought by this motion for three attorneys and a paralegal. I know attorneys McMullen and Pena through my professional work. The rates for each are:

| Name | Role | Admission | Rate |
|------|------|-----------|------|
| Christopher Morris | Attorney | 1992 | $1150 |
| Joe McMullen | Attorney | 2006 | $ 975 |
| Danielle Pena | Attorney | 2012 | $ 800 |

20.    Although I only know Ms. Pena and Mr. McMullen, based on what I read online about Christopher Morris, I believe all three attorneys are highly skilled and experienced and enjoy excellent reputations as such.

21.    I organized the materials I relied on for my opinion on the reasonable of the requested rates by years of experience and not by the individual attorneys. The exhibits demonstrate a range of approved rates for skilled attorneys with similar experience in the relevant legal market.

22.    Several of the fee awards I relied on are based 2022 rates although the Court's order issued in 2023 or later. Where I relied on a fee award based on rates for 2022 and 2023, I adjusted the rate for current 2025 value by adding a cost-of-living increase of 5 percent a year. In my experience, based on reviewing dozens of fee awards and supporting declarations, this percentage is less than the actual increase in rates over the last few years. Where courts approved a greater annual increase in the decisions I rely on, I noted that percentage.  The increase was

8

applied to decisions more than two-years old in accord with the Ninth Circuit instruction in *Hiken v. DOD,* 836 F.3d 1037 (9th Cir. 2016) that the prevailing party was entitled to current market rates. I was the expert in *Hiken* for the plaintiffs. *Id.* at 1047.

23.     Attached at Exhibit 2 is a copy of fee award in *Myles v. Cnty. of San Diego,* Case No. 3:15-cv-01985-JAH-BLM; 2023 U.S. Dist. LEXIS 175808*; 23 WL 6391481 (S.D. Cal. 2023). As noted above, I provided a supporting declaration on reasonable rates on behalf of the plaintiffs' fee motion in this matter. The motion was filed in 2022. *Id.* at p.3. The 2022 hourly rates approved in *Myles* included $1,150 for Browne Greene, $1,000 an hour for Joe Dicks and Linda Workman, $900 an hour for Daniel Balaban, $800 an hour for Holly Boyer (an appellate specialist); and $700 an hour for Shea Murphy. Mr. Dicks was admitted in 1987 and Ms. Workman in 1986, giving them two and three years more experience in 2022, respectively, than Christopher Morris has now. Their approved rate for 2022 was $1,000 an hour. Applying a 5 percent annual increase, the equivalent rate would be approximately $1,160 an hour.

24.     In *Myles,* the Court also approved the 2022 rate of $900 an hour for Daniel Balaban, admitted in 2006, the same year as Joe McMullen. In 2022, Daniel Balaban had three years less experience than Joe McMullen has in 2025. The rate sought by Mr. McMullen is approximately 8 percent higher than the 2022 rate approved for Mr. Balaban. The Court also approved the 2022 rate of $700 an hour for Shea Murphy, identified as a 2008 admittee, then with 14 years of experience, one year more than Danielle Pena. Adjusted for inflation, in 2025, the rate for an attorney with 14 years of experience would be at least $810 an hour.

25.     Attached at Exhibit 3 is the fee order in a patent case, *Clinicomp Int'l, Inc. v. Cerner Corp.,* Case No. 17-cv-02479 GPC (DEB); 2023 U.S. Dist. LEXIS

49033; 2023 WL 2604816 (S.D. Cal. 2023). Nearly all, if not all, of the attorneys representing the prevailing defendant in this matter are based outside of the Southern District. The Court approved the rates set out in the Declaration of Jared Bobrow for attorneys at Orrick, Herrington & Sutcliffe LLP. [Doc. 136-1]. A true and correct copy of the Bobrow declaration is attached at Exhibit 4. The rates are set out in a table at p. 6 of the Bobrow declaration. The Court approved redaction of the discounted rates.

26.    As Mr. Bobrow avers, the fee motion is based on the firm's 2022 rates. Ex. 4, ¶19. The undiscounted rates include $1,465 an hour for Mr. Bobrow, $1,120 an hour for Diana Rutowski and $1,055 an hour for Jason Yu, the three partners at Orrick. Mr. Bobrow avers that he is a 1986 law graduate; Ms. Rutowski is a 2004 law graduate; and Mr. Yu is a 2009 law graduate. *Id.* ¶¶ 19-21.

27.    In addition to the partner rates, associates were approved at the 2022 rates of $805 an hour for Benjamin Austin, a 2018 law graduate: $610 an hour for Amanda Schwartz, a 2021 law graduate. *Id.* ¶¶ 23, 24.

28.    At the time of this fee award, Mr. Bobrow had 34 years of experience. Mr. Christian now has 33 years of experience. Mr. Bobrow's 2022 undiscounted rate is more than 30-percent higher than the rate now requested for Mr. Moris. Adjusted by five percent a year for the past three years, the equivalent 2025 undiscounted rate would be approximately $1,700 an hour. Similarly, Mr. McMullen has the same amount of experience in 2025 as Mr. Rutkowski had in 2022, when her undiscounted rate as $1,120 an hour, almost 20 percent higher than the rate Mr. McMullen seeks now. Finally, Jason Yu's undiscounted 2022 rate of $1,055 is more than 20 percent above the 2025 rate requested for Danielle Pena. In 2025, Ms. Pena has the same amount of experience as Mr. Yu had in 2022.

29.    Attached at Exhibit 5 is a true and correct copy of the order awarding fees in *Bloom v. San Diego*, Case No. 17-cv-02324 AJB-DEB, 2024 U.S. Dist. LEXIS 187518*, 2024 WL 4495512 (S.D. Cal. 2024). I am very familiar with the *Bloom* case and many of the attorneys in the case from my work on behalf of unhoused individuals. I know Tristia Bauman, Anne Menasche, Robert Scott Dreher, Stuart Seaborn and Lili Graham, as well as some of the associates at the various disability rights organizations that served as counsel in the case. In particular, Ms. Graham and I were co-counsel in a class action on behalf of unhoused people in Orange County before the Honorable David Carter. *Orange County Catholic Worker, et al. v. County of Orange, et al.*, USDC Case No. 8:18-cv-00220-DOC (KES). Ms. Graham and I also co-counseled on a class action against the City of Los Angeles, resulting in broad changes to provide disability accommodations in the system the City contracted with to prosecute administrative citations. *Larry Dunn, et al. v. City of Los Angeles*, 2:2020cv00420 (C.D. Cal.).

30.    *Bloom* was filed as a class action. As part of the settlement of the case, the Court was required to approve the award of attorney fees and to perform a lodestar crosscheck on any award sought as a percentage of the overall damages recovery. Although the Court noted that class counsel in *Bloom* sought an award of only about 50 percent of the total time they incurred, the Court set out the actual rates for each counsel. 2024 U.S. Dist. LEXIS 187518,*20. The rates included $1050 an hour for Stuart Seaborn of Disability Rights Advocates; $1,200 for Geoff Biegler at Fish & Richardson; and $720 an hour for Lili Graham at Disability Rights California. *Id.*

31.    I previously provided fee declarations in cases where Stuart Seaborn was counsel and where Lili Graham was counsel. Based on my past experience with both, I concluded that Stuart Seaborn is a 1998 law graduate and Lili Graham

11

is a 2012 law graduate. Christopher Morris has seven years more experience in 2025 than Stuart Seaborn had in 2024. Lili Graham had one year less experience in 2024 than Danielle Pena has now. I reviewed Geoff Biegler's online information and noted that he is now a partner at Cooley. On the firm's website, he is identified as a 2006 law graduate, the same year as Mr. McMullen. Mr. Biegler's 2024 rate of $1200 an hour while he was at Fish & Richardson is 20 percent higher than Mr. McMullen's requested 2025 rate.

32.    Attached at Exhibits 6 and 7 are documents setting out the rates for attorneys at Robbins Geller Rudman & Dowd LLP in two class action cases. Exhibit 6 is a declaration filed by Luke Brooks, seeking approval for 2021 rates. The rates for each attorney are included in Exhibit A to the Brooks Declaration. Exhibit 7 is an award of fees to Robbins Geller in 2024. I reviewed the information on the firm's website to determine when each attorney graduated from law school.

33.    Across the board, the 2021 rates for Robbins Geller attorneys are very close to the rates sought in this motion and the 2024 rates are significantly higher. For example, Darren Robbins graduated from law school the year after Christopher Morris. Robbins' 2021 approved rate was $1325 an hour, nearly $200 an hour higher than the 2025 rate requested for Mr. Morris. Danielle Myers graduated from law school in 2008, two years after Joe McMullen. Her 2024 rate of $1075 an hour is $100 an hour higher than the 2025 rate of $975 an hour requested by Mr. McMullen. Finally, the rate of $800 an hour for Danielle Pena, with 13 years of experience, is only $15 an hour above the 2024 rate of $785 an hour for Michael Albert and Juan Carlos Sanchez, both 2014 law graduates with 10 years of experience in 2024.

34.    The chart below summarizes the rate information set forth in the attached exhibits.

12

| Ex. | Attorney | Experience | Award Year | Rate |
|---|---|---|---|---|
| 2 | Joe Dicks | 35 | 2022 | $1,000 |
| 2 | Linda Workman | 36 | 2022 | $1,000 |
| 2 | Daniel Balaban | 16 | 2022 | $ 900 |
| 2 | Shea Murphy | 14 | 2022 | $ 700 |
| 4 | Jared Bobrow | 36 | 2022 | $1,465 |
| 4 | Diana Rutkowski | 18 | 2022 | $1,120 |
| 4 | Jason Yu | 13 | 2022 | $1,055 |
| 4 | Benjamin Austin | 4 | 2022 | $ 805 |
| 4 | Amanda Schwartz | 1 | 2022 | $ 610 |
| 5 | Stuart Seaborn | 26 | 2024 | $1,050 |
| 5 | Geoff Biegler | 18 | 2024 | $1,200 |
| 5 | Lili Graham | 12 | 2024 | $ 720 |
| 6 | Darren Robbins | 28 | 2021 | $1,325 |
| 6 | Theodore Pintar | 21 | 2021 | $1,100 |
| 6 | Jeffrey Stein | 12 | 2021 | $ 780 |
| 7 | Darren Robbins | 31 | 2024 | $1,400 |
| 7 | Danielle Myers | 17 | 2024 | $1,075 |
| 7 | Albert Michael | 10 | 2024 | $ 785 |

35.    I am informed that Plaintiffs' counsel also seeks compensation for a paralegal. Based on the fee awards I reviewed over the past 10 years, it is my opinion that it is customary to seek fees for non-clerical work of non-lawyers. For example, in the *Clinicomp* order, the Court cited multiple decisions in the Southern District approving paralegal rates in excess of $415 an hour. *See* Ex. 3, pp. 6-7.

13

The Declaration of Jared Bobrow in *Clinicomp* sets out the undiscounted rates for paralegals at Orrick, ranging from $415 an hour to $490 an hour. Ex. 4, p. 6. In Exhibit 6, the rates for paralegals at Robbins, Geller in 2021 were $275-350. Three years later, the rates approved for paralegals at Robbins Geller were $360 to $410 an hour. Ex. 7.

36.    Based on the foregoing, it is my opinion that the rates sought by this motion are well within the range of reasonable market rates for comparably skilled and experienced attorneys.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 1st day of April 2025 at Los Angeles, California.

*Carol A. Sobel*
CAROL A. SOBEL

# EXHIBIT 1

# CAROL A. SOBEL
725 Arizona Avenue• Suite 300 • Santa Monica, CA 90401 •
Tel. 310 393-3055 • Email carolsobellaw@gmail.com

## Employment:

| | |
|---|---|
| LAW OFFICE OF CAROL A. SOBEL<br>Solo civil rights law firm. | APRIL, 1997 TO PRESENT |
| SENIOR STAFF COUNSEL<br>*ACLU Foundation of Southern California* | 1990 TO APRIL, 1997 |

Responsible for conducting civil rights and civil liberties litigation in state and federal courts in California;
supervise litigation by ACLU volunteer counsel and other ACLU legal staff.

| | |
|---|---|
| STAFF ATTORNEY<br>*ACLU Foundation of Southern California* | 1985 TO 1990 |

Civil liberties litigation, primarily in the areas of Establishment Clause and Free Exercise violations, as well as other
First Amendment rights.

| | |
|---|---|
| ASSOCIATE DIRECTOR<br>*ACLU Foundation of Southern California*<br>*American Civil Liberties Union of Southern California* | 1979 TO 1985 |

Under the direction of the Executive Director, responsible for administration of two non-profit organizations,
including working with Boards of Directors on development of policy on civil liberties issues. Engaged in litigation
and assisted Legal Director in coordination and supervision of pro bono attorneys.

| | |
|---|---|
| DEVELOPMENT DIRECTOR<br>*ACLU Foundation of Southern California*<br>*American Civil Liberties Union of Southern California* | 1977 TO 1979 |

Responsible for conducting a variety of fundraising efforts to meet a million-dollar plus annual budget for a
501(c)(3) and a 501(c)(4).

## Admitted to Practice:

| | |
|---|---|
| California Supreme Court | November, 1978 |
| United States Supreme Court | September, 1991 |
| Ninth Circuit Court of Appeals | August, 1986 |
| U.S.D.C. Central District of California | February, 1986 |
| U.S.D.C. Eastern District of California | June, 1990 |

## Litigation Experience:

## Federal courts:   (Partial listing of published opinions and significant cases)

*CPR for SKID ROW,*
779 F.3d 1098 (9th Cir. 2015)
Partial reversal of summary judgment in favor of the Defendant and holding that California Penal Code §403
could not lawfully be applied to criminalize the expressive activity of the Plaintiffs for protesting on Skid
Row.
(Lead counsel and argued on appeal)

*Desertrain v. City of Los Angeles*
754 F.3d 1114 (9th Cir. 2014)
Reversal of summary judgment in favor of the Defendants and holding that Los Angeles Municipal Code
§85.02, prohibiting parking a vehicle on public streets or parking lots any time of day or night if a person
"lives" in the vehicle, is unconstitutionally vague.
(Lead counsel and argued on appeal)

*Lavan v. City of Los Angeles*
693 F.3d 1022 (9th Cir. 2012), *affirming* grant of preliminary injunction 797 F.Supp.2d 1005 (C.D. Cal.
2011)
Preliminary injunction barring City from confiscating and immediately destroying the property of homeless
individuals on Los Angeles' Skid Row.
(Lead Counsel)

*Long Beach Area Peace Network v. City of Long Beach*
522 F.3d 1010 (9th Cir. 2008), as amended July 24, 2009
Upholding and reversing in part on appeal a decision of the district court granting Plaintiffs' request for a
preliminary injunction to enjoin a municipal parade ordinance that included vague permit standards setting, *inter
alia*, advance-notice requirements police charges based on the past unlawful conduct of third parties without
adequate standards to limit the discretion of public officials charged with implementing the parade ordinance.
(Lead counsel)

*Fitzgerald v. City of Los Angeles*
485 F.Supp.2d 1137 (CD CA 2008)
Extending injunction against police sweeps of homeless persons on Los Angeles' Skid Row on the grounds of
searching for parole and probation violations. See below for discussion of permanent injunction in 2003.
(Co-Counsel)

*Multi-Ethnic Immigrant Worker Organizing Network (MIWON) v. City of Los Angeles*
246 F.R.D. 621 (C.D. Cal. 2007)
Order granting class certification in challenge to police assault on a lawful assembly of immigrant rights
supporters by the Los Angeles Police Department on May Day, 2007.
(Class Co-Counsel)

*Edward Jones, et al., v. City of Los Angeles,*
444 F.3d 1118 (9th Cir. 2006), vacated pursuant to settlement 505 F.3d 1006 (2007)
Challenge to City of Los Angeles Municipal Code §41.18(d), prohibiting sitting, lying or sleeping on any street
or sidewalk anywhere in the City at any time of day or night. Plaintiffs, all of whom are homeless persons,
brought an 8th Amendment as-applied challenge to their arrests and citations for violating the ordinance when
their was no available adequate shelter.
(Co-counsel)

*Terry Tipton-Whittingham, et al. v. City of Los Angeles*
316 F.3d 1059 (9thCir. 2003)
Challenge by City of Los Angeles to interim fee award granting plaintiffs' fees as "catalysts" under state civil
rights fee shifting statutes. Following oral argument, the Ninth Circuit certified issue of continued availability
of "catalyst" fees under California law after adverse decision by the United States Supreme Court rejecting
catalyst fee doctrine under federal law absent express legislative authorization. Certified for hearing before the
California Supreme Court and ultimately upheld the catalyst fee doctrine under California law.
(Co-counsel; argued in Ninth Circuit)

*Fitzgerald v. City of Los Angeles*
2003 U.S. Dist. LEXIS 27382 (CD CA 2003)
Permanent injunction enjoining Fourth Amendment violations by the Los Angeles Police Department (LAPD).
The injunction prevents the LAPD from engaging in stops of homeless persons for parole and probation sweeps
on Skid Row without reasonable suspicion to believe that specific individuals are on parole or probation and
subject to a search condition, or that the individual has engaged in, or is about to commit a crime.
(Lead counsel)

*Khademi v. South Orange County Community College District*
194 F.Supp.2d 1011 (C.D. CA 2002)
First Amendment facial challenge invalidating college policy regulating time, place and manner of student
speech on campus.
(Lead counsel)

*Mardi Gras of San Luis Obispo v. City of San Luis Obispo*
189 F. Supp.2d 1018 (C.D. Cal. 2002)
Preliminary injunction to enjoin a municipal parade ordinance that required lengthy advance-notice requirement
and permitted high insurance and police charges based on the past unlawful conduct of third parties without
adequate standards to limit the discretion of public officials charged with implementing the parade ordinance.

*Bauer v. Sampson*
261 F.3d 775 (9th Cir. 2001)
First Amendment challenge to disciplinary action against college professor for publication of an alternative
newsletter criticizing elected and appointed public officials and disclosing wrongdoing by college officials and
personnel. The college sought to discipline the professor for violating the district's policies on discrimination
and work-place violence. The polices were declared unconstitutional as applied to the professor's speech.

*H.C. v. Koppel*
203 F.3d 610 (9th Cir. 2000)
Dismissal of federal civil rights action filed in federal court against state court judge and appointed counsel for
minor in family law matter. Circuit held that Younger Abstention applied and non-custodial parent had adequate
state court remedy.

