EXHIBIT 3

1  Vincent Renda, Esq., SBN 213985
   RENDA LAW OFFICES
2  600 West Broadway, Suite 400
   San Diego, CA 92101
3  Telephone: (619) 819-0011
   Facsimile: (619) 819-0012
4
5  Christopher S. Morris, Esq., SBN 163188
   Danielle R. Pena, Esq., SBN 286002
   MORRIS LAW FIRM, APC
6  401 West A Street, Suite 1820
   San Diego, CA 92101
7  Telephone: (619) 826-8060
   Facsimile: (619) 826-8065
8
   Attorneys for PLAINTIFFS
9

**ELECTRONICALLY FILED**
Superior Court of California,
County of San Diego

**03/08/2016** at 08:53:00 AM

Clerk of the Superior Court
By Christina Villegas, Deputy Clerk

10              SUPERIOR COURT OF THE STATE OF CALIFORNIA

11          COUNTY OF SAN DIEGO – CENTRAL HALL OF JUSTICE

12  ESTATE OF RONNIE PAUL SANDOVAL    Case No. 37-2014-00033347-CU-PO-CTL
    and ANA SANDOVAL, an individual,   [Hon. Joan M. Lewis, Dept. C-65]

13
                  Plaintiffs,          **FIRST AMENDED COMPLAINT**
14
          v.
15                                     *IMAGED FILE*
    COUNTY OF SAN DIEGO, a Public entity;
16  SAN DIEGO COUNTY JAIL, a Public
    Entity, and DOES 1 through 100;
17
                  Defendants.
18

19      Plaintiff, ANA SANDOVAL, individually and as successor in interest to RONNIE

20  SANDOVAL, RONNIE SANDOVAL, JR., individually, and JOSIAH SANDOVAL, individually,

21  are informed and believe, and based upon such information and belief allege the following:

22                                **PARTIES**

23      1.      Plaintiff, ANA SANDOVAL, individually and as successor in interest to RONNIE

24  SANDOVAL, RONNIE SANDOVAL, JR., individually, and JOSIAH SANDOVAL, individually,

25  are to be collectively referred to herein as "Plaintiffs."

26      2.      At all times relevant hereto, Plaintiff Ana Sandoval is and was a resident of San

27  Diego County.

28      3.      At all times relevant hereto, Ronnie Sandoval, Jr. and Josiah Sandoval were

                                        1

1   residents of San Diego County.  At the time of this Complaint, Ronnie Sandoval, Jr. is

2   approximately thirty (30) years old residing in San Diego County; and Josiah Sandoval is

3   approximately seventeen (17) years old residing in Riverside County, California.

4       4.    Pursuant to CCP § 372, if this Court deems it appropriate, Josiah Sandoval, requests

5   he be appointed a *guardian ad litem* for the purposes of pursuing this litigation.

6       5.    Defendant, County of San Diego, ("County") at all times mentioned herein, is a

7   public entity authorized by law to establish certain departments responsible for enforcing the laws

8   and protecting the welfare of the citizens of San Diego County. At all times mentioned herein,

9   Defendant County is responsible for overseeing the operation, management, and supervision of the

10  San Diego Central Jail ("Central"), as well as its Corrections Officers and Medical Staff.

11      6.    At all times relevant hereto, Defendant County of San Diego is a public entity in

12  San Diego, California. It is a government agency duly organized and existing under the laws of the

13  State of California operating and doing business in the City of San Diego.

14      7.    With certain exceptions, none of which apply herein, public entities and public

15  employees are liable for their torts to the same extent as private parties.  Moreover, nothing in this

16  immunity exonerates a public employee from liability for injury proximately caused by his or her

17  own negligent or wrongful acts or omissions. (*Gov. Code*, §§ 820 subd. (a), 820.8, 815.2, subd.

18  (a)). Moreover, pursuant to *Government Code Sections §§ 815.4, 815.2(a)* public entities are

19  vicariously liable for tortious acts or omission of an independent contractor or employee,

20  respectively.

21      8.    The true names and capacities of Defendants sued herein under section 474 of the

22  Code of Civil Procedure as DOES 1 through 100, inclusive, and each of them, is unknown to

23  Plaintiffs, who therefore sue said Defendants by such fictitious names.  Plaintiffs will seek to amend

24  this complaint to set forth the true names and capacities of said fictitiously named Defendants when

25  the names and capacities of said fictitiously named Defendants have been fully ascertained.  Each

26  of the fictitiously named Defendants are responsible in some manner for the events and occurrences

27  herein alleged, and Plaintiffs' damages, as herein alleged, were directly and proximately caused by

28  the conduct, acts, and/or omissions of said Defendants

2

1    9.    At all times relevant hereto, each Defendant was the agent or employee of each co-

2    defendant and, in doing the things alleged herein, was acting within the scope of his/her/its authority

3    as agent or employee and with the permission of each co-defendant.

4    **JURISDICTION AND VENUE**

5    10.    This Court has jurisdiction over all causes of action asserted in this Complaint

6    pursuant to the California Constitution, Article VI, Section 10 because this case is a cause not given

7    by statute to other trial courts.  The claims asserted herein arise under California law.

8    11.    This action is properly filed in this Court because the facts giving rise to Plaintiffs'

9    claims occurred in the County of San Diego, State of California and because all parties live in the

10    County of San Diego.

11    12.    On or about July 7, 2014, the Plaintiffs presented to County of San Diego's Office

12    of County Counsel via US postal mail a 20-page Notice of Claim letter which included: (1) CD1

13    (Rev. 6/11) Claim Form; (2) a copy of San Diego County Sheriff's Department Public Records

14    Request – Victim Copy: 14109768; (3) a copy of the County of San Diego Office of the Medical

15    Examiner's Toxicology Report: Med. Exam No.: 14-00466; (4) a copy of the County of San Diego

16    Office of the Medical Examiner's Investigative Report: Case No.: 14-00466; and (5) a copy of the

17    County of San Diego Office of the Medical Examiner's Autopsy Report: ME#.: 14-00466

18    (collectively "Claim"), for the injuries, losses, and damages suffered and incurred by the Plaintiffs

19    by reason of the above-described occurrence, all in compliance with the California Torts Claims

20    Act.

21    13.    On or about July 28, 2014, The County of San Diego's Office of County Counsel

22    Claims and Investigation Division sent a letter of acknowledgement to counsel for Plaintiff Ana

23    Sandoval, confirming receipt of the Claim, identified the County File No. as: 140232 and informed

24    the Plaintiffs' counsel that the Claim was under investigation. ("Confirmation Letter").

25    14.    On or about August 2014, the County of San Diego sent the Plaintiffs' counsel a

26    letter rejecting the Claim in its entirety ("Rejection Letter").

27    / / /

28

3

FIRST AMENDED COMPLAINT

**FACTS RELEVANT TO ALL COUNTS**

15.     On or about February 22, 2014 at approximately 11:45 a.m., Ronnie Paul Sandoval's (herein "Sandoval") house was searched pursuant to a probation compliance check. When the sheriffs entered his home Mr. Sandoval was apparently seen trying to destroy an unknown amount of methamphetamine as he was standing inside his bathroom. Mr. Sandoval was arrested for possession of a controlled substance and for violation of his parole.

16.     At approximately 1:00 p.m. on February 22, 2014, Mr. Sandoval was taken to San Diego Central Jail (herein "Central"). During his intake process, deputies noticed Mr. Sandoval "was extremely sweaty and appeared to be slightly disoriented." (Attached hereto as Exhibit 1.) Mr. Sandoval said he was cold and not feeling well. Deputies had a nurse approach Mr. Sandoval to perform a blood sugar test. The results of the test were never documented, but the nurse stated in her report that Mr. Sandoval's sugar level was normal.