*Justin v. City of Los Angeles*
2000 U.S. Dist. LEXIS (CD Cal. 2000)
Class action to enjoin police sweeps of homeless population on Los Angeles' Skid Row. Permanent injunction
stipulated to in settlement following certification of the injunctive relief class.
(Lead counsel)

*Los Angeles Alliance for Survival, et al. v. City of Los Angeles*
987 F. Supp. 819 (1997); 157 F.3d 1162 (9th Cir. 1998); on certification to the California Supreme Court, 22
Cal.4th 352 (2000); 224 F.3d 1076 (9th Cir. 2000)
Injunction issued in challenge to municipal ordinance barring so-called "aggressive solicitation" in broad areas
of traditional public fora. Preliminary injunction entered by district court based on California Constitution. On
appeal, the Ninth Circuit certified the California Constitution question to the California Supreme Court.
Following decision by the California Supreme Court, the Ninth Circuit upheld the original injunction.
(Co-counsel)

*Service Employees International Union 660 v. City of Los Angeles*
114 F. Supp.2d 966 (C.D. Cal. 2000)
Challenge to the "no-protest zone" at the Democratic National Convention in Los Angeles in 2000, as well as
a preliminary injunction to enjoin the City of Los Angeles parade ordinance.
(Co-counsel)

*United States v. Wunsch*
54 F.3d 579 (9th Cir. 1995);84 F.3d 1110 (9th Cir. 1996) (reargument)
First Amendment challenge to discipline of male attorney for "gender bias" in sending note to female Asst. U.S.
Attorney after she successfully moved to disqualify him as defense counsel in a criminal case. Ninth Circuit
invalidated the penalty and declared unconstitutional California's "offensive personality" regulation on attorneys'
professional conduct. (Argued and briefed on appeal).

*American Jewish Congress v. City of Beverly Hills*
65 F.3d 1539 (9th Cir. 1995);90 F.3d 379 (9th Cir. 1996) (en banc)
First Amendment challenge to display of a religious symbol on public property and to permit scheme for
expressive activities in public fora in the City of Beverly Hills. The en banc panel held the permit scheme
unconstitutional and found that a preference had occurred for the display of a particular religious symbol. The
en banc decision was unanimous. (Argued and briefed on appeal)

*Baca v. Moreno Valley Unified School District*
936 F. Supp. 719 (C.D. Cal. 1996)
First Amendment challenge to school board regulations preventing speakers from making disparaging remarks
about public employees during public board meetings.

*Wallin v. City of Los Angeles,*
1194 U.S. App. LEXIS 2343 (9th Cir. 2004)

Circuit dismissed appeal of defendant City and law enforcement officers from denial of qualified immunity.
Appellee, a female officer with the Los Angeles Police Department, alleged that appellants violated her right
to equal protection, due process and right to petition the government because they violated LAPD
confidentiality regulations and delayed the investigation into her allegations of co-worker rape.

(Lead counsel)

*National Abortion Federation v. Operation Rescue*
8 F.3d 680 (9th Cir. 1993)
Class-action state-wide injunction against blockades of women's health care clinics by anti-abortion activists.
First case decided under the "frustrate and hinder" clause of 42 U.S.C. § 1985(3), the 1871 Ku Klux Klan
Act. Appeals court held cause of action under "frustrate and hinder" clause was properly plead and reversed
12(b)(6) ruling on that claim.

(Co-lead counsel throughout; argued on appeal)

*Hewitt v. Joyner*

940 F.2d 1561 (9th Cir. 1991)

Establishment Clause challenge to Christian theme park, Desert Christ Park, owned and operated by San Bernardino County. Ninth Circuit held County ownership and operation of the park violated the Establishment Clause.

(Lead counsel throughout litigation; argued on appeal).


*Standing Deer v. Carlson*

831 F.2d 1525 (9th Cir. 1986)

First Amendment challenge for Native Americans at Lompoc Federal Penitentiary to regulation barring religious headbands in the dining facilities for purported health reasons.

(Argued and briefed on appeal)


*Burbridge v. Sampson*

74 F.Supp.2d 940 (C.D. Ca. 1999)

First Amendment challenge to community college policy regulating student speech in public fora on campus. Court issued a preliminary injunction, declaring the college's speech regulations unconstitutional.


*Rubin v. City of Santa Monica*

823 F.Supp. 709 (C.D. Ca. 1993)

First Amendment challenge to city permit scheme limiting access to public parks for protected expressive activities. Court issued a preliminary injunction and declared the permit scheme unconstitutionally on vagueness grounds and procedural due process grounds. (Lead counsel)


# State Court

*Terry Tipton-Whittingham, et al. v. City of Los Angeles*

34 Cal.4th 604 (2002)

California continues to recognize "catalyst" fee awards to prevailing parties under the private attorney-general statute (Cal. Code of Civ. Proc. §1021.5) and Fair Employment and Housing Act (FEHA) despite change in federal civil rights fee-shifting law. Under California law, there is no requirement of a judicial determination establishing a change in the legal obligations of the parties.

(Co-counsel and argued at California Supreme Court)


*Los Angeles Alliance for Survival v. City of Los Angeles*

22 Cal.4th 352 (2000)

Ordinance restricting certain activity as "aggressive solicitation" was not content-based under California Constitution

(co-counsel)

*Williams v. Garcetti*

5 Cal.4th 561 (1993), *sub nom Williams v. Reiner,* 13 Cal.App.4th 392 (1991)

Challenge on due process grounds to portion of STEPP law which imposed a criminal penalty on parents of minor children engaged in or at risk of delinquent conduct.

(Argued and brief on appeal to California Supreme Court)


*Sands v. Morongo Unified School District*

53 Cal.3d 863 , *cert denied,* 112 U.S. 3026 (1991)

225 Cal.App.3d 1385 (1989)

Establishment Clause challenge invalidating prayers at public high-school graduations.

(Argued and briefed as lead counsel throughout litigation)

*Walker v. Superior Court of Sacramento*
47 Cal.3d 112 (1988)
Establishment Clause/Free Exercise/Due Process challenge to criminal prosecution of Christian
Science parents for death resulting from use of prayer instead of traditional medicine in treatment
of ill child. (Wrote amicus brief on due process issues).

*Irvine Valley College Academic Senate, et al. v. South Orange County Community College District*
129 Cal.App.4th 1482 (2005)
Statutory construction of plain language of Education Code §87360, bolstered by legislative intent, requires
actual joint agreement and mutual development of revisions to faculty hiring policies.

(co-counsel, drafted final briefs on appeal)

*Fashion 21, et al. v. Coalition for Humane Immigrant Rights (CHIRLA), et al.*
111 Cal.App.4th 1128 (2004)
Special motion to strike defamation complaint by retailer against garment worker advocates must be granted
as the plaintiff retailer could not establish a probability of prevailing on the merits of their claims.  Garment
worker advocates properly relied on draft labor commission regulations suggesting retailer could be liable for
sweatshop conditions of manufacturing of its retail goods.

(lead counsel at all stages)

*Gonzalez v. Superior Court*

33 Cal.App.4th 1539 (1995)
Challenge to discovery order in sexual harassment case requiring plaintiff to disclose name of confidential
informant who provided her with photographic evidence of harassment.  "After-acquired evidence" rule
applied to require disclosure.

(Lead counsel in trial court and appeal)

*Lantz. v. Superior Court of Kern County*
28 Cal.App.4th 1839 (1994)
Privacy rights challenge to interpretation of Consumer Personnel Records Statute (CCP § 1985(3), requiring
strict adherence to statutory procedures and limiting exemption of local government agencies from adhering
to statutory requirements.

(Lead counsel throughout litigation)

*Rudnick v. McMillan*
25 Cal.App.4th 1183 (1994)
Defamation verdict involving public figure plaintiff and local environmentalist author of letter to editor
overturned on basis that letter was protected opinion and public figure subject to constitutional malice proof
burden. Wrote amicus brief which formed basis of appellate ruling.

*Westside Sane/Freeze v. Hahn*
224 Cal.App.3d 546 (1990)
Challenge to restrictions on First Amendment petition activities in shopping center.
(Co-counsel, co-wrote appeal)

*City of Glendale v. Robert George*
208 Cal.App.3d 1394 (1989)
Reversal of trial court order imposing prior restraints on speech of "Presidential Santa" on the basis that he
constituted a public nuisance to his neighbors in a residential area.
(Argued and briefed on appeal)

*McCarthy v. Fletcher*
207 Cal.App.3d 130 (1989)
Challenge to removal of textbooks from school reading list based on community-based religious objections.
Court of Appeal reversed summary judgment decision, holding that there was sufficient evidence of
constitutionally impermissible factors in evaluation of appropriateness of class-room reading materials.
(Argued and brief on appeal)

*Fiske v. Gillespie*
200 Cal.App.3d 130 (1988)
Challenge to sex-based actuarial presumptions in insurance industry rate for particular types of life insurance
and annuity benefits.
(Co-Counsel, Argued on appeal)

# Publications:
# (Partial listing)s

*Catalyst Fees After Buckhannon*
Civil Rights Litigation and Attorney Fees Annual Handbook
(January 2006)

*Free Speech and Harassment: An Overview*
*in the Public Employee Sector*
CPER: CALIFORNIA PUBLIC EMPLOYEE RELATIONS
Institute of Industrial Relations - UC Berkeley
June 1999 No. 136

*Defeating Employer Defenses to Supervisor Liability*
*After* Ellerth *and* Faragher
ADVOCATE, October 1998

*Student Expression Under California Law*
UCLA Journal of Education
Volume 3, pp. 127-137 (1989)

*Should Attorneys Be Disciplined For Gender Bias*
Point/Counterpoint ABA Journal   August, 1995

*Fight Illegal Police Practices in State Court*
Los Angeles Daily Journal
March 6, 1992

*Judicial Oversight Limited by Supreme Court*
Los Angeles Daily Journal
May 6, 1991

*Jury Nullification is Conscience of Community*
Los Angeles Daily Journal
August 31, 1990

*A Basic Right Merits Shield From The Mob*
Los Angeles Times
August 11, 1991 p.M5

*Prop 115 revisited: Police charged with crimes
deserve fair trials too*
Los Angeles Daily News
May 7, 1991

*Prayer Doesn't Belong at Graduation*
USA Today
May 15, 1991 p. A10

*Killea Tactic Can Only Hurt the Church in the Long Run*
Los Angeles Times (San Diego)
November 20, 1989 p.B7

*The Fifth is a Shield for All*
Los Angeles Times
August 6, 1988   II8
(authored for Exec. Dir. ACLU)

*Which Way Will Rehnquist Court Turn?*
Los Angeles Daily News
June 18, 1986 p.21

*Constitution Exacts Cost for Religious Freedom*
Los Angeles Daily News
June 8, 1986 FOCUS   p.3

## Education:

| | |
|---|---|
| Peoples College of Law | J.D. May, 1978 |
| Douglass College,For Women, Rutgers University | B.A . June, 1968 |

## Professional and
## Community Activities:

| | |
|---|---|
| Adjunct Professor - Loyola Law School<br>Civil Rights Advocacy Practicum | 2007-present |
| Blue Ribbon Panel on LAPD Rampart Inquiry, Member | 2004-2006 |
| Ninth Circuit Gender Bias Task Force<br>Convenor, Advisory Committee on Employment Law | 1992-1993 |
| Ninth Circuit Conference on "Ethnicity, Race, and Religion in the Ninth Circuit"<br>Member, Working Subcommittee | 1993 |
| Los Angeles Public Interest Law Journal<br>Advisory Board | 2007-present |

| | |
|---|---|
| Los Angeles Center for Law and Community Action<br>Member, Board of Directors | 2015-present |
| National Police Accountability Project<br>Member, Advisory Board and Board of Directors | 2006-present |
| National Lawyers Guild, Los Angeles - President | 2001-2008 |
| National Lawyers Guild - National Executive Vice President | 2009-2011 |
| National Lawyers Guild Far West Regional Vice-President | 2003-2005 |
| National Lawyers Guild, National Executive Committee | 2003-2012 |
| NLG National Mass Defense Committee, Co-chair | 2003-2012 |
| Women Lawyers Association of Los Angeles<br>Member, ProChoice Committee | 1985-2002 |
| The California Anti-SLAPP Project<br>Member, Board of Directors | 1995-2010 |

## Awards:
## (Partial listing)

| | |
|---|---|
| PEN Freedom to Write Award | 1991 |
| American Jewish Congress Tzedek Award | 1992 |
| Planned Parenthood Los Angeles, Distinguished Service Award | 1990 |
| Freethought Heroine Award | 1992 |
| National Lawyers Guild - Los Angeles | 1999 |
| ACLU of Southern California Pro Bono Attorney Award | 2001 |
| Asian Pacific American Legal Center Pro Bono Award | 2003 |
| California Lawyer: Super Lawyer -Civil Rights/Constitutional Law | 2004-2019 |
| ACLU of Southern California Freedom of Expression Award | 2007 |
| Daily Journal Top 100 Most Influential Lawyers in California | 2007 |

| | |
|---|---|
| National Lawyers Guild - Ernie Goodman Award | 2007 |
| Angel Award - California Lawyer Magazine Award for pro bono work | 2007 |
| CLAY Award (California Lawyer of the Year - civil rights) - California Lawyer Magazine | 2008 |
| Top 75 Women Litigators in California - Daily Journal | 2008, 2013 |
| California Super Lawyers - Top 50 Women Lawyers in Southern California | 2014 |
| National Lawyers Guild, Los Angeles Law for the People Award | 2014 |
| ACLU Lifetime Achievement Award | 2017 |

# EXHIBIT 2

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

MICKAIL MYLES, an individual,

Plaintiff,

v.

COUNTY OF SAN DIEGO, by and through the SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, a public entity; and DEPUTY J. BANKS, an individual,

Defendants.

Case No. 3:15-cv-01985-JAH-BLM

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND COSTS**

**[ECF No. 445]**

## INTRODUCTION

Pending before this Court is Plaintiff Mickail Myles' motion for attorney fees and costs. Defendants County of San Diego and Deputy J. Banks filed an opposition and Plaintiff filed a reply. After careful consideration of the parties' submissions and for the reasons set forth below, this Court **GRANTS IN PART AND DENIES IN PART** Plaintiff's motion.

## BACKGROUND

On October 11, 2022, a jury returned a verdict in favor of Plaintiff and against Defendants. The jury found Defendants liable for use of excessive force in violation

1  of 28 U.S.C. section 1983, an unlawful policy, practice or custom in violation of

2  section 1983, interference with civil rights in violation of the Bane Act, California

3  Civil Code section 52.1 and negligence. *See* ECF 440. The jury awarded $800,000

4  for past non-economic loss and $4,200,000 for future non-economic loss. *Id.* at 4.

5       On November 14, 2022, Plaintiff filed the instant motion for attorney fees and

6  costs and Defendants filed a motion for new trial and motion for judgment as a matter

7  of law. ECF Nos. 445, 447, 448. The Court granted Defendants' request to stay

8  briefing on Plaintiff's motion for fees and costs until after their motions for a new trial

9  and judgment as a matter of law were resolved. *See* ECF Nos. 456, 459.

10       On May 4, 2023, this Court denied Defendant's motion for new trial and motion

11  for judgment as a matter of law. ECF No. 463. On May 22, 2023, Defendants filed

12  a response in opposition to Plaintiff's motion for attorney fees and costs and Plaintiff

13  file a reply. ECF No. 468, 469. On June 2, 2023, Defendants filed a notice of appeal

14  of the judgment and the orders denying Defendant's motion for a new trial and motion

15  for judgment as a matter of law.[1] ECF No. 473.

16  ## LEGAL STANDARD

17       Plaintiff seeks attorneys' fees and costs pursuant to 42 U.S.C. section 1988,

18  California Civil Code section 52.1(i). A court may award reasonable attorneys' fees

19  to the prevailing party in an action brought under section 1983. 42 U.S.C. §1988(b).

20  A civil rights plaintiff who obtains relief on the merits of his claim that "materially

21  alters the legal relationship between the parties by modifying the defendant's behavior

22  in a way that directly benefits the plaintiff" qualifies as a prevailing party. *Farrar v.*

23  *Hobby*, 506 U.S. 103, 111-12 (1992). The Bane Act, likewise, permits a court to

24  award plaintiff reasonable attorneys' fees "in addition to any damages, injunction, or

25  other equitable relief awarded." Cal. Civ. Code § 52.1(i).

26

27  [1] This Court retains jurisdiction over the instant motion to award attorneys' fees.
*See Masalosalo by Masalosalo v. Stonewall Ins. Co.*, 718 F.2d 955, 957 (9th Cir.

28  1983).

The lodestar method is the customary method for calculating reasonable attorneys' fees. *Ballen City of Redmond*, 466 F.3d 736, 746 (9th Cir. 2006); *Ketchum v. Moses*, 24 Cal.4th 1122, 1133 (2001). The lodestar method determines the amount by multiplying the "number of hours reasonably expended on the litigation" by "a reasonable hourly rate." *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1110 (9th Cir. 2014) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)). "The court may then adjust the lodestar amount based on several factors, including the degree of success achieved by the prevailing party." *Id.*

## DISCUSSION

Plaintiff requests this Court award $9,320,480[2] in attorney's fees and $500,765.15[3] in expenses, for a total of $9,843,245.15. He submits declarations of counsel, invoices, transcripts of proceedings and declarations from attorneys opining on the reasonableness of the hourly rate and time spent litigating the case.

## I. Attorneys' Fees

Counsels' declarations reflect 3,448 hours for Dicks & Workman, at an hourly rate of $1,000 for both attorneys Joseph Dicks and Linda Workman; 294.4 hours for Esner, Chang & Boyer, at hourly rates of $800 for Holly Boyer and $700 for Shea Murphy; 584 hours for Balaban & Spielberger, at an hourly rate of $900 for attorney Daniel Balaban; and 420 hours for Greene, Broillet & Wheeler, at an hourly rate of $1,150 for attorney Browne Greene. Based on the rates and hours and a 2.0 enhancement, Plaintiff seeks a total of $9,342,480 for attorneys' fees.

## A. Hourly Rate

Plaintiff requests the following hourly rate(s):

---

[2] This total includes the $8,992,000 originally sought in Plaintiff's motion and an additional $350,480 requested in the reply for additional time spent by counsel after the filing of the original motion. *See* Dicks Decl. ¶¶ 5-7.

[3] In his reply, Plaintiff deducts $20,000 from his requests for costs for a loan to Plaintiff by Plaintiff's counsel that was mistakenly included in his requests for costs.