17.     At approximately 2:27 p.m. on February 22, 2014, Mr. Sandoval entered the medical pre-screen area where other inmates were present. Mr. Sandoval was escorted by a County deputy. Defendants engaged in conversation with Mr. Sandoval at that time and noticed his condition.

18.     At approximately 2:38 p.m. on February 22, 2014, Mr. Sandoval was escorted from the medical pre-screen area with a County deputy and one other inmate. At that time, Mr. Sandoval was still sweaty and shaking.

19.     At approximately 3:33 p.m. on February 22, 2014, Mr. Sandoval was searched by the County deputies along with other inmates. At 3:40 p.m. Mr. Sandoval was fingerprinted. By 3:44 p.m. Mr. Sandoval was drenched with sweat. One minute later, an officer engaged in conversation with Mr. Sandoval. And one minute after that a medical nurse approached Mr. Sandoval to engage in conversation with him.

20.     At approximately 4:40 p.m. on February 22, 2014, Mr. Sandoval enters another room and takes a seat. At that time the County is preparing to take Mr. Sandoval's booking photograph. While having his booking photograph taken Deputy Chavez stated, Mr. Sandoval "was still sweating a lot and appeared to be very tired and disoriented." (Exhibit 1.) At this point, an inmate told deputies that Mr. Sandoval was shaking violently and was losing pallor.

4

21.     Around 4:47 p.m., on February 22, 2014, County deputies decided to take Mr. Sandoval to the Medical Observation Unit (Herein "MOU") for "further medical observation." (Attached hereto as Exhibit 2.) He was seen by a nurse to have his blood sugar taken again because Mr. Sandoval thought he was a diabetic. The nurse that took his blood test reviewed Mr. Sandoval's chart prior to administering the blood test. The nurse said Mr. Sandoval's chart said he was under the influence of a drug.

22.     Mr. Sandoval was placed in Medical Waiting Room cell #1 and was told by Officer Chavez "a nurse would see him as soon as possible." However, Mr. Sandoval went without any medical attention for the next eight (8) hours. Literally no one entered the threshold of his door until nearly 1:00 a.m. on February 23, 2014, in response to his seizure.

23.     At approximately 12:32 a.m. on February 23, 2014, Mr. Sandoval is first observed by a County deputy who approaches the window of Mr. Sandoval's cell. However, Mr. Sandoval does not respond. No further action was taken.

24.     At approximately 12:41 a.m. on February 23, 2014, Mr. Sandoval falls out of frame on the video footage and, according to officers' reports, has a seizure while sitting on the bench in screening cell #1. Inexplicably, no one enters the cell for another twelve (12) minutes.

25.     Finally, at approximately 12:52 a.m. on February 23, 2014, a medical nurse walks over to Mr. Sandoval's cell and looks in on him. One minute later a County deputy comes to the area with medical equipment. At 12:53 a.m. the cell door is opened for the very first time since 5:01 p.m. on the previous day when Mr. Sandoval was first placed in the screening cell.

26.     At approximately 12:53 a.m. on February 23, 2014, two (2) officers and two (2) nurses enter the screening cell where they find Mr. Sandoval on the floor and non-responsive.

27.     Disregarding the County's "Code Blue" policy, approximately ten (10) minutes after the medical nurse saw Mr. Sandoval having a seizure, she called an EMT at approximately 1:03 a.m. She waited 30 more minutes until she advised her supervisor of Mr. Sandoval's condition. The nurse told her supervisor she called for an EMT. The supervisor said an EMT is insufficient and ordered she call paramedics. However, paramedics were not called until the EMTs arrived and informed medical staff they could not transport Mr. Sandoval. Paramedics did not arrive until 1:48

5

1  a.m., an hour and eight minutes after Mr. Sandoval's seizure. Twelve minutes later, at 2:11 a.m.,

2  paramedics called Mr. Sandoval's time of death.

3      28.    To make matters worse, after the county called paramedics, and as Mr. Sandoval's

4  condition continued to worsen, county employees attempted to stabilize his breathing and suction

5  the foam from Mr. Sandoval's airways by applying an "Easy-Go-Vac" to clear fluid from Mr.

6  Sandoval's lungs and mouth; however, the "Easy-Go-Vac" was not working properly. (RFA, #48)

7  Within minutes, Mr. Sandoval started to lose consciousness.

8      29.    In summary, video footage shows at 5:01 p.m., on February 22, 2014, Mr. Sandoval

9  was taken to the medical screening cells and was left to languish, alone, for nearly eight (8) hours.

10  The videos painstakingly show, hour after hour after hour, no one coming to check on Mr.

11  Sandoval. He was never given food or water, he was never evaluated, medication never

12  administered, and his vitals were never taken. Mr. Sandoval was never glanced at *for the eight (8)*

13  *hours while in the medical observation cell.* In fact, the county admits that no county employee

14  entered the screening cell between the hours of 5:00 p.m. – 11:00 p.m. (RFA, #26, Exhibit 3).

15  Presumably, this is because there is a custom and practice at Central to use medical screening cell

16  #1 and #2 as overflow cells for administrative segregation, when the administrative segregation

17  cells were occupied. A nurse on call at the time of Mr. Sandoval's death said in her death

18  investigation statement,

19      "Inmate Sandoval was already in the cell when she started her shift. She was
20      not briefed by anyone as to the reason Sandoval was in the holding cell.
        Usually, during shift change, the outgoing shift endorses the incoming shift
21      with information about pending medical needs on the floor. If there is no
        endorsement, then it's presumed deputies are using the cells for "keep
22      separate" inmates."

23      30.    Moreover, some evidence indicates that unlike the medical observation bay,

24  sobering and safety cells, medical staff is under the impression that medical monitoring is not

25  required for medical screening cells #1 and #2. A nurse on shift during Mr. Sandoval's passing

26  said, "no monitoring rounds are required in the medical screening areas .... Patients could be there

27  for two days until deputies take them to general population cells." This same nurse stated it would

28  be best practice to require monitoring of medical screening areas as they do for sobering or safety

1    cells, which requires interactive observations.

2         31.    Further, according to reports, after watching Mr. Sandoval seize for ten (10)

3    minutes, medical staff compounded their indifference by calling an EMT rather than a paramedic.

4    An EMT does not have the ability to administer medications, start intravenous lines or provide

5    advanced airway management. In fact, according to an officer's report, when the EMT arrived they

6    told Central staff they could not transport Mr. Sandoval because he was unconscious. That's when

7    medical staff called paramedics. Officers' reports indicate that at approximately 1:20 a.m., when

8    the EMT's arrived, Mr. Sandoval was still breathing on his own with his eyes open. However,

9    approximately 1:48 a.m., while paramedics were strapping Mr. Sandoval to a gurney, he stopped

10   breathing. This indifferent decision caused over an hour delay in providing adequate treatment and

11   transportation for Mr. Sandoval.

12        32.    It is clear that county employees knew Mr. Sandoval was suffering from medical

13   distress; officers admitted that in their reports, which is validated by Deputy Chavez's decision to

14   send Mr. Sandoval to the medical screening area, after a nurse's initial check when being processed.

15   Numerous deputies saw Mr. Sandoval drenched in sweat, appearing exhausted and lethargic,

16   confused, disoriented and slurring his speech. Further, someone, documented in Mr. Sandoval's

17   chart that he was under the influence of drugs but seemingly did not take any further actions to

18   monitor Mr. Sandoval's medical condition due to a combination of deliberate indifference as well

19   as the county's failure to institute a policy requiring safety checks for inmates placed in the medical

20   screening cells. The pathologist stated Mr. Sandoval's cause of death was acute methamphetamine

21   intoxication.