$1,150 for Browne Greene
$1000 for Joseph Dicks and Linda workman
$900 for Balaban
$800 for Holly Boyer
$700 for Shea Murphy

Counsels' declarations demonstrate Mr. Greene has over 61 years of practice, during which he tried over 200 civil cases to verdict and obtained multimillion dollar awards in many cases and has received numerous awards for his work as a consumer rights attorney. Greene Decl. ¶¶ 4, 5, 7, 8, 9, 10 (ECF No. 445-1). Mr. Dicks has been a practicing attorney for over 35 years during which he tried numerous cases to conclusion and received various awards. Dicks Decl. ¶¶ 7, 9, 10, 11, 12 (ECF No. 445-2). Ms. Workman obtained her JD in 1986, began her legal career at a litigation firm that earned numerous multimillion dollar verdicts and settlements, engaged in appellate practice before returning to litigation in 2006 and her litigation experience includes work on cases involving police misconduct. *Id.* ¶¶ 7, 13, 14, 15, 18. Mr. Balaban has taken 25 cases to verdict during his over 15 years of practice including multiple multimillion dollar verdicts, received numerous awards and specializes in cases suing public entities. Balaban Decl. ¶¶ 4, 5, 6, 7, 8, 9 (ECF No. 445-3). Ms. Boyer, an appellate specialist, has been practicing law for 20 years during which she worked on numerous cases involving noteworthy legal issues, including discrimination and liability of an employer for wrongful acts of an employee and has worked with Dicks, Workman, Balaban and Greene on other cases involving *Monell* liability. Boyer Decl. ¶¶ 2, 3, 4, 7 (ECF No. 445-4). Mr. Murphy received his JD in 2006 and was admitted to the California Bar and Hawaii Bar in 2008. *Id.* ¶ 10. Following his work as a deputy prosecutor, he began working at a civil litigation firm in 2010 and focused on complex civil litigation and later focused on civil appellate actions. *Id.* ¶¶ 10, 11, 12.

In support of their rates, Plaintiff also submits the declaration of Eugene Iredale who has extensive experience in criminal defense and civil rights practice with a focus

4

1  on police misconduct litigation and regularly reviews material addressing rates
2  charged and fee awards for civil rights litigation in Southern California. Iredale Decl.
3  ¶¶ 5, 6, 7, 8, 18 (ECF No. 445-5). Mr. Iredale attests that he was awarded an hourly
4  rate of $850 in 2015, $995 in 2019 and his rate for 2022 was $1100. Upon review of
5  information on the case and counsels' experience and work on the case, Mr. Iredale
6  opines the rates sought by counsel are within the range of rates charged by attorneys
7  with comparable experience in San Diego for complex federal and civil rights work.
8  *Id.* ¶¶ 20-26.

9        Carol A. Sobel, an attorney with extensive practice in complex civil rights
10 litigation also provides an opinion on counsel's rates. She explains that during her
11 time as an ACLU lawyer, she regularly obtained current billing rates for attorneys
12 when preparing fee requests because the ACLU does not bill clients on an hourly
13 basis. Sobel Decl. ¶¶, 2, 3, 4 (ECF No. 445-6). As a sole practitioner, she continues
14 to assess reasonable market rates by regularly reviewing fee applications and resulting
15 awards, more than 100 annually, for the last 30 years and explains her process for
16 determining reasonable rates. *Id.* ¶¶ 5-7, 13-19. Ms. Sobel opines that the requested
17 rates are supported by rates for similarly skilled counsel in the geographic area. *Id.*
18 ¶¶ 25 – 35.

19       Attorney David S. Casey, Jr., an attorney with extensive experience and
20 knowledge of salary levels and billing rates provides an opinion on the reasonableness
21 of the rates. Casey Decl. ¶¶ 3-6 (ECF No. 445-7). In determining the appropriate
22 market rates for fees, he attests that he contacts firms, speaks with attorneys familiar
23 with complex litigation rates, and reviews court filings and cases regarding fee
24 awards. *Id.* ¶ 8. In finding the requested rates reasonable, he opines that Mr. Greene
25 has few peers with his experience and sets the standard nationally for advocacy, given
26 his experience, awards and recognition of his peers, Mr. Balaban's requested rate is
27 on the high end but within the spectrum, Ms. Boyer's appellate perspective on
28 complex legal issues concerning immunities, municipal liability, jury instructions and

1  damages have and will continue to prove invaluable in the likely event of an appeal
2  her rate of $800 is appropriate and given the complexity of legal issues Mr. Murphy
3  addressed and his 15 years of experience, the requested rate of $700 is justified. *Id.*
4  ¶¶ 11, 12, 13. He also opines that $1,000 is a reasonable rate for Mr. Dicks and Ms.
5  Workman for the San Diego market, given the complexities of the case and the
6  likelihood they would have had to forgo other work in order to provide the high level
7  of service required of this case, the unique perspective Mr. Dicks provided as a former
8  deputy sheriff, and his trial experience. *Id.* ¶ 14.

9      Defendants argue the hourly rates requested are excessive and the declarations
10 fail to demonstrate the requested rates are in line with those prevailing in the
11 community for similar services by lawyers of reasonably comparable skill,
12 experience, and reputation.  Specifically, they argue Mr. Iredale's declaration is
13 devoid of information regarding the prevailing market rates in the Southern District,
14 Ms. Sobel's opinion is based upon firms in the Los Angeles area which is not the
15 relevant community for determining the applicable prevailing market rates and Mr.
16 Casey's declaration is devoid of information regarding the prevailing market rates in
17 the Southern District for the types of services provided by Plaintiff's attorneys in this
18 case.

19     In support of their opposition, Defendants provide the declaration of James P.
20 Schratz, the principal of Jim Schratz and Associates, a firm that conducts legal fee
21 audits of various law firms through the country, who attests he has conducted or
22 supervised approximately 3,600 legal fee audits, approximately 200-300 involving
23 cases in San Diego, has published numerous articles on legal fees and abuses in billing
24 practices and has provided expert opinions in multiple courts.  Schratz Decl. ¶¶ 5 –
25 11, 19-38.

26     He opines the rates Plaintiffs' counsel seek are not the market rates for similarly
27 sized civil rights law firms prevailing in the San Diego legal community for similar
28 work performed by attorneys of comparable skill, experience, and reputation. *Id.* ¶

1   150.  Based on his experience as well as the fee survey conducted by Judge Anello in

2   *Soler v. Cnty of San Diego*, Mr. Schratz concludes that the hourly rates requested by

3   Plaintiff in his motion are unreasonable.  He opines the hourly rates should be adjusted

4   to provide Mr. Greene $1,150, Mr. Dicks $745, Ms. Workman $745, Mr. Boyer $560,

5   Mr. Balaban $510, Ms. Murphy $485.

6        Reasonable rates are those of "the prevailing market rates in the relevant

7   community." *Blum v. Stenson*, 465 U.S. 886, 895 (1984).  Plaintiff has the burden of

8   demonstrating the requested fees are comparable to "those prevailing in the

9   community for similar services by lawyers of reasonably comparable skill, experience

10  and reputation." *Chaudhry*, 751 F.3d at 1110 (quoting *Camacho v. Bridgeport Fin.,

11  Inc.*, 523 F.3d 973, 980 (9th Cir. 2008)).  He can meet this burden through affidavits

12  from his attorneys and "other attorneys regarding prevailing fees in the community,

13  and rate determinations in other cases.  *See United Steelworkers of Am. v. Phelps

14  Dodge Corp.*, 896 F.2d 403, 407 (9th Cir. 1990).  "District courts may also use their

15  'own knowledge of customary rates and their experience concerning reasonable and

16  proper fees.'" *Sam K. ex rel. Diane C. v. Hawaii Dep't of Educ.*, 788 F.3d 1033, 1041

17  (9th Cir. 2015) (quoting *Ingram v. Oroudjian*, 647 F.3d 925, 928 (9th Cir. 2011)).

18       Plaintiff's declarations provide significant information regarding counsels'

19  considerable experience.  Additionally, Mr. Casey supplies the Court with valuable

20  information on the attorneys' reputation within the relevant community.  Mr. Iredale,

21  an attorney whose practice is located in the relevant market, discusses his method for

22  determining prevailing rates and notes rates he has been awarded in this market.  Ms.

23  Sobel explains she searched various legal databases for fees awarded in San Diego in

24  similarly complex cases and her opinion on prevailing rates, contrary to Defendant's

25  contention, is based on awards in the Southern District.  Sobel Decl. ¶19, 25-27.  The

26  Court is not persuaded by Mr. Schratz's opinion which is based on criteria the Court

27  finds irrelevant, namely the size of the firm.

28       Based upon the opinions of Mr. Iredale, Ms. Sobel, and Mr. Casey, this Court's

7

Case No. 3:15-cv-01985-JAH-BLM

own knowledge of reasonable rates, fee awards from other cases in this district, and counsels' demonstrated skill in obtaining the relief awarded to Plaintiff, the Court finds the rates requested for counsel are in line with rates in San Diego for lawyers of reasonably comparable skill, experience and reputation.

**B. Reasonableness of Hours Expended**

Plaintiff maintains Mr. Greene expended 420 hours, Mr. Balaban 584 hours, Mr. Dicks 2,114.5 hours, Ms. Workman 1,333.5 hours, Ms. Boyer 91.6 hours and Mr. Murphy 202.8 hours. He contends the hours are supported by counsels' declarations. Defendants contends the hours claimed includes multiple incidences of duplicate billing and inadequate documentation.

**1. Duplicate Billing**

Defendants contend Dicks & Workman's time records reflect that in the period from April 13, 2022 to July 14, 2022, 31 days of identical entries for the time worked by Mr. Dicks and Ms. Workman, totaling 510 hours, 255 hours each. They maintain the amount claimed should be reduced by a total of 255 hours, 127.5 hours for each of them. During the period from July 19, 2022 to September 11, 2022, Defendants contend there are 15 days with identical entries for the time worked by Mr. Dicks and Ms. Workman, totaling 267 hours, 133.5 hours each. They ask the Court to reduce the amount claimed by a total of 133.5 hours, 66.75 hours apiece. For the period from September 12, 2022 through October 11, 2022, Defendants maintain there are 21 days with identical entries for the time worked by Mr. Dicks and Ms. Workman, totaling 277 hours, 138.5 hours each. While 144 of those hours reflect the eight hours per day the two attorneys were in court for trial, Defendants argue there is no explanation for both attorneys to engage in identical tasks on the same day for 133 of the hours reported. Therefore, Defendant argues, the Court should reduce the amount claimed by a total of 133 hours, 66.5 hours apiece.

In reply, Plaintiff argues it is not unusual for more than one attorney to work together on a specific issue, motion, or assignment. He maintains there is no

1  duplication of effort.

2      Several entries in Dicks & Workman's time records indicate both Mr. Dicks
3  and Ms. Workman worked on the same task. The "[p]articipation of more than one
4  attorney does not necessarily amount to unnecessary duplication of effort."
5  *Democratic Party of Washington State v. Reed*, 388 F.3d 1281, 1286-87 (9th Cir.
6  2004); *see also Chaudry*, 751 F.3d at 1112 ("[D]uplicative work is not inherently
7  inappropriate."). However, unnecessarily duplicative work will result in a reduction
8  of hours. *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008).
9  "Courts must exercise judgment and discretion, considering the circumstances of the
10 individual case, to decide whether there was unnecessary duplication." *Democratic
11 Party of Washington State*, 388 F.3d at 1286-87.

12     Upon review of Dicks & Workman's time records, the Court finds most of the
13 tasks described would take a significant amount of effort, including opposing
14 Defendant's *in limine* motions, preparing experts, addressing jury instructions,
15 preparing for mediation, analyzing documents produced by Defendants, drafting
16 various substantive motions, and preparing for and participating in each day of trial.
17 It is not unreasonable for two or more attorneys to divide the work without duplicating
18 efforts. The Court also accepts Plaintiff's contention that there was no duplication of
19 effort in performing the tasks given Plaintiff's counsels' conduct during the pendency
20 of the proceedings. The Court is also mindful "that lawyers are not likely to spend
21 unnecessary time on contingency fee cases in the hope of inflating their fees [because]
22 [t]he payoff is too uncertain, as to both the result and the amount of the fee." *Id.*
23 Accordingly, the Court finds no unnecessary duplication of efforts and declines
24 Defendants' request to reduce the hours on that basis.

25 **2. Inadequate Documentation**

26     Defendants argue Mr. Greene's and Mr. Balaban's description of the work
27 performed for the period prior to the commencement of the trial is essentially non-
28 existent. They maintain both Mr. Greene and Mr. Balaban simply described their

1  work as "preparing for the trial" and Plaintiff provides no explanation why it was
2  necessary that both of the attorneys engage in identical work.  Defendants argue the
3  Court should reduce the hours sought by 260, 130 apiece, based on the duplication of
4  effort.

5      In reply, Plaintiff argues both Mr. Greene and Mr. Balaban spent significant
6  hours preparing for trial that spanned a month and fairly evenly split examination of
7  witnesses. Given the workload and complexity of the issues in this case, Plaintiff
8  argues the 584 hours requested by Mr. Balaban and the 420 hours requested by Mr.
9  Greene are reasonable and were necessary.  Additionally, Plaintiff contends Mr.
10 Greene and Mr. Balaban requested hours include a 20% reduction in that they "do not
11 include significant time reading and reviewing e-mails, making phone calls,
12 discussing pre-trial and trial strategy with co-counsel, internal meetings, and various
13 administrative tasks." Pla's Reply at 10, n. 4 (Doc. No. 469).

14     Plaintiff's counsel can meet his or her burden of providing evidence to support
15 the requested hours by listing the hours and "identifying the general subject matter of
16 his [or her] time expenditures." *Fischer v. SJB-P.D. Inc.*, 214 F.3d 1115, 1121 (9th
17 Cir. 2000).  In support of his hours, Mr. Greene states the following:

> In this matter, I have spent at least 420 hours of my own time in working
> towards this verdict. My requested 420 hours of work on this case breakdown
> as follows: For the six weeks preceding the trial date I spent, on average, over
> 40 hours a week preparing for the trial, totaling over 260 hours in trial
> preparation. Once the trial began, I spent over 40 hours per week conducting
> the trial in this case for the four weeks of trial, totaling 160 hours of trial work.
> Therefore, combining my preparation hours with hours spent in trial, I am
> requesting 420 hours in the instant motion.

Greene Decl. ¶ 14.  He provides no time or other records to support his request.

Mr. Balaban makes the following similar statements in support of his requested
hours:

> My requested hours of work on this case breakdown as follows: For the eight
> weeks preceding the trial date I spent an average of well over 40 hours a week
> preparing for the trial, totaling at least 320 hours in trial preparation. Once the

trial began, I spent over 12 hours per day, six days per week, for a total of 22 days (subtracting out the two days I was absent with the Court's gracious leave to do so) for a total of 264 hours of trial work. Therefore, combining my preparation hours with hours spent in trial, I am requesting 584 hours in the instant motion.

The work performed by each attorney in furtherance of this action was reasonable and necessary. All of the time spent was for legitimate, necessary activities such as (1) meetings with the client; (2) drafting pleadings; (3) preparing for, taking and defending numerous depositions and conducting written discovery; (4) attending court proceedings; (6) reviewing extensive documentation and evidence; (7) preparing for trial; and (8) trial.

Balaban Decl. ¶¶ 20, 21. He provides no time records in support.

The Court finds its firsthand observations of counsels' preparedness relating to their in-depth mastery of the facts and anticipation of a host of legal issues during the trial in conjunction with counsels' declarations provides sufficient evidence to support the hours reported for their time during the trial. The Court, however, finds the documentation in support of counsels' time prior to trial for "trial preparation" inadequate. A reduction is appropriate due to the inadequate documentation and the Court will reduce the hours to reflect 30 hours per week for each week up until two weeks prior to trial. As such, Mr. Greene's hours are reduced to 360 and Mr. Balaban's hours are reduced to 524.

## C. Lodestar Multiplier

Plaintiff seeks a 2.0 multiplier. He argues the lodestar figure does not adequately reflect the true market value of the services rendered by counsel in this case. In support, Plaintiff maintains Mr. Dicks and Ms. Workman bore the brunt of the discovery battles and sanctions briefing under time pressures, litigated issues raised by the Defendants' discovery abuses and prepared their witnesses and other materials for trial and responded to Defendants' repetitive "pocket briefs" during trial. Plaintiff also maintains Defendants' conduct of turning over hundreds of pages of new material right before the start of trial and bringing two Rule 50 motions, claiming Plaintiff was attempting to inject new theories of liability into the case, demonstrates

11

the added stress and frustration Plaintiff's attorneys endured. In further support, Plaintiff argues his team of lawyers' performance was extraordinary as evidenced by the unanimous verdict with findings against the County under *Monell*. Plaintiff also contends counsel's significant out-of-pocket expenses into the case supports an enhancement. In further support, Plaintiff contends this Court also found this to be an extraordinary case when Defendants' misconduct came to light.

In opposition, Defendants argue there are no rare and exceptional circumstances here sufficient to justify a multiplier and all Plaintiff asserts in support of an enhancement is included in the lodestar calculation. Defendants also argue verdicts on *Monell* claims are not so rare as to be described as extraordinary. Additionally, they maintain it is now standard practice in personal injury and civil rights actions for attorneys to incur out-of-pocket expenses when they take on a case.

"Because of a strong presumption that the lodestar is sufficient, a multiplier is warranted only in rare and exceptional circumstances." *Chambers v. Whirlpool Corp.*, 980 F.3d 645, 665 (9th Cir. 2020) (quoting *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 546-52 (2010) (internal quotation marks omitted)). Any adjustment to the lodestar must be supported by specific evidence in the record. *Van Gerwen v. Guarantee Mut. Life Co.*, 214 F.3d 1041, 1045 (9th Cir. 2000) (citing *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565 (1986)). The fee applicant has the burden of proving an enhancement is warranted. *Blum*, 465 U.S. at 898.

Plaintiff relies on this Court's discussions and orders regarding Defendant's discovery abuses for which the Court issued sanctions. The Court found Defendant's abuse "extraordinary" and, accordingly, issued a substantial sanction. According to Plaintiff, the Court's finding demonstrates Plaintiff's counsel provided superior representation under challenging conditions. In calculating the lodestar amount, this Court found the requested rates, which are at the high end of the range of prevailing rates, are supported by counsels' experience and skillful performance witnessed by

1  this Court during these proceedings. Plaintiff's attorneys included the additional
2  hours and costs involved in challenging Defendant's eleventh-hour, extraordinarily
3  tardy pre-trial disclosures of additional discovery within days of both trial dates, in
4  responding to objections to his motions, conducting follow-up investigations on
5  material received, determining admissibility of evidence and twice incorporating the
6  additional evidence into Plaintiff's previously set trial plan. However, the Court finds
7  the lodestar does not adequately represent counsel's superior performance in light of
8  the extraordinary circumstances presented in this case.

9       Defendants' suggestion that counsel was experienced enough to handle these
10 discovery violations in stride, as if to do so was part and parcel to routine trial
11 preparation, practice and advocacy, sorely misses the mark. The argument implies
12 that the issues confronted by Plaintiff were part of the normal throws of litigation
13 practice for experienced counsel. To the contrary, the Federal Rules of Civil
14 Procedure and ethical considerations employed by experienced counsel and expected
15 from all counsel do not support Defendants' position.