22        33.    The deliberate indifference, intentional failure, negligence, recklessness and

23   carelessness of the Defendants and Does 1-100, and each of them, was a substantial factor in

24   causing the death of Mr. Sandoval.

25   / / /

26   / / /

27   / / /

28   / / /

7

FIRST AMENDED COMPLAINT

**FIRST CAUSE OF ACTION**

**42 U.S.C § 1983 – 14th Amendment Cruel and Unusual Punishment**

**[Against William D. Gore, individually and DOES 1-100 –**

**Deliberate Indifference to a Serious Medical Need]**

(Brought by ANA SANDOVAL as Successor in Interest to RONNIE SANDOVAL)

34.     Plaintiffs reallege and incorporate by reference all paragraphs above, as though fully set forth herein.

35.     Prison officials are personally liable for a plaintiff's constitutional deprivation if they acted with "deliberate indifference to a substantial risk of serious harm." *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998). To allege deliberate indifference, the medical needs must objectively be "sufficiently serious ...." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citing *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). Additionally, the prison official must "know[] of and disregard[] an excessive risk to inmate health or safety . . . ." *Farmer*, 511 U.S. at 837. A prisoner's right to receive adequate medical treatment is clearly established, and it is also clearly established that prison staff cannot "intentionally deny or delay access to medical care." *Clement v. Gomez*, 298 F.3d 898, 906 (9th Cir. 2002).

36.     Further, although some individually named defendants did not personally participate in the infliction of an inmate's injury, they may be held individually liable if they "caused" him to be subjected to a constitutional deprivation. *Chew v. Gates*, 27 F.3d 1432 (9th Cir. 1994). A supervisor can be held personally liable for implementing a policy so deficient that the policy amounts to a "repudiation of constitutional rights" and causes the violation. *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989). Furthermore, a supervisor is liable in his individual capacity if he "sets in motion a series of acts by others, or knowingly refused to terminate a series of acts by others, which he kn[e]w or reasonably should [have] know[n] would cause others to inflict the constitutional injury." *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991). Sheriff Gore and Central's DOE Medical Director's "DOE MD" were the officials responsible for Central's medical and mental health policies, practices, and customs.

37.     Sheriff Gore and Central's DOE MD's actions set in motion a series of events that

8

1   lead to and caused Mr. Sandoval's death. Gore and DOE MD designed, implemented, authorized,

2   approved, or acquiesced Central's departmental policies that govern the management and

3   monitoring of inmates placed in the MOU or in the medical screening areas.  They are equally

4   responsible for failing to implement a policy that requires monitoring of the medical screening

5   cells, Waiting Cell #1 and #2 (herein "screening cells"). These cells are used to screen inmates for

6   serious medical conditions prior to booking the inmates. These very cells should be monitored as

7   much as the others, if not more, because the screening cells only hold newly arrested inmates who

8   have not been previously screened or those who have not yet been through the intake process. A

9   policy that requires some sort of interactive monitoring is crucial and obvious, especially for rapid

10  assessment of chronic conditions, such as diabetes, or alcohol and drug withdrawals. However,

11  according to several nurses providing statements in this matter, those "screening cells" don't require

12  monitoring, unlike the safety or sobering cells that require interactive monitoring. For these obvious

13  oversights, Gore and DOE MD are liable as they had overall supervisory responsibility for Central's

14  medical policies, and not only were each of them responsible for the medical operations of Central

15  as a whole, but they were familiar with incidents and deaths in the jail due to these inadequate

16  policies as they regularly reported them to the county board of supervisors.   This woefully

17  inadequate custom is a substantial factor in Mr. Sandoval's death.

18         38.     In addition to Gore and DOE MD, other county employees are equally liable for Mr.

19  Sandoval's death.

20         39.     Several various county employees acknowledged Mr. Sandoval's outward

21  symptoms of medical distress. County staff suspected Mr. Sandoval was destroying evidence.

22  Further, someone in the medical staff wrote in Mr. Sandoval's chart that he was suspected of being

23  under the influence. When he was first brought to Central, deputies noticed Mr. Sandoval was

24  extremely sweaty and disoriented. Mr. Sandoval told the deputy he was cold and not feeling well.

25  Sometime later, a fellow inmate told deputies that Mr. Sandoval was shaking violently and was

26  losing pallor. These symptoms were acknowledged two (2) hours after Mr. Sandoval arrived at

27  Central.

28         40.     In short, at this point, Central staff knew Mr. Sandoval was under the influence, had

9

FIRST AMENDED COMPLAINT

been in possession of a controlled substance, was sweating, disoriented, shaking, losing color and was complaining of being cold. Right at this moment, the nursing staff knew Mr. Sandoval was experiencing a serious medical condition. Even if not drug poising, the medical staff knows that diaphoresis – sweating at rest – in men over 50, is a serious medical condition as it is regularly attributed to diabetes, heart failure and Parkinson's disease.

41.     Mr. Sandoval went the next eight hours without any medical attention, despite being in the medical screening area. Literally no one entered his screening cell until ten minutes after witnessing Mr. Sandoval's seizure.

42.     Next, in a blatant disregard for the county's policy, a nurse ignores her duties under the County's "LIFE THREATENING EMERGENCIES: CODE BLUE" policy.

POLICY

The term "Code Blue" shall be used to describe the conditions of a cardiac arrest, respiratory arrest or any other serious medical emergency which is potentially life threatening and shall trigger the 911 request for a paramedic emergency response team.

43.     Here, despite knowing Mr. Sandoval was suspected of being under the influence, had been seen sweating, shaking and disoriented, complaining he was cold, and after just having a seizure, a Central nurse disregarded the "Code Blue" policy by calling for an EMT – a conscious decision – rather than following protocol and calling for a "paramedic." The nurses statement in the death investigation noted she intentionally called for EMTs despite a deputy's (a former EMT) repeated suggestion that paramedics should be dispatched, not EMTs, because Mr. Sandoval was unresponsive and had a seizure with a possible head injury. However, the nurse continued her call to the EMTs. This deliberately indifferent decision caused over an hour delay in providing appropriate medical attention.

44.     Knowing that Mr. Sandoval died from methamphetamine intoxication, literature is clear that had Mr. Sandoval been taken to hospital before his cardiac arrest, he would have been saved. Thus, had paramedics initially been called rather than EMTs, Mr. Sandoval would have still been alive by the time he was transported to the hospital and would have been administered activated charcoal, which binds undigested methamphetamine, cold IV fluids as well as benzodiazepams which controls the patient's anti-psychotic behaviors. Mr. Sandoval would have

10

1   lived but for the nurses failure to adhere to the County's "Code Blue" policy.[1]

2   45.   Then, to compound matters, while waiting for paramedics, the medical staff

3   attempted to clear Mr. Sandoval's airways by suctioning the foam from his mouth, nasal and throat.

4   However the suction machine, Easy-Go-Vac, was not working properly and a deputy was forced to

5   run to the third floor to retrieve that floor's Easy-Go-Vac. By the time the deputy arrived, Mr.

6   Sandoval had lost consciousness.

7   46.   Due to these deliberately indifferent acts and/or omissions herein alleged, Mr.

8   Sandoval's serious medical condition was ignored, and he was left to die in the one place where he

9   was supposed to receive his initial medical observation, the screening cell.

10   47.   These actions and inactions of the Central staff resulted in the violation of Mr.

11   Sandoval's rights under the Fourteenth Amendment of the United States Constitution.

12   48.   As a result of Gore's, DOE MD's and Central staff's deliberate indifference to Mr.