16      Defendants' attempt to spin Plaintiff's request for an enhancement as an
17 additional sanction by the Court due to Defendant's contemptuous conduct also
18 misses the mark. The Court finds defense counsels' actions were last-minute
19 disruptions in Plaintiff's trial plan that caused a substantial distraction in Plaintiff's
20 trial focus that cannot be adequately measured by the payment of additional hours
21 exended to recover. Every experienced trial lawyer knows that last-minute pre-trial
22 distraction in preparation for a complex trial creates unwarranted stress, and
23 heightened anxiety in challenging the late disclosure and thereafter, when successful
24 in doing so, regrouping to absorb, alter or modify pre-established trial strategy after
25 months of disciplined trial preparation throws off the most able of counsel, regardless
26 of how favorable the additional evidence may be. The behavior of Defendants'
27 counsel effectively tossed a wrench in the spokes of Plaintiff's disciplined trial
28 preparation plan causing significant distraction from anticipating trial issues and focus

1 on other aspects of the trial.

2     Moreover, the discovery violations did not originate in a vacuum just days

3 before both scheduled trial dates. They began during the established discovery

4 window when Defendants responded to very specific, written discovery designed to

5 support Plaintiff's Monell and other claims. The record shows that Defendants denied

6 knowledge of information responsive to very clear, properly propounded discovery

7 requests. Defendants conduct of putting their heads in the sand following the

8 magistrate's ruling granting Plaintiff's motion to compel, which occurred relatively

9 early in the proceedings, undermined Plaintiff's counsels' ability to effectively litigate

10 this action. The Court agrees with Plaintiff that it was "abundantly clear that

11 Defendants sought to and were indeed successful in making this litigation far more

12 time consuming, convoluted, stressful, expensive, high risk and contentious than it

13 had to be in order to attempt to gain a tactical and unfair advantage over [Plaintiff.]"

14 Dicks Decl. ¶ 32 (ECF No. 445-2).

15     This case presented rare and exceptional circumstances to justify a multiplier

16 The Court finds the unusual circumstances of this action supports an enhancement

17 and applies a 1.3 multiplier.[4]

18 **II. Costs**

19     Plaintiff seeks $5,00,765.15 for out-of-pocket expenses reasonably incurred in

20 this litigation, including the cost of retaining expert witnesses travel, hotel and meal

21 expenses for Plaintiff and his family and, for counsel, and other necessary costs set

22 forth in declarations and exhibits.

23

24 [4] Because the circumstances justifying the enhancement no longer existed after the

25 trial, the multiplier will not apply to fees for work counsel performed following the
day of the verdict  including responding to the Rule 50 motions. *See Clark v. city of*

26 *Los Angeles*, 803 F.2d 987, 992 (Finding "[u]se of the multiplier to increase the fees

27 for the fee-petition work was an abuse of discretion" when the record did not
indicate the factors justifying the upward adjustment existed at that stage of the

28 litigation).

Defendants argue Plaintiff fails to show that all of the expenses for which he is seeking recovery were reasonable expenditures in litigating this case. They further argue Plaintiff fails to provide any discussion of the reasonableness of the costs and instead, simply itemizes the expenditures.

A prevailing party may recover "out-of-pocket expenses that would normally be charged to a fee paying client" under section 1988. *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994) (quoting *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1216 n. 7 (9th Cir.1986).

Mr. Greene seeks reimbursement for costs for reporter fees, expert fees, investigative services, messenger services, parking, postage, research costs, copies, focus groups and printing. Exh. A, Greene Decl. (Doc. No. 445-1). Dicks & Workman seeks reimbursement of filing fees, messenger fees, service fees, deposition services, transcript fees, copy fees, expert fees, expert evaluations, mediation fees, travel expenses for Plaintiff and family, attorney travel fees, copy fees, scan fees, postal charges, telephone charges and fax charges. Exh. C. Dicks Decl. (Doc. No. 445-2). Mr. Balaban seeks reimbursement of expert fees, deposition fees, investigative costs, postage fees, mediation fees, focus group fees, meals, office supplies, research fees, travel expenses for plaintiff and family, attorney travel fees, audio/visual fees and copy fees. Exh. A, Balaban Decl. (Doc. No. 445-3). With the exception of the travel fees for Plaintiff and his family members who were not witnesses at trial, the Court finds they are recoverable costs. However, travel expenses for clients and his family members are not normally charged to a fee paying client. *See Hess v. Ramona Unified Sch. Dist.*, 2008 WL 5381243 (S.D.Cal. December 19, 2008). Accordingly, the Court deducts the amounts for Plaintiff's travel and other family members' travel ($17,573.01) and awards costs in the amount of $483,192.14.

## III. Sanctions

Plaintiff contends the Court should award Plaintiff all of his attorneys' fees, the

1  requested 2.0 multiplier, plus all costs as sanctions for Defendants' ongoing
2  unwillingness to meet its discovery requirements.  He maintains the net effect of
3  having been denied the discovery and additional discovery opportunities justifies the
4  relief herein sought.

5      This Court already sanctioned Defendants for their discovery abuses and
6  declines Plaintiff's invitation to issue additional sanctions.

**CONCLUSION AND ORDER**

8      Based on the foregoing, IT IS HEREBY ORDERED Plaintiff's motion for fees
9  and costs is **GRANTED IN PART AND DENIED IN PART**.  The Court awards
10  Plaintiff $5,837,820 in attorneys' fees and $483,192.14 in costs.

11  DATED:  September 29, 2023

THE HON. JOHN A. HOUSTON
UNITED STATES DISTRICT JUDGE

# EXHIBIT 3

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLINICOMP INTERNATIONAL, INC., | Case No.: 17-cv-02479-GPC (DEB) |
| Plaintiff, | |
| v. | **ORDER AWARDING DEFENDANT ATTORNEYS' FEES UNDER 35 U.S.C. § 285** |
| CERNER CORPORATION, | |
| Defendant. | |

On February 3, 2023, the Court granted Defendant Cerner Corporation ("Cerner")'s motion for attorneys' fees pursuant to 35 U.S.C. § 285; found this case to be "exceptional;" and awarded Cerner its reasonable attorneys' fees incurred since August 29, 2022. (Dkt. No. 133.)  On February 24, 2023, Cerner filed its brief in support of its request for its attorneys' fees incurred since August 29, 2022. (Dkt. No. 136.)  On March 10, 2023, CliniComp filed its response to Cerner's request for attorneys' fees. (Dkt. No. 141.)  On March 17, 2023, Cerner filed its reply. (Dkt. No. 149.)  For the reasons set forth below, the Court awards Cerner $802,334.60 in attorneys' fees under 35 U.S.C. § 285.

## I.     BACKGROUND

CliniComp is the owner of U.S. Patent No. 6,665,647 ("the '647 Patent") by assignment. (Dkt. No. 1, Compl. ¶ 2.)  In the present action, CliniComp alleged that Cerner directly infringes claims 1, 2, 5, 10-13, 15-18, and 20-23 of the '647 Patent by making,

1    using, selling, and/or offering to sell within the United States Cerner's CommunityWorks,

2    PowerWorks, and Lights on Network services (collectively "the accused services"). (Dkt.

3    No. 103, Ex. 2 at 21; see also Dkt. No. 1, Compl. ¶¶ 15-16.)

4          On December 11, 2017, CliniComp filed a complaint for patent infringement against

5    Cerner, alleging infringement of the '647 Patent. (Dkt. No. 1, Compl.)  On May 16, 2018,

6    the Court granted Cerner's motion to dismiss CliniComp's claims for willful infringement

7    and indirect infringement as well as the relief sought in connection with these claims of

8    injunctive relief, treble damages, and exceptionality damages.  (Dkt. No. 18 at 21.)  On

9    June 25, 2018, Cerner filed an answer to CliniComp's complaint. (Dkt. No. 19.)

10         On March 5, 2019, the Patent Trial and Appeal Board ("PTAB") instituted an inter

11   partes review ("IPR") as to claims 1-25 and 50-55 of the '647 Patent. (Dkt. No. 30-1, Ex.

12   A.)  On March 7, 2019, the Court granted a stay of the action pending completion of the

13   IPR proceedings. (Dkt. No. 31.)  On March 26, 2020, the PTAB issued a final written

14   decision, determining that claims 50-55 of the '647 Patent are not patentable in light of the

15   prior art, but that claims 1-25 of the '647 Patent are patentable.[1]  (Dkt. No. 32, Ex. A at 93-

16   94.)  On April 20, 2021, the Federal Circuit affirmed the PTAB's determination that claims

17   1-25 of the '647 Patent are patentable.[2]  (Dkt. No. 38-2, Ex. B at 10.)  On June 24, 2021,

18   the Court granted the parties' joint motion to lift the stay of the action. (Dkt. No. 44.)

19

20

---

21   [1]      Specifically, the PTAB concluded that Cerner had shown by a preponderance of the
22   evidence that: (1) claims 50-52 are not patentable based on Evans; (2) claims 53 and 54 are
     not patentable based on Evans and Rai; (3) claims 50-53, and 55 are not patentable based
23   on Johnson and Evans; and (4) claim 54 is not patentable based on Johnson, Evans, and
24   Rai. (Dkt. No. 32, Ex. A at 93-94.)  The PTAB further concluded that Cerner had not
     shown by a preponderance of the evidence: (1) that claims 1-5, 10-13, and 15-25 are
25   unpatentable based on Johnson and Evans; or (2) that claims 6-9, and 14 are unpatentable
26   based on Johnson, Evans, and Rai. (Id. at 93.)

27   [2]      On November 15, 2021, the PTO issued an inter partes review certificate for the
     '647 Patent, stating: "Claims 1-25 are found patentable" and "Claims 50-55 are cancelled."
28   (Dkt. No. 71-2, Ex. A at A-20–A-21.)

On July 23, 2021, Cerner filed an amended answer to CliniComp's complaint. (Dkt. No. 52.) On October 7, 2021, the Court issued a scheduling order for the action. (Dkt. No. 55.) On July 28, 2022, the Court issued a claim construction order, construing the disputed claim terms from the '647 Patent. (Dkt. No. 91.)

On November 15, 2022, the Court granted Cerner's motion for summary judgment of non-infringement. (Dkt. No. 120.) Specifically, the Court held that Cerner demonstrated that the accused services do not infringe the asserted claims of the '647 Patent as a matter of law. (Id. at 44.) On November 16, 2022, the Court entered a judgment in the action in favor of Defendant Cerner and against Plaintiff CliniComp. (Dkt. No. 121.)

On December 30, 2022, the Clerk of Court taxed costs in favor of Cerner in the amount of $8,265.80. (Dkt. No. 131 at 3.) On February 3, 2023, the Court granted Cerner's motion for attorneys' fees pursuant to 35 U.S.C. § 285, and the Court awarded Cerner its reasonable attorneys' fees incurred since August 29, 2022. (Dkt. No. 133 at 23.) By the present briefing, Cerner requests that the Court award it $802,334.60 for its attorneys' fees incurred since August 29, 2022. (Dkt. No. 144 at 1, 11; Dkt. No. 149 at 6.)

## II.   DISCUSSION

Cerner requests that the Court award it $802,334.60 in attorneys' fees under the lodestar method. (Dkt. No. 144 at 1-2; Dkt. No. 149 at 6.) An award of attorneys' fees under 35 U.S.C. § 285 must be "reasonable." Kilopass Tech., Inc. v. Sidense Corp., 82 F. Supp. 3d 1154, 1164 (N.D. Cal. 2015); see SRI Int'l, Inc. v. Cisco Sys., Inc., 930 F.3d 1295, 1311 (Fed. Cir. 2019) ("Section 285 permits a prevailing party to recover reasonable attorneys' fees."). "The requirement that fees awarded be reasonable is a safeguard against excessive reimbursement." IPS Grp., Inc. v. Duncan Sols., Inc., No. 15-CV-1526-CAB (MDD), 2018 WL 3956019, at *1 (S.D. Cal. Aug. 17, 2018) (citing Mathis v. Spears, 857 F.2d 749, 754 (Fed. Cir. 1988)).

In calculating an attorneys' fee award under § 285, "a district court usually applies the lodestar method, which provides a presumptively reasonable fee amount by multiplying a reasonable hourly rate by the reasonable number of hours required to litigate a

comparable case." <u>Lumen View Tech. LLC v. Findthebest.com, Inc.</u>, 811 F.3d 479, 483 (Fed. Cir. 2016) (citing <u>Perdue v. Kenny A. ex rel. Winn</u>, 559 U.S. 542, 551, 554 (2010)); <u>see also</u> <u>Staton v. Boeing Co.</u>, 327 F.3d 938, 965 (9th Cir. 2003) ("When a statute provides for such fees, it is termed a 'fee-shifting' statute. Under a fee-shifting statute, the court 'must calculate awards for attorneys' fees using the 'lodestar' method.'"). "Ultimately, a 'reasonable' number of hours equals 'the number of hours which could reasonably have been billed to a private client.'" <u>Gonzalez v. City of Maywood</u>, 729 F.3d 1196, 1202 (9th Cir. 2013) (quoting <u>Moreno v. City of Sacramento</u>, 534 F.3d 1106, 1111 (9th Cir. 2008)). A district court should not award "fees for hours expended by counsel that were 'excessive, redundant, or otherwise unnecessary.'" <u>SRI</u>, 930 F.3d at 1311 (quoting <u>Hensley v. Eckerhart</u>, 461 U.S. 424, 437 (1983)); <u>accord</u> <u>Gonzalez</u>, 729 F.3d at 1203.

"The fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." <u>Hensley</u>, 461 U.S. at 437; <u>see</u> <u>Welch v. Metro. Life Ins. Co.</u>, 480 F.3d 942, 945–46 (9th Cir. 2007) ("The party seeking fees bears the burden of documenting the hours expended in the litigation and must submit evidence supporting those hours and the rates claimed."). "Once the party seeking fees meets that initial burden of adequately documenting the hours requested, the burden shifts to the opposing party" to challenge the accuracy and reasonableness of the hours billed. <u>Maloney v. T3Media, Inc.</u>, No. CV 14-05048-AB VBKX, 2015 WL 3879634, at *4 (C.D. Cal. May 27, 2015); <u>see</u> <u>Hiken v. Dep't of Def.</u>, 836 F.3d 1037, 1045 (9th Cir. 2016) ("'[T]he party opposing the fee application has a burden of rebuttal that requires submission of evidence to the district court challenging the accuracy and reasonableness of the hours charged or the facts asserted by the prevailing party in its submitted affidavits.'" (quoting <u>Gates v. Deukmejian</u>, 987 F.2d 1392, 1397–98 (9th Cir. 1992)).

The determination of the amount of reasonable attorneys' fees under § 285 is "'a matter that is committed to the sound discretion of a district court judge.'" <u>In re Rembrandt Techs. LP Pat. Litig.</u>, 899 F.3d 1254, 1278 (Fed. Cir. 2018) (quoting <u>Lumen View</u>, 811 F.3d at 483). In awarding fees, a district court must "explain how it came up with the

4

amount," and that explanation "must be 'concise but clear.'" <u>Moreno</u>, 534 F.3d at 1111
(quoting <u>Hensley</u>, 461 U.S. at 437); <u>see also</u> <u>United Steelworkers of Am. v. Phelps Dodge
Corp.</u>, 896 F.2d 403, 407 (9th Cir. 1990) ("[H]ours actually expended in the litigation are
not to be disallowed without a supporting rationale."). "Where the difference between the
lawyer's request and the court's award is relatively small, a somewhat cursory explanation
will suffice.  But where the disparity is larger, a more specific articulation of the court's
reasoning is expected." <u>Moreno</u>, 534 F.3d at 1111.

In support of its fees request, Cerner explains that the undiscounted hourly rates for
defense counsel in this action are as follows: (1) $1,465, $1,120, and $1,055 for the three
partners; (2) $805 and $610 for the two associates; and (3) $495, $420, and $415 for the
three paralegals. (Dkt. No. 144 at 2-3.) Cerner further explains that the actual hourly rates
paid by Cerner are lower than this due to the benefit of a negotiated discount that Cerner
received from defense counsel. (<u>Id.</u> at 2-3.)

The Court finds these hourly rates to be reasonable.  First, "rate determinations in
other cases . . . are satisfactory evidence of the prevailing market rate." <u>United
Steelworkers</u>, 896 F.2d at 407.  District courts in other complex patent cases have found
similar rates to be reasonable in awarding attorneys' fees. <u>See, e.g.</u>, <u>Orthopaedic Hosp. v.
Encore Med., L.P.</u>, No. 319CV00970JLSAHG, 2021 WL 5449041, at *13 (S.D. Cal. Nov.
19, 2021) (approving hourly rates of up to $1,260 for partners and $1,065 for associates as
reasonable); <u>NuVasive, Inc. v. Alphatec Holdings, Inc.</u>, No. 3:18-CV-347-CAB-MDD,
2020 WL 6876300, at *3 (S.D. Cal. Mar. 20, 2020) (approving hourly rates of $1,005 and
$860 for partners as reasonable); <u>Facebook, Inc. v. Power Ventures, Inc.</u>, No. 08-CV-
05780-LHK, 2017 WL 3394754, at *7 (N.D. Cal. Aug. 8, 2017) (approving Orrick's hourly
rates of up to $1,200 for a partner, $800 for an associate, and $430 for a paralegal as
reasonable); <u>Healthier Choices Mgmt. Corp. v. Philip Morris USA, Inc.</u>, No. 1:20-CV-
4816-TCB, 2022 WL 870206, at *4 (N.D. Ga. Feb. 22, 2022) (approving hourly rates of

17-cv-02479-GPC (DEB)

up to $1,318 for partners, $935 for associates, and $450 for paralegals as reasonable).[3]
Second, "[t]he reasonableness of the requested rates is strongly supported by the fact that
these are the rates that counsel billed to [Cerner] and that [Cerner] has already paid."
Facebook, 2017 WL 3394754, at *7; see Wi-LAN, 2022 WL 1224901, at *4 ("The Federal
Circuit has explicitly approved the award of attorney fees under § 285 at the rates that the
attorneys actually charged." (citing SRI, 930 F.3d at 1311)).  Third, that Cerner received a
discount on the hourly rates at issue also supports the reasonableness of the rates.  See
Orthopaedic Hosp., 2021 WL 5449041, at *14.  Fourth, "the fact that this matter is a
complex, high-stakes patent litigation" further supports the reasonableness of the rates. Id.;
see also Yufa v. TSI Inc., No. 09-CV-01315-KAW, 2014 WL 4071902, at *5 (N.D. Cal.
Aug. 14, 2014) ("[T]he field of intellectual property law requires specialized knowledge.").
Finally, CliniComp does not challenge the reasonableness of Cerner's hourly rates.