13   Sandoval's serious medical needs, he was subjected to cruel and unusual punishment prohibited by

14   the Eighth and Fourteenth Amendment of the United States Constitution. As a result thereof,

15   plaintiffs are entitled to damages pursuant to 42 U.S.C. § 1983 in an amount to be proven at trial.

16   49.   The aforementioned acts and/or omissions of the defendants were reckless and/or

17   accomplished with a conscious disregard of Mr. Sandoval's rights thereby entitling plaintiffs to an

18   award of exemplary and punitive damages according to proof.

19   **SECOND CAUSE OF ACTION**

20   **42 U.S.C § 1983 – 14th Amendment Cruel and Unusual Punishment**

21   **[Against Defendant County of San Diego – Screening Cell Customs]**

22   (Brought by ANA SANDOVAL as Successor in Interest to

23   RONNIE SANDOVAL)

24   50.   Plaintiffs reallege and incorporate by reference all paragraphs stated above, as

25   though fully set forth herein.

---

[1] The mortality data on methamphetamine toxicity demonstrates a very low incidence of overdose deaths in the community at-large. One 2007 survey estimated that the number of persons who have used methamphetamine in their lifetime in the U.S. was 10.4 million people (about 4.3% of the population), and the death rate amongst these 10.4 million from a pure methamphetamine overdose is minuscule, just several hundred individuals (U.S. DHHS SAMHSA, 2006C; U.S. DHHS NIDA, 2007).

11

51.    As part of the death investigation in this matter, multiple nurses gave statements in relation to Mr. Sandoval's death. Multiple nurses stated there was a custom and practice at Central to use the medical screening cells as administrative segregation cells or "keep separate" cells when those cells are occupied.

~~station and duties for the second floor medical screening:~~ Inmate Sandoval was already in the cell (Waiting Room #1) when she started her shift. She was not briefed by anyone as to the reason Sandoval was in the holding cell. Usually, during shift change, the outgoing shift endorses the incoming shift with information about pending medical needs on the floor. If there is no endorsement, then its presumed deputies are using the cells for "keep separate" inmates. ~~The assigned daytime nurses she relieved were RN Marylene~~

52.    The nurses stated they are usually briefed (pass-down) regarding medical inmates that need attention. If they are not briefed regarding a particular inmate detained in a medical screening cell the nurses assume they are keep separate inmates.

53.    The custom is obviously indifferent to inmates' potential serious medical condition because inmates won't be medically screened unless explicitly told by other nurses during shift change. This custom does not account for busy schedules, limited staff, emergency situations or mandown situations.

54.    These screening cells are where inmates are taken right as they come into Central. These inmates have not yet been booked, nor have they gone through the medical intake process. In short, inmates in the screening cells have not been seen by any medical staff since arriving at Central. These inmates are in the most critical state as many inmates awaiting intake are suffering from chronic and fatal diseases and conditions (without medication), including drug poisoning and alcohol withdrawals.

55.    Here, deputies were clearly concerned about Mr. Sandoval as they had him seen twice by medical, prior to having his mug shot taken, and then ultimately taking Mr. Sandoval to the second floor for "medical observation." He was noticed by the deputies to be sweating profusely, disoriented, confused, shaking and losing color, yet none of the nurses were aware that Mr. Sandoval was awaiting medical attention.

56.    According to several nurses' statements, this is a custom, pattern and practice. This is the normal course and operation of business, as seen by the uncontroverted actions of the medical

12

1    staff that night, in noticing Mr. Sandoval in the screening cell but never thinking to provide him

2    with medical attention in the eight (8) hours span while he was detained in that cell. They assumed

3    Mr. Sandoval was a "keep separate" inmate.

4        57.    Central books 70,000 inmates a year. These inmates must all go through medical

5    screening. However, it appears, because the medical screening cells are used as "keep separate

6    cells," nurses would have to be told to screen any particular inmate rather than screening every

7    inmate as their normal course of practice. This is a painfully destructive custom that is

8    unconscionably indifferent to the lives of inmates and detainees.

9        58.    Thus, the County is liable for permitting and instituting a custom and practice that

10   severely limits the medical screening of newly arriving inmates by making it contingent on an

11   explicit verbal pass-down, per individual inmate, during medical staff shift changes. As here, this

12   allows for inmates to be left to languish – for hours, and according to one nurse, multiple days –

13   without medical observation. As such, Mr. Sandoval's death was a direct and proximate result of

14   Central's custom and practice of only checking inmates in the screening cells if advised to do so

15   by other nurses during shift change.

16       59.    This widely accepted custom and practice was the moving force in causing Mr.

17   Sandoval's premature death.

18                           **THIRD CAUSE OF ACTION**

19              **42 U.S.C § 1983 – 14th Amendment Cruel and Unusual Punishment**

20                      **[Against Defendant County of San Diego –**

21      **Failure to Implement a Screening Cell Observation Policy/ Failure to Train]**

22              (Brought by ANA SANDOVAL as Successor in Interest to RONNIE SANDOVAL)

23       60.    Plaintiffs reallege and incorporate by reference all paragraphs stated above, as

24   though fully set forth herein.

25       61.    According to the medical nurses, most specifically the nurse on-shift prior to Mr.

26   Sandoval seizing, unlike the medical observation bay or the sober or safety cells, there is no County

27   requirement to monitor inmates in the screening cells.

28       62.    In an audio statement recorded by a death investigator after Mr. Sandoval's passing,

                                    13

1  a nurse stated, "no monitoring rounds are required in the medical screening areas." This nurse states

2  *ad nasuem* that no one checks these cells. He even states, on multiple occasions, he's seen inmates

3  being left in those cells for up to two (2) days without being monitored or screened.

4      63.    This same nurse said that deputies are not charged with monitoring the medical

5  screening cells either, thus neither the medical staff nor the deputies are responsible for performing

6  observation checks of the screening cells. The nurse states, unless they are made aware of an inmate

7  awaiting medical attention, they only go to the screening cells if there is a "mandown" call.

8      64.    This same nurse states that it is necessary and best practice to require "interactive"

9  observation checks not just on the third floor (medical observation bay) but in the screening cells

10  as well. He assumed this lack-of-policy is because resources are limited, but again, he stresses the

11  importance of requiring medical rounds in the screening cells.

12      65.    The County's failure to incorporate a critical observation policy for medical

13  screening cells is deliberately indifferent to the serious medical needs of inmates, because there is

14  a custom to only monitor inmates in the medical screening cells if advised to do so, and because

15  there is no requirement for even minimal observation rounds. An inmate, never having been

16  medically screened, can be left to languish as they slip through the cracks, until they mandown.

17      66.    The nurse stated this happens several times as this is the widespread custom and

18  practice at Central. Had the medical staff been required to perform observation rounds they would

19  have seen what all the other deputies saw when Mr. Sandoval was being booked. The medical staff

20  would have seen his diaphoresis, as well as his shaking, disorientation and loss of pallor. Since

21  there is no requirement to make rounds for the medical screening cell and because of the custom to

22  assume, if not told otherwise, that the medical screening cells are actually overflow cells for

23  administrative segregation inmates, Mr. Sandoval was never seen by the medical staff despite

24  multiple deputies acknowledging Mr. Sandoval's medical distress. This was a substantial factor

25  leading to Mr. Sandoval's preventable death.

26      67.    Alternatively, if there is indeed an observation round requirement for the medical

27  screening cells, the County has failed in training its staff as to these requirements. As stated above,

28  multiple nurses admitted they are not required to perform checks on inmates placed in the medical

1   screening cells. This is clearly corroborated in the hours and hours of footage showing nurse after

2   nurse, deputy after deputy, passing Mr. Sandoval's cell without so much as a glance. This is not the

3   practice of one nurse, nor is this a singular incident.