Turning to the reasonable number of hours expended, "to determine whether
attorneys for the prevailing party could have reasonably billed the hours they claim to their
private clients, the district court should begin with the billing records the prevailing party
has submitted." Gonzalez, 729 F.3d at 1202.  As part of its fee request, Cerner has provided
the Court with detailed billing records with time billed in one-tenth of an hour increments
and with specific narratives detailing each billed task. (See Dkt. No. 144, Bobrow Decl.
Ex. 1.)  After reviewing these billing records, the Court finds the hours expended by

---

[3]    Although the Court cites to cases from the Northern District of California and the
Northern District of Georgia, this is permissible because as another court in this District
has explained: "based on the Court's knowledge of local billing rates and of the practices
of national law firms, large national law firms . . . do not charge different rates based on
the jurisdiction in which a complex patent lawsuit is filed." NuVasive, 2020 WL 6876300,
at *3 n.1; see also Wi-LAN Inc. v. Sharp Elecs. Corp., No. CV 15-379-LPS, 2022 WL
1224901, at *4 (D. Del. Apr. 25, 2022) ("[T]his Court remains of the view that the
appropriate 'market' for assessing rates in a high-stakes patent litigation like the instant
case is the market for national (and Delaware) counsel who litigate patent cases in
Delaware.").

1  Cerner's counsel to be reasonable.

2       Although CliniComp does not challenge the total number of hours billed by Cerner's
3  attorneys, CliniComp challenges Cerner's requested fees on the grounds that the amount
4  reflects a disproportionately high use of partners for routine matters. (Dkt. No. 141 at 1-
5  5.)  CliniComp contends that district courts have held that when a case is appropriately
6  staffed, partner time should account for no more than 30% of the total time. (Id. at 2 (citing
7  Larson v. United Nat. Foods W. Inc., No. CV-10-00185-PHX-DGC, 2013 WL 4507473,
8  at *2 (D. Ariz. Aug. 23, 2013).)[4]  CliniComp notes, for example, that Cerner's partners
9  accounted for 71% of the hours expended on Cerner's motion for summary judgment and
10  72% of the hours expended on Cerner's motion for attorneys' fees.[5]  (Id. at 3.)  CliniComp
11  argues that, in light of this "top-heavy billing" by Cerner, the Court should exercise its
12  discretion and reduce Cerner's requested fee amount by 50%, to correct a purported 82%

13

14

---

15  [4]     The Court notes that to support this contention, CliniComp cites to a single district
16  court case that involved claims for violation of the Family Medical Leave Act and for
17  disability discrimination and did not involve complex claims for patent infringement. See
   Larson, 2013 WL 4507473, at *1.  Further, in that case, the district court did not broadly
18  state that when a case is appropriately staffed, partner time should generally account for no
19  more than 30% of the total time.  Rather, the district court specifically stated "a reasonable
   fee in this case includes no more than 30% of the time at partner rates." Id. at *2 (emphasis
20  added).

21  [5]     In its brief, CliniComp asserts that achieving summary judgment on claims that a
22  party considered to be meritless does not require that most of the work be done by a partner,
   and CliniComp notes that Cerner asserted that CliniComp's claim for patent infringement
23  was meritless following the issuance of the Court's claim construction order. (Dkt. No.
24  141 at 3 (citing Larson, 2013 WL 4507473, at *2.)  The Court notes that although this may
   generally be true, the present case involved complex technology.  Further, as explained in
25  the Court's February 3, 2023 order granting Cerner's motion for attorneys' fees,
26  CliniComp changed its theory of infringement at least three times during the summary
   judgment stage of this case. (See Dkt No. 133 at 13-19.)  A theory of infringement that
27  changes three times in a few months, even if meritless, probably demands more attention
28  from partners at the summary judgment stage than a meritless claim for patent infringement
   that is static. (See also Dkt. No. 149 at 2-4.)

1   overbilling by partners. (Id. at 4-5.)

2       In response, Cerner contends that its staffing decisions were reasonable and justified

3   by the demands of its clients in the legal market. (Dkt. No. 149 at 1.) Cerner contends: "It

4   is widely recognized that, for the last decade, clients have been pushing back on the use of

5   junior lawyers, particularly given the increase in associate salaries and billing rates.

6   Clients, including Cerner, find it more efficient to use more senior attorneys because they

7   get the work done in significantly less time than junior lawyers." (Id. (citing Dkt. No. 149-

8   1, Bobrow Decl. ¶ 5).) Cerner explains that this is underscored by "the shrinking delta

9   between partner and non-partner billing rates as associate salaries increase." (Id.) Cerner

10  further notes that the discounted hourly rates for two of its partners on this case were less

11  than or commensurate with the rates of non-partner attorneys that courts in this District

12  have found to be reasonable in other cases. (Id. at 1-2.)

13      Although the Court agrees with CliniComp that Cerner's law firm could have better

14  utilized its associates in this case,[6] Cerner's counsel has provided reasonable explanations

15  for its staffing decisions. (See Dkt. No. 149 at 1-4; Dkt. No. 149-1, Bobrow Decl. ¶¶ 5-7.)

16  Further, the Court agrees with Cerner that the problem with CliniComp's challenge is that

17  it fails to consider the discounted hourly rates that Cerner was paying the partners at issue.

18  In light of those discounts, Cerner was essentially paying reasonable senior associate-level

19  hourly rates for the work of two of three partners in this case. See, e.g., Orthopaedic Hosp.,

20  2021 WL 5449041, at *13 (approving hourly rates of up to $1,065 for associates as

21  reasonable); Healthier Choices, 2022 WL 870206, at *4 (approving hourly rates of up to

22  $935 for associates as reasonable); Facebook, 2017 WL 3394754, at *7 (approving

23  Orrick's hourly rates of up to $800 for an associate). As such, the Court rejects

24  CliniComp's characterization of Cerner's staffing decisions as "top-heavy billing," and the

25

26

---

27  [6]    The Court acknowledges that it also appears to be true that CliniComp's law firm

28  could have better utilized its associates in this case as well. (See Dkt. No. 149 at 2; Dkt.
No. 149-1, Bobrow Decl. ¶ 8.)

Court rejects CliniComp's request to reduce Cerner's requested fee amount by 50%. See also Finjan, Inc. v. Juniper Network, Inc., No. 3:17-CV-05659-WHA, 2021 WL 3674101, at *4 (N.D. Cal. May 20, 2021), report and recommendation adopted by Finjan, Inc. v. Juniper Networks, Inc., No. C 17-05659 WHA, 2021 WL 3140716 (N.D. Cal. July 26, 2021) ("In its strongest form, Finjan's argument appears to be that Juniper could only reasonably defend the case by employing a model where its lead counsel only parachuted in for hearings and trial. That is not the only way to reasonably staff a case, or even necessarily advisable given the benefits that experienced counsel can bring to a case.").

Finally, CliniComp asserts that even if the Court finds Cerner's hourly rates and hours expended to be reasonable, the Court may make a discretionary 10% reduction to the requested fees. (Dkt. No. 141 at 5.) The Ninth Circuit has explained that in determining the reasonableness of a fees request, a "'district court can impose a small reduction, no greater than 10 percent—a "haircut"—based on its exercise of discretion and without a . . . specific explanation.'" Gonzalez, 729 F.3d at 1203 (quoting Moreno, 534 F.3d at 1112). The Court, exercising its sound discretion, declines to perform a "haircut" to Cerner's requested amount of fees.

## III.   CONCLUSION

For the reasons above, the Court awards Cerner $802,334.60 in attorneys' fees under 35 U.S.C. § 285.

IT IS SO ORDERED.

Dated:  March 22, 2023

Hon. Gonzalo P. Curiel
United States District Judge

# EXHIBIT 4

Ryan J. Williams (SBN 228925)
rjwilliams@shb.com
SHOOK, HARDY & BACON LLP
5 Park Plaza, Suite 1600
Irvine, CA 92614
Telephone: 949 475-1500
Facsimile: 949 475-0016

B. Trent Webb
Missouri Bar No. 40778 (pro hac vice)
bwebb@shb.com
SHOOK, HARDY & BACON LLP
2555 Grand Boulevard
Kansas City, MO 64108
Telephone: 816 474-6550
Facsimile: 816 421-5547

Jared Bobrow (SBN 133712)
jbobrow@orrick.com
Diana M. Rutowski (SBN 233878)
drutowski@orrick.com
Jason K. Yu (SBN 274215)
jasonyu@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025-1015
Telephone: 650 614-7400
Facsimile: 650 614-7401

Robert H. Reckers
Texas Bar No. 24039520
(pro hac vice) rreckers@shb.com
Fiona A. Bell
Texas Bar No. 24052288
(pro hac vice) fbell@shb.com
Sharon A. Israel
Texas Bar No. 00789394
(pro hac vice) sisrael@shb.com
Kyle E. Friesen
Texas Bar No. 24061954
(pro hac vice) kfriesen@shb.com
SHOOK, HARDY & BACON LLP
600 Travis Street, Suite 3400
Houston, TX 77002-2926
Telephone: 713 227-8008
Facsimile: 713 227-9508

Attorneys for Defendant,
CERNER CORPORATION

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLINICOMP INTERNATIONAL, INC., <br><br> Plaintiff, <br><br> v. <br><br> CERNER CORPORATION, <br><br> Defendant. | Case No. 3:17-CV-02479-GPC-DEB <br><br> **DECLARATION OF JARED BOBROW IN SUPPORT OF DEFENDANT CERNER CORPORATION'S REQUEST FOR ATTORNEYS' FEES** <br><br> **REDACTED FOR PUBLIC FILING** |

I, Jared Bobrow, declare as follows:

1.     I am a partner at Orrick, Herrington & Sutcliffe LLP ("Orrick"), counsel of record for Defendant Cerner Corporation ("Defendant" or "Cerner"). I make this declaration in support of Cerner's Request for Attorneys' Fees pursuant to the Court's February 3, 2023 Order Granting Defendant's Motion for Attorney's Fees (Dkt. 133) ("Request").

2.     The matters set forth herein are based on my own personal knowledge except where otherwise stated, and in those instances the matters set forth herein are based on information and belief. If called as a witness, I could and would testify competently to the matters set forth herein.

**A.     Cerner's Retention of Orrick, Herrington & Sutcliffe LLP**

3.     Oracle Corporation ("Oracle") announced on June 7, 2022, that it had completed its acquisition of Defendant Cerner. *See* https://www.oracle.com/news/announcement/oracle-completes-acquisition-of-cerner-2022-06-07/. Oracle and Orrick have a long-standing relationship. In fact, Oracle has been an Orrick client for more than three decades, and I have worked for Oracle for the past 10 years, both at Orrick and at my prior firm, Weil, Gotshal & Manges LLP.

4.     Orrick was retained to represent Cerner in this action on July 8, 2022. Since Orrick was first retained, I have been in charge of managing this engagement on a day-to-day basis.

5.     Orrick is an international law firm originally founded in San Francisco, California in 1863. Today, Orrick has more than 1,400 attorneys, of which more than 250 are in its northern California offices and more than 140 are in its southern California offices. Orrick's attorneys handle a wide range of matters, including transactions, litigation, and compliance matters, for its global client base. More than a third of the Fortune 100 companies have engaged Orrick litigators to help resolve their disputes.

DECL. OF BOBROW ISO CERNER'S
REQUEST FOR ATTORNEYS' FEES
CASE NO. 3:17-CV-02479-GPC-DEB

6.     Orrick has been recognized for its successes both in and out of the courtroom.  Six Orrick attorneys are fellows of the American College of Trial Lawyers.  We have been ranked Top 5 for AmLaw Litigator of the Week awards and runner-up mentions in the last year.  Orrick is #3 on the American Lawyer's 2022 "A-List" of law firms and has been on the "A-List" every year since 2013. Additionally, the *Financial Times* awarded Orrick as the top firm for Innovation in Enabling Business Resilience for Clients and for Innovation in Reinventing Legal Practice in North America in 2022.  Orrick's attorneys have been nationally recognized in *Chambers & Partners* and *The Legal 500*.

7.     Orrick's IP team in particular has been nationally ranked for Patent Litigation and Intellectual Property Litigation in *Chambers & Partners*, *The Legal 500*, *Managing IP*, and *IAM*.  My personal 2022 rankings include: *Chambers USA*: Nationwide Intellectual Property, *Chambers USA*: California Intellectual Property-Patent, *IAM Patent 1000*: California-Patent Litigation, and *Managing Intellectual Property*: IP Star-California, Patent Litigation.

## B.     Orrick's Billing Practices

8.     Orrick sets its standard billing rates consistent with the market for legal services based on the skill, experience, and reputation of its lawyers and staff. Orrick's undiscounted hourly rates in 2022 range from $1,030 to $1,750 for partners; $610 to $1,025 for associates; and $235 to $530 for paralegals.

9.     Additionally, Cerner negotiated and received a ▮▮▮ percent discount off Orrick's standard hourly rates in this matter.

10.     Orrick bills Cerner for attorney and paralegal time in one-tenth hour increments and provides separate billing entries with contemporaneous narratives specific to the billed tasks.

11.     Cerner has paid all attorneys' fees incurred up to and including Orrick's invoice issued in December 2022.  Cerner has not yet paid Orrick's invoices issued in January or February 2023, which constitute only $40,234.40 of

- 2 -

1    the requested amount.

2         12.    Orrick provides invoices to Cerner monthly.

3         13.    Attached as **Exhibit 1** is a true and correct copy of a spreadsheet

4    containing excerpts of billing records for Orrick's services rendered from August

5    30, 2022 through and including January 31, 2023 in connection with the defense of

6    the lawsuit. The spreadsheet includes excerpts only for those portions of the

7    invoiced fees for which Cerner is seeking payment. Orrick has not yet submitted a

8    bill to Cerner for its time in February 2023 but intends to supplement its Request

9    with that information in connection with its reply brief.

10        14.    The billing record excerpts contain the following information: (a) the

11   date each timekeeper performed the work; (b) the timekeeper's name; (c) the

12   timekeeper's position; (d) the total billed amount; (e) billed hours, recorded in

13   tenths of an hour; and (f) a narrative describing the work each timekeeper

14   performed. Information in the narratives has been redacted as necessary due to

15   attorney-client privilege, work product protection, and/or other applicable

16   privileges. Orrick is prepared to submit un-redacted copies of Exhibit 1 for *in*

17   *camera* review by the Court upon the Court's request. The billing record excerpts

18   are further redacted to excise time entries and charges for which Cerner is not

19   seeking reimbursement in this proceeding (such as in connection with CliniComp's

20   appeal and consideration of strategies that Cerner ultimately did not pursue). For

21   such entries we have completely redacted the corresponding narrative and made the

22   corresponding adjustments to the billed amount and billed hours to reflect the fees

23   sought here.

24        15.    With respect to the tasks set forth on Exhibit 1, Cerner seeks the

25   reimbursement of $766,474.80 as reasonable attorneys' fees incurred from August

26   30, 2022 through January 31, 2023.

27        16.    The total billed amount from August 30, 2022 through January 31,

28   2023 for which Cerner is not seeking reimbursement through this Request (such as

DECL. OF BOBROW ISO CERNER'S
REQUEST FOR ATTORNEYS' FEES
CASE NO. 3:17-CV-02479-GPC-DEB

1    in connection with CliniComp's appeal and consideration of strategies that Cerner

2    ultimately did not pursue) is $29,172.00.

3         17.    The total amount of Orrick fees that were unbilled as a result of the

4    ███ discount and various other time write offs and write downs between August

5    30, 2022 and January 31, 2023 was ███████

6    **C.    The Orrick Attorneys And Paralegals Staffed On This Action**

7         18.    In order to litigate this action, Orrick staffed attorneys with the skills,

8    reputation, and experience to handle the responsibilities inherent in defending this

9    action.

10        19.    I am the Orrick partner in charge of the overall defense of this case. I

11   have more than three decades of litigation experience with a primary focus on

12   patent litigation. I graduated from Columbia Law School in 1986. My

13   undiscounted 2022 billing rate was $1,465 per hour. My discounted billing rate

14   charged to Cerner in this action is ███ per hour. A true and correct copy of my

15   current biography appears on the Orrick website.[1]

16        20.    Diana Rutowski is the Orrick partner in charge of managing the day-

17   to-day tasks in this case. She has more than eighteen years of litigation experience

18   with a primary focus on intellectual property litigation for technology companies.

19   She graduated from Harvard Law School in 2004. Her undiscounted 2022 billing

20   rate was $1,120 per hour. Her discounted billing rate charged to Cerner in this

21   action is ███ per hour. A true and correct copy of Ms. Rutowski's current

22   biography appears on the Orrick website.[2]

23        21.    Jason Yu is the Orrick partner in charge of the technical aspects of the

24   case. He has more than thirteen years of litigation experience with a primary focus

25   on patent litigation. He graduated from the University of Southern California

26   Gould School of Law in 2009. His undiscounted 2022 billing rate was $1,055 per

27   [1] https://www.orrick.com/People/7/9/7/Jared%20Bobrow

28   [2] https://www.orrick.com/People/A/7/3/Diana%20Rutowski

- 4 -

hour. His discounted billing rate charged to Cerner in this action is ▮▮ per hour. A true and correct copy of his current biography appears on the Orrick website.[3]

22. In addition to the partners mentioned above, the core team included associate Benjamin Austin, law clerk Amanda Schwartz, paralegal/analyst Matthew Bonini, and paralegals Katri Lahtinen and Miwako Burleigh.

23. Benjamin Austin is a Managing Associate at Orrick's Orange County office with a specialty in Intellectual Property law. He graduated from the University of California, Berkeley School of Law in 2018. His undiscounted 2022 billing rate was $805 per hour. His discounted billing rate charged to Cerner in this action is ▮▮ per hour. A true and correct copy of his current biography appears on the Orrick website.[4]

24. Amanda Schwartz is a Law Clerk in Orrick's San Francisco office. She graduated from The George Washington University Law School in 2021. Her undiscounted 2022 billing rate was $610 per hour. Her discounted billing rate charged to Cerner in this action is ▮▮ per hour. Amanda started as an Associate in Orrick's Washington, DC office and is admitted to the DC Bar. In 2022 she moved to Orrick's San Francisco, California office, and she is currently studying to take the California Bar, which is why her current title is "Law Clerk." A true and correct copy of her current profile appears on her LinkedIn page.[5]

25. Matthew Bonini, a Paralegal/Analyst in Orrick's Silicon Valley office, assisted on this matter. Mr. Bonini has over 29 years of experience. Mr. Bonini's undiscounted 2022 billing rate was $495 per hour. His discounted billing rate charged to Cerner in this action is ▮▮ per hour.

26. Katri Lahtinen, a Senior Paralegal in Orrick's Silicon Valley office assisted on this matter. Ms. Lahtinen has eleven years of experience. Ms.