4        68.    Likewise, had Central staff been adequately trained to make interactive rounds for

5   the medical screening cells, the nurses would have seen firsthand Mr. Sandoval's rapid

6   deterioration; such as his diaphoresis as well as his shaking, disorientation and loss of pallor.

7        69.    The county's deliberate indifference in failing to train its employees is the direct and

8   proximate cause of Mr. Sandoval's death. This inaction resulted in the violation of his rights under

9   the Fourteenth Amendment of the United States Constitution.

10   **FOURTH CAUSE OF ACTION**

11   **Negligence**

12   **[Against DOES 1-100]**

13   (Brought by ANA SANDOVAL as Successor in Interest to

14   RONNIE SANDOVAL)

15        70.    Plaintiffs reallege and incorporate by reference all paragraphs stated above, as

16   though fully set forth herein.

17        71.    Defendants, and each of them, have a duty to monitor, supervise, operate and

18   manage Central and its inmates in a manner so as to prevent the acts and/or omissions alleged

19   herein. Said defendants owed Mr. Sandoval, as an inmate in defendants' custody, care and

20   control, a duty of due care to protect his health and physical safety.

21        72.    Defendants were negligent and their conduct fell below a reasonable standard of

22   care when they failed to discharge their duties as custodians of Mr. Sandoval. It was foreseeable

23   that as a result of defendants' acts and omissions, as described above, Mr. Sandoval, known to be

24   under the influence of a drug, seen sweating profusely, shaking, disoriented and showing signs of

25   diaphoresis,  would encounter serious medical complications if his conditions went unmanaged.

26   Defendants' breach directly and proximately caused Mr. Sandoval's premature death.

27   ///

28   ///

15

**FIFTH CAUSE OF ACTION**

**Medical Malpractice**

**[Against DOES 1-100]**

(Brought by ANA SANDOVAL as Successor in Interest to

RONNIE SANDOVAL)

73.     Plaintiffs reallege and incorporate by reference all paragraphs stated above, as though fully set forth herein.

74.     Defendants, and each of them, have a duty to operate and manage Central in a manner so as to prevent the acts and/or omissions alleged herein. Said defendants owed Mr. Sandoval, as an inmate in defendants' custody, care and control, a duty of due care to protect his health and physical safety.

75.     Defendants were negligent in their administering of medical care. DOES either failed to give medical care or gave such care that falls below the standard of reasonable care when they failed to discharge their duties as custodians and/or medical professionals. It was foreseeable that as a result of defendants' acts and omissions, as described above, that Mr. Sandoval would encounter serious medical complications if his conditions went unmanaged. Defendants' breach directly and proximately caused Chino's death.

**SIXTH CAUSE OF ACTION**

**Wrongful Death**

**[Against All Defendants]**

(Brought by ANA SANDOVAL, individually and RONNIE SANDOVAL, JR.,

individually, and JOSIAH SANDOVAL, by and through his *Guardian Ad Litem*)

76.     Plaintiffs reallege and incorporate by reference all paragraphs stated above, as though fully set forth herein.

77.     As a result of the Central staffs' grossly negligent treatment of Mr. Sandoval's known serious medical needs, Mr. Sandoval was left to die.

78.     By reason of Mr. Sandoval's death, and the negligent actions as explained above, his heirs have suffered, and continue to suffer, loss of love, society, companionship, comfort,

16

care, guidance, financial support, and other services as a result of Mr. Sandoval's preventable death.

### SEVENTH CAUSE OF ACTION

### Negligent Hiring, Supervision and Retention

### [Against All Defendants]

79.    Plaintiffs reallege and incorporate by reference all paragraphs stated above, as though fully set forth herein.

80.    At all times mentioned herein Defendants acted negligently in the hiring, training, supervision and retention of its employees, independent contractors, agents and other individuals.

81.    As a direct and proximate result of the Defendants aforementioned acts and omissions the Plaintiffs, and each of them, sustained serious injury and damage in the sum within the jurisdiction of this Court.

82.    The Plaintiffs and each of them have sustained economic damages consisting of: (1) the value of the lost of financial and other support from the Decedent; (2) the value of gifts or benefits that the Decedent would have provided, (3) the value of burial expense, and (4) the reasonable value of household services the Decedents would have provided.

83.    Further, the Plaintiffs and each of them have also sustained non-economic damages consisting of loss of the Decedent's love, companionship, comfort, care, assistance, protection, affection, society and moral support.

### EIGHTH CAUSE OF ACTION

### Intentional & Negligent Infliction of Distress

### [Against All Defendants]

84.    Plaintiffs reallege and incorporate by reference all paragraphs stated above, as though fully set forth herein.

85.    At all times mentioned herein Defendants in acting in the manner alleged herein, intentionally and negligently inflicting both physical distress on the Decedent and emotional distress on Plaintiffs.

17

86.   As a direct and proximate result of the Defendants aforementioned acts and omissions the Plaintiffs, and each of them, sustained serious injury and damage in the sum within the jurisdiction of this Court.

87.   The Plaintiffs and each of them have sustained economic damages consisting of: (1) the value of the lost of financial and other support from the Decedent; (2) the value of gifts or benefits that the Decedent would have provided, (3) the value of burial expense, and (4) the reasonable value of household services the Decedents would have provided.

88.   Further, the Plaintiffs and each of them have also sustained non-economic damages consisting of loss of the Decedent's love, companionship, comfort, care, assistance, protection, affection, society and moral support.

## **NINTH CAUSE OF ACTION**

### **Reckless Endangerment & Increased Risk of Harm**

### **[Against All Defendants]**

89.   Plaintiffs reallege and incorporate by reference all paragraphs stated above, as though fully set forth herein.

90.   At all times mentioned herein Defendants acting in the manner alleged herein, increased and detrimentally changed the risk of harm that existed by taking the Decedent from the first general arrestee holding cell where he was among others and isolated the Decedent in Waiting Room #1 for over eight (8) hours without observation or adequate preventative measure.  But for Defendants actions, individuals in the general holding cell would have monitored the Decedent, warned San Diego County Jail personal of the Decedent's condition, administered first aid and/or otherwise assisted the Decedent.

91.   As a direct and proximate result of the Defendants aforementioned acts and omissions the Plaintiffs, and each of them, sustained serious injury and damage in the sum within the jurisdiction of this Court.

FIRST AMENDED COMPLAINT

92.   The Plaintiffs and each of them have sustained economic damages consisting of: (1) the value of the lost of financial and other support from the Decedent; (2) the value of gifts or benefits that the Decedent would have provided, (3) the value of burial expense, and (4) the reasonable value of household services the Decedents would have provided.

93.   Further, the Plaintiffs and each of them have also sustained non-economic damages consisting of loss of the Decedent's love, companionship, comfort, care, assistance, protection, affection, society and moral support.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for the following relief:

1.   For compensatory, general and special damages against each defendant, jointly and severally, in an amount according to proof;

2.   For punitive and exemplary damages against each individually named defendant, in their individual capacity, in an amount appropriate to punish defendants and deter others from engaging in similar misconduct;

3.   For costs and reasonable attorney's fees pursuant to 42 U.S.C. § 1988 and as otherwise authorized by statute or law; and

4.   For such other relief, including injunctive and/or declaratory relief, as the Court may deem proper.

## REQUEST FOR JURY

Plaintiffs hereby request a jury trial in this action.