---

[3] https://www.orrick.com/People/C/1/7/Jason%20Yu

[4] https://www.orrick.com/People/B/F/6/Benjamin%20Austin

[5] https://www.linkedin.com/in/amanda-schwartz-66999794

Lahtinen's undiscounted 2022 rate was $420 per hour. Her discounted billing rate charged to Cerner in this action is ████ per hour.

27. Miwako Burliegh, a Senior Paralegal in Orrick's Seattle office assisted on this matter. Ms. Burleigh has twenty-three years of experience. Ms. Burleigh's undiscounted 2022 billing rate was $415 per hour. Her discounted billing rate charged to Cerner in this action is ████ per hour.

28. The effective billing rates for each of Orrick's timekeepers was reduced by the negotiated discount of ████ percent during the relevant period as reflected above and in the billing records attached as Exhibit 1. Accordingly, a summary of the timekeepers and billing rates can be found below:

| Timekeeper | Position | Years of Practice | Undiscounted Rate | Discounted Rate |
|---|---|---|---|---|
| Jared Bobrow | Partner | 34 | $1,465 | ████ |
| Diana Rutowski | Partner | 18 | $1,120 | ████ |
| Jason Yu | Partner | 13 | $1,055 | ████ |
| Ben Austin | Associate | 4 | $805 | ████ |
| Amanda Schwartz | Associate | 1 | $610 | ████ |
| Matthew Bonini | Paralegal/ Analyst | 29 | $495 | ████ |
| Katri Lahtinen | Paralegal | 11 | $420 | ████ |
| Miwako Burleigh | Paralegal | 23 | $415 | ████ |

29. I have reviewed the supporting bills in this matter and believe they accurately reflect the services performed. I do not believe there is any unreasonable inefficiency or duplication of effort reflected in the bills. The litigation team was efficiently staffed.

**D.    Comparable Billing Rates at Other Firms**

30. Attached hereto as **Exhibit 2** is a report pulled from Docket Navigator of the firms representing defendants in patent cases since 2018. The firms are

largely global firms and firms that have specialized intellectual property attorneys, including Fish & Richardson, Sheppard Mullin, Paul Hastings, Covington & Burling, DLA Piper, Quinn Emanuel, and others.

31.     Attached hereto as **Exhibits 3 and 4**, respectively, are true and correct excerpts from the American Intellectual Property Law Association's 2019 and 2021 Report of the Economic Survey ("AIPLA Survey"), which lists the average billing rates for firms in various regions of California. The AIPLA Surveys show that the rates paid by Cerner in this matter are within the ranges of partner and associate billing rates for attorneys of law firms in California. Note that these surveys reflect billing rates in 2018 and 2020, respectively, and Cerner is seeking reimbursement based on its 2022 rates.

32.     The Orrick rates paid by Cerner in this matter are also comparable to the rates charged by the attorneys representing Plaintiff CliniComp in this action according to public information. According to the complaint in this action, CliniComp's counsel Amar Thakur and Bruce Zisser were at Quinn Emanuel Urquhart & Sullivan's Los Angeles office when they filed the complaint in 2017. Attached hereto as **Exhibit 5** are articles reporting that Quinn Emanuel's attorney rates range as high as $2,130 and its paralegal rates are as high as $670. Messrs. Thakur and Zisser moved from Quinn Emanuel to the Los Angeles office of Manatt, Phelps & Phillips, LLP in 2020 (*see* https://www.manatt.com/insights/press-releases/2020/manatt-adds-duo-of-elite-patent-litigators-to-nati). Attached hereto as **Exhibit 6** is an article reporting that Manatt has disclosed a partner rate of $1,175 per hour in a California case.

Executed on February 24, 2023 at San Francisco, California.

I declare under penalty of perjury that the foregoing is true and correct.


_____ */s/ Jared Bobrow*
Jared Bobrow

DECL. OF BOBROW ISO CERNER'S
REQUEST FOR ATTORNEYS' FEES
CASE NO. 3:17-CV-02479-GPC-DEB

1

## CERTIFICATE OF SERVICE

2   I, the undersigned hereby certifies that I am over the age of eighteen years

3   and not a party to this action; that a true and correct copy of the above and

4   foregoing document has been served on February 24, 2023 to all counsel of record

5   who are deemed to have consented to electronic service via the Court's CM/ECF

6   system per Civil Local Rule 5.4. Any other counsel of record will be served by

7   electronic mail, facsimile and/or overnight delivery.

8

9                                    */s/ Jared Bobrow*
                                     Jared Bobrow

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CERTIFICATE OF SERVICE
CASE No. 3:17-CV-02479-GPC-DEB

# EXHIBIT 5

1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10

11   MICHAEL BLOOM, STEPHEN                Case No.:  17-cv-02324-AJB-DEB
     CHATZKY, TONY DIAZ, VALERIE
12   GRISCHY, PENNY HELMS,                 **ORDER GRANTING MOTIONS FOR**
     BENJAMIN HERNANDEZ, DOUG              **FINAL APPROVAL OF CLASS**
13   HIGGINS, SUZONNE KEITH,               **ACTION SETTLEMENT AND**
                                           **ATTORNEYS' FEES**
14   GERALD STARK, ANNA STARK, and
     DAVID WILSON, individually and on
15   behalf of themselves and all others   **(Doc. Nos. 336, 337)**
     similarly situated,[1]
16
                                Plaintiffs,
17
18   v.

19   CITY OF SAN DIEGO,
                                Defendant.
20

21

22         Presently before the Court is Plaintiffs' unopposed motions for final approval of

23   class action settlement and for attorneys' fees. (Doc. Nos. 336, 337.) Defendant City of

24   San Diego (the "City") has filed notices of non-opposition as to each motion. (Doc. Nos.

25   340, 341.) The deadline to object to the Settlement was July 10, 2023, and class member

26

27   _____
     [1] Plaintiffs Michael Bloom and David Wilson passed away during the course of this litigation. (Doc. No.
28   336 at 9 n.1.) Plaintiffs' counsel informed the Court during the October 10, 2024 hearing that there are
     no survival claims for the decedent plaintiffs.

                                           1

Christopher Scott Endres filed an Opposition to the Settlement. (*See* Doc. No. 335.) The Court held a hearing on Plaintiffs' Final Approval Motion on October 10, 2024, at 2:00 p.m. For the reasons stated herein, the Court **GRANTS** the motions.

## I.    BACKGROUND

On November 15, 2017, Plaintiffs filed a class action complaint against the City, alleging violations of the constitutional and statutory rights of San Diego residents, including those with disabilities who rely on their vehicles for shelter and cannot access alternative housing. (Doc. No. 1.) The operative complaint specifically challenges two of the City's ordinances: one prohibiting recreational vehicle ("RV") parking from 2:00 a.m. to 6:00 a.m. ("Oversized Vehicle Ordinance" or "OVO"), and another prohibiting vehicle human habitation in most areas of San Diego any time of the day or night ("New VHO"). (Second Amended Complaint, Doc. No. 137, ¶¶ 61, 63.)

Between May 9, 2017 and October 2023, the parties participated in approximately twenty-four settlement conferences and informal discussions with the Honorable Magistrate Judges Nita Stormes and Daniel Berg, in addition to private mediation before the Honorable Carla M. Woehrle (Ret.), all of which were unsuccessful. (Doc. No. 329 at 13.) In January 2022, the Honorable Magistrate Judge Daniel Butcher began negotiations with the parties, and the parties eventually reached a complete settlement on all substantive issues on March 29, 2023, pending final approval by City Council. (*Id.*) On May 5, 2023, the parties reached an agreement on reasonable attorneys' fees. (*Id.*) After a hiccup in the settlement agreement terms, the parties returned to negotiations with Judge Butcher, and a second agreement was finalized in August 2023. (*Id.*) On October 30, 2023, the City Council voted to approve the settlement in closed session, and in January 2024, voted to approve the settlement in open session. (*Id.*) The Mayor did not veto the action of the City Council within the ten-day period allotted to him. (*Id.*)

On March 18, 2024, the Court preliminarily approved the Settlement Agreement and the proposed class notice, and further directed that the notice be distributed. (*See* Doc. No. 333.) As part of the Order, the Court approved the Parties' proposal for distribution of the

17-cv-02324-AJB-DEB

1   notice at places where class members tend to park; that Plaintiffs engage in press coverage
2   and interviews and that the notice be published in periodicals of general circulation; that
3   Plaintiffs create and post a website with a copy of the Notice of Settlement Agreement and
4   points of contact; and that Plaintiffs establish a telephone number for class members to call
5   to have their questions answered. (*Id.*) In addition, the City was to conspicuously
6   communicate the settlement notice on the City's webpage. The Parties have distributed the
7   notice as agreed.

8        On June 12, 2024, Christopher Scott Endres filed an opposition and objection to the
9   Settlement. (Doc. No. 335.) He asserts the Settlement "falls short of delivering justice and
10  equity" for a number of reasons and provides proposed alternative settlement terms, as
11  discussed further below. (*Id.* at 1, 3–5.)

12  **II.   SETTLEMENT AGREEMENT**

13       Plaintiffs and the City have executed a proposed Settlement Agreement ("Settlement
14  Agreement" or "Settlement"). The primary terms of Settlement are provided below:

15   **A. <u>Substantive Relief</u>**:

16       1. <u>Ticket Forgiveness</u>: The City of San Diego will forgive all outstanding OVO
17          tickets incurred by class members for parking oversized vehicles between
18          2:00 a.m. and 6:00 a.m., and tickets for "violation of signs" prohibiting vehicle
19          habitation between November 15, 2017, and the date of the Settlement. The
20          City, if feasible, will promptly forgive the class members' unpaid parking
21          tickets and other debts related to unpaid parking tickets upon request. The City
22          will inform the Department of Motor Vehicles that the fines are null and void.

23       2. <u>Amended VHO Training Bulletin and Limitations on VHO Enforcement</u>: The
24          City will issue an amended VHO training bulletin for law enforcement. The
25          amendments to the training bulletin are intended to avoid VHO enforcement
26          for sheltering in, resting in, sleeping in, and/or storing property in vehicles
27          while being otherwise law-abiding, *i.e.*, without committing a criminal law
28          violation other than the VHO. Enforcement of the VHO will only occur if the

3

police determine reasonable suspicion of a crime or violation of a law *other than* residing in one's vehicle. A class member parked illegally will have an opportunity to move the vehicle to a legal parking location before they can be cited under the VHO. In addition, people who live in their vehicle may use the same vehicle for transportation without being cited under the VHO, such as traveling and temporarily parking to visit parks, beaches, shops, libraries, go to the doctor, attend school, work, or religious services, or to visit family or friends.

3. <u>Safe Parking Program</u>: This Settlement expands and improves the City's designated parking program ("safe lots"). Additional options for legal nighttime parking will be provided in various locations throughout the City. The City will update a list of available spots in the parking program on its website nightly, including indicating if the spaces are suitable for oversized vehicles. Each parking lot in the City's program will have safe, accessible bathrooms, security and/or personnel on-site. The City will also make improvements to the Mission Valley Safe Lot in order to enhance the health and safety for residents of oversized vehicles (*e.g.*, widening the entrance to the lot and adding running water, showers, electric hookups, improved lighting, and shade). Class members may have a second vehicle at the Mission Valley Safe Lot. Mission Valley Safe Lot will continue to operate on a 24-hour basis during the three-year period of the Settlement.

4. <u>Nighttime Enforcement When Safe Lot Options Are Unavailable</u>: The City will not enforce by arrest, citation, or ticket the VHO or OVO during the hours of 9:00 p.m. to 6:00 a.m. when legal parking under the City's designated parking lot program is unavailable to a class member because the lots are full, closed, or there is no spot reasonably available to the class member, considering, among other factors, the type of vehicle, the distance to the lot, and whether there is adequate space for the vehicle. Members of the

4

Settlement Class will be provided an opportunity to relocate to an available space in a "safe lot" before enforcement or issuing of tickets or citations to the class member under the VHO or OVO may occur.

5. <u>Consideration of ADA-Related Requests for Class Members with Disabilities</u>: In compliance with Title II of the ADA, the City agrees to evaluate all requests for reasonable modifications from Plaintiffs and class members in good faith but retains the right to refrain from actions that would fundamentally change the nature of its programs or services or impose an undue financial or administrative burden.

**B. <u>Enforcement and Monitoring</u>**: Under the Settlement, the Court shall have jurisdiction to enforce the terms of the settlement agreement for three years. During this period, the City will provide Plaintiffs' counsel every three months with available records of: (i) enforcement of the VHO, including records of grounds for reasonable suspicion of criminal activity; (ii) enforcement of the OVO; (iii) ticket forgiveness; and (iv) reasonable accommodation/modification requests and responses regarding enforcement of the VHO and/or the OVO.

**C. <u>Dispute Resolution</u>**: The parties have agreed to a multi-step process to resolve disputes. First, any party notified of a dispute through a written Notice of Dispute has 45 days to cure or identify a plan to cure any non-compliance. Second, if the alleging party maintains that the violation or failure to perform has not been cured within 45 days, the alleging party can petition Judge Butcher for resolution of systemic issues. In the case of systemic violations, Judge Butcher has the authority to extend jurisdiction and prescribe suitable remedies.

**D. <u>Released and Unreleased Claims</u>**: The members of the Settlement Class will release the City and its relevant departments from all claims for equitable relief relating to the allegations in the operative Complaint up through the three-year settlement term. The Named Plaintiffs will also release their claims for monetary damages, but the release does not apply to claims for monetary damages by other

5

class members.

### E. Damages and Service Awards:

1. The City will pay Fifteen Thousand Dollars ($15,000.00) in monetary damages to each of the nine current Plaintiffs. This award of monetary damages does not extinguish or otherwise disturb any claim for monetary damages that other members of the class may have against the City.

2. In addition to the individual monetary damages to current Plaintiffs, the seven class representatives will each receive a Service Award of $7,500.00.

### F. Reasonable Attorneys' Fees, Costs, and Expenses.

1. The City will pay Plaintiffs' counsel $2,950,000 in attorneys' fees and costs for work through final approval of the Agreement. The City also agrees to pay reasonable attorneys' fees and costs in an amount not to exceed $25,000 to monitor the Settlement. Class Counsel will file a motion to recover their reasonable attorneys' fees, costs, and expenses pursuant to Federal Rule of Civil Procedure 23(h).

(*See* Ex. 1, Doc. No. 329-2, Proposed Settlement Agreement.)

## III.  LEGAL STANDARD

A class action may not be settled without court approval, "which may be granted only after a fairness hearing and a determination that the settlement taken as a whole is fair, reasonable, and adequate." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) (citing Fed. R. Civ. P. 23(e)(2)). The Ninth Circuit Court of Appeals has a "strong judicial policy" in support of class action settlements. *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992). However, when presented with a motion to finally approve a class action settlement, "judges have the responsibility of ensuring fairness to all members of the class . . . ." *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003).

## IV.  OBJECTION TO THE SETTLEMENT

Mr. Endres raises an objection to the proposed settlement, asserting "the settlement

6

falls short of delivering justice and equity." (Doc. No. 335 at 1.) Mr. Endres specifically asserts the settlement does not adequately address the following issues:

1. **The State Action Doctrine**: asserting the OVO and VHO do not pass the State Action Doctrine scrutiny because the ordinances are discriminatory either on its face or administration;

2. **Discriminatory Practices**: The City's policies and enforcement of the OVO and VHO disproportionately target and harm homeless individuals through vague ordinances and unequal access to resources;

3. **Misapplication of Law**: The OVO and VHO ordinances unfairly impose restrictions and punishments on non-sex offender homeless individuals, though these restrictions and punishments are typically reserved for sex offenders;

4. **Color of Law Violations**: The City is responsible for color of law violations through issuance of unlawful orders via policing agency;

5. **Equal Protection**: The City's policies violate the equal protection clause by discriminating against homeless individuals, particularly those with disabilities, by denying them access to the same parking permits and opportunities as housed individuals;

6. **California Constitution**: The City's actions violate the due process and equal protection provisions of the California Constitution;

7. **Right to Associate**: The City violates the right to association via the Safe Parking Lots, which "segregate the undesired socioeconomically disadvantaged population[;]"

8. **California Coastal Act**: The City disregards the Act by way of assertive privatization management practices, including unlawful signage and unlawful enforcement in areas designated for 24 hours a day, 7 days a week public coastal access;

9. **Bane Act**: The City's policies and practices are seen as threats, intimidation, and coercion that interfere with the homeless individuals' rights, including their right to

7

be present on public streets. Objector asserts the ordinances are punitive and restrictive;

10. **The ADA**: The City discriminates against individuals with disabilities by failing to provide reasonable modifications to its policies;

11. **Rehabilitation Act**: As a recipient of federal funds, requiring it to ensure meaningful access to its programs for individuals with disabilities, the City's refusal to modify its policies is a violation of this act;

12. **Lack of Sustainable Solutions**: The settlement focuses on punitive measures rather than investing in sustainable housing solutions that could effectively address the root causes of homelessness. The ordinances fail to address the root causes and instead are a punitive measure to assault the victim and therefore must be voided.

(Doc. No. 335 at 1–3.)

In his objection, Mr. Endres also provides a proposed alternative settlement, which includes such terms as a permanent injunction to enjoin the City from enforcing the ordinances, an award of $700 million in compensatory damages, implementing sustainable housing programs, forgiving all tickets issued under the ordinances and ensuring the return of impounded property, and holding city council members, the mayor, and other officials accountable for their roles in enforcing the ordinances. (*Id.* at 3–4.)

## V. MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENT

### A. Class Certification

Before granting final approval of a class action settlement agreement, the Court must first determine whether the proposed class can be certified. *Amchem Prods. v. Windsor*, 521 U.S. 591, 620 (1997) (indicating that a district court must apply "undiluted, even heightened, attention [to class certification] in the settlement context" in order to protect absentees). In the present case, the Court previously granted in part Plaintiffs' motion for class certification. (*See* Doc. No. 180.) Accordingly, the Court reaffirms and incorporates by reference its prior analysis under Rules 23(a) and (b)(2) as set forth in its Order Granting in Part Plaintiffs' Motion for Class Certification. (*See id.* at 5–25.)

8

## B.    Adequacy of Notice

Next, the Court must determine whether the Class received adequate notice. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1025 (9th Cir. 1998), *overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011). "Adequate notice is critical to court approval of a class settlement under Rule 23(e)." *Id.*

In its Preliminary Approval Order, the Court approved the Parties' proposed notice and notice plan. (*See* Doc. No. 333 at 12–13.) As part of their Final Approval Motion, Plaintiffs filed the Declaration Ann E. Menasche, who is lead counsel for Plaintiffs and all class members in this action. (Declaration of Ann E. Menasche ("Menasche Decl."), Doc. No. 336-1, ¶ 1.) Ms. Menasche details the actions taken by herself, co-counsel, several Plaintiffs and Class Representatives, and the cooperation of the City Attorney's Office to provide notice in accordance with the Preliminary Approval Order. (*Id.* ¶ 5.) Having reviewed Ms. Menasche's declaration, the Court finds the Settlement Class received adequate notice of the Settlement.