Respectfully Submitted,

RENDA LAW OFFICES

Dated: February 8, 2016

_____
Vincent Renda, Esq.
Attorneys for PLAINTIFFS

19

Ex. 1



**San Diego County Sheriff's Department**
**Officer Report**

| CAD Event No. E1465588 | Case No. 14109768 | **1** |
|---|---|---|
| | Report No. 27156 | Page 1 of 1 |

## GENERAL CASE INFORMATION

| Special Studies: | | | | Related Cases: |
|---|---|---|---|---|
| Location, City, State, ZIP: 1173 Front St. San Diego, Ca 92101,San Diego, CA 92101 | | | | Occurred On: 2/23/2014 12:53:00 AM (Sunday) |
| Jurisdiction: DETENTION FACILITY - CENTRAL | Beat: 021 | Call Source: | | (and Between): |

## INDIVIDUAL/S

| Name: Sandoval, Ronnie | | | | | | Person Code: | | Interpreter Language: |
|---|---|---|---|---|---|---|---|---|
| ALIAS / AKA / NICKNAME / MONIKER: | | | | | | | | |
| Home Address, City, State, ZIP: | | | Res. Country: | | County Residence: N Nonresident | | | Undocumented: |
| Race: H | Sex: M | Date of Birth / Age: 09/30/1967 - | Height: 5'9" | Weight: 187 lbs | Hair Color: GRY | Eye Color: BRO | Facial Hair: 06 - Mustache Only | Complexion: |
| Employment Status: | | Occupation/Grade: | | Employer/School: | | Employer Address, City, State, ZIP: | | |

## CONTACT INFORMATION
### IDENTIFICATION

| Type: BN - Booking Number | Number: 14713020 | State: | | Country: |
|---|---|---|---|---|
| Attire: | | Injury: | Extent Of Treatment: | Violent Crime Circumstances: |

## REPORT NARRATIVE

Case# 1465588

ORIGIN:

On 02-22-14, I was assigned the Intake Deputy Position at San Diego Central Jail where I interacted with Inmate Ronnie Sandoval (BN#14713020).

DEPUTY'S OBSERVATIONS:

On 02-22-14, at approximately 1530 hours, I first made contact with Inmate Sandoval while taking his fingerprints. Inmate Sandoval was extremely sweaty and appeared to be slightly disoriented. I asked Sandoval if he was alright. Sandoval replied that he was very cold and did not feel well. Sandoval then spontaneously said that approximately eight months ago he was told that he may be "borderline diabetic". I asked Sandoval if he told the Intake Nurse this and he responded "Yes; I don't take any medication for it though."
At this time I notified Deputy Bryan (2880) about Inmate Sandoval. Deputy Bryan informed the intake nurse who promptly came out to the fingerprinting area and tested Sandoval's blood sugar. The nurse said that his blood sugar was normal. I placed Sandoval in Holding Cell #5 on the first floor.

At approximately, 1630 hours Inmate Sandoval was escorted to the forensics room to have his booking photograph taken. Sandoval was still sweating a lot and appeared to be very tired and disoriented. Deputy Martinez (7059) asked Sandoval how he was feeling. Sandoval became agitated and refused to answer any more questions regarding his health. Deputy Martinez and I decided that it would be best to expedite the booking process for Sandoval so he could see the nurse on the second floor. As soon as the photograph was completed, I escorted Sandoval through the intake sally port up to the second floor. I spoke with Nurse De Guzman (0770) and explained what I observed while in contact with Sandoval. Nurse De Guzman instructed me to place Sandoval in the Medical Observation Cell #1 and that he would examine Sandoval as soon as possible. I placed Sandoval in Medical Observation Cell #1 and explained to him that the nurse would see him as soon as possible. Sandoval responded, "Thank you."

I notified Deputies Wilkinson (3226) and Rodriguez (2334) that Sandoval was placed in the Medical Observation Cell #1.

I had no further contact with Sandoval.

| Reporting Officer SH1147 - CHAVEZ, MATTHEW | Division / Organization SDCJ / SDCJ - San Diego Central Jail | Reviewed By SH4202 - KAMOSS, KARL |
|---|---|---|
| Report Date 2/23/2014 7:34:43 AM | Detective Assigned SH1881 - CARRILLO, PETE | Reviewed Date 2/25/2014 12:25:49 AM |

NetRMS_CASDCR.rtf v11-15-06

Printed: February 19, 2015 - 7:25 AM

COSD RRFP 000005

Ex. 2



# San Diego County Sheriff's Department
## Crime/Incident Report

| | | | | | | |
|---|---|---|---|---|---|---|
| CAD Event No.: | E1465588 | | Case No. | 14109768 | | **2** |
| Primary Victim: | Sandoval, Ronnie Paul | | Report No. | 14109768.1 | | Page 2 of 4 |

---

### ARRESTEE/S

### SUSPECT/S (Not Yet Arrested)
### WITNESSES

### OTHER ENTITIES
### PROPERTY
### REPORT NARRATIVE

SYNOPSIS:
I responded to Inmate Ronnie Sandoval #14713020 lying on the floor having what appeared to be a seizure inside of Waiting Room #1, located on the 2nd Floor, at the San Diego Central Jail (SDCJ). I entered the cell to assist SDCJ medical staff with first aid. EMTs responded to SDCJ and escorted to the 2nd Floor. Sandoval's condition was not improving, paramedics were called to respond. Shortly after paramedics arrived, Sandoval stopped breathing and had no pulse. Paramedics administered C.P.R. on Sandoval. At 0211 hours, Sandoval was pronounced dead by Dr. Hwang from Scripps La Jolla. Sheriff's Homicide, Division of Inspectional Services (DIS), and the Crime Lab responded to SDCJ to conduct their investigation.

ORIGIN:
On the morning of 02-24-2014, at approximately 0055 hours, I was assigned as the Search/Medical Screening Deputy at SDCJ when I was asked by Sergeant Shawcroft #5213 to meet him at Waiting Room #1 and assist him with an inmate having a seizure.

BACKGROUND:
Ronnie Sandoval was arrested on 02/21/14 at 1149 hours for 11377(A) HS- possession of a controlled substance and 11364 HS- possession of drug paraphernalia. He arrived at SDCJ, at approximately 1424 hours. Sandoval went through the initial medical screening with no medical problems noted.

At approximately 1530 hours, Sandoval was examined a second time by a nurse on the 1st Floor. At approximately 1700 hours, Sandoval was escorted to the 2nd Floor via the inmate elevators and placed into Waiting Room #1 for further medical observation. See attached Deputy's report by Deputy Chavez #1147 for further details.

INVESTIGATION:
I opened the door to Waiting Room #1 and entered the cell. I saw Sandoval lying down on his right side in the corner of the cell near the door with his head underneath the bench. Sergeant Shawcroft informed me that Sandoval had hit his head on the wall as he fell to the floor from the bench.

I placed my right hand on Sandoval's left arm and gently shook his arm while calling his name in an attempt to see if Sandoval was responsive. Sandoval's left arm was shaking and his muscles were tense. Sandoval was breathing hard and spitting on the floor. At approximately 0056 hours, Nurse Harris #5055 placed an oxygen mask on Sandoval's face and asked me to hold it in place. I held the oxygen in place with my left hand. Nurse Harris applied a cuff on Sandoval's right arm in order to take his blood pressure. An O2 sensor was placed on Sandoval's right hand to monitor his oxygen level. I continued to call

| Reporting Officer | Division / Organization | Reviewed By |
|---|---|---|
| SH4706 - EDGE, NOLAN | San Diego Central Jail | SH4202 - KAMOSS, KARL |
| Report Date | Detective Assigned | Reviewed Date |
| 2/23/2014 6:27:46 AM | SH1881 - CARRILLO, PETE | 02/25/2014 17:38:07 |

COSD RRFP 000002



| San Diego County Sheriff's Department Crime/Incident Report | | | |
|---|---|---|---|
| CAD Event No.: **E1465588** | Case No. **14109768** | | **3** |
| Primary Victim: **Sandoval, Ronnie Paul** | Report No. **14109768.1** | | Page 3 of 4 |

Sandoval's name in an attempt to get a response. Sandoval would periodically open his eyes for a second, but he would never respond to me.