## C.    Fairness of the Settlement

The Court must next determine whether the proposed settlement is "fair, reasonable, and adequate" pursuant to Federal Rule of Civil Procedure 23(e)(1)(C), while considering the fairness factors.

In its Preliminary Approval Order, the Court addressed each of the fairness factors in turn and found all the pertinent factors weighed in favor of approving the Settlement. (*See* Doc. No. 333 at 8–12.) Among other criteria, the ticket forgiveness, expanded and improved safe parking program, and an amended VHO training bulletin restricting VHO enforcement to settle and resolve all claims in the action by or on behalf of the potentially over 800 Class Members against the City is a fair, reasonable, and appropriate settlement amount to resolve all claims in this action. Under the Parties' proposed settlement, every class member, including Plaintiffs, will benefit from the same policy changes that will protect class members from unrestricted enforcement of the VHO and OVO. The only difference in recovery between the Plaintiffs and other class members is a service award in

1    the amount of $7,500 for each of the Plaintiffs who were appointed Class Representatives

2    and $15,000 to each Named Plaintiff for damages.[2] The Settlement Agreement, however,

3    preserves unnamed class members' rights to sue for individual damages, in contrast to

4    Named Plaintiffs, who otherwise waive the right to sue for additional damages.

5         One Class Member, Mr. Endres, has filed an objection against the settlement as

6    discussed above. (Doc. No. 335.) In response, Plaintiffs assert that with respect to the issue

7    of compensatory damages for class members, the Settlement Agreement does not prevent

8    Mr. Endres from suing the City for his own damages; while Named Plaintiffs have released

9    the City from additional claims for damages, the Settlement Agreement's release of claims

10   on behalf of class members only applies to equitable relief. (Doc. No. 336 at 29.) Moreover,

11   the Settlement Agreement's release of claims on behalf of class members for equitable

12   relief only lasts three years, and so Mr. Endres is free to sue the City for additional equitable

13   relief after the period of reserved jurisdiction expires. (*Id.* at 30.) Plaintiffs assert all class

14   representatives support the Settlement Agreement and believe it is fair, and that the reaction

15   from other class members to the proposed settlement has been overwhelmingly positive.

16   (*Id.*)

17        During the October 10, 2024 hearing, Mr. Endres was given an opportunity to voice

18   his objections to the Settlement Agreement. Plaintiffs' counsel and the Court emphasized

19   the narrow scope of the instant action, and that Mr. Endres and other class members are

20   free to independently file suit for damages. Plaintiffs' counsel further highlighted that the

21   instant case did not seek damages, but rather was for injunctive relief. Plaintiffs' counsel

22   and the Court are unaware of any other objections to the proposed Settlement Agreement.

23        Because no pertinent facts have changed, the Court reaffirms and incorporates by

24   reference its analysis of the Rule 23(e) requirements as set forth in its Preliminary Approval

25

26

---

27   [2] In the Court's Order granting in part and denying in part Plaintiffs' motion for class certification, the
     Court concluded Named Plaintiffs Tony Diaz and Doug Higgins were inadequate to serve in representative
28   capacities. (Doc. No. 180 at 12.)

17-cv-02324-AJB-DEB

Order. (*See* Doc. No. 333 at 8–12.) Accordingly, the Court finds the settlement to be "fair, reasonable, and adequate" pursuant to Federal Rule of Civil Procedure 23(e).

## VI.   MOTION FOR ATTORNEYS' FEES AND COSTS

Plaintiffs' counsel request attorneys' fees and costs for a total of $2,950,000.00 ("Agreed Amount"). (Doc. No. 337 at 10.) Of this Agreed Amount, $2,845,567.06 is requested for attorneys' fees and $104,432.94 is requested for costs and expenses. (*Id.* at 24.)

### A.   Attorneys' Fees

In its moving papers, Plaintiffs' counsel state that through June 1, 2024, they devoted more than 8,819.4 hours to this action over the course of 7 years, for a full lodestar totaling $6,215,338.30. (*Id.* at 21–22.) However, Plaintiffs are requesting an approximate 53% reduction of its actual fees expended to demonstrate the reasonableness of its request. (*Id.* at 24–25.) As such, they request $2,845,567.06 in attorneys' fees for the work done by the Law Office of Ann Menashe; Disability Rights Advocates ("DRA"); Disability Rights California ("DRC"); Dreher Law Firm; Law Foundation of Silicon Valley; Fish & Richardson P.C.; National Homelessness Law Center ("NHLC"); Manfred, APC; and Bonnett, Fairbourn, Friedman & Balint, PC ("BFFB"). (*Id.*) The full lodestar of $6,215,338.30 is calculated as follows:[3]

| Attorney/Staff | Billable Time | Hourly Rate | Billable Amount |
|---|---|---|---|
| Ann E. Menasche | 545.2 | $915 | $498,858 |

---

[3] On October 4, 2024, the Court requested more information from counsel regarding the billable time, hourly rate, and total billable amount for each timekeeper. Counsel thereafter provided the Court with a spreadsheet with the requested information, and filed a declaration stating that, in responding to the Court's order, Fish & Richardson, P.C. ("Fish") discovered two discrepancies: (1) in the total hours calculated for Fish's time as reflected in the July 8, 2024 declaration, and (2) in the billing rate used to calculate Fish's total billed amount across all timekeepers. (Declaration of Michael A. Amon, Doc. No. 343, ¶ 4.) Thus, Fish made two adjustments to its calculation but has not changed the total amount that it is claiming for its work on the case, and indeed has reduced the total number of hours. (*Id.* ¶ 8.) Thus, this change does not impact the City, given the parties have agreed on a reduced total attorneys' fees and costs as part of the settlement agreement. (*Id.*)

11

| | | | |
|---|---|---|---|
| (Law Office of Ann E. Menasche) (Beginning January 2023) | | | |
| Stuart Seaborn (DRA) | 477 | $1050 | $500,850 |
| Jinny Kim (DRA) | 36.2 | $990 | $35,838 |
| Kevin Knestrick (DRA) | 151.3 | $930 | $140,709 |
| Madeleine Reichman (DRA) | 199.2 | $585 | $116,532 |
| Jameelah Najieb (DRA) | 171.6 | $440 | $75,504 |
| Shira Tevah (DRA) | 390.1 | $635 | $247,713.50 |
| Jess Miller-Suchet (DRA) | 76.2 | $280 | $21,336 |
| Nathan Weister (DRA) | 89.2 | $300 | $26,760 |
| Robert Scott Dreher (Dreher Law Firm) | 191.5 | $810 | $155,115 |
| Tristia Bauman (The Law Foundation) | 79.1 | $725 | $57,347.50 |
| Ann Menasche (DRC until May 2022) | 2,394.20 | $915 | $2,190,693 |
| Stuart Seaborn (DRC) | 34.1 | $1050 | $35,805 |
| Nichole Mendoza (DRC) | 175.8 | $625 | $109,875 |
| Lili Graham | 180.8 | $720 | $130,176 |

17-cv-02324-AJB-DEB

| (DRC) | | | |
|---|---|---|---|
| Natasha Reyes (DRC) | 63.2 | $505 | $31,916 |
| Kendra Muller (DRC) | 509.1 | $305 | $155,275 |
| Michael Amon (Fish & Richardson P.C.) | 192.6 | $1125 | $216,699 |
| Geoff Biegler (Fish & Richardson P.C.) | 124.7 | $1200 | $149,608 |
| Angela Castagnola (Fish & Richardson P.C.) | 1.4 | $455 | $624 |
| Ahmed Davis (Fish & Richardson P.C.) | 1.1 | $1250 | $1,423 |
| Ryan Frei (Fish & Richardson P.C.) | 151.7 | $505 | $76,614 |
| Monika Kapuscinska-Kass (Fish & Richardson P.C.) | 18.3 | $390 | $7,118 |
| Nancy Ly (Fish & Richardson P.C.) | 277.2 | $830 | $230,099 |
| Madelyn McCormick (Fish & Richardson P.C.) | 369.8 | $795 | $293,982 |
| Kathryn Quisenberry (Fish & Richardson P.C.) | 1.9 | $795 | $1,508 |
| Jeanel Sunga (Fish & Richardson P.C.) | 3.3 | $620 | $2,025 |
| Tucker Terhufen (Fish & Richardson P.C.) | 0.4 | $760 | $315 |
| Elizabeth Wilton (Fish & Richardson P.C.) | 7.4 | $310 | $2,285 |

13

| Robert Yeh (Fish & Richardson P.C.) | 55.4 | $760 | $42,093 |
|---|---|---|---|
| Tristia Bauman (NHLC) | 233.5 | $778 | $181,663 |
| Maria Foscarinis (NHLC) | 0.3 | $864 | $259.20 |
| Will Knight (NHLC) | 80.7 | $698 | $56,328.60 |
| Alex Matak (NHLC) | 51.5 | $574 | $29,561 |
| Lily Milwit (NHLC) | 73.5 | $574 | $42,189 |
| Eric Tars (NHLC) | 1.8 | $795 | $1,431 |
| Manfred Muecke (Manfred, APC) (Beginning 2020) | 239.2 | $750 | $179,312.50 |
| Manfred Muecke (BFFB) (through 2019) | 511.4 | $425 | $217,345 |
| Patricia Syverson (BFFB) | 67.2 | $600 | $40,320 |

Under 42 U.S.C. section 12205 of the ADA, 29 U.S.C. section 794a(b) of the Civil Rights Act of 1964, and California Code of Civil Procedure section 1021.5, reasonable attorney's fees and litigation costs are available to the prevailing party in a claim, in the Court's discretion. Moreover, "[i]n a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). However, "courts have an independent obligation to

14

1  ensure that the award, like the settlement itself, is reasonable, even if the parties have

2  already agreed to an amount." *In re Bluetooth*, 654 F.3d at 941.

3    The Ninth Circuit utilizes the lodestar method for calculating reasonable attorneys'

4  fees, "multiplying the number of hours reasonably expended on the litigation by a

5  reasonable hourly rate." *Welch v. Metro Life Ins. Co.*, 480 F.3d 942, 945 (9th Cir. 2007).

6  The burden is on the party seeking fees to establish their reasonableness. *Id.* at 945–46

7  (citing *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983)). In determining "a reasonable

8  hourly rate, the district court should consider: '[the] experience, reputation, and ability of

9  the attorney; the outcome of the results of the proceedings; the customary fees; and the

10  novelty or the difficulty of the question presented.'" *Hiken v. Dep't of Def.*, 836 F.3d 1037,

11  1044 (9th Cir. 2016) (quoting *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1211 (9th

12  Cir. 1986)). Additionally, district courts may "rely[] on their own knowledge of customary

13  rates and their experience concerning reasonable and proper fees." *See Ingram v.*

14  *Oroudjian*, 647 F.3d 925, 928 (9th Cir. 2011).

15    Plaintiffs bear the burden of demonstrating its counsels' hourly rates are reasonable

16  and in line with prevailing rates in the relevant legal community of the Southern District

17  of California. *See Herring Networks, Inc. v. Maddow*, No. 19-cv-1713, 2021 WL 409724,

18  at *4 (S.D. Cal. Feb. 5, 2021). To do so, Plaintiffs must produce "satisfactory evidence, in

19  addition to the affidavits of its counsel, that the requested rates are in line with those

20  prevailing in the community for similar services of lawyers of reasonably comparable skill

21  and reputation." *Jordan v. Multnomah Cnty.*, 815 F.2d 1258, 1263 (9th Cir. 1987); *see also*

22  *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984); *Roberts v. City & Cnty. of Honolulu*, 938

23  F.3d 1020, 1025 (9th Cir. 2019) ("It is the responsibility of the attorney seeking fees to

24  submit evidence to support the requested hourly rate").

25    To support the requested lodestar amount, Plaintiffs submit the declarations of Ann

26  Menashe (Doc. No. 337-1), Jinny Kim (Doc. No. 337-3), Robert Scott Dreher (Doc. No.

27  337-11), Tristia Bauman (Doc. No. 337-13), Melinda Bird (Doc. No. 337-15), Michael

28  Amon (Doc. No. 337-19), William Knight (Doc. No. 337-21), Manfred Muecke (Doc. No.

337-25), and Francis Balint, Jr. (Doc. No. 337-27), and accompanying exhibits, which explain in detail the amount of experience, skills, and reputation of each attorney and staff member involved in this case. Significantly, the City filed a notice of non-opposition to the motion for attorneys' fees and did not challenge the hourly rates set forth in Plaintiffs' fee application, nor did it argue that the hours expended by Plaintiffs' counsel were unreasonable. (*See* Doc. No. 341.) Moreover, the hourly rates above are generally in line with rates prevailing in this community for similar services by lawyers of reasonably comparable skill, experience, and reputation. *See, e.g., Soler v. Cnty. of San Diego*, No. 14cv2470-MMA (RBB), 2021 WL 2515236, at *5 (S.D. Cal. June 18, 2021) (collecting cases and noting that "courts in this District have awarded hourly rates for work performed in civil cases by attorneys with significant experience anywhere in the range of $550 per hour to more than $1000 per hour"); *Herring Networks, Inc.*, 2021 WL 409724, at *8 (collecting cases awarding fees based on hourly rates in the range of $295 to $943 and concluding that "reasonable rates in this district for those of comparable skill, experience, and reputation" justified rates between $470 to $1,150).

In reviewing the billing invoices of Plaintiffs' counsel, the Court finds 54.8 hours were billed for clerical tasks. Time billed for clerical tasks is not recoverable as the tasks should be absorbed into law firm overhead rather than billed at the rate of paralegals. *Rosemary G. V. v. Saul*, 3:19-CV-00715-RBM, 2020 WL 6703123 at *4 (S.D. Cal. Nov. 12, 2020). Tasks such as calendaring, organizing exhibits, and circulating ECF filings are clerical in nature. *Id.* However, because Plaintiffs have reduced their own request by 53%, the Court ultimately finds Plaintiffs' request of $2,845,567.06 to be reasonable.

**B.    Litigation Expenses**

In their motion, Plaintiffs seek an award of $104,432.94 in litigation costs for experts, translators, distributing class notice, and deposition expenses, transcripts, and necessary travel. (Doc. No. 337 at 24.) Class Counsel is entitled to reimbursement of the out-of-pocket costs they reasonably incurred investigating and prosecuting this case. *See Staton*, 327 F.3d at 974. The Court finds Class Counsel's out-of-pocket costs were

16

1 | reasonably incurred in connection with the prosecution of this litigation, were advanced by
2 | Class Counsel for the benefit of the Class, and shall be reimbursed in full in the amount
3 | requested. The Court approves the request for litigation costs and expenses in the amount
4 | of $104,432.94.

5 | **C.    Incentive and Individual Damages Awards to Class Plaintiffs**

6 | Finally, the Settlement Agreement provides each of the seven Class Representative
7 | will receive $7,500.00, totaling $52,500.00. (Doc. No. 329 at 26.)

8 | "[I]ncentive awards that are intended to compensate class representatives for work
9 | undertaken on behalf of a class are fairly typical in class actions cases" and "do not, by
10 | themselves, create an impermissible conflict between class members and their
11 | representatives." *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 943 (9th Cir.
12 | 2015) (internal citation and quotations omitted). Named plaintiffs in class action litigation
13 | are eligible for reasonable incentive payments. *Staton*, 327 F.3d at 977. The incentive
14 | award for the Class Plaintiffs in this case is presumptively reasonable. *See, e.g., Lloyd v.
15 | Navy Fed. Credit Union*, No. 17-cv-1280-BAS-RBB, 2019 WL 2269958, at * (S.D. Cal.
16 | May 28, 2019) (awarding a service award of $5,000 to each Class Representative); *Vasquez
17 | v. Kraft Heinz Foods Co.*, No.: 3:16-cv-2749-WQH-BLM, 2020 WL 1550234, at *9 (S.D.
18 | Cal. Apr. 1, 2020) (finding reasonable incentive awards of $7,500 and $3,000).
19 | Accordingly, the Court finds the service awards to the Class Representatives are
20 | appropriate.

21 | Further, each of the nine Named Plaintiff will also receive $15,000.00 in individual
22 | monetary damages under the Settlement Agreement, totaling $135,000.00. (Doc. No. 336
23 | at 17, 22.) The Court finds the individual damages award to the Named Plaintiffs to
24 | compensate Plaintiffs' claims is reasonable given the alleged individual harms each
25 | Plaintiff experienced.

26 | **VII.  CONCLUSION**

27 | Based on the foregoing and the entire record, the Court **GRANTS** Plaintiffs'
28 | motions for final approval of the Settlement and for attorneys' fees. The Court also

17-cv-02324-AJB-DEB

**ORDERS**:

1. The claims of Plaintiffs and Class Members are hereby released as against Defendant consistent with Paragraph 12 of the Settlement Agreement;

2. The City pay $15,000 in monetary damages to each of the nine current Named Plaintiffs, and $7,500 to each of the seven Class Representatives within thirty (30) days of this Order;

3. Without affecting the finality of this Final Approval Order, the Court **RETAINS JURISDICTION** over implementation of the settlement for a period of three years, with enforcement delegated to Magistrate Judge Butcher;

4. This action be **DISMISSED WITH PREJUDICE**, with each side to bear its own costs and attorneys' fees except as provided by the Settlement Agreement and the Court's Orders;

5. This document constitutes a final judgment and separate document for purposes of Federal Rule of Civil Procedure 58(a); and

6. The Clerk of Court is **ORDERED** to **CLOSE** this case.

    **IT IS SO ORDERED.**

Dated: October 14, 2024

Hon. Anthony J. Battaglia
United States District Judge

17-cv-02324-AJB-DEB

# EXHIBIT 6

1   ROBBINS GELLER RUDMAN
    & DOWD LLP
2   SHAWN A. WILLIAMS (213113)
    Post Montgomery Center
3   One Montgomery Street, Suite 1800
    San Francisco, CA  94104
4   Telephone:  415/288-4545
    415/288-4534 (fax)
5   shawnw@rgrdlaw.com
    – and –
6   SPENCER A. BURKHOLZ (147029)
    THEODORE J. PINTAR (131372)
7   LUKE O. BROOKS (212802)
    ERIC I. NIEHAUS (239023)
8   JEFFREY J. STEIN (265268)
    ERIKA OLIVER (306614)
9   NATALIE F. LAKOSIL (322836)
    655 West Broadway, Suite 1900
10  San Diego, CA  92101
    Telephone:  619/231-1058
11  619/231-7423 (fax)
    spenceb@rgrdlw.com
12  tedp@rgrdlaw.com
    lukeb@rgrdlaw.com
13  eniehaus@rgrdlaw.com
    jstein@rgrdlaw.com
14  eoliver@rgrdlaw.com
    nlakosil@rgrdlaw.com
15
    Lead Counsel for Plaintiffs
16
17                 UNITED STATES DISTRICT COURT
18             NORTHERN DISTRICT OF CALIFORNIA
19                    OAKLAND DIVISION

| | |
|---|---|
| GREG FLEMING, Individually and on Behalf of All Others Similarly Situated, )<br><br>Plaintiff, )<br><br>vs. )<br><br>IMPAX LABORATORIES INC., et al., )<br><br>Defendants. ) | Case No. 4:16-cv-06557-HSG<br><br>CLASS ACTION<br><br>DECLARATION OF LUKE O. BROOKS FILED ON BEHALF OF ROBBINS GELLER RUDMAN & DOWD LLP IN SUPPORT OF APPLICATION FOR AWARD OF ATTORNEYS' FEES AND EXPENSES<br><br>DATE:  March 31, 2022<br>TIME:  2:00 p.m.<br>CTRM:  2, 4th Floor<br>JUDGE:  Honorable Haywood S. Gilliam, Jr. |

20
21
22
23
24
25
26
27
28

4869-4996-0199.v1

1    I, LUKE O. BROOKS, declare as follows:

2    1.    I am a member of the firm of Robbins Geller Rudman & Dowd LLP ("Robbins

3    Geller" or the "Firm"). I am submitting this declaration in support of my Firm's application for an

4    award of attorneys' fees, expenses and charges ("expenses") in connection with services rendered in

5    the above-entitled action (the "Litigation").