At approximately 0101 hours, Deputy Andrade #0137, Corporal Fox #5868, and Deputy Sobaszek #3209 entered the cell to assist with administering first aid. I informed the responding deputies about Sandoval's situation. Due to the nature of Sandoval's fall it was determined that a C-Spine collar be placed on his neck to prevent any further injury to Sandoval's head, neck, and spine. Keeping Sandoval's head and neck immobile we slid him into the middle of the cell to allow more space to be available to continue with first aid. At approximately 0102 hours, Nurse Llamado #6492 entered the cell and handed the C-Spine collar, (Orthopedic medical device to support the neck), to Deputy Andrade. Deputy Andrade and I placed the C-Spine collar on Sandoval's neck. At approximately 0105 hours, EMT personnel were called per Nurse Harris.

At approximately 0106 hours, Nurse Harris applied a nasopharyngeal airway, (A medical appliance tube that opens the airway), to assist with keeping Sandoval's airway open. To further assist with keeping Sandoval's airway clear, Deputies Johnson #4983 and Valbuena #3296 went up to the 3rd Floor and brought back an "Easy-Go-Vac" to suction out any fluids in Sandoval's mouth to keep his airway clear. At approximately 0110 hours, suction was applied to Sandoval's nasal and throat.

Sandoval's breathing became shallow and his pupils did not react to light. Deputy Andrade applied a bag valve mask, (A medical device to provide positive pressure ventilation), to assist Sandoval with breathing. At approximately 0112 hours, Registered Charge Nurse Bautista #9226 entered the cell. Nurse Bautista monitored Sandoval and applied an oropharyngeal airway, (A medical device preventing the tongue from covering the epiglottis). Sandoval still had a gag reflex and started vomiting. RN Bautista removed the oropharyngeal airway from Sandoval's mouth. Sandoval was turned to his right side and suction was applied to remove the secretions in his mouth. Nurse Bautista established an IV in Sandoval's right arm. Leg and waist chains were placed onto Sandoval to prepare him for transport. Deputy Andrade suggested assistance from paramedics due to Sandoval's current condition. Medical staff continued to monitor Sandoval's vital signs.

At approximately 0120, American Medical Response EMTs arrived at the cell. The EMTs informed us that they will assist with first aid but they would not be able to transport Sandoval in the current condition he was in. At that time paramedics were called to respond. EMT Trunick entered the cell and took over ventilating Sandoval with the bag valve mask. Sandoval was placed on a backboard to keep him immobile and to prepare him for transport. At approximately 0136 hours, EMT Trunick informed medical staff that he could still feel a pulse.

At approximately 0142 hours, San Diego Fire Department Engine 201, and Medic 11 arrived at the scene. The paramedics began to asses Sandoval and secure him to the backboard.
As the paramedics were about to tape down and secure Sandoval's head to the backboard they noticed Sandoval had stopped breathing and had no pulse. The paramedics removed Sandoval from the cell, placed him onto a medical gurney, and at approximately 0148 hours CPR was started. At approximately 0201 hours, Deputy Andrade secured the door to Waiting Room 1.

| Reporting Officer | Division / Organization | Reviewed By |
|---|---|---|
| **SH4706 - EDGE, NOLAN** | **San Diego Central Jail** | **SH4202 - KAMOSS, KARL** |
| Report Date | Detective Assigned | Reviewed Date |
| **2/23/2014 6:27:46 AM** | **SH1881 - CARRILLO, PETE** | **02/25/2014 17:38:07** |



| | San Diego County Sheriff's Department<br>Crime/Incident Report | | |
|---|---|---|---|
| CAD Event No.: **E1465538** | Case No. **14109768** | | **4** |
| Primary Victim: **Sandoval, Ronnie Paul** | Report No. **14109768.1** | | Page 4 of 4 |

At approximately 0211 hours, Sandoval was pronounced dead by Dr. Hwang from Scripps La Jolla. Sandoval was taken off of the gurney and placed on the floor outside of Waiting Room 1.

At approximately 0455 hours, Homicide, Crime Lab, and DIS began a de-brief with Corporal Fox, Deputy Andrade, and I. A timeline of the events is attached to the report.


EVIDENCE:
Collected by the Homicide Division.

INJURIES:
See Medical Examiner's report.

PROPERTY DAMAGE:
None.

FOLLOW UP:
The Homicide Division will conduct the follow up investigation.


RELATED REPORTS:
Deputy's Reports by: Sergeant Shawcroft 5213, Chavez 1147, Powell 7307, Bohannan 0632, Bryan 2880, Johnson 4983, Sobaszek 3209, Valbuena 3296, Andrade 0137, Fox 5868, McKinney 5731, Richards 7594

| Reporting Officer<br>**SH4706 - EDGE, NOLAN** | Division / Organization<br>**San Diego Central Jail** | Reviewed By<br>**SH4202 - KAMOSS, KARL** |
|---|---|---|
| Report Date<br>**2/23/2014 6:27:46 AM** | Detective Assigned<br>**SH1881 - CARRILLO, PETE** | Reviewed Date<br>**02/25/2014 17:38:07** |

COSD RRFP 000004

Ex. 3

1   THOMAS E. MONTGOMERY, County Counsel
    County of San Diego
2   By JAMES M. CHAPIN, Senior Deputy (SBN 118530)
    1600 Pacific Highway, Room 355
3   San Diego, California 92101-2469
    Telephone: (619) 531-5244; Fax: (619) 531-6005
4   *[Exempt From Filing Fees (Gov. Code § 6103)]*

5   Attorneys for Defendant County of San Diego

6

7

8              IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                   IN AND FOR THE COUNTY OF SAN DIEGO

10

11  ESTATE OF RONNIE PAUL SANDOVAL )    No. 37-2014-00033347-CU-PO-CTL
    and ANA SANDOVAL, an individual )   Action filed: October 1, 2014
12                                  )
         Plaintiffs,               )    IMAGED FILE
13                                  )
         v.                        )    **COUNTY OF SAN DIEGO'S RESPONSE**
14                                  )    **TO PLAINTIFF'S REQUEST FOR**
    COUNTY OF SAN DIEGO, a Public   )    **ADMISSION**
15  Entity; SAN DIEGO COUNTY JAIL, a )
    Public Entity and DOES 1 through 100, )  (Set Two)
16                                  )
         Defendants.               )    Dept.: C-65
17                                  )    ICJ:   Hon. Joan M. Lewis
                                    )
18  _____)

19  PROPOUNDING PARTY: Plaintiff Estate of Ronnie Paul Sandoval

20  RESPONDING PARTY:   Defendant County of San Diego

21  SET NUMBER:         Two

22       Defendant County of San Diego ("County") hereby responds to Plaintiff's Second Set of

23  Request for Admission as follows:

24                       **PRELIMINARY STATEMENT**

25       Responding party has not completed discovery, the investigation of the facts, witnesses or

26  documents, the analysis of available information, or the preparation for trial in this case.