6

7    2.    This Firm is Lead Counsel of record for Lead Plaintiff New York Hotel Trades

8    Council & Hotel Association of New York City, Inc. Pension Fund, class representative Sheet Metal

9    Workers' Pension Plan of Southern California, Arizona and Nevada and the Class herein.

10    3.    The information in this declaration regarding the Firm's time and expenses is taken

11    from time and expense reports and supporting documentation prepared and/or maintained by the

12    Firm in the ordinary course of business. I am the partner who oversaw and/or conducted the day-to-

13    day activities in the Litigation and I reviewed these reports (and backup documentation where

14    necessary or appropriate) in connection with the preparation of this declaration. The purpose of this

15    review was to confirm both the accuracy of the entries on the printouts as well as the necessity for,

16    and reasonableness of, the time and expenses committed to the Litigation. As a result of this review,

17    reductions were made to both time and expenses in the exercise of billing judgment. Based on this

18    review and the adjustments made, I believe that the time reflected in the Firm's lodestar calculation

19    and the expenses for which payment is sought herein are reasonable and were necessary for the

20    effective and efficient prosecution and resolution of the Litigation. In addition, I believe that these

21    expenses are reasonable and were necessary for the effective and efficient prosecution and resolution

22    of the Litigation.

23

24    4.    After the reductions referred to above, the number of hours spent on the Litigation by

25    the Firm is 4,718.00. A breakdown of the lodestar is provided in the attached Exhibit A. The

26    lodestar amount for attorney/paraprofessional time based on the Firm's 2021 rates is $3,815,664.75.

27    The hourly rates shown in Exhibit A are the Firm's regular 2021 rates in contingent cases set by the

28

DECL OF LUKE BROOKS ON BEHALF OF ROBBINS GELLER RUDMAN & DOWD LLP IN
SUPPORT OF APP FOR AWARD OF FEES AND EXPENSES - 4:16-cv-06557-HSG    - 1 -
4869-4996-0199.v1

1   Firm for each individual. These hourly rates are consistent with hourly rates submitted by the Firm

2   to state and federal courts during 2021 in other securities class action litigation. The Firm's rates are

3   set based on periodic analysis of rates charged by firms performing comparable work both on the

4   plaintiff and defense side. For personnel who are no longer employed by the Firm, the "current rate"

5   used for the lodestar calculation is based upon the rate for that person in his or her final year of

6   employment with the Firm.

7

8       5.      The Firm seeks an award of $176,501.78 in expenses and charges in connection with

9   the prosecution of the Litigation. Those expenses and charges are summarized by category in the

10  attached Exhibit B.

11      6.      The following is additional information regarding certain of these expenses:

12

13      (a)     Filing, Witness and Other Fees: $2,273.35. These expenses have been paid to

14  the Court for filing fees and to attorney service firms or individuals who either: (i) served process of

15  the complaint or subpoenas; or (ii) obtained copies of court documents for plaintiffs. The vendors

16  who were paid for these services are set forth in the attached Exhibit C.

17      (b)     Transportation, Hotels & Meals: $3,834.77. In connection with the

18  prosecution of this case, the Firm has paid for travel expenses to attend court hearings. The date,

19  destination and purpose of each trip is set forth in the attached Exhibit D.

20

21      (c)     Court Hearing Transcripts: $256.75. The vendors who were paid for these

22  services are listed in the attached Exhibit E.

23      (d)     Consultants/Investigators: $97,882.00.

24          (i)     Tasta Group (dba Caliber Advisors, Inc.) ("Caliber"): $55,387.50.

25  Lead Plaintiff retained the services of Caliber, a valuations and economic consulting firm and its

26  managing director, Bjorn Steinholt, CFA, to assist in financial analysis of materiality, loss causation,

27  market efficiency, and damages. Caliber specializes in financial analyses and related economic

28

1   consulting services with Mr. Steinholt having more than 25 years of experience providing capital

2   markets consulting. Mr. Steinholt provided Lead Counsel with substantial assistance in its economic

3   analysis of market efficiency, materiality, loss causation and damages.  Lead Counsel worked

4
    closely with Mr. Steinholt throughout the mediation process with Judge Phillips and, after reaching
5
    the Settlement, Mr. Steinholt assisted Lead Counsel in developing the proposed plan for allocating
6
7   the settlement proceeds to eligible Class Members as set forth in the Notice.

8                    (ii)     Gryphon Investigations (dba Gryphon Strategies) ("Gryphon"):

9   $20,665.00.  Gryphon is a private investigative firm retained by Lead Counsel to assist in the factual

10  investigation of the claims alleged in the Second Amended Complaint.  Gryphon's investigators

11  reviewed and analyzed materials in preparation for the investigation, assisted in researching,
12
    identifying, and confirming the employment status of prospective witnesses, and conducted
13
14  interviews with targeted witnesses, and prepared witness interview memoranda in connection with

15  the Second Amended Complaint.

16                   (iii)    Fideres Partners LLP ("Fideres"): $15,000.00.  Fideres is a leading

17  provider of economic analysis with specialization in antitrust matters. Fideres assisted Lead Counsel

18  in understanding the structure of the generic drug market, and how that structure facilitated the

19  alleged conspiracy.  Fideres also provided statistical analyses related to various aspects of the
20
    generic drug market that were used in the First and Second Amended Complaints, and assisted in
21
22  quantifying the impact of the alleged conspiracy.

23                   (iv)    Soundview Intelligence LLC ("Soundview"): $6,829.50.  Soundview

24  is a private investigative firm retained by Lead Counsel to assist in the factual investigation of the

25  claims alleged in the First Amended Complaint.  Soundview's investigator reviewed and analyzed

26
    materials in preparation for the investigation, assisted in researching, identifying, and confirming the
27

28

DECL OF LUKE BROOKS ON BEHALF OF ROBBINS GELLER RUDMAN & DOWD LLP IN
SUPPORT OF APP FOR AWARD OF FEES AND EXPENSES - 4:16-cv-06557-HSG
4869-4996-0199.v1                                                                                              - 3 -

1    employment status of prospective witnesses, conducted interviews with targeted witnesses, and

2    prepared witness interview memoranda in connection with the First Amended Complaint.

3           (e)    Outside Photocopies: $248.65. The Firm paid $248.65 to an outside vendor

4    for blowback printing and coil binding.

5           (f)    Online Legal and Financial Research: $9,556.98. This category includes

6    vendors such as LexisNexis Products, Thomson Financial, and Westlaw. These resources were used

7    to obtain access to SEC filings, factual databases, legal research and for cite-checking of briefs. This

8    expense represents the expenses incurred by Robbins Geller for use of these services in connection

9    with this Litigation. The charges for these vendors vary depending upon the type of services

10   requested. For example, Robbins Geller has flat-rate contracts with some of these providers for use

11   of their services. When Robbins Geller utilizes online services provided by a vendor with a flat-rate

12   contract, access to the service is by a billing code entered for the specific case being litigated. At the

13   end of each billing period in which such service is used, Robbins Geller's costs for such services are

14   allocated to specific cases based on the percentage of use in connection with that specific case in the

15   billing period. As a result of the contracts negotiated by Robbins Geller with certain providers, the

16   Class enjoys substantial savings in comparison with the "market-rate" for *a la carte* use of such

17   services which some law firms pass on to their clients. For example, the "market rate" charged to

18   others by LexisNexis for the types of services used by Robbins Geller is more expensive than the

19   rates negotiated by Robbins Geller.

20          (g)    Mediation Fees (Phillips ADR Enterprises, P.C.): $62,097.50. The parties

21   retained former United States District Judge, Layn Phillips of Phillips ADR, to serve as mediator.

22   Judge Phillips conducted a full-day mediation, followed by additional mediation sessions and

23   negotiations leading to the settlement of the Litigation.

7.    The expenses pertaining to this case are reflected in the books and records of this Firm. These books and records are prepared from receipts, expense vouchers, check records and other documents and are an accurate record of the expenses.

8.    The identification and background of my Firm and its partners is attached hereto as Exhibit F.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 18th day of January, 2022, at San Diego, California.

                                               *s/Luke O. Brooks*
                                               LUKE O. BROOKS

# EXHIBIT A

## EXHIBIT A

*Fleming v. Impax Laboratories Inc., et al.*, Case No. 4:16-cv-06557-HSG
Robbins Geller Rudman & Dowd LLP
Inception through January 13, 2022

| NAME | | HOURS | RATE | LODESTAR |
|---|---|---|---|---|
| Alba, Mario | (P) | 38.60 | 870 | $    33,582.00 |
| Brooks, Luke O. | (P) | 844.80 | 945 | 798,336.00 |
| Burkholz, Spencer A. | (P) | 47.50 | 1200 | 57,000.00 |
| Daley, Joseph D. | (P) | 6.10 | 970 | 5,917.00 |
| Gusikoff Stewart, Ellen A. | (P) | 6.00 | 1080 | 6,480.00 |
| Lau, Angel P. | (P) | 908.80 | 760 | 690,688.00 |
| Love, Andrew S. | (P) | 48.50 | 1150 | 55,775.00 |
| Niehaus, Eric I. | (P) | 597.45 | 840 | 501,858.00 |
| Pintar, Theodore J. | (P) | 163.90 | 1100 | 180,290.00 |
| Robbins, Darren J. | (P) | 26.65 | 1325 | 35,311.25 |
| Stein, Jeffrey J. | (P) | 304.55 | 780 | 237,549.00 |
| Lakosil, Natalie F. | (A) | 17.10 | 425 | 7,267.50 |
| McGuire, Sean C. | (A) | 15.00 | 450 | 6,750.00 |
| Oliver, Erika L. | (A) | 446.30 | 520 | 232,076.00 |
| Tull, Joseph J. | (A) | 8.30 | 175 | 1,452.50 |
| Alexander, Susan K. | (OC) | 570.50 | 1150 | 656,075.00 |
| McCormick, Tricia | (OC) | 28.50 | 935 | 26,647.50 |
| Schroder, Stephanie M. | (OC) | 48.00 | 895 | 42,960.00 |
| Walton, David C. | (OC) | 2.50 | 1080 | 2,700.00 |
| Koelbl, Terry R. | (FA) | 159.00 | 600 | 95,400.00 |
| Barhoum, Anthony J. | (EA) | 20.20 | 430 | 8,686.00 |
| Cabusao, Reggie F. | (EA) | 18.75 | 335 | 6,281.25 |
| Uralets, Boris | (EA) | 10.20 | 415 | 4,233.00 |
| Roelen, Scott R. | (RA) | 17.80 | 295 | 5,251.00 |
| Lewis, Bradley P. | (LS) | 5.00 | 150 | 750.00 |
| Torres, Michael | (LS) | 8.60 | 375 | 3,225.00 |
| Paralegals | | 327.65 | 275-350 | 109,861.25 |
| Document Clerks | | 21.75 | 150 | 3,262.50 |
| **TOTAL** | | **4,718.00** | | **$  3,815,664.75** |

(P) Partner                               (EA) Economic Analyst
(A) Associate                             (RA) Research Analyst
(OC) Of Counsel                           (LS) Litigation Support
(FA) Forensic Accountant

# EXHIBIT 7

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FILED

DEC 18 2024

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY_____DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

AUSTIN DICKER, Individually and on
Behalf of All Others Similarly Situated,

Plaintiff,

vs.

TUSIMPLE HOLDINGS, INC., et al.,

Defendants.

Case No. 3:22-cv-01300-BEN-MSB
(Consolidated with No. 3:23-cv-00282-
BEN-MSB)

CLASS ACTION

ORDER FOR AN AWARD OF
ATTORNEYS' FEES AND
EXPENSES AND AWARDS TO
PLAINTIFFS PURSUANT TO 15
U.S.C. §78u-4(a)(4) .

1     This matter having come before the Court on December 2, 2024, on Plaintiffs'

2    Counsel's motion for an award of attorneys' fees and expenses and §78u-4(a)(4)

3    awards to Plaintiffs (the "Fee Application"), the Court, having considered all papers

4    filed and proceedings conducted herein, having found the Settlement of this

5    Litigation to be fair, reasonable, and adequate, and otherwise being fully informed

6    in the premises and good cause appearing therefore;

7     IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

8     1.   This Order incorporates by reference the definitions in the Stipulation

9    of Settlement dated August 22, 2024 (the "Stipulation"), and all capitalized terms

10    not otherwise defined herein shall have the same meanings as set forth in the

11    Stipulation.

12     2.   The Court has jurisdiction to enter this Order and over the subject

13    matter of this application and all matters relating thereto, as well as personal

14    jurisdiction over all parties to the Litigation, including all Members of the

15    Settlement Class.

16     3.   Notice of Plaintiffs' Counsel's Fee Application was given to all

17    Settlement Class Members who could be identified with reasonable effort. There

18    were no objections to Plaintiffs' Counsel's Fee Application. The form and method

19    of notifying the Settlement Class of the Fee Application met the requirements of

20    Rule 23 of the Federal Rules of Civil Procedure, the United States Constitution

21    (including the Due Process Clause), the Private Securities Litigation Reform Act

22    of 1995, as amended, and any other applicable law. This constituted the best notice

23    practicable under the circumstances and due and sufficient notice to all Persons

24    entitled thereto.

25     4.   Lead Counsel is hereby awarded attorneys' fees of 25% of the

26    Settlement Amount, plus expenses in the amount of $230,279.90, together the

27    interest earned on both amounts for the same time period and at the same rate as

28

- 1 -

1    that earned on the Settlement Fund until paid. The Court finds that the amount of

2    fees awarded is fair, reasonable, and appropriate under either the "percentage-of-

3    recovery" or lodestar methods.

4        5.    The fees and expenses shall be allocated among Plaintiffs' Counsel in

5    a manner which, in Lead Counsel's good faith judgment, reflects such counsel's

6    contribution to the institution, prosecution, and resolution of the Litigation.

7        6.    The awarded attorneys' fees and expenses and interest earned thereon,

8    shall be paid to Lead Counsel immediately upon execution of this Order and the

9    Judgment and subject to the terms, conditions, and obligations of the Stipulation,

10   and in particular, Section 6 thereof, which terms, conditions, and obligations are

11   incorporated herein.

12       7.    In making this award of attorneys' fees and expenses to be paid from

13   the Settlement Fund, the Court has considered and found that:

14       (a)    The Settlement has created a fund of $189,000,000 in cash that

15   has been funded into escrow pursuant to the terms of the Stipulation, and Settlement

16   Class Members will benefit from the Settlement created by the efforts of Plaintiffs'

17   Counsel;

18       (b)    Over 35,800 Postcard Notices were disseminated to potential

19   Settlement Class Members and nominees indicating that Plaintiffs' Counsel would

20   move for attorneys' fees in an amount not to exceed 25% of the Settlement Amount

21   and for expenses in an amount not to exceed $300,000, plus interest on both amounts,

22   and there have been no objections to the requested attorneys' fees or expenses;

23       (c)    Plaintiffs' Counsel conducted the Litigation and achieved the

24   Settlement with skill, perseverance, and diligent advocacy;

25       (d)    Plaintiffs' Counsel have devoted more than 8,100 hours, with a

26   lodestar value of $5,965,117.50, to achieve the Settlement. A 25% fee represents a

27   multiplier of 7.92 to the aggregate lodestar;

28

3:22-cv-01300-BEN-MSB
(Consolidated with No. 3:23-cv-
00282-BEN-MSB)

1         (e)    Plaintiffs' Counsel pursued the Litigation on a contingent basis;

2         (f)    The Litigation involves complex factual and legal issues and, in

3 the absence of settlement, would involve lengthy proceedings whose resolution

4 would be uncertain;

5         (g)    Had Plaintiffs' Counsel not achieved the Settlement, there would

6 remain a significant risk that the Settlement Class may have recovered less or

7 nothing from the Defendants;

8         (h)    Public policy concerns favor the award of reasonable attorneys'

9 fees and expenses in securities class action litigation; and

10        (i)    The attorneys' fees and expenses awarded are fair and reasonable

11 and consistent with awards in similar cases within the Ninth Circuit.

12    8.    Pursuant to 15 U.S.C. §78u-4(a)(4), Lead Plaintiff Indiana Public

13 Retirement System is hereby awarded $4,200, plaintiff Michelle Poirier is hereby

14 awarded $1,840, and plaintiff Robert Miller is hereby awarded $7,200, for their time

15 spent directly related to their representation of the Settlement Class.

16    9.    Any appeal or any challenge affecting this Court's approval regarding

17 the Fee Application shall in no way disturb or affect the finality of the Judgment

18 entered with respect to the Settlement.

19    10.    In the event that the Settlement is terminated or does not become Final

20 or the Effective Date does not occur in accordance with the terms of the Stipulation,

21 this Order shall be rendered null and void to the extent provided in the Stipulation

22 and shall be vacated in accordance with the Stipulation.

23    IT IS SO ORDERED.

24

25 DATED: 12/18/2024               

26              THE HONORABLE ROGER T. BENITEZ

              UNITED STATES DISTRICT JUDGE

27

28

- 3 -                   3:22-cv-01300-BEN-MSB
(Consolidated with No. 3:23-cv-
00282-BEN-MSB)