27  Discovery and investigation are continuing.  All the following responses are based solely upon

28  such information and documents that are presently available to and specifically known to

    COUNTY OF SAN DIEGO'S RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSION
                              (Set Two)

1    **REQUEST FOR ADMISSION No. 23:**

2         Admit that YOU forgot about RONNIE PAUL SANDOVAL after he was placed in the

3    HOLDING CELL.

4    **RESPONSE TO REQUEST FOR ADMISSION No. 23:**

5         Deny.

6    **REQUEST FOR ADMISSION No. 24:**

7         Admit that YOU did not check on RONNIE PAUL SANDOVAL at any time when he

8    was placed in the HOLDING CELL.

9    **RESPONSE TO REQUEST FOR ADMISSION No. 24:**

10        Deny.

11   **REQUEST FOR ADMISSION No. 25:**

12        Admit that after RN Romeo Deguzman checked RONNIE PAUL SANDOVAL's blood

13   sugar levels YOU did not complete any subsequent medical evaluations on RONNIE PAUL

14   SANDOVAL.

15   **RESPONSE TO REQUEST FOR ADMISSION No. 25:**

16        Objection, this request is vague and ambiguous as to time.

17   **REQUEST FOR ADMISSION No. 26:**

18        Admit that on the date of the INCIDENT between the hours of 17:00 - 23:00 YOU did

19   not go into the HOLDING CELL.

20   **RESPONSE TO REQUEST FOR ADMISSION No. 26:**

21        Admit.

22   **REQUEST FOR ADMISSION No. 27:**

23        Admit that on the date of the INCIDENT between the hours of 17:00 - 23:00 YOU did

24   not monitor RONNIE PAUL SANDOVAL's medical condition while he was in the HOLDING

25   CELL.

26   **RESPONSE TO REQUEST FOR ADMISSION No. 27:**

27        Objection, the request is vague and ambiguous as to the term "medical condition" and is

28   not limited in time. Without waiving the objection, County responds: Deny.

COUNTY OF SAN DIEGO'S RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSION
(Set Two)

1  **REQUEST FOR ADMISSION No. 42:**

2      Admit that a suction machine was need in regard to this INCIDENT.

3  **RESPONSE TO REQUEST FOR ADMISSION No. 42:**

4      Admit.

5  **REQUEST FOR ADMISSION No. 43:**

6      Admit that YOUR medical personnel utilized a suction machine in this INCIDENT.

7  **RESPONSE TO REQUEST FOR ADMISSION No. 43:**

8      Admit.

9  **REQUEST FOR ADMISSION No. 44:**

10      Admit that the suction machine on RONNIE PAUL SANDOVAL'S floor was broken at

11  the time of the INCIDENT.

12  **RESPONSE TO REQUEST FOR ADMISSION No. 44:**

13      Admit.

14  **REQUEST FOR ADMISSION No. 45:**

15      Admit that YOU had to get the suction machine from another floor to utilize on RONNIE

16  PAUL SANDOVAL during this INCIDENT.

17  **RESPONSE TO REQUEST FOR ADMISSION No. 45:**

18      Admit.

19  **REQUEST FOR ADMISSION No. 46:**

20      Admit that Deputy Shawcroft witnessed RONNIE PAUL SANDOVAL's seizure in the

21  HOLDING CELL.

22  **RESPONSE TO REQUEST FOR ADMISSION No. 46:**

23      Admit.

24  **REQUEST FOR ADMISSION No. 47:**

25      Admit that YOU did not complete an oral interview of Deputy Shawcroft.

26  **RESPONSE TO REQUEST FOR ADMISSION No. 47:**

27      Admit.

28  ///

---

9

COUNTY OF SAN DIEGO'S RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSION
(Set Two)

1  **RESPONSE TO REQUEST FOR ADMISSION No. 58:**

2      Admit.

3  **REQUEST FOR ADMISSION No. 59:**

4      Admit that RN Cesar Costa interactions with RONNIE PAUL SANDOVAL occurred

5  approximately eleven (11) hours prior to when RONNIE PAUL SANDOVAL was declared

6  dead.

7  **RESPONSE TO REQUEST FOR ADMISSION No. 59:**

8      Admit.

9  **REQUEST FOR ADMISSION No. 60:**

10     Admit that there was no electronic records as to why RONNIE PAUL SANDOVAL was

11 being held in the HOLDING CELL.

12 **RESPONSE TO REQUEST FOR ADMISSION No. 60:**

13     Admit.

14 **REQUEST FOR ADMISSION No. 61:**

15     Admit YOU did not place RN Maria Llamado on notice as to why RONNIE PAUL

16 SANDOVAL was in the HOLDING CELL.

17 **RESPONSE TO REQUEST FOR ADMISSION No. 61:**

18     Admit.

19 **REQUEST FOR ADMISSION No. 62:**

20     Admit that the medical nurses working at YOUR facility on the date of the INCIDENT

21 did not know why RONNIE PAUL SANDOVAL was in the HOLDING CELL.

22 **RESPONSE TO REQUEST FOR ADMISSION No. 62:**

23     Deny.

24 **REQUEST FOR ADMISSION No. 63:**

25     Admit that the deputies working at YOUR facility on the date of the INCIDENT did not

26 know why RONNIE PAUL SANDOVAL was in the HOLDING CELL.

27 **RESPONSE TO REQUEST FOR ADMISSION No. 63:**

28     Deny.

COUNTY OF SAN DIEGO'S RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSION
(Set Two)

| ATTORNEY OR PARTY WITHOUT ATTORNEY AND ADDRESS    TELEPHONE No.: | COURT USE ONLY |
|---|---|
| Vincent Renda, Esq. (213985)                    (619) 819-0011<br>RENDA LAW OFFICES<br>600 West Broadway, Suite 400<br>San Diego, California 92101<br>ATTORNEYS FOR  Plaintiffs | **ELECTRONICALLY FILED**<br>Superior Court of California,<br>County of San Diego<br>**03/08/2016** at 08:53:00 AM<br>Clerk of the Superior Court<br>By Christina Villegas, Deputy Clerk |

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF SAN DIEGO, CENTRAL DIVISION**

| Plaintiff(s)    Estate of Ronnie Paul Sandoval, et al. | I/C Judge: Hon. Joan M. Lewis |
|---|---|
| Defendant(s)  County of San Diego, et al. | Dept:    C-65 |
| **PROOF OF SERVICE** | Case No. 37-2014-00033347-CU-PO-CTL |

    I, Laurie E. Dillon, declare that: I am over the age of eighteen years and not a party to the case. I am employed in, or am a resident of, the County of San Diego, California, where the mailing occurs; and my business address is 600 West Broadway, Suite 400, San Diego, California 92101.

    That on **March 8, 2016,** I served the following document(s):

**FIRST AMENDED COMPLAINT**

____    **Service By Mail (CCP 1013a(1)&(3))**  I declare that I am readily familiar with the business' practice for collection and processing of correspondence for mailing with the United States Postal Service; and that the correspondence shall be deposited with the United States Postal Service the same day in the ordinary course of business. In accordance with that practice, I placed a true and correct copy of the document(s) listed above in a separate envelope addressed to each addressee listed below. I then sealed each envelope and, with postage thereon fully prepaid, I placed each for deposit in the United States Postal Service, at my business address shown above.

__X__    **Service By E-Mail Or Electronic Transmission**:  Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the document(s) to be electronically served to the individuals listed below by sending a request for service to the San Diego Superior Court's e-file provider, One Legal. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

    **James M. Chapin, Esq.**
    **Office of County Counsel**
    **Attorneys for Defendant**
    **James.chapin@sdcounty.ca.gov**

    **Shelly Haight, Paralegal**
    **Office of County Counsel**
    **Shelly.haight@sdcounty.ca.gov**

    I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed on **March 8, 2016.**

_____
Laurie E. Dillon